```
 1              UNITED STATES DISTRICT COURT
               MIDDLE DISTRICT OF FLORIDA
 2                   ORLANDO DIVISION

 3             Docket No.6:07-cv-15733

 4  . . . . . . . . . . . . ..
    DAVID HALLER              :
 5                            :
           v.                 :         Orlando, Florida
 6                            :         January 14, 2009
    ASTRAZENECA               :         9:00 a.m.
 7  . . . . . . . . . . . . .:

 8

              TRANSCRIPT OF PRETRIAL CONFERENCE
 9         BEFORE THE HONORABLE ANNE C. CONWAY
                UNITED STATES DISTRICT JUDGE
10

11  APPEARANCES:

12  For the Plaintiffs:

13                          Larry M. Roth

14                          Fletch Trammell

15                          Tom Pirtle

16                          Rick Laminack

17                          Rob Cowan

18                          John Roberson

19  For the Defendant       Stephen Raber

20  AstraZeneca:            Mike Brock

21                          Chris Coutroulis

22                          Steven Weisburd

23                          Earl Austin

24  Court Reporter:  Sandra K. Tremel

25  Proceedings recorded by mechanical stenography, transcript
```

1    produced by computer-aided transcription

2                    P R O C E E D I N G S

3             THE COURT:  Good morning.  All right.  We're

4    starting with Mr. Abramson?

5             MR. TRAMMELL:  Dr. Abramson this morning, Your

6    Honor.

7             THE COURT:  Dr. Abramson.  I'm sorry.

8             MR. TRAMMELL:  Just -- I suppose, just for

9    clarification, we had expected to put Dr. Abramson on this

10   morning followed by their cross and then tomorrow to bring

11   Dr. Tulloch and Dr. Marks and then on Friday, according to

12   Your Honor's agenda, there would be a noncausation motion,

13   the Daubert motion the defendant had filed.  I want to

14   make sure that was still the schedule as far as --

15            THE COURT:  Well, I thought we had talked

16   yesterday about doing the specific causation this

17   afternoon when you finished with Dr. Abramson since you

18   don't have another witness that we expected this

19   afternoon.

20            MR. TRAMMELL:  There are two separate motions.

21   They have a Daubert motion they filed against

22   Dr. Abramson, our other case-specific causation witnesses,

23   and they have a noncausation.

24            THE COURT:  Right.  I'm sorry.  I meant

25   noncausation.

```
 1          MR. TRAMMELL:  Well, we had prepared to argue
 2  noncausation motion on Friday, Your Honor.  We're not
 3  prepared to argue that today.
 4          THE COURT:  Well, we talked about that
 5  yesterday.
 6          MR. TRAMMELL:  No.  We talked --
 7          THE COURT:  About the noncausation because you
 8  didn't have a witness and you wanted to put a live witness
 9  on on Friday.
10          MR. TRAMMELL:  Respectfully, Your Honor, I think
11  what we talked about yesterday was their argument of their
12  Daubert motion, which they had requested time at the end
13  of the proceedings to argue that --
14          THE COURT:  Well, are you putting a witness on
15  Friday?
16          MR. TRAMMELL:  We're not bringing a witness on
17  Friday.
18          THE COURT:  All right.  Because you said that, I
19  think it was Dr. Perry was going to come on Friday.
20          MR. LAMINACK:  That's right, Your Honor.  And
21  Dr. Perry cannot be here, and we, this morning, made an
22  offer to the defendants to withdraw Dr. Perry as a
23  witness, if they'll agree not to attempt to use his
24  deposition.
25      Of course, I think if we don't put him on and they
```

1   decide to offer him through deposition, affirmatively, I

2   guess we could bring him as rebuttal, and they wouldn't

3   have any right, then, to object to him.

4           THE COURT:  Well, I would think that would be

5   correct.

6           MR. LAMINACK:  But we're not offering --

7           THE COURT:  All right.  Well, as long as we

8   don't have a witness on Friday, we can do the nonspecific

9   causation.

10          MR. COUTROULIS:  Your Honor, may I just ask for

11  clarification, because I had thought, as well, that

12  because they didn't have a witness this afternoon that we

13  were going to do the noncausation Daubert motion this

14  afternoon.  That had originally been scheduled for Friday.

15  If -- and I'm prepared to do it this afternoon.  If

16  counsel is not prepared to do it, obviously we will try to

17  work around the schedule.

18      What we would like to have, some time as well on

19  Friday to argue the specific causation Daubert motion.  So

20  if they're not going to bring a witness on Friday --

21          THE COURT:  Well, my understanding the Daubert

22  hearing on the specific causation is today and tomorrow,

23  so we can do argument today or tomorrow when we finish

24  with live witnesses on that motion.

25          MR. TRAMMELL:  Right.  That allows us to conform

1   to the scheduling, Your Honor, has issued.

2           THE COURT:  Right.

3           MR. COUTROULIS:  I understand, Your Honor.  I

4   guess the only issue with that is, because they don't have

5   a witness this afternoon, I don't know that it really

6   would be optimal to have argument in the middle of the

7   testimony.  But perhaps we have time, even with two

8   witnesses tomorrow, to have argument on that motion at the

9   end of the day tomorrow.  And argue the noncausation

10  motion on Friday.

11      Alternatively, perhaps, if we don't have time to get

12  to argument, we could do argument on both those motions on

13  Friday, depending on how much time the Court has in the

14  a.m.  I don't think that the noncausation motion should

15  take more than about maybe an hour and 20 minutes total

16  for both sides, and perhaps even shorter.

17          THE COURT:  Well, I have from 9:00 to noon on

18  Friday.

19          MR. COUTROULIS:  I think if we needed to do

20  argument on both the specific medical causation Daubert

21  motion and the nonmedical causation, I think we could do

22  them both on Friday morning.

23          THE COURT:  All right.  So today we're just

24  going to take Dr. Abramson's testimony?

25          MR. TRAMMELL:  That's right, Your Honor.

```
 1              THE COURT:  And then tomorrow we do Dr. Tulloch
 2    and Dr. Marks?
 3              MR. TRAMMELL:  That's correct.
 4              THE COURT:  All right.
 5              MR. COUTROULIS:  Thank you, Your Honor.
 6              THE COURT:  And so I'm clear, you are not
 7    calling Dr. Perry?  I don't want to spend a lot of time
 8    reviewing Dr. Perry's deposition for objections or
 9    anything if he's not going to be called.
10              MR. LAMINACK:  That's correct.  We're not
11    calling Dr. Perry in the Guinn case, Your Honor.
12              THE COURT:  Okay.
13              MR. RABER:  Your Honor, may I deal with one more
14    housekeeping-type issue?
15              THE COURT:  Yes.
16              MR. RABER:  This is Steve Raber for AstraZeneca.
17    We just want to let Your Honor know that we have no
18    objection to Professor Salzburg.
19              THE COURT:  Okay.
20              MR. RABER:  Thank you.
21              MR. TRAMMELL:  May I proceed, Your Honor?
22              THE COURT:  Yes.
23              MR. TRAMMELL:  Plaintiffs call Dr. Jack
24    Abramson.
25              THE COURT:  I don't want the plaintiffs to
```

1  object to Mr. Salzburg just because the defense didn't,

2  so...

3          MR. TRAMMELL:  That's a general inclination --

4          THE COURT:  Well, I know it is.  That's why I

5  said that, so I tried to find somebody with no

6  pharmaceutical background so that you wouldn't have that

7  objection.

8                    (Witness sworn.)

9                    DIRECT EXAMINATION

10         MR. TRAMMELL:  Your Honor, I'm already here, but

11  do I have permission to use the podium?

12         THE COURT:  Yes.

13  BY MR. TRAMMELL:

14  Q    Please state your name for the record, sir.

15  A    Israel Jack Abramson.

16  Q    And, Dr. Abramson, where do you live?

17  A    I live in Fort Lauderdale, Florida.

18  Q    And what do you do for a living?

19  A    I am a medical doctor, specialized in the field of

20  psychiatry.

21  Q    Doctor, where did you go to college?

22  A    I went to --

23         THE COURT:  It's really not necessary to go over

24  anything that's in his curriculum vitae.

25         MR. TRAMMELL:  Okay.  For purposes of -- Your

1    Honor, I expect some argument on Dr. Abramson's capacity

2    to render a causation opinion in this case because he's

3    not a endocrinologist.  Can I ask him a few background

4    questions about the types of patients he treats?

5              THE COURT:  Yes.  I can read his qualifications

6    in his report and see where he went to school, so...

7    BY MR. TRAMMELL:

8    Q    Dr. Abramson, what types of patients do you treat?

9    A    I treat a general population of patients.  I do not

10   see children, so from 18 years of age to the end of the

11   life cycle.  I treat patients with a variety of

12   psychiatric disorders and comorbid medical disorders, both

13   in inpatient and outpatient settings.

14   Q    You treat the seriously mentally ill?

15   A    Yes, I do.

16   Q    You treat patients with schizophrenia?

17   A    Yes, I do.

18   Q    Do you treat patients with bipolar disorder?

19   A    Yes.

20   Q    And do you prescribe atypical antipsychotic drugs?

21   A    Yes, I do.

22   Q    You prescribe Seroquel to your patients?

23   A    Yes, I do.

24   Q    When was the last time you prescribed Seroquel to a

25   patient?

1    A    Within the last week.

2    Q    And for how long have you prescribed Seroquel to

3    patients?

4    A    For many, many years.

5    Q    And does that go for other atypical antipsychotics,

6    too?  As soon as they're introduced to the market, you

7    begin exploring their use with your patients; is that

8    correct?

9    A    Correct.

10   Q    Have you ever treated a patient with diabetes?

11   A    Yes.

12   Q    Are you familiar with the diagnostic criteria for

13   diabetes?

14   A    Yes, I am.

15   Q    Can you describe those for the Court?

16   A    Generally, one wants to see two fasting blood sugars

17   greater than 129 or a random blood sugar above 199.

18   Q    Do you have any opinions -- or do you have any

19   knowledge as to whether there is an increased incidence of

20   diabetes in the mentally ill population, in general?

21   A    Epidemiological studies do show an increase in the

22   prevalence of diabetes in the mentally ill.

23   Q    And so is it part of the practice in treating

24   mentally ill patients that you become familiar with issues

25   related to diabetes in the management of diabetes?

```
 1   A     Yes.

 2   Q     Dr. Abramson, were you retained by my office to

 3   render an opinion in the David Haller case?

 4   A     Yes, I was.

 5   Q     And did you arrive at opinion?

 6   A     Yes, I did.

 7   Q     And what is -- what are those opinions?

 8   A     The opinions were summarized in my report.

 9   Mr. Haller had a longstanding psychiatric history with

10   multiple diagnoses over the years.  I think the most

11   consistent diagnosis was of a bipolar spectrum disorder,

12   along with a very significant personality disturbance,

13   which I would qualify as a narcissistic and antisocial

14   intendancy.

15        He was treated with mood-stabilizing agents for much

16   of the 1990s.  These mood-stabilizing agents included

17   lithium and valproic acid, which is also known as

18   Depakote.  At some point in the 2000s, he was started on

19   Seroquel as an adjunctive mood stabilizer.

20        Mr. Haller, through the '90s, did demonstrate

21   significant risk factors for diabetes, including obesity

22   and fluctuations in his weight, family history, and other

23   risk factors.  However, all through that time, he did not

24   develop diabetes.

25        Within a time after receiving Seroquel, there appears
```

1  to have been a pattern in his -- a change in the pattern

2  of his risk factors.  His weight significantly increased

3  and began to fluctuate at a higher range than it had prior

4  to the administration of the Seroquel.  And his blood

5  glucose readings also began to show abnormalities

6  compatible, with the need for further assessment for

7  diabetes.  For example, he had some elevated random blood

8  glucose levels, and he was ultimately diagnosed with

9  diabetes.

10      It's my opinion that Mr. Haller had the original risk

11  factors that the addition of Seroquel was a substantial

12  contributing factor to his ultimately developing diabetes.

13          MR. TRAMMELL:  Your Honor, may I approach the

14  witness?

15          THE COURT:  Yes.

16  MR. TRAMMELL:

17  Q    This will be marked Abramson 1.

18      Doctor, can you tell me what Abramson 1 is?

19  A    This is a report that I prepared for your office

20  regarding my opinions in this case.

21  Q    And does Exhibit 1 accurately reflect the opinions

22  you have just spoken about?

23  A    I believe so, yes.

24  Q    Doctor, what materials did you rely on in arriving at

25  the opinions you have just given?

A     I reviewed the medical records that were provided as

well as other records that were provided to me by your

office.  I used as a basis for my opinions my experience

in treating patients with illnesses similar to

Mr. Haller's, as well as conducting some literature

research myself to become more conversant with the issues

of diabetes and atypical antipsychotic medications.

          MR. TRAMMELL:  Permission to approach again,

Your Honor?

          THE COURT:  Yes.

MR. TRAMMELL:

Q     Doctor, what is Abramson Exhibit 2?

A     This is a list of the documentation that was provided

to me for review prior to my September 1st, 2008 report.

Q     And there's more to it than this, right?  You have

reviewed material since this list was compiled?

A     Correct.  Subsequent to my report, I was given

periodically more information from your office to review.

Q     Everything on this list you've at least considered in

rendering your opinion?

A     Yes.

Q     Did you review the 2007 Seroquel package insert for

purposes of arriving at any part of your opinion?

A     Yes, I did.

          MR. TRAMMELL:  Permission to approach again,

1    Your Honor?

2         THE COURT:  Yes.

3    MR. TRAMMELL:

4    Q    Doctor, what is Abramson 3?

5    A    This is the Seroquel label from 2008.

6    Q    I believe it says revised July of '08, so it's the

7    most current label, perhaps?

8    A    Correct.

9    Q    Doctor, what role, if any, did the current labeling

10   for Seroquel play in your opinion as to whether there is

11   association between Seroquel and diabetes?

12   A    In reviewing this label, one sees warnings regarding

13   hyperglycemia and diabetes mellitus with Seroquel.

14   Q    What information in particular in the labeling

15   supports -- well, let me ask you first:  Do you have an

16   opinion as to whether Seroquel is associated with an

17   increased risk of diabetes?

