# EXHIBIT 2

1

# UNITED STATES DISTRICT COURT

# MIDDLE DISTRICT OF FLORIDA

# ORLANDO DIVISION

-------------------------------------------x

**IN RE: Seroquel Products Liability Litigation**

**MDL DOCKET NO. 1769**

**This Document Relates to:**

**Haller v. AstraZeneca LP, et al.
[David Haller 6:07-cv-15733]**

-------------------------------------------x

## February 11, 2008

Oral deposition of DAVID D. HALLER,

taken pursuant to Fed.R.Civ.P. 30, held

at the Sheraton Suites, Orlando Airport,

7550 Augusta National Drive, Orlando,

Florida 32822, beginning at 9:56 a.m., on

the above date, before Denise D. Bach, a

Federally-Approved Certified Court

Reporter, License No. 30X10009330.

**ESQUIRE DEPOSITION SERVICES**
Four Penn Center
1600 John F. Kennedy Boulevard
Suite 1210
Philadelphia, Pennsylvania 19103
(215) 988-9191

**Page 2**

1  A P P E A R A N C E S :
2
3  BAILEY PERRIN BAILEY, LLP
   BY: THAO HO, ESQUIRE
4  JOHN HAMPTON, ESQUIRE
   440 Louisiana Street
5  The Lyric Centre
   Suite 2100
6  Houston, Texas 77002
   (713) 425-7100
7  www.bpblaw.com
   Representing the Plaintiff
8
9
   FAEGRE & BENSON, LLP
10 BY: STEVEN J. ELLISON, ESQUIRE
   2200 Wells Fargo Center
11 90 South Seventh Street
   Minneapolis, Minnesota 55402-3901
12 (612) 766-7000
   sellison@faegre.com
13 Representing the Defendant
14
15
16
17
18
19
20
21
22
23
24

**Page 4**

1           DEPOSITION SUPPORT INDEX
2
3   DIRECTION TO WITNESS NOT TO ANSWER
4   Page  Line     Page  Line     Page  Line
5   (None)
6
7
8   REQUEST FOR PRODUCTION OF DOCUMENTS
9   Page  Line     Page  Line     Page  Line
10  52    21
11
12
13          STIPULATIONS
14  Page  Line     Page  Line     Page  Line
15  (Witness to Read & Sign)
16
17
18          QUESTIONS MARKED
19  Page  Line     Page  Line     Page  Line
20  (None)
21
22
23
24

**Page 3**

1         I N D E X
2  WITNESS                    PAGE
   DAVID D. HALLER
3  By Mr. Ellison        6
4
5      E X H I B I T S
6  MARKED      DESCRIPTION      PAGE
7  D. Haller-1  Plaintiff Fact    39
              Sheet
8  D. Haller-2  Name Change       304
              Petition for
9             David Haller
10 D. Haller-3  Psychiatric       337
              Progress Notes
11            for David Haller,
              6/1/2006
12
13 D. Haller-4  Psychiatric       340
              Progress Notes
14            for David Haller,
              10/6/2006
15 D. Haller-5  Psychiatric       343
              Progress Notes
16            for David Haller,
              1/12/2007
17
18 D. Haller-6  Pinellas County   354
              Sheriff's Office
19            Medical Division
              Receiving Screening
20            Document
21 D. Haller-7  LabCorp Chemistry  356
              and Hematology
22            Studies Document,
              9/24/98
23 D. Haller-8  Forensic Service   364
              Psychology
24            Assessment for

**Page 5**

1              - - -
2          DAVID D. HALLER, having been
3      first duly sworn, was examined and
4      testified as follows:
5              - - -
6          EXAMINATION
7              - - -
8  BY MR. ELLISON:
9      Q.   Good morning, sir.  Will you
10 please state your full name for the
11 record?
12     A.   David Dwayne Haller.
13     Q.   And that's spelled
14 H-A-L-L-E-R?
15     A.   Correct.
16 REDACTED
17
18
19     Q.   That's a mobile home?
20     A.   Yes.
21     Q.   And you understand you're
22 here to give a deposition today?
23     A.   I do.
24     Q.   You filed a lawsuit against

6

1   my client, AstraZeneca?
2       A.   Yes.
3       Q.   Can you explain to me why?
4       A.   Well, I was kind of really
5   amazed to the fact that I'm a diabetic
6   and I was concerned a lot about my health
7   and so on and so forth.  I didn't expect
8   to get diabetes, didn't want it.  Had a
9   lot of complications, weight gain,
10   gastroparesis, acid reflux.
11       Q.   No doctor has told you that
12   Seroquel caused your diabetes, correct?
13       A.   No.
14       Q.   That is correct?
15       A.   But --
16       Q.   Excuse me, that is correct?
17       A.   Yeah.
18       Q.   And no doctor has told you
19   that Seroquel caused your gastroparesis,
20   correct?
21       A.   Gastroparesis is diabetic.
22       Q.   My question is different.
23   Do you understand that, sir?
24       A.   Yes, I understand that.

7

1       Q.   My question is not for your
2   medical opinion, my question to you is,
3   no doctor has told you that Seroquel
4   caused your gastroparesis, correct?
5       A.   Correct.
6       Q.   And what was the other issue
7   that you claim?
8       A.   I have gastroparesis
9   diabetic.
10       Q.   You've said that.  You've
11   put on weight since you've had diabetes?
12       A.   Yes.
13       Q.   No doctor has told you that
14   Seroquel caused you to put on weight?
15       A.   No.
16       Q.   Correct?  That is correct?
17       A.   Correct.
18       Q.   Yet, you believe that
19   Seroquel caused these things, correct?
20       A.   Yes.
21       Q.   Why?
22       A.   Because all through my life
23   of growing up, I never had any problem
24   with diabetes and I had no family

8

1   history, so I don't know where the
2   diabetes could come from.
3       Q.   But you had gastroparesis
4   before --
5       A.   No.
6       Q.   -- you ever used Seroquel,
7   correct?
8       A.   No.
9       Q.   And if the medical records
10   reflect to the contrary, would you
11   dispute those?
12       A.   Yes.
13       Q.   And you were obese before
14   you ever took Seroquel, is that correct?
15       A.   No.
16       Q.   And if the medical records
17   show that you, in fact, were, would you
18   dispute those medical records?
19       A.   Yes.
20       Q.   What would your basis be for
21   disputing your medical records?
22       A.   I always -- I was always in
23   good health and then gained a lot of
24   weight.  In the last past years, I've

9

1   noticed I've been putting on more weight
2   than I can really carry with me.
3       Q.   You have high cholesterol,
4   correct?
5       A.   Yes.
6       Q.   You have high blood
7   pressure, correct?
8       A.   Yes.
9       Q.   You've had these problems
10   for decades, correct?
11       A.   No.
12       Q.   You've been diagnosed with a
13   number of mental illnesses, correct?
14       A.   Only one.
15       Q.   And what is that?
16       A.   Bipolar.
17       Q.   Which type?
18       A.   Type II.
19       Q.   And if the medical records
20   reflect other diagnoses, you would
21   dispute those?
22       A.   Yes.
23       Q.   Have you looked at any of
24   your medical records?

(Pages 6 to 9)

**10**

1      A.   No.
2      Q.   Is it your view that your
3  physicians are liars?
4      A.   A lot of them are written
5  that I don't know about.
6      Q.   And if things were written
7  and you didn't know about them, what
8  would your basis be for disputing them?
9      A.   Well, because in 1987, I was
10  diagnosed bipolar and they were treating
11  me with bipolar medications called
12  lithium and Depakote.
13      Q.   My question was different.
14  Did you understand that?  My question
15  was, if your physicians wrote things in
16  your medical records and you don't know
17  they're there, what would your basis be
18  for disputing them?
19      A.   I wouldn't dispute it.
20      Q.   Okay.  So if your
21  physicians' records show that you were
22  obese long before you ever used Seroquel,
23  you wouldn't have a basis for disputing
24  that, correct?

**11**

1      A.   No.
2      Q.   That is correct?
3      A.   That's correct.
4      Q.   And if your medical records,
5  in fact, reflect that you were diabetic
6  long before you ever used Seroquel, you
7  wouldn't have a basis for disputing that
8  either, would you?
9          MS. HO:  Objection to form.
10          THE WITNESS:  No.
11  BY MR. ELLISON:
12      Q.   That is correct?  Yes?
13      A.   Yes.
14      Q.   And if your medical records
15  reflect that you had gastroparesis long
16  before you ever used Seroquel, you
17  wouldn't have a basis for disputing that
18  either, would you?
19      A.   No.
20      Q.   And if your medical records
21  show that, notwithstanding your weight,
22  your diabetes is well controlled and your
23  blood sugars are in regular, normal
24  ranges and you, in fact, have no

**12**

1  complications from diabetes, you would
2  have no basis for disputing that either,
3  would you?
4      A.   No.
5      Q.   So you don't think your
6  physicians are liars, correct?
7      A.   No.
8      Q.   And you have no basis for
9  that assertion, correct?
10      A.   No.
11      Q.   That is correct?
12      A.   Correct.
13      Q.   How much do you weigh today,
14  sir?
15      A.   The last time I weighed
16  myself -- I don't know right now, I
17  haven't weighed in so long, but I weighed
18  239 pounds.
19      Q.   Do you think your weight is
20  approximately 239 pounds?
21      A.   My doctor I see every
22  90 days weighs me, so 239 was when I was
23  weighed.
24      Q.   And how long ago was that?

**13**

1      A.   About a month or two ago.
2      Q.   And do you think you're
3  about the same amount today?
4      A.   Give or take a little, but I
5  don't know.
6      Q.   You're not sure?
7      A.   No.
8      Q.   Do you think you've put on
9  weight?
10      A.   I feel like I have.
11      Q.   Why?
12      A.   Well, my breathing, and so
13  on and so forth, is erratic at times.
14      Q.   You've had heart problems,
15  right?
16      A.   Heart murmur when I was a
17  child.
18      Q.   I'm sorry?
19      A.   I had a heart murmur when I
20  was a child.
21      Q.   And you've had heart
22  problems since then as well?
23      A.   No.
24      Q.   Is that correct?  You've

**14**

1  been in for testing for your heart, isn't
2  that correct?
3      A.  Yes.
4      Q.  And that's because you had
5  pain in your chest, isn't that right?
6      A.  Yes.
7      Q.  And Seroquel -- you don't
8  contend that Seroquel is responsible for
9  that, correct?
10      A.  Correct.
11      Q.  The only thing you claim
12  Seroquel did to you was caused your
13  diabetes, right?
14      A.  Right.
15      MS. HO:  Objection, form.
16  BY MR. ELLISON:
17      Q.  Is there anything else you
18  claim Seroquel did to you?
19      A.  No.
20      Q.  Have you ever given a
21  deposition before?
22      A.  No.
23      Q.  I'm sure your lawyer
24  explained to you the process beforehand,

**15**

1  but let me just run over just a couple of
2  ground rules.
3      You understand that you have
4  sworn to tell the truth?  Yes?
5      A.  Yes.
6      Q.  And you will tell the truth
7  today?
8      A.  Yes.
9      Q.  I guess the only other thing
10  I'm going to tell you is, it's important
11  for you to answer the question that I'm
12  asking you.  If you have -- if you don't
13  understand the question, let me know and
14  I'll rephrase it.  Okay?
15      A.  Okay.
16      Q.  Do you understand that?
17      A.  Yes.
18      Q.  And you will answer the
19  questions I ask you today?
20      A.  Yes.
21      Q.  I will also say that if, for
22  whatever reason, you need a break during
23  our deposition today, just let me know,
24  and so long as there is not a question

**16**

1  pending, we can take a break right then.
2      All right?
3      A.  All right.
4      Q.  Are you on medications
5  today?
6      A.  Yes.
7      Q.  Which ones?
8      A.  I'm on Artane.
9      Q.  What is Artane?
10  A-R-T-A-N-E, correct?
11      A.  Right.
12      Q.  And what is Artane?
13      A.  I take that for side
14  effects.
15      Q.  Side effects of what?
16      A.  Of other medication I'm
17  taking.  Side effects of other
18  medications.
19      Q.  You take Artane --
20      A.  For the side effects of the
21  psychotropic medications.
22      Q.  -- for your -- I'm sorry,
23  can you repeat that?
24      A.  For my psychiatric needs.

**17**

1      Q.  For your psychiatric needs.
2      I just want the record to
3  reflect that your speech isn't
4  particularly clear.  Would you agree with
5  that?
6      A.  Um-hmm.
7      Q.  Yes?
8      A.  Yes.
9      Q.  So if the record shows that
10  I am tending to repeat what you're
11  saying, I am seeking clarification of
12  what your answer is in light of the lack
13  of clarity of your speech.
14      Okay?
15      A.  Okay.
16      Q.  Do you understand that?
17      A.  Yes.
18      Q.  Do you have a medical reason
19  for why your speech may not be clear?
20      A.  No.
21      Q.  You said you took the Artane
22  for side effects of your psychotropic
23  medications, is that right?
24      A.  Yes.

**(Pages 14 to 17)**

18

1      Q.   What side effects do you
2  believe --
3      A.   **Tremors.**
4      Q.   Tremors.
5           And what medication do you
6  believe caused your tremors?
7      A.   **Well, I'm on Risperdal**
8  **injections.**
9      Q.   Risperdal injections,
10 correct?
11     A.   **Yes.**
12     Q.   And you attribute those side
13 effects, the tremors, to Risperdal, is
14 that correct?
15     A.   **Yes.**
16     Q.   Have you filed a lawsuit
17 against the manufacturer of Risperdal?
18     A.   **No.**
19     Q.   Have you filed a lawsuit
20 against anyone other than AstraZeneca for
21 your diabetes?
22     A.   **No.**
23     Q.   Why haven't you sued the
24 manufacturer of Risperdal because you

19

1  believe it caused your tremors?
2           MS. HO:  Objection, form.
3           THE WITNESS:  I was
4  urinating 400 cc's of sugar --
5  BY MR. ELLISON:
6      Q.   You need to slow down,
7  please, sir, because the court reporter
8  is transcribing everything we're saying.
9      A.   **When I was diagnosed with**
10 **diabetes, they told me I was urinating**
11 **400 cc's of sugar in my urine.  I haven't**
12 **had any complications other than the**
13 **normal — normalities of psychotropic**
14 **medications, shakes, tremors, so on.**
15         **So I couldn't bring a claim**
16 **against the subscriber or maker of**
17 **Risperdal because I've been on Risperdal**
18 **for a very short period of time.**
19     Q.   So you didn't sue the
20 manufacturer of Risperdal because you
21 thought you were on the medication for
22 too short a period of time?
23     A.   **No, because a short time of**
24 **period, I was already diagnosed with**

20

1  diabetes in around 2004, 2005.  And
2  that's — and that's why I believe it was
3  Seroquel that caused my diabetes.
4      Q.   My question was different.
5  Did you understand that, sir?
6      A.   **No.**
7      Q.   Okay.  Let me repeat.  If I
8  understood you correctly, you believe
9  that Risperdal caused you to develop
10 tremors, is that correct?
11     A.   **No.**
12     Q.   What do you think --
13     A.   **I have tremors because of**
14 **Risperdal.**
15     Q.   So you believe that
16 Risperdal caused your tremors, is that --
17     A.   **Pretty much, yes.**
18     Q.   Okay.  Why didn't you sue
19 the manufacturer of Risperdal?
20         MS. HO:  Objection, form.
21         THE WITNESS:  Because the
22         medication I'm taking for the
23         tremors is doing me quite well.
24 BY MR. ELLISON:

21

1      Q.   And you're still on
2  Risperdal today, is that correct?
3      A.   **Yes.**
4      Q.   And the reason you didn't
5  sue the manufacturer of Risperdal is
6  because you've benefited from that
7  medication, is that correct?
8          MS. HO:  Objection, form.
9          THE WITNESS:  Yes.
10 BY MR. ELLISON:
11     Q.   And how has, in your view,
12 Risperdal helped you?
13     A.   **Well, I'm not as moody as I**
14 **used to be.  I'm pretty much able to**
15 **function within normality.**
16     Q.   You're still on Seroquel
17 today, correct?
18     A.   **Yes.  I'm slowly being**
19 **weaned off of it right now.**
20     Q.   Who is your current
21 physician?
22     A.   **Right now, I don't know her**
23 **name.  She's a new doctor.  I don't see**
24 **her till the 13th.**

**(Pages 18 to 21)**

**22**

1  Q.  You don't know your
2  physician's name?
3  A.  Well, I got another
4  physician so I don't know who it is.
5  Q.  Who is the person who is
6  weaning you off Seroquel?
7  A.  It started — the doctor
8  that put me on Seroquel, who was
9  monitoring it and all, has moved on to
10  another field of work.  She's no longer
11  with Directions.
12  Q.  What is the name of that
13  doctor?
14  A.  Dr. Nicole Keene (sic).
15  Q.  Where is Dr. Keene,
16  K-E-E-N-E?
17  A.  She was an employee of
18  Directions for Mental Health Services,
19  Incorporated, but she now moved on to
20  something else.
21  Q.  Do you know what she's moved
22  on to?
23  A.  No.
24  Q.  Do you know if she's still

**23**

1  in the state of Florida?
2  A.  I don't know.
3  Q.  We are in the state of
4  Florida today, is that correct?
5  A.  Correct.
6  Q.  And this is where you
7  reside, am I right?
8  A.  No.
9  Q.  Where do you reside?
10  A.  Dunedin.
11  Q.  But that's in Florida, isn't
12  that correct?
13  A.  Yes.
14  Q.  So it's Dr. Nicole Keene who
15  is weaning you off Seroquel?
16  A.  Yes.
17  Q.  When did she begin to wean
18  you off Seroquel?
19  A.  About two months ago.
20  Q.  And that is long after you
21  had originally filed your lawsuit, is
22  that correct?
23  A.  Yes.
24  Q.  Did you ask to be weaned off

**24**

1  Seroquel?
2  A.  Yes.
3  Q.  Why?
4  A.  I didn't — I didn't want
5  diabetes.
6  Q.  Is it your view that if you
7  stopped taking Seroquel, you would stop
8  — your diabetes would disappear?
9  A.  No.
10  Q.  Did you stop taking Seroquel
11  because you were told that continuing on
12  Seroquel, while your lawsuit was pending,
13  would hurt your case?
14  A.  No.
15      MS. HO:  Objection, form.
16  BY MR. ELLISON:
17  Q.  And you want us to
18  understand that your decision to stop
19  taking Seroquel, to wean yourself off
20  Seroquel, has nothing to do with this
21  litigation, is that what you want us to
22  understand?
23  A.  Pretty much.
24  Q.  You approached Dr. Keene

**25**

1  about taking yourself off Seroquel,
2  correct?
3  A.  Um-hmm.
4  Q.  Yes?
5  A.  Yes.
6  Q.  I need you to answer my
7  questions out loud.  As you can see, the
8  court reporter is taking down everything
9  I'm saying.  Nods of the head, shrugs of
10  the shoulders, um-hmms and unh-unhs are
11  hard for her to take down.  So will you
12  do your best to answer my questions out
13  loud, please?
14  A.  Yes.
15  Q.  How many milligrams of
16  Seroquel are you taking?
17  A.  Right now I'm taking 450.
18  Q.  And you take that amount to
19  help you with your psychiatric problems,
20  correct?
21  A.  Yes.
22  Q.  So you're on Artane,
23  Risperdal, Seroquel.  Anything else?
24  A.  I'm on Norvasc for blood

**26**

1  pressure.
2      Q.   Can you spell that, please?
3      A.   N-O-R-V-A-S-C.
4      Q.   And what else?
5      A.   I'm on Vytorin for
6  cholesterol.  I'm on Reglan for my
7  stomach.
8      Q.   You're on what?
9      A.   Reglan.
10     Q.   Can you spell that, please?
11     A.   R-E-G-L-A-N.
12          I'm on Prevacid.
13     Q.   Prevacid?
14     A.   And Lopressor.
15     Q.   And what are those
16  medications for?
17     A.   The Lopressor is for my
18  blood pressure.  The Prevacid is for my
19  acid reflex.  And Regulin is just used
20  for my gastroparesis.
21     Q.   Any other medications you're
22  on today?
23     A.   Unh-unh.
24     Q.   No?

**27**

1      A.   No.
2      Q.   How many medications is
3  that?  The witness is counting.
4      A.   Eight, I believe.
5      Q.   Of all those medications
6  that you're on, why do you think it's
7  Seroquel and not something else that may
8  have caused your diabetes?
9      A.   I don't know.
10     Q.   So as far as you know, one
11  of those other medications might be
12  responsible for your diabetes, correct?
13          MS. HO:  Objection to form.
14          THE WITNESS:  Well, Nicole
15  Keene says I'm --
16  BY MR. ELLISON:
17     Q.   Can you repeat your answer,
18  please?
19     A.   Nicole Keene said that a lot
20  of other medications, psychotropic
21  medications will cause diabetes.  But I'm
22  not a doctor, so I don't know.
23     Q.   And no doctor has -- strike
24  that.

**28**

1          Have you asked a doctor
2  whether Seroquel caused your diabetes?
3      A.   No.
4      Q.   Why not?
5      A.   Because I pretty much
6  believe that it did.
7      Q.   And it doesn't matter to you
8  what the doctors think?
9      A.   I didn't say that.
10     Q.   Then why wouldn't you ask
11  them?
12     A.   I don't know.
13     Q.   Has anyone told you that
14  Seroquel caused your diabetes?
15     A.   No.
16     Q.   Do any of those drugs affect
17  your memory?
18     A.   No.
19     Q.   Is there any reason why you
20  would not be able to testify completely
21  and truthfully today?
22     A.   No.
23     Q.   How did you meet your
24  lawyer?

**29**

1      A.   I saw an ad on TV and called
2  it, about the suit.
3      Q.   When was this?
4      A.   About a year and a half ago.
5      Q.   Describe the ad.
6      A.   Basically talking about if
7  you -- if you have results of diabetes
8  caused by Seroquel, so on, that you may
9  have an action in the suit that was being
10  filed.  So I joined it.
11     Q.   So, essentially, if you have
12  diabetes and you took Seroquel, you may
13  have a claim, give us a call?
14     A.   Pretty much, yes.
15     Q.   Do you remember what channel
16  you were watching?
17     A.   No.
18     Q.   What city were you in?
19     A.   I was in Dunedin.
20     Q.   Where you live?
21     A.   Yes.
22     Q.   Do you watch a lot of
23  television?
24     A.   Yes.

**(Pages 26 to 29)**

**30**

1 Q.   You're unemployed, correct?
2 A.   I'm on disability.
3 Q.   You're unemployed, correct?
4 A.   Yes.
5 Q.   And you've been on
6 disability since 1987, is that correct?
7 A.   No, '85.
8 Q.   '85. Thank you for the
9 correction.
10        And you're disabled because
11 of your mental health --
12 A.   Yes.
13 Q.   -- disease, correct?
14 A.   Yes.
15 Q.   And that's your bipolar
16 disorder, correct?
17 A.   Yes.
18 Q.   I'm sorry, Type I was it?
19 A.   Type II.
20 Q.   What is your understanding
21 of Type II bipolar disorder?
22 A.   I don't — I really don't
23 know.
24 Q.   You have no understanding

**31**

1 whatsoever of bipolar disorder?
2 A.   I know bipolar, but I don't
3 understand what Type I and Type II is and
4 all that, no.
5 Q.   Let's come back to this ad
6 that you saw about a year and a half ago.
7     I got up because someone
8 stuck their head in the room.
9     We're talking about
10 sensitive and perhaps confidential issues
11 today, so with counsel's permission, I
12 have shut the door.
13     MS. HO: Yes.
14     MR. ELLISON:  Counsel's
15     nodding.
16 BY MR. ELLISON:
17 Q.   Let's get back to this ad
18 you saw a year and a half ago on
19 television.  Okay?  Are you with me?
20 A.   Um-hmm.
21 Q.   Yes?
22 A.   Yes.
23 Q.   What, if anything, did you
24 do in response to that ad?

**32**

1 A.   I don't remember.
2 Q.   If I were to suggest that,
3 perhaps, you picked up the telephone and
4 called the number that was identified,
5 would that refresh your recollection?
6 A.   No.  I pretty much thought
7 about that.
8 Q.   You have no idea, as you sit
9 here today, what you did after you saw
10 this ad on television?
11 A.   I thought about it.
12 Q.   Thought about what?
13 A.   What the issues on TV they
14 were talking about.
15 Q.   Did you talk with anyone
16 about it?
17 A.   No.
18 Q.   How did it come to pass that
19 you retained a lawyer?
20 A.   I called the number on the
21 ad and joined it.
22 Q.   So, like I said, you called
23 the number on the ad after you saw it?
24 A.   Yes.

**33**

1 Q.   How long between the time
2 you saw the ad --
3 A.   About a month.
4 Q.   About a month.  You waited
5 about a month?
6 A.   Um-hmm.
7 Q.   Yes?
8 A.   Yes.
9 Q.   Do you know who you spoke
10 with?
11 A.   No.
12 Q.   Was that the first contact
13 you had with a lawyer?
14 A.   Yes.
15 Q.   Have you had any other
16 lawyers, apart from the firm that's
17 representing you in this litigation,
18 relevant to your diabetes claims?
19 A.   Other than the time they
20 talked to me about a deposition and so
21 forth, yes.
22 Q.   So let's make sure we're
23 clear.  I'm going to ask you some
24 questions about what you did to prepare

34

1  for the deposition today.  I am not
2  asking for and I don't want you to tell
3  me about the substance of conversations
4  that you've had with your lawyers.
5          Do you understand what I
6  mean?
7      A.  Yes.
8      Q.  I'm entitled to know when
9  they occurred, what you looked at, how
10 long they lasted, whether there was
11 someone else that was present there, but,
12 at this point, I do not want to hear
13 about the substance, what was discussed,
14 between you and your lawyers.  Okay?
15     A.  Okay.
16     Q.  Do you understand that?
17     A.  Yes.
18     Q.  When did you first
19 communicate with your lawyers about this
20 litigation?
21     A.  I don't remember the date.
22     Q.  Did you recently communicate
23 with your lawyers about this deposition?
24     A.  Yes.

35

1      Q.  When is the earliest time
2  that you remember?
3      A.  This morning.
4      Q.  Today's the first time
5  you've talked with a lawyer --
6      A.  No.  I talked before, but I
7  can't remember the dates.  About a week
8  before I got the Notice of Deposition,
9  so --
10     Q.  About a week ago, you talked
11 with --
12     A.  They notified me that the
13 deposition was going to take place and
14 asked me what date is a good time for me
15 to get it done, and I agreed to go on the
16 11th, like today.  So I came here today
17 and we talked about it yesterday
18 afternoon, this morning, about a week
19 ago.
20     Q.  How long did each of those
21 discussions last?
22     A.  Maybe about five or ten
23 minutes.
24     Q.  You met this morning with

36

1  counsel, correct?
2      A.  Correct.
3      Q.  How long did that meeting
4  take?
5      A.  About ten minutes.
6      Q.  Have you talked to anyone
7  else, apart from your lawyer, about your
8  deposition?
9      A.  No.
10     Q.  Any friends?
11     A.  Unh-unh.
12     Q.  Any family?
13     A.  No.
14     Q.  The answer to the previous
15 question was also a no.
16         Any of your physicians?
17     A.  I don't remember.
18     Q.  You may have, but you don't
19 remember?
20     A.  I may have, but I don't
21 remember.
22     Q.  Which physicians, if any,
23 might you have spoken with?
24     A.  Nicole Keene was one.

37

1  That's probably the only one that really
2  is knowing, because Dr. Bacha, my medical
3  doctor, already knows about the diabetes.
4      Q.  Doctor who?
5      A.  Bacha.
6      Q.  Can you spell that, please?
7      A.  B-A-C-H-A.
8      Q.  Any other physicians you
9  might have spoken with about your
10 deposition?
11     A.  Not that I remember.
12     Q.  Do you remember if any of
13 those physicians said anything about your
14 deposition?
15     A.  No.
16     Q.  Did any of your physicians
17 tell you that you really have no basis
18 for a lawsuit here?
19         MS. HO:  Objection, form.
20         THE WITNESS:  No.
21 BY MR. ELLISON:
22     Q.  Did any of your physicians
23 ask you how you could possibly sue the
24 manufacturer of one of the medications

38

1 that you take for your psycho -- for your
2 psychiatric condition?
3      MS. HO:  Objection to form.
4      THE WITNESS:  Could you
5 repeat that, please?
6 BY MR. ELLISON:
7      Q.   You bet.
8           Have any of your physicians
9 asked you how you possibly could sue the
10 company that makes one of your
11 medications that you use for your
12 psychiatric problems?
13     A.   No.
14     Q.   So you've not asked their
15 view, is that right?
16     A.   No.
17     Q.   That is correct?
18     A.   That's correct.
19     Q.   Did you talk to any friends
20 or family members about your deposition
21 today?
22     A.   No.
23     Q.   Did you look at anything to
24 prepare for your deposition?

40

1 at?
2      Q.   The very, very last page,
3 sir.
4      A.   Um-hmm.
5      Q.   Is that your signature?
6      A.   Yes.
7      Q.   There's no date, correct?
8      A.   Correct.
9      Q.   Can you tell me when you
10 signed this?
11     A.   I don't remember.
12     Q.   Why didn't you put the date?
13     A.   I forgot.
14     Q.   Can you give me an
15 approximation of when?
16     A.   I can't do that, no.
17     Q.   There were two blanks that
18 you needed to fill out on that sheet,
19 correct?
20     A.   Yes.
21     Q.   One was the date, correct?
22     A.   Correct.
23     Q.   The other was signature,
24 correct?

39

1      A.   Other than the fact sheet.
2 That's all I looked at.
3      Q.   That would be the
4 plaintiff's fact sheet that you completed
5 in this case?
6      A.   Yes.
7      Q.   I'm now showing you what
8 I'll mark as Exhibit 1 to this
9 deposition, which purports to be your
10 fact sheet.
11          (Exhibit No. D. Haller-1,
12          Plaintiff Fact Sheet, was marked
13          for identification.)
14 BY MR. ELLISON:
15     Q.   I previously tendered a copy
16 to your lawyer.  Please take that and
17 review it.  Take as much time as you
18 need, sir.  My question to you is simply,
19 at this point, going to be, is that the
20 fact sheet?
21     A.   Yes.
22     Q.   Do you see the last page,
23 sir?  Do you see the last page, sir?
24     A.   What number are you looking

41

1      A.   Correct.
2      Q.   And you only filled out one
3 of those two, is that correct?
4      A.   Um-hmm.
5      Q.   Yes?
6      A.   Yes.
7      Q.   And as you sit here today,
8 you have no memory whatsoever of when you
9 filled this fact sheet out?
10     A.   No.
11     Q.   I'll represent to you that
12 you filed your complaint in this case on
13 October 11th, 2006.  Do you have that
14 date in mind?
15     A.   Say that again?
16     Q.   I represent to you that you
17 filed your complaint in this lawsuit on
18 October 11th, 2006.  Do you have that
19 date in your mind?
20     A.   I do now.
21     Q.   Does having that date in
22 your mind refresh your memory as to --
23     A.   No.
24     Q.   -- when you completed this

**42**

1  form?
2      A.   No.
3      Q.   Was it more than a month
4  ago?
5      A.   **Might have been.**
6      Q.   You're not sure?
7      A.   **Not sure.**
8      Q.   Will you turn to the last
9  page again.
10         At the top, it says
11  acknowledgment, am I right?
12      A.   Yes.
13      Q.   It says, I declare under
14  penalty of perjury that all of the
15  information is true and correct to the
16  best of your knowledge, is that right?
17      A.   Yes.
18      Q.   Do you understand that by
19  signing this, you were swearing that the
20  information --
21      A.   **Right.**
22      Q.   -- in it was true?
23      A.   Yes.
24      Q.   And you took your time and

**43**

1  were careful in filling it out so that
2  you made sure you were truthful, correct?
3      A.   **Correct.**
4      Q.   As you sit here, you don't
5  think you lied in this, right?
6      A.   No.
7      Q.   That is correct?
8      A.   **That's correct.**
9      Q.   And as you sit here, you
10  don't know of any information that would
11  have -- that would be inaccurate,
12  correct?
13         MS. HO:  Objection, form.
14         THE WITNESS:  Correct.
15  BY MR. ELLISON:
16      Q.   I was asking you if you
17  looked at anything to prepare for your
18  deposition.  Did you look at any of your
19  medical records?
20      A.   No.
21      Q.   Did you look at any of your
22  prison records?
23      A.   No.
24      Q.   Any of your Social Security

**44**

1  records?
2      A.   No.
3      Q.   Do you have any of those
4  records at your house?
5      A.   No.
6      Q.   The only document you looked
7  at was your fact sheet?
8      A.   **That's it.**
9      Q.   What was your answer?
10      A.   Yes.
11      Q.   Have you seen the complaint
12  you filed in this case?
13      A.   No.
14      Q.   Have you ever asked to see
15  the complaint?
16      A.   No.
17      Q.   Do you have any records at
18  your house that relate to your diabetes?
19      A.   No.
20      Q.   You have the medications
21  themselves that you take, correct?
22      A.   Yes.
23      Q.   Do you have any old bottles?
24      A.   No.