18   A    Yes.

19   Q    And what is that opinion?

20   A    Generally, the literature supports doubling of the

21   risk from the general population.

22   Q    And does Abramson Exhibit 3 support that opinion?

23   A    Yes, it does.

24   Q    Can you identify specific language in Abramson

25   Exhibit 3 that supports that opinion?

1  A    I'm having a little trouble reading it because of my

2  glasses, but I'll do my best.  If one goes to the adverse

3  reactions, hyperglycemia part of the label, some studies

4  are referenced.  The first study was a long-term

5  placebo-controlled study in which patients were exposed to

6  Seroquel and placebo, and the exposure-adjusted rate of

7  increased blood glucose for patients on Seroquel was 18

8  per 100 patients; whereas, it was 9.5 for the placebo

9  group.

10      In a short-term study, the rate of elevated blood

11  glucose was 3.5 percent for the Seroquel group and 2.1 for

12  the placebo group.

13  Q    And how does that support your opinion that Seroquel

14  is associated with diabetes?

15  A    The elevated blood glucose findings in these studies

16  do meet the criteria that we discussed earlier.  So it's

17  supportive of my opinion.

18  Q    As a medical doctor, is it common when attempting to

19  diagnose a patient to -- or what are the common sources of

20  information in attempting to determine whether a

21  medication is associated with a side effect in any given

22  patient?

23  A    One, first of all, has a lot of exposure to patients

24  who are on medication, so there's observational data from

25  one's own practice and discussion with colleagues, for

1  example.  There is also a database of literature which I

2  regularly subscribe to.  The psychiatric literature does

3  discuss this particular side effect with this particular

4  class of medication and this particular medication.

5      In addition, the general side effects are reported

6  through interactions with company representatives in CME

7  conferences, and side effect bulletins that I receive from

8  various drug companies.

9          MR. TRAMMELL:  Permission to approach, Your

10  Honor?

11          THE COURT:  Yes.

12  MR. TRAMMELL:

13  Q    Doctor, what are Abramson Exhibits 4 and 5?

14  A    These are two research papers that I came across in

15  conducting literature review in this case.

16  Q    Do these papers inform your opinion in any way?

17  A    Yes, they do.  They are confirmatory of my opinions.

18  Q    In what way?

19  A    They discuss the metabolic issues inherent and

20  present with patients who are on atypical antipsychotics.

21  That's the Achter article.  The second report is a general

22  discussion of metabolic syndrome and mental illnesses.

23  This discusses --

24          THE COURT:  Which one is 4 and which is 5?

25          MR. TRAMMELL:  Your Honor, I marked -- I'm not

1   sure which one was marked which by the court, but I had

2   marked the Newcomer article as 4 and the Achter article as

3   5.

4              THE COURT:  Okay.

5              THE WITNESS:  The Newcomer article discusses the

6   background presence of metabolic syndrome in the mentally

7   ill and discusses the need for higher vigilance in this

8   population given the underlying risk that is present in

9   the mentally ill population.

10  MR. TRAMMELL:

11  Q    You say "higher vigilance."  What does that mean with

12  respect to the risks posed by Seroquel?

13  A    Well, you have a population here who is at risk

14  anyway.  As we discussed, the mentally ill do show higher

15  frequency of metabolic syndrome, lipid problems and

16  diabetes.  And then they are exposed to medications that

17  further increase that risk so they need to be watched more

18  carefully.  Vigilance is now felt to include things like

19  monitoring blood glucose, monitoring abdominal girth,

20  which is part of definition of the metabolic syndrome,

21  following lipids, doing laboratory evaluations to follow

22  those indices.

23  Q    Doctor, is the literature search that you did to

24  arrive at your opinion that you stated that Seroquel is

25  associated with an increased risk of diabetes, is that the

1    type of literature search you would do in your medical

2    practice to determine whether an adverse event experienced

3    by a patient might be associated with the drug treatment?

4    A    Yes.

5            MR. TRAMMELL:  Permission to approach, Your

6    Honor?

7            THE COURT:  Yes.

8    MR. TRAMMELL:

9    Q    Doctor, what is Abramson 6?

10   A    This is a letter that I received from AstraZeneca in

11   response to a request for medical information regarding

12   Seroquel and glucose metabolism issues.

13   Q    So you actually sent AstraZeneca a letter -- or you

14   actually made a request from AstraZeneca for information

15   related to the association between Seroquel and diabetes,

16   and this is what they sent you?

17   A    Yes.  At that time, the pharmaceutical sales

18   representative was still allowed to talk to me, and at

19   this point, she won't.  But she sent in a request for me,

20   and this is what I received in response.

21   Q    And does Abramson Exhibit 6 inform your opinion in

22   any way?

23   A    Yes, it does.  Once again, it is confirmatory of my

24   opinion.  Some of the issues that we discussed are present

25   in this discussion.  For example, the doubling of risks

1    that was seen in that double-blind long-term study and the

2    increased risk that was seen in the shorter term study are

3    both listed.   There are some other results that were

4    considered in rendering my opinions including the CATIE,

5    C-A-T-I-E, studies, as well.

6    Q    I apologize.   I don't have a copy of the CATIE study

7    for you.   Can you tell the Court what that is?

8    A    That's the Clinical Antipsychotic Trial of

9    Intervention Effectiveness in schizophrenic patients.   And

10   the summary provided by AstraZeneca notes the increase in

11   abnormal hemoglobin A1c that was found with certain

12   atypical second generation antipsychotic but at a greater

13   level than with Seroquel.

14   Q    We may becoming redundant.   But how does that

15   information inform or support your opinion?

16   A    The study wasn't designed specifically to measure

17   glucose issues; however, it, once again, highlights the

18   issue of glucose dysregulation in this class of

19   medication.

20          MR. TRAMMELL:   Permission to approach again,

21   Your Honor?

22          THE COURT:   Yes.

23          MR. TRAMMELL:   I apologize in advance.   Abramson

24   7 is the only format in which we could print this

25   document, Your Honor.   I apologize.   It's very difficult

1    to read.

2         THE COURT:  It's impossible to read.

3       Maybe Dr. Abramson has better glasses than I do.

4    It's not readable with my glasses.

5    MR. TRAMMELL:

6    Q    Maybe Dr. Abramson can bring it to life for us.

7       Dr. Abramson, did you have an opportunity to review

8    David Haller's medical history with specific attention

9    paid to his history of glucose levels and weight?

10   A    Yes, I did.  This -- this graph I had the advantage

11   of being able to review it on a computer screen as opposed

12   to reviewing it on this little piece of paper.

13      It basically plots the available blood glucose values

14   that were extracted from the -- I'm sorry -- the available

15   weight values that were extracted from the medical record,

16   and then certain points were highlighted in red.

17      The first one is when Seroquel was initially

18   introduced.  The second one is when diabetes diagnosis was

19   made.  And the final one is when Seroquel was completely

20   discontinued.  And I think what is important in this

21   graph -- first thing you have to realize is this little

22   box on top comes before the bottom one.  I think that

23   there is a -- there is a difference between the curve

24   before the introduction of Seroquel and after the

25   introduction of Seroquel.

1       Mr. Haller did show fluctuations in his weight prior

2   to administration of Seroquel; however, these fluctuations

3   from point to point were quite wide, with a large variance

4   between them.  And even though at times there were

5   recordings of higher weight, he was able to achieve a

6   baseline prior to the administration of Seroquel; that is

7   around 180 pounds.  After the administration of Seroquel,

8   the curve rises significantly and his baseline level of

9   weight seems to hover around 230 pounds.  And then

10  ultimately that diagnosis of diabetes was made, and he was

11  started on metformin which, when given to diabetic

12  patients, they do tend to lose weight and his weight came

13  down.

14  Q    Was Mr. Haller ever overweight or significantly

15  overweight prior to the initiation of Seroquel therapy?

16  A    Yes.

17  Q    What role, in your opinion, if any, does the fact

18  that Mr. Haller was -- let me ask you this first:  Was

19  Mr. Haller diabetic at that point at which he became

20  significantly overweight prior to Seroquel treatment?

21  A    No.

22  Q    What role does the fact that Mr. Haller was

23  significantly overweight prior to Seroquel treatment

24  without diabetes and then became significantly overweight

25  with Seroquel treatment, subsequently becoming diabetic,

1    play in your opinion as to whether Seroquel is a causative

2    agent in his diabetes?

3    A    I think that that there are two issues there.  The

4    first thing is that Mr. Haller possessed certain risk

5    factors before the introduction of Seroquel.  Among them,

6    the high weight, yet he did not develop diabetes.  He

7    continued to possess those risk factors after the

8    introduction of Seroquel.  However, it seems that the

9    administration of the Seroquel unleashed -- or was a

10   significant contributing factor that appears to have

11   almost broken the camel's back, and then he was

12   subsequently diagnosed with the diabetes.

13          MR. TRAMMELL:  Permission to approach again,

14   Your Honor?

15          THE COURT:  Yes.

16   MR. TRAMMELL:

17   Q    Dr. Abramson, can you tell us what Abramson Exhibit 8

18   is?

19   A    Which one is that?  I'm sorry.

20   Q    This one (indicating).

21   A    This is similarly the glucose levels that were found

22   in the chart were extracted and placed on this chart to

23   make it easier to review them.

24   Q    Can you say, having reviewed Mr. Haller's records,

25   whether the information in Abramson Exhibit 8 is extracted

1   from those records?

2   A    Obviously, I didn't check every particular point, but

3   these values appear consistent with my initial review of

4   his records.

5   Q    What is your opinion as to whether Mr. Haller was

6   diabetic prior to taking Seroquel?

7   A    Well, prior to taking Seroquel, Mr. Haller's serum

8   glucose levels did not meet the criteria for a diagnosis

9   of diabetes.  In the second paper that you gave me, there

10  are a few elevated blood glucose values.  For example, on

11  July 22nd, 1987, his glucose was 120, which is elevated.

12  It is not known if this is a fasting or random value;

13  however, even if it was fasting, it is not meeting the

14  criteria that we discussed earlier.  It is 120, which is

15  below the values that we discussed.

16      A few days later, it is repeated and his glucose

17  level is basically in the normal range.  That's on

18  July 29th, 1987.

19  Q    Are you -- sorry --

20  A    I'm sorry.

21          THE COURT:  You're talking about Exhibit 9?

22          MR. TRAMMELL:  Yes.

23          THE WITNESS:  Yes.

24          THE COURT:  I want to make sure the record is

25  clear on that.

1          THE WITNESS:  Similarly, on 24 September, 1998,

2    his glucose is 128.  The record shows that this was

3    collected at 4:00 a.m.  It is not indicated if this is a

4    fasting or not level.  But this one random value alone is

5    inadequate to make a diagnosis of diabetes.  So when you

6    compare these few values of somewhat elevated glucose to

7    the values that are seen after the introduction of

8    Seroquel, there is a very significant difference.

9    MR. TRAMMELL:

10   Q    Are you able to say, within a reasonable degree of

11   medical certainty, whether Mr. Haller had diabetes before

12   he took Seroquel?

13   A    Once again, I'm not an endocrinologist, but basing

14   upon the disseminated criteria, it does not appear that he

15   had diabetes before the administration of Seroquel.

16   Q    What was Mr. Haller's peak weight prior to the

17   initiation of Seroquel treatment?

18   A    Could I just have a look at my notes?  Because I did

19   write that down.

20   Q    Sure.

21   A    On March 4th, 2002, his weight was up to 184 pounds.

22   Q    What was his peak weight -- what was his all-time

23   peak weight prior to using Seroquel?

24   A    From the graph that we have, it appears that it was

25   close to 220 pounds.

1   Q     Can you tell when that was?

2   A     It was 8-2000.

3   Q     If you look at Exhibit 8 --

4   A     I'm sorry.  Which one is that?

5   Q     This was the glucose chart.

6         What was Mr. Haller's glucose reading at his peak

7   weight before Seroquel treatment around the same time?

8   A     He had two values tested on 8-23-2000 and 8-26-2000,

9   and both were normal glucose of 81 and a glucose of 94.

10  Q     Subsequent to the initiation of Seroquel treatment,

11  did Mr. Haller gain weight?

12  A     Yes.

13  Q     How would you characterize Mr. Haller's pattern of

14  weight gain subsequent to the initiation of Seroquel

15  treatment?

16  A     It appears that his weight went from a baseline of

17  around 180 to a baseline of around 230, 240 pounds.

18  Q     Is that a statistically significant weight gain?

19  A     I believe it is.

20  Q     Is that clinically significant in your experience?

21  A     Yes.

22  Q     Is weight gain a known risk factor for diabetes?

23  A     Yes, it is.

24  Q     Had Mr. Haller gained weight -- gained a significant

25  amount of weight prior to using Seroquel?

1   A    Yes, he had.  He had both gained and lost.

2   Q    But at no time prior to using Seroquel had he

3   developed diabetes, right?

4   A    That's correct.

5   Q    Can you look at the Exhibit 7 and tell the Court

6   approximately what Mr. Haller's weight was on the day he

7   was diagnosed with diabetes?

8   A    I'm sorry, sir.  They're not numbered.  I'm not

9   keeping track --

10  Q    The weight chart.

11  A    Please ask your question again.

12  Q    Can you tell the Court approximately what

13  Mr. Haller's weight was on the day he was diagnosed with

14  diabetes?

15  A    Approximately 225 pounds.

16  Q    And again, what was the weight on the day he started

17  diabetes -- or started Seroquel?  Pardon me.

18  A    Approximately 180 pounds.

19         MR. TRAMMELL:  Permission to approach again,

20  Your Honor?

21         THE COURT:  Yes.

22  MR. TRAMMELL:

23  Q    Can you tell the Court what Abramson Exhibit 10 is?

24  A    That's this one (indicating)?

25  Q    Yes.

1    A    That is an extract from the medical record from

2    Morton Plant Hospital, which shows the results of a serum

3    chemistry metabolic profile done on 8-6-2004 at 7:45 a.m.

4    Q    Is there anything significant about this record for

5    purposes of rendering your opinion?