**45**

1      Q.   Do you have any old
2  labeling, packaging?
3      A.   No.
4      Q.   You don't keep that stuff?
5      A.   No.
6      Q.   Do you just throw that out
7  in the ordinary course?
8      A.   Yes.
9      Q.   Did you bring anything with
10  you to the deposition today?
11      A.   **My medication.  I don't have**
12  **it here.  It's in my suitcase.**
13      Q.   You have a suitcase here?
14      A.   **A little handbag.**
15      Q.   How far away is Dunedin?
16      A.   **I don't know.  I couldn't**
17  **tell you.**
18      Q.   How long did it take you to
19  get here?
20      A.   **For a while.  I flew here.**
21      Q.   From where?
22      A.   **Dunedin.  Actually, I flew**
23  **from Tampa.**
24      Q.   So you flew from Tampa to

46

1 Orlando, right?
2    A.   **Tampa to Tallahassee.**
3    Q.   You went from Tampa to
4 Tallahassee to Orlando?
5    A.   **Yes.**
6    Q.   How much travel time did
7 that take?
8    A.   **Well, the plane left Tampa**
9 **at 12:25. I got here about 4 o'clock.**
10   Q.   And you spent the night
11 here, being the Sheraton Suites Hotel?
12   A.   **Yes.**
13   Q.   Outside of the Orlando
14 Airport?
15   A.   **Yes.**
16   Q.   And you said you've got a
17 little handbag that you brought with you?
18   A.   **Yes.**
19   Q.   And you keep your medication
20 in that, correct?
21   A.   **I brought it in, yes.**
22   Q.   Do you keep a journal?
23   A.   **No.**
24   Q.   Have you ever kept a

47

1 journal?
2    A.   **No.**
3    Q.   Do you take notes about
4 things that interest you?
5    A.   **No.**
6    Q.   Your medications?
7    A.   **No.**
8    Q.   Do you write in any way a
9 log or daily occurrences in a notebook or
10 anything like that?
11   A.   **No.**
12   Q.   Do you keep track of your
13 doctors' visits or medications you're
14 taking?
15   A.   **No.**
16   Q.   Do you use anything to help
17 you remember when you take your
18 medications?
19   A.   **No.**
20   Q.   If I understand correctly,
21 the Risperdal you're taking is injected
22 into your body, is that correct?
23   A.   **Yes.**
24   Q.   The other medications you

48

1 identified are pills, correct?
2    A.   **Yes.**
3    Q.   You're currently not on any
4 medication for your diabetes, is that
5 correct?
6    A.   **I'm on diet control.**
7    Q.   You are currently not on
8 any --
9    A.   **No.**
10   Q.   -- medications for your
11 diabetes, correct?
12   A.   **Correct.**
13   Q.   You said you were on diet
14 control, is that correct?
15   A.   **Yes.**
16   Q.   And by that you mean you're
17 supposed to watch what you eat, is that
18 correct?
19   A.   **Correct.**
20   Q.   Has a doctor told you that?
21   A.   **Yes.**
22   Q.   Which one?
23   A.   **Dr. Yamani is one of them.**
24   Q.   Can you spell that doctor's

49

1 last name?
2    A.   **No.**
3    Q.   Any other doctors?
4    A.   **Dr. Bacha maintains me on a**
5 **diet control system as well.**
6    Q.   What type of doctor is Dr.
7 Bacha?
8    A.   **Bacha is an internalist**
9 **(sic).**
10   Q.   An internist.
11       What type of doctor is
12 Yamani?
13   A.   **Internal medicine.**
14   Q.   Did Dr. Keene tell you to
15 watch what you eat?
16   A.   **No.**
17   Q.   Have you followed your
18 doctors' instructions in that regard?
19   A.   **Yes.**
20   Q.   Have you lost weight?
21   A.   **No.**
22   Q.   Do you exercise?
23   A.   **No.**
24   Q.   How do you spend your days?

**(Pages 46 to 49)**

**50**

1    A.  Watching TV.
2    Q.  Do you have video games?
3    A.  No.
4    Q.  You just watch TV?
5    A.  Um-hmm.
6    Q.  Yes?
7    A.  Yes.
8    Q.  Is there anything you do
9  else?
10    A.  Other than maybe walk to the
11  store. But that's it.
12    Q.  But you don't regularly
13  walk?
14    A.  No.
15    Q.  You don't lift weights?
16    A.  No.
17    Q.  You don't run?
18    A.  No.
19    Q.  You don't do physical
20  activity outside, correct?
21    A.  No.
22    Q.  You don't play sports,
23  right?
24    A.  No.

**51**

1    Q.  That is correct?
2    A.  That's correct.
3    Q.  Have any of your doctors
4  told you that you should exercise?
5    A.  Yes.
6    Q.  Which ones?
7    A.  All of them most —
8  basically, you know. They said I should
9  be more active.
10    Q.  But you don't follow your
11  doctors' instructions in that --
12    A.  Not in that part, no.
13    Q.  Why not?
14    A.  I don't know.
15    Q.  Do you have any idea what
16  your condition would be in terms of your
17  diabetes if you did follow your doctors'
18  instructions in that regard?
19    A.  No.
20    Q.  You said you were diagnosed
21  with diabetes in the 2004, 2005 time
22  frame?
23    A.  Yes.
24    Q.  Can you be more specific?

**52**

1    A.  I cannot.
2    Q.  All right. Let me make a
3  reservation on the record, I am taking
4  this deposition without having anything
5  approaching a full understanding of your
6  medical history. In fact, I have
7  virtually no medical records whatsoever,
8  despite our best efforts to obtain them.
9  I was notified by my office over the
10  weekend that, in fact, we had obtained an
11  additional thousand pages of your medical
12  records. The file was too big, it got
13  bumped through technological systems that
14  are beyond my capability of
15  understanding, so I've not even been able
16  to look at those records.
17        You would agree that you
18  have an extensive medical and psychiatric
19  history, correct?
20    A.  Yes.
21    Q.  In light of that, I'm going
22  to reserve on the record the right to
23  bring you back and take a more complete
24  deposition after we have the chance to

**53**

1  obtain your medical records, as well as a
2  chance to review what you have agreed is
3  an extensive medical and psychiatric
4  history. I say that just for the
5  purposes of the record.
6        Okay?
7    A.  Okay.
8    Q.  You cannot be more specific
9  than 2004, 2005 on your diabetes
10  diagnosis?
11    A.  No, that's it.
12    Q.  Who told you you had
13  diabetes?
14    A.  Well, I had a day that my
15  gastroparesis was bothering me, so I went
16  to the emergency room and they took a
17  urine sample and said I was urinating 400
18  cc's of sugar and that I was a diabetic.
19    Q.  You were in the emergency
20  room because of your gastroparesis, is
21  that correct?
22    A.  Yes.
23    Q.  And as part of the workup,
24  you were asked to give a urine sample, is

**54**

1  that right?
2  A.  Correct.
3  Q.  And in giving that urine
4  sample, it came back with sugar, is that
5  your testimony?
6  A.  Yes.
7  Q.  Do you know which doctor
8  told you about the results of that test?
9  A.  No.
10  Q.  Which hospital's ER were you
11  in?
12  A.  Morton Plant.
13  Q.  Morton Plant, is that
14  correct?
15  A.  Yes.
16  Q.  And where is that?
17  A.  Clearwater.
18  Q.  Clearwater, Florida?
19  A.  Yes.
20  Q.  You have never gotten --
21  strike that.
22      Do you know you filed your
23  complaint in this case in Massachusetts?
24  A.  Huh?

**55**

1  Q.  Did you know you filed your
2  complaint --
3  A.  No.
4  Q.  You're hearing about that
5  for the first time?
6  A.  Pretty much, yes.
7  Q.  Have you ever been to
8  Massachusetts?
9  A.  No.
10  Q.  You've had no medical
11  treatment there, correct?
12  A.  Correct.
13  Q.  You've not picked up any
14  medications there, correct?
15  A.  Correct.
16  Q.  And that includes Seroquel,
17  correct?
18  A.  Correct.
19  Q.  Do you have any idea of why
20  you filed your lawsuit in Massachusetts?
21  A.  No.
22  Q.  Would you be able to go to
23  Massachusetts and stay there for a trial
24  in this case?

**56**

1  A.  I don't know.
2  Q.  Could you afford it?
3  A.  Myself, no.
4  Q.  Currently, from where do you
5  get money?
6  A.  I'm on disability.
7  Q.  And that's through the
8  Social Security department?
9  A.  SSI.
10  Q.  SSI.
11  A.  And Social Security.
12  Q.  How much do you get for both
13  of those?
14  A.  Both of those, $657.
15  Q.  600?
16  A.  And $57.
17  Q.  Thank you.  And that's
18  monthly?
19  A.  Monthly.
20  Q.  Do you pay rent?
21  A.  Yes.
22  Q.  How much is your rent?
23  A.  360 plus utilities.
24  Q.  And the rest of the money,

**57**

1  how do you spend it?
2  A.  Well, co-payments on
3  medication, co-payments on doctors.
4  Q.  Do you have any other
5  sources of money?
6  A.  Food stamps.
7  Q.  Any others?
8  A.  That's it.
9  Q.  Do you live with anyone?
10  A.  Myself.
11  Q.  So no?
12  A.  No.
13  Q.  For how long have you lived
14  alone?
15  A.  23 years.
16  Q.  Has any physician told you
17  you do not have diabetes?
18  A.  No.
19  Q.  Has any physician told you
20  that your diabetes is well controlled?
21  A.  Yes.
22  Q.  Who?
23  A.  Dr. Bacha.
24  Q.  Do you remember when this

**58**

1  was?
2     A.   No.
3     Q.   Have you ever gone with
4  someone to visit the doctor?
5     A.   No.
6     Q.   You've always been alone?
7     A.   Yes.
8     Q.   Do you remember what Dr.
9  Bacha told you about your diabetes?
10    A.   No.
11    Just that it was well
12 controlled?
13    A.   Yes.
14    Q.   Correct?  No doctor has told
15 you that you've suffered any
16 complications because of your diabetes,
17 correct?
18    A.   No.
19    Q.   That is correct?
20    A.   That's correct.
21    Q.   I asked you a couple of
22 minutes ago about bipolar disorder.  Do
23 you remember when I asked you those
24 questions?

**59**

1     A.   Um-hmm.
2     Q.   Yes?
3     A.   Yes.
4     Q.   Tell me what you understand
5  bipolar disorder to be.
6     A.   I will change my moods.
7     Q.   Say that again?
8     A.   Highly changeable moods.
9     Q.   What do you mean?
10    A.   I have peaks, my mood
11 disorder goes up and down.  Sometimes it
12 can be very low, where I can be manic, or
13 it would be euphoric.
14    Q.   What was the word you just
15 used?
16    A.   Euphoric.
17    Q.   Euphoric.  What do you mean
18 by manic?
19    A.   Where I have bouts of
20 depression.
21    Q.   I asked you what you meant
22 by manic.
23    A.   That's part of manic -- it's
24 called manic depression, but they don't

**60**

1  call it that anymore today, they call it
2  bipolar.
3     Q.   Do you understand a
4  distinction between mania and depression?
5     A.   No.
6     Q.   Do you know that's the same
7  thing?
8     A.   No.
9     Q.   What's the difference
10 between them?
11    A.   I don't know.
12    Q.   You used the word euphoric.
13 Do you remember using that word?
14    A.   Um-hmm.
15    Q.   Yes?
16    A.   Yes.
17    Q.   What do you mean by that?
18    A.   I mean by being very happy
19 to being very sad.
20    Q.   And this was diagnosed in
21 1987?
22    A.   Yes.
23    Q.   Who diagnosed you?
24    A.   Dr. Ferris, psychiatrist,

**61**

1  department of corrections.
2     Q.   That's F-A-R-R-I-S?
3     A.   Say that again?
4     Q.   You spell Dr. Farris' last
5  name, F-A-R-R-I-S?
6     A.   E-R.
7     Q.   F-E-R-R-I-S?
8     A.   Yes.
9     Q.   And that was with the
10 department of corrections?
11    A.   Yes.
12    Q.   Where was that?
13    A.   Chattahoochee, Florida.
14    Q.   What was the city?
15    A.   Chattahoochee.
16    Q.   You were incarcerated there?
17    A.   Yes.
18    Q.   What for?
19    A.   Started back in 1986, four
20 counts of lewd and lascivious.  And then
21 back in 1989, while an officer was doing
22 my sentencing in the department of
23 corrections, I got battery on law
24 enforcement officer.

**(Pages 58 to 61)**

62

1     Q.   Battery on a law enforcement
2  officer?
3     A.   Yes.
4     Q.   Stop for a second.  I will
5  ask you some questions about your
6  criminal history in a minute.  At this
7  point, I'm just focusing on where you
8  were and what was going on at that 1987
9  time frame.
10        Okay?  Do you understand
11 that?
12    A.   Um-hmm.
13    Q.   Yes?
14    A.   Yes.
15    Q.   You told me that Dr. Ferris
16 diagnosed you with bipolar disorder, is
17 that correct?
18    A.   1987, yes.
19    Q.   What were the symptoms you
20 were manifesting at that time?
21    A.   I don't know.  He didn't
22 tell me that.  He just diagnosed me with
23 bipolar.
24    Q.   How did you feel at that

63

1  time?
2     A.   I felt relieved to know that
3  I — it took all these years of my life
4  to try and find out what my mental
5  illness was and someone was able to
6  pinpoint it to be bipolar.  So I was
7  relieved.
8     Q.   You've known you had mental
9  illnesses your --
10    A.   Since I was five years of
11 age.
12    Q.   What about five years of age
13 made you think you had mental illness?
14    A.   I was going through
15 outpatient treatment in the mental health
16 services.
17    Q.   What were you doing?
18    A.   What do you mean?
19    Q.   What was your behavior like?
20    A.   Very hyper.
21    Q.   What do you mean by hyper?
22    A.   Well, I was on medication
23 called Ritalin for years.
24    Q.   What do you mean by hyper?

64

1     A.   I was hyper.  I mean, I'm
2  very restless.
3     Q.   You were restless.  What
4  else?
5     A.   I can't explain it very
6  well.
7     Q.   Were you violent?
8     A.   Yes.
9     Q.   In what way?
10    A.   I would throw things.
11    Q.   You would throw things.
12 What else?
13    A.   I would hit people.
14    Q.   You would hurt other
15 children, correct?
16    A.   Pretty much, yes.
17    Q.   And you would attack adults,
18 correct?
19    A.   Yes.
20    Q.   Your teachers, correct?
21    A.   Yes.
22    Q.   Your parents, is that right?
23    A.   Pretty much.
24    Q.   Yes?

65

1     A.   Yes.
2     Q.   You were adopted, is that
3  right?
4     A.   Yes.
5     Q.   Have you ever cut anybody?
6     A.   Other than myself.
7     Q.   Have you ever cut anybody?
8     A.   No.
9     Q.   Would you hit them with
10 something that you would use like a club
11 or a weapon of any sort?
12    A.   Maybe.
13    Q.   Yes?
14    A.   Yes.
15    Q.   And what would you use?
16    A.   Chairs.
17    Q.   Anything else?
18    A.   Objects.
19    Q.   Such as?
20    A.   Anything that could be
21 thrown.
22    Q.   Whatever you could grab, you
23 would use to beat whoever you were angry
24 at at that point in time, correct?

66

1    A.    Yes.
2    Q.    So you'd agree that this
3 disease, at least in you, you get very
4 angry and irritable, is that correct?
5    A.    Yes.
6    Q.    And easily provoked, is that
7 right?
8    A.    Yes.
9    Q.    You would get very upset, is
10 that correct?
11    A.    Yes.
12    Q.    Did you ever see things or
13 hear things?
14    A.    No.
15    Q.    Have you had any epi -- has
16 anyone told you you were psychotic?
17    A.    No.
18    Q.    Are there any other symptoms
19 that you had at that time that made you
20 think you had a mental illness, looking
21 back?
22    A.    Myself personally, I'm not a
23 doctor, so I don't know.
24    Q.    So you didn't think there

67

1 was anything wrong?
2    A.    Oh, I thought there was
3 something wrong, but I don't know what it
4 would be.
5    Q.    What else did you think was
6 wrong?
7    A.    I don't know.
8    Q.    You didn't think it was
9 right that you were beating kids,
10 correct?
11    A.    Well, I don't know about
12 beating kids, but, I mean, I was out of
13 control.
14    Q.    And what do you mean by "out
15 of control," what were you doing?
16    A.    My faculties, my mind and so
17 forth was not calm.  I was always
18 agitated.
19    Q.    You were always agitated?
20    A.    Yes.
21    Q.    What else?
22    A.    That's about it.
23    Q.    What would you do when you
24 were agitated?

68

1    A.    Who knows.  Anything could
2 happen.
3    Q.    Okay.  You said that in
4 1987 -- let me back up.
5        Dr. Ferris put you on
6 Haldol, is that correct?
7    A.    Yes, Dr. Ferris put me on a
8 medication called lithium.
9    Q.    Lithium.  You have used
10 Haldol, correct?
11    A.    Yes.
12    Q.    At what time?
13    A.    I don't know what time.
14    Q.    I'm going to ask you a
15 general question, and that's based on
16 your testimony that you have an extensive
17 medical and psychiatric condition, okay?
18    A.    Okay.
19    Q.    You don't remember every
20 medication you used and when, correct?
21    A.    No, no, I don't.
22    Q.    You have no idea, is that
23 right?
24    A.    I have no idea.

69

1    Q.    You don't remember which
2 doctors you saw and when, is that
3 correct?
4    A.    No.
5    Q.    And, in fact, if I were to
6 ask you to tell me the names of the
7 doctors you saw in 1987, 1997 or even
8 like 2003, you couldn't be precise, could
9 you?
10    A.    No.
11    Q.    In fact, you would tell me
12 to go look at your medical records to get
13 that information, is that correct?
14    A.    Yes.
15        MS. HO:  Objection to form.
16        THE WITNESS:  Correct.
17 BY MR. ELLISON:
18    Q.    And you would tell me to
19 look at your medical record, because they
20 would be a more accurate indication, in
21 your view --
22    A.    Yes.
23        MS. HO:  Objection to form.
24 BY MR. ELLISON:

**(Pages 66 to 69)**

70

1    Q.  -- of the medications you
2  were using and the physicians you were
3  seeing, is that correct?
4    A.  Yes.
5       MR. ELLISON: Counsel,
6  you've objected to the form.  What
7  do you contend is wrong with the
8  form of that question?
9       MS. HO:  You're not asking
10  him a question, you're telling him
11  how he would answer.
12       MR. ELLISON:  So you're
13  objecting because I'm leading?
14       MS. HO:  I'm objecting, I
15  don't like the way you're
16  asking -- ask him a question.
17  Don't tell him how he's going to
18  answer your question.
19       MR. ELLISON:  Well, I'll
20  stand by the form of the question,
21  which we both know was perfect,
22  but I can understand that you
23  don't like the answer.
24       Counsel graciously,

71

1  notwithstanding my wise-guy
2  remark, handed me the coffee
3  stirrer.
4       MS. HO:  I'm always
5  gracious.
6       MR. ELLISON:  As am I,
7  notwithstanding the occasional
8  snide remark.  And we are
9  laughing, so the record's clear.
10  BY MR. ELLISON:
11    Q.  If your memory is different
12  from something that's in the medical
13  records, would you trust your memory or
14  would you say the medical records are
15  probably right?
16    A.  They're probably right.
17    Q.  The medical records?
18    A.  Pretty much, yes.
19    Q.  Okay.  You said you were
20  incarcerated in 1987, is that right?
21    A.  Yeah.
22    Q.  And you said you were
23  incarcerated because of lewd and
24  lascivious conduct, is that right?

72

1    A.  Yes.
2    Q.  What does that mean?
3    A.  I was sexually gratifying
4  myself in front of some people.
5    Q.  You were masturbating in
6  front of people?
7    A.  Yes.
8    Q.  Who?
9    A.  Neighborhood kids.
10    Q.  How old were you in 1987?
11    A.  About 25.
12    Q.  When were you born, what was
13  your birth date?
14    A.  11/24/61.
15    Q.  And you were convicted in a
16  state court?
17    A.  Yes.
18    Q.  And that was four counts of
19  masturbating in front of children?
20    A.  Yes.
21    Q.  Had you masturbated in front
22  of children?
23    A.  At that time I did, yes.
24    Q.  How many children?

73

1    A.  Four of them.
2    Q.  How many total children have
3  you masturbated in front of in your
4  lifetime?
5    A.  Four.
6    Q.  Did you ever touch them?
7    A.  No.
8    Q.  Describe how you would go
9  about setting this -- strike that.
10       Did you set up the scenario?
11    A.  No.
12    Q.  What did you do?
13    A.  Just got in front of the
14  window and masturbated.
15    Q.  You just walked down the
16  street --
17    A.  No, in my house, facing the
18  street, in the window.
19    Q.  Did you find those children
20  attractive?
21    A.  No.
22       MS. HO:  Objection, form.
23  BY MR. ELLISON:
24    Q.  How old were they?

(Pages 70 to 73)

**74**

1    A.   I don't remember.
2    Q.   But they were children,
3 correct?
4    A.   Yes.
5    Q.   Why did you do that?
6    A.   I don't know.
7    Q.   Did you think that was
8 strange?
9    A.   Pretty much.
10    Q.   Were you able to orgasm?
11    A.   Yes.
12        MS. HO:  Objection, form.
13 BY MR. ELLISON:
14    Q.   Were you witnessed?
15    A.   I don't know.
16    Q.   Did someone see you?
17    A.   The kids did.
18    Q.   Did you know they were
19 seeing you?
20    A.   No.
21    Q.   Did you see them looking at
22 you?
23    A.   Yes.
24    Q.   And you still proceeded to

**75**

1 masturbate, is that correct?
2    A.   Yes.
3    Q.   Were you wearing clothing?
4    A.   Yes.
5    Q.   Did you just undo your
6 pants?
7    A.   Yes.
8    Q.   And was there more than one
9 child playing at a time?
10    A.   Four of them.
11    Q.   All right.  So it was a
12 single instance?
13    A.   (Witness nodding head.)
14    Q.   Yes?
15    A.   Yes.
16    Q.   There was a group of
17 children playing, correct?
18    A.   Yes.
19    Q.   What about a group of
20 children -- strike that.
21        Did you know the window was
22 open?
23    A.   The window was closed.  I
24 was in the window standing, where they

**76**

1 could see me.
2    Q.   Were the blinds open?
3    A.   Yes.
4    Q.   You knew they could see you,
5 is that correct?
6    A.   Pretty much.
7    Q.   And that was why you were
8 doing -- masturbating in front of them,
9 is that correct?
10    A.   No.
11    Q.   You found it exciting, is
12 that correct?
13    A.   I don't know.
14    Q.   What about masturbating
15 through open blinds in front of children
16 appealed to you such that you engaged in
17 that behavior?
18        MS. HO:  Hold on a second.
19     You know, you've asked him about
20     the count.  I think that we can
21     move on from this.  He's already
22     said that he had four counts.
23        MR. ELLISON:  We absolutely
24     can't go on, because this is prior

**77**

1     to the time that he was medicated
2     and, counsel, I absolutely am
3     entitled to find out how his
4     mental illness impacted on his
5     behavior and the justification for
6     his medications.
7        MS. HO:  And I appreciate
8     that.
9        MR. ELLISON:  You may not
10     want to hear about his
11     masturbating in front of children,
12     and I can surely understand why,
13     but I am absolutely entitled to
14     find out about his mental state.
15        MS. HO:  I understand that.
16     I'm saying move it along.
17        MR. ELLISON:  Are you
18     instructing the witness not to
19     answer?
20        MS. HO:  No, I'm not, I'm
21     not.  I'm trying to get you to
22     move along with the question.
23        MR. ELLISON:  Counsel, I'll
24     use my time the way that I think

78

1    is important to defend my client
2    in the lawsuit.
3        MS. HO:  And I appreciate
4    that.
5        MR. ELLISON:  I know you do.
6    You're making a record statement.
7        MS. HO:  Yes.
8  BY MR. ELLISON:
9        Q.  Sir, do you have my question
10  in mind?  What was it about masturbating
11  through open blinds in front of four
12  children that made you do that?
13       **A.  As I told them in 1986, I'll**
14  **tell them again in 2008, I have no idea.**
15       Q.  Did you see that behavior as
16  an aspect of your disease?
17       **A.  No.**
18       Q.  Did any doctor tell you --
19       **A.  No.**
20       Q.  -- that hypersexuality is a
21  symptom of hypomania which is an aspect
22  of bipolar disorder?
23       **A.  No.**
24       Q.  You have no such

79

1  understanding?
2        **A.  No.**
3        Q.  That is correct?
4        **A.  That's correct.**
5        Q.  And is that the only time
6  you have masturbated in front of a child?
7        **A.  Yes.**
8        Q.  Have you engaged in any
9  other criminal activity toward children?
10      **A.  No, no.**
11      Q.  And this was in 1986,
12  correct?
13      **A.  Yes.**
14      Q.  And you were incarcerated
15  in '87, is that correct?
16      **A.  No, incarcerated in '86.**
17      Q.  How long were you
18  incarcerated in '86 for masturbating in
19  front of children?
20      **A.  Seven years.**
21      Q.  And that's a felony, am I
22  right?
23      **A.  Second degree felony.**
24      Q.  I'm sorry?

80

1        **A.  Second degree felony.**
2        Q.  It's a felony, correct?
3        **A.  Yes.**
4        Q.  Are you required -- strike
5    that.
6            Do you understand whether
7    you're required to register as a sexual
8    offender?
9        **A.  I am.**
10       Q.  Are you registered?
11       **A.  Yes.**
12       Q.  And that's where?
13       **A.  I don't know where.**
14       Q.  All right.  I will represent
15  to you that before I came to your
16  deposition, I checked the Florida
17  registry online to see if you were
18  registered and you do not appear -- the
19  name Haller appears nowhere in either
20  your hometown or elsewhere in the state
21  of Florida.
22           When was the time that you
23  registered?
24       **A.  I don't remember.**

81

1        Q.  Do you know whether you are
2    currently registered?
3        **A.  I do not know that.**
4        Q.  Have you decided not to
5    register --
6        **A.  No.**
7        Q.  -- for the purpose of
8    evading the law?
9        **A.  No.**
10       Q.  I'm going to ask you some
11  more questions about your history in a
12  little while, but right now I'd like to
13  turn to your fact sheet.
14           Do you have that in front of
15  you?
16       **A.  Um-hmm.**
17       Q.  Yes?
18       **A.  Yes.**
19       Q.  This fact sheet, which I've
20  marked as Exhibit 1, is typed.  Is that
21  correct?
22       **A.  Yes.**
23       Q.  Do you own a typewriter?
24       **A.  No.**

**(Pages 78 to 81)**

82

1    Q.   Do you own a computer?
2    A.   No.
3    Q.   Have you ever done research
4  online of any sort?
5    A.   No.
6    Q.   Do you have an e-mail
7  account?
8    A.   No.
9    Q.   Have you ever had an e-mail
10  account?
11    A.   No.
12    Q.   Have you ever communicated
13  with another person using a computer?
14    A.   No.
15    Q.   Have you ever been charged
16  with cyberstalking?
17    A.   No.
18    Q.   Do you know what that is?
19    A.   No.
20    Q.   If the records reflect that
21  you have been accused of cyberstalking,
22  you would have no idea what that meant?
23    A.   No.
24    Q.   Did you use a computer when

83

1  you were in prison?
2    A.   No.
3    Q.   Did you have access to a
4  computer when you were in prison?
5    A.   No.
6    Q.   Would you turn to Page 2 of
7  your fact sheet, please.
8         I'm sorry, just to make
9  clear, I forget if I've asked, you didn't
10  type this, correct?
11    A.   Correct.
12    Q.   Do you know who did?
13    A.   My attorney did.
14    Q.   Did you obtain your medical
15  records at any point in time for your own
16  purpose?
17    A.   No.
18    Q.   Is the information that's
19  contained in your fact sheet based on
20  your memory?
21    A.   Yes.
22    Q.   Is it based on anything
23  else?
24    A.   No.

84

1    Q.   Did you talk with anyone,
2  apart from your lawyers, to get
3  information for your fact sheet?
4    A.   No.
5    Q.   Were you asked to?
6    A.   No.
7    Q.   So, once again, all of the
8  information that's contained in your fact
9  sheet comes from your memory, is that
10  correct?
11    A.   Correct.
12    Q.   I'm going to start with your
13  educational history.  It begins on
14  Page 2.  It says schools you have
15  attended, high school and beyond.
16         You've never attended high
17  school, is that correct?
18    A.   Correct.
19    Q.   What was the highest level
20  of education that you obtained?
21    A.   In public school, I only got
22  to the third.
23    Q.   Third grade, is that
24  correct?

85

1    A.   Yes.
2    Q.   And you were kicked out
3  because you were beating up other kids
4  and teachers?
5    A.   No -- pretty much.
6    Q.   Yes?
7    A.   Yes.
8    Q.   Do you remember the children
9  and teachers you attacked?
10    A.   No.
11    Q.   Do you have any idea of why
12  you did that?
13    A.   No.
14    Q.   Do you perceive that that
15  was an aspect of your mental illness?
16    A.   Yes.
17    Q.   I forgot to ask you this.
18  Do you perceive that those sexual urges
19  you were feeling that resulted in you
20  being incarcerated, the masturbating, in
21  front of children, that that was an
22  aspect of your disease?
23    A.   No.
24    Q.   You don't know one way or

**(Pages 82 to 85)**

86

1    the other?
2        A.   No.
3        Q.   Let's turn back to Page 2.
4    Have you had any education after third
5    grade?
6        A.   In rehabs.
7        Q.   Rehabs.  What do you mean by
8    rehabs?
9        A.   Juvenile detention centers.
10       Q.   Where have you been in
11   juvenile detention centers?
12       A.   I've been in New Castle,
13   Pennsylvania; North Side, Pennsylvania;
14   Erie, PA.
15       Q.   Can you spell that?
16       A.   E-R-I-E.
17       Q.   Erie, Pennsylvania.
18           What did you say before
19   Erie?  You have New Castle.
20       A.   New Castle, North Side.
21       Q.   North Side.  Where else?
22       A.   I'm thinking now.
23       Q.   That's three.  We're talking
24   just now about juvenile centers.

87

1        A.   Yes.  New Castle, North
2    Side, Erie, Pennsylvania, Heidelberg,
3    Pennsylvania.
4        Q.   Heidelberg?
5        A.   I was Baker'd at 12 years of
6    age.
7        Q.   Heidelberg?
8        A.   Yes.
9        Q.   Any other rehab centers?
10       A.   That's about it.
11       Q.   Okay.  That's four, is that
12   right?
13       A.   That's all I can remember.
14       Q.   Which is the first rehab
15   center you were in?
16       A.   First one?
17       Q.   That was the New Castle one?
18       A.   Well, I was Baker Acted at
19   12 years of age.
20       Q.   Say it again?
21       A.   At 12 years of age, I was
22   Baker Acted into a state hospital,
23   psychiatric.
24       Q.   You were -- were you

88

1    committed?
2        A.   I was Baker Acted.
3        Q.   Baker Acted.
4            What do you mean by Baker
5    Acted?
6        A.   In other words, I was
7    involuntarily placed in a state's
8    facility.
9        Q.   Involuntarily, right?
10       A.   Not of my own volition.
11       Q.   So you did it yourself?
12       A.   No, I did not.
13       Q.   Okay.  You were committed
14   involuntarily, is that right?
15       A.   Right.
16       Q.   And that was where?
17       A.   Woodville State Hospital.
18       Q.   Woodfield State --
19       A.   Woodville.
20       Q.   Woodville.  How long were
21   you there?
22       A.   I was there two years.
23       Q.   And that was from 12 to 14?
24       A.   Yes.

89

1        Q.   And that's in Pennsylvania?
2        A.   Yes.
3        Q.   What were you involuntarily
4    committed for?
5        A.   At age 12 years of age, I
6    grabbed a woman by her breast at 12 years
7    old.
8        Q.   I need to have you slow
9    down.
10       A.   I grabbed a woman by her
11   breast at 12 years of age.
12       Q.   You grabbed a woman's breast
13   when you were 12?
14       A.   Yes.
15       Q.   Were you charged with rape?
16       A.   Attempted.
17       Q.   I'm sorry?
18       A.   Attempted rape.
19       Q.   Did you attempt to rape that
20   woman?
21       A.   No.
22       Q.   How old was that woman?
23       A.   She was about 18.
24       Q.   Did you know her?

90

1   A.   No.
2   Q.   You just went up to a woman
3 on the street and grabbed her breast?
4   A.   Yes.
5   Q.   What made you do that?
6   A.   I don't know.
7   Q.   Do you see that as an aspect
8 of your disease?
9   A.   I don't know.
10   Q.   Do you ever feel depression?
11   A.   No.
12   Q.   Have you ever attempted
13 suicide?
14   A.   Yes.
15   Q.   How many times?
16   A.   Twice.
17   Q.   How did you try to kill
18 yourself?
19   A.   First time I cut my arm all
20 up.
21   Q.   Which arm?
22   A.   Left arm.
23   Q.   Do you have scarring?
24   A.   Yes.

91

1   Q.   Will you show me your scar,
2 please? Let the record reflect the
3 witness is unbuttoning his sleeve.
4        Okay.  Let's describe this.
5 On the back of your arm, you have what
6 appears to be about a four-inch scar of
7 irregular shape -- strike that.
8        Turn it over, please, back
9 to where you were.  Palm on the table,
10 please.
11        You have approximately a
12 four-inch scar on the top of your forearm
13 which appears to be at its widest a half
14 an inch long, is that correct?
15   A.   Yes.
16   Q.   How many stitches appear to
17 be there?  I'd say probably a dozen
18 stitches, is that right?
19   A.   Um-hmm.
20   Q.   Yes?
21   A.   I'd say so.
22   Q.   What did you use to do that
23 on your arm?
24   A.   A razor blade.

92

1   Q.   Can you turn your hand over,
2 please.
3        Can you take off your watch?
4 There appears to be a scar under there as
5 well.
6   A.   (Witness complies with
7 counsel's request.)
8   Q.   Thank you.
9        One, two, three, four, five,
10 six --
11   A.   And, honestly, altogether --
12   Q.   -- seven, eight.  There are
13 about eight scars on the underside of
14 your forearm.
15   A.   From this scar to this scar,
16 there's a total of 66 sutures.
17   Q.   You say six sutures?
18   A.   I said 66 sutures
19 altogether.
20   Q.   66.  All right.  And you did
21 all of the scarring, all of the cutting
22 in a single instance, is that right?
23   A.   Yes.
24   Q.   Now, again, do you agree

93

1 that you've got about eight scars on the
2 underside of your forearm, is that right?
3   A.   That sounds about right.
4   Q.   Each is about three or four
5 inches long, is that right?
6   A.   Um-hmm.
7   Q.   Yes?
8   A.   Um-hmm.
9   Q.   Yes?
10   A.   Yes.
11   Q.   And one of the scars at its
12 widest is approximately say a half to
13 three-quarters of an inch long -- or inch
14 wide, is that right?
15   A.   Yes.
16   Q.   And you said it took a total
17 of 66 --
18   A.   Sutures.
19   Q.   Do you have scars on your
20 other arm?
21   A.   No.
22   Q.   Have you tried to cut
23 yourself anywhere else?
24   A.   No.

**94**

1  Q.  Were you attempting to kill
2  yourself?
3     A.  Um-hmm.
4     Q.  Yes?
5     A.  Yes.
6     Q.  Why?
7     A.  I don't know.
8     Q.  Was it an aspect of your
9  disease?
10    A.  Yes.
11    Q.  Is it your view that bipolar
12  disorder untreated makes you want to do
13  these things, like commit suicide and be
14  aggressive and attack other people and
15  gives you these sexual urges that make
16  you want to grab a woman's breast on the
17  street?
18    A.  I don't know.
19    Q.  Has any doctor told you that
20  they are?
21    A.  No.
22    Q.  Those urges have gone away
23  when you take medication, is that right?
24    A.  Yes.

**95**

1     Q.  You don't want to rape
2  people when you're on your meds, is that
3  correct?
4     A.  No.
5     Q.  That is correct?
6     A.  Yes.
7     Q.  You don't want to kill
8  people when you're on your meds, correct?
9     A.  Correct.
10    Q.  Have you ever wanted to kill
11  someone?
12    A.  No.
13    Q.  So if the records show that
14  you were threatening to kill someone, you
15  would dispute that?
16    A.  Yes.
17    Q.  And you have, you said,
18  tried to kill yourself, is that right?
19    A.  Yes.
20    Q.  And you've never tried to
21  kill yourself while you were on your
22  psychiatric medications, is that right?
23    A.  No.
24    Q.  That is correct?