6    A    Yes.  He has a critical elevation of his glucose.

7    It's at 410 milligrams per deciliter.  One also notes that

8    this is marked as a critical value.  Such values would

9    typically be called by the laboratory to the floor for

10   immediate notification of the physician.

11   Q    Do you have any opinion as to whether this blood

12   glucose reading of 410 on August the 6th, 2004, is alone

13   sufficient to diagnose diabetes?

14   A    According to the criteria that we discussed earlier,

15   it is.

16   Q    What is Abramson Exhibit 11, which is the Morton

17   Plant record?

18   A    That's the admission note dictated by the physician

19   at Morton Plant Hospital.

20   Q    And what medications does the admission note show

21   Mr. Haller was on at the time of admission?

22   A    He was on, in terms of psychotropic medications,

23   lithium, Depakote and Seroquel.  He was also on Prevacid,

24   Lopresor, Norvasc and Reglan.

25   Q    If you read the bottom of the first page of

1    Exhibit 11, what is the diagnosis of Mr. Haller on

2    August 4 -- August 6th, 2004, at the Morton Plant?

3    A    He has a few diagnoses listed.  Generally, in a

4    document like this, the initial diagnoses will be the ones

5    that precipitated the admission to the hospital, and these

6    are the gastroparesis and abdominal pain.  The doctor also

7    diagnoses him with new onset diabetes, bipolar disorder

8    and dehydration.

9    Q    Is the diagnosis of new onset diabetes consistent

10   with Abramson Exhibit 10?

11   A    Yes, it is.

12   Q    And is it consistent with your opinion that Seroquel

13   is associated with Mr. Haller's diabetes -- or caused

14   Mr. Haller's diabetes?

15   A    Yes.

16   Q    What is Abramson Exhibit 12?

17   A    This was also collected during the hospitalization.

18   This is a report of his hemoglobin A1c level.  It

19   demonstrates that his hemoglobin A1c was elevated at 10.3,

20   which is outside of the reference range.  This value

21   represents a quantification of glucose dysregulation

22   present over the weeks prior to the value being taken.

23   Q    So this shows that not only did Mr. Haller have an

24   elevated blood glucose on the day he was admitted to the

25   hospital, but it had been something that he had

 1   experienced over the past three months?

 2   A    Correct.  It shows that his blood glucose levels had

 3   been poorly controlled over the few months prior to

 4   admission.

 5   Q    At which time he was on Seroquel, correct?

 6   A    Correct.

 7   Q    Is this material upon which you relied in rendering

 8   your opinion?

 9   A    Yes.

10   Q    Dr. Abramson, what risk factors does -- aside from

11   Seroquel, what risks factors does David Haller have for

12   the development of diabetes?

13   A    I noted them down.  He had his weight issue.  He had

14   the presence of a mental disorder.  He had lipid problems.

15   He was sedentary.  He was on a variety of other

16   medications which can be associated with weight gain.  He

17   was hypertensive.

18   Q    And did those risks factors, each one of them, did

19   they predate his use of Seroquel?

20   A    Yes.

21   Q    I'm sorry.  Was he also a smoker -- or is he a

22   smoker?

23   A    Yes, he is a smoker.

24   Q    Which is also a risk factor for diabetes, correct?

25   A    Yes.

1   Q    What other meds was he on that can cause weight gain?

2   A    Well, the Depakote, the valproic acid, is associated

3   with weight gain.  Lithium can also be associated with

4   weight gain.

5   Q    He had been on Depakote and Lithium for a

6   considerable amount of time prior to using Seroquel?

7   A    That's correct.

8   Q    And had gained weight, right?

9   A    Yes.

10  Q    Along with all these other risk factors, correct?

11  A    Correct.

12  Q    And had he developed diabetes as a result of the sum

13  of those risk factors prior to taking Seroquel?

14  A    No, he had not.

15  Q    Are you able to say, within a reasonable degree of

16  medical certainty, that Depakote was not the sole cause of

17  Mr. Haller's diabetes?

18  A    Yes.

19  Q    And what is the basis for that opinion?

20  A    That he had been on Depakote for years, along with

21  the other risk factors that were inherent in who he was,

22  and had not had progression to diabetes.

23  Q    Are you able to say, within a reasonable degree of

24  medical certainty, that any of the other risk factors that

25  we have discussed were not the sole cause of Mr. Haller's

1   development of diabetes in August of 2004?

2   A    Yes.

3   Q    And what is the basis for that opinion?

4   A    The same response that I just gave, in terms of the

5   valproic acid, the Depakote, but also one needs to

6   recognize that a disease state like diabetes is a

7   complicated multifactorial disease where all these risk

8   factors may play a role.

9   Q    And so it is your opinion that those other risk

10   factors may have played some role in Mr. Haller's

11   development of diabetes in August of '04?

12   A    Yes.

13   Q    Is it your opinion that -- is the basis of your

14   opinion that Seroquel caused Mr. Haller's diabetes the

15   fact that Mr. Haller was on Seroquel when he got diabetes,

16   or is there more to it than that?

17   A    There's much more to it than that.  It's not just a

18   temporal relationship.  Mr. Haller had certain risk

19   factors for diabetes and did not develop the disease.  His

20   weight fluctuated over time prior to the administration of

21   the Seroquel, and he did not develop the disease.  After

22   the administration of the Seroquel, his general weight had

23   shifted upwards, and after a time, began to show evidence

24   of glucose dysregulation.  That's all.

25   Q    Do you have an opinion as to whether Seroquel is a

1  substantial contributing cause of Mr. Haller's development

2  of diabetes in August of 2004?

3  A    Yes, I do.

4  Q    And what is that opinion?

5  A    I do believe that Seroquel was a substantial

6  contributing cause to the development of his diabetes.

7  Q    Do you have an opinion as to whether Mr. Haller would

8  have developed diabetes in August of 2004 but for his use

9  of Seroquel?

10  A    That's a very difficult question for a physician to

11  answer, because there is no way to prove a negative.  And

12  Mr. Haller did have a whole constellation of risk factors

13  that predisposed him to developing diabetes.  And I cannot

14  say with medical certainty that at no point in his life

15  would he have not developed diabetes.

16      However, given the specific facts of this case, it

17  appear that he lived for many years with those risk

18  factors without developing diabetes, and only after the

19  introduction of Seroquel did he then progress to the

20  diagnosis of diabetes.

21  Q    And again, subsequent to the initiation of Seroquel,

22  were any of the other risk factors inherent in

23  Mr. Haller's condition made worse, or did those other risk

24  factors change after the initiation of Seroquel treatment?

25  A    Well, we see clearly there was an aggravation in

1   terms of his weight; that his weight did increase

2   significantly after the introduction of Seroquel.

3   Q    Doctor, is it possible, in your experience -- well,

4   let me ask you this first:  Is diabetes a multifactorial

5   disease?

6   A    Yes.

7   Q    And what does that mean?

8   A    It means that there are many factors that play a role

9   in its development, its course, its prognosis.

10  Q    And is it part of the practice of medicine when

11  diagnosing an injury to be able to -- or to quantify

12  exactly the percentage any risk factor place in the

13  development of the illness?

14  A    That is not something that doctors do.

15  Q    But it is possible, given the presence of risk

16  factors in the patient's medical history, to develop an

17  opinion as to what the more likely than not cause of the

18  injury is; is that correct?

19  A    Yes.

20          MR. TRAMMELL:  I'll pass the witness, Your

21  Honor.

22          MR. BROCK:  Proceed?

23          THE COURT:  Yes.

24                      CROSS EXAMINATION

25  MR. BROCK:

1    Q    Dr. Abramson, good morning.  My name is Mike Brock.

2    I'm from Montgomery, Alabama.  We have not met, have we?

3    A    No, sir.

4    Q    Okay.  I want to go through some questions with you,

5    first of all, about your background in terms of your

6    medical practice.

7         You have been in the private practice of psychiatry

8    since September of 1990, correct, sir?

9    A    That is correct.

10   Q    And I believe you told the Court that you have

11   practiced on both an outpatient and an inpatient basis.

12   Correct?

13   A    Yes.

14   Q    You don't see patients under 18 years of age, but for

15   those that have psychiatric problems that's are 18 years

16   of age and older, you would see sort of all comers with

17   psychiatric problems, correct?

18   A    Correct.

19   Q    And you deal with the spectrum of psychiatric

20   problems.  You deal with mood disorders, psychotic

21   disorders, various kinds, schizophrenia; that type of

22   thing, correct, sir?

23   A    Yes.

24   Q    You have some specialty training, and that's in

25   geriatrics and addiction psychiatry, correct, sir?

1   A     Correct.

2   Q     And I believe you told us that somewhere around

3   30 percent or so of your practice deals with folks with

4   addiction issues, correct, sir?

5   A     Yes.

6   Q     Is part of your practice a referral practice?

7   A     I'm not sure I know what that means.

8   Q     Well, do you know what referral practice is in the

9   context of practicing medicine?

10  A     Does that mean that I receive patients on a referral

11  from other doctors?

12  Q     Right.

13  A     Yes.

14  Q     All right.  So if a general practitioner is seeing a

15  patient with a psychiatric problem, he or she might refer

16  that patient to you, correct?

17  A     Yes.

18  Q     General practitioners don't refer patients with

19  diabetes to you, do they?

20  A     Well, they may refer patients with psychiatric

21  disorders who have diabetes to me.

22  Q     Well, let be clear about it.  General practitioners

23  and internists and endocrinologists don't refer patients

24  with diabetes problems to you for treatment of their

25  diabetes, correct?

1    A     Correct.

2    Q     You agree, don't you, that you have -- that you

3    wouldn't say that you have ever diagnosed diabetes in a

4    patient?

5    A     I would agree that I have not made the definitive

6    diagnosis of the diabetes; however, within my practice, it

7    is very common for me to screen patients and come across

8    various endocrinological abnormalities for which I then

9    refer patients on for further specialized care.  For

10   example, at least a few times a month, I come across

11   patients who are clearly suffering from hypothyroidism,

12   and I refer them to endocrinologists for workup of the

13   thyroid disorder.

14   Q     I'll ask the question again:  Do you agree that you

15   wouldn't say that you have ever diagnosed diabetes in a

16   patient?

17   A     I agreed with that.

18   Q     Okay.  And as you have said, if you saw a patient

19   with an elevated blood sugar in your practice, you would

20   send them to a different doctor, wouldn't you?

21   A     Yes.

22   Q     You might send them to a primary care physician

23   correct?

24   A     Generally, I would send them -- if they've come from

25   a primary care physician, I would send them back to the

1    primary care.  If they have come independently and show a

2    problem possibly of an endocrinological origin, I would

3    send them to an endocrinologist.

4    Q    If by some circumstance you learned that a patient

5    has a glucose reading in the diabetic range, you would

6    send that patient to a general practitioner or a

7    endocrinologist, correct, sir?

8    A    Yes.

9    Q    At the time of your deposition, you did not actually

10   remember making a diagnosis of diabetes in any of your

11   patients.  Do you recall saying that?

12   A    Yes.

13   Q    Is that still true today?

14   A    Yes.

15   Q    You don't treat any of your patients for diabetes, do

16   you?

17   A    No.

18   Q    And the only time you might write a prescription for

19   diabetes is if you were discharging a patient from a

20   hospital and the patient was carrying a diagnosis of

21   diabetes, you might continue a prescription so that when

22   the patient was discharged, you would be comfortable that

23   the patient had medicines sufficient to treat -- to treat

24   with, correct?

25   A    Yes.  Subsequent to the deposition, I also recall

1    episodes where I have had patients under my care in

2    inpatients seatings, and I have ordered the sliding scale

3    insulin to control their sugars in the hospital.

4    Q    And, then, do you immediately refer those folks to

5    general practitioners or endocrinologists for treatment?

6    A    Well, I order consultation.

7    Q    Correct.

8         Now, there is a specialty of practice that deals with

9    patients with diabetes, correct?

10   A    Yes.

11   Q    And that's the specialty of endocrinology, correct?

12   A    Correct.

13   Q    And you don't have any special training or

14   certifications in endocrinology, do you?

15   A    No.

16   Q    Family practitioners also diagnosis and treat

17   patients with diabetes, correct?

18   A    Correct.

19   Q    And you're not board certified or trained as a family

20   practitioner, are you?

21   A    No, I'm not.  However, I have completed much of the

22   same training as most general practitioners, including a

23   multispecialty internship.  I could, if I wanted to,

24   practice primary care.

25   Q    Since 1990, you have not held yourself out as a

1    family practitioner, have you?

2    A    Correct.

3    Q    Or an internist?

4    A    Correct.

5    Q    Or an endocrinologist?

6    A    Correct.

7    Q    Dr. Abramson, you've never published anything related

8    to diabetes, have you?

9    A    No.

10   Q    In fact, since obtaining your medical license, you

11   have not published anything in any peer-reviewed journal,

12   have you?

13   A    Correct.

14   Q    Now, it's true, isn't it, that you do not hold

15   yourself out as an expert in the diagnosis of diabetes?

16   A    Correct.

17   Q    Further to that, you have not published any articles

18   on glucose metabolism, have you?

19   A    No, I have not.

20   Q    And you agree with me, do you not, that you are not

21   an expert in diagnosing the course of diabetes in

22   particular individuals?

23   A    Yes, I would agree.

24   Q    You're not qualified to talk about the typical

25   progression of diabetes in a particular individual,

1   correct, sir?

2   A    I think as a general statement I would agree with

3   you.

4   Q    You're not qualified to evaluate whether a patient's

5   clinical course is consistent with the typical development

6   of diabetes, are you?

7   A    Yes.

8   Q    You agree that an endocrinology opinion is beyond

9   your area of expertise?

10  A    Yes.

11  Q    Now, you have talked a little bit today about

12  hemoglobin A1cs, correct?

13  A    Correct.

14  Q    When we deposed you, we asked you about some

15  hemoglobin A1c values.  Do you recall those questions?

16  A    I reviewed the deposition.  I don't recall the

17  specific questions.

18  Q    Okay.  And you agree that hemoglobin A1c is one of

19  the tools that you'd utilize for diagnosing diabetes,

20  correct?