**96**

1     A.  No.
2     Q.  When did you try to kill
3  yourself?
4     A.  I OD'd one time.
5     Q.  Was that a deliberate
6  attempt to kill yourself?
7     A.  Yes.
8     Q.  When was that?
9     A.  2000 -- I can't even
10  remember when it was.
11    Q.  You said 2000 --
12    A.  2000-something.
13    Q.  That was before you were on
14  Risperdal and Seroquel, correct?
15    A.  Right.  But I was on lithium
16  and Depakote for bipolar.
17    Q.  And you answered the
18  question properly, therefore.
19        But I should be more narrow.
20  Since you've started Seroquel, Risperdal,
21  you have not wanted to kill yourself,
22  correct?
23    A.  No.
24    Q.  And you've not tried,

**97**

1  correct?
2     A.  Correct.
3     Q.  So it's correct to both of
4  those?
5     A.  Yes.
6     Q.  And you've not felt a sexual
7  urge that you couldn't control since
8  you've started Seroquel and Risperdal, is
9  that correct?
10    A.  Yes.
11    Q.  That is correct?
12    A.  Correct.
13    Q.  And you've not wanted to get
14  angry at or -- strike that.
15        You've not felt
16  uncontrollable anger towards someone
17  since you've started Seroquel and
18  Risperdal, is that correct?
19    A.  Correct.
20    Q.  Do you think you may have
21  killed yourself if it weren't for your
22  medications?
23    A.  No.
24    Q.  You don't think you would

**(Pages 94 to 97)**

98

1  have?
2      A.  No.
3      Q.  You have a number of --
4  about nine scars on your arm.
5      A.  These scars are issues of
6  trying to get attention.
7      Q.  Did you get attention?
8      A.  Oh, yeah.  You sit in a room
9  and you turn around and say to someone,
10  you call 911, and I'm waiting to see what
11  your response is, so you turn around and
12  say, do what you got to do, and then I do
13  something.  That's an outcry for
14  attention.
15      Q.  You could have died from
16  that, correct?
17      A.  No.
18      Q.  Why not?
19      A.  These scars are superficial
20  to the fact that they didn't bleed very
21  long.  When they bled, they bled so long
22  and stopped.
23      Q.  You got medical care, is
24  that right?

99

1      A.  Sutures, yeah.
2      Q.  And they stopped because you
3  got them stitched up, isn't that right?
4      A.  They stopped on their own.
5      Q.  It's your testimony that
6  those four -- three to four-inch long
7  gashes on your arm stopped bleeding on
8  their own?
9      A.  Yes.  They clotted.
10      Q.  Okay.  So you don't think --
11  well, strike that.
12          You overdosed on medication,
13  correct?
14      A.  Um-hmm.
15      Q.  Yes?
16      A.  Yes.
17      Q.  And you could have died from
18  that, correct?
19      A.  Could have, but I didn't.
20      Q.  So you'd agree that if it
21  weren't for your psychiatric medications,
22  you may have actually killed yourself, is
23  that correct?
24      A.  I don't know.

100

1      Q.  You may have, correct?
2      A.  I don't think so.
3      Q.  You just said a minute ago,
4  you could have died from the drug OD?
5      A.  I could have, but the fact
6  it's an outcry.  I had the whole
7  paramedic squad up there, right there,
8  and I don't think the paramedic squad is
9  going to say, well, he OD'd, he's going
10  to die.  They can't do that, there's a
11  law against that.
12      Q.  Oh, there's a law against
13  that?
14      A.  Yeah.  If you got a
15  paramedic, you have a heart attack,
16  you're going to tell me that you had a
17  heart attack, and the paramedic says, oh,
18  the heck with him.  He don't mean nothing
19  to me.  Let me put it like this, someone
20  who tries to commit suicide, and wants to
21  die, they have to save your life.
22      Q.  What if they couldn't get
23  there on time, sir?
24      A.  Well, let's see, if they did

101

1  get there on time.
2      Q.  No, no, my question --
3      A.  You have a question that
4  can't be answered.
5      Q.  Well, you said you could
6  have died from the drug overdose.
7      A.  Could have, but didn't.
8      Q.  All right.
9      A.  Because --
10      Q.  Would you have done the OD,
11  would you have, as you put it, been
12  crying out for attention, if you were on
13  the right meds?
14      A.  Yeah, I would have done it.
15      Q.  You would have done it
16  anyway?
17      A.  I would have done it anyway.
18      Q.  Why do you think you would
19  have done it anyway?
20      A.  That's part of being
21  bipolar.
22      Q.  But you told me when you're
23  medicated, you don't --
24      A.  When you go home --

**(Pages 98 to 101)**

102

1    Q.   Sir, I need to finish the
2  question.
3      A.   When you go home --
4    Q.   Sir, excuse me, you have to
5  let me finish my question.  Do you
6  understand that?
7      A.   Yes, I understand that.
8    Q.   Okay.  You told me that you
9  do not try to do those things when you're
10  on your meds.  Is that correct?
11      A.   I OD'd while I was on my
12  meds.
13    Q.   You're right.  I should
14  clarify.  You're right to correct me.
15        You have not tried to do
16  those things since you've started
17  Risperdal and Seroquel, correct?
18      A.   Not recently, no.
19    Q.   You never have, correct?
20      A.   Well, I was on Seroquel and
21  I OD'd on it.  So your question to me is
22  saying, if you were -- weren't on
23  Seroquel, you wouldn't have done that.
24  Well, I was on Seroquel at the time I

103

1  OD'd.
2    Q.   You told me something
3  different before.  You said that you OD'd
4  around 2000.
5      A.   Around 2000-something.  I
6  don't remember -- I was married in 2004.
7  So it wasn't then.  So it would have to
8  be around 2005 that I tried suicide.
9    Q.   All right.  Sir, you seem to
10  be getting agitated.
11      A.   No, because you're asking
12  questions that a psychiatrist couldn't
13  answer.  A person is serious enough for
14  suicide, I almost did die on an overdose.
15  They had me on a respirator.
16    Q.   When was that?
17      A.   When I OD'd, about 2005.
18    Q.   So you OD'd and were on a
19  respirator in 2005 as well?
20      A.   Yes.
21    Q.   So even though you were
22  taking psychiatric medications, you still
23  were a suicide risk?
24      A.   I'm on suicide risk every

104

1  day of my life.
2    Q.   When was the last time you
3  felt like killing yourself?
4      A.   2005 was the last time I
5  attempted it.
6    Q.   When was the last time you
7  felt like killing yourself?
8      A.   I don't know.
9    Q.   You told me you feel that
10  almost every day?
11      A.   I said I could go through
12  that decision, well, I don't want to die
13  tomorrow, but I'll die today, or I'll
14  commit suicide today or whenever.
15  Suicide has no determined point.  Oh,
16  you're on Seroquel, so you won't commit
17  suicide.  Oh, you're on this, you won't
18  commit suicide because of that.
19        What I'm saying is, the
20  questions you asked about suicide,
21  there's people who have never been
22  suicidal in their whole life and, all of
23  a sudden, they have the capacity to do
24  so.  I always have that capacity.  It

105

1  could be any day of the week.  I don't
2  like what so and so said to me one day.
3  Well, he ain't going to talk to me like
4  that.  I can't hit him, I can't fight
5  him, I'll just kill myself tomorrow.
6        You can't sit there and say
7  because I'm on a medication, it won't
8  happen, because it will happen one way or
9  another.
10    Q.   My question isn't whether
11  you've done it, my question is whether
12  you've felt like doing it.
13      A.   There's times I have.
14    Q.   And then my question was,
15  which seemed to upset you, when was the
16  most recent time --
17      A.   Because you said you're
18  going to narrow the question down to the
19  fact.  You're going farfetched.
20    Q.   Mr. Haller, whether or not
21  you like the question, the way this works
22  is I ask them, you answer them.  Do you
23  understand that?
24      A.   I'll answer I don't know.

(Pages 102 to 105)

106

1    Q.   I'm sorry?
2    A.   I don't know — I can't
3  answer your question.  So there's the
4  question answered.
5    Q.   Here's my question.  When
6  was the last time you felt like killing
7  yourself?
8    A.   Oh, about a month ago.
9    Q.   Okay.  What were the
10 circumstances?
11   A.   Me and a friend of mine were
12 living together for a while and he has --
13 he has panic anxiety, me and him were
14 arguing and fussing, I felt why do I help
15 people for.  I might as well go ahead and
16 die.
17   Q.   Who were you living with
18 about a month ago?
19   A.   I was sharing my place with
20 a friend of mine who didn't have anyplace
21 to go.
22   Q.   Who?
23   A.   My friend Sam.
24   Q.   Sam, what is Sam's last

107

1  name?
2    A.   Gentile.
3    Q.   How do you spell that?
4    A.   G-E-N-T-I-L-E.
5    Q.   And where does Sam currently
6  reside?
7    A.   Right now he's at my house.
8    Q.   So he's living there today?
9    A.   He's living there because he
10 has nowhere else to go.  I won't put a
11 60-year old man who's my friend for years
12 and say, live on the street.
13   Q.   Let the record reflect the
14 witness is yelling at me.
15        Sir, my question is -- well,
16 strike that.
17        How long has he been living
18 there?
19   A.   Two days.
20   Q.   You told me he was living
21 there a month ago?
22   A.   He was living there.  He
23 left on the 1st of February.
24   Q.   And now he's back?

108

1    A.   Yes, he's back again,
2  because I'm helping him out again so he
3  doesn't live on the streets.
4    Q.   How long have you known Sam?
5    A.   I knew him ever since the
6  year 2004.
7    Q.   How did you come to meet
8  Sam?
9    A.   I lived in another mobile
10 home park where he lived.
11   Q.   Before he moved back in,
12 when he was living with you about a month
13 ago, for how long was he living there?
14   A.   About three weeks.
15   Q.   Do you remember telling me a
16 long time ago in this deposition that you
17 have lived alone for 23 years?
18   A.   Pretty much, yeah, I have.
19   Q.   Are you now telling me
20 that --
21   A.   If I decided to open my
22 doors to take a 62-year old man with a
23 heart condition, instead of putting my
24 best friend on the streets, to help him

109

1  out till he gets out on his feet, yes,
2  I'll do that.
3    Q.   Sir, you understand that I
4  asked you if you were living with anyone
5  and you told me you were not.
6        Is that right?
7    A.   I'm not living with him.  I
8  gave him a home instead of someone living
9  on the street.  Now, I'll tell you what,
10 if you were my best friend and you told
11 me you didn't have nowhere to live, I'd
12 put you on my front -- on the floor.  I
13 ain't supposed to have anybody living in
14 my house with me, period.
15   Q.   All right.  So the record is
16 clear, I'm not sure that you understand
17 the obligation to tell the truth, or I'm
18 not sure you understand the nature of the
19 questions that you are answering.
20 Although you have said you --
21   A.   You're a bit farfetched.
22   Q.   Please let me finish.
23 Although you say you have understood the
24 questions and have answered them, there

(Pages 106 to 109)

**110**

1 seem to be repeated contradictions in
2 your testimony.
3      MR. ELLISON:  Counsel, is
4 that your perception as well?
5      MS. HO:  I object to the
6 form.
7      THE WITNESS:  You want me to
8 draw answers from things I don't
9 have.
10      MR. ELLISON:  Counsel, do
11 you disagree with that?
12      MS. HO:  I think he's
13 answering the questions as best he
14 can as you're asking them.
15      MR. ELLISON:  But I asked
16 him before if he was living with
17 anyone, he said he wasn't and
18 hasn't for 23 years.  Now he's
19 saying he is.
20      MS. HO:  He doesn't believe
21 that he is.  The guy's not living
22 with him.  The guy's staying with
23 him.  So, for him, there's a
24 distinction.  So...

**111**

1 BY MR. ELLISON:
2      Q.   Is that a distinction in
3 your mind, sir?
4      **A.   Pretty much.**
5      MR. ELLISON:  All right.
6 Let's take a break now.
7      MS. HO:  I think that's a
8 good idea.
9      MR. ELLISON:  And why do you
10 think that's a good idea, counsel?
11      MS. HO:  I think David needs
12 to get some air, freshen up a
13 little bit.
14      MR. ELLISON:  I'm sure it
15 has nothing to do with the change
16 in affect and temperament.  We're
17 both laughing.  But I'm not
18 laughing because of that
19 assessment.
20      (Recess is taken from 11:10
21 a.m. until 11:21 a.m.)
22 BY MR. ELLISON:
23      Q.   Let's go back on the record.
24      We just took a brief break

**112**

1 and I noted that you went outside and had
2 a cigarette.  Is that true?
3      **A.   Um-hmm.**
4      Q.   Yes?
5      **A.   Yes.**
6      Q.   How much do you smoke?
7      **A.   About a pack a day.**
8      Q.   Pack a day?
9      **A.   (Witness nodding head.)**
10      Q.   Yes?
11      **A.   Yes.**
12      Q.   For how long have you been a
13 smoker?
14      **A.   Since age 12.**
15      Q.   And have you smoked about a
16 pack a day since age 12?
17      **A.   No.**
18      Q.   Did it change during that
19 time?
20      **A.   Yes.**
21      Q.   How did it change?
22      **A.   As time went on, I smoked**
23 **more.**
24      Q.   And you're smoking less now?

**113**

1      **A.   I'm about a pack a day.**
2      Q.   So how much were you smoking
3 when you said you were smoking more?
4      **A.   Say that again?**
5      Q.   You said that it's changed
6 from the time when you were 12 through
7 the time that's today, correct?
8      **A.   Right.**
9      Q.   That it was about a pack a
10 day when you started at 12 --
11      MS. HO:  Object to form.
12 BY MR. ELLISON:
13      Q.   Did I mishear you?
14      MS. HO:  Yes.
15      THE WITNESS:  I was smoking
16 a pack in two days when I was
17 first smoking.
18 BY MR. ELLISON:
19      Q.   Okay.  Fair enough.
20      About when did it become a
21 pack a day?
22      **A.   I don't know.**
23      Q.   Years and years ago?
24      **A.   Yeah.**

**(Pages 110 to 113)**

114

1       Q.   Has any doctor told you that
2   smoking isn't good for your health?
3       A.   I've been told that.
4       Q.   Has any doctor told you that
5   smoking can cause or contribute to
6   diabetes?
7       A.   No.
8       Q.   And as you sit here, you
9   have no understanding of that?
10      A.   No.
11      Q.   You were telling me about
12  your educational history.  Do you
13  remember doing that beforehand?
14      A.   Um-hmm.
15      Q.   Yes?
16      A.   Yes.
17      Q.   And you told me you got to
18  third grade, is that right?
19      A.   Well, I was only kept in the
20  public school till the third.  I was in
21  some special ed classes for behavioral
22  problems.
23      Q.   Were you ever in remedial
24  classes?

116

1       Q.   And that's because of your
2   mental illness, is that correct?
3       A.   Yes.
4       Q.   What were you doing?
5       A.   It wasn't what I was doing.
6   They just felt there was some things that
7   needed further treatment than I could get
8   if I was home.
9       Q.   What were you doing that
10  needed treatment?
11      A.   I wasn't doing anything
12  personally.
13      Q.   What were you feeling?
14      A.   I wasn't feeling anything.
15  I just had a lot of issues with my mental
16  illness that they thought it would be --
17      Q.   What issues?  I'm sorry, had
18  you finished your answer?
19      A.   No.
20      Q.   Please finish.
21      A.   They just felt that my
22  bipolar, the way it was, I had a lot of
23  trouble -- they had a lot of trouble with
24  medications.  They tried me on a slew of

115

1       A.   I didn't even know what one
2   of those is.
3       Q.   You were involuntarily
4   committed --
5       A.   At age 12.
6       Q.   -- and that was in
7   Woodville, Pennsylvania, is that right?
8       A.   Heidelberg.  I was also
9   Baker Acted back in 1992.
10      Q.   And that means involuntarily
11  committed?
12      A.   Yes.
13      Q.   How old were you then?
14      A.   I believe I was in my
15  thirties.
16      Q.   You were 30?
17      A.   In my thirties, yes.
18      Q.   Why were you involuntarily
19  committed?
20      A.   When I was incarcerated,
21  they found I needed further treatment.
22      Q.   So that was during your
23  incarceration, is that correct?
24      A.   Yes.

117

1   drugs to control the bipolar.  And they
2   felt maybe if I got further treatment,
3   they could continue to do so.
4       Q.   What issues with your mental
5   illness were you having that required
6   them to try, as you put it, a slew of
7   medications?
8       A.   They didn't know what it was
9   until I was incarcerated that I was
10  bipolar.  They treated me for
11  hyperactivity on Ritalin and then they
12  changed that and started adding other
13  medications to it.
14      Q.   What were you doing or what
15  were you feeling that they were trying to
16  treat?
17      A.   I don't know.
18      Q.   As you sit here today, you
19  have no idea what symptoms you were
20  having?
21      A.   No.
22      Q.   That is correct?
23      A.   That's correct.
24      Q.   So if I wanted to know what

**(Pages 114 to 117)**

**118**

1  symptoms you were having, I'd have to
2  talk to the folks at the prison?
3      A.  **Or talk to somebody who was**
4  **treating me for that purpose.**
5      Q.  Or one of the other people
6  that saw you then?
7      A.  **Yeah.**
8      Q.  Other inmates?
9      A.  **Probably, yeah.**
10      Q.  The prison staff?
11      A.  **Yes.**
12      Q.  And they would have a
13  better -- they would have better
14  information than you can give me about
15  what you were doing?
16      A.  **Yes.**
17      Q.  You told me about
18  Heidelberg.  You've also been in a
19  juvenile detention center in New Castle?
20      A.  **Yeah.**
21      Q.  And what were you put into
22  that detention center for?
23      A.  **When I was in the other**
24  **rehabs, they tried to control me and get**

**119**

1  **my medicine under control and I was off**
2  **the wall with behaviors and so forth, so**
3  **they transferred me from one to the one**
4  **in New Castle.**
5      Q.  Okay.  Which one did they --
6  where were you?
7      A.  **In Erie, Pennsylvania.**
8      Q.  Where?
9      A.  **The first one I was in Erie,**
10  **Pennsylvania called Harborcreek School**
11  **for Boys.**
12      Q.  How old were you when you
13  went in?
14      A.  **About 16.**
15      Q.  Why?
16      A.  **I had a lot of issues and**
17  **problems with my mental illness.  They**
18  **didn't know what it was.**
19      Q.  What were the issues and
20  problems you were having?
21      A.  **A lot of mood swings.  A lot**
22  **of aggression.**
23      Q.  What would you do when you
24  were up?

**120**

1      A.  **Well, who knows?**
2      Q.  You don't know?
3      A.  **Because, see, I didn't**
4  **understand bipolar at all till I was at**
5  **Directions.**
6      Q.  My question is different.
7  What would you do when you were up?
8      A.  **Who knows?  I have no idea**
9  **what I did.  It was all different.**
10      Q.  You said it was aggression,
11  right?
12      A.  **Sometimes I'd get very**
13  **hyper.**
14      Q.  And what do you mean by
15  hyper?
16      A.  **I don't know how -- I don't**
17  **know how to explain it.**
18      Q.  Tell me the best way you
19  can.
20      A.  **I can't think of any way to**
21  **say it.**
22      Q.  Do you start acting
23  irrationally?
24      A.  **Pretty much.**

**121**

1      Q.  In what way?
2      A.  **I don't know how -- how I**
3  **explain that.**
4      Q.  Do you start obsessing about
5  things?
6      A.  **No.  I don't obsess on**
7  **things.**
8      Q.  Would you become violent?
9      A.  **Yes.**
10      Q.  In what way?
11      A.  **Well, when bipolar, I go in**
12  **a very high -- very high manic where I**
13  **get very aggressive.**
14      Q.  And you would do what?
15      A.  **Throw things, hit people.**
16      Q.  Who would you hit?
17      A.  **Staff.  Or other people.  Or**
18  **other patients.  I should phrase it that**
19  **way.**
20      Q.  Other detainees?
21      A.  **Yes.**
22      Q.  Did you ever hurt anyone?
23      A.  **Yes.**
24      Q.  And what -- who, if you

**(Pages 118 to 121)**

122

```
1   remember?
2      A.   There was a correctional
3   officer I hit one time.  I bit him.
4      Q.   Did you hit him with
5   something?
6      A.   Yeah, my hand.
7      Q.   Did you punch him?
8      A.   I bit him.
9      Q.   You bit him?  You didn't do
10  that with your hand, did you?
11     A.   No.  But I just -- I just
12  threw some punches.
13     Q.   You punched him more than
14  once?
15     A.   Yes.
16     Q.   And then you bit him?
17     A.   Yes.
18     Q.   Where did you bite him?
19     A.   On his hand.
20     Q.   Anywhere else?
21     A.   That's all I can remember.
22     Q.   Did you cut him?
23     A.   No.
24     Q.   And that was while you were
```

124

```
1      Q.   Did you ever hurt any of
2   those folks when you were at Erie?
3      A.   I can't remember.
4      Q.   Were you kept alone?
5      A.   No.
6      Q.   Were there times when you
7   were kept alone?
8      A.   I can't remember.
9      Q.   Were you ever put in
10  restraints?
11     A.   Yes.
12     Q.   How many times?
13     A.   Never -- never in Erie, but
14  I've been in restraints for other things.
15     Q.   Well, since we're on
16  restraints, what have you been in
17  restraints for?
18     A.   For hitting people, breaking
19  things.
20     Q.   This is while you were in
21  prison, correct?
22     A.   Yeah.
23     Q.   And while you were in other
24  juvenile detention centers, correct?
```

123

```
1   at Erie?
2      A.   No, while I was
3   incarcerated.
4      Q.   I want you to stick with me
5   on Erie.
6      A.   Okay.
7      Q.   I'll tell you when we're
8   going to leave Erie.  Okay?
9      A.   Okay.
10     Q.   I'm focusing now on what you
11  did when you were high, and then I'll
12  talk with you about what you would do
13  when you were low.
14         Okay?
15     A.   Okay.
16     Q.   What would you do when you
17  were hyper at Erie?  You said you would
18  hit people, you said you were violent and
19  you were aggressive, is that right?
20     A.   Yes.
21     Q.   Then I asked you, whom would
22  you hit, and you said the staff and other
23  detainees, is that right?
24     A.   Yes.
```

125

```
1      A.   Right.
2      Q.   And describe what restraints
3   are.
4      A.   Leather straps.
5      Q.   And those straps would be
6   around your wrists, is that right?
7      A.   Right, correct.
8      Q.   And they'd also be around
9   your ankles, is that right?
10     A.   Correct.
11     Q.   Any other straps?
12     A.   Handcuffs.
13     Q.   Sorry?
14     A.   Handcuffs.
15     Q.   You've been in handcuffs
16  too?
17     A.   I've been in handcuffs, yes.
18     Q.   And they would restrain you,
19  those straps would tie you to what?
20     A.   A bed.
21     Q.   A bed.
22         And for how long would you
23  be in restraints?
24     A.   Anywhere from four hours to
```

**(Pages 122 to 125)**

126

1   determine my behavior while I was in
2   them, could go four hours or more.
3        Q.   Did they ever give you a
4   shot to calm you down?
5        A.   Yes.
6        Q.   Many times?
7        A.   Many times.
8        Q.   And it was -- this is how
9   your disease would manifest when you were
10  up, is that right?
11       A.   Right.
12       Q.   You don't blame anything
13  other than bipolar for that, right?
14       A.   That's about it.
15       Q.   Did you ever go on spending
16  sprees?
17       A.   No.
18       Q.   At any point in time?
19       A.   No.
20       Q.   Did you ever have sex with
21  someone you didn't know?
22       A.   No.
23       Q.   Did you ever have sex
24  frequently?

127

1        A.   No.
2        Q.   Did you ever masturbate
3   frequently?
4        A.   Yes.
5        Q.   When was this?
6        A.   I can't remember when, time
7   periods, but I know I did.
8        Q.   Do you still today?
9        A.   Yes.
10       Q.   How many times a day will
11  you masturbate?
12       A.   Once.
13       Q.   And do you have a ritual
14  that you engage in?
15       A.   No.
16       Q.   What, if anything, do you
17  look at?
18       A.   Nothing.
19       Q.   You just fantasize?
20       A.   Pretty much.
21       Q.   What do you fantasize about?
22       A.   I don't know.  Actually, if
23  I see a pretty woman somewhere on the
24  street, I'll go home and think about her.

128

1        Q.   Will you watch people
2   through your window?
3        A.   No, no.
4        Q.   And for how long have you
5   been masturbating once a day?
6        A.   Long time.
7        Q.   Is that, in your view, an
8   aspect of your bipolar?
9        A.   No.
10       Q.   Has any doctor ever told you
11  that hypersexuality is associated with
12  bipolar?
13       A.   They have said that.  I've
14  been told that.
15       Q.   You have been told that?
16       A.   Yes.
17       Q.   And do you see masturbation
18  as a sign of hypersexuality?
19       A.   I don't know.
20       Q.   You don't know whether once
21  a day is excessive, is that what you're
22  saying?
23       A.   Right.
24       Q.   There was a time, though,

129

1   when you would do it more frequently in a
2   day, is that right?
3        A.   No.
4        Q.   No.  Okay.  You've told me
5   about the ups and that you've been
6   restrained and sometimes drugged when you
7   were at Erie, is that right?
8        A.   Um-hmm.
9        Q.   Yes?
10       A.   Yes.
11       Q.   Now, let's talk about what
12  it was like when you were down at Erie.
13  Tell me how you'd know you were down.
14       A.   Well, I'd become very
15  withdrawn.  I'd draw into myself.  Don't
16  talk about my problems or talk to anybody
17  about anything that I'm thinking or
18  feeling.  Just withdraw.
19       Q.   Did you feel sad --
20       A.   Yeah.
21       Q.   -- or was it that you just
22  couldn't feel at all?
23       A.   There was times I felt sad,
24  but most of the time when I get a little

130

1  manic, I withdraw from people.
2      Q.   What would you do?
3      A.   I would just become very
4  quiet.  And I would just keep all my
5  feelings and all that bottled inside.
6      Q.   Would you stop doing those
7  things that ordinarily you would do that
8  gave you pleasure?
9      A.   Yes.
10      Q.   You wouldn't watch
11  television?
12      A.   I don't know.  I'd watch TV,
13  but I'd just watch anything.
14      Q.   What other things would you
15  do?  Strike that.
16          Are there particular shows
17  you like to watch that you wouldn't watch
18  when you were down?
19      A.   No.
20      Q.   You said that there were
21  things that you enjoyed doing that you
22  would not do when you were down, is that
23  right?
24      A.   No.

131

1      Q.   Did I mishear you?
2      A.   Yes.
3      Q.   Okay.  Other than
4  withdrawing, was there any other way your
5  downs manifested?
6      A.   Well, my suicides.
7      Q.   Okay.  You would try and
8  commit suicide, is that right?
9      A.   Right.
10      Q.   And this is an aspect,
11  trying to commit suicide, is an aspect of
12  your disease, is that right?
13      A.   Yes.
14      Q.   You would agree that those
15  ups, when you'd become aggressive,
16  violent, hurt people, are bad, right?
17      A.   Yes.
18      Q.   And you'd agreed that those
19  downs, when you try to kill yourself, are
20  bad, right?
21      A.   Yes.
22      Q.   You would agree that
23  Seroquel and Risperdal have made those
24  feelings either lessen or go away, is

132

1  that right?
2      A.   Yes.  But I didn't -- I
3  didn't want the diabetes part of it,
4  because I'm gaining weight.  I'm like
5  90 pounds -- at least 90 pounds
6  overweight.
7      Q.   You'd agree you're obese, is
8  that right?
9      A.   Yes, I agree.
10      Q.   Do you know whether obesity
11  causes diabetes?
12      A.   I don't know.
13      Q.   You haven't seen anything on
14  television --
15      A.   No, unh-unh.
16      Q.   -- about obesity causing
17  diabetes?
18      A.   No, I don't know nothing
19  about that.
20      Q.   Do you ever watch daytime
21  talk shows?
22      A.   Not really.
23      Q.   Jerry Springer, Montel
24  Williams?

133

1      A.   Any kind of show I watch
2  that is talk show-wise is Dr. Phil.
3      Q.   And you haven't seen Dr.
4  Phil talk about diabetes?
5      A.   Unh-unh.
6      Q.   No?
7      A.   Unh-unh.
8      Q.   No?
9      A.   No.
10      Q.   Is that correct?
11      A.   That's correct.
12      Q.   You were at Erie.  How long
13  were you at Erie?
14      A.   Six months.
15      Q.   Did you get kicked out?
16      A.   Yes.
17      Q.   And why did you get kicked
18  out?
19      A.   Because of my aggressive
20  behavior.
21      Q.   What were you doing?
22      A.   Well, I threw a staff member
23  through a window.
24      Q.   You threw a staff member

134

1  through a window?
2      A.   Yes.
3      Q.   You're smiling.  Why are you
4  smiling?
5      A.   I don't know.
6      Q.   You don't know?
7      A.   Because I couldn't
8  understand my behaviors.  It's very
9  difficult to express them, explain them
10  or talk about them.
11      Q.   That's why you're smiling?
12      A.   I try to put it on the
13  back -- away from me, why I do it at all.
14  I don't like to talk about my past.  I
15  don't like talking about things I've done
16  or what I didn't do or what I should have
17  done.  All I try to do is my best.
18      Q.   Do you currently see a
19  psychiatrist regularly?
20      A.   I see them every 90 days.
21      Q.   Every 90 days?
22      A.   Um-hmm.
23      Q.   And who is that?
24      A.   I see a lady named Susan

135

1  something.  I can't remember her name.
2  Marieni, or something like that.  I'm not
3  sure.
4      Q.   Can you spell it as best you
5  can for the court reporter?
6      A.   I don't even know how to
7  spell it.
8      Q.   Give me your best guess.
9      A.   M-A-R-I-E-N-I, I believe.
10  It's something like that.  I'm not sure.
11      Q.   That's the psychiatrist you
12  see every 90 days?
13      A.   Yes.
14      Q.   And that psychiatrist is the
15  one that juggles your current
16  medications?
17      A.   Yes.
18      Q.   Are you in therapy?
19      A.   No.
20      Q.   Has any physician told you,
21  boy, you should go to therapy?
22      A.   No.
23      Q.   Let's come back.  You threw
24  a staff member through a window, is that

136

1  right?
2      A.   Um-hmm.
3      Q.   Yes?
4      A.   Yes.
5      Q.   Tell me what was happening
6  there.
7      A.   I wanted to leave.  He
8  didn't want me to leave.
9      Q.   It was a male staff member?
10      A.   Yes.
11      Q.   Did you physically pick him
12  up and throw him through --
13      A.   He had his arms around me
14  and I grabbed him, did a fireman's carry
15  through the window.
16      Q.   Did you yourself go through
17  the window as well?
18      A.   No, he did.
19      Q.   So you picked him up over
20  your shoulders?
21      A.   No, he was behind me,
22  behind, with his arms grabbed around my
23  shoulders, I grabbed him here.
24      Q.   So he came around behind

137

1  you, wrapped his arms around your arms --
2      A.   To restrain me.
3      Q.   -- and chest to restrain you
4  and you, in turn, grabbed his right leg,
5  picked him up and flipped him back
6  through the window, is that right?
7      A.   Right.
8      Q.   Was he hurt?
9      A.   No.
10      Q.   Was there any other reason
11  why you were kicked out of the Erie,
12  Pennsylvania juvenile detention facility?
13      A.   I don't know the other
14  reasons why.  Just because my behaviors
15  weren't satisfying them enough to -- for
16  me to be in there.
17      Q.   Were there other staff
18  members that you had hurt?
19      A.   I can't remember.
20      Q.   Were there other detainees
21  that you hurt there?
22      A.   Can't remember.
23      Q.   So you were transferred to
24  New Castle, was it?

**(Pages 134 to 137)**

138

1      A.   Yes.
2      Q.   About how old were you at
3  that point?
4      A.   I was about 17.
5      Q.   Okay.  Did your disease
6  symptoms remain essentially the same?
7      A.   Yes.
8      Q.   How long were you at New
9  Castle?
10     A.   About a year.
11     Q.   How did it come to pass that
12 you left New Castle?
13     A.   I turned the age of 18 and I
14 left.
15     Q.   So you got out when you
16 turned 18?
17     A.   Yes.
18     Q.   You weren't thrown out, is
19 that right?
20     A.   No.
21     Q.   You told me you were at
22 North Side.
23     A.   There was a rehab I was in
24 on North Side.  I can't remember the name

139

1  of it.  I stayed there about eight months
2  and they threw me out of there.
3      Q.   Now, what were you in rehab
4  for?
5      A.   A lot of my juvenile arrests
6  for batteries, attempted rapes, stuff
7  like that.
8      Q.   Okay.  Why did you get
9  kicked out?
10     A.   Behavior.
11     Q.   What were you doing?
12     A.   Not following the rules,
13 being aggressive, stuff like that.
14     Q.   What would you do?
15     A.   Get in fights.
16     Q.   With staff?
17     A.   Staff.  And other patients.
18     Q.   Did you hit any of the staff
19 members there too?
20     A.   Yeah.
21     Q.   Tell me about them.
22     A.   Well, I don't have a
23 recollection about all of that.
24     Q.   Did you hit -- but you do

140

1  remember hitting a staff member?
2      A.   Yeah.
3      Q.   Tell me what you do
4  remember.
5      A.   I don't remember very much.
6      Q.   Tell me what you do
7  remember.
8      A.   I don't remember anything
9  hardly at all.
10     Q.   All right.  You just
11 remember hitting staff members?
12     A.   Yeah.
13     Q.   And that's more than one,
14 right?
15     A.   Yeah.
16     Q.   Tell me about what you
17 remember about hitting a patient.
18     A.   Got in a fight.
19     Q.   With who?
20     A.   One of the residents.
21     Q.   What did you do?
22     A.   Hit him.
23     Q.   Where?
24     A.   In fisticuffs.

141

1      Q.   With your fists?
2      A.   Yeah.
3      Q.   Did you bite him?
4      A.   No.
5      Q.   And then what happened to
6  you?
7      A.   Then they finally got to the
8  point where they threw me out of there.
9      Q.   They kicked you out, right?
10     A.   Yeah.
11     Q.   Now, you told me that you
12 were put here originally because of all
13 of your -- because of your juvenile
14 record, is that right?
15     A.   I have a very extensive
16 juvenile record.
17     Q.   You have a very extensive
18 juvenile record, is that what you said?
19     A.   Yes.
20     Q.   Tell me about your juvenile
21 record.
22     A.   Well, I don't remember, it's
23 been a long time, so I don't remember it.
24     Q.   Well, let's go through it.