21  A    Correct.

22  Q    But when we asked you about it in the deposition, you

23  didn't know what was normal and what was abnormal when

24  considering hemoglobin A1c values, did you?

25  A    Correct.

1    Q    Now, let's talk a little bit about the materials that

2    you have reviewed in preparation for giving your

3    testimony.  You have not reviewed the weight data from the

4    Seroquel clinical trial program, have you?

5    A    No.

6    Q    You can't tell the Court today what percentage of

7    patients gained weight at all in the Seroquel clinical

8    trials, can you?

9    A    No.

10   Q    You don't know what percentage gained more than

11   7 percent of body weight in the Seroquel clinical trials,

12   true?

13   A    Correct.

14   Q    You remember being asked questions about a

15   Dr. Brecker at the deposition, where they asked you had

16   you read his peer-reviewed articles concerning weight

17   gain?  Do you remember those questions?

18   A    Yes.  I remember the name; I don't remember the

19   specific questions.

20   Q    And you haven't read Dr. Brecker's papers on Seroquel

21   weight gain that are in the published medical literature,

22   have you?

23   A    Correct.

24   Q    Now, you haven't reviewed the clinical trial data of

25   the Seroquel program, have you?

1    A    Other than what I have spoken to today, no.

2    Q    Right.

3         And you have told us in your deposition -- or told us

4    in your deposition that since you haven't reviewed the

5    clinical trial data, you don't have any criticism at all

6    of the clinical trials that were performed by AstraZeneca,

7    correct, sir?

8    A    Correct.

9    Q    You're not even an expert in designing clinical

10   trials, are you?

11   A    No, I'm not.

12   Q    Now, would you pull out your Exhibit 2?

13   A    Which is which one?

14   Q    Which is this list right here (indicating).  Do you

15   have that?

16   A    Yes, I did.

17             MR. BROCK:  Permission to approach the witness,

18   Your Honor.

19             THE COURT:  Yes.

20   MR. BROCK:

21   Q    You can leave that there.  I just want to show you

22   this.

23         Do you see that this is a copy of your deposition?

24   A    Yes.

25   Q    Do you see that Exhibit 16 to your deposition is this

1    reference exhibit list?

2    A    Yes, it is.

3    Q    Hold that spot right there.

4         MR. BROCK:  Permission to approach, Your Honor.

5         THE COURT:  Yes.

6    MR. BROCK:

7    Q    I'm going to put your deposition here.  I might have

8    some other uses for it later, but this is just one

9    specific question right here.

10        MR. BROCK:  Need to come back up one more

11   second, please.

12        THE COURT:  Okay.

13        MR. BROCK:  Your Honor, can I stand here and ask

14   one question and one answer?

15        THE COURT:  Yes.

16   MR. BROCK:

17   Q    Do you recall, sir, that at your deposition this

18   exhibit here was presented you -- to you as Exhibit 16?

19   A    Not specifically, no.

20   Q    Okay.  You do see here that it's marked as Exhibit 16

21   to your deposition, correct, sir?

22   A    Yes.

23   Q    And did you tell us in the deposition, sir, that you

24   had never seen this list before?

25   A    Correct.  I didn't prepare the list.

```
1   Q    No.  Did you tell us in the deposition you had never

2   seen the list?

3   A    Correct.

4   Q    Right.

5        So when you told the lawyer over here that you had

6   reviewed all these articles in this exhibit, that wasn't

7   true, was it?  You haven't reviewed all the information in

8   that document, have you?

9   A    Yes, I have.

10  Q    You have reviewed every article in that list?

11  A    This has happened over a long period of time.  I have

12  had a chance to see all the articles that are listed here,

13  including the Brecker article that is listed.

14  Q    Okay.  Did we ask you at the deposition, "Doctor, I'm

15  going to show you what I have marked as Exhibit 16.  Have

16  you seen this before?"  And was your answer, "No, sir"?

17  A    Yes, it was.

18  Q    So are you telling the Court that you had not seen

19  that list at the time you prepared and submitted your

20  report?

21  A    Correct.  I had not seen it in this form.

22  Q    Do you know that that document was actually furnished

23  to us as a list of things that you said you relied on for

24  formulating your opinions?

25  A    Yes.
```

1   Q    And yet you had not seen the list?

2   A    Correct.

3   Q    Now, let's turn to your report, if we could, please,

4   sir.  That's Exhibit 1.

5        Now, your report is dated September the 1st, 2008,

6   correct, sir?

7   A    Yes.

8   Q    And it's true, is it not, that if we read your entire

9   report where all of your general opinions are listed, we

10  will not see anywhere in this report that you have

11  rendered the opinion that Seroquel causes diabetes?

12  Correct, sir?

13  A    Well, if you look on the second to last page, I

14  indicate that it was my opinion that Seroquel was a cause

15  of his diabetes.

16  Q    Right.  Focus on my question, if you would, please,

17  sir.

18       Did you hear me ask you if you looked at the general

19  section of your report, which includes the general

20  questions, did you hear that as part of my question, sir?

21  A    Yes, I did.

22  Q    If we look at the general opinions that you have

23  rendered about Seroquel, we will not see in your report

24  that you have stated the opinion that you believe that

25  Seroquel causes diabetes.  That's true, isn't it?

1   A     Yes.

2   Q     Few more questions about your qualifications, please,

3   sir.

4        You have not been involved in any of the clinical

5   trials involving Seroquel, correct, sir?

6   A     No, I've not.

7   Q     You have not been involved in any observational

8   studies involving Seroquel, correct, sir?

9   A     No.

10  Q     At any point in your medical-legal career, have you

11  ever been asked to render an opinion in a Court as to the

12  cause of someone's diabetes?

13  A     No.

14  Q     In any legal case, have you ever offered the opinion

15  that you understood the cause of an individual's diabetes?

16  A     No.

17  Q     And the truth of the matter is you haven't been asked

18  to do that because that's just not part of what you do in

19  practice, is it?

20  A     I don't know the answer to that question.  I don't

21  think I'm the one to ask --

22  Q     Let's see if I can clarify.

23       In your practice, if you see a patient in a limited

24  circumstance, where you might see a high glucose reading,

25  as part of your practice, you don't undertake to determine

1    the cause of that high blood glucose level; you don't

2    undertake to determine how long the high glucose level has

3    been present; you don't undertake to determine what the

4    proper treatment regimen is; and you don't follow the

5    patient to see how the patient responds to treatment?

6    Those are all true statements, in a general sense, aren't

7    they?

8    A    Yes.

9    Q    No one has ever asked you to conduct any research for

10   any of the antipsychotics, have they?

11   A    That's not true.  I was involved in the Geodon study.

12   Q    And did that relate to any issues relating to glucose

13   dysregulation?

14   A    No.  They were looking at cardiovascular.

15   Q    All right.  So let me be more specific with my

16   question.  No one as ever asked you to do any research

17   with regard to glucose dysregulation in any antipsychotic,

18   correct?

19   A    Correct.

20   Q    Do you know what an FDA advisory committee is?

21   A    Yes.

22   Q    Have you ever sat on an FDA advisory committee

23   advising the FDA about antipsychotics in glucose issues?

24   A    No.

25   Q    Have you ever been asked to present at an FDA

1  advisory committee conference about those issues?

2  A    No.

3  Q    Do you know what a IND is?

4  A    No.

5  Q    If I told that it was an investigational new drug

6  application, would that ring a bell?

7  A    Yes.

8  Q    Do you know what it is now?

9  A    Yes.

10  Q    You did not look at the IND for Seroquel, did you?

11  A    No.

12  Q    You wouldn't know what kind of material would be

13  included in that, would you?

14  A    Correct.

15  Q    Do you know what an NDA is?

16  A    No.

17  Q    If I told you that it's the new drug application,

18  where a medicine company asks for permission to market a

19  medicine, would that ring a bell for you?

20  A    Yes.

21  Q    You did not look at the NDA for Seroquel, did you?

22  A    No.

23  Q    Do you know what kind of information is included in

24  the NDA?

25  A    I have come across references to NDAs before, but I

1   can't sit here reliably and tell you what's in it.

2   Q    Do you know what an ISS is in the context of

3   regulatory matters?

4   A    No.

5   Q    If I told you that it was an integrated summary of

6   safety, could you tell the Court what -- what that would

7   be?

8   A    No, I could not.

9   Q    You didn't look at the integrated summary of safety

10  for Seroquel, did you?

11  A    No.

12  Q    Can you confirm that when AstraZeneca applied to the

13  FDA for permission to market Seroquel in the United

14  States, that there was no signal or indication for

15  increased risk of hyperglycemia in the materials submitted

16  to FDA?  Or do you know?

17  A    I do not know.

18       When you have a moment, could I take a pause to go to

19  the restroom.

20  Q    That would be up to Your Honor.

21            THE WITNESS:  Your Honor?

22            THE COURT:  Go ahead.

23            THE WITNESS:  Thank you.

24            THE COURT:  We will just wait for you.

25       We will break for lunch at 11:30.

MR. BROCK:

Q     Ready to proceed?

A     Thank you for indulging me.

          MR. BROCK:  Your Honor, may we proceed?

          THE COURT:  Yes.  Go ahead.

MR. BROCK:

Q     Going back to your report which is marked as Exhibit
1, can you confirm for the Court that if we look at your
report that the only article that you cite as being a
matter of importance is the Sernyak article which is the
association of diabetes mellitus with use of atypical
neuroleptics in the -- in the treatment of schizophrenia,
which I've placed before you as Defendant's Exhibit 16?

A     Yes.

Q     And you're familiar with this report, correct, sir?

A     Yes, I am.

Q     And you cited this report because you thought it had
useful information in terms of the relationship between
atypical antipsychotics and glucose issues, as well as
being a point of reference for when physicians and other
healthcare providers started discussing this potential
association, correct, sir?

A     Correct.

Q     Now, you do recognize, do you not, sir, that there
are significant limitations to this report?  Right?

1    A    Correct.

2    Q    And if we look over at page 565, do you see that

3    there are a number of limitations of the report listed on

4    the left-hand side -- the left-hand column?  This would be

5    on page 565 of the article.

6    A    This is what you have highlighted?

7    Q    Yes.

8    A    Yes, I see that.

9    Q    And do you see that the first one that's listed is

10   that although the study examined data for more than 38,000

11   patients with a diagnosis of schizophrenia who received

12   prescriptions for neuroleptics.

13        Now, neuroleptics are -- are antipsychotics, correct,

14   sir?

15   A    Yes.

16   Q    The narrow time frame of four months yielded a

17   virtual cross-section -- sectional sample.

18        Do you see that?

19   A    Yes.

20   Q    Now, why is that a limitation to this study?

21   A    Because it's measuring incidents over a specific

22   period of time, so it's epidemiologically limited.

23   Q    Okay.  The second limiter is that data on changes in

24   weight in patients who received prescriptions for atypical

25   neuroleptics were also unavailable.

```
 1          Do you see that?

 2     A    Yes.

 3     Q    So that's another significant limitation of the only

 4     study you cited in your report, correct, sir?

 5     A    Correct.

 6     Q    And the third one is the patients who received

 7     prescriptions for typical neuroleptics may have been less

 8     likely to take the medicines because of their side effect

 9     profiles than were those with prescriptions for the

10     atypical neuroleptics.

11          Do you see that?

12     A    Yes.

13     Q    And you have some personal experience with that

14     issue, don't you?

15     A    Well, I've prescribed medications -- antipsychotics

16     before the atypicals were available.

17     Q    Right.  So you've prescribe both atypicals and

18     typicals, correct?

19     A    Correct.

20     Q    And just so that the Court understands, the atypicals

21     are sometimes referred to as the first-generation

22     antipsychotics, correct?

23     A    No.  No.  The atypicals are second generation.

24     Q    I'm sorry.  I apologize.

25          The typicals were referred to as first-generation
```

```
 1    antipsychotics?

 2    A     Correct.

 3    Q     And the second-generation antipsychotics, of which

 4    Seroquel is one of the medicines, would be called atypical

 5    antipsychotics?

 6    A     Correct.

 7    Q     And your personal experience with this is that you

 8    know that when the first-generation antipsychotics came

 9    along, they were a huge improvement over what was

10    available to patients prior to that time, correct sir?

11    A     Yes.

12    Q     You were able to improve and even save lives with the

13    first generations, correct?

14    A     I don't believe you're asking me what you mean to ask

15    me.

16    Q     With the use of those medicines, were you able to

17    improve your patients' lives?

18           THE COURT:  His question is, which medicine are

19    you referring to?

20    MR. BROCK:

21    Q     The first generations.

22    A     The first generations were useful in treating and

23    save lives, so did the second -- the newer class of

24    medications as well.

25    Q     Right.  I'm coming to that.
```

1        But the issue with the first generations is that they

2   had a significant side effect profile, correct?

3   A    Correct.

4   Q    And you would see side effects with the

5   first-generation antipsychotics as the third point here

6   says, that may cause them to cease taking the medicine,

7   correct?

8   A    Correct.

9   Q    And describe for the Court what those -- what those

10  problems were with the first generations?

11  A    The first generation?  There are a variety of side

12  effects, including, at the early onset of treatment, one

13  can see extrapyramidal side effects, which are motor side

14  effects that are very uncomfortable for patients.

15       Over long-term use, patients can exhibit a lot of

16  disfiguring symptoms related to a rare, but nevertheless

17  disease that exists called tardive dyskinesia that makes

18  it uncomfortable for patients.  They drool.  They can have

19  blood pressure problems, cardiovascular problems related

20  to the first generation of medications.

21  Q    And with the second-generation antipsychotics, you

22  see an improvement in this side effect profile, correct,

23  sir?

24  A    Correct.

25  Q    So that patients are more likely to stay on the

1    second-generation antipsychotics because of the favorable

2    side effect profile?

3    A    Correct.

4    Q    And that's what this article is speaking to is that

5    if you have a medicine that patients are more likely to

6    stay on because the side effect profile is less, that

7    could be a confounder to the result of the study?

8    A    Yes.

9    Q    Now, in the end, this study concludes that there --

10   there is no establishment of a causal relationship between

11   atypical antipsychotics and diabetes, correct, sir?