142

1 We talked about one attempted rape, when
2 you grabbed a woman's breast. Do you
3 remember that?
4     A.   **Right, um-hmm.**
5     Q.   Yes?
6     A.   **Yes.**
7     Q.   You said a minute ago that
8 you were there because of your attempted
9 rapes and your batteries?
10    A.   **Batteries.**
11    Q.   Tell me about another
12 attempted rape.
13    A.   **I only had one.**
14    Q.   So when you used a plural
15 before to describe rapes, that was --
16    A.   **There wasn't more than one,**
17 **no.**
18    Q.   How many juvenile battery
19 cases do you have?
20    A.   **Quite a few. I hit my dad**
21 **one time.**
22    Q.   All right. When did you hit
23 your dad?
24    A.   **My dad was disciplining me**

143

1 **and I turned around and hit him back.**
2     Q.   Was your dad spanking you?
3     A.   **Yeah.**
4     Q.   How old were you?
5     A.   **I forget.**
6     Q.   Do you remember the
7 incident?
8     A.   **Not much.**
9     Q.   What did you hit your dad
10 with?
11    A.   **A two-by-four.**
12    Q.   You picked up a two-by-four
13 and you hit your dad with it?
14    A.   **Um-hmm.**
15    Q.   Yes?
16    A.   **Yes.**
17    Q.   Did you hit him in the head?
18    A.   **I hit him in the body.**
19    Q.   Did it hurt him?
20    A.   **I don't know if it hurt him.**
21 **I didn't see no injuries, but I'm sure it**
22 **hurt when he got hit with it, so, yeah.**
23    Q.   Did it knock him over?
24    A.   **No.**

144

1     Q.   What were you feeling when
2 you hit your dad with a two-by-four?
3     A.   **Anger.**
4     Q.   What happened to you as a
5 result of that?
6     A.   **Well, I got arrested. Went**
7 **to juvenile detention center.**
8     Q.   Did your parents throw you
9 out of the house at any point in time?
10    A.   **No.**
11    Q.   Do you have a relationship
12 with your mom and dad?
13    A.   **Yes.**
14    Q.   How often do you talk with
15 them?
16    A.   **I talk to my dad about twice**
17 **a week. I talk to my mom every day.**
18    Q.   You talk to your mom every
19 day?
20    A.   **Yeah.**
21    Q.   Does she call you or you
22 call her?
23    A.   **I call her.**
24    Q.   You don't have a cell phone,

145

1 do you?
2     A.   **No.**
3     Q.   Do they know about this
4 lawsuit?
5     A.   **Yes.**
6     Q.   And if I wanted to talk --
7 if I want to learn more about what your
8 disease was like when you were a kid
9 before you obtained medical treatment for
10 it, I can talk to them?
11    A.   **I don't know. I don't know**
12 **what they would do.**
13 REDACTED
14
15
16    Q.   Where does she live?
17    A.   **Pittsburgh.**
18    Q.   Does your mom live with your
19 dad?
20    A.   **No, they're divorced.**
21    Q.   When were they divorced?
22    A.   **I can't remember. It's been**
23 **a while.** And where does your dad
24    Q.

(Pages 142 to 145)

146

1  live?
2       A.   **Ravenswood, West Virginia.**
3  REDACTED
4
5       Q.   You have two brothers,
6  right?
7       A.   **One died.**
8       Q.   I'm sorry.  When did your
9  brother die?
10      A.   **He died two years ago on the**
11 **4th of July.**
12      Q.   What was his name?
13      A.   **Patrick.**
14      Q.   Was it an accident?
15      A.   **No, he — his aorta**
16 **exploded.**
17      Q.   What is your other brother's
18 name?
19      A.   **Michael.**
20      Q.   He's still alive?
21      A.   **Yes.**
22      Q.   Where does he live?
23      A.   **Pittsburgh.**
24      Q.   What is his phone number?

148

1  lawsuit?
2       A.   **No.**
3       Q.   You haven't told anyone in
4  the world about this lawsuit?
5       A.   **I told —**
6            MS. HO:  Objection, form.
7            THE WITNESS:  I talked to my
8            mom and dad about it, but I
9            haven't talked to my brother about
10           it.
11 BY MR. ELLISON:
12      Q.   Do they tell you it doesn't
13 make sense for you to do this?
14      A.   **No.**
15      Q.   What did they tell you?
16      A.   **You got to do what you got**
17 **to do.**
18      Q.   Have you asked them for any
19 information?
20      A.   **No.**
21      Q.   All right.  We were going
22 through what you called an extensive
23 juvenile record.  We've got the attempted
24 rape.  We have the battery where you hit

147

1       A.   **I won't give you his phone**
2  **number, because he doesn't talk very**
3  **much.  He's very withdrawn.**
4       Q.   I'm sorry?
5       A.   **He doesn't talk very much**
6  **about me at all.  You'd ask a question,**
7  **he would have no answers.**
8       Q.   No, my question is
9  different.  I said what's the phone
10 number?
11      A.   **If you called him on the**
12 **phone, it won't do any good because he**
13 **won't talk about it.**
14 REDACTED
15
16
17
18      Q.   Okay.  Do you have a good
19 relationship with your brother?
20      A.   **Yes.**
21      Q.   When was the last time you
22 talked to him?
23      A.   **About a week ago.**
24      Q.   Does he know about this

149

1  your dad.  What others?
2       A.   **I can't remember very much**
3  **of it.  A lot of, a lot of anger problems**
4  **and aggression.**
5       Q.   I want to know what your
6  record is.  Okay?
7       A.   **I can't remember that far**
8  **back.**
9       Q.   You've told me about an
10 attempted rape.  You've told me about
11 when you hit your dad.
12      A.   **There are certain things in**
13 **my juvenile record I can remember.  Other**
14 **things I don't remember.**
15      Q.   Tell me the things you
16 remember.
17      A.   **The rape.**
18      Q.   Anything else?
19      A.   **When I hit my dad.**
20      Q.   Anything else?
21      A.   **That's all I can remember.**
22      Q.   You'd agree that there's
23 more there, you just don't remember it
24 now?

**(Pages 146 to 149)**

150

```
1      A.   Right, I don't remember it
2   now.
3      Q.   How would I go about finding
4   that?
5      A.   I don't know.
6      Q.   You're the only person that
7   can tell me about those things if your
8   court records are sealed, is that right?
9      A.   They're not sealed.
10     Q.   They're not.  How many other
11  offenses do you think there are?
12     A.   Quite a bit.
13     Q.   More than ten?
14     A.   Probably.
15     Q.   More than 20?
16     A.   I don't know.
17     Q.   Maybe?
18     A.   Maybe.
19     Q.   Does 20 sound right?  Your
20  face is twitching on your right side.
21     A.   I'm thinking.
22     Q.   Are you okay?
23     A.   Yeah.
24     Q.   Are you getting angry?
```

151

```
1      A.   No.  I'm trying to think if
2   there are any more.  That's all I can
3   remember.  I don't have recollection of
4   my childhood.
5      Q.   Again, about 20?
6      A.   Maybe.
7      Q.   Could be more, could be
8   less?
9      A.   My juvenile record started
10  when I was 12 to 18, so that's six years.
11     Q.   And you were living in
12  Pennsylvania at this time?
13     A.   Yes.
14     Q.   Can you tell me the town?
15     A.   Well, I lived in a little
16  town called Hamilton Township, in Allison
17  Park.
18     Q.   And that was where you were
19  when you were arrested?
20     A.   Yeah, a juvenile, yeah.
21     Q.   Were any of those for
22  felonies?
23     A.   Some of them, yeah.
24     Q.   Which ones were felonies?
```

152

```
1      A.   Attempted rape one of them.
2   I know that much.
3      Q.   And you were convicted of
4   attempted rape, correct?
5      A.   Right.
6      Q.   Was that after a trial?
7      A.   I don't know if I had a
8   trial or not.  I can't remember.
9      Q.   You don't remember if you
10  pled guilty or --
11     A.   I don't know.  I don't know
12  if it was a trial or not.  I'm not sure.
13     Q.   What other felonies do you
14  have that you were convicted of as a
15  juvenile?
16     A.   I can't remember.
17     Q.   But you're sure attempted
18  rape was?
19     A.   Yeah.
20     Q.   All right.  Have you told me
21  all you remember about your juvenile
22  record?
23     A.   Basically, yeah.
24     Q.   Turn back to Exhibit 1.  Do
```

153

```
1   you see the fact sheet in front of you,
2   Page 2?  Do you have that in front of
3   you?
4      A.   Yes, I do.
5      Q.   Do you see G at the top, it
6   says marital status, married?  Page 2,
7   sir.  You were just there.
8      A.   I'm separated.
9      Q.   When were you married?
10     A.   May of 2004.
11     Q.   To whom?
12     A.   A Russian woman named Nadia
13  Jakovenko.
14     Q.   How did it come to pass that
15  you married a Russian woman?
16     A.   We lived together.
17     Q.   How did you meet her?
18     A.   She had an ad in the paper
19  for someone to help her share rent at her
20  mobile home and I answered it.
21     Q.   Does she own the home you
22  live in?
23     A.   I'm by myself now.
24     Q.   Does she own that home?
```

154

1    A.   No.
2    Q.   All right.  You own the
3  mobile home?
4    A.   No.
5    Q.   Who owns it?
6    A.   Randy Russell.
7    Q.   Who?
8    A.   A man named Randy Russell.
9  It's his park.  I don't live with my wife
10 anymore.
11   Q.   You rent the mobile home?
12   A.   Yeah.
13   Q.   So you answered an ad --
14   A.   She had an ad in the paper
15 for someone to share a mobile home and I
16 answered it.  And we moved in together.
17 She was facing deportation if she didn't
18 get her green card at the time.  So I
19 agreed to marry her for her green card.
20   Q.   So you married her, not for
21 the intention of getting married to her,
22 but for the sole purpose of keeping her
23 in the United States?
24   A.   Yes.

155

1    Q.   Have you ever talked to a
2  lawyer about whether that's legal?
3    A.   I've been told it's illegal.
4    Q.   So you understand that that
5  is a crime, is that right?
6    A.   Right.
7    Q.   And you understand you could
8  be prosecuted for that?
9    A.   Yes.
10   Q.   Yet, you're answering these
11 questions notwithstanding your Fifth
12 Amendment right to remain silent, is that
13 right?
14   A.   Right.
15   Q.   You said you were -- how
16 long was it between the time that she
17 moved in and the time that you married
18 her?
19   A.   Well, I moved in with her.
20   Q.   All right.  I'm confused.  I
21 thought you said that you --
22   A.   I rent a mobile home in
23 Dunedin.  My wife lives in Clearwater.
24   Q.   All right.  Let's back up.

156

1        You were renting a mobile
2  home, is that right?
3    A.   No.
4    Q.   All right.  It was her
5  mobile home?
6    A.   She owned one.
7    A.   She owned one.
8    A.   And she needed somebody to
9  help her with the bills, so on and so
10 forth.  So I moved in with her.
11   Q.   You saw an ad and then you
12 moved in with her, is that right?
13   A.   Right.
14   Q.   And this was in May of 2004?
15   A.   We got married in 2004.
16   Q.   Right.  When did you move in
17 together?
18   A.   I can't remember.
19   Q.   And where is that mobile
20 home?
21   A.   Japanese Gardens in
22 Clearwater.
23   Q.   All right.  So that was the
24 house you were living in.  Then you moved

157

1  out to where you are now?
2    A.   Right.
3    Q.   When did you move out?
4    A.   Well, actually, I was Baker
5  Acted first, because she threw me out of
6  the house.  So I was Baker Acted, and I
7  went to ALF, to where I am now.
8    Q.   Slow down now.  You were, as
9  you say, Baker Acted, is that right?
10   A.   What I did, I told -- when
11 she grabbed me and threw me out the
12 house, I got real bipolar and told her, I
13 says, I'll tell you what, I think I'll
14 walk out on US 19 out here and walk in
15 front of the first bus, truck or car that
16 comes by so I can die.
17   Q.   Have you ever told someone
18 that when you threaten suicide, you're
19 not really meaning it, you're just doing
20 it to manipulate?
21   A.   Yes, but people take me
22 serious.
23   Q.   And you laugh at them
24 because they're taking you serious?

**(Pages 154 to 157)**

158

```
1    A.   Not always.
2    Q.   But sometimes you do?
3    A.   Maybe.
4    Q.   I need a yes or a no.
5    A.   I'm saying maybe.
6    Q.   Sometimes you do laugh at
7   them, is that right?
8    A.   Maybe.
9    Q.   Why are you saying maybe?
10    A.   Because I don't know — I
11   don't have no feelings towards them at
12   all.
13    Q.   You do it --
14    A.   I'm seeking attention in the
15   sense of saying, I don't want to be
16   homeless on the streets, so put me in a
17   state hospital and —
18    Q.   You do it to control the
19   other person, is that right?
20    A.   Yes.
21    Q.   You don't care what they
22   feel, is that right?
23    A.   No.  Right.
24    Q.   You do this for your own
```

159

```
1   selfish -- self reasons, right?
2    A.   Yes.
3    Q.   When was it that you started
4   to live in the mobile home that you're
5   renting now?
6    A.   I went from my house, Baker
7   Acted me, then I got out of the Baker Act
8   and ended up in Dunedin, moved in there,
9   after I got out of ALF.  I spent about
10   three months in an ALF, then I moved in
11   to where I'm at.
12    Q.   When did you move in where
13   you are at?
14    A.   I can't remember what date.
15   It was January 11th, 2000, and I believe,
16   5.
17    Q.   Okay.  That's January 2005?
18    A.   Yeah.
19    Q.   When you say Baker Acted,
20   you mean involuntarily committed,
21   correct?
22    A.   Yes.
23    Q.   And that means put in a
24   hospital or institution against your will
```

160

```
1   because of your psychiatric issues,
2   correct?
3    A.   Right.
4    Q.   You say she Baker Acted you?
5    A.   She did it herself, she
6   filed an injunction against me and had me
7   thrown out the house.  When the sheriff
8   came and served the injunction on me, I
9   threatened suicide.
10    Q.   And at that time, you were
11   instituted, is that right?
12    A.   Right.
13    Q.   When were you separated?
14    A.   I'm not certain of the date,
15   but I think it was back in 2000 — that
16   ain't right.  I can't remember.
17    Q.   Do you have contact with
18   her?
19    A.   No.
20    Q.   At all?
21    A.   No contact.
22    Q.   When was the last time you
23   talked to her?
24    A.   I can't talk to her at all.
```

161

```
1    Q.   When was the last time you
2   talked to her?
3    A.   The day she threw me out of
4   the house.
5    Q.   So the last time you talked
6   to her was May of 2004?
7    A.   About September.  I don't
8   even know when was the last time I saw
9   her.  I know it was before I moved in
10   where I am at, so I don't know what day
11   it was.
12    Q.   Have either of you filed for
13   divorce?
14    A.   No.
15    Q.   Do you intend to?
16    A.   When the money is right.
17    Q.   What do you mean by that?
18    A.   It's going to cost me $300
19   to divorce her.
20    Q.   And you don't have $300?
21    A.   No.
22    Q.   Is that one of the things
23   you're hoping to get out of this lawsuit,
24   money?
```

**(Pages 158 to 161)**

**162**

1    A.   No.
2    Q.   Do you hope to get money out
3  of this lawsuit?
4    **A.   I don't know what I want.   I**
5  **never really contemplated it or thought**
6  **about it.**
7    Q.   You've never thought about
8  what you want?
9    **A.   Unh-unh.**
10    Q.   Well, you know filing a
11  lawsuit isn't going to get rid of your
12  diabetes, is that right?
13    **A.   Right.**
14    Q.   So what do you hope to get?
15    **A.   Some condition that people**
16  **who go on Seroquel should be told they're**
17  **facing the chance of getting diabetes.**
18    Q.   Have you ever looked at the
19  warning label for Seroquel?
20    **A.   No.**
21    Q.   You know when you get your
22  medicines, there's a little insert that
23  has a bunch of information on it?
24    **A.   Not mine.**

**163**

1    Q.   Have you ever read -- I take
2  it, you've never read the stuff that's in
3  there?
4    **A.   No.  Never got it.**
5    Q.   When you go to the pharmacy,
6  they give you information?
7    **A.   Not my pharmacy.**
8    Q.   And if I show you records
9  that show that, in fact, they did give
10  you warning information about Seroquel,
11  would you have reason to dispute those
12  records?
13        MS. HO:  Objection, form.
14        THE WITNESS:  Huh?
15        MS. HO:  You can answer.
16        THE WITNESS:  I don't know.
17  BY MR. ELLISON:
18    Q.   If I showed you records from
19  the pharmacy that show the warning label
20  they gave you, would you dispute either
21  the label or that they gave it to you?
22    **A.   I don't know.**
23    Q.   You never read any of the
24  stuff that came from the pharmacy, is

**164**

1  that right?
2    **A.   No.**
3    Q.   You relied totally on your
4  doctors to pick the best medicines for
5  you, is that correct?
6    **A.   Yes.**
7    Q.   You didn't rely on anything
8  else in the world, is that right?
9    **A.   No.**
10    Q.   That is correct?
11    **A.   Yes.**
12    Q.   You didn't rely -- you
13  didn't talk with anyone from AstraZeneca,
14  is that correct?
15    **A.   No.**
16    Q.   You've never talked with
17  anyone from AstraZeneca, is that correct?
18    **A.   Correct.**
19    Q.   You've never contacted
20  AstraZeneca yourself, is that right?
21    **A.   Correct.**
22    Q.   And you never read anything
23  that AstraZeneca provided to anyone about
24  the medication, is that correct?

**165**

1    **A.   Correct.**
2    Q.   By the medication, you
3  understand I mean Seroquel, is that
4  right?
5    **A.   Correct.**
6    Q.   Now, you started to tell me
7  about this relationship you had with
8  Nadia.  Okay?
9    **A.   Um-hmm.**
10    Q.   You've never loved her, is
11  that right?
12    **A.   I don't know.**
13        MS. HO:  Objection, form.
14        THE WITNESS:  There's
15    some -- there was some emotion to
16    it.
17  BY MR. ELLISON:
18    Q.   You said there was emotion
19  to it.  But it wasn't love, is that
20  right?
21    **A.   I don't know.**
22    Q.   Do you know whether you are
23  capable of loving?
24    **A.   Yeah, one.**

**(Pages 162 to 165)**

166

1    Q.   Whom have you loved?
2    A.   I've had other girlfriends
3 I've dated and I've loved them.  Never
4 married them.
5    Q.   I thought you married Nadia
6 so that she could stay in the U.S.?
7    A.   That was the first basis of
8 the marriage.  Second basis was so she
9 could have a companion.
10    Q.   Okay.
11    A.   And so I could have a
12 companion.
13    Q.   So you'd have a friend, is
14 that right?
15    A.   Yeah.
16    Q.   She threw you out of the
17 house.
18        Your face is twitching
19 again, the right side.  Are you okay?
20    A.   Um-hmm.
21    Q.   Yes?
22    A.   I'm fine.
23    Q.   Has any physician told you
24 that you have a facial tic?

167

1    A.   No.
2    Q.   Are you aware of the tic or
3 the tremor that you're having on the side
4 of your face, right side?
5    A.   Unh-unh.
6    Q.   There it is.
7        MR. ELLISON:  Do you see
8    that, counsel?
9        MS. HO:  Yes.
10 BY MR. ELLISON:
11    Q.   And you don't feel it, is
12 that right?
13    A.   Unh-unh.
14    Q.   You keep saying unh-unh.
15 You mean no, right?
16    A.   No.
17    Q.   Are you getting agitated?
18    A.   No.
19    Q.   All right.  You were telling
20 me about the relationship that you had
21 with Nadia.  Okay?  She threw you out.
22 Why?
23    A.   She didn't want me to live
24 with her anymore.

168

1    Q.   Did you hit her?
2    A.   No.
3    Q.   Have you ever hit her?
4    A.   Never.
5    Q.   Did she tell you why she
6 didn't want you there anymore?
7    A.   No.  I don't know why she
8 didn't want me.  She was in jail for
9 seven months for deportation.
10    Q.   And she was not deported?
11    A.   No.
12    Q.   That is correct?
13    A.   That's correct.
14    Q.   Then she came back to the
15 house and threw you out?
16    A.   Yes.
17    Q.   And you said you have no
18 idea why she threw you out, is that
19 right?
20    A.   Right.
21    Q.   Now, before you told me that
22 your bipolar was getting bad then, is
23 that right?
24    A.   It was, but it didn't have

169

1 nothing to do with our separation.
2    Q.   What makes you think it was
3 bad?
4    A.   We argued.
5    Q.   Were you hostile?
6    A.   No.
7    Q.   Did you yell at her?
8    A.   Yes.
9    Q.   And did you swear at her?
10    A.   Um-hmm.
11    Q.   Yes?
12    A.   Yes.
13    Q.   What would you say?
14    A.   I don't remember.
15    Q.   All right.  So if I want to
16 know what you said to her, I would have
17 to talk to Nadia, is that right?
18    A.   Good luck.
19    Q.   My question was different.
20 I would have to talk to her, is that
21 right?
22    A.   Right.
23    Q.   Well, then, who else in the
24 world could tell me what you said to her?

170

1    A.   You can talk to Nadia till
2  you're blue in the face, but Nadia
3  doesn't speak English.  So you better go
4  to Nadia and speak in Russian if you want
5  to talk to her.
6    Q.   Right.  And as you sit here,
7  you don't know whether I speak Russian or
8  not, is that right?
9    A.   No.  That's why — good luck
10 when you talk to her.
11   Q.   Do you speak Russian?
12   A.   Nope.
13   Q.   How would you communicate
14 with Nadia?
15   A.   I did not communicate very
16 well.  She always said "Me no
17 understand."
18   Q.   All right.  So you married
19 this Russian girl who didn't speak
20 English and you yourself don't speak
21 Russian?
22   A.   Right.
23   Q.   Is there a language that
24 each of you does speak that you could

171

1  communicate with?
2    A.   No.
3    Q.   And you would swear at her,
4  but you don't remember what you said?
5    A.   Unh-unh.
6    Q.   No, that is correct?
7    A.   Correct.
8    Q.   All right.  Again, you need
9  to answer my questions audibly.  Okay?
10 It seems to me that almost after every
11 single question, I have to remind you, so
12 do your best to answer out loud.  Okay?
13   A.   Okay.
14   Q.   And it's your testimony that
15 you never hit her, is that right?
16   A.   Never hit her.
17   Q.   Why an injunction then?
18   A.   One of her friends who
19 speaks very well — very much English
20 told her the best thing to do is to do
21 that to get rid of me.
22   Q.   What is the name of that
23 friend?
24   A.   I have no idea.

172

1    Q.   Then how do you know such a
2  friend exists?
3    A.   Because she only talked to
4  her friends in Russian or Russian
5  friends.  She don't talk very much to
6  English people.  It's all Russian
7  friends.  So a woman who comes to the
8  United States on a visa, only been there
9  four years, and never been to a courtroom
10 for any type of proceedings would know —
11 would not know about an injunction.  So
12 that's why somebody else had to tell her
13 about it.
14   Q.   My question is, what's the
15 basis of an injunction, or is it your
16 understanding that the court just ordered
17 you to get out for no reason?
18   A.   No.  The simple fact, in
19 Florida, anybody can get an injunction
20 against anybody they want.  I could put
21 an injunction between me and you and
22 nothing you could do about it.  You could
23 go to court after 90 days, you could go
24 to court and say your side of the story,

173

1  and the judge say, okay, the injunction
2  is enforced.  Years ago in Florida, they
3  used to have injunctions where they're
4  only good for one year.  Now, they're
5  indefinite.
6    Q.   So it's your view, anyone --
7    A.   Any type of argument or
8  fussing or whatever between two people
9  who have two incidents of violence.
10   Q.   All right.  So, again,
11 that's a little different.  You're saying
12 that as long as there is violence --
13   A.   No, doesn't have to be
14 violence.  That's one of the key things
15 you can get it on.  You could get it just
16 for the fact there are two married people
17 who don't get along.
18   Q.   Describe what you meant by
19 not get along.
20   A.   Argue.
21   Q.   So you're saying that you
22 can get an injunction against someone
23 just for arguing?
24   A.   Well, the first they let you

**174**

1 say what you want. If I go to my wife's
2 house —
3    Q.   Sir, you're talking very
4 quickly.
5    A.   — and I say to her, I'm
6 going to kill you, she goes right to the
7 courthouse, you're done.
8    Q.   Did you ever say you were
9 going to kill Nadia?
10    A.   Um-hmm.
11    Q.   Yes?
12    A.   Um-hmm.
13    Q.   No, I need you to answer out
14 loud.
15    A.   Yeah.
16    Q.   You're clutching your hands
17 and you're elevating your shoulders.
18    A.   You're trying to get
19 somewhere with my wife and I, and I don't
20 discuss my wife and I, because I can't
21 stand her. I can't stand the ground she
22 walks on. The day I walked out of her
23 home, I said, see you in hell.
24    Q.   Why can't you stand her?

**175**

1    A.   Because she used me.
2    Q.   What do you mean?
3    A.   She couldn't get a green
4 card anywhere else in the United States
5 unless she had an American last name.
6 Well, I'm American, I lived in the United
7 States, I gave her another name.
8    Q.   But you said you knew she
9 wanted to marry you because of the green
10 card right —
11    A.   Right, that's right, I knew
12 that.
13    Q.   — from the very beginning.
14    A.   She called it doing
15 business. It ain't, I love you, thanks
16 for marrying me, blah, blah, blah. We
17 must finish our business. Okay.
18    Q.   So you said you were going
19 to kill her, is that right?
20    A.   Yeah.
21    Q.   You told her you were going
22 to kill her, is that right?
23    A.   I said it.
24    Q.   And you felt it, isn't that

**176**

1 right?
2    A.   No.
3       MS. HO:  Objection, form.
4       THE WITNESS:  I don't know,
5    I don't think I was very serious.
6    I was angry.
7 BY MR. ELLISON:
8    Q.   You were angry at her, is
9 that right?
10    A.   Right.
11    Q.   And you threatened to kill
12 her, is that correct?
13    A.   Yes.
14    Q.   Was it that that was the
15 basis of the injunction?
16    A.   That's part of it.
17    Q.   What else?
18    A.   I can't — I can't — I
19 mean, I have the injunction sitting in my
20 house to this day, because those things
21 are on it.
22    Q.   What?
23    A.   I have the injunction
24 sitting in my house.

**177**

1    Q.   So you are still barred by
2 court order from getting anywhere near
3 her, is that right?
4    A.   She can't come near me, I
5 can't come near her. And nobody else
6 can't.
7    Q.   But again my question was
8 different. I was asking you about the
9 basis of the injunction. You told me
10 part of it was the death threat. I'm
11 asking about the other part. What's the
12 other part?
13    A.   I don't want to discuss it.
14    Q.   I don't care, I want to hear
15 about it. What is the other part?
16    A.   She wrote things in there
17 that I never said or did. But when
18 you're a woman in Florida and they say
19 every ten seconds in a relationship
20 between a man and a woman, the woman is
21 abused or beaten or whatever.
22    Q.   Well, but you have abused
23 women, isn't that right?
24    A.   No.

**(Pages 174 to 177)**

178

1    Q.   Well, you said you were
2  walking down the street when you were a
3  kid even and you grabbed a woman by the
4  breast.  Isn't that right?
5    A.   That ain't abusing.
6    Q.   And you've never laid a hand
7  on a woman apart from that?
8    A.   Nope.
9    Q.   That's your testimony?
10   A.   Yep.
11   Q.   All right.  Again, coming
12  back to your circumstance, you said that
13  there was the death threat and then you
14  suggested that she included stuff in
15  there that you differ with, is that
16  right?
17   A.   You're an attorney.  Come
18  down to Florida and you try to do the
19  things you're doing in Florida, you won't
20  last very long, because Florida does what
21  they want to.  I told my attorney here
22  the same thing.  You go to jail, supposed
23  to be you're innocent until proven
24  guilty, but in Florida, you're guilty

179

1  till you're proven innocent.
2    Q.   Sir, the way this works is I
3  ask you questions.
4    A.   And they're redundant.
5    Q.   And --
6    A.   And they're redundant.
7    Q.   -- you are to give me
8  answers.  And I will just say for the
9  record that I am a member of the Eleventh
10  Circuit Court of Appeals and I have
11  appeared pro hac vice in the Middle
12  District in Florida and I have nothing
13  but the highest regard for the judicial
14  system here.
15   A.   You won't if you come on
16  down to Florida.
17   Q.   With that said, again, the
18  way this works under the Federal Rules of
19  Civil Procedure, I ask you questions --
20   A.   And they're redundant.
21   Q.   -- and you answer.
22   A.   And I'm not going to discuss
23  my injunction about me and my wife.
24   Q.   Well, you have to.

180

1    A.   No, I don't have to.
2    Q.   Are you refusing to answer
3  the questions that I'm asking?
4    A.   On the grounds I will
5  self-incriminate myself, yeah.
6    Q.   You're asserting the Fifth
7  Amendment?
8    A.   Yep.
9    Q.   All right.  So if I were to
10  ask you the questions about what
11  additional information gave rise to an
12  injunction barring you from getting near
13  Nadia, you would refuse to --
14   A.   I wasn't -- what does my
15  wife have to do with this part of this?
16  She doesn't even know I filed a lawsuit
17  going against AstraZeneca.  She didn't
18  ask AstraZeneca to sit there and tell her
19  business.
20   Q.   Sir, if I were to ask you --
21   A.   But what -- what basis are
22  you asking these questions?
23       MS. HO:  Let's go off.
24       MR. ELLISON:  The witness is

181

1      yelling at me and I agree with
2      counsel that this is an
3      appropriate time to go off the
4      record and he can discuss his
5      Fifth Amendment issues with his
6      counsel.
7          MS. HO:  Let's go take a
8      walk.
9          THE WITNESS:  You ask
10      questions that doesn't have
11      nothing to do with the lawsuit.
12          MR. ELLISON:  Counsel, so
13      that it's clear, if he opens his
14      mouth while we're in the room, I'm
15      going to ask the court reporter to
16      transcribe.
17          MS. HO:  I understand.  Come
18      on.
19          (Recess is taken from 12:06
20      p.m. until 12:18 p.m.)
21  BY MR. ELLISON:
22   Q.   Let's go back on the record.
23       Administrative question,
24  have you ever filled out a supplemental

182

1  fact sheet?
2      A.   Unh-unh.
3      Q.   No?
4      A.   I don't remember.
5      Q.   Okay.  Again, I need you to
6  answer the questions out loud.  Okay?
7  Okay?
8      A.   (Witness nodding head.)
9      Q.   You keep nodding your head.
10      A.   Okay.
11      Q.   And you don't remember ever
12  filling out a supplement to what we've
13  marked as Exhibit 1?
14      A.   No.
15      Q.   I was asking you some
16  questions before we took the break about
17  the other bases for the injunction, apart
18  from the death threat.
19           Do you remember those
20  questions?
21      A.   Yes.
22      Q.   And if I understand
23  correctly, you have refused to answer
24  questions about the relationship with

183

1  Nadia Jakovenko on Fifth Amendment
2  grounds, is that right?
3      A.   Um-hmm.
4      Q.   Yes?
5      A.   Yes.
6      Q.   And if I were to ask you
7  questions about when you met her, how you
8  met her, what you did to her, what she
9  did to you, during the marriage, as well
10  as why you -- what your understanding is
11  of why she got an injunction against you,
12  you would decline to answer on the
13  grounds that the answers to those
14  questions might incriminate you.  Is that
15  correct?
16      A.   Correct.  As well as her.
17      Q.   What do you mean?
18      A.   Well, you said in your
19  statement, you're saying things that
20  could get you in trouble in the long run.
21  Well, she could get in trouble as well.
22  She could be deported.
23      Q.   Okay.  But you're asserting
24  your rights?

184

1      A.   Right.
2      Q.   Have you ever been married
3  to anyone else?
4      A.   No.
5      Q.   At any point in time?
6      A.   Never.
7      Q.   And it's just the one
8  marriage to Nadia Jakovenko, correct?
9      A.   Right.
10      Q.   What was the name of the
11  last school you attended?
12      A.   I can't remember.
13      Q.   Have you told me everything
14  there is about your educational
15  background?
16      A.   Basically, yes.
17      Q.   Have you ever had any
18  vocational or technical training?
19      A.   I had a little bit, not
20  much.
21      Q.   What little bit did you
22  have?
23      A.   I had a little bit of
24  welding and I had some training in

185

1  electrician.
2      Q.   Where did you get the
3  welding training?
4      A.   When I was in New Castle.
5      Q.   In detention?
6      A.   Yeah.
7      Q.   And where did you get the
8  electrical training?
9      A.   Same place.
10      Q.   All right.  So you had some
11  education while you were in a juvenile
12  detention facility, is that right?
13      A.   Yeah.
14      Q.   Have you ever had any
15  education of any sort while in prison?
16      A.   No.
17      Q.   All right.  Have you told me
18  about all of the different education
19  you've had --
20      A.   Yes.
21      Q.   -- both formal as well as
22  what you may have had outside of grade
23  school?
24      A.   Yes.

(Pages 182 to 185)

**186**

1    Q.   All right.  Employment, now,
2  I understand you have been entirely
3  unemployed since 1985, is that right?
4    A.   Yes.
5    Q.   When was the last time you
6  had a job?
7    A.   I can't remember.  It's been
8  a while.
9    Q.   What jobs have you had?
10    A.   I worked in restaurants.
11    Q.   Doing what?
12    A.   Busboy and dishwasher.
13    Q.   Do you remember about how
14  old you were?
15    A.   No.
16    Q.   How many different
17  restaurants?
18    A.   A lot of them.  I can't
19  remember.
20    Q.   Do you remember the names of
21  those?
22    A.   I can remember one of them
23  offhand.
24    Q.   Tell me.