12   A    Can you highlight where that is?

13   Q    Sure.  Over on the right-hand column, it says,

14   "although this study in a large national sample has

15   demonstrated a substantially -- a substantial and

16   statistically significant association between atypical

17   neuroleptic prescription in diabetes mellitus, it did not

18   definitively establish a causal relationship, correct,

19   sir?

20   A    That's correct.

21   Q    Now, association is different than causation,

22   correct, sir?

23   A    Correct.

24   Q    All right.

25   A    They do, however, go on to state that their findings

1  are strongly suggestive of such a causal relationship,

2  however.

3  Q    Now, you were aware, at the time that this paper was

4  written, that there were also papers that went the other

5  way, correct?

6  A    Yes.

7  Q    So while this paper that you cited in your report as

8  your only source document for your opinions says that

9  there is an association -- there were many well-done

10  studies that were in circulation about this same time that

11  did not show that increased risk, correct, sir?

12  A    Correct.

13  Q    So at this point in time, would you agree that the

14  data was discrepant; there were some studies showing an

15  increased risk and some studies showing no increased risk?

16  A    Well, I believe I said in my report that this was the

17  point in time where we began to see a discussion in the

18  literature, which is why I cited the study.

19  Q    Right.  And -- but the other point, coming back to my

20  question, is that there were studies that went both ways

21  at this point in time, correct, sir?

22  A    Yes.

23  Q    And you can't look at the Sernyak article and make

24  the conclusion that Seroquel causes diabetes, can you?

25  A    No.

1   Q    This study that I have handed you, Defendant's

2   Exhibit 2, is the consensus development conference on

3   antipsychotic drugs in obesity and diabetes, correct, sir?

4   A    Yes.

5   Q    Now, this report, the paper tells us was jointly put

6   together by the American Diabetes Association, the

7   American Psychiatric Association, the American Association

8   for Clinical Endocrinologists, and the North American

9   Association for the Study of Obesity, correct?

10   A    Correct.

11   Q    And you agree that those are all well-regarded

12   institutions, correct, sir?

13   A    Yes.

14   Q    And that this paper reflects the thinking of the

15   field at this particular point of time, correct sir?

16   A    Yes.

17   Q    Do you see on the first column on the left side where

18   it says, "an eight-member panel heard presentations from

19   14 experts drawn from areas of psychiatry, obesity and

20   diabetes."

21       Do you see that?

22   A    Yes.

23   Q    So there's an eight-member panel, and they heard from

24   14 different experts in the area of psychiatry, obesity

25   and diabetes, correct?

```
 1   A     Yes.

 2   Q     You see that there were also industry presenters

 3   there, correct?

 4   A     Yes.

 5   Q     You have no criticism of that, correct, sir?

 6   A     No.

 7   Q     Now, do you see on page 598, which is page 3 of the

 8   study, that it says, "despite limitations in the study

 9   design, the data consistently showed an increased risk for

10   diabetes in patients treated with clozapine compared to

11   patients not receiving treatments with FGAs or other

12   second-generation antipsychotics.

13   A     Which column is that in?

14   Q     It's on page 598, which is the third page -- I don't

15   have my marked copy.  Hold on just one second.

16         It's on the second column, about 12 lines down,

17   "despite limitations in the study design"...

18         Do you see that?

19   A     Yes, I do.

20   Q     And does it say, "the data consistently showed

21   increase risk for diabetes in patients treated with

22   clozapine or olanzapine compared with patients not

23   receiving treatment with first-generation antipsychotics

24   or other second-generation antipsychotics?"

25         Do you see that?
```

1  A    Yes.

2  Q    And then does the next sentence say, "the risk in

3  patients taking Risperidone and Quetiapine is less clear.

4  Some studies show an increased risk for diabetes while

5  others do not."

6       Do you see that?

7  A    Yes.

8  Q    Do you agree that as of the time of this paper in

9  2004 that the consensus of the experts in the field was

10  that the data on Quetiapine was less clear and did not

11  consistently show an increased risk for the development of

12  diabetes with the use of Seroquel?

13  A    Yes, I do.

14  Q    And this document was published in February of 2004,

15  correct?

16  A    Correct.

17         MR. BROCK:  I'm sorry.  Can I approach?

18         THE COURT:  Yes.

19  MR. BROCK:

20  Q    Do you have now Defendant's Exhibit 17?

21  A    Yes, I do.

22  Q    And do you see the indication that says revised

23  January of '04 there?

24  A    Yes, I do.

25  Q    And do you understand this to be the label that was

1    put in place when the FDA asked for class labeling for the

2    antipsychotic medications?

3    A    Yes.

4    Q    And just to help you a little bit, would you turn

5    over to 7383781, so, actually, I think if you look for 81,

6    that will be where the section is on hyperglycemia and

7    diabetes mellitus.

8         Do you have that?

9    A    Yes.

10   Q    Now, in the middle of the page there is a section in

11   the label titled hypoglycemia and diabetes mellitus.

12        Do you see that?

13   A    Yes, I do.

14   Q    And you've told us in your deposition that you don't

15   have any criticisms of the Seroquel labels from 2004

16   forward, correct?

17   A    Correct.

18   Q    You have no problem with the label since its change

19   in January of 2004, correct?

20   A    I believe I said that, yes.

21   Q    Yes.

22        Now, the warnings section here of the label on

23   page 11 states, does it not, in the first sentence,

24   "hypoglycemia in some cases extreme and associated with

25   ketoacidosis or hyperosmolar coma or death has been

1    reported in patients treated with atypical antipsychotics

2    including Seroquel," correct?

3    A    Yes.

4    Q    This label change was made in January of '04,

5    correct, sir?

6    A    Yes.

7    Q    What date did you tell the Court Mr. Haller was

8    diagnosed with diabetes?  August?

9    A    I don't recall.  I have to look back.

10   Q    All right.  We will come back to it.  Let's keep

11   going.

12   A    Yeah, August '04.

13   Q    All right.  Thank you.

14        Now, let's look at the next sentence.  Do you see

15   where it says, "assessment of the relationship between

16   atypical antipsychotic use and glucose abnormalities is

17   complicated by the possibility of an increased background

18   risk of diabetes mellitus in patients with schizophrenia

19   and the increasing incidents of diabetes mellitus in the

20   general population?"

21        Did I read that right?

22   A    Yes.

23   Q    And do you agree what that statement?

24   A    Yes.

25   Q    And then it says, "given these confounders, the

```
 1    relationship between atypical antipsychotic use and
 2    hyperglycemia adverse events is not completely understood.
 3         Do you see that?
 4    A    Yes.
 5    Q    And do you agree what that?
 6    A    I agree with it.
 7    Q    Okay.  And the next sentence is, "epidemiological
 8    studies suggest an increased risk of treatment emergent
 9    hyperglycemia-related adverse events in patients treated
10    with atypical antipsychotics."
11         Do you see that?
12    A    Yes.
13    Q    Do you agree with that?
14    A    Yes.
15    Q    And "precise risk estimates for hyperglycemia-related
16    adverse events in patients treated with atypical
17    antipsychotics are not available."
18         Do you see that?
19    A    Yes.
20    Q    And was that true at that time?
21    A    Yes.
22    Q    Still true today?
23    A    Well, yes, but -- yes.
24    Q    Now, you have testified today that the incidents of
25    diabetes in patients with mental illness is higher than
```

1  that for the general population, correct?

2  A    Yes.

3  Q    And that's one of the things that makes your task

4  difficult in this particular setting, in terms of

5  understanding whether or not Seroquel played any role in

6  the development of diabetes for Mr. Haller, correct?

7  A    Correct.

8  Q    Just some background on this:  You understand that

9  between 7 and 10 percent of Americans have diabetes,

10  correct?

11  A    Yes.

12  Q    And that's increasing in the general population,

13  correct?

14  A    Yes.

15  Q    And as you've said, the background rate for people

16  that suffer from mental illness is higher than that, and I

17  believe you told us in your deposition that it was in the

18  range of 15 to 20 percent --

19  A    Correct.

20  Q    -- correct sir?

21      So two questions about this:  First of all, every

22  person that takes Seroquel is not going to acquire the

23  diagnosis of diabetes, that's correct, isn't it?

24  A    Yes.

25  Q    And every person that takes Seroquel who acquires the

1   diagnosis of diabetes does not have Seroquel as a causal

2   factor for the development of disease; that's true also on

3   a population basis, isn't it?

4   A    Yes.

5   Q    Because we know that there is a very, very high

6   background rate in patients with mental illness and that

7   some of those patients are going to develop diabetes

8   whether they take Seroquel or not?

9   A    Correct.

10  Q    Now, you were asked some questions about the 2007

11  label, and I believe that that is Exhibit 3.  Do you have

12  that there?

13  A    I have the 7-2008 revision here.

14  Q    2008 revision?

15  A    Yes.

16  Q    Okay.  That's fine.  I assume that's the one I have

17  also.

18       All right.  Look at the tables that you were looking

19  at on page 6 of the document, if you would, please, sir.

20  Do you have that there?

21  A    Yes, I do.

22  Q    Okay.  Do you remember testifying to the Court that

23  you thought that this section of the label reflected a

24  doubling of the risk for the development of diabetes?

25  A    I didn't rely on the tables.

1    Q     I'm not talking about the table.  I'm talking about

2    the language of the document.  Are we clear?

3    A     Okay.  I thought you mentioned the table.

4    Q     I'll ask the question again.

5          Do you recall telling the Court that you relied on

6    the hyperglycemia language here for the proposition that

7    Seroquel doubled the risk for the development of diabetes?

8    A     Yes.

9    Q     And you said that in order to have a diagnosis for

10   diabetes, you would need two fasting blood sugars of 126

11   or more, correct?

12   A     Correct.

13   Q     Now, look at the first set of trials that's described

14   under hyperglycemia.

15         Do you see that?

16   A     Yes.

17   Q     And do you see it says, "in two long-term

18   placebo-controlled trials, mean exposure 213 days for

19   Seroquel and 152 days for placebo, the exposure adjusted

20   rate of any increased blood glucose level greater than or

21   equal to 126 milligrams for patients more than eight hours

22   since a meal was 18.1 per hundred for Seroquel and 9.5 for

23   placebo."

24         Do you see that?

25   A     Yes.

1   Q    You can't look at that language and conclude that a

2   diagnosis of diabetes was made in any of the patients that

3   are referenced there, correct?

4   A    That's correct.

5   Q    Likewise, if you look down in the short-term

6   placebo-controlled trials, the percent of patients who had

7   fasting blood glucose of 126 or nonfasting glucose of over

8   200 was 3.5 percent for Quetiapine and 2.1 for placebo,

9   you can't look at that data and conclude that any of those

10  patients acquired the diagnosis of diabetes, correct?

11  A    Correct.  One would need the specific patient

12  information.

13  Q    And you haven't looked at the clinical trial data for

14  these trials, have you?

15  A    No.

16  Q    So it would not be proper to conclude from that

17  language that the two portions that we just looked at,

18  that the label reflects a doubling of the risk for the

19  development of diabetes.  That's true, isn't it?

20  A    Correct.

21          THE COURT:  You were referring to Exhibit 3,

22  right?

23          MR. BROCK:  Yes.  I was referring then to

24  Plaintiff's Exhibit 3.  Yes, Judge.

25  MR. BROCK:

1  Q    All right.  Let's look at Exhibit 4.  This is the

2  article by John Newcomer, correct?

3  A    Go ahead.

4  Q    All right.  Let me -- you made some general

5  statements about this article -- or this paper.  I want to

6  focus on some of the precise language here.

7      If you look at page S173, on the right-hand column,

8  the first full paragraph, do you have it there?

9  A    The left-hand column?

10 Q    It's on the right-hand column, first full paragraph

11 that begins pharmacoepidemiologic studies.

12     Do you see that?

13 A    Yes.

14 Q    I'm going to read it, and then I'll have a question.

15 "Studies in healthcare databases over all suggest

16 increased risk for incident diabetes and dyslipidemia in

17 treated patients compared with nonpatients with variable

18 pattern of differential risk of cross agents but

19 relatively consistent evidence of increased risk with --

20 what two medicines are listed?"

21 A    Clozapine and olanzapine.

22 Q    Do you agree with that?

23 A    Yes.

24 Q    And Seroquel is not listed as a medicine where there

25 is consistent evidence of increased risk in this article

1   dated 2007, correct?

2   A    Correct.

3   Q    That statement that I just read to you doesn't --

4   doesn't suggest that Seroquel causes diabetes, does it?

5   A    No.

6   Q    Look over at the next page, please.  It would be page

7   S174.  And I first want to focus on the top paragraph,

8   which is the reason for the metanalysis.

9        Do you see "overall approximately two-thirds of these

10   studies report findings suggesting that drugs associated

11   with greater weight were also associated with an increased

12   risk for diabetes compared with no treatment, conventional

13   treatment or a drug associated with less weight gain.  The

14   other one-third of studies reported to date have generally

15   detected either no difference between the groups or a

16   nonspecific increase in the association.

17        Do you see that?

18   A    Yes.

19   Q    Okay.  So again, it's saying here, we're seeing

20   findings that are all over the map, right?

21   A    I'm not sure what you mean by "all over the map," but

22   it shows what they stated.

23   Q    All right.

24   A    It is what it is.

25   Q    Okay.  Now, look at the next paragraph.  It says, "to

1    clarify these findings, a recent metanalysis of 14

2    studies, 11 retrospective, 5 case controlled, examine the

3    association of diabetes incidents among patients treated

4    with atypical antipsychotics compared with conventional or

5    no antipsychotic treatment."

6         Do you see that?

7    A    Yes, I do.

8    Q    Now, go down to the bottom of the page.  Do you see

9    where it says "neither"?  Do you see that?  "Neither

10   Risperidone."  Do you see that?

11   A    Yes.

12   Q    "Versus conventional versus no antipsychotic, nor

13   Quetiapine versus conventional versus no antipsychotic was

14   associated with an increased diabetes risk."

15        Do you see that?

16   A    Yes, I do.

17   Q    You certainly can't conclude from this paper that

18   Seroquel causes diabetes, can you?

19   A    I'm sorry.  I was reading the paragraph.  Could you

20   please repeat that?