**187**

1    A.   Shogun Japanese Steakhouse.
2    Q.   Shogun?
3    A.   Yes.
4    Q.   And where was that?
5    A.   Pittsburgh.  It's no longer
6  around anymore.  It's gone.
7    Q.   About how old were you then?
8    A.   In my twenties.  I can't
9  remember exactly.
10    Q.   When was the last time you
11  lived with one of your parents?
12    A.   Last time I lived with them
13  was like '83.
14    Q.   How old were you?
15    A.   I don't remember.
16    Q.   All right.  What year were
17  you born?
18    A.   '61.
19    Q.   And if it was '83, by my
20  math, that would make you about 22, is
21  that right?
22    A.   About right.
23    Q.   Is there a reason why you
24  remember the year or is that an

**188**

1  approximation?
2    A.   I remember that's the year I
3  came to Florida.
4    Q.   Why did you move to Florida?
5    A.   Basically I didn't want to
6  be in the snowbelt anymore.
7    Q.   You're talking to someone
8  who came here from Minnesota, sir.
9    A.   I prefer the weather down
10  here than in Pittsburgh.
11    Q.   Fair enough.  You moved
12  because of the weather?
13    A.   That, and my former employer
14  at the Japanese — Shogun Japanese
15  Steakhouse, he was working down here, I
16  was going to try to find him and work
17  down here.  But I never did find him.
18    Q.   When you got here, did you
19  try to get your name legally changed?
20    A.   No.
21    Q.   At no point have you tried
22  to get your name legally changed?
23    A.   No.
24    Q.   If there are records that

**189**

1  suggest that you have, those would be
2  wrong?
3    A.   Yes.
4    Q.   All right.  We'll talk about
5  that in a sec.
6         And you have been out of
7  work for more than 30 days because of
8  your psychiatric condition, is that
9  correct?
10    A.   Yes.
11    Q.   How do you refer to it, as
12  your bipolar?
13    A.   I'm bipolar, yes.
14    Q.   Is that what you call it?
15    A.   I don't use my medical as a
16  scapegoat, so to speak.  But I had a
17  friend of mine who filed for disability
18  himself and he explained what it's all —
19  some of it was entailed about.  So I
20  said, maybe I can get it too.
21    Q.   And who is your friend?
22    A.   I can't remember his name.
23  It's been a long time.
24    Q.   So you thought you might be

190

1  able to use your bipolar and get some
2  money?
3        MS. HO: Objection, form.
4        THE WITNESS: Let's put it
5    this way.  I don't want to say to
6    use it to get money, but it was
7    the basis to get disability, like
8    somebody else had, and I got it.
9    And I've been on it since then.
10 BY MR. ELLISON:
11   Q.   All right.  If you turn the
12 page to Page 3.  We have precious little
13 information at this point about your
14 Seroquel use, and on your sworn fact
15 sheet you put that you have used it from
16 2000 through the present at
17 300 milligrams.
18       Do you see that there?
19   A.   I see that.
20   Q.   Now, in fact, you're
21 currently on a 450-milligram dose?
22   A.   Correct.
23   Q.   So it's been increased since
24 2003, is that right?

191

1     A.   Well, the maximum I had
2  altogether was 600 milligrams.
3     Q.   And that was to control your
4  bipolar, right?
5     A.   Yes.
6     Q.   And it worked, right?
7     A.   It worked quite well, yes.
8     Q.   And that's why you still
9  take it to this day, isn't that right?
10    A.   No.
11    Q.   All right.  You do take it
12 to this day, is that correct?
13    A.   Right.
14    Q.   And you take it because your
15 physician tells you to, is that right?
16       MS. HO: Objection to the
17    form.
18       THE WITNESS: The physician,
19    when I first discussed it about
20    anything, about quitting or
21    nothing, and I tried to quit
22    taking the Risperdal also and
23    they're going to cut out the
24    Artane for the side effects I was

192

1     having, and so I said, well, I
2     need my Artane. And the only way
3     I'm going to get the Artane is go
4     back on the Risperdal and so on.
5  BY MR. ELLISON:
6     Q.   When did you tell -- let's
7  focus on Seroquel.
8        Have you told the doctor you
9  don't want to take it?
10    A.   I'm being tapered off it
11 right now.
12    Q.   And who is doing that?
13    A.   At the time who I talked to
14 was Nicole Keene.  She said she's moving
15 on to something else.
16    Q.   So Dr. Keene didn't take you
17 off it, is that right?
18    A.   No.
19    Q.   Who is the doctor who's
20 taking you off it you said?
21    A.   I'm not off it.  I'm being
22 weaned -- I'm being weaned off slowly.
23    Q.   All right.  And who is that
24 doctor?

193

1     A.   Susan Marieni, I guess her
2  name is.
3     Q.   And is she a psychiatrist?
4     A.   She's an AARNP.
5     Q.   She's a nurse practitioner,
6  is that right?
7     A.   Right.
8     Q.   She's not a medical doctor,
9  correct?
10    A.   Right.
11    Q.   She's not a psychiatrist, is
12 that correct?
13    A.   Correct.
14    Q.   And you've not asked any
15 medical doctor, psychiatrist or
16 otherwise, about your medication --
17    A.   All --
18    Q.   Sir, I have to finish the
19 question.  Okay?  You don't know what I'm
20 -- how can you answer until you know what
21 I've asked?  Fair enough?
22    A.   Fair enough.
23    Q.   It's not fair to you to try
24 to make you guess at where I'm going with

**194**

1 a question either. Okay?
2  **A.  Okay.**
3  Q.  So in fairness to both of
4 us, we each have to let each other talk.
5  **A.  Okay.**
6  Q.  My question is, you've not
7 asked a medical doctor, a psychiatrist or
8 other medical doctor, about stopping your
9 Seroquel?
10  **A.  No.**
11  Q.  That is correct?
12  **A.  That's correct.**
13  Q.  Does the nurse practitioner
14 who you claim is weaning you off Seroquel
15 right now know about your criminal
16 history?
17  **A.  Yes.**
18  Q.  And you've talked with her
19 about it?
20  **A.  I never talked to her about**
21  **it, but it's well known.**
22  Q.  Well known to whom?
23  **A.  To Directions.**
24  Q.  Is she in the criminal

**195**

1 system?
2  **A.  No.  She works with**
3  **Directions.**
4  Q.  What is Directions?
5  **A.  A mental health service.**
6  Q.  And that is what, a
7 hospital?
8  **A.  That's a clinic.**
9  Q.  All right.  And what do you
10 mean it's well known to Directions?
11  **A.  Anybody who is a client of**
12  **Directions who has been through the penal**
13  **system, they released all that**
14  **information to them as well, because they**
15  **worked through the penal system as well.**
16  Q.  And if I understand, you
17 asked the nurse practitioner if you would
18 get off Seroquel about a month or so ago
19 because you thought that it might have
20 something to do with diabetes, is that
21 right?
22  **A.  Right.**
23  Q.  You didn't stop it because
24 it wasn't working, correct?

**196**

1  **A.  Correct.**
2  Q.  And, in fact, as you sit
3 here today, you're on how many
4 milligrams?
5  **A.  450.**
6  Q.  450 milligrams?
7  **A.  Down from 600.**
8  Q.  And when were you upped to
9 600?
10  **A.  I can't remember.**
11  Q.  And you've used Seroquel
12 continuously since 2003 through 2005 or
13 2000 -- through today I guess?
14  **A.  Yes.**
15  Q.  There's no period where you
16 were not using Seroquel?
17  **A.  Correct.**
18  Q.  And I want you to tell me
19 the name of every doctor who has
20 prescribed you Seroquel.
21  **A.  Well, in Directions, the**
22  **AARNPs are directed to go along with the**
23  **medications.  They go through the**
24  **director, Dr. Zenel.**

**197**

1  Q.  And what is Dr. Zentel's
2 first name?
3  **A.  James, I believe.  I'm not**
4  **sure.**
5  Q.  Can you spell the last name?
6  **A.  I can't spell it, no.**
7  Q.  Give me your best spelling.
8  **A.  Z-E-N-T-E-L, I guess.  I'm**
9  **not sure.**
10  Q.  Is he the head of the
11 clinic?
12  **A.  He's the director.**
13  Q.  How many other doctors are
14 at Directions?
15  **A.  Well, there's Dr. Scargo,**
16  **there's Dr. Desai.  That's all I can**
17  **think of.  I can't remember any others.**
18  Q.  And you see all of the
19 different doctors?
20  **A.  No, I see one.**
21  Q.  And who is the one you see?
22  **A.  The AARNP.**
23  Q.  So you have never talked
24 with a medical doctor at Directions?

198

1    A.   No.
2    Q.   At any point in time?
3    A.   There is no medical — there
4  is no medical doctor.
5    Q.   All right.  You told me
6  there was a Dr. Desai?
7    A.   Desai is a psychiatrist.
8    Q.   It's your understanding that
9  psychiatrists are not medical doctors?
10    A.   To my knowledge, no.
11    Q.   All right.  I represent to
12  you in order to practice psychiatry, you,
13  in fact, do need to be a licensed medical
14  doctor.
15    A.   Okay.
16    Q.   Okay?  Having that in mind,
17  medical doctors, including psychiatrists,
18  how many are at Directions?
19    A.   I don't know how many there
20  is.  I only know of Dr. Zentel, Dr.
21  Scargo and Dr. Desai.  That's all I know.
22    Q.   But you know there to be
23  more than just those?
24    A.   Yes.

199

1    Q.   Which of those individuals
2  have you seen for care or treatment?
3    A.   I seen Dr. Desai, but I
4  didn't see her for Seroquel.
5    Q.   All right.  What other
6  physicians at Directions do you see?
7    A.   I've sat at one meeting with
8  Dr. Zentel who changed the Seroquel from
9  400 to 600.
10    Q.   And what is your
11  understanding of why he did that?
12    A.   I really don't have any
13  understanding.  I don't know.
14    Q.   Did you tell him that you
15  weren't feeling well?
16    A.   No.
17    Q.   As you sit here, you have no
18  idea why he upped those?
19    A.   I have no idea, no.  I just
20  went along with it.
21    Q.   What do you suspect?
22    A.   I don't.
23    Q.   Maybe your symptoms were
24  acting up?

200

1    A.   Maybe, or maybe they were
2  trying to get a therapeutic level.  I
3  don't know.
4    Q.   You don't know whether 450
5  was therapeutic?
6    A.   450 — I was at 600 and Dr.
7  — I mean, the nurse practitioner, Nicole
8  Keene, dropped it down to 450, so I can
9  start to wean off it finally.
10    Q.   And then he kicked it back
11  up?
12    A.   Well, he's the one — Dr.
13  Zentel is the one that had all the
14  concern.  He went along with Nicole Keene
15  to go ahead and reduce it.
16    Q.   All right.  Let's start at
17  the beginning.  Who is the first doctor
18  to prescribe Seroquel for you?
19    A.   I don't remember who it was.
20  It was a nurse practitioner.
21    Q.   So if we wanted to know what
22  went into that and what was discussed
23  with you, we would have to look at that
24  person's medical records, right?

201

1    A.   Or get my records, period,
2  from Directions.
3    Q.   And you don't have any
4  independent memory of talking with the
5  person who first prescribed you Seroquel?
6    A.   I only had one visit with
7  her.
8    Q.   And you don't know her name?
9    A.   No.  I couldn't remember the
10  name.
11    Q.   And you don't remember
12  anything about what was discussed?
13    A.   Pretty much no.
14    Q.   You don't remember if she
15  told you about the risks of Seroquel?
16    A.   I don't remember anything.
17    Q.   You don't remember if she
18  told you about the benefits of Seroquel?
19    A.   I don't remember anything.
20    Q.   She may have told you that
21  Seroquel can cause diabetes, do you still
22  want it, you said yes, is that right?
23    MS. HO:  Objection to the
24  form.

(Pages 198 to 201)

**202**

1       THE WITNESS:  It's possible.
2   I don't know.
3   BY MR. ELLISON:
4       Q.   You just don't remember one
5   way or the other?
6       A.   No.
7       Q.   Do you still go to
8   Directions today?
9       A.   Yes.
10      Q.   Do you think they're good
11  doctors there?
12      **A.   I think they do a good job,**
13  **yes.**
14      Q.   And you feel better today
15  than you did when you first went there,
16  is that right?
17      A.   Yes.
18      Q.   And so their care and
19  treatment of you has been beneficial, is
20  that right?
21      A.   Yes.
22      Q.   And that includes the
23  medications that they've chosen to
24  prescribe for you, is that right?

**203**

1       A.   Yes.
2       Q.   You don't have any criticism
3   of your medical doctors at all, is that
4   right?
5       A.   No.
6       Q.   At no point in time,
7   correct?
8       A.   No.
9       Q.   And you don't challenge the
10  decision to prescribe you Seroquel, is
11  that correct?
12      **A.   Right.**
13      MS. HO:  Objection, form.
14  BY MR. ELLISON:
15      Q.   You're not critical of your
16  doctors, in other words, you don't think
17  your doctors did something wrong by
18  giving you Seroquel, correct?
19      A.   No.
20      Q.   That is correct?
21      A.   Correct.
22      Q.   Is Directions the only
23  facility that you've been seeing for
24  mental healthcare?

**204**

1       A.   On an outpatient, yes.
2       Q.   Are there any other
3   hospitals, clinics, doctors that you have
4   seen since you moved to Florida for
5   healthcare?
6       **A.   Well, I've been Baker Acted**
7   **in a hospital before and there's doctors**
8   **who continued it.**
9       Q.   You have been involuntarily
10  committed in a hospital because -- since
11  you've moved to Florida, is that right?
12      **A.   Yes.**
13      Q.   Is that the instance you
14  told me about before or is this a new
15  one?
16      **A.   Well, see, in Clearwater,**
17  **they have hospitals that have behavioral**
18  **treatment, whatever you want to call it.**
19      Q.   And what hospital was that?
20      **A.   Morton Plant is one of them.**
21      Q.   What else?
22      **A.   I was in there and I was in**
23  **Sun Coast.  And I was in St. Anthony's.**
24      Q.   You've been involuntarily

**205**

1   committed in each one?
2       **A.   Yes.**
3       Q.   How many times have you been
4   committed to a facility against your will
5   because of your psychiatric condition?
6       **A.   Twice in -- twice in Sun**
7   **Coast.  Once in St. Anthony's and three**
8   **or four times in Morton Plant.**
9       Q.   So since you moved to
10  Florida -- strike that.
11      You were also involuntarily
12  committed as a kid, correct?
13      **A.   Yes.**
14      Q.   So since you moved to
15  Florida, when you were 22, you have been
16  committed because of your bipolar,
17  hospitalized, committed, against your
18  will, about seven or so times, is that
19  right?
20      **A.   About right.**
21      Q.   How much time have you spent
22  committed because of your bipolar?
23      **A.   Well, in Pennsylvania as a**
24  **juvenile, I was there for two years.**

**(Pages 202 to 205)**

---

**206**

1  I've done a couple weeks, a couple months
2  in other places.  I've also been in ALF
3  also.
4      Q.   What does that mean?
5      A.   Assisted living facilities.
6      Q.   And that was because of your
7  bipolar?
8      A.   Yes.
9      Q.   Which assisted living
10 facilities have you been in?
11     A.   Well, I can't remember the
12 names offhand.  But one was in Gulfport.
13 One is in St. Pete.
14     Q.   And you don't remember the
15 names?
16     A.   I can remember one of them.
17 One of them was called — I had the name
18 in my head and it went out of my head.
19     Q.   If it comes back, will you
20 let me know?
21     A.   Yeah, I'll let you know.
22     Q.   We were talking about your
23 use of Seroquel and the places that you
24 went to get it.

**207**

1          If I understand, from 2003
2  to the present, you've been using
3  Directions for your mental healthcare, is
4  that right?
5      A.   Yes.
6      Q.   And you've been, you
7  acknowledged, committed involuntarily to
8  a few institutions?
9      A.   Right.
10     Q.   But you've not gone to any
11 separate hospital or clinic because of
12 your mental health?
13     A.   No.
14     Q.   Is that right?  That is
15 correct?
16     A.   That's right.
17     Q.   Are there any other -- who
18 do you see for your diabetes?
19     A.   Dr. Bacha.  She's all my
20 medical.
21     Q.   Do you consider Dr. Bacha
22 your primary physician?
23     A.   Yes.
24     Q.   How often do you see Dr.

**208**

1  Bacha?
2      A.   About every 90 days.
3      Q.   How often -- when did you
4  start seeing Dr. Bacha?
5      A.   I can't remember.
6      Q.   Has it been more than ten
7  years?
8      A.   No.
9      Q.   Five years?
10     A.   Less.
11     Q.   Now, where is Dr. Bacha?
12     A.   She's at 1173 Turner Street.
13     Q.   What city?
14     A.   Clearwater.
15     Q.   How far away is Clearwater
16 from your mobile home?
17     A.   I couldn't — I couldn't
18 recollect.
19     Q.   How do you get to your
20 medical appointments?
21     A.   City bus.
22     Q.   You don't own a car,
23 correct?
24     A.   No.

**209**

1      Q.   Have you ever?
2      A.   I had a car, but no license.
3      Q.   You had a car when?  I'm
4  sorry.
5      A.   I had a car, but no license.
6      Q.   Have you ever had a driver's
7  license?
8      A.   No.
9      Q.   Have you ever applied?
10     A.   Tried three times.  Failed.
11     Q.   Failed what?
12     A.   Driving test.
13     Q.   The driving or the writing?
14     A.   The driving.
15     Q.   Have you ever had something
16 taken away from you because of your
17 bipolar?
18     A.   No.
19     Q.   Have you ever had a license
20 that you lost?
21     A.   No.
22     Q.   We're back on the Seroquel.
23 Okay?
24          I need to know every place

**210**

1 that you got Seroquel from. Okay? Have
2 we covered -- and through. Have we
3 covered all of your physicians?
4     A.   I guess.
5     Q.   Are there any others that
6 you can think of?
7     A.   No.
8     Q.   Are there any others that
9 you can think of that have had anything
10 to do with your medical care, including
11 your mental healthcare?
12     A.   Other than Dr. Yamani.
13     Q.   You mentioned him. Anyone
14 else?
15     A.   There was another doctor,
16 female. I can't remember her name.
17     Q.   Where is that doctor?
18     A.   I don't know where she is
19 anymore.
20     Q.   What was the name of where
21 she was when you saw her?
22     A.   You mentioned it before.
23 Something geriatrics -- I can't remember.
24     Q.   If it comes to you, will you

**211**

1 let me know?
2     A.   Yes.
3     Q.   Now I need to know the name
4 of every place from which you got
5 Seroquel. Okay? Pharmacies, where would
6 you get it?
7     A.   Medicine Shoppe.
8     Q.   Medicine Shoppe?
9     A.   CVS.
10     Q.   Walgreens?
11     A.   Walgreens.
12     Q.   And those are listed on
13 Page 4 of your fact sheet, in case that
14 helps.
15         Do you see that there?
16     A.   Yes, I see that.
17     Q.   Are there any others? No?
18     A.   That's all I can think of
19 right now. Eckerd, but Eckerd is no
20 longer around.
21     Q.   That's right. They were
22 bought by CVS, weren't they?
23     A.   I think so.
24     Q.   Up under A, it says identify

**212**

1 your healthcare providers, and I think
2 there's a name we neglected to mention,
3 Belur, and Belur is B-E-L-U-R, and
4 Sreenath is S-R-E-E-N-A-T-H,
5 gastroenterologist.
6         Do you see that there?
7     A.   Yes.
8     Q.   Is that the person who
9 helped you with your reflux and your
10 gastroparesis?
11     A.   Yes.
12     Q.   And the date of the
13 treatment is 2004, is that right?
14     A.   About right.
15     Q.   How long were you taking
16 Seroquel before you think it may have
17 caused your diabetes?
18     A.   I don't know.
19     Q.   It says here you were on
20 Seroquel in 2003 and you told me before
21 that you developed diabetes in about
22 2004, 2005?
23     A.   That's about right.
24     Q.   So we were thinking you were

**213**

1 on it about a year, two years?
2     A.   Yeah, something like that.
3     Q.   Now, in terms of your
4 injuries, you're claiming that Seroquel
5 caused you to have diabetes, correct?
6     A.   Um-hmm.
7     Q.   Yes?
8     A.   Yes.
9     Q.   And you are not claiming
10 that Seroquel did anything else harmful
11 to you, correct?
12         MS. HO:  Objection, form.
13         THE WITNESS:  Correct.
14 BY MR. ELLISON:
15     Q.   Well, is there something
16 else that you're claiming Seroquel did to
17 you?
18     A.   No.
19     Q.   And it says how you first
20 become aware of it, this is on Page 3 of
21 Exhibit 1, diagnosed by a doctor.
22         Do you see that? Page 3.
23     A.   I'm on Page 3.
24     Q.   Right in the middle.

**(Pages 210 to 213)**

214

1 Actually, it's about two-thirds of the
2 way down, how you first become aware of
3 it.
4     A.   I see injuries, symptoms —
5     Q.   A few lines down from there.
6         MS. HO:  Under three.
7         THE WITNESS:  Okay.  I see
8 it.
9 BY MR. ELLISON:
10     Q.   Do you see that?
11     A.   I see it now.
12     Q.   Which doctor?
13     A.   I can't remember who it was.
14 I was diagnosed with diabetes when I was
15 in the emergency room.  So I don't know
16 who it was.
17     Q.   We talked about that
18 completely before, right?
19     A.   Um-hmm.
20     Q.   Yes?
21     A.   Yes.
22     Q.   And then it says whether you
23 have consulted with any healthcare
24 provider regarding the condition.  And

215

1 you wrote yes.  Do you see that there?
2     A.   Yes.
3     Q.   And that's Dr. Bacha that we
4 talked about?
5     A.   Okay.
6     Q.   Is it?  I'm asking you.
7 Who's the doctor, the healthcare provider
8 regarding the diabetes that you
9 consulted?
10     A.   Well, I seen Dr. Yamani for
11 that first and I moved from Dr. Yamani to
12 Dr. Bacha.
13     Q.   Then we asked you about --
14 strike that.
15         Are there any other doctors
16 or that is it?
17     A.   Dr. Sreenath takes care of
18 my — Dr. Sreenath was maintaining myself
19 for my gastrology (sic) problems because
20 I have GERD and I have gastroparesis.
21     Q.   But Dr. Sreenath hasn't told
22 you that --
23     A.   No.
24     Q.   -- Seroquel had anything to

216

1 do with that, right?
2     A.   Right, right.
3     Q.   Do you see under C there,
4 are you claiming that you have to pay
5 money because of your diabetes?  Do you
6 see that there?
7     A.   I see that.
8     Q.   What money have you had to
9 spend on your diabetes?
10     A.   Well, since diabetic
11 gastroparesis I have, it cost me an
12 ambulance ride to the hospital.
13     Q.   Cost what?
14     A.   Cost me an ambulance ride to
15 the hospital.
16     Q.   How much did that cost?
17     A.   It averages anywhere from
18 $500 and under.  It depends.
19     Q.   How much did you spend?
20     A.   Out of my insurance money
21 that I had to pay co-payments on.
22     Q.   So you're out of pocket the
23 co-payments?
24     A.   Yes.

217

1     Q.   Your insurance is what, SSI?
2     A.   SS — I got Medicare and
3 Medicaid.
4     Q.   Oh, okay.  And what was your
5 co-pay?
6     A.   It averages.  I couldn't
7 especially start to say.
8     Q.   What's the average?
9     A.   The lowest it could ever be
10 is about $2.
11     Q.   All right.  Let's take a
12 step back, counsel.  You understand
13 that -- strike that.
14         Mr. Haller, you understand
15 that I got to go back and tell my client
16 that you think it owes you money.
17         Do you understand that,
18 right?
19     A.   Um-hmm.
20     Q.   You do?
21     A.   Yes.
22     Q.   And they're going to ask me,
23 he does?  How much?  And so I'm asking
24 you, how much?  What do you think my

(Pages 214 to 217)

**218**

1 clients owes you?
2    A.   **I don't know.**
3    Q.   You haven't tried to
4 determine how much in medical bills,
5 expenses or anything else that you think
6 my client owes you? No? You haven't?
7    A.   **No.**
8    Q.   Why are you smiling?
9    A.   **I'm not smiling.**
10    Q.   Do you need a minute?
11    A.   **No.**
12    Q.   So what am I supposed to
13 tell my client?
14    A.   **I don't know.**
15    Q.   Well, who would know?
16    A.   **I don't have no idea.**
17    Q.   So as you sit here today,
18 you have no idea what you're trying --
19 what you think my client should pay you,
20 is that right?
21    A.   **Um-hmm.**
22    Q.   Yes?
23    A.   **Yes.**
24    Q.   And you have no idea what

**219**

1 your medical bills are, correct?
2    A.   **Yes.**
3    Q.   And you have no idea what
4 your medical expenses are that you claim
5 result from your diabetes, is that right?
6    A.   **Yes.**
7    Q.   Well, you don't have any
8 medications for your diabetes, is that
9 correct?
10    A.   **Correct.**
11    Q.   You've never needed
12 medication --
13    A.   **I was on metformin for a**
14 **while.**
15    Q.   When were you on Metformin?
16    A.   **I can't remember. It's been**
17 **a while back.**
18    Q.   What was the time frame?
19    A.   **About six months to a year.**
20    Q.   Okay. And, again, you
21 didn't pay for the whole pill, you were
22 just out of pocket the co-pay?
23    A.   **Yes.**
24    Q.   What was the co-pay for

**220**

1 that?
2    A.   **I believe it was like $2 or**
3 **$1.50.**
4    Q.   And how often did you have
5 to fill a prescription?
6    A.   **Every 30 days.**
7    Q.   So if you're on six months,
8 that would be six prescriptions, is that
9 right?
10    A.   **I guess.**
11    Q.   Two bucks a co-pay, we're
12 talking $12, is that right?
13    A.   **Okay.**
14    Q.   I'm asking you.
15    A.   **I don't know.**
16    Q.   Is that about how much you
17 spent on your Metformin out of your own
18 pocket?
19    A.   **I don't know what I paid.**
20    Q.   Does that sound right to
21 you?
22    A.   **I don't know.**
23    Q.   What else, what other
24 medications or any other expenses have

**221**

1 you had as a result of your diabetes?
2    A.   **I don't know. None.**
3    Q.   All right. So the only
4 thing you're out for your diabetes, care
5 and treatment, medication, docs, the only
6 thing you're out is the co-pay for your
7 Metformin?
8    A.   **I guess.**
9    Q.   You tell me. I mean, if you
10 can't tell me the amount, tell me the
11 nature, what type. And if I'm hearing
12 you right, the only thing you're out of
13 pocket is the co-pay on the Metformin?
14    A.   **I guess.**
15    Q.   Well, are there any more?
16    A.   **No.**
17    Q.   And the co-pay for each of
18 those prescriptions, those monthly
19 prescriptions, was about two bucks, am I
20 hearing you right?
21    A.   **Yeah.**
22    Q.   To determine what other
23 medications you have been on since the
24 time you started Seroquel, you'd send me

**(Pages 218 to 221)**

222

1  to your medical records, right?
2      A.   I guess.
3      Q.   What do you mean you guess?
4      A.   Whatever you said.  I mean,
5  I tried to get them already.  I tried to
6  get them before, but I guess that fell
7  through.
8      Q.   If I understood you
9  correctly, what you were telling me about
10  before was in response to a question that
11  I asked you about the medications you're
12  on today, is that right?
13      A.   Right.
14      Q.   I'm talking about all of the
15  different medications you've been on
16  since 2003 when you started Seroquel.
17  Okay?
18      A.   I'm pretty much on all of
19  the same ones, except for Metformin.  I'm
20  off Metformin now.
21      Q.   All right.  Fair enough.
22      A.   Everything is the same,
23  except for the Metformin.
24      Q.   All right.  Can you turn to

223

1  Page C or Page 5, under C.  It's got
2  drinking history.  Do you see that at the
3  top?
4      A.   Um-hmm.
5      Q.   Yes?
6      A.   Yes.
7      Q.   You said you don't drink, is
8  that right?
9      A.   No, I don't drink anymore.
10      Q.   Are you an alcoholic?
11      A.   Recovering.
12      Q.   And for how long have you
13  been recovering?
14      A.   23 years.
15      Q.   Okay.  How many?
16      A.   23 years.  The last drink I
17  had was in October '85.
18      Q.   Now, do you see under C2, it
19  says do you currently -- strike that.
20          Have you ever drunk alcohol.
21  Do you see that?
22      A.   Um-hmm.
23      Q.   Yes?  And you had two boxes,
24  yes and no, is that right?

224

1      A.   Yes.
2      Q.   You did not check the box
3  that said yes, correct?
4      A.   Correct.
5      Q.   You checked the box that
6  said no, correct?
7      A.   Right.
8      Q.   And that's false, correct?
9      A.   Yes.
10      Q.   You should have checked yes,
11  is that right?
12      A.   Correct.
13      Q.   And you checked no and
14  didn't answer any of the other questions,
15  correct?
16      A.   Correct.
17      Q.   You should have answered the
18  other questions, correct?
19      A.   Exactly.
20      Q.   Because not answering them
21  was also false, right?
22      A.   Correct.
23      Q.   What was your greatest
24  alcohol consumption over a six-month or

225

1  greater period?  Actually, in fairness to
2  you, it says within the last ten years.
3  So you were right not to answer that
4  question, and I sit corrected.
5          With that said, what were
6  you drinking such that you thought you
7  were an alcoholic?
8      A.   Whiskeys, bourbons,
9  scotches, gins.
10      Q.   How much?
11      A.   Till I was intoxicated in a
12  day.
13      Q.   Every day?  How did you pay
14  for it?
15      A.   On disability at the time.
16      Q.   So you just took your check
17  and spent it on alcohol?
18      A.   Some of it.
19      Q.   What else did you spend it
20  on?
21      A.   Food.
22      Q.   What else?
23      A.   Medications, co-payments.
24      Q.   What else?

(Pages 222 to 225)

226

1    A.    That's all I can think of.
2    Q.    Rent?
3    A.    Yeah.
4    Q.    And you were doing this
5    every day?
6    A.    Every day.
7    Q.    How did you quit?
8    A.    Just went cold turkey.
9    Q.    Did you go to Alcoholics
10   Anonymous?
11   A.    Never.
12   Q.    Have you ever?  You've not
13   ever?
14   A.    Never.
15   Q.    So you today consider
16   yourself a recovering alcoholic, is that
17   right?
18   A.    Yes.
19   Q.    Are you aware of whether
20   alcohol abuse is a symptom of bipolar or
21   is frequent in bipolar people?
22   A.    No.
23   Q.    No physician has ever talked
24   with you about that?

227

1    A.    No.
2    Q.    Now, look under D, medical
3    history, for the different conditions,
4    this is on Page 5 of Exhibit 1 --
5    A.    Okay.
6    Q.    -- you checked yes for
7    bipolar disorder.  Is that right?
8    A.    Yes.
9    Q.    But you checked no for
10   schizophrenia?
11   A.    I've never been diagnosed or
12   treated for schizophrenia.
13   Q.    To your knowledge, none of
14   your physicians have thought you have
15   schizophrenia?
16   A.    No.
17   Q.    No doctor has ever told you
18   that?
19   A.    No.
20   Q.    And under depression, you
21   checked no.  Is that right?
22   A.    Correct.
23   Q.    Is there a difference in
24   your mind between bipolar disorder, the

228

1    depressions with that, and depression
2    generally?
3    A.    I don't know, I don't know.
4    Q.    Well, then, are you telling
5    me you should have checked yes?
6    A.    I don't think so.  I don't
7    know why, but I just don't think so.
8    Q.    And you have diabetes
9    mellitus, is that right?
10   A.    I guess.
11   Q.    Type II?
12   A.    Type II.
13   Q.    Why do you say you guess?
14   A.    Because I don't know -- I
15   don't know what that word means.
16   Q.    Well, you're the one who
17   checked yes in that box.  Do you see that
18   there?
19   A.    I see it.
20   Q.    When you checked yes and
21   swore it was true, what did you
22   understand it to mean?
23   A.    I don't know.
24   Q.    So you were just checking

229

1    off answers on your fact sheet and
2    swearing it's true and you're not even
3    sure what it knew -- or what it meant?
4    A.    No.
5    Q.    Is that correct?
6    A.    I don't know.
7    Q.    How many of these answers do
8    you not have any idea what it means?
9    Take the time you need to flip through
10   your fact sheet.
11   A.    Well, medical history, as a
12   child, I have no memory of what my
13   medical history is.
14   Q.    You have no memory of your
15   medical history at all?
16   A.    From birth to now, I have no
17   history, for myself right now.
18   Q.    How far back does your
19   memory go?  You're reaching in your
20   pocket.
21   A.    Not far at all.
22   Q.    What are you reaching for?
23       MS. HO:  Some keys.
24   BY MR. ELLISON:

(Pages 226 to 229)

230

1    Q.   How far back does your
2  memory go?
3    A.   Not very far.
4    Q.   How far back does your
5  memory go?
6    A.   Not far enough.
7    Q.   All right.  You've answered
8  my question without answering my
9  question.  Does it go back a week?
10    A.   I don't know how far it
11  goes.
12    Q.   Do you remember what we did
13  this morning?
14    A.   Now I don't know.
15    Q.   Do you remember your plane
16  flight here?
17    A.   A little bit.
18    Q.   Do you remember the room you
19  stayed?
20    A.   Yeah.
21    Q.   What room?
22    A.   115.
23    Q.   Okay.  So your memory goes
24  back at least to your check-in last

231

1  night, is that right?
2    A.   At least.
3    Q.   You can't tell me how much
4  you remember?
5    A.   I don't think about things
6  like that.
7    Q.   And you have no idea of
8  whether you were being accurate or
9  truthful when you filled out this fact
10  sheet as a result?
11      MS. HO:  Object to form.
12      THE WITNESS:  I do it to the
13    best of my ability.
14  BY MR. ELLISON:
15    Q.   You checked yes to
16  hyperglycemia.  Do you see that there,
17  high blood sugar?
18    A.   I see that.
19    Q.   And do you understand that
20  having high blood sugar means you have
21  diabetes, is that right?
22    A.   I guess.
23    Q.   What do you mean you guess?
24    A.   I don't even know what

232

1  hyperglycemia is.  I know I have high
2  blood pressure -- high blood sugar.
3    Q.   Well, it says here
4  hyperglycemia is high blood sugar.
5    A.   When a doctor tells me,
6  you're urinating 400 cc's of sugar,
7  that's awful high.
8    Q.   Why?  Why do you think
9  that's high?
10    A.   That's a lot of sugar to be
11  urinating.  A box of cereal don't even
12  have 400 milligrams of sugar in it.  A
13  bottle of maple syrup don't have 400 cc's
14  of sugar in it.
15    Q.   Is there a level that you
16  understand to be normal for the amount of
17  sugar --
18    A.   For diabetes -- myself going
19  through the Joslin Center, the Joslin
20  Center says the average sugar that should
21  be in your blood should be no more than
22  50 to 150.  Any more than that, you get
23  high blood sugar.
24    Q.   So 50 to 150, is that right?