21   Q    All right.  You can't conclude from the Newcomer

22   paper, the things that we have looked at, that Seroquel

23   causes diabetes?

24   A    Correct.

25   Q    Do you have your -- do you have your weight chart

```
1   there?

2   A    Yes.

3   Q    Now, you talked about a significant weight gain of

4   this patient that occurred between October of 2002, when

5   Seroquel was first prescribed for him, over into the

6   spring of the next year, correct?

7   A    Correct.

8   Q    What investigation have you done into the possible

9   reasons for that increase in weight, other than thinking

10  about Seroquel as the cause?

11  A    When I looked through the documentation, I reviewed

12  the entire circumstance of the patient.

13  Q    Were there any significant changes that occurred in

14  Mr. Haller's life at about the time he was prescribed

15  Seroquel?

16  A    I can't recall as I'm sitting here now.

17  Q    Have you interviewed Mr. Haller to ask him why he

18  might have lost so much weight between January of 2001 and

19  when he started taking Seroquel in October of 2002?

20  A    No, I have not interviewed Mr. Haller.

21  Q    Would you say that being discharged from prison would

22  be a dramatic change in circumstance that may very well

23  attribute or account for a weight gain?

24  A    That is possible.

25  Q    You didn't consider that, did you?
```

1   A     Yes, I did.

2   Q     You did?

3   A     Yes.

4   Q     Okay.  I thought you said you didn't know anything

5   about his circumstance in the months leading up to the

6   prescription of Seroquel.

7   A     No.  I said I couldn't recall as I'm sitting here.

8   I'm not 100 percent certain as to the dates of

9   incarceration and release.

10  Q     You can't say, as you sit here right now, that the

11  incarceration was in proximity to his beginning Seroquel,

12  then, correct?

13  A     Correct.

14  Q     Now, you would agree, though, that in evaluating

15  someone who is gaining weight, that being in prison and

16  being out of prison is going to reflect a very different

17  circumstance for the patient, correct?

18  A     Yes.

19  Q     In prison you get up and you eat when you're told to

20  eat; when you're out of prison, you have a lot more

21  freedom to ingest food freely, correct, sir?

22  A     That is possible.

23  Q     You've not interviewed or obtained any information

24  from Mr. Haller about why he lost a lot of weight in 2002,

25  have you?

1    A    No.

2    Q    You mentioned, I think earlier -- I'll just give you

3    a chance to correct this -- that you thought Mr. Haller's

4    high weight before Seroquel, I think you said was in the

5    220-pound range; but if I remind you that in January of

6    2001, he actually weighed 230 pounds, would that refresh

7    your recollection?

8    A    Let me just have a look at my notes.  January of

9    which year?

10   Q    2001.

11        That's okay.  I'll show you the record.

12   A    Okay.  Please.

13   Q    I don't want to try to make a memory test of it.

14   A    Yeah.

15   Q    Now, do you have Defendant's Exhibit 15 in front of

16   you?

17   A    Yes, I do.

18   Q    Do you see that as a record from directions for

19   mental health?  Do you see that?

20   A    Yes, I do.

21   Q    And do you see it's a psychiatric evaluation?

22   A    It's the first page of some evaluation, yes.

23   Q    Sure.  And it's dated 10-1 of 2002, correct?

24   A    Correct.

25   Q    And can you tell the Court when Mr. Haller started

1    taking Seroquel?

2    A     Based upon this document?

3    Q     No.  Do you know?

4    A     So we're back to the memory test?  I'll get it for

5    you.

6    Q     He started taking Seroquel in early October 2002,

7    didn't he?

8    A     Yes.

9    Q     All right.  Focus on the identifying data chief

10   complaint section there.

11          THE COURT:  Counsel, before you do that, we need

12   to break for lunch.

13          MR. BROCK:  All right.

14          THE COURT:  We will be in recess until 10 after

15   1:00.

16                    (luncheon recess)

17          THE COURT:  Good afternoon.

18      Go ahead.

19   BY MR. BROCK:

20   Q     Dr. Abramson, I want to go through, if I could,

21   please, a few of Mr. Haller's risk factors at this point

22   to make sure that we're clear on the ones that he had as

23   risk factors for the development of diabetes before he

24   ever took Seroquel.

25      I believe that you mentioned earlier today that

1   before Mr. Haller ever took Seroquel, that he was obese.

2   Correct?

3   A    Yes.

4   Q    And to your understanding, from your review of the

5   literature, long-term obesity is one of the primary

6   driving factors for the development of diabetes, correct,

7   sir?

8   A    Yes.

9   Q    You testified in your deposition that your judgment

10  was that he likely had a waist measurement greater than

11  38 inches, which would also be a risk factor associated

12  with the development of diabetes, correct?

13  A    Yes.

14  Q    When we think about individuals and where their fat

15  is, if it's in the middle part of their body, that puts

16  them at more risk for the development of the disease than

17  does fat in other places of the body, correct?

18  A    That's correct.

19  Q    All right.  You also note in your report, and had

20  testified today, that Mr. Haller has been diagnosed with

21  schizophrenia, bipolar disorder, schizoaffective disorder

22  and other mental health problems, correct?

23  A    Yes.

24  Q    And those carry with them an increased risk for the

25  development of diabetes, correct?

1   A    Yes, they do.

2   Q    If you look at it on a population basis, 15 to

3   20 percent of folks carrying those diseases, whether they

4   take an antipsychotic or not, are likely to go on to

5   develop the disease, correct?  The disease of diabetes.

6   A    Yes.

7   Q    You saw in the records that Mr. Haller had a family

8   history for diabetes, correct?

9   A    Yes.

10  Q    And that's also a significant risk factor for the

11  development of diabetes, correct?

12  A    Correct.

13  Q    If you were to list the top two risk factors for the

14  development of diabetes, would they be long-term obesity

15  and family history?

16  A    Yes.  Genetic predisposition and weight, yes.

17  Q    All right.  And Mr. Haller carried both of those,

18  correct?

19  A    Yes.

20  Q    You also noted in your report that Mr. Haller

21  suffered from high cholesterol and high triglycerides,

22  correct?

23  A    Yes.

24  Q    Is that referred to by physicians as dyslipidemia?

25  A    Yes.

1   Q    And is dyslipidemia also considered a risk factor for

2   the development of diabetes?

3   A    Yes.

4   Q    You noted in your report, or in your testimony

5   today -- I can't remember which -- that Mr. Haller had a

6   blood glucose reading on a fasting basis of 128 in 1998,

7   correct?

8       I don't want to make this a memory test.  Look at

9   Exhibit 9.

10          MR. BROCK:  Your Honor, this is one point, if I

11  could approach the witness, I'll show him.  I think it

12  will be quicker.

13          THE COURT:  Okay.

14  BY MR. BROCK:

15  Q    I apologize.  I highlighted it, but 9-23-98, fasting

16  glucose of 128, correct?

17  A    Yes.

18  Q    And fasting glucose of 128 puts the patient in the

19  diabetic range, correct?

20  A    I believe it's 129 and above, is it not?

21  Q    I believe it's 126, but --

22  A    I'm sorry.

23  Q    Would you accept that a fasting glucose of 128 puts

24  Mr. Haller in the diabetic range?

25  A    Yes.

1   Q    And this is 10 years -- or, excuse me.  This is four

2   years before he ever took Seroquel, correct?

3   A    Correct.

4   Q    And eight years before he was diagnosed -- or, excuse

5   me, six years before he was diagnosed with diabetes,

6   correct?

7   A    Yes.

8   Q    Let me ask the question again so the record is clear.

9        He had a fasting blood glucose in the diabetic range

10  six years before he ever took Seroquel, correct?

11  A    Correct.

12  Q    Excuse me.  I did it wrong again.  Let me ask it

13  again.

14       Six years before the diagnosis in this patient of

15  diabetes, he had a fasting blood glucose in the diabetic

16  range?

17  A    Yes.

18  Q    All right.  I apologize for that.

19       Now, the fact that he has a fasting blood glucose in

20  the diabetic range shows that he was having problems with

21  glucose regulation before he ever took Seroquel, correct?

22  A    Well, it shows that he had that one measurement that

23  was high.

24  Q    Right.  Are you familiar with the perimeters for the

25  diagnosis of prediabetes?

1  A    No.

2  Q    You've never heard of the concept of a patient being

3  prediabetic?

4  A    Yes, I have.  I'm just not familiar with the

5  perimeters, per se.

6  Q    You don't know -- you don't know the ranges for

7  prediabetes?

8  A    No.

9  Q    That would be something that you would have to ask a

10 general practitioner or an endocrinologist about?

11 A    Or I would have to look it up.

12 Q    Sure.  If I represent to you that prediabetes, in the

13 literature, is reflected as being between 100 and 126,

14 would you accept that?

15 A    Yes.

16 Q    Does that sound about right to you, in terms of your

17 knowledge as a physician?

18 A    Or fasting blood sugar, yes.

19 Q    Yes.  All right.  Look down at 3-20 of 2000, if you

20 would.  Did you find Exhibit 9?  I'm sorry.

21 A    Can you just show me what it looks like?  Because

22 mine are not numbered so I don't know what I'm looking

23 for.

24 Q    It's this one (indicating), the glucose chart.

25      On page 3 is the entrance for 3-20 of 2000.  And do

1  you see that that is a fasting blood sugar of 100 --

2          THE COURT:  Are you referring to Exhibit 8?  You

3  said 9.

4          MR. BROCK:  Exhibit 9, Your Honor.  I'm sorry.

5  I marked it as 9.

6          THE COURT:  That's 8 -- well, let's see.

7          MR. TRAMMELL:  8 is the chart.  It's the glucose

8  chart.

9          MR. BROCK:  I didn't have a --

10          THE COURT:  Right.  This is 8?  That's what

11  you're talking about?

12          MR. BROCK:  It is, Your Honor.  I apologize.

13  BY MR. BROCK:

14  Q    That might be why you had trouble finding it.  I

15  apologize.

16      All right.  So the questions I was asking you before

17  about the fasting blood glucose of 9-23-98 are in Exhibit

18  8, correct?

19  A    Yes.

20  Q    All right.  And then, if you look down to the entry

21  of 3-20 of 2000, do you see that there is a fasting blood

22  glucose of 100?

23  A    Yes, I do.

24  Q    All right.  If you look over on page 4 to 12-11 of

25  2001, do you see that there is a fasting glucose of 102?

1   A     Yes.

2   Q     So for this patient, in the years leading up to his

3   ingestion of Seroquel, he had at least one fasting blood

4   glucose in the diabetic range and two in the prediabetic

5   range, correct?

6   A     Correct.

7   Q     Now, you testified earlier that you don't have

8   expertise in the evolution of diabetes in an individual

9   patient.  But I'll ask you this question:  Are you

10  familiar generally with the fact that the literature

11  reports that it takes a long period of time for diabetes

12  to develop?

13  A     Yes.

14  Q     And can you tell the Court what that period of time

15  is in your judgment?

16  A     I do not have an estimate for a particular amount of

17  time.

18  Q     If I represent to you that the literature reflects

19  that it's in the 8- to 12-year period of time, would that

20  sound reasonable to you?

21  A     Yes.

22  Q     Okay.  And in this particular situation, we see a

23  patient who's going through the steps of diabetic --

24  diabetic range readings as well as prediabetic range

25  readings, correct?

1  A     Correct.

2  Q     If you'll look at the blood glucoses, it looks as

3  though he's progressing to diabetes before he ever takes

4  Seroquel, correct?

5  A     He has some elevated blood glucose readings.  He also

6  has normal hemoglobin A1cs during that time as well, so

7  that's a debatable question.

8  Q     All right.  Taking into account what you know about

9  his blood glucoses, his long-term obesity, his family

10  history and the other issues that you described this

11  morning as being risk factors, would you agree that this

12  patient was progressing to diabetes before he ever took

13  Seroquel?

14  A     I would say that he was at risk for diabetes before

15  he took Seroquel.

16  Q     Would you agree that he was progressing to diabetes,

17  that he was evolving to diabetes, given these readings and

18  given the many risk factors that he had?

19  A     I cannot say that with reasonable medical certainty.

20  Q     Now, let's talk about a few more of his risk factors.

21  You also identified a number of medicines that he was

22  taking that were risk factors for the development of the

23  disease, correct, sir?

24  A     Yes.

25  Q     He also had a sedentary lifestyle, and that is a risk

```
 1   factor for the development of the disease, correct?

 2   A    Correct.

 3   Q    He had hypertension going back to at least the

 4   mid-'80s, and that's a risk factor for the development of

 5   diabetes, correct?

 6   A    Correct.

 7   Q    You didn't mention his alcohol use, but he was an

 8   alcoholic.  And alcoholism is a risk factor for developing

 9   diabetes, correct?

10   A    Correct.

11   Q    He'd also been known to abuse cocaine.  And that's a

12   risk factor for the development of diabetes, isn't it?

13   A    That, I'm not certain about.  It may or it may not

14   be.

15   Q    You do agree that he in his lifetime had abused

16   cocaine?

17   A    Yes.

18   Q    And you cannot say that it is not a risk factor for

19   the development of diabetes, correct?

20   A    Right.

21   Q    You just don't know?

22   A    Right.

23   Q    He's also a long-term pack-and-a-half-a-day smoker,

24   isn't he?

25   A    Yes.
```

```
1    Q     And that's a risk factor?

2    A     Yes, it is.

3    Q     Another one that you didn't mention is stress.

4    Stress is a risk factor for the development of diabetes,

5    isn't it?

6    A     Yes.

7    Q     And Mr. Haller has certainly had a lot of stress in

8    his life, hasn't he?

9    A     Yes, he has.

10   Q     He's had suicide attempts, he's had many

11   incarcerations, he's had problems while in jail and other

12   issues that have created stress in his life?

13   A     Correct.

14   Q     And those are risk factors for him also for the

15   development of diabetes?

16   A     Yes, they are.

17   Q     If Mr. Haller came into your office as a psychiatric

18   patient and he was not on any antipsychotic, he was coming

19   to you for the first time, and he had a blood glucose in

20   the diabetic range, you wouldn't be surprised at all that

21   he diabetes, given the many risk factors that he had,

22   correct?

23   A     Correct.

24   Q     You will agree that Mr. Haller was likely to develop

25   diabetes in his lifetime whether or not he took Seroquel,
```

```
 1   correct?
 2   A    That's a hypothetical.  He may or may not have
 3   developed.  There are a lot of people with just his risk
 4   factors who don't develop diabetes.
 5   Q    All right.  Would you agree that he very well may
 6   have developed diabetes even if he had taken Seroquel?
 7   A    Again, he may or may not have developed diabetes.
 8   Q    All right.  Let me ask the question one more time.
 9   Do you agree that he very well may have developed diabetes
10   even if he hadn't taken Seroquel?
11           MR. TRAMMELL:  Objection, Your Honor.  It's the
12   third time.  He's already answered that question.
13           THE COURT:  Overruled.
14           THE WITNESS:  Please repeat the question.
15   BY MR. BROCK:
16   Q    Do you agree that Mr. Haller very well may have
17   developed diabetes even if he hadn't taken Seroquel?
18   A    Yes, he may have.
19   Q    He may very well have developed it, correct?
20   A    I don't understand the semantic difference between
21   may and very well --
22   Q    Let me see JAS58, please.
23        Could you turn to page 227 of your deposition there?
24   Or hopefully it will come up on the screen where can you
25   look at it.
```

1  A    I see it.

2  Q    Do you see where you answer, "I can say that he very

3  well may have developed diabetes even if he didn't take

4  Seroquel?"

5  A    Yes.

6  Q    Was that your testimony when we took your deposition

7  under oath?