233

1    A.   So if I'm urinating 400,
2  that's an awful lot of sugar in it.
3    Q.   Has anyone told you if you
4  have blood sugar over 125, that's
5  diabetes?
6    A.   No.
7    Q.   Okay.
8    A.   I'm only going by what the
9  Joslin Center told me.
10    Q.   It says obesity, and you
11  wrote September 2006.  Is that right?
12    A.   Okay.
13    Q.   Do you see that there?
14    A.   I see it.
15    Q.   Is that true?
16    A.   Yes.
17    Q.   You were of normal weight
18  until September of 2006, is that your
19  testimony?
20    A.   Not really.
21      MS. HO:  Object to form.
22  BY MR. ELLISON:
23    Q.   I need you to tell me when
24  you first were overweight, when you were

(Pages 230 to 233)

234

1  first obese.
2      A.   **About 2003 or -- 2000, I was**
3  **weighing about 200 pounds.**
4      Q.   And is that -- it's your
5  contention that Seroquel made you fat?
6      A.   **It was a key factor.**
7      Q.   You say a key factor.  You
8  were not fat until you started using
9  Seroquel?
10     A.   **I weighed 200 pounds in**
11 **1995, 1996, 1997, 1998.  But come around**
12 **the year 2003, 2000 -- 2000, yeah, I was**
13 **overweight.**
14     Q.   Let's take a step back, sir.
15 You said you were 200 pounds in
16 around '97 or so, is that right?
17     A.   **I said as of 2000, 2003, I**
18 **was about 200 pounds.**
19     Q.   How much were you
20 around '97, '98?
21     A.   **Only about 160, 180.**
22     Q.   Okay.  So you were 2000
23 around the time you started -- 200 around
24 the time you started Seroquel, is that

235

1  what you're saying?
2      A.   **Yes.**
3      Q.   How tall are you?
4      A.   **Five-six.**
5      Q.   Has any doctor told you that
6  five-six, 200 pounds is obese?
7      A.   **They didn't say it was good**
8  **either.**
9      Q.   Did any of them tell you it
10 was obese?
11     A.   **They didn't say it wasn't.**
12     Q.   What did you think it was?
13     A.   **I call it obese.  I'm like**
14 **90 pounds overweight.**
15     Q.   Will you flip to Page 6.
16 Under medications, it identifies a number
17 of different medications.  Do you see
18 that there?
19     A.   **Um-hmm.**
20     Q.   Yes?
21     A.   **Yes.**
22     Q.   You checked Haldol, right?
23     A.   **In the past I've been on it.**
24     Q.   And you were on it beginning

236

1  1986 for about 20 years, is that right?
2      A.   **20 years, where do you see**
3  **that at?**
4      Q.   No, that's my head.
5      A.   **In your head?**
6      Q.   Yeah, I did the math based
7  on your medical records.
8      A.   **Well, I haven't been on**
9  **Haldol for years.**
10     Q.   You haven't been on it in
11 years?
12     A.   **But I've been on it in the**
13 **past.**
14     Q.   And how long were you on it
15 in the past when you were taking it?
16     A.   **For about a year or so.**
17     Q.   How long were you on
18 lithium?
19     A.   **Well, the first dose of**
20 **lithium was 1987 and I was taken off of**
21 **it in 2003, 2005.**
22     Q.   So you were on that about
23 20 years?
24     A.   **Where are you getting this**

237

1  20 years at?
2      Q.   I thought you said '87 to
3  2005.  Did I mishear you?
4      A.   **Somewhere around there.**
5      Q.   Well, that's, I guess,
6  18 years.
7          MS. HO:  18.
8          THE WITNESS:  But that ain't
9  20.
10 BY MR. ELLISON:
11     Q.   My math is corrected.
12         You took perphenazine,
13 Trilafon?
14     A.   **Yeah, I took Trilafon, yes.**
15     Q.   What is that?
16     A.   **Antipsychotic.**
17     Q.   What is that for?
18     A.   **Well, I was just taking the**
19 **medications that would help me.**
20     Q.   Why were you taking an
21 antipsychotic?
22     A.   **I'm taking one now.  What do**
23 **you think Seroquel is?**
24     Q.   And you're raising your

**(Pages 234 to 237)**

238

1 voice at me.
2     A.  You asked questions about
3 why am I taking antipsychotic.  Well, why
4 am I taking Seroquel then for bipolar?
5 It's an antipsychotic.
6     Q.   This is in 1986.  Do you see
7 that there?
8     A.  You requested 1986, why did
9 they give you that for antipsychotic.  So
10 is Seroquel.
11     Q.   What time frame were you
12 using that?
13     A.  I don't remember.  A long
14 time.
15     Q.   But that was 20 or so,
16 18 years or so ago, is that right?
17     A.  I guess.  I don't count
18 numbers.
19         MR. ELLISON:  Let me just do
20 a couple more and then we'll call
21 it a break.
22         MS. HO:  Okay.
23 BY MR. ELLISON:
24     Q.   You were asked about fact

239

1 witnesses.  Do you see that on Page 7 at
2 the top?  The only person you identified
3 was your mother.
4     A.  That's about it.
5     Q.   Does your father know about
6 your mental illness?
7     A.  He knows about it, but it
8 didn't really — not as much as my mother
9 knows.
10     Q.   Does your brother know about
11 your mental illness?
12     A.  Yes.
13     Q.   Your wife knows about your
14 mental illness?
15     A.  Yes.
16     Q.   Do any of her friends know
17 about your mental illness?
18     A.  No.
19     Q.   Who else knows about your
20 mental illness?  Are there inmates who
21 know about your mental illness?
22     A.  Sure.
23     Q.   What are their names?
24     A.  Heck if I know.

240

1     Q.   Do you know any of the
2 names?
3     A.  I didn't care.
4     Q.   My question is different.
5     A.  I know that, but I'm saying
6 I don't care.  In other words, I don't
7 know the names.  Don't care.
8     Q.   I just need you to tell me
9 if you know the names or not.  Okay?
10     A.  No.
11     Q.   You don't know any of their
12 names?
13     A.  No, don't remember any of
14 them.
15     Q.   What about any of the
16 individuals in the staff at any of the
17 facilities, prison, hospital or juvenile
18 that you've been in?
19     A.  No.
20     Q.   You don't know any of their
21 names?
22     A.  Don't remember them at all.
23     Q.   The only person you think
24 can talk about your mental illness is

241

1 your mom?
2     A.  Pretty much.  And my dad can
3 talk.  But he don't really — really have
4 all the facts as my mom does.
5     Q.   You've been on Medicare or
6 Medicaid for the past ten or so years, is
7 that right, even longer?
8     A.  Well, I got on Medicare and
9 Medicaid — Medicaid was the first thing
10 I got on.  Medicare didn't come into
11 effect until about 1987, 1997.
12     Q.   Okay.  Have you ever had
13 private insurance?
14     A.  No.
15     Q.   It says, have you ever
16 applied for Workers' Compensation, Social
17 Security Disability or other form of
18 disability.  Is that right?  And you
19 checked yes.  Do you see that there on
20 Page 7?
21     A.  Yeah, that would be right, I
22 got Medicare and Medicaid.
23     Q.   Did you ever have benefits
24 denied because you had been convicted of

242

1  a felony?
2      A.   I had my benefits stopped.
3      Q.   And why was that?
4      A.   Because I was incarcerated.
5      Q.   When was that?
6      A.   2001 on through 2002, I
7  didn't have no benefits.
8      Q.   And that's because you had
9  been convicted of a felony, is that
10 right?
11     A.   Yes.
12     Q.   Which felony?
13     A.   Violation of probation.
14     Q.   And which probation
15 violation, which crime had you been
16 originally convicted?
17     A.   Aggravated stalking.
18     Q.   Aggravated stalking?
19     A.   Yes.
20     Q.   And that's what you
21 identified under prior legal actions, is
22 that correct, aggravated stalking?
23     A.   That's one of them.
24     Q.   Five years probation.  And

243

1  who were you stalking?
2      A.   I wasn't actually stalking
3  anybody, but I was in a position where I
4  had no witnesses on my behalf, so I went
5  in and accepted the five years probation
6  and went on with my life.
7      Q.   You pled guilty to the
8  charge of aggravated stalking?
9      A.   Yes, I did.  Just to get it
10 out of my hair and go on with life.
11     Q.   And that aggravated stalking
12 under Florida law is a felony, correct?
13     A.   Second degree felony.
14     Q.   It's a felony, correct?
15     A.   Third degree felony, third
16 degree.
17     Q.   I'm sorry, it's a felony?
18     A.   If it's a third degree
19 felony, I'm saying yes.
20     Q.   The reason you're saying
21 it's a third degree felony, because in
22 your mind it's not such a big deal if
23 it's a third degree as opposed to some
24 other felony?

244

1      A.   What do you think it is, a
2  first degree felony?
3      Q.   No, I'm just asking.
4      A.   I'm telling you it was a
5  third degree felony.  It ain't no big
6  deal, because I never did it.  I had no
7  witnesses to testify in my behalf to say
8  I didn't do it, so I accepted it and went
9  on with my life.
10     Q.   How did the charge come to
11 be?
12     A.   My next-door neighbor didn't
13 like me because all I did was sit in my
14 house, didn't work or nothing, and she
15 didn't like the fact at all.
16     Q.   So your --
17     A.   She tried to get her mother
18 to put me in jail for aggravated
19 stalking.  Her mother wouldn't do it, so
20 she had her mother arrested.
21     Q.   Your neighbor is a woman?
22     A.   Yeah.  United States Marine
23 Corps, she was captain out of the
24 military, and she's so scared of her life

245

1  that somebody like me, and she's a little
2  military brat, raised in the military,
3  gone through the military as a captain,
4  served in Gulf War and all that, and
5  she's all of a sudden worried about what
6  I say, if I do whatever.  She could have
7  shot me if she wanted to and nothing
8  would have happened.
9      Q.   You understand that shooting
10 people is wrong, correct?
11     A.   Why not?  St. Pete police
12 shoot them all the time.
13     Q.   You think it would have been
14 okay if she had shot you?
15     A.   Probably would have.
16     Q.   You appear agitated.
17     A.   No, I'm saying she could
18 have shot me, she didn't have to worry
19 about what I did to her or how I did it.
20 She knew good enough, she had more money
21 than I did, she could have got -- she
22 could have hired somebody to take care of
23 the problem.  Or she could have got a
24 legal action against me.  But, no, she

(Pages 242 to 245)

246

1  had to go lie by telling her mother to go
2  testify against me and when the mother
3  refused to testify against me in court,
4  she had her mother arrested.
5      Q.   What is her name?
6      A.   Her name was Lisa Nucci,
7  N-U-C-C-I.
8      Q.   And she was your neighbor?
9      A.   Yes.
10     Q.   Where does she live today?
11     A.   I have no idea.
12     Q.   But you would agree that
13  she's someone who might be able to tell
14  me about your mental illness?
15     A.   No.
16     Q.   Why do you think she can't?
17     A.   Because she don't know
18  anything.
19     Q.   You said she thought you
20  were bothering her, is that right?
21     A.   She filed the charges of
22  aggravated stalking, yes.
23     Q.   What were the charges?
24     A.   Aggravated stalking.

247

1      Q.   I understand you don't think
2  that what she says you were doing you
3  were doing, but what did she say you were
4  doing?
5      A.   Aggravated stalking.
6      Q.   In what way?
7      A.   Talking to her.  That's what
8  her deposition said that all I do is --
9      Q.   She gave a deposition?
10     A.   Yeah, she did.
11     Q.   Did you give one?
12     A.   No.
13     Q.   Okay.  And what did she
14  claim you were doing that constituted --
15     A.   Engaging her in
16  conversation.
17     Q.   What would you ask her?
18     A.   She said in her words, in a
19  deposition, she said that all I could do
20  was tell her that she's pretty.  I said,
21  well, I didn't know you couldn't tell no
22  woman she was pretty if you wanted to.
23  There's no crime in that.
24     Q.   So you would tell her she

248

1  was pretty?
2      A.   Yeah, she was.
3      Q.   How often would you do it?
4      A.   Every so often when I see
5  her.
6      Q.   And would you go over to her
7  house?
8      A.   Nope.
9      Q.   Where would these
10  conversations take place?
11     A.   I'd be on my porch of my
12  apartment and she'd be in her yard
13  playing -- doing yardwork.
14     Q.   How far away is that?
15     A.   About as far as me and the
16  stenographer is here.
17     Q.   As far away as the
18  stenographer is?
19     A.   Yeah.
20     Q.   And you'd agree that that's,
21  perhaps, six feet?
22     A.   Perhaps.
23     Q.   How would you characterize
24  the distance between you and the

249

1  stenographer?
2      A.   Not very far.
3      Q.   Not very far.
4          And that's all she said you
5  were doing?
6      A.   Yeah.
7      Q.   And what did you understand
8  she told her mom?
9      A.   She wanted her mother to
10  testify against me because the mother and
11  I talked more than her did.  So she
12  figured her mother had more power to get
13  me arrested.  So she had her mother
14  arrested because she wouldn't do what her
15  daughter wanted.
16     Q.   Do you think she was afraid
17  of you?
18     A.   Yeah.
19     Q.   Why?
20     A.   Because she's a piece of --
21  she's a real strange person.  She used to
22  doctor her own prescriptions and go to
23  different pharmacies and get her
24  prescriptions filled.

(Pages 246 to 249)

250

1    Q.   How on earth would you know
2  that?
3    A.   Her mother told me.
4    Q.   What is her mother's name?
5    A.   I don't remember her
6  mother's name.  I haven't seen her in
7  years.
8    Q.   Where is her mother?
9    A.   Somewhere in New York, but
10  the mother was living with the daughter
11  for a while.
12    Q.   What were you talking with
13  the mother about her for?
14    A.   I never talked about her, I
15  talked to her mother.
16    Q.   You're shouting at me.
17    A.   That's right.  I'm going to
18  shout more in a minute.
19    Q.   What do you mean by that?
20    A.   Because you're being
21  redundant.
22    Q.   What do you mean by
23  redundant?
24    A.   You want to worry about what

251

1  I did, but when I tell you something
2  that's factual, it's in the depositions
3  in the court sitting, to this day, I
4  could go down and get them and I could
5  show them to you, all the things her --
6  she said about me about stalking her,
7  never happened.
8    Q.   Is it -- are you saying that
9  I shouldn't be asking you these questions
10  because you don't --
11    A.   The questions don't even
12  refer to any reason why I'm taking
13  Seroquel.  You didn't mention one thing
14  between my aggravated stalking and taking
15  Seroquel and suing your client for
16  whatever I can get has nothing to do with
17  my aggravated stalking.  I ain't stalking
18  AstraZeneca.  I didn't go down there
19  peeping around the corner every time they
20  do something or be at the same store they
21  shop at or being whatever.
22    MS. HO:  David, there's not
23  a question.  It's 1 o'clock now.
24  We've been going for a couple

252

1  hours.
2    MR. ELLISON:  Yeah, we have.
3    THE WITNESS:  I don't see
4  where my aggravated stalking has
5  anything to do with AstraZeneca.
6    MS. HO:  David, there's not
7  a question on the table.  Why
8  don't we take a lunch break.  It's
9  1 o'clock.
10    MR. ELLISON:  Yeah, I think
11  we should take a lunch break.  I
12  want to see what I, in fact, heard
13  is what, in fact, the witness
14  said.  I had asked a question to
15  which the witness responded, yeah,
16  he was shouting, he was going to
17  do something a little more in a
18  minute.
19    THE WITNESS:  I'm going to
20  yell some more if I want to yell.
21    MR. ELLISON:  All right.
22  Well, let's go off the record for
23  now.
24    MS. HO:  David.

253

1    MR. ELLISON:  Let's go off
2  the record now and I'll talk with
3  your lawyer and the court reporter
4  in a minute.
5    Would you excuse us, please,
6  sir?
7    (Whereupon, a discussion was
8  held off the record.)
9    (Luncheon recess is taken
10  from 1:10 p.m. until 2:01 p.m.)
11  BY MR. ELLISON:
12    Q.   Let's go back on.
13    Mr. Haller, when I was
14  asking you questions about your diabetes
15  and you were telling me about the 400
16  cc's of sugar they found in your urine,
17  you mentioned a phrase, the Joslin
18  Center?
19    A.   Joslin Center, yes.
20    Q.   Okay.  What is that?
21    A.   It's educational, people
22  that educate people on their diabetes,
23  how to care for it, how to take care of
24  it, what to eat and so forth.

**(Pages 250 to 253)**

254

1  Q.  How do you spell Joslin?
2  A.  I'm not sure.
3  Q.  Are these the dieticians?
4  A.  These are nurses and
5  dieticians that help people learn how to
6  eat the right foods so they can maintain
7  their diabetes.
8  Q.  Where are they located?
9  A.  I'm not -- tell you the
10  truth, I'm not really sure where they're
11  located.
12  Q.  Do they come to your house?
13  A.  No, I had to go to the
14  Countryside Hospital over there.
15  Q.  Countryside Hospital?
16  A.  Yeah, Countryside.
17  Q.  But it's your understanding
18  that those folks aren't affiliated with a
19  hospital?
20  A.  No.
21  Q.  They're in a separate thing?
22  A.  All separate.
23  Q.  Fair enough.
24  A.  They educate you on your

255

1  diabetes so you can care for it.
2  Q.  The only person you
3  identified in your fact sheet as someone
4  who had knowledge of the facts
5  surrounding the claim is your mother.
6  This is on Page 7 of Exhibit 1.  And the
7  type of information you identified was
8  knowledge of facts surrounding
9  plaintiff's ingestion of Seroquel and
10  surrounding injuries.
11      Do you see that on your fact
12  sheet?
13  A.  What page?
14  Q.  Page 7, right at the top.
15  A.  Okay.
16  Q.  Your mom has never seen you
17  take Seroquel, has she?
18  A.  Yes, she has.
19  Q.  When was this?
20  A.  As a matter of fact, last
21  Christmas.
22  Q.  How often do you visit them?
23  A.  I go up there once a year.
24  Q.  And they visit you?

256

1  A.  No.
2  Q.  And how long do you stay
3  when you're there?
4  A.  Last time, I was there for
5  13 days.
6  Q.  Do you stay at their house,
7  at your mom's house?
8  A.  Yes.
9  Q.  Are you and your mom the
10  only people living in the house at the
11  time?
12  A.  Well, my mom has an
13  apartment under HUD.
14  Q.  I see.  So you'd stay at her
15  apartment?
16  A.  Yeah.
17  Q.  What does your older brother
18  do for a living?
19  A.  He owns his own business.
20  Q.  What is the name of the
21  business?
22  A.  Haller Craftsmanship
23  Unlimited.  Something like that, I'm not
24  sure.

257

1  Q.  What was the first word?
2  A.  Haller's Craftsmanship
3  Unlimited.
4  Q.  What type of business is it?
5  A.  He does remodeling.
6  Q.  What information do you
7  think your mother would have that relates
8  to your claims?
9  A.  Not much.
10  Q.  What do you think she would
11  know?
12  A.  I don't know.
13  Q.  Why did you put her name
14  down?
15  A.  Well, that's the only one
16  knows that I am diabetic -- my brother
17  knows I'm diabetic, but he doesn't know
18  the problems I've had.  My mom has a
19  little more knowledge than the family
20  does.
21      Q.  I was asking you some
22  questions about this aggravated stalking
23  offense for which you were convicted,
24  which is identified on Page 7 under B,

**(Pages 254 to 257)**

258

1 and you were telling me, if I understood
2 your testimony correctly, that Miss Nucci
3 claimed you were -- you told her she was
4 pretty.  Is that right?
5     A.   That's what I told her one
6 time, yes.  Well, she is.
7     Q.   And there was nothing else
8 of which you're aware?
9     A.   I'm not aware of.
10    Q.   What else do you understand
11 she said you did?
12    A.   I can't remember.
13    Q.   When was this charge?
14    A.   This charge took place back
15 in 1997.
16    Q.   And you don't remember
17 anything beyond what you've told me?
18    A.   Right now I pretty much
19 forget a lot about it.  Didn't dwell on
20 it.
21    Q.   Well, I'm asking about it
22 now.
23    A.   Right.  I don't know, I
24 don't know, you know -- my -- when I did

259

1 it, I didn't argue the issues in court.
2 I just -- because I had no witnesses to
3 testify against (sic) my behalf.  I never
4 did anything like that.  I just went
5 ahead and accepted it for what it was.
6     Q.   What do you mean you had
7 never done anything like that?
8     A.   I'm saying she's saying I
9 done aggravated stalking.  But I had no
10 witnesses to testify in my behalf to say,
11 yeah, Dave never did that.
12    Q.   I understand that, but what
13 is it she told -- said that you did that
14 amounted to that?
15    A.   She said I was threatening
16 her and so on and so forth.
17    Q.   What threat did she say you
18 issued?
19    A.   I can't remember all the
20 details.
21    Q.   Did she say you threatened
22 to kill her?
23    A.   No.
24    Q.   Did she say you threatened

260

1 to harm her?
2     A.   Yes.
3     Q.   Did she say you threatened
4 to hit her?
5     A.   No.
6     Q.   How did she say you
7 threatened to harm her?
8     A.   I can't remember.
9     Q.   All right.  What else do you
10 remember that she said you did?
11    A.   That's about it.
12    Q.   So you threatened to harm
13 her and you said on one occasion that she
14 was pretty?
15    A.   Right.
16    Q.   Nothing else?
17    A.   She said I always engaged
18 her guests in conversation, which I never
19 did.
20    Q.   Talked to her guests, said
21 on one occasion she was pretty and that
22 you threatened her harm?
23    A.   Right.
24    Q.   But you don't know what the

261

1 harm was?
2     A.   No, I can't remember.
3     Q.   And you don't remember
4 anything else that --
5     A.   No.
6     Q.   Why did you agree to spend
7 five years of your life under
8 probation --
9     A.   I had no witnesses in my
10 behalf.
11    Q.   Just to finish the question.
12        Why did you agree to spend
13 five years of your life under probation
14 as well as to be a convicted felon
15 because you were alleged to have told a
16 woman she was pretty, threatened harm of
17 some nature and engaged her guests in
18 conversation?
19        MS. HO:  Objection.  Asked
20    and answered.
21        THE WITNESS:  I just didn't
22    have no witnesses to testify on my
23    behalf.  It was just my word
24    against her word.  And she had

**(Pages 258 to 261)**

262

1    people that were willing to be
2    paid or whatever reason on her
3    behalf.  I had none.
4  BY MR. ELLISON:
5    Q.   What information do you have
6  that would make you suggest that she was
7  paying people to testify in her behalf?
8    A.   Well, the fact that her
9  mother was living with her for about a
10  year and she tried to get her mother to
11  testify and so on.  I had a roommate at
12  one time and my checks were stopped.
13    Q.   What was your roommate's
14  name?
15    A.   I can't remember his name.
16    Q.   You had a roommate.  Was he
17  living with you?
18    A.   I took him out of a homeless
19  shelter for a roommate to help me pay the
20  bills.
21    Q.   Did he live in your house?
22    A.   Yes.
23    Q.   For how long?
24    A.   I can't remember.

263

1    Q.   And this individual is
2  another individual that you have not
3  identified when I asked you the
4  question --
5    A.   I understand.
6    Q.   And you don't remember this
7  person's name?
8    A.   No.
9    Q.   Do you remember when this
10  person lived with you for a couple
11  months?
12    A.   I know it was in '97.
13    Q.   Okay.  Is there anyone else
14  that you can think of who has lived in
15  your house?
16    A.   Unh-unh.
17    Q.   No?
18    A.   (Witness shaking head.)
19    Q.   You need to answer out loud.
20    A.   I said no.
21    Q.   You were convicted of
22  aggravated stalking, is that correct?
23    A.   Correct.
24    Q.   And a protective order -- an

264

1  order of protection, rather, was entered
2  against you?
3    A.   Right.
4    Q.   In her favor, is that right?
5    A.   Right.
6    Q.   Does that order still apply
7  today?
8    A.   I don't believe so.
9    Q.   When did it expire, to your
10  knowledge?
11    A.   I have no idea.
12    Q.   All right.  Look down on
13  Page 7 under prior legal actions.  Do you
14  see that there?
15    A.   Yes.
16    Q.   It says, Have you ever been
17  convicted of or pled guilty to a
18  misdemeanor or a felony?  You've checked
19  yes, and the only thing you've identified
20  here is aggravated stalking.
21        Is that correct?
22    A.   Why would that be incorrect?
23    Q.   Well, no, the only thing
24  listed here is aggravated --

265

1    A.   I have a slew of misdemeanor
2  charges, but I don't have the
3  recollection of them.
4    Q.   All right.  Let me start
5  again.  Do you have Exhibit 1 in front of
6  you?
7    A.   I found that.
8    Q.   And under Roman numeral XII,
9  Subsection B, it says, Have you ever been
10  convicted of or pled guilty on a
11  misdemeanor or felony.  Did I read that
12  correctly?
13    A.   Yes, you did read it
14  correct.
15    Q.   And there's a box checked
16  yes, is that correct?
17    A.   Correct.
18    Q.   Then it says, If yes,
19  describe the crime or offense, the state
20  and the county and the outcome of the
21  charge.
22        Did I read that correctly?
23    A.   I lost you, where you're at.
24    Q.   Right underneath.

**(Pages 262 to 265)**

266

1      MR. ELLISON:  Thank you,
2  counsel.  Counsel is indicating.
3  BY MR. ELLISON:
4      Q.   If yes, describe the crime
5  or offense, the state and county and the
6  outcome of the charge.
7        Did I read that correctly?
8      A.   **Um-hmm.**
9      Q.   Yes?
10     A.   **Yes.**
11     Q.   And the only thing listed
12 there is aggravated stalking, is that
13 correct?
14     A.   **There are misdemeanor**
15 **charges also.**
16     Q.   Sir?  So that answer was
17 incorrect, is that correct?
18     A.   **It's correct, but I don't**
19 **have the recollection of the prior ones**
20 **of misdemeanors.**
21     Q.   You failed to identify any
22 of your offenses beyond the aggravated
23 stalking, is that correct?
24     A.   **Yes.**

267

1      Q.   And you're telling me today
2  for the first time that you may have had
3  some misdemeanors, but you don't remember
4  them?
5      A.   **Right.**
6      Q.   All right.  You don't have
7  any other felonies?
8      A.   **No.**
9      Q.   Were you arrested on April
10 7th, 1984, by the Pinellas County
11 Sheriff's Office for failure to appear
12 with reference to open alcohol?  I'm
13 asking this separate and apart from your
14 paper.
15        Do you need the question
16 back?
17     A.   **Yes, I need it back.**
18     Q.   Were you arrested on
19 April 7th, 1984 by the Pinellas County
20 Sheriff's Office and charged with failure
21 to appear in reference to open alcohol?
22     A.   **I don't recall.**
23     Q.   Do you dispute it?
24     A.   **Yes.**

268

1      Q.   So if the records show that,
2  in fact, you were, those records would be
3  wrong?
4      A.   **They would be correct then.**
5  **It would refresh my memory, but to just**
6  **say, I don't recall it.**
7      Q.   So hearing this from me --
8      A.   **This is the first time.**
9      Q.   So I guess my question is,
10 do you dispute that you were arrested on
11 that day?
12     A.   **Yes.**
13     Q.   And if the records show you
14 were arrested, if the Pinellas County
15 Sheriff's Department does, in fact, have
16 a record of your arrest on that date --
17     A.   **That would bring something**
18 **to my attention I didn't know about.**
19     Q.   You don't know whether you
20 were arrested for open alcohol?
21     A.   **No.**
22     Q.   You don't remember ever in
23 your life being arrested for open
24 alcohol?

269

1      A.   **No, no.**
2      Q.   Do you remember being
3  arrested about a month later, May 15th,
4  1984 for disorderly conduct, resisting a
5  police officer and arrest without
6  violence?
7      A.   **I believe so.**
8      Q.   And you were, in fact,
9  convicted of that, is that correct?
10     A.   **Correct.**
11     Q.   And you spent nine days in
12 jail, is that right, credited with time
13 served?
14     A.   **I believe so.**
15     Q.   You don't dispute that?
16     A.   **No.**
17     Q.   Third, do you remember being
18 arrested on April 6th, 1985 for resisting
19 an officer with violence, two counts, and
20 two counts of battery, the resisting the
21 officer with violence being a felony --
22 oh, forgot, disorderly conduct as well?
23     A.   **Don't recall.**
24     Q.   Do you remember being

(Pages 266 to 269)

**270**

1  confined for six months with three years
2  probation because resisting an officer?
3       A.   I remember — I remember
4  that.
5       Q.   Do you remember being
6  convicted of both the disorderly conduct
7  and the battery and being sentenced to
8  two months and 20 days in jail for those?
9       A.   I don't recall that.
10      Q.   Do you dispute it?
11      A.   No.
12      Q.   Do you remember being
13  arrested a few months later,
14  September 9th, 1985, and charged with
15  aggravated battery on a police officer or
16  correction officer, a felony?
17      A.   What year?  Do you have a
18  year on that?
19      Q.   Yeah, I sure do.  In fact, I
20  think I gave a precise date of the
21  arrest, the arrest being September 9th,
22  1985.
23      A.   That would be right.
24      Q.   Okay.  And, in fact, you

**271**

1  were convicted of that felony on
2  March 31st, 1986, correct?
3       A.   Sounds right.
4       Q.   You don't dispute that?
5       A.   No.
6       Q.   You didn't put that
7  felony —
8       A.   Because —
9       Q.   I'm not finished with my
10  question.  Please, sir.  I'm trying very
11  hard to allow you all the time you need
12  to answer.  I would ask that you extend
13  to me the same courtesy.
14           Okay?
15      A.   Okay.
16      Q.   You didn't include that on
17  your fact sheet, did you?
18      A.   I didn't have no
19  recollection of it at the time.
20      Q.   You didn't remember that
21  felony conviction?
22      A.   No, I didn't remember it.
23      Q.   Do you remember being
24  arrested October 31st, a little more than

**272**

1  a month later, 1985, and being charged
2  with resisting a police officer with
3  violence, resisting arrest with violence,
4  as part of a probation violation?
5       A.   That might be on a record
6  that I don't have available to me would
7  be right.
8       Q.   Well, let me ask it a
9  different way.
10           Do you remember being
11  arrested on October 31st, 1985 and
12  charged with violating the probation
13  because you were being violent toward a
14  police officer?
15      A.   No.
16      Q.   You don't remember being
17  convicted of that felony and spending
18  nine years in jail once those charges
19  were reinstituted after your probation
20  violation?
21      A.   Don't recall that.
22      Q.   In fact, you served nine
23  years in jail because of the felony
24  conviction based on your resisting the

**273**

1  officer with violence, which was the
2  probation violation.  Isn't that correct?
3       A.   The only thing I ever did
4  any time for, it was eight and a half
5  years, from a first — prior arrest for
6  lewd and lascivious.
7       Q.   So if this — if the records
8  show that you, in fact, spent nine years
9  for violating your probation by resisting
10  a police officer with violence and that
11  you were convicted of that, the records
12  would be wrong?
13      A.   Yes.
14      Q.   A couple months later,
15  January 14th, 1986, do you remember being
16  arrested by the Pinellas County Sheriff's
17  Office and charged with resisting an
18  officer with violence, disorderly
19  intoxication, probation violation and
20  simple battery?
21      A.   Don't recall it.
22      Q.   Forgot one, resisting an
23  officer with violence, you don't recall?
24      A.   Don't recall that.

274

1    Q.   Do you recall being
2  convicted of that felony, resisting an
3  officer with violence?
4    A.   I don't recall that.
5    Q.   So if the records show it,
6  those are wrong?
7    A.   Pretty much, yes.  My only
8  charges I have serving anywhere near nine
9  years was when they gave me seven years
10  for each count of lewd and lascivious,
11  that's four counts to run concurrent.
12  Then in 1989, I hit a corrections
13  officer, bit him, they gave me another
14  18 months on that.  Then I had the
15  violation of probation on aggravated
16  stalking, they gave me 24 months on that.
17        The first incarceration they
18  gave me, they gave me supervised release
19  under conditional release.
20    Q.   I'll take you through them.
21        Do you recall being arrested
22  on February 1st, 1986 for aggravated
23  battery on a police officer, here it is,
24  lewd and lascivious, child fondling.  Do

275

1  you recall that?
2    A.   No.  I remember lewd and
3  lascivious.  I don't remember fondling.
4    Q.   Fair enough.  It might be
5  part of the name of the offense.  It
6  might be an option.
7    A.   Okay.
8    Q.   Do you recall being
9  convicted of aggravated battery on a
10  police officer?
11    A.   What year?
12    Q.   1986, sir.
13    A.   No.
14    Q.   Do you recall being
15  convicted of lewd and lascivious?
16    A.   Yes.
17    Q.   And you were incarcerated
18  and then discharged on January 27, 1995,
19  isn't that correct?
20    A.   What was in 1995?
21    Q.   You were discharged from
22  custody in January of 1995, correct?
23    A.   Okay, I'll agree with that.
24    Q.   You don't dispute it?

276

1    A.   No.
2    Q.   You were arrested by the
3  Gadsden County Sheriff's Office on
4  April 26th, 1989 for aggravated assault
5  on a police officer?
6    A.   I remember that.
7    Q.   And that's a felony, right?
8    A.   Yes.
9    Q.   And you pled nolo contendere
10  to that, right?
11    A.   Yes.
12    Q.   What is nolo contendere?
13    A.   No contest.
14    Q.   So you didn't dispute that
15  you had done it?
16    A.   No.
17    Q.   And that's a felony?
18    A.   Yes.
19    Q.   You didn't put that one on
20  your sheet either, did you?
21    A.   I didn't think about that
22  one.
23    Q.   How many felonies have you
24  had?

277

1    A.   Probably quite a few.
2    Q.   That you haven't thought
3  about?
4    A.   My history, I don't keep
5  dwelling on it, so I didn't think about
6  it.
7    Q.   Did you understand that you
8  filed a lawsuit in this case and that
9  when you filled out Exhibit 1, you swore
10  that it was true and complete, but you
11  didn't think about these things?
12    A.   No.
13    Q.   Were you arrested on
14  September 17th, 1992 with a parole
15  violation?
16    A.   Conditional release.
17    Q.   So you do remember it?
18    A.   Okay.
19    Q.   Yes?
20    A.   Yes.
21    Q.   Do you remember being
22  arrested February 27th, 1995 for
23  disorderly conduct?
24    A.   No.

278

1      Q.   Do you remember being
2  arrested on June 24th, 1996 for another
3  disorderly conduct?
4      A.   **No.**
5      Q.   Do you recall pleading nolo
6  contendere to that and getting six days
7  in jail?
8      A.   **No.**
9      Q.   And do you recall on
10 December 14th, 1996 being arrested for
11 aggravated stalking?
12     A.   **What year?**
13     Q.   1996, December 14th to be
14 precise, just before Christmas.
15     A.   **No.**
16     Q.   You don't recall being
17 charged with battery, aggravated stalking
18 at that time?
19     A.   **No.**
20     Q.   Now, I'm saying you don't
21 recall being charged because I think --
22     A.   **I remember being charged**
23 **with aggravated stalking in 1997.**
24     Q.   I think the charge was

279

1  dropped, at least at that time.
2           Now, January 15th, 1997,
3  this is about a month after what the
4  record suggests was an arrest, you were
5  charged with aggravated stalking, first
6  degree.
7      A.   **No, I don't recall that.**
8      Q.   This is '97 now.
9      A.   **Yeah, I know that, but my**
10 **aggravated stalking was a level one.**
11     Q.   By --
12     A.   **Count one.**
13     Q.   By the St. Petersburg Police
14 Department?  Does that refresh your
15 memory?
16     A.   **Aggravated stalking does,**
17 **but not the date.**
18     Q.   Do you remember pleading --
19 okay.  So it's your view that aggravated
20 stalking is a felony, but it's a third
21 degree felony, right?
22     A.   **Right.**
23     Q.   And you pled nolo contendere
24 to that, right?