8  A    Yes, it was.

9  Q    Is that your testimony today?

10  A    Yes.

11  Q    Now, it's true, is it not, that you can't sit here in

12  this courtroom and give the opinion, to a reasonable

13  degree of medical certainty, that if Mr. Haller hadn't

14  taken Seroquel that he would not have developed diabetes?

15  A    Correct.

16  Q    You can't say that Seroquel alone caused Mr. Haller

17  to develop diabetes, correct?

18  A    Correct.

19  Q    Can you rule out family history and long-term obesity

20  as the cause of Mr. Haller's diabetes?

21  A    As the sole cause of his diabetes, yes.  He lived

22  with them for many years and did not develop the syndrome.

23  Q    All right.  So is it your testimony that you can rule

24  out family history as a cause of Mr. Haller's diabetes?

25  A    As a cause?

1    Q    Right.

2    A    (Inaudible response.)

3    Q    Yes?

4    A    I said no.

5    Q    Okay.  You can't rule out long-term obesity as a

6    cause of his diabetes, correct?

7    A    Correct.

8    Q    Now, I think I asked you this earlier, but coming

9    back to it, you agree that there are a lot of people that

10   have taken Seroquel who don't develop diabetes, correct?

11   A    Yes.

12   Q    And you can't state the percentage of patients over

13   all who develop diabetes while taking Seroquel, can you?

14   A    No, I cannot.

15   Q    Statistically, you would agree that it would be a

16   valid statement to say that there are people who take

17   Seroquel who get diabetes and Seroquel had nothing to do

18   with the development of diabetes in the person?

19   A    Yes.  As a statistical statement, yes.

20   Q    All right.  Now, you can't say, can you, that absent

21   Seroquel, that this patient would not have developed

22   diabetes, correct?

23   A    No, I cannot.

24   Q    You're not giving an independent medical diagnosis of

25   for diabetes for Mr. Haller, are you?

1   A     No, I'm not.

2   Q     You're not giving any opinions as to when Mr. Haller

3   first developed diabetes, are you?

4   A     No.

5   Q     You can't say that it was only the Seroquel that

6   pushed him over the edge, can you?

7   A     No.

8   Q     And for Mr. Haller, he could have developed diabetes

9   without taking Seroquel and he could have developed it at

10  the time that he did, correct?

11  A     That is a possibility.

12  Q     It's a possibility that you cannot rule out, correct?

13  A     Correct.

14  Q     So to come back to my question, you can't rule out --

15  excuse me.

16        Coming back to my question, you can't rule out that

17  he would have developed diabetes even if he had never

18  taken Seroquel?

19  A     I'm sorry.  Can you repeat that?  There was a lot of

20  negatives in there.

21  Q     Sure.  You can't rule out that he wouldn't develop

22  diabetes even if -- even if he had never taken Seroquel?

23  Let me rephrase it.

24        You can't rule out the possibility that he would

25  develop diabetes even if he never took Seroquel?

1   A     That's correct.  That possibility exists.

2   Q     Now, you don't know, do you, sir, the mechanism

3   through which Seroquel may contribute to the development

4   of diabetes, do you?

5   A     Well, there are a variety of mechanisms that have

6   been proposed.

7   Q     Right.  You can't testify to a reasonable degree of

8   medical certainty as to any mechanism that causes -- that

9   would point to Seroquel causing diabetes, true?

10  A     Well, there are mechanisms in the literature that

11  have been proposed as ways that Seroquel may contribute to

12  diabetes.  The -- the medical state of the art at this

13  point is still trying to figure that question out

14  definitively.

15  Q     You have testified under oath, have you not, that the

16  mechanism is unknown?

17  A     Correct.  I'm saying there are mechanisms that have

18  been proposed.

19  Q     Now, one of the things that you have said, in terms

20  of Mr. Haller, is that you think that his weight gain was

21  a factor in the development of diabetes, true?

22  A     True.

23  Q     Do you agree that in January of 2001 that his weight

24  was 230 pounds?

25        Let me give you something that might help you.  You

1    have Exhibit 14?

2    A    Yes.

3    Q    Turn over to -- it's a composite exhibit of several

4    different weights that I just want to ask you about.  If

5    you will turn over to the fifth page of that document,

6    it's a Pinellas County Sheriff's Office Medical Division

7    record.

8    A    It's the sixth page.

9    Q    Thank you.  I apologize.

10        Do you see on the bottom left-hand corner, there's a

11   place for height and weight?  It says five foot, six

12   inches, 230 pounds?

13   A    Yes.  It's under the remarks section.

14   Q    Correct.

15        So can we agree that on January 15th, 2001, that

16   Mr. Haller weighed 230 pounds?

17   A    Yes.

18   Q    If you return your attention to Defendant's Exhibit

19   15 --

20   A    I'm sorry.  Which one is that again?

21   Q    That's the directions for mental health.  It's the

22   record that shows when he was in prison?

23   A    Okay.

24   Q    And can we agree that this record states that

25   Mr. Haller was in prison from 1-13 of '01 to 9-24 of '02?

1    A    Yes.

2    Q    So his release from prison was a week or so before he

3    started taking Seroquel, correct?

4    A    Yes.

5    Q    And what was his weight at the time of his release

6    from prison?

7         Can you tell what it is from your chart?

8    A    Oh, from the chart?  There's so many things up here

9    now --

10   Q    I can't read this thing.

11   A    Approximately 180 pounds.

12   Q    So while he's in prison, from January of 2001 until

13   his discharge in September of 2002, he has lost from 230

14   to about 180 pounds, correct?

15   A    Yes.

16   Q    And in terms of understanding Mr. Haller's weight

17   gain during the period of time that he was taking

18   Seroquel, beginning in October of 2002, it is important to

19   consider that his circumstance had changed in terms of his

20   dietary habits, correct?

21   A    Correct.

22   Q    And you did no investigation into what his diet was

23   while he was in prison versus what his diet was once he

24   was released, correct?

25   A    No.

1  Q    So you have not taken into account, in your opinion

2  about weight gain, the very important change in his

3  circumstances, have you?

4  A    I don't think I have taken into account how his diet

5  might have changed.

6  Q    All right.  And weight gain is a multifactorial

7  process, is it not?

8  A    Correct.

9  Q    It relates to how much food you eat; that's a

10  component of it, correct?

11  A    Yes.

12  Q    In your opinion about his weight gain, you have not

13  taken into account the fact that his diet likely changed

14  when he left prison and went out to live on his own,

15  correct?

16  A    Well, it may or may not have change.

17  Q    Right.  You haven't taken that important change into

18  account, though.  That's the point, isn't it?

19  A    Well, the point is you're making an assumption.

20  Q    Right.  My -- the point I'm making is that you

21  haven't investigated or ruled out a significant change in

22  diet as the reason for his weight gain.  True?

23  A    Well, I think any time a person gains weight, they

24  eat differently.

25  Q    Okay.  So you would assume from that that he's eating

1  differently after he's out of prison than he was eating

2  before, correct?

3  A     Yes.

4  Q     His access to meals is different in prison than it is

5  on the outside, correct?

6  A     It may or may not be.  I'm not sure.

7  Q     The point is, you don't know the answer to that, do

8  you?

9  A     Correct.

10 Q     And you do agree that it's very possible that the

11 reason for his weight gain between October of 2002 and the

12 diagnosis of diabetes over in 2004 is related to a change

13 in his circumstance in terms of where he was living?

14 A     Well, I think if you -- if you look at the period

15 before this, he was in and out of incarcerations and had

16 fluctuations in weight, but his weight didn't remain at a

17 higher level.

18 Q     Please focus on my question.

19 A     Well, I'm trying to respond to it as best I can.

20 Q     You have not taken into account, in the opinion that

21 you have stated about weight gain, the substantial change

22 in circumstance that occurred for this patient when he was

23 released from prison; that's correct, isn't it?

24 A     Please repeat.

25 Q     You have not taken into account the substantial

1  change in circumstance that occurred for this patient when

2  he was released from prison in formulating your opinions

3  about weight gain, correct?

4  A    No.  I disagree.

5  Q    And didn't you testify earlier that you didn't even

6  know when he got out of jail?

7  A    Correct.

8  Q    All right.  Now, there have been times in his life

9  when he has had substantial changes in weight before he

10 ever took Seroquel, correct?

11 A    Correct.

12 Q    If you look at that exhibit that I just handed to

13 you, do you see on the first page that there is the date

14 of 10-88, it looks like, and the weight is 144?  Excuse

15 me.  It's 141, at the top left-hand corner.

16 A    Yes.

17 Q    And do you see that by 7-14 of '89, that he is gained

18 up to 164 pounds?

19 A    Is that on the next page?

20 Q    It's on the -- it's at the bottom of the page that

21 I'm on.  7-14-89, 164.

22 A    Yes.

23 Q    Okay.  So that's a significant weight gain that has

24 occurred in his life when he's not on Seroquel, correct?

25 A    Correct.

1   Q     If you look at the next page, do you see that on 7-27

2   of '89 that he weighs 164?

3   A     Yes.

4   Q     And that on 3-12 of '90, he weighs 181, correct?

5   A     I'm just trying to find it.

6   Q     3-12 of '90.  It's on right-hand column.  He's 181.

7   A     I don't see a 3-12-90.  I see a 3-2-90.

8   Q     It is a 3-2.  I apologize.

9         3-2 of '90, he's 181, correct?

10  A     That's correct.

11  Q     And that's a substantial weight gain over a short

12  period of time?

13  A     Yes.

14  Q     And he's not on Seroquel, is he?

15  A     No.

16  Q     And do you see the next page, which is the period of

17  time 2-6 to 2-13 of 1992?  It's a Florida Department of

18  Corrections graphic chart.

19  A     Yes.

20  Q     And do you see that by that time his weight is down

21  to 156?

22  A     Yes.

23  Q     And then, if you turn the page and you look at the

24  period of time April 21, 1993, do you see that his weight

25  during that period of time has gone from 156 to 196?

1    A    I'm sorry.  Where is that on this?

2    Q    If you look under -- right under "occupation" on the

3    April 21, 1993 record.

4    A    Yes.  I see occupation.

5    Q    It says 156 to 196.  Do you see that?

6    A    Yes.

7    Q    Right.  So from February of '92 to April of '93, he

8    gained from 156 to 196 pounds.  Do you see that?

9    A    Yes.

10   Q    And he wasn't taking Seroquel then, was he?

11   A    Correct.

12   Q    So this patient demonstrated increases and decreases

13   in weight that were substantial before he ever took

14   Seroquel, correct?

15   A    That's correct.

16   Q    Now, his weight out of prison, at the time of the

17   diagnosis of diabetes, was what?  I believe you testified

18   earlier it was 225.  Does that help you?

19   A    Yeah.  But I'm not sure now, in reading it, if that

20   was the weight.  I have to check.

21   Q    Okay.

22   A    No, that looks correct.

23   Q    All right.  So his weight out of prison in 2004 at

24   the time of the diagnosis of diabetes is 225 pounds,

25   correct?

```
 1   A    Yes.

 2   Q    His weight in January of 2001 when he entered prison

 3   was 230, correct?  That's the Pinellas County Sheriff's

 4   record of 1-15-01.

 5   A    Correct.

 6   Q    So at the time of his diagnosis of diabetes in 2004,

 7   he weighed less than he did when he entered prison in

 8   January of 2001, correct?

 9   A    Yes.

10   Q    Have you undertaken to look at the literature to see

11   what it says about whether or not increases in weight over

12   the short term for persons who are already obese increase

13   their risk of the development of diabetes?

14   A    Not specifically, no.

15   Q    Are you aware, generally, that the literature

16   reflects that for patients like Mr. Haller, if they are

17   already obese, short-term weight gain does not increase

18   their risk of diabetes?

19   A    No.

20   Q    You're not aware of that literature?

21   A    Correct.

22   Q    Do you see that this is an article -- excuse me.

23        Do you see that this is a peer-reviewed article in

24   diabetes care?

25   A    Yes.
```

1  Q    Is diabetes care a well-regarded peer-reviewed

2  journal?

3  A    Yes.

4  Q    Have you seen this article before today?

5  A    No.

6  Q    Let me just ask you a couple of questions about it.

7       If you could pull this up on the screen, the pullout

8  we have on this.  It's doc 110001.

9            THE COURT:  Do you have Exhibit 5 in front of

10  you?  That's not very readable.