280

1      A.   **Right.**
2      Q.   You were sentenced to two
3  years in prison on April 10th, 2001,
4  right?
5      A.   **Violation of probation.  I**
6  **did 24 months on that.**
7      Q.   That's two years in prison,
8  right?
9      A.   **Right.**
10     Q.   And you were credited with
11 317 days of time served, but you were
12 ordered to pay court costs, right?
13     A.   **Um-hmm, yes.**
14     Q.   I think that's 14 arrests.
15 Let's move on to 15, June 29th, 1998,
16 about ten years or so ago, you were
17 charged -- arrested by the St. Petersburg
18 Police Department for contempt of court,
19 violation, domestic violence.  Ring a
20 bell?
21     A.   **No.**
22     Q.   Do you remember being
23 charged with violating an injunction in
24 Pinellas County court as a result of that

281

1  arrest?
2      A.   **Yes.**
3      Q.   What was that about?
4      A.   **That's when I was five years**
5  **probation for the aggravated stalking.**
6      Q.   I have a year listed here.
7  Does that ring a bell?
8      A.   **What is the year?**
9      Q.   We're in 1998.  You were
10 sentenced September 15th, 1998, probation
11 for a year.  You pled nolo contendere to
12 that.
13     A.   **Don't recall it.**
14     Q.   Do you remember what that
15 was about?
16     A.   **No.**
17     Q.   You have no idea that you
18 were charged with domestic violence in
19 1998?
20     A.   **No.**
21     Q.   You don't know to whom?
22     A.   **Unh-unh.**
23     Q.   No?  No?
24     A.   **No.**

**(Pages 278 to 281)**

**282**

1  Q.   Okay.  On January 15th,
2  2001, do you recall being arrested by the
3  Pinellas County Sheriff's Office for
4  cruelty toward a child in violation of
5  Florida Statute Section 827.032?
6  A.   No.
7  Q.   Do you recall being
8  prosecuted for battery, striking or
9  touching, on such a child?
10  A.   No.
11  Q.   Do you recall pleading nolo
12  contendere to such offense and being
13  sentenced April 11th, 2001 to two months,
14  29 days in jail, credited 89 days?
15  A.   No.
16  Q.   You have no idea what that
17  was about?
18  A.   Don't remember it.
19  Q.   Never touched a kid?
20  A.   No.  As far as I can
21  remember.
22  Q.   You don't remember, you may
23  have?
24  A.   I may have, but I don't

**283**

1  remember.
2  Q.   You don't remember spending
3  two months and 29 days in jail?
4  A.   No.
5  Q.   April 17th, 2001, you were
6  put into supervision and custody at the
7  North Florida Reception Medical Center
8  for credible threat of aggravated
9  stalking.  Did I read that correctly?
10  You were credited with 89 days?
11  A.   I don't remember that.
12  Q.   You don't remember being
13  placed in custody of the North Florida
14  Reception Medical Center on April 17th,
15  2001?
16  A.   No.
17  Q.   Do you remember being
18  transferred to the Central Florida
19  Reception Center the following day?
20  A.   No.
21  Q.   You don't remember
22  threatening anyone in 2001?
23  A.   I don't remember.  I don't
24  remember.

**284**

1  Q.   Do you dispute you did?
2  A.   I'm not disputing anything.
3  I just don't remember.
4  Q.   Number 17, May 24th, 2002,
5  do you recall being arrested by the
6  Volusia County Sheriff's Office and
7  charged with battery on an officer,
8  either a fire officer, firefighter,
9  police officer?
10  A.   I remember that.
11  Q.   What was going on?
12  A.   I spit on a correction
13  officer.
14  Q.   Who did you spit on?
15  A.   A correctional officer.
16  Q.   And, in fact, you did,
17  right?
18  A.   Yes.
19  Q.   That's a felony, isn't it?
20  A.   Yes, now it is, yes.
21  Q.   And then it was as well,
22  right?
23  A.   I guess.
24  Q.   Battery on a police officer,

**285**

1  correct?
2  A.   No time served.
3  Q.   Why did you spit at the
4  police officer?
5  A.   I was angry.
6  Q.   You were angry.  Actually,
7  it wasn't time served, you were sentenced
8  to eight months, 17 days in jail, to run
9  concurrently with the sentence you were
10  already serving?
11  A.   Don't recall that.
12  Q.   Who was it that you spat on?
13  A.   One -- in Volusia County, it
14  was the correctional officer.
15  Q.   What was the name?
16  A.   I can't remember the name.
17  Q.   Why did you spit on him?
18  A.   I was angry.
19  Q.   Is that, in your view,
20  appropriate behavior for someone to
21  engage in when they're angry?
22  A.   Not really.
23  Q.   Is that an aspect of your
24  disease?

**(Pages 282 to 285)**

**286**

1  A.  Yes.
2  Q.  What were you angry about?
3  A.  I can't remember all the
4  details.
5  Q.  What details do you
6  remember, sir?
7  A.  I don't remember any.  All I
8  know is I spit on him.  That's all I
9  remember.
10  Q.  Have you been charged --
11  well, it's a felony, right?
12  A.  Yes.
13  Q.  That one didn't show up on
14  your fact sheet either, did it?
15  A.  I don't remember it.
16  Q.  I've just covered 17
17  arrests, none of which were included on
18  your fact sheet.
19  MS. HO:  Objection, form.
20  BY MR. ELLISON:
21  Q.  Are there any other arrests,
22  charges, convictions, whether in Florida
23  or elsewhere, that you failed to identify
24  on your fact sheet?

**287**

1  A.  I can't remember any.
2  Q.  You can't remember any?
3  A.  Unh-unh.
4  Q.  You couldn't remember any
5  before, and I found 17.  My concern is
6  that there are others out there, but that
7  because you say you can't remember, I'm
8  never going to find out about them.  I
9  want you to think real hard.  Are there
10  others out there?
11  A.  Not that I can remember.
12  Q.  Have you ever been charged
13  with a crime in Massachusetts?
14  A.  Never been to Massachusetts.
15  Q.  And for the life of you, as
16  you sit here, you can't tell me why you
17  filed suit in Massachusetts?
18  A.  No.
19  Q.  That is correct?
20  A.  That's correct.
21  Q.  Have you ever been charged
22  with a crime in Pennsylvania?
23  A.  Yes.
24  Q.  Other than when you were a

**288**

1  juvenile?
2  A.  I think I have a indecent
3  exposure charge.
4  Q.  I'm sorry?
5  A.  I think I have an indecent
6  exposure charge.
7  Q.  How old were you then?
8  A.  Around 20, 21.
9  Q.  Is this different from the
10  masturbation event?
11  A.  Yes.
12  Q.  So who did you expose
13  yourself to?
14  A.  Some high school girl.
15  Q.  You were an adult, right?
16  A.  Yeah.
17  Q.  Did you go to a high school?
18  A.  No.
19  Q.  What did you do?
20  A.  I waited till she came home
21  from school.
22  Q.  So you knew she was coming
23  home from school.  Did you go to her
24  house?  Were you waiting for her?

**289**

1  A.  No.
2  Q.  Was she a neighbor?
3  A.  No.
4  Q.  Could you remove your hand
5  from your mouth, sir?  I'm having a tough
6  time understanding you.
7  What did you do?
8  A.  I exposed myself.
9  Q.  No, I'm trying to figure out
10  the scene.  You're rolling your eyes.
11  Are you frustrated with this?
12  A.  Yes, I am.
13  Q.  Why?
14  A.  Because you're coming back
15  with all this stuff in my past that I
16  don't have no recollection for.
17  Q.  Well, I'm sure your lawyer
18  told you that we were going to cover your
19  psychiatric history in your deposition,
20  sir.  Correct?
21  A.  Um-hmm.  I don't have no
22  answers for them.
23  Q.  Well, we'll take care of
24  that.  I'm not a doctor either.

**(Pages 286 to 289)**

290

1      I want you to tell me about
2 this event which led to a charge of
3 indecent exposure.
4      A.  I don't have very much
5 knowledge.
6      Q.  Well, let's go through it,
7 then.  You said you were not at your
8 house when you exposed yourself to this
9 high school girl, correct?
10     A.  Correct.
11     Q.  Where were you?
12     A.  In a wooded area.
13     Q.  And you went to a wooded
14 area.  Where was the wooded area in
15 relation to her?
16     A.  Behind the grocery store.
17     Q.  You went to -- what was the
18 name of the grocery store?
19     A.  I have no idea.
20     Q.  Did you know she was going
21 to be at the grocery store?
22     A.  I did it in a wooded area
23 next to a grocery store.
24     Q.  You did it in a wooded area

291

1 next to the grocery store?
2      A.  Yes.
3      Q.  What did you do?
4      A.  Exposed myself.
5      Q.  Where was the girl?
6      A.  She was walking through the
7 woods in the area and I exposed myself to
8 her.
9      Q.  Was there a trail?
10     A.  Yeah.
11     Q.  And you thought she would be
12 there?
13     A.  Yeah.
14     Q.  Had you seen this girl
15 before?
16     A.  Yes.
17     Q.  Did she excite you?
18     A.  Yes.
19     Q.  And she was a minor, she was
20 a child, right?
21     A.  Yes.
22     Q.  And you were an adult,
23 correct?
24     A.  Yes.

292

1      Q.  And what about her excited
2 you?
3      A.  I don't know.
4      Q.  But she did, is that right?
5      A.  Yeah.
6      Q.  And you had a sexual urge
7 associated with those feelings, correct?
8      A.  Yes.
9      Q.  And had you ever touched
10 her?
11     A.  No.
12     Q.  Did you masturbate to her?
13     A.  No.
14     Q.  She wasn't involved in any
15 of the fantasies that you described
16 earlier?
17     A.  No, no.
18     Q.  Did you know her name?
19     A.  No.
20     Q.  Did that matter to you?
21     A.  No.
22     Q.  Why didn't it?
23     A.  I don't know.
24     Q.  Was she alone?

293

1      A.  Yes.
2      Q.  And you saw her coming, is
3 that right?
4      A.  Yes.
5      Q.  Did you hide from her?
6      A.  Yes.  Tried to.
7      Q.  And then she came closer, is
8 that right?
9      A.  Yes.
10     Q.  And you unzipped your pants?
11     A.  Yes.
12     Q.  Did you do it so that she
13 would see you?
14     A.  I tried not to.
15     Q.  Why did you unzip your
16 pants?
17     A.  I don't know.
18     Q.  Were you going to masturbate
19 until she saw you?
20     A.  No, no.
21     Q.  How far away from you was
22 she when she saw you?
23     A.  About a couple feet.
24     Q.  Were you behind a tree?

294

1    A.   Behind some bushes.
2    Q.   Were you squatting, were you
3  sitting?
4    A.   Squatting.
5    Q.   Were your pants down around
6  your ankles?
7    A.   No.
8    Q.   You had just unzipped your
9  fly?
10   A.   (Witness nodding head.)
11   Q.   You're nodding.  Is that
12  yes?
13   A.   Yes.
14   Q.   Had you undone your belt
15  too?
16   A.   No.
17   Q.   You just unzipped?
18   A.   Yes.
19   Q.   And you pulled out your
20  penis?
21   A.   Yes.
22   Q.   And you showed it to her?
23   A.   Yes.
24   Q.   Were you erect?  Were you

295

1  aroused?
2    A.   I don't remember.  It was a
3  long time ago.
4    Q.   And what did she do?
5    A.   She ran home and told her
6  family about it.
7    Q.   Did she scream?
8    A.   No.
9    Q.   Had she seen you before?
10   A.   No.
11   Q.   Were you arrested?
12   A.   No.
13   Q.   Why is it that you think
14  there was a criminal charge associated
15  with this event?
16   A.   Because it was threatened to
17  me.
18   Q.   By whom?
19   A.   By the parents.
20   Q.   Have you ever exposed
21  yourself to anyone else?
22   A.   No.
23   Q.   In your life?
24   A.   Unh-unh.

296

1    Q.   No?  Is that correct?
2    A.   Yes.
3    Q.   Let's focus on sexual issues
4  with children, okay, for a moment.
5  There's the one charge that led you to
6  being convicted of four counts of
7  masturbating in front of four children,
8  is that right?
9    A.   Um-hmm.
10   Q.   Yes?
11   A.   Yes.
12   Q.   There's this issue, this
13  exposition where you pulled your penis
14  out and showed it to a high school girl,
15  correct?
16   A.   Correct.
17   Q.   Are there any others?
18   A.   Not that I can recall.
19   Q.   There may be, you just don't
20  remember?
21   A.   Maybe.
22   Q.   How many times, if any, have
23  you masturbated to children and not been
24  caught?

297

1    A.   None.
2    Q.   How many times, if any, have
3  you exposed yourself to someone --
4    A.   None.
5    Q.   -- and not been prosecuted?
6    A.   None.
7    Q.   Now, you see on Page 7 where
8  it says tell us about your prior legal
9  actions?
10       MS. HO:  Right here.
11  BY MR. ELLISON:
12   Q.   Do you see that there?
13   A.   Okay.
14   Q.   It asks you if you've ever
15  been a party to a lawsuit, judicial
16  proceeding -- this is 12A on Page 7 -- or
17  made a claim, whether civil, criminal or
18  administrative.  Do you see that?
19   A.   Yes.
20   Q.   And there are two boxes,
21  right?
22   A.   Yes.
23   Q.   Which ones did you check?
24   A.   I took no.

**298**

1    Q.   And you swore that that was
2  true, correct?
3    A.   **Correct.**
4    Q.   You filed a civil rights
5  action in Federal Court on December 24th,
6  1990 in the Middle District of Florida,
7  Case Number 90-CV-01149.
8    A.   **Don't recall that.**
9    Q.   You don't remember filing a
10 civil rights suit?
11   A.   **No.**
12   Q.   In 1990 do you remember it
13 being dismissed?
14   A.   **No.**
15   Q.   Let's jump ahead,
16 February 14th -- do you dispute that you
17 filed such a lawsuit?
18   A.   **No.  I don't recall doing**
19 **that.**
20   Q.   Do you remember filing
21 lawsuits?
22   A.   **No.**
23   Q.   All right.  What about
24 February 14th, 1994, do you recall filing

**299**

1  a lawsuit in the Middle District of
2  Florida alleging that the State of
3  Florida was violating the civil rights
4  you had as a prisoner?
5    A.   **No.**
6    Q.   Do you recall filing a writ,
7  a petition for a writ of habeas corpus in
8  1994?
9    A.   **No, I don't.**
10   Q.   Sorry?
11   A.   **No, I don't.**
12   Q.   You may have, you just don't
13 remember?
14   A.   **I don't remember anything of**
15 **it.**
16   Q.   March 1st, 1994, do you
17 remember filing a petition for a writ of
18 habeas corpus in the Middle District of
19 Florida claiming that your civil rights
20 were being violated?
21   A.   **No.**
22   Q.   You don't remember?  You may
23 have, but you don't remember?
24   A.   **I may have, but I don't**

**300**

1  remember.
2    Q.   Have you ever heard of the
3  Tomoka Correctional Institution?
4    A.   **Okay.**
5    Q.   My question is, have you
6  heard of it?
7    A.   **Yes.**
8    Q.   Is that one of the places
9  you've spent some time?
10   A.   **Yes.**
11   Q.   Do you recall filing a
12 petition for a writ of habeas corpus in
13 the Southern District of Florida on
14 June 1st, 1994?
15   A.   **No.**
16   Q.   At that time, you were
17 residing at the Tomoka Correctional
18 Institution in Daytona Beach, isn't that
19 correct?
20   A.   **Yes.**
21   Q.   Was there, to your
22 knowledge, anyone else named David Haller
23 at that institution?
24   A.   **No.**

**301**

1    Q.   Do you deny that you filed
2  such a lawsuit on that day?
3    A.   **I don't recall it.**
4    Q.   I think we're up to four or
5  five.  I forget.  None of these are
6  included on your fact sheet, is that
7  right?
8    A.   **Yes.**
9    Q.   Do you recall -- I think I
10 may have done that one.
11       June 15th, 1994, do you
12 recall filing a petition for a writ of
13 habeas corpus -- let me rephrase that.
14 I'm not sure if it's 19 -- it's 1983.
15       Do you recall filing a
16 complaint under 42 U.S.C. Section 1983,
17 claiming that your civil rights were
18 being violated?
19   A.   **No.**
20   Q.   In the Southern District of
21 Florida?  Again, the date, June 15th,
22 1994.
23       MS. HO:  '94 or '84?
24       MR. ELLISON:  '94.

**(Pages 298 to 301)**

302

1        THE WITNESS:  Don't
2    remember.
3    BY MR. ELLISON:
4        Q.  Doesn't ring a bell?
5        A.  No.
6        Q.  Do you remember applying for
7    permission to proceed in forma pauperis?
8        A.  I don't recall.
9        Q.  Do you know what that means?
10       A.  In person.
11       Q.  Okay.  We talked about the
12   Middle District of Florida and Southern
13   District of Florida.
14       Do you recall on July 7th,
15   1994, a month or so later, filing a
16   petition for writ of habeas corpus
17   against the Florida Department of
18   Corrections in the Northern District of
19   Florida?
20       A.  Don't recall.
21       Q.  Don't remember that either.
22       By the way, the records
23   suggest that you lost all of these.  Does
24   that refresh your recollection at all?

303

1        A.  No.
2        Q.  Do you recall filing another
3    petition for writ of habeas corpus in the
4    Middle District of Florida on
5    July 18th, '94?
6        A.  No.
7        Q.  A month after?
8        A.  Don't recall.
9        Q.  Remember me asking you those
10   questions about whether you have filed a
11   petition to change your name?
12       A.  Yes.
13       Q.  Do you want to stand by
14   those answers?
15       A.  Sure do.
16       Q.  All right.  Do you recall
17   filing an action in Pinellas County
18   court, I think if I'm reading this right,
19   the case number is 94009400 FD.
20       That could be wrong.  But do
21   you recall filing a petition around
22   September 8th, 1994 in that court to have
23   your name changed?
24       A.  No, I do not.

304

1        Q.  You know what, I'm real
2    interested, you had just gotten out of
3    prison in 1995, had you?
4        A.  '95.
5        Q.  '95.  And you're saying you
6    didn't try to get your name changed after
7    you spent nine years in prison?
8        A.  No, I did not.
9        Q.  I'm now going to show you
10   what I'll mark as Exhibit 2.
11       MR. ELLISON:  And I
12       apologize for the highlighting on
13       this, counsel, and this is one of
14       those that I just don't have
15       copies of, so I'm just going to
16       give it to you.
17       (Exhibit No. D. Haller-2,
18       Name Change Petition for David
19       Haller, was marked for
20       identification.)
21       MR. ELLISON:  And if I
22       could trouble you, when you've had
23       a chance, if you'd show it to the
24       witness.

305

1    BY MR. ELLISON:
2        Q.  And are you comfortable if I
3    come around, sir?
4        A.  (Witness nodding head.)
5        Q.  You're nodding.
6        Right here in the top left
7    corner, it says "In Re, the petition of
8    David Haller for change of name."
9        Isn't that right?
10       A.  It does say it.  I don't
11   remember.
12       Q.  And the top says "In the
13   Circuit Court for Pinellas County,
14   Florida, Case Number 949400FD12."
15       Is that right?
16       A.  Yes.
17       Q.  And it says "Final judgment,
18   changing name."
19       Isn't that correct?
20       A.  Yes.
21       Q.  And it said "This cause
22   having come on to be heard upon the sworn
23   petition of David Haller as being
24   otherwise fully advised in the premises,

**(Pages 302 to 305)**

306

1  it is ordered and adjudged that said
2  petition be and the same is hereby fully
3  denied."
4       Correct?
5    A.  Don't recall this.
6    Q.  My question, did I read that
7  right?
8    A.  Yes.
9    Q.  That was signed by a judge
10  on February 21st, 1995, is that correct?
11    A.  Yes.
12    Q.  You don't remember?
13    A.  No.
14    Q.  Do you think this was you or
15  do you think it was someone else?
16    A.  I don't know.
17    Q.  But you want all of us to
18  know that you did not get out of prison
19  and then run in to try to get your name
20  changed?
21    A.  Not as I can recall.
22    Q.  You can't recall, you may
23  have, you just don't remember?
24    A.  I don't recall.

307

1    Q.  Again, you may have, but you
2  don't remember?
3    A.  I don't recall.
4    Q.  Do you understand my
5  question?
6    A.  I understand your question.
7    Q.  You may have, but you don't
8  remember?
9    A.  I do not recall.
10    Q.  Do you recall Carolyn Ann
11  Milford?
12    A.  Yes.
13    Q.  Who is she?
14    A.  It was a girlfriend I was
15  dating.
16    Q.  This was around right after
17  you got out of prison?
18    A.  And your point is?
19    Q.  This was right around the
20  time, right after you left prison?
21    A.  What year?
22    Q.  Well, that would be '95,
23  wouldn't it?
24    A.  And I would have been Baker

308

1    Acted.
2    Q.  Baker Acted --
3    A.  To --
4    Q.  By whom?
5    A.  By the state courts in Union
6  County.
7    Q.  Who is Carolyn Ann Milford?
8    A.  A girlfriend I was dating.
9    Q.  You kept in touch?
10    A.  No.
11    Q.  Why not?
12    A.  Because I didn't date her
13  till in the year 2000s.
14    Q.  What?
15    A.  Me and her didn't date till
16  around 2000-something.
17    Q.  You had not met her prior to
18  2000?
19    A.  Nope.  If you're talking
20  about 1995, I was Baker Acted in the
21  Memorial Hospital.
22    Q.  Do you recall yourself
23  filing a civil case in the Circuit Court
24  of Pinellas County, Case Number

309

1  9512106FD12, against Carolyn Ann Milford
2  in and around December of '95?
3    A.  No.
4    Q.  Do you recall dismissing
5  that petition?
6    A.  No.
7    Q.  You have no memory of this
8  at all?
9    A.  No.
10    Q.  You are David Dwayne Haller,
11  aren't you?
12    A.  I am.
13    Q.  What do you recall about
14  Carolyn Ann Milford?
15    A.  Not much.
16    Q.  If you only met her in 2000,
17  do you have any understanding or
18  explanation why --
19    A.  No.
20    Q.  -- you would have sued her
21  in '95?
22    A.  You can't sue somebody if
23  they ain't got no money.
24    Q.  And it's your view that she

(Pages 306 to 309)

310

1  has no money?
2      A.  **She has no money.**
3      Q.  How did you come to meet
4  her?
5      A.  **She didn't get no money**
6  **until around the year 2000-something.**
7      Q.  How did you come to meet
8  her?
9      A.  **I used to live in St. Pete.**
10  **I dated her.**
11     Q.  You met her in St.
12  Petersburg?
13     A.  **Yeah.**
14     Q.  And how did you meet her?
15     A.  **How else do you meet**
16  **anybody? I mean, you go out every day,**
17  **you see a woman, you want to meet her,**
18  **how do you go about doing that?**
19  **Interesting question.**
20     Q.  How do you go about doing
21  it, sir?
22     A.  **I go up and introduce**
23  **myself.**
24     Q.  And you did that to Miss

311

1  Milford?
2      A.  **Yes, I did.**
3      Q.  Where in St. Petersburg
4  were you?
5      A.  **Williams Park.**
6      Q.  And you began to date?
7      A.  **Yes.**
8      Q.  Who paid for the dates?
9      A.  **Me.**
10     Q.  And you don't maintain a
11  relationship with Miss Milford, do you?
12     A.  **No.**
13     Q.  When was the last time you
14  talked to her?
15     A.  **I can't remember.**
16     Q.  Did she ever file a
17  petition --
18     A.  **Not that I know of.**
19     Q.  -- for a protective order
20  against you?
21     A.  **Not that I know of.**
22     Q.  Order of protection I should
23  say.
24         You have to help me with the

312

1  name. Karen Dineen Guyatt?
2      A.  **Don't know it.**
3      Q.  G-U-Y-A-T-T?
4      A.  **Don't know it.**
5      Q.  Never heard of the name?
6      A.  **No.**
7      Q.  Do you recall filing a case
8  in Pinellas County Small Claims Court,
9  Number 96276FC45, against a Karen Dineen
10  Guyatt?
11     A.  **Don't recall.**
12     Q.  It was dismissed on
13  settlement February 13th, '96?
14     A.  **Don't recall it.**
15     Q.  You have no idea who Karen
16  Dineen Guyatt is?
17     A.  **No.**
18     Q.  So -- well, when you were in
19  St. Petersburg, were you living at 111
20  Sixth Avenue North, Apartment 7, St.
21  Petersburg, Florida 33701?
22     A.  **Address again, please?**
23     Q.  111 Sixth Avenue North,
24  Apartment 7?

313

1      A.  **No.**
2      Q.  Your face is twitching
3  again. Are you okay?
4      A.  **Um-hmm.**
5      Q.  Yes? Yes?
6      A.  **Yes.**
7      Q.  So you have no idea what
8  this record of a lawsuit between a David
9  D. Haller --
10     A.  **I never lived at 111 Sixth**
11  **Avenue.**
12     Q.  You did or didn't?
13     A.  **I did not.**
14     Q.  Did you ever file a lawsuit
15  against Directions?
16     A.  **No.**
17     Q.  You don't recall filing a
18  case in the Circuit Court of Pinellas
19  County, Number 962396CI013, against
20  Directions?
21     A.  **I don't recall that.**
22     Q.  May have, just don't
23  remember?
24     A.  **I don't recall it.**

(Pages 310 to 313)

314

1    Q.   Have you ever heard of a
2  Bobby Tucker?
3    A.   Nope.
4    Q.   Do you ever recall filing a
5  petition in small claims court against
6  someone for beating you up?
7    A.   No.
8    Q.   Do you recall seeking a
9  temporary injunction in a case, Number
10  96003319 FD, around, say, April of '96?
11    A.   No.
12    Q.   You don't recall any such
13  application being denied?
14    A.   No.
15    Q.   Lisa Nucci, did you sue her?
16    A.   I don't remember.
17    Q.   What do you mean you don't
18  remember?
19    A.   Actually, I didn't do
20  anything to her, because she had an
21  injunction against me.  I couldn't go
22  against her.  That would be a violation
23  of the injunction.
24    Q.   Do you recall suing her in

316

1       Have you ever sued any
2  government agency?
3    A.   Not that I'm aware of.
4    Q.   What do you mean not that
5  I'm aware of?
6    A.   I don't know none.
7    Q.   You don't know if you've
8  sued a government agency or you have
9  not --
10    A.   I would look awful stupid
11  going against a governmental agency where
12  I would lose automatically if I didn't
13  have an attorney, so, no, I don't.
14    Q.   You don't recall filing a
15  lawsuit in Pinellas County Small Claims
16  Court, Case Number 96003383SC, in the
17  name, again, it's in the name Bryant --
18  strike that -- Julia Bryant?
19    A.   No, I do not.
20    Q.   Do you recall Lisa Francis
21  Nucci filing a lawsuit against you on
22  December 12, '96?
23    A.   No, I do not.
24    Q.   Case Number 9601105FD,

315

1  July of '96?
2    A.   No.
3    Q.   You don't recall accusing
4  her of a wrongful act?
5    A.   No.
6    Q.   On July 8th, '96, under Case
7  Number 96005410 CO?
8    A.   No.
9    Q.   And that's the Lisa Nucci --
10  well, you spelled Nucci, N-U-C-C-I?
11    A.   Yes.
12    Q.   And that's the same spelling
13  of the name of the person you told us
14  about before, right?
15    A.   Yes.
16    Q.   Julia Bryant, do you know
17  the name?
18    A.   No.
19    Q.   Did you ever sue the Social
20  Security Administration to recover
21  benefits of any sort?
22    A.   No.
23    Q.   What about small claims
24  court, under 9633 -- strike that.

317

1  doesn't ring a bell?
2    A.   No.
3    Q.   Do you recall an order of
4  protection being issued against you on
5  behalf of Lisa Nucci --
6    A.   I do.
7    Q.   -- on December 31st, '96?
8    A.   I remember that.
9    Q.   Do you recall her getting a
10  judgment against you and a judgment lien
11  issuing against you?
12    A.   I remember that.
13    Q.   So that's at least one
14  lawsuit that you were involved in,
15  correct?
16    A.   An order of protection is
17  not a lawsuit.
18    Q.   And is that why you didn't
19  include it on your fact sheet?
20    A.   What?
21    Q.   This --
22    A.   An order of protection is
23  not a lawsuit.  So, no, I did not put it
24  on my fact sheet.

(Pages 314 to 317)

318

1    Q.   Can I see your fact sheet
2 for a second, please?
3    A.   (Witness complies with
4 counsel's request.)
5    Q.   You didn't say just lawsuit,
6 you said lawsuit, judicial proceeding or
7 a claim.
8    A.   She filed against me, I
9 didn't file it against her.
10   Q.   It says whether you have
11 ever been a party, not whether you
12 yourself have sued, correct?
13   A.   Correct.
14   Q.   And you didn't include this,
15 did you?
16   A.   I didn't pay any attention
17 to it.
18   Q.   You didn't pay any attention
19 to it. Do you know a Russell Hewitt?
20   A.   Yes.
21   Q.   Do you recall him suing you?
22   A.   No.
23   Q.   Case Number 97000353FD in
24 Pinellas County Small Claims Court?

319

1    A.   Don't remember it.
2    Q.   Don't remember it.
3         Gabriel Roshco?
4    A.   Don't know it.
5    Q.   Never heard of him?
6    A.   Don't remember it.
7    Q.   Don't remember you suing
8 him, 97006118 SC?
9    A.   No.
10   Q.   Nadia Jakovenko sued for
11 domestic violence and an order of
12 protection sought, Case Number 05010225
13 FD in Pinellas County on August 16th --
14   A.   I mentioned that already.
15   Q.   -- August 16th, 2005?
16   A.   We discussed that.
17   Q.   That's the case we talked
18 about?
19   A.   Yes.
20   Q.   And an injunction --
21   A.   Right. We discussed that
22 already.
23   Q.   And the basis for this was
24 domestic violence?

320

1    A.   Right, domestic violence. I
2 told you that. She had an injunction on
3 me. That's what we were discussing
4 before at our last break.
5    Q.   I haven't yelled at you.
6    A.   I'm telling you that
7 injunction was discussed when we left for
8 the break.
9    Q.   Well, I'm not done yet.
10   A.   Woo.
11   Q.   What do you mean by "woo"?
12   A.   Like I'm not done yet.
13   Q.   I'm not. The injunction was
14 based on domestic violence.
15   A.   And I told you that already.
16   Q.   What did you do?
17   A.   We were discussing it. I
18 ain't going to go through it twice. You
19 can go back in your notes and find out.
20 You've been over there with a pen and
21 paper and all writing everything else.
22 You don't remember we discussed that? I
23 threatened her. Mmm.
24   Q.   You were charged with

321

1 domestic violence.
2    A.   No, I was not charged with
3 domestic violence. She filed an order of
4 protection and that's the one she got me
5 and threw me out of the house.
6    Q.   And the order was granted,
7 correct?
8    A.   Yes.
9    Q.   And the judgment was entered
10 on the order, correct?
11   A.   Yeah, I told you that, and I
12 told you that already.
13   Q.   Let the record reflect that
14 the witness is yelling at me. Do you
15 need a break, sir?
16   A.   No, you need a break. You
17 need to get a life.
18   Q.   Are you threatening me, sir?
19   A.   You need to get a life.
20   Q.   Are you threatening me, sir?
21   A.   No, sir, you need to get a
22 life.
23   Q.   I have one, and I'm quite
24 content with it, sir.

(Pages 318 to 321)

322

1    A.  No, you don't.  I can't
2  tell.  Because I discussed the injunction
3  with you already.
4    Q.  And you went in to have the
5  injunction modified, isn't that correct?
6    A.  That's correct.  So I can
7  talk about personal property.
8    Q.  And you lost, right?
9    A.  Right.  I wanted my
10  property, I wanted my clothes, I wanted
11  my personal effects.
12    Q.  And your motion to modify
13  the injunction was denied, not just once,
14  November 1st, 2005, you asked again and
15  it was denied again, June 13th, 2006, is
16  that correct?
17    A.  We discussed the injunction
18  already before, so I'm not going to be
19  prodded like I don't know what I'm
20  talking about.
21    Q.  Here's the part I'm
22  struggling with, sir.  The basis, at
23  least in the court records, is that it
24  was domestic violence without kids, and

323

1  you're telling me that all you did was
2  said something to her, and I'm trying --
3    A.  I'm not going to go into the
4  injunction, I refuse.  So I'm pleading
5  the Fifth.
6    MS. HO:  Why don't we take a
7  break.  Let's take a break.  Come
8  on.  We're going to take a break,
9  David.
10    THE WITNESS:  This is the
11  same injunction we discussed
12  before we went on the last break
13  and had lunch.
14    MS. HO:  Let's go.  There's
15  no question on the table.  We're
16  taking a break.  Be quiet.  Let's
17  go.  Stand up.
18    THE WITNESS:  You
19  double-talk yourself too much.
20    MS. HO:  Stop talking.
21    (Recess is taken from 2:55
22  p.m. until 3:03 p.m.)
23  BY MR. ELLISON:
24    Q.  I was asking you some

324

1  questions about the injunction before the
2  break.
3    A.  And I'm saying that was
4  discussed before.
5    Q.  And you told me the reason
6  you went in to get it modified had
7  something to do with you getting your
8  personal property back, correct?
9    A.  Correct.
10    Q.  Well, I'm looking at the
11  injunction and it says that respondent,
12  that would be you, in the presence of a
13  law officer, may return to the premises
14  at a time arranged with the law
15  enforcement department for the purpose of
16  obtaining your clothing, items of
17  personal health, hygiene and tools of the
18  trade.
19    So the injunction lets you
20  do that so long as the law enforcement --
21    A.  No, I made three attempts to
22  get my personal effects out of the house.
23  She was unavailable.
24    Q.  Please let me finish my

325

1  question.
2    The injunction permitted you
3  with the assistance --
4    A.  Right, and I made three
5  attempts.  I'm not going to go into a
6  long drawn story, song, because I tried
7  three times by order of an injunction to
8  get my personal effects.  She was not
9  there.  It took three times for me to go
10  to the house to get it.  She finally had
11  it all waiting for me.
12    Q.  The injunction says she's
13  not supposed to be there when you go
14  there, sir.
15    A.  She is.  I can't go in her
16  house without a key.  I can't break and
17  enter the house to get my personal
18  effects.  It says with law enforcement.
19  So law enforcement knocked on the door.
20  I did not knock on the door.  The police
21  knocked on her door and she ain't got no
22  response.  So I called — I filed the
23  motion to modify the injunction so I may
24  go there and take the house into my

(Pages 322 to 325)

326

1  custody, where I can go get it at my
2  leisure.
3      Q.   And you lost, right?
4      A.   I lost.
5      Q.   Twice?
6      A.   Twice.
7      Q.   The injunction bars you from
8  getting anywhere within 500 feet of her,
9  is that right?
10     A.   Exactly.
11     Q.   And it's your testimony the
12 reason the court barred you from getting
13 anywhere from within 500 feet of Nadia is
14 because you threatened her?
15     A.   Yes.
16     Q.   No other reason?
17     A.   I can't give you no other
18 reasons.
19     Q.   Apart from Pennsylvania and
20 Florida, have you been charged with
21 crimes in any other cities -- states I
22 should say?
23     A.   None that I haven't
24 discussed already.