11           THE WITNESS:  I have it.

12  BY MR. BROCK:

13  Q    All right.  Do you see under the objective statement

14  where it says, "although there is consensus that excess

15  adiposity is strongly associated with type 2 diabetes, its

16  relationship with weight change is less clear.  The study

17  investigates the relative impact of BMI at baseline and

18  short-term two- or three-year weight changes on the

19  incidence of diabetes."

20       Do you see that?

21  A    Yes.

22  Q    So this is taking into account, in part, patients

23  like Mr. Haller who have long-term obesity, correct?

24  A    Well, it appears this was a study of women, so I

25  don't know if one could generalize it to Mr. Haller.

1    Q    Okay.  Is what I said correct, that it's looking at

2    patients who are already obese and the effect of two- to

3    three-year weight changes?

4    A    Yes.

5    Q    And under the results section, do you see the pullout

6    that I have there, where it says, "there was no

7    association between shorter-term weight gain or weight

8    loss on first-reported diagnosis of diabetes?"

9         Do you see that?

10   A    Well, I can't read it from here, so I'm trying to

11   look at it here.

12        Yes, I see that.

13   Q    And that's referring to patients who are in the very

14   obese group, correct?

15   A    I don't know.  I haven't reviewed the entire article.

16   Q    Well, in terms of formulating your opinions, do you

17   first of all agree, after looking at this, that there is a

18   reliable peer-reviewed literature that indicates that for

19   patients who are already obese that short-term incremental

20   weight gain over a two- to three-year period of time is

21   not increasing the risk of the development of diabetes?

22   A    I can't agree or disagree because I have not had the

23   time to look over the entire article.  I'd have to review

24   it.  You're just reading from the abstract.

25   Q    Would you agree with me, as you sit here today, that

1  you didn't investigate this issue with regard to

2  Mr. Haller's case, in terms of doing a peer-reviewed

3  literature or going out to see what was available in the

4  peer-reviewed literature on this issue?

5  A    Regarding which particular issue?

6  Q    The issue of whether incremental weight gain for

7  persons who are already obese increases the risk of

8  diabetes.

9  A    I would agree with that.

10         MR. BROCK:  Just one second, Your Honor.

11  BY MR. BROCK:

12  Q    Given the fact that Mr. Haller's weight has cycled

13  before he ingested Seroquel and while he was taking

14  Seroquel, and given the fact that we know that he had a

15  substantial change in his circumstance in being released

16  from prison the week before he started taking Seroquel,

17  isn't it true, sir, it's just a guess for you to say that

18  Seroquel caused his weight gain?

19  A    No, that's not true.

20         MR. BROCK:  That's all.

21         MR. TRAMMELL:  Brief redirect.

22         MR. BROCK:  I do have one other question.

23  BY MR. BROCK:

24  Q    Can you say, to a reasonable degree of medical

25  certainty, what number of pounds Seroquel caused

1    Mr. Haller to gain?

2    A    No.

3    Q    Can you say what percentage of weight it caused him

4    to gain?

5    A    No.

6    Q    Can you say whether it was one pound or forty pounds?

7    A    No, sir.

8              MR. BROCK:  That's all.

9                        REDIRECT EXAMINATION

10   BY MR. TRAMMELL:

11   Q    Dr. Abramson, if you could refer again to Plaintiff's

12   Exhibit 9.

13   A    Please show me what it is.

14   Q    Yeah.  It's the transient hyperglycemic events.

15   A    Go ahead.

16   Q    Is there any evidence from the September 24th, 1998

17   record that 128 is a fasting measurement?

18   A    No.

19   Q    Does it say that it is anywhere on the page?

20   A    No, it does not.

21   Q    Is there any evidence from the medical records that

22   you reviewed before Mr. Haller took Seroquel that he met

23   the diagnostic criteria for diabetes?

24   A    No.

25   Q    In fact, Mr. Haller had several glucose readings,

1   even at his highest weight, before taking Seroquel, that

2   were normal; is that right?

3   A     That's correct.

4   Q     You were asked questions about certain materials you

5   had reviewed, things that you had reviewed and things that

6   you hadn't.  You were asked whether you reviewed the IND

7   or the NDA and the data contained therein or other

8   Seroquel clinical trials.  You don't, as far as you know,

9   have access to internal AstraZeneca data, do you?

10  A     No.  I requested that AstraZeneca send me

11  information, and you've seen what they sent me.

12  Q     That's right.  You didn't review that information,

13  but you requested directly from AstraZeneca to send you

14  information on the issue, and they sent you what's marked

15  as Exhibit 6, right?

16  A     I'm not sure what it's marked, but yes.

17  Q     And what does this information say on the issue of

18  whether Seroquel is associated with elevated blood glucose

19  levels, or blood glucose levels in the diabetic range, as

20  counsel for AstraZeneca characterizes them?

21  A     It shows a higher rate in the Seroquel-treated

22  patients than in the placebo-treated patients.

23  Q     It says that more than double the number of Seroquel

24  patients had a fasting blood glucose in the diabetic range

25  than placebo patients, right?

1    A     Correct.

2              MR. TRAMMELL:  Permission to approach, Your

3    Honor?

4              THE COURT:  Yes.

5              MR. TRAMMELL:  This is going to be Plaintiff's

6    Exhibit 17 -- Abramson 17.  Pardon me.

7    BY MR. TRAMMELL:

8    Q     Dr. Abramson, can you tell me what this is?

9    A     This is pages taken out of the PDR.  I'm not sure

10   what year.

11   Q     I'll submit to you it's the 2002 Seroquel PDR entry.

12         If you will turn over to the second to last page

13   marked AstraZeneca, slash, 687 in the upper right-hand

14   corner, if you look at the middle column, near the top,

15   it's got an entry that says "weight gain."

16         Do you see that?

17   A     Yes.

18   Q     Can you read that, please?

19   A     "The proportions of patients meeting a weight gain

20   criterion of greater than or equal to 7 percent of body

21   weight were compared in a pool of four 3-to-6 weeks'

22   placebo-controlled clinical trials revealing a

23   statistically significant greater increase of weight gain

24   for Seroquel, 23 percent, compared to placebo, 6 percent."

25   Q     This is from the Seroquel label, right?

1   A    That's correct.

2   Q    Is there anything controversial, in your opinion, as

3   to whether Seroquel is associated with an increase in

4   weight?

5   A    No.  I think it's generally accepted within the

6   medical community that Seroquel is associated with

7   increased weight.

8   Q    Again, you have characterized weight gain and obesity

9   as one factor in the potential development of diabetes,

10  right?

11  A    That's correct.

12  Q    Mr. Haller had been obese throughout the course of

13  his life at various times, right?

14  A    That's correct.

15  Q    And at no time, despite that obesity, had he

16  developed diabetes; is that right?

17  A    That's correct.

18  Q    At the inception of Seroquel treatment, he began to

19  gain weight and subsequently developed diabetes; is that

20  your opinion?

21  A    Yes.

22  Q    And again, what does the fact that Mr. Haller had

23  been obese in the past and then gained weight on

24  Seroquel -- how does that inform your opinion as to

25  whether the obesity alone was the cause of Mr. Haller's

1   diabetes as opposed to the Seroquel-induced weight gain?

2          MR. BROCK:  I'm going do object.  It's been

3   asked and answered, same question, several times.

4          THE COURT:  Overruled.

5          THE WITNESS:  It mitigates against that as being

6   the sole factor.

7   BY MR. TRAMMELL:

8   Q    If you look back at Abramson 17, could you please

9   find for me in the warning section the discussion of the

10  risk of diabetes for Seroquel treatment?

11  A    Please show me which one that is again.

12  Q    Abramson 17 was the '02 label.

13  A    That's the one you just provided?

14        In the warning section, only neuroleptic malignant

15  syndrome and tardive dyskinesia.

16  Q    There's no warning of diabetes, is there?

17  A    No.

18  Q    Did you prescribe Seroquel to patients in 2002?

19  A    Yes.

20  Q    Do you recall whether you were ever told in 2002 by

21  AstraZeneca that Seroquel's associated with diabetes?

22  A    I do not recall ever being told that.

23  Q    Is there any way in examining the PDR entry from

24  2002, which was the year in which Mr. Haller was first

25  prescribed Seroquel, to derive an understanding that

1    Seroquel might be associated with diabetes?

2              MR. BROCK:  I'll object to this as beyond the

3    scope of the proceeding today.  They're now asking him

4    questions -- he's now asking questions about what the

5    label said at earlier points in time and how physicians

6    might perceive that.  That's a whole 'nother issue for

7    another day.  And I object to going into this at this

8    point.

9              THE COURT:  Overruled.

10             THE WITNESS:  Could you please repeat the

11   question?

12   BY MR. TRAMMELL:

13   Q    Sure.

14        Is there any way for a -- was there any way for you

15   in 2002 or for a prescriber of Seroquel in 2002, relying

16   on this label, to have arrived at an inference that

17   Seroquel was associated with diabetes?

18   A    No.  It would have taken a big jump to go from the

19   weight gain to the diabetes.

20   Q    In your opinion, is it possible for someone relying

21   only on this label to have obtained proper informed

22   consent for a patient on the issue of Seroquel and its

23   risks associated with diabetes?

24             MR. BROCK:  That goes beyond the scope of the

25   proceeding.  It's not a question that could be asked in

1    the abstract.  And we object to it on that basis.

2              THE COURT:  Overruled.

3              THE WITNESS:  Relying just on this, no.

4    BY MR. TRAMMELL:

5    Q    The questions about what qualifications you have

6    versus what your an expert in.  Is there a distinction in

7    your mind between being qualified to talk about an issue

8    as opposed to being an expert on an issue?

9    A    Well, I think that as a medical doctor, I have

10   familiarity and qualifications to deal with certain things

11   as they impact my practice.  And that would include

12   endocrine disorders in psychiatric patients.  However,

13   there clearly is a spectrum of expertise, and a specialty

14   endocrinologist would have more knowledge about the

15   intricacies of diabetes and diabetes management than I

16   would.

17   Q    In fact, you testified that when you have patients

18   who require the care -- require treatment for their

19   diabetes, you refer them to an endocrinologist or a

20   primary care doctor that devotes their practice to that;

21   is that right?

22   A    Correct.

23   Q    And how is it you know that they need that referral?

24   A    Because I know what to look for.

25   Q    Right.  You know what the diagnostic criteria are for

1    diabetes?

2    A    Correct.

3    Q    Do you have to be an endocrinologist to be able to

4    analyze blood glucose readings or understand that a

5    patient meets the diagnostic criteria for diabetes?

6    A    No.

7    Q    In the course of your practice, in the course of

8    treating patients, you render differential diagnosis --

9    diagnoses regularly; is that correct?

10   A    Yes.

11   Q    Does the fact that you have never designed a clinical

12   trial inhibit your ability to render differential

13   diagnoses in your practice?

14   A    No.

15   Q    If it were a requirement that you had designed a

16   clinical trial or carried one out or published in the

17   literature to be able to render an adequate differential

18   diagnosis, would you be able to adequately treat patients?

19   A    No.

20   Q    And none of those is a requirement, as far as you

21   know; is that right?

22   A    Correct.

23   Q    On the issue of Mr. Haller's weight loss while in the

24   Pinellas County Prison, do you have any evidence or have

25   you seen any evidence that his diet was different inside

1    of prison as opposed to outside of prison?

2    A    No, I have not.

3    Q    Can you say that significant variances in his diet

4    inside prison versus when he was released was the sole

5    cause of his weight gain upon release?

6    A    No.

7                MR. TRAMMELL:  That's all I have, Your Honor.

8                MR. BROCK:  One quick follow-up.

9                         RECROSS EXAMINATION

10   BY MR. BROCK:

11   Q    Have you looked at the Volusia County Department of

12   Corrections medical records to see what evidence there

13   might be of his adherence to diet while in jail?

14   A    I looked at those records a long time ago.  I'd be

15   happy to review it.

16   Q    Let me ask you if you have seen Defendant's

17   Exhibit -- what number is this? -- 3.

18        I'll furnish this one to the Court in just a second.

19        Do you see here on 6-8 of '02 that the inmate was

20   brought to the clinic claiming, since he's been moved to

21   the unit, that he will stop eating?

22   A    Yes, I see that.

23   Q    You didn't know about that, did you?

24   A    Apparently, no, not as I sat here.

25                MR. BROCK:  That's all.  I'm finished, Your

1    Honor.

2              THE COURT:  Okay.  You may be excused.

3        Is there anything you-all want to take up now or -- I

4    understand you don't want to argue the motion at this

5    time.

6              MR. TRAMMELL:  Right.  We have witnesses

7    tomorrow, Your Honor.  I think what we discussed this

8    morning, argue the motion on Friday is what we prefer.

9              THE COURT:  Okay.  All right.

10             MR. LAMINACK:  Your Honor, may I have a quick

11   question -- a clarification point?  I took some criticism

12   yesterday over the way we were introducing -- or trying to

13   introduce some of our health records and the fact that the

14   exhibits were voluminous, and based on your instruction,

15   we were repairing that.  I just want to make sure I

16   understand what the rules are, because in going through

17   the Defendant's exhibits, I find exhibits 2500 pages long,

18   an exhibit called -- their Exhibit 128 called study 15CSR

19   that's 15,000 pages long.

20       With respect to the medical records, I was criticized

21   for, one of the records I was criticized for were our

22   records from Citrus Health Network which were 216 pages.

23   The Defendant's Exhibit 849 is entitled chart Citrus

24   Health Care Network, 216 pages long.  So I just want to

25   make sure the rules apply equally.

1        THE COURT:  Of course the rules apply equally.

2   The question is whether the documents all would have the

3   same objections to them.  Otherwise, if there's one

4   objection to one page, it goes to the whole document.  If

5   you want to leave it as it is, and you just run the risk

6   that there's one page that's objectionable, they'll keep

7   the whole exhibit out.

8        MR. LAMINACK:  Thank you, Your Honor.

9        THE COURT:  All right.  Is there anything else?

10   All right.  I'll see you tomorrow at 9:30.

11                    (End at 2:02 p.m. )

12               C E R T I F I C A T E

13        I certify that the foregoing is a correct

14   transcript from the record of proceedings in the

15   above-entitled matter.

16

17   s\Sandra K. Tremel

18

19

20

21

22

23

24

25