327

1      Q.   What is your answer?
2      A.   My answer is none that I
3  haven't discussed sometime before.
4      Q.   You never had spending
5  sprees as part of your bipolar?
6      A.   No.
7      Q.   I've got a record I'm
8  looking at, March 13th, 2003. I won't
9  mark it as an exhibit, but it's Bates
10 numbered Haller Directions for Mental
11 Health 54 and 55 that says as follows --
12 well, let me ask you.
13         Do you recall telling the
14 physician or an ARNP, Carol Corelle,
15 C-O-R-E-L-L-E --
16     A.   No.
17     Q.   -- that you, in 2003, were
18 having mood swings which switch over a
19 few weeks, raising thoughts which cause
20 difficulty sleeping, poor concentration,
21 periods of hypersexuality, spending
22 sprees, cleaning excessively and
23 increased irritability that people were
24 telling you to stop talking so fast or so

328

1  much, and that you were starting projects
2  and not finishing them?
3      A.   What does that got to do
4  with spending spree?
5      Q.   Do you have my question in
6  mind, sir?
7      A.   My question to you is --
8      Q.   I don't have to answer your
9  question.
10     A.   Then I'm not going to answer
11 that.
12     Q.   That's not how this works.
13 Are you refusing to answer my question,
14 sir?
15     A.   The point right now?  I
16 don't remember that.  And I don't recall.
17     Q.   Do you deny that you did?
18     A.   Yes.
19     Q.   So if the record says that
20 you told Carol those things on those days
21 that I already stated --
22     A.   That's her interpretation.
23     Q.   And you deny it?
24     A.   Yes.

329

1      Q.   You never engaged in that
2  type of behavior?
3      A.   No.
4      Q.   And you never told her that,
5  right?
6      A.   No.
7      Q.   So she's a liar?
8      A.   Yes.
9      Q.   Do you know what a
10 cholecystectomy is?
11     A.   A what?
12     Q.   That answered that.
13     A.   I don't even know what it
14 is.
15     Q.   Ever used illicit drugs?
16     A.   Never.
17     Q.   Never?
18     A.   No.
19     Q.   No form, correct?
20     A.   None.
21     Q.   You've never used cocaine,
22 right?
23     A.   No.
24     Q.   Never used crack, is that

330

1 right?
2    A.   Never.
3    Q.   Do you recall telling your
4 physicians that you thought your meds
5 were helping --
6    A.   Yes.
7    Q.   -- in March of 2005?
8    A.   Yes.
9    Q.   You don't deny doing that?
10    A.   No.
11    Q.   So you don't deny that, at
12 the time, it looks like you were on
13 Eskalith, lithium carbonate, Depakote and
14 Seroquel, is that correct?
15    A.   Yes.
16    Q.   You don't deny telling your
17 physicians that those had fixed your
18 severe mood swings?
19    A.   I don't remember telling
20 them that they fixed them. I said they
21 helped.
22    Q.   Same for the psychotic
23 symptoms?
24    A.   Yes.

331

1    Q.   That you weren't suicidal or
2 feeling violent, correct?
3    A.   Correct.
4    Q.   And do you recall telling
5 them that you did not have any side
6 effects from those medicines in March
7 of 2005?
8    A.   No, I do not.
9    Q.   I'm now going to show you, I
10 won't mark it, but it's Bates numbered
11 Haller Directions 0052, and this is a
12 medical record dated 3/29/2005 of Don
13 Davis, an ARNP.
14       I'm going to hand this to
15 you, sir. I'm just going to direct your
16 attention to the last sentence, Denies
17 side effects from the meds.
18       Do you see that in front of
19 you?
20    A.   I don't remember that.
21    Q.   Do you deny that you told
22 him that?
23    A.   I don't recall.
24    Q.   Do you deny that?

332

1    A.   I do. And that's probably
2 before -- if I did tell him that, that's
3 because I wasn't taking Risperdal at the
4 time either. Or if I did, I misquoted
5 myself, because I know I didn't say that.
6 I wouldn't tell him something like that.
7 Why would a physician --
8       MS. HO: There's not a
9 question pending, David.
10       THE WITNESS: There was a
11 question for me.
12       MS. HO: No.
13       THE WITNESS: Yeah.
14 BY MR. ELLISON:
15    Q.   What else were you going to
16 say?
17    A.   I'll leave it alone.
18    Q.   You told me that you had a
19 question.
20    A.   I'll pass. There's a lot of
21 things in my records of Directions that
22 say things that I didn't say.
23    Q.   Has anyone ever told you
24 that you appear to be paranoid?

333

1    A.   No.
2    Q.   Do you recall having
3 abnormal liver function tests as a result
4 of using Depakote?
5    A.   I don't recall. None of my
6 lab work was ever explained to me.
7    Q.   Did you ever ask?
8    A.   No.
9    Q.   Anyone ever tell you you
10 have a fatty liver?
11    A.   I've been told I had a fatty
12 liver, but never discussed my lab work.
13 That's why I had a colonoscopy and
14 another one on the throat.
15    Q.   Do you recall going in in
16 July of 2005 and asking that your
17 Seroquel be increased because you were
18 having mood swings, irritability, racing
19 thoughts and that you had noted a
20 definite change on lower doses of
21 medication?
22    A.   No, I do not.
23    Q.   You wouldn't dispute it,
24 though, if it's in the records?

(Pages 330 to 333)

334

```
1     A.   I would dispute it.
2     Q.   Do you recall anyone telling
3  you that you had drug -- or hepatitis
4  most likely as a result of drug abuse?
5     A.   No.
6     Q.   Do you recall -- is there a
7  Dr. Zemel?
8     A.   There's a Dr. Zenel.
9     Q.   Dr. Zenel.
10         Do you recall refusing to
11 have labs done on July 21st, 2005 that he
12 had ordered?
13    A.   No, I do not.
14    Q.   Have you ever refused a lab
15 test because you were concerned it might
16 come back positive for illicit
17 substances?
18    A.   No.
19    Q.   You don't remember in
20 January of 2006 asking to have your
21 Seroquel increased because you were
22 having difficulty with sleep?
23    A.   I do not recall.
24    Q.   If your medical records said
```

335

```
1  it, you would agree with it?
2     A.   Yes.
3     Q.   It's Bates Numbers
4  Directions 0044.
5         So you don't dispute that in
6  January of 2006, you were asking that
7  Seroquel actually be increased?
8     A.   I do not recall that.
9     Q.   But you don't dispute it?
10    A.   Yes, I do.
11    Q.   You just said a minute ago
12 you didn't dispute it.
13    A.   I said yes, I dispute it.
14    Q.   Do you recall telling a
15 physician in June of 2006 that you were
16 reporting much better and not feeling
17 suicidal at all and that you were
18 sleeping well on 600 milligrams of
19 Seroquel?
20    A.   I don't recall.
21    Q.   When did you first learn
22 that -- or when did you first come to the
23 view that Seroquel could cause diabetes?
24    A.   I don't recall. I don't
```

336

```
1  remember.
2     Q.   You'd agree that you used
3  Seroquel --
4     A.   All I know, I went to the
5  emergency room for gastroparesis, I was
6  not feeling very well, and they took my
7  sugar lab tests and they came back and
8  said I was urinating 400 cc's of sugar.
9  And that's when I was told I had
10 diabetes.
11    Q.   And at that time, did you
12 think it was Seroquel that did it?
13    A.   I had no other reason not to
14 think so.
15    Q.   My understanding of your
16 earlier testimony was the first time you
17 thought Seroquel may have caused your
18 diabetes was when you saw the ad on
19 television.
20    A.   Well, say it like this, I
21 have no family history, so I couldn't say
22 it came from my family, because I don't
23 know.
24    Q.   Dr. Keene, or rather I
```

337

```
1  should say AARNP Nicole Keene,
2  specifically told you that there was an
3  association between Seroquel and
4  diabetes, correct?
5     A.   Correct.
6     Q.   And you chose to stay on the
7  medication despite the risks, correct?
8     A.   More or less.
9     Q.   More, not less, right?
10    A.   Well, they were going to
11 take it off me anyhow (sic), so why even
12 ask?  I have to get off it totally
13 percent -- 100 percent this time, and I'm
14 told they're going to taper me off of it.
15    Q.   Do you need another break,
16 sir?  You're becoming very antagonistic.
17    A.   You're bringing up things,
18 Directions -- I can tell you things in my
19 records at Directions that I never said
20 or would have said.  They're talking
21 about me having an alcohol problem, I
22 did.  Did I have a drug problem?  Never.
23        (Exhibit No. D. Haller-3,
24        Psychiatric Progress Notes for
```

338

1     **David Haller, 6/1/2006, was marked**
2     **for identification.)**
3  BY MR. ELLISON:
4     Q.  I now show you what I marked
5  as Exhibit 3, which is Bates Number DH
6  Haller Directions 00034 and I've
7  highlighted a line right down here under
8  medication.  Now, if I understand you
9  correctly, you said you didn't take
10  Seroquel knowing of the risks.
11     Take a look at that record,
12  which I'm handing to you now, and will
13  you please read the highlighted sentence
14  into the record for me?
15     MS. HO: Which one?
16  BY MR. ELLISON:
17     Q.  There are two.  The one in
18  the bottom says medication.  Will you
19  read that out loud, please?
20     **A.  I don't recall this, so I'm**
21  **not going to read it.**
22     Q.  All right.  I will read it
23  then, so the record is clear.  It says
24  "The patient is aware of Seroquel and

339

1  lipids and possible diabetes.  He wishes
2  to stay on the medication despite these
3  risks."
4     I read that right, didn't I?
5     **A.  Yeah, but I don't recall**
6  **that.**
7     MS. HO: Did you mark that
8  as three?
9     MR. ELLISON:  Yes, that's
10  three.
11  BY MR. ELLISON:
12     Q.  Were you ever on insulin?
13     A.  No.
14     Q.  Do you know what
15  hydrocodocone (sic) is?
16     **A.  Hydrocodone?  It's a pain**
17  **pill.**
18     Q.  Did you ever abuse it?
19     A.  No.
20     Q.  Has any physician ever told
21  you that you were abusing it?
22     A.  No.
23     Q.  I showed you one, Exhibit 3
24  was June of 2006.  But you don't

340

1  remember -- your face is twitching.  Do
2  you need a minute?
3     **A.  I'm all right.**
4     Q.  Do you need a minute?
5     **A.  No.**
6     Q.  I just showed you June
7  of 2006 on Exhibit 3, Bates numbered DH
8  Haller 00024 is for October 6th, 2006,
9  which is five days before your complaint
10  was filed in this case.
11     Do you recall the
12  physician -- or rather Nicole Keene
13  talking with you about the risk of
14  Seroquel and diabetes and you telling her
15  that you wanted to stay on the medication
16  despite the risks?
17     **A.  I don't recall that.**
18     **(Exhibit No. D. Haller-4,**
19     **Psychiatric Progress Notes for**
20     **David Haller, 10/6/2006, was**
21     **marked for identification.)**
22  BY MR. ELLISON:
23     Q.  I'm now showing you what
24  I'll mark as Exhibit 4, which is a

341

1  medical record, a Bates number I've read,
2  dated October 6th, 2006, five days before
3  your lawsuit was filed.  Look at the
4  second highlighted part.  Can you read
5  that sentence into the record for me,
6  sir?  Sir, will you read that out loud,
7  please?
8     **A.  You can read.**
9     Q.  I'm sorry?
10     **A.  You can read.**
11     Q.  The witness is refusing to
12  read.
13     **A.  You can read it.**
14     Q.  Are you unable to read it,
15  sir?
16     **A.  I don't agree with it, so**
17  **I'm not going to read it.**
18     Q.  My question isn't whether
19  you agree with the sentence or not, sir --
20     **A.  And I'm not going to read**
21  **it.**
22     Q.  And you're not going to read
23  it why?
24     **A.  Because it's a lie.**

342

1    Q.   All right.  The record says,
2  "The patient is aware of the risk on
3  Seroquel and lipids and possible
4  diabetes.  He wishes to stay on the
5  medication despite these risks."
6       I read that right, didn't I?
7    A.   I guess so.
8    Q.   And Nicole Keene, in your
9  view, is a liar, is that right?
10   A.   Yes.
11   Q.   Maybe three's the charm.  We
12 did June, we did October, let's talk
13 about January of 2007.  Your lawsuit is
14 pending.  Okay?
15      Do you recall having a
16 discussion with Nicole Keene in which you
17 told her that you had filed the lawsuit
18 regarding Seroquel and Risperdal as
19 causing your diabetes?  Do you recall
20 telling her that?
21   A.   No.
22   Q.   Do you remember telling her
23 that even though you had been given
24 clear, informed consent, you did not want

343

1  to come off of that medication, correct?
2    A.   I don't remember that.
3       (Exhibit No. D. Haller-5,
4       Psychiatric Progress Notes for
5       David Haller, 1/12/2007, was
6       marked for identification.)
7  BY MR. ELLISON:
8    Q.   All right.  I'm now going to
9  show you what I marked as Exhibit 5,
10 which is D. Haller Bates numbered 00017.
11 It's Directions.  Look at that
12 highlighted section in the top line.
13   A.   The same doctor you're
14 getting paperwork from, she tells me when
15 I walk in the office and asked to get off
16 the Seroquel, she says, well, all — all
17 the psychotropic medications cause
18 diabetes.  So if I'm supposed to get off
19 Seroquel, then I turn around, the next
20 time I get on a drug that says
21 AstraZeneca and it says can cause
22 diabetes, I'll get off of it, then I'll
23 see you again right where we're sitting
24 in the room again for another deposition

344

1  and it'll lose some more money.
2    Q.   So now you do remember
3  having a discussion with her?
4    A.   No, I brought that to her
5  attention before, I wanted to get off
6  Seroquel, and she told me, the words
7  were, that all psychotropic medications
8  have side effects and they cause
9  diabetes.
10   Q.   The record reads, He is
11 involved in a lawsuit regarding diabetes
12 mellitus related to Seroquel and
13 Risperdal.  He has been given clear and
14 informed consent in this regard and does
15 not want to come off the medications.
16      That's what it says, right?
17   A.   They're liable to say
18 anything to save their neck.
19   Q.   Have you threatened her?
20   A.   No.  Save her neck, see,
21 Directions doesn't have malpractice
22 lawsuits insurance.
23   Q.   Sir, that is what the
24 document says, isn't that correct?

345

1    A.   She can put anything she
2  wants, and I don't recall that.
3    Q.   So she --
4    A.   I dispute that.
5    Q.   She's a liar?
6    A.   She's a bald-faced liar.
7    Q.   Bald-faced liar.  Forgive
8  me.  And at the bottom, it once again
9  says, The patient is aware of the risk of
10 Seroquel and lipids and possible
11 diabetes.  He is also aware of the risk
12 of EPS, extrapyramidal symptoms, and
13 possible TD, tardive dyskinesia.  He
14 wishes to stay on the medication despite
15 these risks.
16      I read that right, correct?
17   A.   Umm.
18   Q.   You're nodding when you say
19 umm.  So yes?
20   A.   Umm.  May be.  But then
21 again, I must have, every month, every
22 year that goes by, I got to go into the
23 emergency room with gastroparesis and
24 throwing up my intestines and everything

346

1 else in my stomach and be told, we can't
2 help you. You got to go home and take
3 your medication.
4    Q.   Are you under the view that
5 gastroparesis is related to diabetes?
6    A.   Yes, it is.
7    Q.   And who told you that?
8    A.   Dr. Belur.
9    Q.   When did Dr. Belur Sreenath
10 tell you that?
11    A.   The first time I ever went
12 in the hospital and was admitted for my
13 diabetes. He called it diabetic
14 gastroparesis.
15    Q.   You had gastroparesis before
16 you ever had diabetes?
17    A.   No, I did not.
18    Q.   That's your view?
19    A.   No, I did not.
20    Q.   And if the medical records
21 reflect that, the people who wrote them
22 are, as you say, are bald-faced liars?
23    A.   Yeah.
24    Q.   Do you ever remember being

347

1 screened by the medical division of the
2 Pinellas County Sheriff's Office, say
3 January 13th, 2001, Bates Number DH
4 Haller, Pinellas County Sheriff 00037?
5    A.   You lost me.
6    Q.   Do you remember being
7 interviewed by the medical division of
8 the Pinellas County Sheriff's Office,
9 January of 2001?
10    A.   No, I do not.
11    Q.   Do you recall around that
12 same time being there because a woman
13 claimed that you had abused a child in
14 her neighborhood?
15    A.   Yeah.
16    Q.   Who is the kid?
17    A.   They tried to get me for
18 child abuse, but the state attorney put
19 it under civil battery.
20    Q.   Who is the kid?
21    A.   A neighborhood kid. In the
22 mobile home park I lived in.
23    Q.   And who was the kid?
24    A.   I don't remember.

348

1    Q.   Boy or girl?
2    A.   Boy.
3    Q.   How old was this boy?
4    A.   I have no idea.
5    Q.   Give me your best guess.
6    A.   103. That's my best guess.
7 103.
8    Q.   It seems to me that you're
9 not taking this process seriously.
10       MR. ELLISON: Counsel --
11       THE WITNESS: And when I
12 said I don't recall, I don't
13 recall.
14       MR. ELLISON: Counsel, do
15 you need a minute to talk with
16 your client? Because I don't have
17 to sit here and be abused.
18       THE WITNESS: That's a lie.
19 Abuse goes two directions.
20       MR. ELLISON: Do you want to
21 do this off the record?
22       MS. HO: David, be quiet,
23 let's go. Come on. Get up.
24       THE WITNESS: When someone

349

1 says they don't recall, they don't
2 recall.
3       MS. HO: David, stop.
4       THE WITNESS: I'm going to
5 file a bar complaint.
6       MR. ELLISON: A what?
7       THE WITNESS: I'm going to
8 file a bar complaint.
9       MS. HO: David, be quiet.
10       (At this time, the witness
11 and his counsel leave the
12 deposition room and confer off the
13 record.)
14       (Recess is taken from 3:28
15 p.m. until 4:00 p.m.)
16       MR. ELLISON: Mr. Haller and
17 his counsel left, as indicated by
18 the record, and have apparently
19 been conferring. They have been
20 gone for an extended period of
21 time, in excess of a half-hour. I
22 have searched the public areas of
23 the hotel in an attempt to try to
24 find them so I can proceed with my

350

1    deposition and have been unable to
2    do so. I'm going to wait a little
3    while longer and in the event they
4    do not show up, I will have to
5    adjourn the deposition and,
6    subject to the reservation of
7    rights appropriate, at such
8    instance.
9        (Pause.)
10       I made a statement on the
11   record about the extended absence,
12   but in that you are here, we can
13   get started.
14       (At this time, John Hampton,
15   Esquire enters the deposition
16   room.)
17   BY MR. ELLISON:
18   Q.   Sir, do you own a gun?
19   A.   No.
20   Q.   Have you ever?
21   A.   Never.
22   Q.   No firearm of any type?
23   A.   None.
24   Q.   Do you own any weapons?

351

1    A.   No.
2    Q.   You paused. Were you
3    thinking?
4    A.   Well, I'm thinking how to
5    answer that.
6    Q.   Did your mom abuse you?
7    A.   No.
8    Q.   What about your biological
9    mother?
10   A.   I have no knowledge.
11   Q.   I have a mental health
12   status exam from the Correctional
13   Physician Services, Inc., Bates numbered
14   Pinellas County Sheriff 00134, that says
15   "History of abuse," physical is checked
16   and there's a line that says "Biological
17   mother" on it. I'll just show it to your
18   lawyer.
19       You don't know anything
20   about that?
21   A.   I was never told.
22   Q.   How old were you when you
23   were adopted?
24   A.   Six months.

352

1    Q.   Do you recall being picked
2    up in January of '97 and the arresting
3    officer telling you or concluding or
4    asking you if you were on crack?
5    A.   No, I don't recall.
6    Q.   I've got a record here that
7    says Pinellas County Sheriff, Bates
8    Number 00165, and I'll show it to your
9    counsel, that says, Does the inmate
10   appear to be under the influence of or
11   withdrawing from drugs or alcohol, and it
12   says Crack, per arresting officer.
13       MR. ELLISON: That's what
14       that says, doesn't it, counsel?
15   BY MR. ELLISON:
16   Q.   You don't know anything
17   about that?
18   A.   No, I don't know anything
19   about it.
20   Q.   You never used crack?
21   A.   Never used any illicit
22   drugs.
23   Q.   Do you remember how we
24   talked about your weight earlier and you

353

1    said you were 200 pounds?
2    A.   Well, I'm 92 pounds
3    overweight.
4    Q.   But you told me that your
5    weight gain occurred --
6    A.   The medication I'm taking
7    now caused me to be less active than I
8    normally would be.
9    Q.   You're saying -- how much do
10   you weigh now?
11   A.   I'm not exactly certain what
12   I weigh.
13   Q.   What was your -- like 230?
14   A.   Last time I got weighed at
15   the doctor's office, they weighed me at
16   239.
17   Q.   And you're saying that that
18   is something that -- your weight
19   increased from 200 to 239 while you were
20   on Seroquel?
21   A.   I'm estimating that. I
22   don't even know what my weight was when I
23   first started Seroquel. But I know I was
24   getting rather obese looking.

**(Pages 350 to 353)**

354

1    Q.   All right.  So even before
2  you started Seroquel, you were obese?
3    A.   Pretty much, yeah.
4    Q.   All right.  So you would not
5  dispute a report from January 15th, 2001
6  that shows your height at five-six and
7  your weight at 230 pounds, Bates numbered
8  Pinellas County Sheriff's 0032?
9    A.   That's a rough estimate.
10  I'm not sure.
11    Q.   But, again, my question is,
12  would you dispute that?  I understand
13  that's --
14    A.   I probably -- I probably
15  wouldn't, because I don't know.
16    Q.   So this one which I've
17  marked as Exhibit 6 sounds right?
18    A.   About right.  Close to it.
19        (Exhibit No. D. Haller-6,
20    Pinellas County Sheriff's Office
21    Medical Division Receiving
22    Screening Document, was marked for
23    identification.)
24  BY MR. ELLISON:

355

1    Q.   And that's before you ever
2  started using Seroquel?
3    MS. HO:  Object to form.
4  BY MR. ELLISON:
5    Q.   Well, is it?
6    A.   My weight fluctuates.
7    Q.   Was that weight before you
8  started Seroquel?
9    A.   I don't know.
10    Q.   You just don't know, as you
11  sit here, when you started Seroquel?
12    A.   Huh?  I didn't hear the
13  question.
14    Q.   You don't know when you
15  started Seroquel?
16    A.   No, I don't know exactly
17  when.
18    Q.   But I thought you said it
19  was 2003?
20    A.   Around there somewhere.  I'm
21  not really sure.
22    Q.   And this is 2001, right?
23    A.   I'm not sure.
24    Q.   Well, I'll show it to you

356

1  again.  I highlighted it at the top.
2  That's January 2001, right?  It's the
3  highlighted part at the top.
4    A.   I see that.  But I don't
5  know if that's right or wrong or not.
6    Q.   But you're not sure, but
7  that sounds right, correct?
8    A.   That's close.
9    Q.   Now, did anyone tell you you
10  were hyperglycemic or that you had
11  diabetes in 1998?
12    A.   Not that I know of.
13        (Exhibit No. D. Haller-7,
14    LabCorp Chemistry and Hematology
15    Studies Document, 9/24/98, was
16    marked for identification.)
17  BY MR. ELLISON:
18    Q.   I'll now show what you I'll
19  mark for the record Exhibit 7, which is
20  Bates numbered Pinellas County Sheriff
21  0128.  You see at the top, it's
22  highlighted, it says, Date reported, and
23  then under here, it says, Chemistry
24  studies, glucose, and it flags you at

357

1  128?
2    A.   Oh, yeah.
3    Q.   Do you see that there?
4  That's what it says, right?
5    A.   Okay.
6    Q.   You don't dispute that?
7    A.   I don't --
8    Q.   Did anyone tell you about
9  that result?
10    A.   No.
11    Q.   Is this news to you?
12    A.   It's news to me now.
13    Q.   Are you seeing this for the
14  very first time?
15    A.   Yes.
16    Q.   No one ever told you you
17  were hyperglycemic or diabetic in 1998?
18    A.   No.  This is the first I've
19  ever heard of it.
20    Q.   What's your understanding of
21  a 128 glucose level?
22    A.   I don't know what that is.
23  I have no idea.
24    Q.   You don't know what that

(Pages 354 to 357)

358

1  means?
2      A.  No.
3      Q.  If a doctor were to say that
4  that shows that you're hyperglycemic or
5  may have diabetes, you wouldn't dispute
6  it, isn't that right?
7          MS. HO:  Objection.
8          THE WITNESS:  I don't know
9      what those --
10 BY MR. ELLISON:
11     Q.  Sorry?
12     A.  I have no arguments against
13 that.
14     Q.  You would defer to the
15 doctor?
16     A.  Yeah.
17     Q.  Did you ever abuse Valium or
18 other prescription drugs?
19     A.  No.
20     Q.  Do you have epilepsy?
21     A.  No.
22     Q.  Have you ever been tested
23 for your functional IQ, intelligence
24 quotient?

359

1      A.  No, I don't recall.
2      Q.  You would refer to the
3  records, what they say?
4      A.  I have to refer to the
5  records, I don't recall.
6      Q.  I have a record I want to
7  ask you about, it's a Social Security
8  Disability record, Bates numbered 30
9  through 32, and I'm going to ask you some
10 questions.
11         Do you remember us spending
12 some time going over your interaction
13 with law enforcement, your convictions
14 and such?
15     A.  I don't recall.
16     Q.  You do remember us talking
17 about that, don't you?
18     A.  A little bit, but not much.
19 I mean, I don't recall.
20     Q.  Well, let me ask you, then.
21 You were expelled when you were 12 from
22 school for fighting with your teachers?
23     A.  Yes.
24     Q.  And we talked about an

360

1  attempted rape on an 18-year old girl, is
2  that right?
3      A.  Okay.
4      Q.  Do you remember that?
5      A.  I remember that.
6      Q.  At age 17 was the fight with
7  your dad where you hit him with the
8  two-by-four?
9      A.  I remember that.
10     Q.  And that's right?
11     A.  That's correct.
12     Q.  And then it says, Following
13 his tenure at New Castle, he again was
14 involved in an indecent exposure charge
15 which involved his masturbating in front
16 of two 13-year old girls?
17     A.  I don't recall that.
18     Q.  Does having me read that to
19 you refresh your memory about it, another
20 indecent exposure charge?
21     A.  A little bit, a little bit.
22     Q.  We talked about the two
23 beforehand, the one where you were
24 masturbating in front of the four kids

361

1  and then the one where you exposed
2  yourself to the high school girl.
3  There's another instance where you
4  exposed your -- where you masturbated in
5  front of two 13-year old girls?  Is that
6  another instance?
7      A.  I think so.
8      Q.  You were jailed in
9  Pittsburgh, Pennsylvania for ten days for
10 that?
11     A.  I remember that.
12     Q.  Did you know the kids?
13     A.  No.
14     Q.  You just saw them?
15     A.  Yes.
16     Q.  Were you in your apartment
17 or your home?
18     A.  I don't remember where I
19 was.
20     Q.  But you remember them seeing
21 you?
22     A.  Yes.
23     Q.  And how did they react?
24     A.  Very angry.

**(Pages 358 to 361)**

362

1    Q.   What about that instance
2  excited you?
3    A.   I don't know.
4    Q.   It says here, As an adult,
5  Mr. Haller has been arrested on four
6  occasions to include -- I'm sorry, I
7  should clarify.  This record is dated
8  1986.  Okay?
9    A.   All right.
10   Q.   As of then, you had been
11 arrested on four occasions to include two
12 counts of indecent exposure, one count of
13 possession of open alcohol and one count
14 for disorderly conduct.
15       Did I -- does that sound
16 right to you?
17   A.   I would dispute the alcohol.
18   Q.   Okay.
19   A.   I don't remember doing that.
20   Q.   Anyone tell you, you had
21 adjustment disorder with depressed mood?
22   A.   I don't recall.
23   Q.   Do you remember telling a
24 physician around then, I need to get

363

1  help, psychiatric help, I'm really not
2  charged, but my charge is a sexual crime
3  and I think I need help for that lewd and
4  lascivious behavior to kids?
5    A.   I don't recall that.
6    Q.   Do you recall feeling around
7  that time frame that there was something
8  weird or wrong --
9    A.   No.
10   Q.   -- about your feeling toward
11 children?
12   A.   I don't recall.  I don't
13 recall.
14   Q.   Do you recall having such
15 feelings toward children?
16   A.   No.
17   Q.   But you don't dispute that
18 you engaged in the behavior that we've
19 discussed?
20   A.   Well, I believe the behavior
21 itself showed some type of problem in
22 that area, yes.
23   Q.   So you think you had a
24 problem, but you didn't feel that way at

364

1  the time?
2    A.   No.
3    Q.   Is the reason you think that
4  you had a problem, looking back, because
5  you're medicated today?
6    A.   I don't know.
7    Q.   Have you given it any
8  thought?
9    A.   Not really.
10   Q.   I'm going to mark this
11 document that I read the Bates number for
12 beginning Page 30 as Exhibit 8 so we have
13 it in the transcript.
14   A.   I have six years now
15 incarceration free.  Six years.  I
16 haven't been incarcerated in six years.
17       My last incarceration was
18 2002, when I got out.
19       MS. HO:  There's not a
20 pending question.
21       (Exhibit No. D. Haller-8,
22 Forensic Service Psychology
23 Assessment for David Haller, was
24 marked for identification.)

365

1        MR. ELLISON:  Give me a
2  second.  I'm going to whip through
3  my notes.  We're running pressed
4  for time.  I understand that
5  counsel took breaks that needed to
6  be taken and took them for as long
7  as counsel needed to take,
8  notwithstanding, we're running up
9  against flights now.
10       So let me just whip through
11 and see if I missed anything,
12 subject to the reservation I
13 expressed earlier today about not
14 having medical records.
15       I think I've done what I
16 needed to do.  Mr. Haller, I'm
17 just going to thank you for your
18 time today.  I know this is not a
19 lot of fun, but this is part of
20 the process.  Pursuant to Federal
21 Rule of Civil Procedure 30(e), you
22 have the right to review the
23 transcript within 30 days after
24 receiving it from the court

(Pages 362 to 365)

366

1  reporter.
2      I'm sorry, I take it you
3  don't have any questions, do you?
4      MS. HO:  No, I don't have
5  any questions.
6      MR. ELLISON:  Okay.  I do it
7  as a matter of rote at this point.
8      Pursuant to Federal Rule of
9  Civil Procedure 30(e), you have
10  the right to review the transcript
11  within 30 days of receiving it and
12  make whatever changes you believe
13  are appropriate and then submit it
14  to us.  You may exercise that
15  right or you may waive that right.
16  The decision is up to you.  I just
17  need you to give me a statement on
18  the record for the court reporter
19  or your counsel, for that matter.
20      THE WITNESS:  I'd like to
21  see it.
22      MR. ELLISON:  Fair enough.
23  We're done.
24           - - -

367

1      (Deposition is concluded at
2  4:13 p.m.)
3           - - -
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24

368

1      C E R T I F I C A T E
2      I hereby certify that the
3  proceedings and evidence noted are
4  contained fully and accurately in the
5  notes taken by me on the deposition of
6  the above matter, and that this is a
7  correct transcript of the same.
8
9
10
11      _____
12      DENISE D. BACH, CSR
13
14      DATE:_____
15
16
17
18      (The foregoing certification
19  of this transcript does not apply to any
20  reproduction of the same by any means,
21  unless under the direct control and/or
22  supervision of the certifying reporter.)
23
24

369

1      INSTRUCTIONS TO WITNESS
2      Please read your deposition
3  over carefully and make any necessary
4  corrections.  You should state the reason
5  in the appropriate space on the errata
6  sheet for any correction that is made.
7      After doing so, please sign
8  the errata sheet and date it.
9  ———— You are signing same subject
10  to the changes you have noted on the
11  errata sheet, which will be attached to
12  your deposition.
13      It is imperative that you
14  return the original errata sheet to the
15  deposing attorney within thirty (30) days
16  of receipt of the deposition transcript
17  by you.  If you fail to do so, the
18  deposition transcript may be deemed to be
19  accurate and may be used in court.
20
21
22
23
24

(Pages 366 to 369)

370

```
 1      --------
 2      E R R A T A
 3      --------
 4    PAGE   LINE   CHANGE
 5    ___   ___   _____
 6    ___   ___   _____
 7    ___   ___   _____
 8    ___   ___   _____
 9    ___   ___   _____
10    ___   ___   _____
11    ___   ___   _____
12    ___   ___   _____
13    ___   ___   _____
14    ___   ___   _____
15    ___   ___   _____
16    ___   ___   _____
17    ___   ___   _____
18    ___   ___   _____
19    ___   ___   _____
20    ___   ___   _____
21    ___   ___   _____
22    ___   ___   _____
23    ___   ___   _____
24    ___   ___   _____
```

372

```
 1           LAWYER'S NOTES
 2    PAGE  LINE
 3    ___   ___   _____
 4    ___   ___   _____
 5    ___   ___   _____
 6    ___   ___   _____
 7    ___   ___   _____
 8    ___   ___   _____
 9    ___   ___   _____
10    ___   ___   _____
11    ___   ___   _____
12    ___   ___   _____
13    ___   ___   _____
14    ___   ___   _____
15    ___   ___   _____
16    ___   ___   _____
17    ___   ___   _____
18    ___   ___   _____
19    ___   ___   _____
20    ___   ___   _____
21    ___   ___   _____
22    ___   ___   _____
23    ___   ___   _____
24    ___   ___   _____
```

371

```
 1        ACKNOWLEDGMENT OF DEPONENT
 2      I, _____, do hereby
 3    certify that I have read the foregoing
 4    pages, _____ and that the same is a
 5    correct transcription of the answers
 6    given by me to the questions therein
 7    propounded, except for the corrections or
 8    changes in form or substance, if any,
 9    noted in the attached Errata Sheet.
10    _____
11    DATE          SIGNATURE
12
13    Subscribed and sworn to before me this
14    _____ day of _____,
15    200_.
16    My commission expires: _____
17              Notary Public
18
19
20
21
22
23
24
```

**(Pages 370 to 372)**