# EXHIBIT 3

Page 2

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:  SEROQUEL PRODUCTS LIABILITY LITIGATION,
MDL DOCKET NO. 1769
THIS DOCUMENT RELATES TO:
HALLER v. ASTRAZENECA LP, ET AL.
[DAVID D. HALLER 6:07-cv-15733]

---------------------------------

THE VIDEOTAPED DEPOSITION OF

DEE BURKE

August 9, 2008

Deborah K. Watson, RPR
STRATOS LEGAL SERVICES
1001 West Loop South, Suite 809
Houston, Texas 77027
713.481.2180 * Fax 713.583.9191
Toll Free 800.971.1127

INDEX

EXAMINATION                                      PAGE
Examination by Mr. Ellison ........................ 6
Examination by Mr. Barringer ...................... 184
Further Examination by Mr. Ellison ................ 285
Further Examination by Mr. Barringer .............. 289

EXHIBITS

EXHIBIT        DESCRIPTION              PAGE

1   Copies of David Haller's medical record ...... 12
    provided to witness by BrownGreer
2   Medication Flow Sheets and Psychiatric ........ 13
    Evaluations which witness pulled from
    Exhibit 1 that bear her name
4   Treatment Plan Review/Addendum ................ 156
5   Managing Weight Gain and Diabetes in ........ 201
    Schizophrenia, A Patient Case Study From the
    files of Michael J. Reinstein, M.D. - AZSER
    10427473 to 478 (Confidential)
6   Clinical Study, The Weight Profile of ........ 207
    Seroquel Over The Long Term - AZSER 10417174
    to 10417181 (Confidential)
7   Cover page and e-mails between Greenidge ..... 216
    and Travers, 3-2001, AZSER 4867379 to
    4867380 (Confidential)
8   1-30-04 letter to "Dear Health Care .......... 225
    Provider" from Macfadden, AstraZeneca -
    AZSER 10376373 to 10376374
8A  E-mails between Ishiguro and Martin - ........ 228
    AZSER 7016902 to 7016903
9   12-20-02 e-mail to Jones from Russo - ........ 237
    AZSER 08667462
10  September 2003 e-mails between Leong and ..... 239
    Ishiguro with attachments - AZSER 7302765 to
    7302778
11  Consensus Development Conference on .......... 245
    Antipsychotic Drugs and Obesity and
    Diabetes, Diabetes Care, Vol 27, No. 2,
    February 2004
12  Treatment Plan Review/Addendum, 12-20-05 ..... 267

Page 3

        THE VIDEOTAPED DEPOSITION OF DEE BURKE, was
taken before me, DEBORAH K. WATSON, RPR, in the
conference room of Best Western Inn, 1602 Dinah Shore
Boulevard, Winchester, Tennessee, on August 9, 2008,
at 10:00 a.m., at the instance of the Defendants,
pursuant to the Federal Rules of Civil Procedure
and/or stipulation and waiver of counsel.
        Reading and signing of the deposition by
the deponent is waived.

Page 4

A P P E A R A N C E S

For Plaintiffs in Coordinated Discovery:

    ROBERT J. BARRINGER, ESQ.
    Bailey Perrin Bailey LLP
    440 Louisiana Street, Suite 2100
    Houston, TX 77002
For Defendants AstraZeneca Pharmaceuticals LP and
AstraZeneca LP in Coordinated Discovery:

    STEVEN J. ELLISON, ESQ.
    Faegre & Benson LLP
    2200 Wells Fargo Center
    90 South Seventh Street
    Minneapolis, MN 55402-3901

The Videographer:

    MR. COLIN PLANK
    VCE Inc.
    2604 Foster Avenue
    Nashville, TN 37210

Page 5

1    THE VIDEOGRAPHER:  We're on the record at
2  10:07, and this is the videotaped deposition of Dee
3  Burke in the matter of David D. Haller versus
4  AstraZeneca, LP, et al, in the United States District
5  Court, Middle District of Florida, Orlando Division,
6  Case No.:  6:07-cv-15733.
7    This deposition is being held at Best
8  Western, 1602 Dinah Shore Boulevard, Winchester,
9  Tennessee, on August 9th, 2008.
10    My name is Colin Plank, and I am the
11  videographer.  I am present on behalf of Stratos
12  Legal.  The court reporter is Debbie Watson, also
13  present on behalf of Stratos Legal.
14    Counsel will now state -- state their
15  appearance and firm affiliation for the record.
16    MR. ELLISON:  Steven Ellison on behalf of
17  AstraZeneca, and my firm is Faegre & Benson in
18  Minneapolis.
19    MR. BARRINGER:  Robert Barringer.  I
20  represent David Haller.
21    THE VIDEOGRAPHER:  Will the court reporter
22  please swear in the witness.
23
24
25

Page 6

DEE BURKE,
having been first duly sworn, testified as follows:
EXAMINATION
BY MR. ELLISON:
    Q.   Good morning, ma'am.  Will you state your
full name for the record, please.
    A.   Legal name, Dorothy Deette Burke, and I go
by Dee.
    Q.   Your work address?
    A.   2126 Thompson Lane, Murfreesboro,
Tennessee.
    Q.   Your work phone number?
    A.   615-898-0771.
    Q.   And how are you employed?
    A.   I'm employed with the Volunteer Behavioral
Health System as a nurse practitioner.
    Q.   As a nurse practitioner, you are licensed
here in Tennessee?
    A.   I am.
    Q.   And we're taking your deposition here in
Tennessee, correct?
    A.   That's correct.
    Q.   You used to be employed by Directions For
Mental Health in Florida; is that correct?
    A.   Correct.

Page 7

1    Q.   And while you were there, you treated,
2  among other clients, David Haller, David Duane Haller,
3  correct?
4    A.   I did.
5    Q.   And you understand the reason you're here
6  today -- and we appreciate that -- is because
7  Mr. Haller filed a lawsuit claiming that one of the
8  medications that he got while he was at Directions,
9  namely Seroquel, caused him to develop diabetes; did
10  you understand that?
11    A.   I did.
12    Q.   I understand you've been deposed before.
13    A.   I have.
14    Q.   How many times?
15    A.   Does that include personal?
16    Q.   Let's start within a work capacity.
17    A.   Okay.  Within work, four.
18    Q.   What were the circumstances of those,
19  generally?
20    A.   It was regarding patients and being
21  competent to proceed.
22    Q.   And did you testify in court in those
23  cases?
24    A.   I did.
25    Q.   And you had depositions taken of you in

Page 8

that capacity too?
    A.   It was live courtroom.
    Q.   Okay.  Have you, yourself, been sued?
    A.   No.
    Q.   In any capacity?
    A.   No.  I've just been in court.
    Q.   Now, you asked whether you had any -- or
you suggested you may have had additional deposition
experience in nonwork-related context; is that
correct?
    A.   Correct.
    Q.   In what capacity?
    A.   Recently with visitation rights regarding
my grandson and son, and divorces.
    Q.   Fair enough.  How many?
    A.   How many divorces?
    Q.   Yes, ma'am.
    A.   Two.
    Q.   You're currently not married?
    A.   Oh, I'm married.
    Q.   What's your husband's name?
    A.   John Thomas Burke.
    Q.   What is his employment?
    A.   He's retired.
    Q.   What was it?

Page 9

1    A.   He was a project manager for Smucker's in
2  California.
3    Q.   Nothing to do with legal profession or
4  mental health issues, correct?
5    A.   No.  No.
6    Q.   You brought with -- well, I should run over
7  the general rules anyway.  I recognize that you've had
8  experience in the deposition process, but I just want
9  to run over some of the ground rules today so that we
10 understand each other.  You have taken an oath to tell
11 the truth, correct?
12   A.   Correct.
13   Q.   And you -- and you will tell the truth
14 today to the best of your ability; isn't that correct?
15   A.   That's correct.
16   Q.   You're not on any medications that would
17 interfere with your ability to remember or tell the
18 truth; is that correct?
19   A.   Correct.
20   Q.   And you have no condition that would do
21 either; is that correct?
22   A.   That's correct.
23   Q.   As you can see, the court reporter on your
24 right is transcribing everything that's being said
25 today.  We have to make her job as easy as possible

Page 10

because she will otherwise get really mad at me, and I
don't want that to happen, okay?
   A.   Yes, good.
   Q.   Nods of the head, shrugs of the shoulders,
uh-huhs and huh-uhs are really hard for her to
transcribe, so will you do your best to answer my
questions audibly today?
   A.   I will.
   Q.   Also, just as folks get to know each other
better, this process will become more conversational.
When that happens, folks tend to understand where
someone is going, and they'll finish a sentence for
them.  That also will make our court reporter mad at
me, and again, I want to avoid that.  Will you do your
best to wait until I finish a question before you
answer it?
   A.   Certainly.
   Q.   I will do my best to --
   A.   And you will --
   Q.   The -- the witness is laughing, and rightly
so.  I will -- I will do my best.
       I will also say that during the course of
today's deposition, I am bound to ask a question that,
notwithstanding my accent, doesn't even sound like
it's in English.  If I do that, or if for whatever

Page 11

1  reason you don't understand the question, will you
2  please just let me know, and I will rephrase it?
3    A.   I will.
4    Q.   Also, if you answer a question, can we
5  understand that -- that you understood the question?
6  Let me rephrase that.  It's awfully early for me to
7  already be doing that.
8        If you answer a question, we will assume
9  that you understood it; is that fair?
10   A.   That's fair.
11   Q.   Do you have any questions before we
12 proceed?
13   A.   No.
14   Q.   Final point on this.  If, for whatever
15 reason, you need a break at any point in time, just
16 let me know, and so long as a question is not pending,
17 we'll take that break right then and there.
18   A.   All right.
19   Q.   Fair enough?
20   A.   That's fair.
21   Q.   All right.  You brought stuff with you
22 today.  There is a stack of documents approximately
23 4 inches high right in front of your right arm; is
24 that correct?
25   A.   That's correct.

Page 12

   Q.   And what are those?
   A.   It is copies of the medical record on David
Haller sent to me by, I think, Browns and Greer.
       MR. ELLISON:  I'm now marking as Exhibit 1
the entire stack of documents that you just
identified.
       (Dee Burke Exhibit 1 was marked and is
attached hereto.)
   Q.   (By Mr. Ellison)  Is Exhibit 1 in fact
the stack of documents that you just identified?
   A.   It is.
   Q.   In that we have now introduced confidential
medical records as well as other issues -- we talked
about this beforehand -- you understand that a
protective order has been issued in this case?
   A.   I do.
   Q.   You also have agreed to -- to keep
confidential this entire deposition, all of the
information that's discussed, and every subject that's
covered, correct?
   A.   That's correct.
       MR. ELLISON:  We have that statement on the
record.  Are you comfortable with that, Bob?
       MR. BARRINGER:  I am.  Just to let the
record reflect that Exhibit 1 is -- is not fully

**Page 13**

1  complete as to what she delivered because she
2  extracted certain documents which I think you're going
3  to attach.
4      MR. ELLISON: Actually, I don't believe
5  that's true, and I'll establish that the witness --
6      MR. BARRINGER: Okay.
7      MR. ELLISON: -- with the witness.
8      MR. BARRINGER: Okay.
9      Q.  (By Mr. Ellison) Now, the documents I marked
10  as Exhibit 1 were the stack of medical records that you
11  received?
12     A.  That's correct. But I did pull that out.
13     Q.  Oh, okay. You did, in fact -- all right.
14  I stand corrected.
15     MR. ELLISON: Thank you, Bob.
16     Q.  (By Mr. Ellison) You also went through
17  Exhibit 1 and identified all the material that had
18  your name on it; is that right?
19     A.  That's correct.
20     Q.  And you have set those apart in a separate
21  stack; is that right?
22     A.  That's right.
23        (Dee Burke Exhibit 2 was marked and is
24  attached hereto.)
25     Q.  (By Mr. Ellison) I'm now marking as

**Page 14**

Exhibit 2 the documents that you handed me. It's a
few pages, and I'm handing those to you. Are those
the documents that you said you pulled out
beforehand because they bore your name?
    A.  This is correct.
    Q.  Okay. You also brought with you today a
copy of the subpoena in the order that you were
provided from the office at BrownGreer; is that
correct?
    A.  I did.
    Q.  Did you bring anything else with you to the
deposition today?
    A.  Something to drink, my glasses.
    Q.  No other paper?
    A.  No.
    Q.  All right. Did you look at anything to
prepare for your deposition today?
    A.  I went through this record twice.
    Q.  Now, by "this record," you're referring to
Exhibit 1?
    A.  To, yeah, David's chart.
    Q.  You went through that entire chart?
    A.  I did, twice.
    Q.  For what reason?
    A.  To extrapolate my stuff.

**Page 15**

1      Q.  You wanted to identify your material and
2  separate that; is that correct?
3      A.  Right.
4      Q.  And your material, we've identified as
5  Exhibit 2; is that right?
6      A.  That's correct.
7      Q.  Did you also look at Exhibit 2 prior to
8  your deposition today?
9      A.  When I worked at Directions, I used to see
10  it every time I saw David.
11     Q.  Did you look at it in preparation for your
12  deposition today?
13     A.  Yes.
14     Q.  Okay. Did you do any research to prepare
15  for your deposition today?
16     A.  Outside of going through the record, no.
17     Q.  You didn't look up any medications, you
18  didn't --
19     A.  No.
20     Q.  -- go on the Internet and -- and check
21  anything?
22     A.  No.
23     Q.  You're shaking your head no, correct?
24     A.  No.
25     Q.  Did you talk to anyone in connection with

**Page 16**

your deposition today?
    A.  No.
    Q.  You didn't -- you've never spoken to David
Haller about this deposition?
    A.  No.
    Q.  Or this lawsuit?
    A.  No.
    Q.  You have not talked with any of his
treating physicians or clinicians about this
deposition or his lawsuit?
    A.  I talked to James Zenel who is --
    Q.  That's Dr. Zenel?
    A.  Yeah. -- who was my previous medical
director, but the only thing we discussed was what the
customary charge was.
    Q.  When did you talk to Dr. Zenel? You're
looking at --
    A.  I'm looking at the record. This was dated
July 21st. It had to be right around that time. I
can't give an exact date.
    Q.  But the record, you're referring to the
materials received from --
    A.  To my order.
    Q.  -- BrownGreer, correct?
    A.  Right.

## Page 17

1    Q.   Why did you call him?

2    A.   To find out what the customary charge was

3  to do a subpoena.

4    Q.   What do you mean, "customary charge"?

5    A.   For the -- for me doing this today.

6    Q.   Oh, you wanted to find out what your fee

7  was?

8    A.   Right.

9    Q.   Oh, fair enough.  You didn't ask him about

10  David Haller or the lawsuit or anything like that?

11    A.   No.

12    Q.   Is there a reason why you didn't?

13    A.   I didn't feel there was a need to.

14    Q.   Did he volunteer any information about the

15  lawsuit or other people at Directions who had been

16  deposed or anything like that?

17    A.   No.

18    Q.   Anyone else you talked to about this

19  deposition other than just to let them know you'd be

20  occupied today?

21    A.   My husband.  I mean, he knows where I'm at.

22    Q.   But you've talked to no one else about the

23  substance of this deposition; is that correct?

24    A.   No.

25    Q.   If I were to ask you all those questions

## Page 18

about the lawsuit in general, would your answers be

the same?

    A.   They would.

    Q.   Okay.  Now, my understanding is you were

provided with a subpoena by BrownGreer.  They asked

you for documents, and you provided to BrownGreer the

documents --

    A.   No.

    Q.   Do you know where the documents marked as

Exhibit 1 and 2 came from?

    A.   I assumed it came from BrownGreer because

it came with this order.

    Q.   Right.  You do not have copies of David's

records, both Exhibits 1 and 2, --

    A.   No.

    Q.   -- in your own?

    A.   No.  Directions would have that, not me.

    Q.   So your best guess is that the records that

we've marked as Exhibits 1 and 2 came from Directions?

    A.   Originally.

    MR. BARRINGER:  You want to go off the

record?

    MR. ELLISON:  Yeah, let's go off the

record.

    THE VIDEOGRAPHER:  We are off the record at

## Page 19

1  10:19.

2    (Recess from 10:19 a.m. to 10:22 a.m.)

3    THE VIDEOGRAPHER:  We're back on the record

4  at 10:22.

5    Q.   (By Mr. Ellison)  Ms. Burke, I should have

6  asked you this at the beginning:  Is that how you'd

7  prefer to be addressed today?

8    A.   Call me Dee.

9    Q.   I would love to, but I -- I have to

10  maintain formality.  I thank you for that courtesy.

11  The question I was asking was more directed to the

12  nature of -- of what would be an appropriate title for

13  you as a nurse practitioner.  Are you referred to

14  "Ms. Burke"?  Are you referred to "Dr. Burke"?

15    A.   No, no.  Just call me "Ms. Burke."

16    Q.   "Ms. Burke"?  Okay.  Fair enough.  And

17  thank you for that.  Again, thank you for that

18  courtesy.  I appreciate it.

19    We had a brief discussion off the record

20  about the documents that you brought today which are

21  marked Documents No. 1 and 2, and I'll just lead

22  through this so we can get it on the record quickly.

23    It's our understanding that you obtained

24  those documents from BrownGreer; is that correct?

25    A.   That's my assumption, that they came from

## Page 20

BrownGreer.

    Q.   Well, you were telling me that they -- they

sent them to you, correct?

    A.   They did.

    Q.   You did not have and do not have any of

David's medical records at your house; is that

correct?

    A.   I do not.

    Q.   The only materials that you had available

to you are the documents that you brought with you

today that we marked Exhibits 1 and 2; is that

correct?

    A.   That's correct.  I have the FedEx box too

(indicating).

    MR. ELLISON:  She's holding up the FedEx

box.

    Q.   (By Mr. Ellison)  And that's addressed to

you and it comes from BrownGreer; is that correct?

    A.   I -- I would have to wear my glasses,

but . . .

    Q.   Sorry to make you do that.  It says from --

from an individual at BrownGreer shipped to Dee Burke.

We'll just move along then.  Thank you, ma'am.

    Now, while we were off the record, you

suggested that the -- there may be additional records

Page 21

1   that are missing; is that correct?
2       A.   As I went through things that I found with
3   my name, and knowing that I left there in August of
4   2006, I thought that I had been seeing David up till
5   the time I left, and yet my last note is dated 12 of
6   2005.  Now, there are records in there from Nicole
7   Keene in 2006.  But I thought that I had seen David a
8   little bit in 2006, but the records aren't reflecting
9   that -- that I have.
10      Q.   So there is, in your view, additional
11  records that we do not have?
12      A.   I think there could be.
13      Q.   And you would believe that the best place
14  to look for those is Directions?
15      A.   At Directions.
16      Q.   You mentioned that you left Directions in
17  August of 2006.  Did I hear you correctly?
18      A.   That's right.
19      Q.   When did you start?
20      A.   May of 2000.
21      Q.   And I may have asked you this:  You were --
22  you were a licensed nurse practitioner in the state of
23  Florida; is that correct?
24      A.   I still am.
25      Q.   You maintain your license?

Page 22

1       A.   I do.
2       Q.   You are also licensed here in Tennessee; is
that correct?
3
4       A.   I am.
5       Q.   Anywhere else?
6       A.   No.
7       Q.   Did you work continuously at Directions
from May of 2000 through August of 2006?
8
9       A.   I did.
10      Q.   Were you employed by anyone else during
that time frame as well?
11
12      A.   I actually was a professional speaker for
Bristol-Myers Squibb, for Janssen and Janssen.
13
14      Q.   What did you talk about for them?
15      A.   Abilify for Bristol-Myers Squibb, and
Risperdal Consta for Janssen.
16
17      Q.   When did you first start as a speaker for
those companies?
18
19      A.   Bristol-Myers Squibb was 2002, Risperdal
Consta, I think 2005.
20
21      Q.   Now, Risperdal Consta and Abilify are both
atypical antipsychotics; is that correct?
22
23      A.   They are.
24      Q.   And that term also refers to what are known
as second-generation antipsychotics; is that correct?
25

Page 23

1       A.   That's correct.
2       Q.   What were the subjects on which you spoke
3   regarding Risperdal?
4       A.   You talk about the -- the label
5   indications, which for Risperdal Consta is
6   schizophrenia, and how it fits into a treatment plan
7   for a client.
8       Q.   To whom would you speak?
9       A.   Case managers, other nurse practitioners,
10  physicians.
11      Q.   And these are places other than Directions;
12  is that correct?
13      A.   Yeah.  It's completely away from
14  Directions.  I was a contract --
15      Q.   They paid you for your work?
16      A.   They did.
17      Q.   Janssen did?
18           Do you have any idea, as you sit here
19  today, how much you made in that capacity as a
20  speaker?
21      A.   Oh, in 2006, it was, between the two
22  companies, --
23      Q.   Yes, ma'am.
24      A.   -- $8,000.
25      Q.   You can't separate in your mind who paid

Page 24

you for what?
1       A.   Oh, I . . .
2       Q.   Not really?
3       A.   I have to think it was like $3,000 with
Janssen and maybe $5,000 with Bristol-Myers Squibb.
4
5       Q.   You've never been a speaker for
AstraZeneca; is that correct?
6
7       A.   No.
8       Q.   That is correct?
9       A.   That's correct.
10      Q.   What subjects did you address regarding
11  Abilify when you'd speak about Abilify?
12      A.   At that time, the label indication, which
was schizophrenia, and then they launched the bipolar
indication.
13
14      Q.   Do you recall when that was?
15      A.   I think they got the bipolar indication in
2004.
16
17      Q.   Did you also talk about risks?
18      A.   Always.
19      Q.   And this is when you were acting as a
speaker?
20
21      A.   Yes.
22      Q.   And this begins as early as 2002?
23      A.   From the very beginning, they always talked

Page 25

1  about the risk.
2      Q.  Did that include the risk of waking?
3      A.  The risk of any of the metabolic issues.
4      Q.  Do I correctly understand that you believe
5  there may be a risk associated with atypicals and
6  weight gain metabolic issues and diabetes as early as
7  2002?
8      A.  At that point in time, we already knew that
9  olanzapine had issues.
10     Q.  This is in 2002?
11     A.  Right.
12     Q.  By "issues," you mean the olanzapine
13  caused --
14     A.  Was with a potential for weight gain.
15     Q.  As well as diabetes; is that correct?
16     A.  Well, weight gain leads to diabetes.
17     Q.  Fair enough.  And was it around that same
18  time frame that you came to that understanding
19  vis-à-vis the other atypicals?
20     A.  Not really.  Not really.  You know, the --
21  the research has continued on all of the medications.
22  I think that you've got a couple of them that don't,
23  at this point, show metabolic issues except maybe in
24  kids.
25     Q.  Which ones?

Page 26

1      A.  Abilify, in particular, --
2      Q.  Okay.
3      A.  -- seems to have weight gain in children,
4  not in adults.  Geodon has not shown anything as far
5  as weight gain.  In fact, it improves triglycerides
6  and cholesterol when you move them away from
7  olanzapine or Risperdal.  Seroquel appears to be
8  dose-related.  Risperdal seems to be very iffy.  It's
9  more so in the oral agent than it is in the injection.
10  Olanzapine definitely has its metabolic issues.
11     Q.  Let's start with Seroquel.  Did I correctly
12  infer that it's your view that a risk of weight gain
13  or diabetes is -- is dose-related?
14     A.  It appears to be dose-related clinically.
15     Q.  When did you come to the understanding that
16  it was possible that there may be an association
17  between Seroquel and weight gain?
18     A.  I think we've always been aware that there
19  was the possibility.  We just didn't see it that often
20  clinically.
21     Q.  Fair enough.  In your experience it was
22  possible, but you didn't see a lot of patients put on
23  weight because of Seroquel; is that correct?
24     A.  Correct.  I had patients lose weight on
25  Seroquel.

Page 27

1      Q.  Fair enough.  I was going to raise that.
2      A.  Yeah.
3      Q.  So you said "always."  By that, do you mean
4  around 2002?
5      A.  From the time I was starting to practice.
6  I can't speak for other nurse practitioners, but I
7  started in 2000.
8      Q.  So from around 2000, you understood that it
9  was possible that atypicals such as Seroquel might
10  cause weight gain, hyperglycemia, and diabetes; is
11  that correct?
12     A.  This is my view, this is my take.
13     Q.  That's all I'm asking is yours.
14     A.  Okay.  What I think we have to look at is
15  the illness itself, and that these people with bipolar
16  disorder and schizophrenia have a much higher risk for
17  inadequate dietary recommendations, they aren't able
18  to afford the better foods, the better diet, they
19  typically don't exercise.  There is a high risk of
20  substance abuse.  We have a large homeless population,
21  working in community mental health.  Therefore, then
22  you've got that in the beginning.  So what do you
23  treat?  Do you treat the illness or what?  So then
24  you've got the medications that have the potential as
25  well.  So now you've got a twofold problem going on.

Page 28

1      Q.  Let -- let me go through this again.  I've
2  got to do this by question and answer.  I appreciate
3  that information.
4      It's your view that the underlying patient
5  population that you're treating presents with its own
6  risk of weight gain, hyperglycemia, and diabetes just
7  because the nature of its illness; is that correct?
8      A.  No, not just my opinion.  It's researched
9  and substantiated.
10     Q.  I -- fair enough.  But again, I'm only
11  asking your view here.  You don't have to represent
12  the --
13     A.  Okay.
14     Q.  -- entire medical community.  Fair enough?
15     A.  That's fair.
16     Q.  Okay.
17     A.  But yes.
18     Q.  And in addition to that, it was your
19  understanding, from the time you began practice in
20  2000, that the medications that treat this population
21  such as Seroquel had their own potential for
22  increasing weight, hyperglycemia, and potentially
23  diabetes; is that correct?
24     A.  In the very beginning, we -- we knew that
25  they could increase the appetite.  I don't think that

Page 29

1  we knew fully about the metabolic risk until
2  everything with olanzapine came out and that further
3  research started.
4      Q.  And that was around 2000?
5      A.  2000, 2001, 2002.
6      Q.  Okay.  So it was around -- what I'm trying
7  to get is a date by which you understood --
8      A.  Right.
9      Q.  -- that there may be a risk of diabetes as
10  to Seroquel.  And if I'm hearing you right, it was
11  around 2002?
12      A.  Uh-huh.
13      Q.  Yes?
14      A.  Yeah.
15      Q.  Okay.  And was that risk something that
16  factored into your -- strike that.
17          You know what a risk benefit analysis is?
18      A.  Yes.
19      Q.  And what is that?
20      A.  It means that the benefits are outweighing
21  the risk.
22      Q.  And what -- you entertain that risk benefit
23  analysis whenever you prescribe a medication for a
24  patient; is that correct?
25      A.  Every one.

Page 30

1      Q.  What are the factors that enter into your
2  risk benefit analysis?
3      A.  I have to look at the risk that they're
4  going to be institutionalized; that just isn't
5  available anymore.
6      Q.  The patient's condition; is that correct?
7      A.  Right.
8      Q.  The patient's --
9      A.  The patient's health, their status in the
10  community, their functional level.
11      Q.  Their medical history?
12      A.  Their medical history, their risk to
13  themselves, their risk to others.
14      Q.  Those are all factors?
15      A.  Those are all factors.
16      Q.  And there may be more, is that correct,
17  depending on the particular patient?
18      A.  Yes.
19      Q.  Is it part of your professional practice to
20  stay abreast of developments in the areas in which you
21  practice as well as regarding the medications that you
22  prescribe?
23      A.  That's correct.
24      Q.  How do you go about doing that?
25      A.  I attend continuing education programs,

Page 31

1  usually the Psychiatric Congress every two years, as
2  well as we have Internet availability.
3      Q.  So you do your own independent research?
4      A.  A lot.
5      Q.  And has that been your practice from the
6  time you began with Directions in 2000?
7      A.  From the time I became a nurse practitioner
8  in '97.
9      Q.  You also learn from colleagues; is that
10  correct?
11      A.  I do.
12      Q.  Their clinical experience, correct?
13      A.  Correct.
14      Q.  As well as your own?
15      A.  Uh-huh.
16      Q.  Yes?
17      A.  I do.
18      Q.  Could you briefly describe your educational
19  background?
20      A.  My undergrad was at Indiana University.
21      Q.  Hoosier?
22      A.  Yeah, I am a Hoosier.
23          I did 11 years of trauma nursing and then
24  entered psychiatry, and worked then in administrative
25  for several years as director of nursing, director of

Page 32

1  clinical services, and then got my master's at the
2  University of Illinois in Chicago.
3      Q.  Where were you a trauma nurse?
4      A.  Methodist Hospital in Indianapolis,
5  Indiana.
6      Q.  And where did you get your, I think you
7  said, master's?
8      A.  University of Illinois at Chicago.
9      Q.  You did say that.  I'm sorry.
10          And that's where you were in
11  administration?
12      A.  I was in -- I was in administration in
13  Florida and in Illinois.
14      Q.  How did it come to pass that you ended up
15  in Florida?
16      A.  The first time, National Medical
17  Enterprises moved me there.
18      Q.  What's that?
19      A.  And they were a psychiatric freestanding --
20  they owned several hospitals.  They were Charter's
21  main competitive back in the Eighties and Nineties.
22      Q.  Did you get specialized training as a
23  psychiatric nurse practitioner?
24      A.  I did.
25      Q.  And where did you get that?

Page 33

1    A.  The University of Illinois in Chicago.
2    Q.  How long of a program was that?
3    A.  Two years.
4    Q.  As we're discussing the -- the ways in
5 which you maintain -- you remain abreast of
6 developments in the field, you base your prescribing
7 decisions in part on your education; is that correct?
8    A.  In part on education. More on clinical
9 practice and current knowledge.
10    Q.  Your own experience?
11    A.  My own experience as well as what the most
12 recent data shows.
13    Q.  Do you regularly review any medical
14 journals?
15    A.  Yes. We get them at work.
16    Q.  Which ones?
17    A.  New England Medical Journal is one of them.
18 We have our own Nurse Practitioner Journal, as well as
19 whatever is available on the websites.
20    Q.  Were there certain websites that, while you
21 were at Directions, you checked on a regular basis?
22    A.  CME, Continuing Medical Education.
23    Q.  Any others?
24    A.  Those were -- that was free.
25    Q.  From time to time, would you look at the

Page 34

PDR?
1    A.  I have my own Nursing Drug Handbook. It's
less confusing than the PDR.
2    Q.  How often is that book updated?
3    A.  Every year.
4    Q.  While you were at Directions, was it your
custom and practice to record information relating to
the care and treatment of the clients you saw?
5    A.  Record by -- yes. Originally, I
transcribed -- you know, I would go into a tape
recorder and it be transcribed.
6    Q.  You would dictate notes?
7    A.  I'd dictate, and then I started doing my
own.
8    Q.  Okay. Let's focus on the time while you
were at Directions, okay?
9    A.  Uh-huh.
10    Q.  Yes?
11    A.  Yes.
12    Q.  You began the practice by dictating notes
of visits that you had with your clients; is that
correct?
13    A.  Correct.
14    Q.  That included clients like David Haller; is
that right?

Page 35

1    A.  That's correct.
2    Q.  You yourself didn't transcribe those notes,
3 correct?
4    A.  No.
5    Q.  Those were passed on to someone who handled
6 transcription?
7    A.  Correct.
8    Q.  And did you pass on those -- those
9 tape-recordings shortly after the -- the visit with
10 the patient?
11    A.  By the day.
12    Q.  By the day?
13    And were they transcribed that same day?
14    A.  No, not always.
15    Q.  About how long after?
16    A.  It got to the point where they were running
17 six weeks behind, and that's when I asked for my own
18 computer program.
19    Q.  And you started using your own computer
20 program to generate?
21    A.  I did. I did.
22    Q.  And what was the name of that program?
23    A.  ICANotes.
24    Q.  Do you recall when you switched from using
25 the transcription service to the program ICANotes?

Page 36

1    A.  No.
2    Q.  But it was while you were at Directions,
3 right?
4    A.  Yeah.
5    Q.  Let's start with the transcription. When
6 the transcription came back, was it put in the file?
7    A.  No. We had to proofread it and sign it.
8    Q.  And you would proof and sign it in your --
9 that was your regular custom and practice?
10    A.  Right.
11    Q.  And then it would be put in a file?
12    A.  And then it would be in the file.
13    Q.  And it would be maintained in the ordinary
14 course of -- of your professional practice?
15    A.  You mean in the chart?
16    Q.  Yeah.
17    A.  Yeah.
18    Q.  And let's now talk about ICANotes. You
19 would -- you would physically, your own self, type the
20 notes of -- of the care and treatment of your
21 patients; is that correct?
22    A.  Correct.
23    Q.  And that includes David Haller; is that
24 correct?
25    A.  That's correct.

Page 37

1   Q.   Did you print off --
2   A.   Print it right off.
3   Q.   You would then print off this
4   information --
5   A.   Put it right in the file.
6   Q.   -- and you would physically, your own self,
7   put it in the patient's files; is that correct?
8   A.   I -- that's correct.
9   Q.   And those records were also maintained in
10   the client's file as part of your ordinary course and
11   professional practice; is that correct?
12   A.   Correct.
13   Q.   And those are the records, among others,
14   that we marked as Exhibits 1 and 2 today; is that
15   correct?
16   A.   Correct.
17   Q.   I want to ask you a little bit about
18   Directions.  And if it changed over time, let me know,
19   okay?
20   A.   All right.
21   Q.   My understanding is that there is a
22   supervising physician; is that correct?
23   A.   Yes, there is.
24   Q.   And your supervising physician was
25   Dr. Zenel?

Page 38

A.   James Zenel.
Q.   Okay.  He's still at Directions; is that
correct?
A.   He still is.
Q.   And he was your supervising physician the
entire time you were at Directions; is that right?
A.   He was.
Q.   While you were there, how many nurse
practitioners were there?
A.   Are you wanting me to count the ones that
came and went?
Q.   Sure.
A.   Seven, counting myself.  No, I'm sorry.
Eight.  Eight, counting myself.
Q.   Do you remember their names?
A.   I do.
Q.   Can you tell me, please.
A.   There was Karen Martin, Carol Corell,
Nicole Keene, Jackie Harrison, Don Davis.  And I can't
remember the other one.  She left after she had her
second child.  She was there about a year.  I can't
remember her name.
Q.   Any others?
A.   Myself.  Oh, Donna Felkins-Dohm.
Q.   Now, we know that Don Davis saw Mr. Haller

Page 39

1   on one occasion.  Nicole Keene treated him for a time.
2   In addition to yourself and those others I mentioned,
3   do you know of any other ARNPs who actually provided
4   care and treatment for David Haller?
5   A.   Carol Corell.  She's in here frequently in
6   the record.
7   Q.   Do you know where she lives?
8   A.   She was in Tampa the last I knew.
9   Q.   You haven't kept in touch?
10   A.   No.  Her other name is Carol Stevens.
11   Q.   What is your maiden name?
12   A.   Mine?
13   Q.   Yes, ma'am.
14   A.   Schotter, S-C-H-O-T-T-E-R.
15   Q.   Have you gone by any other names?
16   A.   Yes.  Meng, M-E-N-G.
17   Q.   Dee Meng?
18   A.   Uh-huh.  McLaughlin.
19   Q.   Any others?
20   A.   Rounder.
21   Q.   I saw a reference, I think, --
22   A.   Yeah.  I --
23   Q.   -- in one of the records.
24   A.   I got married while I was there.
25   Q.   Any other names that you've gone by?

Page 40

A.   No.
Q.   Your DEA number has stayed the same
throughout --
A.   We didn't have to have a DEA number in
Florida because we couldn't write for controlled.  I
have a DEA number here in Tennessee.
Q.   Okay.  Let's not worry about that on the
record.
        Does Directions itself also employ case
managers?
A.   They do.
Q.   And did the case managers interact with the
nurse practitioners regarding patients?
A.   I interacted with the case managers
frequently.
Q.   Why?
A.   Because I felt that they were a true asset
to help me understand what was going on with the
client and because physically, my office was on the
back hall with them.
Q.   What would the case managers do?
A.   Case managers were available to the clients
to help them meet and receive all the necessary things
for the resources in the community.  And that also
sometimes included housing, rent, vouchers, food

Page 41

1   stamps, transportation, applying for disability,
2   getting to their mental health appointments, getting
3   to their physical doctor appointments. They were
4   busy.
5       Q.   And you would consult with them for
6   additional perspective regarding the patients that you
7   were treating?
8       A.   That's correct.
9       Q.   That includes David Haller; am I right?
10      A.   That was.
11      Q.   Do you recall the names of the case
12  managers that you interacted with regarding David
13  Haller?
14      A.   There was Honey Weber. Terry was a male
15  and he's in here, but I can't --
16      Q.   Wallace?
17      A.   Terry Wallace.
18          Tracy Mahaney. Laura Orcutt.
19      Q.   Can you spell Mahaney?
20      A.   M-A-H-A-N-E-Y.
21      Q.   And what was the next one?
22      A.   Laura Orcutt, O-R-C-U-T-T.
23      Q.   You mentioned Honey Weber. One B?
24      A.   Not sure.
25      Q.   Any others?

Page 42

        A.   Keith Lake.
        Q.   Grady Poole?
        A.   I don't -- I mean, I interact with Grady,
but I don't remember interacting with Grady regarding
David.
        Q.   Okay. Any others?
        A.   Terry, more than anybody. Terry Wallace
was the main one where David was concerned.
        Q.   Any others?
        A.   I recognized some of the other names in the
chart, but I can't tell you that I --
        Q.   Don't recall?
        A.   -- yeah, that I interacted with them
regarding David.
        Q.   Is the number of people that you've
identified, in your view, a large number of case
managers?
        A.   For one client, yes.
        Q.   Yes, ma'am. Why?
        A.   David was extremely difficult.
        Q.   In what way?
        A.   He'd fire us.
        Q.   What do you mean?
        A.   He would become disturbed and think that he
was not being served or wasn't being treated right or

Page 43

1   they weren't doing as much for him as they could. You
2   know, in his words they were worthless, and he would
3   fire them. He'd fire the agency.
4       Q.   At the beginning of -- of the dep while we
5   were off the record, you suggested that you didn't
6   want David Haller to have your own unlisted cell
7   number. Did I hear you correctly?
8       A.   That's correct.
9       Q.   Why?
10      A.   I think David can be dangerous.
11      Q.   In what regard?
12      A.   I think that he could harm others,
13  especially if he feels he's been wronged.
14      Q.   Do you think he could kill someone?
15      A.   I do.
16      Q.   You said that very quickly.
17      A.   Uh-huh.
18      Q.   You're nodding and saying yes.
19      A.   Yes.
20      Q.   Do you think he'd kill himself?
21      A.   I think he could mistakenly kill himself.
22  He has made several suicide attempts and --
23      Q.   Was that to manipulate people?
24      A.   I think it was to gain what he was going
25  after. And he admitted that. It's in one of my notes

Page 44

that he admitted that.
        Q.   Did he ever threaten you?
        A.   Yes.
        Q.   In what way?
        A.   That he was going to kill me.
        Q.   How often?
        A.   One time.
        Q.   Can you explain the circumstances?
        A.   It was regarding lab work. He didn't want
to do lab work. And I was trying to explain to him
that if he was going to be on the medications he was
on, he was going to have to do lab work. And those
medications were Seroquel, lithium, and Depakote.
        Q.   The lab work included glucose checking?
        A.   Yeah, it did. And it -- the lithium
level and the Depakote level and liver function. And
he told me he didn't need to do lab work. He knew
that his medications were fine and that he was not in
any way being risked by the medications; he was fine.
And I told him if he wasn't going to comply with the
treatment program, I wasn't going to treat him.
        Q.   And that's when he threatened to kill you?
        A.   And he told -- you know, "You do what --
you write my prescriptions; I'm going to kill you."
Terry Wallace was sitting there. He threatened him as

Page 45

1  well.
2      Q.   Did he describe how he was going to kill
3  you?
4      A.   No.
5      Q.   He wasn't graphic.  He just said he'd
6  kill --
7      A.   No.
8      Q.   And you believed him?
9      A.   I do believe him.
10     Q.   Do you -- did Terry say whether he believed
11  him or not?
12     A.   He did.
13     Q.   And Terry did believe that David would kill
14  him?
15     A.   Terry did believe that he could harm either
16  one of us.  He immediately got a form that discharged
17  us, that he didn't want care provided by us any
18  longer, he didn't want case management services
19  provided by Terry any longer, services provided by
20  Directions any longer, and he signed it.
21     Q.   Did he ever threaten to sue you?
22     A.   Several times.
23     Q.   That wasn't at all unusual for him; is that
24  right?
25     A.   No.

Page 46

1      Q.   He threatened to sue Directions too?
2      A.   Yes.
3      Q.   Would it come, as a treater of his, as a
4  surprise to learn that he threatened to sue me?
5      A.   No.
6      Q.   That's perfectly consistent with what you
7  saw?
8      A.   That's perfectly -- that's very consistent.
9      Q.   And David threatened to kill you even
10  though he was on his medications; is that correct?
11     A.   He did.
12     Q.   Did you perceive David to be a complicated
13  case to treat?
14     A.   He was complicated in that he was so
15  noncompliant.
16     Q.   Had he taken his medications, do you think
17  he would have been more capable of dealing with
18  every-day-to-day things?
19         MR. BARRINGER:  Objection; form.
20     Q.   (By Mr. Ellison)  Yeah, let me try that one
21  again.
22         It's your view he was noncompliant?
23     A.   He was noncompliant.
24     Q.   In what way?
25     A.   He would adjust his medications or not take

Page 47

1  them or not do the lab work or go to the lab not
2  fasting when he knew it should have been fasting.
3      Q.   Why -- do you have an understanding of why
4  he would do that?
5      A.   I can't speak for -- David's just
6  noncompliant.  David's going to do what David wants to
7  do and how he perceives it can be done.
8      Q.   Did you ever perceive of David as
9  sociopathic?
10     A.   I think he's antisocial.
11     Q.   What do you mean by that?
12     A.   I think that he doesn't think that the
13  normal societal norms abide, you know, that he should
14  abide by them, that they pertain to him.
15     Q.   Kind of --
16     A.   He has a distorted view that everybody and
17  everything owes him, that he's a victim.
18     Q.   And he had that view during the whole time
19  you were treating him?
20     A.   The entire time.
21         MR. ELLISON:  Let's take a quick break.
22         THE VIDEOGRAPHER:  We're off the record at
23  10:50.
24         (Recess from 10:50 a.m. to 10:54 a.m.)
25         THE VIDEOGRAPHER:  We're back on the record

Page 48

1  at 10:54.
2      Q.   (By Mr. Ellison)  I was asking you before the
3  break about the different folks that actually provided
4  care and treatment for David during the time you were at
5  Directions.  And you were telling me that David was a
6  difficult patient, and among other things, he would fire
7  the caseworkers, he'd fire the nurse practitioners, and
8  he'd fire Directions.  Did I understand that correctly?
9      A.   That's correct.
10     Q.   I asked you about some of the case
11  managers.  Are you aware of whether David threatened
12  any of the other case managers apart from Terry
13  Wallace?
14     A.   I don't know.  I can't answer that one.
15     Q.   Okay.  Did you -- what about the other
16  nurse practitioners?  Do you know whether David
17  threatened any of the other nurse practitioners?
18     A.   I don't know that either.
19     Q.   You don't recall any discussions amongst
20  your colleagues about that?
21     A.   We discussed how difficult he was --
22     Q.   In what regard?
23     A.   -- and the fact that he got passed around
24  because he would wear people out.
25     Q.   What do you mean by that?

## Page 49

1     A.  Because he was so noncompliant.  He moved
2  frequently, he would not show up for appointments, he
3  would then call nonstop to the case manager on call
4  who was then coming to the nurse practitioner or
5  physician who was treating him at the time, and he had
6  then a lot of needs.  And it wasn't needs.  David had
7  demands.  They weren't always needs.
8     Q.  What do you mean by "demands"?
9     A.  Whether it be a demand to come and pick him
10  up or to bring him money or to take him shopping or to
11  find him a place to stay.  The shelters in the area
12  had refused to allow him to come into the shelters
13  anymore because of his violence.  So he couldn't go to
14  shelters and he would end up homeless frequently
15  because he wouldn't pay bills.  So he -- he absorbed a
16  lot of resources within Directions.
17     Q.  Was it your view that David thought he was
18  entitled?
19     A.  He was very entitled, but there was a
20  reasoning even behind that.  David was what was called
21  a class member.  In Florida, as the
22  deinstitutionalization took place of the state
23  hospitals and these folks were put into the community
24  mental health centers, you had a contract that you
25  treated them, no matter what their behavior was.  So

## Page 50

that is why he was allowed to come back several times
even though he had been threatening, even though he
had fired us.  He moved between Directions For Mental
Health and Suncoast For Mental Health down in
St. Petersburg.
   Q.  Did that make him even harder to treat
and --
   A.  Exactly, because you could not do any kind
of continuity with him either.
   Q.  Did David ever throw that class member
status in your face?
   A.  Yes.
   Q.  And how would he do that?
   A.  He would -- he told Dr. Zenel, "You have to
treat me."
   Q.  Kind of a "nyeah, nyeah, nyeah, nyeah,
nyeah" --
      MR. BARRINGER:  Objection.
   Q.  (By Mr. Ellison) -- sort of thing?
      MR. BARRINGER:  Objection; form.
   Q.  (By Mr. Ellison) You can answer.
   A.  Yes.
   Q.  Exactly right?  Am I right?
   A.  Yes.
   Q.  My colleague, or I, for that matter, will

## Page 51

1  sometimes object to the nature of a question.  That is
2  simply to preserve an objection for the record.  It
3  has nothing to do with whether or not you have to
4  answer the question.  Do you understand that?
5     A.  Okay.
6     Q.  Okay.  Did David ever taunt you?
7     A.  No.
8     Q.  Did David ever make an -- what you
9  perceived to be an inappropriate sexual advance?
10     A.  (No answer.)
11     Q.  You're pausing.
12     A.  I'm trying to remember.  Not an
13  inappropriate sexual comment.  It would -- degrading,
14  you know, --
15     Q.  In what regard?
16     A.  -- in -- in that -- you know.
17     Q.  Do you recall what he said?
18     A.  I don't, but it was within regards to me
19  being female.
20     Q.  And you don't remember what he said?
21     A.  But I don't.  I don't remember exactly what
22  he said.
23     Q.  You said -- you referenced violence in
24  shelters.  David wasn't welcome at any of the shelters
25  in the area?

## Page 52

   A.  None of them.
   Q.  And you said violence.  What do you mean by
violence?
   A.  He had hit people.  He had attacked people.
He had exposed himself.
   Q.  What do you mean by that?
   A.  He had exposed his penis.
   Q.  Did he masturbate in public?
   A.  I don't know.  But he would expose himself
to young girls.
   Q.  Why would he do that?
   A.  He told me it was just for the kick.
   Q.  What sort of kick?
   A.  I don't --
   Q.  Sexual arousing?
   A.  (Witness shrugs.)
   Q.  You're shaking your head.
   A.  I just don't explore that with him, you
know?
   Q.  Why not?
   A.  Because I wasn't going to help him explore
that.
   Q.  Did you think David would tell you those
things because he found public discussion with you and
making you uncomfortable satisfying to him?

Page 53

1   A.   I think that's what he had hoped for.  I
2   wasn't uncomfortable, but I wasn't going to entertain
3   him either.
4   Q.   He was -- in other words, he was raising
5   that subject with you to make you feel uncomfortable?
6   A.   Exactly.
7   Q.   Okay.
8   A.   Intimidating.
9   Q.   Did he try to intimidate you?
10  A.   He tried to intimidate everybody he came in
11  contact with.  That is how I always saw him.  With the
12  front office staff, he had been spoken to about that,
13  with --
14  Q.   What would he do?
15  A.   Just very physically aggressive, coming
16  into your space.  He was very loud, cursing,
17  threatening, that he'd have their jobs, that he'd have
18  them.  "I'll see you outside."  He would do it
19  outside.  We ran a day treatment program.  If he felt
20  someone was not doing what he thought they should do
21  or not responding to him --
22  Q.   Not giving him what he wanted?
23  A.   -- not giving what he wanted, you know, he
24  would act out in the parking lot.
25  Q.   What do you mean by "act out"?

Page 54

1   A.   Threatening people, cursing at them,
2   yelling.
3   Q.   Were the staff afraid of him?
4       MR. BARRINGER:  Objection; form.
5   A.   I can't answer for the other people.  I
6   was --
7   Q.   (By Mr. Ellison) Did anyone ever tell
8   you they were afraid of him?
9   A.   No.
10  Q.   Did you ever observe anyone who was being
11  subjected to one of David's rants as cringing or
12  concerned?
13  A.   The front office staff would.  They were
14  young girls.
15  Q.   What do you mean by "young girls"?
16  A.   Early 20s.
17  Q.   Did you perceive David's behavior as an
18  aspect of his disease?
19  A.   As part of his personality disorder, not
20  part of his bipolar.
21  Q.   How do you distinguish?
22  A.   The bipolar has more to do with mood.  The
23  personality disorder has to do with behavior.
24  Q.   David's had numerous diagnoses over the
25  course of his treatment at --

Page 55

1   A.   He has.
2   Q.   -- disorders -- at Directions, correct?
3   A.   He has.
4   Q.   Is it difficult to identify a particular
5   diagnosis in David?
6   A.   I think so.
7   Q.   Why?
8   A.   Because of the personality disorder.
9   Q.   What is the personality disorder?
10  A.   His is antisocial personality disorder.
11  Q.   Can you describe what that is?
12  A.   It means that he has no regard for others.
13  He cannot show empathy.  He doesn't display sympathy.
14  He doesn't think societal norms apply to him.  And he
15  will use anything and anyone to get what he wants.
16  Q.   You've said a lot.  Do you perceive of
17  David as not having regard for human life?
18  A.   I don't think he has regard for human life.
19  Q.   And that's even while he's being treated?
20  A.   That's even while he's being treated.
21  Q.   I assume you've had a number of very
22  difficult patients over the course of your career.  Is
23  that a fair assumption?
24  A.   I have.  That is.
25  Q.   Where does David fit into the totem pole?

Page 56

Was he your most difficult patient?
    A.   He's not my most difficult patient
clinically.  He was one of the most difficult patients
with his personality disorder, because I truly think
he is a true forensic kind of patient.
    Q.   What do you mean by that?
    A.   Meaning he has served prison time and
probably shouldn't have been let out.
    Q.   You think David should still be
incarcerated; is that correct?
    A.   I do.
    Q.   Do you perceive of him as a threat to
society?
    A.   I do.
    Q.   Do you think the least of his concerns is
diabetes?
    A.   I think that's the least concern with --
    Q.   You're laughing out loud.  Is that correct?
    A.   That's true.
    Q.   You think David needs his medications;
isn't that correct?
    A.   I do think he needs his meds.
    Q.   And that if he doesn't take his meds, he
poses a risk to himself as well as the rest of us; is
that correct?

Page 57

1   A.  I do.
2       MR. BARRINGER:  Objection; form.
3   Q.  (By Mr. Ellison)  You can answer.
4   A.  I do.
5   Q.  I want you to assume that David told Nicole
6   Keene that his -- he -- he needed to get off his
7   Seroquel because the lawyer told him it hurt his
8   chance at getting a settlement in the Seroquel
9   litigation.  Do you have that assumption in mind?
10   A.  I -- it wouldn't surprise me at all.
11   Q.  Do you need a license in Florida to
12   prescribe medications?
13   A.  You do.
14   Q.  Do you need a license in Florida to
15   manipulate patients' medications?
16   A.  You do.
17   Q.  Do you need a medical license in Florida to
18   tell patients to stop taking particular medications?
19   A.  You do.
20   Q.  Would, assuming such event occurred, would
21   that interfere with a clinician's practice of medicine
22   if a lawyer were to tell one of the clinician's
23   patients to stop taking medication because it might
24   hurt their chance at a litigation settlement?  Would
25   that make it harder to treat that patient?

Page 58

1       MR. BARRINGER:  Objection; form.
2   Q.  (By Mr. Ellison)  In other words, would you
3   see that as interfering with your treatment of a
4   patient?
5   A.  I would see it as interference.
6   Q.  And in David's situation, if I understand
7   you correctly, it's not just interference, it's
8   dangerous; isn't that correct?
9   A.  That would be --
10       MR. BARRINGER:  Objection; form.
11   A.  That would be dangerous.
12   Q.  (By Mr. Ellison)  Do you think it would
13   be wrong if the lawyer were to tell David to stop
14   taking Seroquel because it might hurt his chance at
15   getting a settlement in litigation?
16       MR. BARRINGER:  Objection; form.
17   A.  I think it would be wrong?  It's wrong
18   coming from the medical standpoint, but I understand
19   it from the attorney's standpoint.
20   Q.  (By Mr. Ellison)  You're laughing because
21   you're saying, if I understand you, that you can
22   understand why the lawyer would say that, but it
23   does -- it is not right, from a clinical practice --
24   A.  It's not right clinically.
25   Q.  Okay.  So the record is clear:  I'm not at

Page 59

1   all suggesting that it was the particular lawyer here
2   at the table that said any of those things.  In fact,
3   I don't believe it was, just so you know.
4       You were telling me about antisocial
5   personality disorder.  Have you told me everything
6   about David's antisocial personality disorder?
7   A.  I mean, I'm -- do you want me to go into
8   specific behaviors that substantiate it?
9   Q.  Absolutely.
10   A.  All right.  David has been incarcerated
11   multiple times and, in fact, served an extended prison
12   term.
13   Q.  What for?
14   A.  He was charged with rape.
15   Q.  What was the basis of that charge, as you
16   understand it?
17   A.  From what I have read and what David says,
18   David just says he inappropriately touched a female's
19   breast.  That's not rape.  So I don't know what all
20   took place.  But he -- he served eight or ten years.
21   Q.  Did you not believe David when he told you
22   that?
23   A.  I think there was more than what David was
24   telling.
25   Q.  Do you have a view of whether David is

Page 60

1   believable?
2   A.  Oh, I -- I think he's very dishonest.
3   Q.  I -- I'm going to draw a distinction here.
4   Is it that you think David is a liar or that David may
5   honestly believe what he's saying is true, but that
6   what he believes is true does not comport with
7   reality?  Do you understand the distinction?
8   A.  I do.
9   Q.  Do you think he's just a liar?
10   A.  I think he can do both.
11   Q.  Would you rely on anything David told you?
12   A.  No.
13   Q.  About anything?
14   A.  No.  That's why I had the case managers in
15   with the appointments.
16   Q.  You would typically -- strike that.
17       It was your custom and practice to have the
18   case manager sit in with you on meetings that you had
19   with David; is that correct?
20   A.  That's correct.
21   Q.  And was one of the reasons why because you
22   were threatened by him?
23   A.  No.  He threatened me with the case manager
24   there.
25   Q.  That didn't make him shy?

Page 61

1    A.   No.
2    Q.   Did you -- what were the reasons as to why
3   you felt it appropriate or indeed necessary to have
4   someone else in the room with you when you --
5    A.   To -- to validate what he was saying.
6    Q.   How would that person do that?
7    A.   Because they had so much contact with him.
8    Q.   I see.  The case manager would spend an
9   awful lot of time with David as is reflected in what
10  we've marked Exhibit 1; is that correct?
11   A.   That's correct.
12   Q.   And you would bring that person into the
13  room so that the case manager could lend his or her
14  additional perspective to whatever David was saying?
15   A.   That's correct.
16   Q.   And that's because you couldn't rely on
17  what David was saying?
18   A.   That's correct.
19   Q.   Now, let's come back to that rape
20  situation.  Your understanding of rape is that sexual
21  intercourse and penetration is required?
22   A.   I don't know that penetration has to, but
23  it's more than touching somebody's breast.
24   Q.   Okay.  So you don't know what happened, but
25  you believe that there was more to it than what David

Page 62

said?
 A.   Correct.
 Q.   What other behaviors make you believe that
antisocial personality disorder is one of the
appropriate diagnoses for David?
 A.   His propensity for violence, his history of
substance abuse.
 Q.   What substances?
 A.   Alcohol in particular, but I'm not too sure
that in his time, there hadn't been other substances.
 Q.   Did he ever talk to you about cocaine?
 A.   No.
 Q.   Crack?
 A.   No.
 Q.   Anything else?
 A.   No.  He -- he wasn't actively using, as far
as I know, when I treated him.
 Q.   He denied it; is that correct?
 A.   Right.
 Q.   But you believe he may well have been?
 A.   He could have been during -- I mean, there
was an extended time frame that he would disappear.
 Q.   How do you mean?
 A.   I wouldn't see him.  He wouldn't show for
appointments.

Page 63

1    Q.   How regularly did you see him?  Strike
2   that.
3         How regularly did you tell him to come in?
4    A.   He was supposed to be seen monthly.
5    Q.   And as the records reflect, there were
6   gaps; is that right?
7    A.   Huge gaps.
8    Q.   Would he call and cancel?
9    A.   Or just not show.
10   Q.   And was that something that also
11  complicated his treatment?
12   A.   Extremely.
13   Q.   You were unable to monitor his condition?
14   A.   Correct.
15   Q.   You were unable to adjust medications as
16  warranted?
17   A.   Correct.
18   Q.   And those were things that were important
19  to David's care and treatment; is that correct?
20   A.   Correct.
21   Q.   What --
22   A.   There was times he was also incarcerated,
23  and they would use generic medications with David.
24   Q.   Is that problematic?
25   A.   They have a lot more side effects to them.

Page 64

 Q.   And we'll go through those in your records
in a couple of seconds, okay?
 A.   Uh-huh.
 Q.   You understand that?
 A.   I do.
 Q.   All right.  You're doing great.  But like I
said, as the course of the day goes on, we become much
more conversational.
 A.   Right.
 Q.   You know me a little better now, and I know
you a little better now, but Debbie's going to get
real mad at me, okay?
      Let's come back.  Are there any -- you said
David's propensity for violence, how would that
manifest?
 A.   He physically attacked people and he had
domestic -- and it didn't matter.  He would do
females.  He had domestic violence against him as
well.
 Q.   Did he predominantly assault men or women?
 A.   I -- I don't know if there was a, you know,
predominance for one sex or another.  I don't think
sex mattered.
 Q.   Okay.
 A.   If they angered him or he felt that he was

Page 65

1 being betrayed or wronged or not getting what he
2 wanted and -- and he was angry enough, he would
3 attack.
4   Q.  Did you ever meet his wife?
5   A.  No.
6   Q.  Do you understand anything about their
7 relationship?
8   A.  What I read was supposedly so she could
9 become a citizen.
10   Q.  Do you know whether he ever threatened to
11 kill her?
12   A.  I don't know.
13   Q.  But you never met with her as part of --
14   A.  No.  Didn't even know she was married until
15 I read the record.
16   Q.  Fair enough.  Are you aware of any specific
17 instances where David physically assaulted someone
18 while he was under your care and treatment?
19   A.  Not under my care and treatment.
20   Q.  Can you give me an example of something
21 that happened before?
22   A.  He had attacked someone at Everybody's
23 Tabernacle.  That's why he wasn't allowed there
24 anymore.  That's one of the shelters.
25   Q.  Do -- do you recall how he did that?

Page 66

1   A.  I don't.  It's in the record, though.
2   Q.  I saw a record that suggested he wasn't
3 welcome in St. Pete's, St. Petersburg.  Do you know
4 anything about that?
5   A.  I don't.
6   Q.  Okay.  You're not aware that there was some
7 injunction keeping David away from the city of
8 St. Petersburg or anything like that?
9   A.  No.
10   Q.  Okay.  David demonstrates, from time to
11 time, bizarre sexual behavior; is that correct?
12   A.  He does.
13     MR. BARRINGER:  Objection; form.
14   Q.  (By Mr. Ellison)  Would you characterize
15 it as bizarre?
16   A.  I think anytime you're exposing yourself to
17 children, that's bizarre.
18   Q.  Okay.  Did David talk with you ever about
19 masturbating in front of children?
20   A.  No.
21   Q.  Do you know whether any such instance led
22 to his conviction or any of his convictions?
23   A.  I don't.
24   Q.  Do you know whether David's a registered
25 sexual offender in the state of Florida?

Page 67

1   A.  I don't know.  He should be.
2   Q.  Why?
3   A.  Because he served time for rape.  And he
4 also was incarcerated for the exposure to the young
5 girls.
6   Q.  Did David ever tell you about instances
7 when he did that as a kid?
8   A.  There was something when he was 12.  I
9 can't remember if he raped somebody at the age of 12
10 or touched somebody at the age of 12.
11   Q.  Did he ever say -- are you aware of whether
12 he ever acted inappropriately towards any of the --
13 the staff or any of the other caseworkers -- strike
14 that -- any other case managers or any of the other
15 nurse practitioners?
16   A.  Inappropriate in what way?
17   Q.  Sexually.
18   A.  Outside of making derogatory remarks when
19 you're a female, I don't know that he ever touched
20 anybody or, you know, exposed himself to anybody.  I
21 don't know that.
22   Q.  Did any of you talk about being afraid of
23 David in the sense that he might do that?
24   A.  Nicole was.
25   Q.  In what regard?

Page 68

1   A.  That he might attack her in her office.
2   Q.  That Nicole expressed to you that she was
3 concerned David might attempt to rape her?
4   A.  At least touch her.
5   Q.  And you're nodding your head.
6   A.  Yes.
7   Q.  So touching would have been the least of
8 Nicole's concerns?
9   A.  I think Nicole was afraid that he would
10 touch her and rape her given the opportunity.
11   Q.  She told --
12     MR. BARRINGER:  Objection; form to the last
13 question.
14     MR. ELLISON:  And -- and I'll stipulate
15 that the objection can be inserted in front of the
16 answer.
17   Q.  (By Mr. Ellison)  And she told you that,
18 right?
19   A.  She did.
20   Q.  Do you recall -- was anyone else present
21 when Nicole told you this?
22   A.  No.  We were in her office.
23   Q.  Was it following a visit with David?
24   A.  It was.
25   Q.  Did she seem shaken up?

Page 69

1    A.  She did.
2    Q.  Can you describe -- well, strike that.
3        What did she tell you?
4    A.  She told me he gave her the creeps.
5    Q.  Anything in particular?
6    A.  His demeanor, the words he would use, his
7    physical proximity, because he would -- he would get
8    close.  And that's when I told her, "Have the case
9    manager present.  Don't allow after-5:00
10   appointments."
11   Q.  So she came to you essentially, or you met
12   with her essentially because -- to give advice; is
13   that right?
14   A.  Correct.
15   Q.  Anything else about that visit that she
16   described as unsettling?
17   A.  No.
18   Q.  Not that that isn't enough.
19   A.  No.  That would be enough.
20       MR. BARRINGER:  Objection; form.
21   Q.  (By Mr. Ellison)  Any other ways that --
22   strike that.
23       Any other behaviors that support your
24   conclusion that David has antisocial personality
25   disorder?

Page 70

1    A.  His -- his use of people.
2    Q.  How do you mean?
3    A.  His demands of people, you know.  Blowing
whatever money he would have and then the demand for
someone to bring him money or to pay his electric bill
or to pay a phone bill or to find him a place to live
because he's been kicked out of another place, and
expecting that to happen and then becoming very angry.
I mean, he never, never was accountable for his
behavior.
     Q.  David didn't feel the need to account, in
your feeling?
     A.  He never took accountability for his
behavior.  There was always an -- a reason, an excuse,
a justification, outside of him that caused him to do
whatever had happened.  Or he would deny or make light
of what happened.
     Q.  I'm going to jump now to David's actual
medical records so that we have these in front of
there -- I -- I see that you have Exhibit 2 in front
of you; is that correct?
     A.  That's correct.
     Q.  The -- and forgive my reach.  It's probably
easiest to do it this way.  The first couple of pages
are the medications that David was on; is this

Page 71

1    correct?
2    A.  Correct.
3    Q.  This is not a complete list; is that right?
4    A.  It's not.
5    Q.  It's what -- what you were provided; am I
6    right?
7    A.  That have my name to them.
8    Q.  The very first record is a lengthy record
9    dated October 1st, 2002, which reflects your first
10   visit with David; is that right?
11   A.  That's correct.
12   Q.  And this is the first record that you have
13   in front of you, --
14   A.  Uh-huh.
15   Q.  -- that you yourself generated; am I right?
16   A.  This is a dictated record.
17   Q.  I don't have that copy.  My colleague, Bob,
18   is handing me his to look through, and I appreciate
19   that.  Let's go through this together in that it's
20   already been marked as a -- an exhibit.
21       It says: "Psychiatric Evaluation,
22   October 1st, 2002."  Am I correct?
23   A.  That's correct.
24   Q.  And it was for an entire hour, correct?
25   A.  That's correct.

Page 72

1    Q.  And you yourself observed David and took a
2    history; is that correct?
3    A.  That's correct.
4    Q.  Is it important to take a history?
5    A.  It is.
6    Q.  Why?
7    A.  So that you see what they've been treated
with, what they've been thought to have as far as an
Axis I in the past, how they've reacted to certain
things, what their functional level has been through
the years, if there's any legal involvement, what is
the family history, any medical concerns, medications
that have been tried and failed or tried and worked,
their history of compliance, and then to determine
what their needs are going to be.
     Q.  Okay.  Let's start at the beginning.  It
says: "Identifying Data/Chief Complaint.  David is
here" -- strike that.
          "David is a 40-year-old single Caucasian
male who is case managed here at Directions, having
been a former client and recently released from
prison."
          Did I read that correctly?
     A.  That's correct.
     Q.  So David had been at Directions before you

Page 73

1    first saw him; is that correct?
2        A.   He had.
3        Q.   It says he was a former client; is that
4    correct?
5        A.   Yes.
6        Q.   What do you -- what was a former client for
7    Directions? Someone that had -- that was
8    participating in his care and treatment and then fired
9    them?
10       A.   Not always.  I mean, they may have moved
11   when he's incarcerated, if he's being treated
12   elsewhere.  Can't be treated by two people at the same
13   time.
14       Q.   Although David did that, didn't he?
15            MR. BARRINGER:  Objection; form.
16       A.   He tried.
17       Q.   (By Mr. Ellison)  It says:  "He relates
18   that he was in prison from January 13th, 2001 to
19   September 24, 2002" -- a little more than a year and
20   a half, it looks like -- "for violation of probation
21   on an aggravated stalking charge."
22            Did I read that correctly?
23       A.   Yes.
24       Q.   And that's what David told you; is that
25   correct?

Page 74

1        A.   That's correct.
2        Q.   And that why you recorded it, right?
3        A.   Right.
4        Q.   Do you have an understanding what the
5    nature of the aggravated stalking charge was?
6        A.   I didn't know what had -- what he had
7    actually done, no.
8        Q.   You didn't ask?
9        A.   No.
10       Q.   It says:  "David has a long-standing
11   psychiatric history and was first diagnosed bipolar
12   within the Department of Corrections in 1987."
13            Did I read that correctly?
14       A.   Yes.
15       Q.   And it's your view that one of David's
16   conditions is Bipolar Disorder Type I; am I correct?
17       A.   That's correct.
18       Q.   What is bipolar disorder?
19       A.   Bipolar is a mood disorder that can lead to
20   multiple issues --
21       Q.   Such as?
22       A.   -- to include substance abuse, memory,
23   concentration, sleep, as well as thought disorder
24   issues.
25       Q.   What are its features?

Page 75

1        A.   Racing thoughts, impulsive, engaging in
2    high-risk behaviors.  They have a tendency to have a
3    higher risk for suicide, they have a higher risk for
4    substance abuse, they usually cannot hold a job,
5    frequent moves, frequent relationships.  They have a
6    tendency, especially the males, to be violent.
7        Q.   Did David have all of those symptoms?
8        A.   He did.
9        Q.   Were there any others that David had?
10       A.   David also had the propensity for
11   inappropriate social interactions.
12       Q.   What do you mean?
13       A.   Meaning in his relationships, he could try
14   to be dominant, abusive, take advantage of, not regard
15   other people's needs, not regard their -- their
16   feelings.
17       Q.   Was David hypersexual?
18       A.   When I saw David, he was usually medicated,
19   which can certainly decrease sexual drive.  But his
20   history reflects hypersexual, as well as that's part
21   of Bipolar I, a hypersexuality.
22       Q.   You said bipolar is a mood disorder,
23   correct?
24       A.   Right.
25       Q.   And there are ups and there are downs; is

Page 76

1    that correct?
2        A.   In Bipolar I.
3        Q.   The up -- and we're talking about
4    Bipolar I, right?
5        A.   Uh-huh.
6        Q.   Yes?
7        A.   We are.
8        Q.   That's what David has, correct?
9        A.   Correct.
10       Q.   That's characterized by both depression as
11   well as mania; am I right?
12       A.   That's correct.
13       Q.   What is mania?
14       A.   Mania is where they typically do not have a
15   required need for sleep.  They may not even have a
16   required need for food.  They're agitated, irritable.
17   They're more likely to engage in the high-risk
18   behaviors and seek adrenaline kind of thrill-seeking
19   type of things.  They may go on shopping sprees, they
20   may engage in things, stealing, lying.
21       Q.   And David did all of that; is that right?
22       A.   He did.
23       Q.   Sleep is both a cause as well as a symptom
24   of mania; is that correct?
25       A.   Correct.

Page 77

1    Q.   One of the things you try to do when you're
2 treating a bipolar patient who is having a manic
3 episode is try to control their sleep; isn't that
4 correct?
5    A.   That's correct.
6    Q.   You often see psychoses with Type I bipolar
7 disorder, correct?
8    A.   We do.
9    Q.   David had that; is that right?
10   A.   Yes.
11   Q.   What is psychoses?
12   A.   It's where he loses contact with reality,
13 having a distinct problem, telling what's real, not
14 real, they may hear voices, see things, extreme
15 paranoia.
16   Q.   Delusions?
17   A.   Can have delusions.
18   Q.   David did?
19   A.   I don't know that David had delusions.
20   Q.   We'll see some in your records, okay?
21   A.   Okay.
22   Q.   See if that refreshes your memory.
23   A.   Yeah.
24   Q.   Hallucinations?
25   A.   He alleged that he heard voices.

Page 78

1    Q.   You said "he alleged." Do you think he
2 did?
3    A.   David was difficult in that you never knew
4 if he was just giving you textbook answers or if it
5 was actually going on with him.
6    Q.   That would be characteristic of Type I
7 bipolar disorder, correct?
8    A.   That would be characteristic of your
9 antisocial personality disorder.
10   Q.   But you do see hallucinations with Type I,
11 correct?
12   A.   You see hallucinations with Type I, but for
13 a client to allege hallucinations --
14   Q.   That --
15   A.   -- when you don't really think they're
16 having hallucinations goes along with the antisocial
17 personality disorder.
18   Q.   I'm tracking. I'm just trying to get
19 where --
20   A.   Okay.
21   Q.   -- your jury is on this.
22   A.   Okay.
23   Q.   Do you think he was actually having
24 hallucinations, or do you think he was fibbing?
25 Either way, it's an aspect of a disorder he has?

Page 79

1    A.   That's correct.
2    Q.   Which do you feel?
3    A.   I never saw him in a state where I thought
4 he was having hallucinations.
5    Q.   But you did see him in states where you
6 thought he was psychotic; is that correct?
7    A.   I thought he was having trouble with
8 organized thinking --
9    Q.   So --
10   A.   -- because he was so manic.
11   Q.   So you don't think he was all the way
12 psychotic? Do I understand you correctly?
13   A.   They don't always have hallucinations.
14   Q.   Okay.
15   A.   They can have just a disorganized thinking.
16   Q.   And that's enough for psychoses?
17   A.   Yes.
18   Q.   Okay. Fair enough.
19      Says he -- further down under History Of
20 Present Illness, it says: "He states he touched a
21 female's breast at the age of 12, who was 18. She
22 yelled rape, and he ended up being sent to jail and
23 then to treatment."
24      And that's the instance you described
25 before?

Page 80

1    A.   That's correct.
2    Q.   And then: "At 16 through the age of 19, he
3 was incarcerated concurrently. He has had multiple
4 charges and multiple problems."
5       Did I read that correctly?
6    A.   You did.
7    Q.   Did I right -- strike that.
8       Did you have an understanding of what those
9 multiple charges and multiple problems were?
10   A.   I probably did at the time, --
11   Q.   You don't recall now?
12   A.   -- but I wouldn't know now, huh-uh.
13      MR. ELLISON: Sorry, Debbie.
14   Q.   (By Mr. Ellison) You don't recall now?
15   A.   No.
16   Q.   And this record doesn't refresh your
17 recollection in that regard?
18   A.   No.
19   Q.   Next line is: "He states he has been on
20 every antipsychotic out there to the point of almost
21 developing tardive dyskinesia."
22      Did I read that correctly?
23   A.   You did.
24   Q.   What's tardive dyskinesia?
25   A.   Tardive dyskinesia is a disorder that can

## Page 81

1  develop mostly with the older antipsychotics, although
2  the new generation can do it as well.  And it is
3  different things to different people.  Some people
4  develop what we call perioral movements where they're
5  constantly moving their mouth.  Other people, I've
6  seen do a pill rolling (indicating).  Other people
7  will pace.
8      Q.  By "pill rolling," you're moving your
9  fingers back --
10      A.  Pill rolling where they -- yeah, where you
11  constantly take, you know, the index finger against
12  the thumb.  A pacing, not able to sit still.
13  Clenching of the jaws, grinding their teeth.  And it
14  becomes permanent.
15      Q.  Did David tell you that he had almost
16  developed tardive dyskinesia?
17      A.  Yes.
18      Q.  Did it surprise you that David was familiar
19  with that side effect of the first-generation
20  antipsychotics?
21      A.  Not given his history.
22      Q.  You figured that David would be familiar
23  with the side effects of his medications?
24      A.  Yeah.  David was very familiar with side
25  effects of medications.  He made it a point to know

## Page 82

everything about every medication.
    Q.  Do you ever recall talking with David
specifically about a risk of diabetes or weight gain
associated with antipsychotics?
    A.  Always.
    Q.  From the time you first treated him?
    A.  I did.
    Q.  Including in this evaluation in October of
2002?
    A.  Right.  That's what's meant by "risk,
benefits, and alternatives to treatment discussed."
    Q.  So when it says that in here throughout
your medical records, that would also mean that on
that date, you actually talked with David about the
risk of diabetes and with the antipsychotics,
including Seroquel, that he was taking; is that
correct?
    A.  The way I approach this metabolic issue
with these atypical antipsychotics:  I tell every one
of them that they can have the side effect of an
increased appetite, and depending on what they do with
that, they could end up gaining weight.  And weight
gain is an indication leading towards Diabetes
Type II.
    Q.  And you told David that every time it's

## Page 83

1  reflected --
2      A.  Every time.
3      Q.  -- in your records that you did a
4  risk-benefit analysis and talked with him about
5  alternative treatment; is that correct?
6      A.  Every time.
7      Q.  And David had the opportunity to ask you
8  questions about it; isn't that right?
9      A.  He did.
10      Q.  And did he, from time to time, ask you
11  questions?
12      A.  No.  He would want to stay on his
13  medications or whatever medication regimen he felt at
14  the time was working.
15      Q.  So in your view, at least as to the risk of
16  what you call metabolical issues, the increased
17  appetite leading to weight gain leading to diabetes,
18  you had told David about that as early as
19  October 2002?
20      A.  That's right.
21      Q.  As to the atypicals including Seroquel; is
22  that correct?
23      A.  That's right.
24      Q.  Do you have a view as to whether David then
25  had informed consent?

## Page 84

    A.  He always had informed consent.
    Q.  And that includes as to the treatment of a
atypical such as Seroquel; is that right?
    A.  That includes --
    Q.  Yes?
    A.  That includes -- yes.
    Q.  I meant to ask you this:  From time to time
while you were at Directions, did you get visits from
sales representatives of the manufacturers of atypical
antipsychotics?
    A.  We did.
    Q.  And did that include Seroquel?
    A.  It did.
    Q.  They would give you a sales patter?
        You're smiling.
    A.  I --
    Q.  They gave you a sales pitch?
    A.  I -- I guess you'd call it a sales pitch.
They'd talk about their medication that they were
representing.
    Q.  You understand that the role of a sales
representative --
    A.  I know, and some of them were more
aggressive than others.
    Q.  They would drive you nuts?

## Page 85

1     A.   Well, I didn't see those.

2     Q.   Did you rely on the -- the sales pitch of

3  sales representatives in prescribing medications to

4  treat your patients?

5     A.   Absolutely not.

6     Q.   No, of course not.  You relied on your

7  skill, training, experience, expertise, talent, and

8  education as well as consultation with your colleagues

9  in prescribing the medications that you did; am I

10 correct?

11          MR. BARRINGER:  Object.  Objection; form.

12    A.   That's correct.

13    Q.   (By Mr. Ellison)  From time to time,

14 sales reps would -- would give you and the staff

15 things?  Is that right?  Pads?

16    A.   Yeah.  They --

17    Q.   That sort of thing?

18    A.   Yeah.  They leave that kind of stuff all

19 the time.

20    Q.   Did you ever prescribe a medication because

21 someone gave you a clock with their logo on it?

22    A.   No.

23    Q.   Never would have prescribed any medication

24 because of something a pharmaceutical company

25 provided; is that correct?

## Page 86

A.   Not at all.

Q.   Do you recall ever communicating directly

with any pharmaceutical company regarding the issue of

weight gain associated with atypicals?

A.   With the pharmaceutical company itself?

Q.   Yes, ma'am.

A.   No.

Q.   You don't recall any such incidents?

A.   No.

Q.   Okay.  Now, let's come back to the

paragraph we were looking at.

     "He states he has been on every

antipsychotic out there."

     Is that correct?

A.   That's what he told me.

Q.   Do you agree that bipolar can be difficult

to treat?

A.   It's extremely difficult to treat.

Q.   Why?

A.   Mostly because you do have the severe mood

swings.  You have the in and out of the psychotic

process that can happen at either end, whether it be

depression or mania.  There's a high risk of suicide.

There is usually -- usually substance abuse involved.

And when they're manic, they don't want to take their

## Page 87

1  medications.

2     Q.   It feels good when you're manic; is that

3  correct?

4     A.   When they're younger.

5          MR. BARRINGER:  Objection; form.

6     Q.   (By Mr. Ellison)  Not so good when

7  they're older; is that right?

8     A.   Not good when they're older.

9     Q.   You hear of people saying they see colors

10 differently, they're more vibrant; you hear of them

11 telling you that music sounds more enthralling; am I

12 correct?

13    A.   I've just heard that they've got more

14 energy, they feel better, they go out and they have

15 fun.

16    Q.   Fair enough.  There are a number of

17 different medications that are available to treat

18 bipolar disorder and antipersonality disorder.  Strike

19 that.

20         Let's focus on bipolar disorder.

21    A.   You can't treat antisocial.

22    Q.   You cannot treat antisocial personality

23 disorder?

24    A.   No.

25    Q.   And David had that?

## Page 88

A.   Yes.

Q.   In that regard, he was untreatable?

A.   Untreatable.

Q.   What do you mean by that?

A.   That is something only the client

themselves can fix.

Q.   Can it be fixed?

A.   I think with intensive therapy and a real

want to change it, it can be.

Q.   And David has no such desire, in your view?

A.   No desire.  Doesn't recognize it.

Q.   Let's come back to bipolar.  You mentioned

before first-generation antipsychotics.  Did I hear

you right?

A.   Correct.

Q.   What are those?

A.   There are so many.  Stelazine, Loxitane,

Haldol, Thorazine, Mellaril, --

Q.   David's been --

A.   -- Prolixin.  Some that are probably not

even made anymore.

Q.   David's been on those?

A.   He told me he had been on all of them.

Q.   In your view, did they work?

          MR. BARRINGER:  Objection; form.

Page 89

1    A.   Evidently not.
2    Q.   (By Mr. Ellison)  You -- you don't think
3  they did?
4    A.   I don't think they worked for this young
5  man.
6    Q.   How -- how do the first-generation
7  antipsychotics -- strike that.
8         Do you still prescribe first-generation?
9    A.   I do.
10   Q.   For certain patients?
11   A.   For certain people.
12   Q.   If the benefits, in your view, outweigh the
13  risks?
14   A.   There are some people that don't respond to
15  the second-generation antipsychotics.
16   Q.   And, therefore, you use the
17  first-generation?
18   A.   Right.
19   Q.   You'd agree that every medication has
20  risks?
21   A.   All medications have risks.
22   Q.   Including the risk of death?
23   A.   I guess there's been some medications that
24  are proven to put you at risk for death.
25   Q.   But sometimes the benefits of that

Page 90

medication outweigh the risk; am I correct?
   A.   That's right.
   Q.   And it's your view that -- strike that.
        Do you prescribe second-generation
antipsychotics today?
   A.   I do.
   Q.   Are they the regular course of your
practice?
   A.   They are.
   Q.   So you prescribe that medication
notwithstanding any risk of diabetes; is that correct?
   A.   I do.
   Q.   Let's come back to first-generation.  How
would first-generation antipsychotics help patients?
   A.   Typically, what you're looking at -- with a
bipolar patient?
   Q.   Sure.
   A.   Okay.  You're keeping them out of mania.
   Q.   And what's the benefit of that?
   A.   So that they don't go out and act on their
impulses.
   Q.   In the ways that you've described; am I
correct?
   A.   Right.
   Q.   Any other benefits?

Page 91

1    A.   Usually they sleep better.  They're more
2  calm.  They become more rational.  You give them a
3  pause so that they can stop and think before they act.
4    Q.   Now, let's talk with the down sides or the
5  potential down sides.  Apparently David told you that
6  he was fully aware of tardive dyskinesia; am I
7  correct?
8    A.   Right, that's correct.
9    Q.   And you've told me what that is, right?
10   A.   Right.
11   Q.   It has other side effects, too; am I
12  correct?
13   A.   Right, right.
14   Q.   And this is the first-generation?  Am I
15  right?
16   A.   That's correct.
17   Q.   One set of potential downsides are
18  extrapyramidal symptoms; am I correct?
19   A.   That's correct.
20   Q.   You're smiling.  Is it because you're --
21  I'm showing --
22   A.   You're very good.
23   Q.   Thank you.  I'm much more of a doctor than
24  I was before; am I right?
25   A.   That's right.

Page 92

   Q.   Can you describe what extrapyramidal
symptoms are?
   A.   Oh, they can include a restlessness, an
agitation, vision problems, definite dryness of the
mouth.  You can get into postural hypotension.
   Q.   A lot of Parkinson's-like symptoms?
   A.   A Parkinson's-like syndrome, yeah.
   Q.   And with the first-generation atypicals, if
a patient started manifesting these symptoms, or
tardive dyskinesia, for that matter, and you withdrew
the medication, those symptoms might never go away; is
that correct?
   A.   That's correct.
   Q.   So that you could become permanent; is that
right?
   A.   That's right.
   Q.   And these are some of the problems that you
face as a -- a prescriber of medications when -- when
prescribing for bipolar patients like David; isn't
that correct?
   A.   That's correct.
   Q.   Let's now talk about the second-generation
antipsychotics.  That includes Seroquel; am I right?
   A.   It does.
   Q.   Zyprexa, Abilify, Geodon, Risperdal?

Page 93

1　A.　And Invega.
2　Q.　And Invega? Who makes Invega?
3　A.　Janssen, Johnson & Johnson.
4　Q.　Clozaril?
5　A.　And Clozaril, yeah.
6　Q.　Clozaril carries a risk of agranulocytosis;
7　am I correct?
8　A.　It does.
9　Q.　What's that?
10　A.　It is an anemia that can actually kill.
11　Q.　And that's bad, right?
12　A.　That's very bad.
13　Q.　I take it, then, that Clozaril is not your
14　first line second-generation --
15　A.　Nurse practitioners don't prescribe
16　Clozaril.
17　Q.　Is it controlled?
18　A.　It's not controlled. It's just typical
19　with any, especially in the community mental health
20　centers, because you have to be licensed, you have to
21　be on a registry, that the physicians do it. And at
22　Directions, Dr. Sangita Desai did the Clozaril.
23　Q.　So you don't prescribe, your own self,
24　Clozaril?
25　A.　I do not.

Page 94

1　Q.　Did you recommend it for certain patients?
2　A.　Yes, I did.
3　Q.　Because sometimes they -- they needed it;
4　am I right?
5　A.　Right.
6　Q.　And that's notwithstanding the potential
7　risk of death; is that correct?
8　A.　That's right.
9　Q.　Would you agree that the invention of
10　second-generation atypical antipsychotics
11　revolutionized the treatment of bipolar disorder?
12　　　　MR. BARRINGER: Objection; form.
13　A.　And schizophrenia.
14　Q.　(By Mr. Ellison) And schizophrenia; is
15　that correct?
16　A.　That's correct.
17　Q.　So you'd agree with that statement; is that
18　right?
19　A.　I would.
20　Q.　Why were they better?
21　A.　Because people would remain compliant.
22　They were much more likely to remain compliant because
23　they didn't have the side effects.
24　Q.　They -- did the medications work better?
25　A.　That's up for debate. I mean, there's some

Page 95

1　research that says no. But I think, you know, if
2　you've got someone that's more compliant, they're
3　going to be working better.
4　Q.　In your experience, they were more
5　effective?
6　A.　I think they're more effective, especially
7　with what we call the negative symptoms.
8　Q.　And those were?
9　A.　Those are the cognitive abilities, the
10　ability to socialize, the thinking.
11　Q.　Anything else?
12　A.　I think they're just safer drugs.
13　Q.　They were more effective at helping
14　patients think rationally; is that correct?
15　A.　Correct.
16　Q.　And that helped them deal with day-to-day
17　life better; is that correct?
18　A.　Right.
19　Q.　And they have less of the downsides; am I
20　correct?
21　A.　They have a lot less of the downside.
22　Q.　What less of the downside do they have?
23　Can you tell me what you mean?
24　A.　Rarely do you get tardive dyskinesia, even
25　with long-term.

Page 96

1　Q.　Have you seen it? Have you seen it?
2　A.　I have seen it. I have seen it. But
3　rarely do you get it.
4　Q.　Okay.
5　A.　There is actually less cardiovascular
6　effects than some of the older ones, especially like
7　Mellaril.
8　Q.　What cardiovascular effects?
9　A.　The lengthening of the QT segment within,
10　you know, the sudden cardiac death that can take
11　place. They thought Geodon had it; Geodon didn't have
12　it, but they found Mellaril -- which had been used for
13　years -- did have it.
14　Q.　And that means that the medication can
15　upset the electricity in the heart and can cause a
16　heart attack? I'm overgeneralizing, but is that
17　essentially it?
18　A.　Right.
19　Q.　Okay. QT prolongation?
20　A.　That's right.
21　Q.　Any other benefits?
22　A.　The fact that they do have the benefits of
23　the cognitive.
24　Q.　That's huge, right?
25　A.　That's huge, that they have more ability to

Page 97

1    treat the depression within these illnesses.  People
2    forgot that these people get depressed as well.
3    That's a huge thing.  Haldol, you know, you've
4    probably heard of the flat face, you know; people just
5    kind of stumbling down the hall.  They're not hearing
6    voices anymore, but they're miserable.  You know,
7    these medications can help that.
8         Q.   And you have patients that you prescribe
9    atypicals, including Seroquel, to who can live very
10   productive lives; am I correct?
11        A.   They can get jobs.
12        Q.   In your view, could David work?
13        A.   No.
14        Q.   How come?
15        A.   Because he would not be able to function in
16   an environment where he was -- had a boss.
17        Q.   And that's even medicated?
18        A.   Even medicated.
19        Q.   Why?  Do you think he'd kill his boss?
20        MR. BARRINGER:  Objection; form.
21        A.   I just don't think he'd do what he was
22   supposed to do.
23        Q.   (By Mr. Ellison)  Do you think his boss
24   would be at risk if they were to have an
25   altercation?

Page 98

A.   Yes.
Q.   And you think it likely he would have an
altercation with someone who was --
A.   Guaranteed.
Q.   Okay.  So the answer to my question that
David might kill him was yes?  Am I right?
A.   Yes.
     MR. BARRINGER:  Same objection.
Q.   (By Mr. Ellison)  When -- when treating
David, did the risk of diabetes, given his mental
health, matter to you at all?
A.   It always matters, because then you worry
can they handle that illness on top of what's going on
with them.
Q.   Okay.  If I understood you earlier, you
said -- you agreed that diabetes would have been the
least of David's problems?
A.   That would be correct.
Q.   And you would prescribe and did prescribe
atypicals for David, including Seroquel,
notwithstanding the risk of diabetes; is that correct?
A.   Right.  Yeah, but you still have concerns.
Q.   I understand.  And you talked with David
about the diabetes issues, right?
A.   Correct.

Page 99

1         Q.   And you recommended that notwithstanding
2    the diabetes issues, he uses Seroquel; is that
3    correct?
4         A.   I did.
5         Q.   And you thought it was important to him; is
6    that right?
7         A.   I did.
8         Q.   And your view hasn't changed at all having
9    reviewed the records; is that right?
10        A.   It has not.
11        Q.   You have no qualms, looking back over your
12   records, about having prescribed Seroquel; is that
13   right?
14        A.   I did not.
15        Q.   You thought --
16        A.   I thought it was the perfect medication at
17   the time for him.
18        Q.   And you found him responsive to it; isn't
19   that correct?
20        A.   Very responsive.
21        Q.   The drug worked well for him; isn't that
22   correct?
23        A.   That's right.
24        Q.   And you have no opinions as to whether it
25   caused or contributed to any negative condition David

Page 100

might have, whether it be stomach pains, diabetes, or
anything else; is that correct?
A.   I don't think it caused any of his
problems.
Q.   You -- you thought David only benefited
from it; am I right?
A.   I did.
Q.   Are atypical antipsychotics, including
Seroquel, a necessary part of your treatment of
available therapies to you as a -- someone who treats
bipolar?
     Shall I try that one again?
A.   Yeah.  I'm not sure what you're saying.  I
don't use them all the time.
Q.   I --
A.   I use them when they're appropriate.
Q.   I understand.
     Do you think it's important that you have
them available to you?
A.   Absolutely.
Q.   So it would be bad if AstraZeneca and the
other providers went back and withdrew all atypical
antipsychotics from the market; is that correct?
     MR. BARRINGER:  Objection; form.
Q.   (By Mr. Ellison)  You're kind of rolling

## Page 101

1  your eyes.
2      A.  With -- without the atypicals --
3      MR. BARRINGER:  Objection; form.
4      Q.  (By Mr. Ellison)  You were kind of rolling
5  your eyes.
6      A.  Okay.
7      MR. BARRINGER:  Well -- well, to the
8  questioning.
9      MR. ELLISON:  I hear you.
10     Q.  (By Mr. Ellison)  Go ahead.
11     A.  All right.  Without the atypicals, we'd
12 have a huge increase in our homeless population.
13     Q.  Why?
14     A.  Because most of the homeless are the
15 mentally ill that used to be institutionalized, and
16 that's not available anymore.  These medications keep
17 people functional.  They keep some people actually
18 with the ability to work and not on disability.
19     Q.  So not only do you think they're important;
20 they are essential to you as a treater, and in your
21 view as a treater to the public, that they remain
22 available; is that right?
23     A.  Absolutely.
24     MR. ELLISON:  I'm going to take a quick
25 break.  Is now a good time?

## Page 102

THE WITNESS:  Yeah.
MR. ELLISON:  Let's go off the record.
THE VIDEOGRAPHER:  We're off the record at 11:45.
    (Recess from 11:45 a.m. to 11:59 a.m.)
    THE VIDEOGRAPHER:  We're back on the record at 11:59.
    Q.  (By Mr. Ellison)  Ms. Burke, during the break, you, plaintiff's counsel, and I were sitting here.  One of the subjects that you raised was litigation against Eli Lilly regarding the Zyprexa medication; is that fair?
    A.  Yes.
    Q.  And one of the things that you said was you had concerns about that litigation because it would, in your view, open the floodgates of litigation against other companies for the same condition; is that correct?
    A.  Correct.
    Q.  And one of -- there was a discussion about company behavior that took place; am I right?
    A.  Correct.
    Q.  Do you -- you've never worked for a pharmaceutical company, have you?
    A.  Outside of speaking for Bristol-Myers

## Page 103

1  Squibb and Janssen, no.
2      Q.  You haven't been involved in the invention,
3  development, or labeling of a medication; is that
4  correct?
5      A.  No.
6      Q.  You don't work for the FDA; am I right?
7      A.  No.
8      Q.  You -- you have not been consulted by the
9  FDA in the development of any atypical antipsychotic;
10 is that correct?
11     A.  Correct.
12     Q.  Do you have any idea how many millions of
13 documents are generated internally at a company when
14 they make a new medication?
15     A.  I can only imagine.
16     Q.  We're talking millions.  Is that where your
17 imagination is?
18     A.  Yes.
19     Q.  Do you think it's fair if a plaintiff's
20 lawyer were to go through those millions of pages of
21 records and pull out one or two --
22     A.  No.
23     Q.  -- and show them to you as suggestive of
24 company behavior?
25     MR. BARRINGER:  Objection; form.

## Page 104

    A.  No.
    Q.  (By Mr. Ellison)  So you have no idea whether Eli Lilly or any other company, for that matter, did or didn't do anything with regard to an atypical antipsychotic; is that correct?
    A.  No, I don't.
    Q.  Has anything you've ever written been taken out of context?
    A.  Yes, it has.
    Q.  Been misunderstood?
    A.  Yes, it has.
    Q.  Even though the words that you've used were clear?
    A.  Yes.
    Q.  And when someone has misunderstood or misconstrued something you've written, you've liked the opportunity to explain yourself; isn't that right?
    A.  That's correct.
    Q.  You think that's fair; am I right?
    A.  Right.
    Q.  I don't know what my colleague across the table has in his briefcase that he might want to show you, but I sure believe it's not going to be millions of pages of records, and the people that may or may not have written those documents aren't here.  Will

Page 105

1   you take that into consideration when you look at
2   whatever he shows you that may have been provided by
3   my company?
4      A.   I will.
5      Q.   I was asking you some questions before the
6   break about this first visit you had with Mr. Haller
7   on October 1st, 2002.  Do you have that visit record
8   in front of you?
9      A.   I do.
10      Q.   We were talking about the side effects of
11   atypical antipsychotics.  And further down -- this is
12   in the third paragraph under History of Present
13   Illness on the first page -- it says that a Dr. Ferris
14   in the Department of Corrections started him on
15   lithium; am I right?
16      A.   Yes.
17      Q.   According to the American Psychiatric
18   Association's recommendations, lithium and Lamictal
19   are the first line of therapy for bipolar disorder; is
20   that correct?
21      A.   Lithium, not necessarily Lamictal.
22      Q.   Not necessarily Lamictal?
23      A.   No.
24      Q.   Why do you draw a distinction?
25      A.   Because Lamictal, in the recent research,

Page 106

1   has not shown effectiveness to prevent mania.
2      Q.   Again, my question wasn't what current
3   research says.  My question was about the
4   recommendations of the American Psychiatric
5   Association.  Do you understand that?
6      A.   I do.  I don't recall that --
7      Q.   You're not familiar with it?
8      A.   -- Lamictal was first line.
9      Q.   Fair enough.  What does lithium do?
10      A.   Lithium is a mood stabilizer that, to this
11   date, they still don't know exact mechanism of action.
12   It is a salt, and it does control the mood swings,
13   especially mania, in most people.
14      Q.   And it says that David was started on 900,
15   then 1200, then 1500, then 1800.  That's milligrams,
16   right?
17      A.   That's right.
18      Q.   1800's a lot; am I correct?
19      A.   It is.
20      Q.   It's considered a very high dose; am I
21   right?
22      A.   I consider it a high dose.
23      Q.   And it was at -- according to what David
24   told you, it was at that high dose that he had any
25   relief from his mood swings; am I right?

Page 107

1      A.   That's what he reported.
2      Q.   Further, it says he was on Depakote at that
3   same time; am I correct?
4      A.   He's saying that Depakote was added.
5      Q.   But Depakote was added, and he was on it at
6   the time you saw him; am I correct?
7      A.   He was.
8      Q.   And he said that this is the most stable he
9   had been in years, but he continued with mood swings;
10   am I correct?
11      A.   Correct.
12      Q.   Depakote's an antiepileptic; am I correct?
13      A.   That's true.
14      Q.   What does it do?
15      A.   It also supposedly helps control the mood
16   swings, and it's one of the better agents to prevent
17   mania.
18      Q.   Is that in your experience as well?
19      A.   It is.
20      Q.   Depakote has some side effects?
21      A.   It does.
22      Q.   It can make you -- make you stupid; am I
23   right?
24      A.   Well, it can certainly cause some cognitive
25   problems.

Page 108

1      Q.   And what cognitive problems can it -- can
2   it cause?
3      A.   It's slow.  You may forget words
4   mid-sentence, forget immediate recall, have problem
5   with short-term memory.
6      Q.   And those are side effects that you talk
7   with patients about when you prescribe Depakote; am I
8   correct?
9      A.   That's right.
10      Q.   Further down, it says that he had
11   "self-mutilated his arms in the prison system with
12   a -- a razor."
13          Did I read that right?
14      A.   You did.
15      Q.   Did you ever see those scars?
16      A.   I don't remember them.  I probably did.
17      Q.   Do you ever recall David saying he tried to
18   kill himself by taking razorblades to his wrists?
19      A.   Told me he self-mutilated; he didn't tell
20   me that he was trying to kill himself.
21      Q.   You don't -- again, this comes back to the
22   issue of whether David was actually suicidal or
23   whether he was trying to manipulate people?
24      A.   Correct.
25      Q.   Is it your perspective, based on the way

Page 109

1  you wrote that, that David was trying to be
2  manipulative?
3      A.   Correct.
4      Q.   Thank you.  Next page, on page 2, it says:
5  "Without medications his moods will change within
6  seconds, days or months, but he is usually at least
7  hypomanic and then will quickly move to manic."
8          Did I read that correctly?
9      A.   You did.
10     Q.   When David isn't medicated, he's not
11 normal; am I right?
12     A.   His behavior is not normal.
13     Q.   What is hypomania?
14     A.   Hypomania is a less need for sleep.  They
15 can still be impulsive, they can be hyperactive,
16 agitated, irritable, make poor decisions, but they
17 typically think they're feeling better and they like
18 to be at that level.
19     Q.   "He has no impulse control, low frustration
20 tolerance, and excessive anger with rages."
21         Did I read that correctly?
22     A.   You did.
23     Q.   And David told you that; am I right?
24     A.   He did.
25     Q.   "He knows that his thoughts race, he

Page 110

becomes too talkative, and even now has rapid and
pressured speech and has been mistaken for having an
anxiety problem."
        Did I read that correctly?
    A.   You did.
    Q.   So David at least had some insight, as of
that time, to the nature of his, at least, symptoms,
if not condition?
    A.   David can quote what bipolar is.
Recognizing it in himself is not always accurate.
    Q.   What do you mean?
    A.   He's read the books.  He's probably read
the DSM-IV.  He can exactly quote the signs and
symptoms of bipolar disorder, and yet when he's
talking too fast or having racing thoughts or making
poor decisions, he doesn't see it in himself.  He
doesn't have insight into himself.
    Q.   So he knows what to say?
    A.   He knows what to say.
    Q.   He can walk the walk?
    A.   He can.
    Q.   Do you see that as David being
manipulative?
    A.   I thinks at -- I think at times, he's
manipulative with it.

Page 111

1      Q.   Further down, it says: "He goes on to
2  state that he has PTSD due to the child abuse that he
3  endures."
4          Did I read that correctly?
5      A.   That's correct.
6      Q.   Did -- do you recall what he may have told
7  you about that?
8      A.   He told me about it in this session.
9      Q.   What did he tell you?
10     A.   That he had been abused by his parents.
11     Q.   Did he tell you how?
12     A.   I don't remember.  I mean, he didn't go
13 into detail or I would have put it in here.
14     Q.   Had he told you about the detail, you would
15 have recorded it, correct?
16     A.   I would have.
17     Q.   And if David had ever complained about any
18 of the medications he was on, you would have recorded
19 it in your records; am I correct?
20     A.   It would have been in the record.
21     Q.   If David had reported any side effects that
22 he had had with any medication, you would have
23 recorded it; is that correct?
24     A.   That's correct.
25     Q.   One of the things you might have considered

Page 112

doing in that regard was changing his medications,
correct?
    A.   That would be correct.
    Q.   You -- one of the things you may have
considered in that regard was adjusting dose; isn't
that correct?
    A.   Yes.
    Q.   One of the things you might have considered
doing was nothing, depending on a variety of
conditions, correct?
    A.   Correct.
    Q.   Then it says: ". . . as well as some of
the abuse that happened to him while incarcerated."
        Did I read that correctly?
    A.   That's true.
    Q.   Did he describe the abuse that happened to
him while incarcerated?
    A.   No.
    Q.   Otherwise he would have told you; is that
correct?
    A.   Right.
    Q.   Next page, page 3, just under Family Mental
Health History, you know that David was adopted?
    A.   That's what he reported.
    Q.   And, therefore, said he was unable to

Page 113

1  identify family medical history, correct?
2      A.   That's right.
3      Q.   Further down, last paragraph, it says: "He
4  has had laparoscopy in the past for kidney stones," --
5  that's L-A-P-A-R-O-S-C-O-P-Y -- correct?
6      A.   Right.
7      Q.   And you wrote that because that's what
8  David told you; am I right?
9      A.   Right.
10     Q.   Now, the paragraph above that, he says:
11 "He himself denies hypertension, cardiac disease, a
12 history of cancer, diabetes, thyroid disease, or
13 kidney disease."
14         Did I real that -- read that correctly?
15     A.   You did.
16     Q.   And that is what David told you, correct?
17     A.   Right.
18     Q.   You did nothing to independently verify
19 that; is that correct?
20     A.   No.
21     Q.   And if the medical records reflect that
22 David, in fact, had hypertension and indeed instances
23 where he had elevated blood glucose levels prior to
24 this first visit, you would have no reason to dispute
25 those records, would you?

Page 114

     A.   I would not have.
     Q.   Now, further down under Medications, it
identifies Eskalith, lithium, and Depakote.  Did I
read that correctly?
     A.   Correct.
     Q.   I neglected to ask you, what's Eskalith?
     A.   Lithium.  It's another form of lithium.
     Q.   So he's on two forms of lithium, right?
     A.   Right.
     Q.   One is extended release and the other one
is taken at night, right?
     A.   Right.
     Q.   Depakote twice a day?
     A.   Right.
     Q.   And then you've identified a number of
medications as medications that have been tried with
David; am I correct?
     A.   Correct.
     Q.   Xanax, Klonopin, Vistaril, Sinequan, Moban,
Serentil, Thorazine, Haldol -- Haldol, Mellaril,
Loxitane, Stelazine, Prolixin, and Risperdal; am I
correct?
     A.   That's correct.
     Q.   Those are medications that had been tried
with David?

Page 115

1      A.   That's what he reported he had tried in the
2  past.
3      Q.   And he reported that those didn't work for
4  him?
5      A.   Correct.
6      Q.   One of those medications is Risperdal; is
7  that correct?
8      A.   That's right.
9      Q.   Oral Risperdal?
10     A.   At that point, it would have been oral.
11     Q.   And at that point in time, you understood
12 that there was a risk of diabetes, weight gain,
13 metabolic process associated with Risperdal; am I
14 correct?
15     A.   There was potential for weight gain with
16 that.
17     Q.   I -- I should be careful when I say that.
18 You recognize --
19     A.   Right.
20     Q.   Let me make sure I understand.  You said
21 that as of this date, October 2002, you were aware
22 that there was a risk of increased appetite associated
23 with atypicals which could lead to weight gain which
24 could lead to diabetes; is that correct?
25     A.   Correct.

Page 116

     Q.   And you discussed that issue as well as
that process from weight gain to -- or appetite to
weight gain to diabetes as well as other consequences
with the patients, correct?
     A.   Correct.
     Q.   David told you he was allergic to
ampicillin; am I correct?
     A.   He did.
     Q.   Now, further, under Legal History on
page 4, it says he had a battery, a number of
different battery convictions; am I correct?
     A.   Right.
     Q.   He says then in 1986, he had four counts of
what you wrote as "rude" -- lewd -- "and
lasciviousness."
         Did I read that correctly?
     A.   Right.
     Q.   Battery on a law enforcement officer and
then conditional release.
         Did I read that generally right?
     A.   Yes.
     Q.   Do you know the circumstances around the
lewd and lasciviousness, the four counts?
     A.   I know that he exposed himself to the -- to
four young girls.  Other than that, I don't know what

Page 117

1   else.
2       Q.   Do you know whether --
3       A.   Well, four young girls.  There was four
4   counts.
5       Q.   Do you know whether he masturbated in front
6   of those girls?
7       A.   I don't know that.
8       Q.   And this is all based on what David told
9   you; am I right?
10      A.   That's correct.
11      Q.   You hadn't done anything to independently
12  verify that history as of this point; is that correct?
13      A.   That's correct.
14      Q.   Is it your custom and practice to review a
15  patient's chart before you visit with him or her?
16      A.   Not usually.
17      Q.   Why not?
18      A.   Because you're taking the history, and then
19  you can always refer back to it if you need to.
20      Q.   Okay.  I should be careful.  When you --
21  when you're doing -- when you're visiting a patient
22  for the first time, you don't necessarily do that; is
23  that correct?
24      A.   That's correct.
25      Q.   When you see the patient subsequently, do

Page 118

you look back at the previous visits to see what the
status is?
    A.   Yes.
    Q.   Okay.  And that was your custom and
practice?
    A.   Yes.
    Q.   Under Comprehensive Mental Status Exam,
you've identified your perspective of David and his
behavior; is that correct?
    A.   That's right.
    Q.   Under Diagnosis:  Bipolar I, Alcoholic
Abuse in Remission, with a GAF of 50.
        Did I read that right?
    A.   You did.
    Q.   And you wrote that because that was your
perception and conclusion at that point; is that
correct?
    A.   It was.
    Q.   What's GAF of 50 -- GAF of 50 stand for?
    A.   Global assessment of functioning, meaning
he's gone along with about half the people in the
population as far as his ability to function.
    Q.   Where would I be on that scale?
    A.   Well, you --
        MR. BARRINGER:  Objection; form.

Page 119

1       Q.   (By Mr. Ellison) Go ahead.
2       A.   -- should --
3       Q.   You won't hurt my feelings.
4       A.   You should be in the 90s.
5       Q.   And that's -- everyone should be in the
6   90s, correct?
7       A.   Well, everyone is not in the 90s is the
8   reality.
9       Q.   Fair enough.  Now, under
10  Recommendation/Pharmacologic Management/Plan, you've
11  identified what you think is an appropriate regimen
12  for David; is that right?
13      A.   That's correct.
14      Q.   You thought that the medications he was on,
15  given that he still had mood swings, were not
16  sufficient, correct?
17      A.   Correct.
18      Q.   And you talked with David about Zyprexa,
19  Tegretol, and Seroquel; is that correct?
20      A.   I did.
21      Q.   And if I understood your previous
22  testimony, at least as to Zyprexa and Seroquel, you
23  talked with him about the risks and benefits and
24  alternatives, including the risk of increased
25  appetite, weight gain, diabetes; is that correct?

Page 120

        MR. BARRINGER:  Objection; form.
    Q.   (By Mr. Ellison) You can answer.
    A.   Yes.
    Q.   Tegretol, what's that?
    A.   Tegretol is another anticonvulsant that is
approved and used for bipolar disorder.  It does have
some tendencies towards the anemia like Clozaril does.
It also can increase liver enzymes.  It's a little bit
harsher than, say, Depakote is with the liver enzymes,
and unless somebody's really going to be compliant
with lab work, you just don't want to use it.
    Q.   In that you understand that David was using
Depakote, did you order lab work for him?
    A.   I did.
    Q.   Did that lab work include full blood
workup?
    A.   It did.
    Q.   And that would include glucose readings; is
that correct?
    A.   It did.
    Q.   Now, David reported the sleep issues that
are reflected in your record; am I correct?
    A.   He did.
    Q.   And you talked with him about the
importance of maintaining regular sleep patterns; am I

Page 121

1  right?
2      A.   I did.
3      Q.   And in that regard, you talked about, as to
4  Seroquel, potential sedating effect; is that right?
5      A.   Yes, I did.
6      Q.   As well as management of the mood swings;
7  is that correct?
8      A.   Yes.
9      Q.   So you decided to titrate David on
10  Seroquel?
11      A.   I did.
12      Q.   Up 50 milligrams the first night, 100
13  milligrams the second, 200 the third, 300 the fourth,
14  and then 400 --
15      A.   That's correct.
16      Q.   -- for the next two weeks; is that right?
17      A.   Yes.
18      Q.   And then you wanted to see him again; am I
19  correct?
20      A.   I did.
21      Q.   Was that so that you could see if the
22  medication was working?
23      A.   And if he was having any side effects to
24  it.
25      Q.   As well as if he was tolerating it,

Page 122

1  correct?
2      A.   Right.
3      Q.   Did you give him samples?
4      A.   I don't remember giving him samples.
5      Q.   You think you would have written a scrip --
6      A.   I think he had Medicaid.
7      Q.   Medicaid?
8      A.   Uh-huh.
9      Q.   So you don't need samples?
10      A.   No.  You just write a scrip.
11      Q.   Okay.
12          MR. ELLISON:  She said "uh-huh."
13      Q.   (By Mr. Ellison)  You meant "yes," right?
14      A.   Yes.
15      Q.   I'll miss, too.
16          Do you know who his case manager was at
17  that point in time?
18      A.   You know, I don't.
19      Q.   Fair enough.
20      A.   I don't.
21      Q.   You saw David a couple of weeks later; is
22  that correct?
23      A.   I did.
24      Q.   And that was on October 23rd, 2002; is that
25  correct?

Page 123

1      A.   (No answer.)
2      Q.   Is that correct?
3      A.   That's correct.
4      Q.   And this document that we're looking at is
5  a -- a note from October 23rd, 2002; is that correct?
6      A.   Yeah.  Actually, this note allows me to
7  know exactly how I wrote.  I gave him a pink
8  prescription.
9      Q.   What's that?
10      A.   Pink prescription meant he didn't have
11  insurance, and we had a fund where it came out of
12  Directions For Mental Health's pocket, and they could
13  take it to an Eckerd drugstore, which was within a
14  mile, and get it filled.
15      Q.   Okay.  This document that you're looking at
16  is amidst the documents that we identified as
17  Exhibit 2; am I correct?
18      A.   That's correct.
19      Q.   All right.  Let's go through this.  This is
20  a Psychiatric Progress Note; is that right?
21      A.   It is.
22      Q.   Now, it says:  "Client's a Caucasian male
23  opened here on October 1st, 2002."
24          Did I read that right?
25      A.   Yes.

Page 124

1      Q.   In fact, David had been there before, but
2  the first time you saw him was October 1st, 2002,
3  correct?
4      A.   That's correct.
5      Q.   Now, you note he had "a long-standing
6  psychiatric history with chronic paranoid
7  schizophrenia/schizo-affective/bipolar with history of
8  psychotic features diagnoses throughout his
9  psychiatric history."
10          Did I read that correctly?
11      A.   That's correct.
12      Q.   Again, David had been diagnosed with many
13  mental health conditions; is that correct?
14      A.   He has.
15      Q.   And in that regard, he's hard to classify
16  as well as hard to treat; am I correct?
17      A.   That's correct.
18      Q.   It says:  "He was started on Seroquel,
19  maintained on Depakote, Eskalith, and lithium which
20  has worked very well for him.  He can maintain
21  stability and stay out of institutions."
22          Did I read that correctly?
23      A.   Yes.
24      Q.   All right.  And that's what he reported to
25  you; is that correct?

**Page 125**

1   A.   That's correct.
2   Q.   Further down, it says: "He reports he lost
3   the pink prescription last month, therefore did not
4   get it filled so he's been without medications."
5        Is that correct?
6   A.   That's correct.
7   Q.   This ties in to your noncompliance you
8   described earlier; is that right?
9   A.   Yes.
10  Q.   And David said that "without it, he becomes
11  quite manic, delusional, loud, and boisterous."
12       Is that right?
13  A.   That's correct.
14  Q.   That's what David reports; is that correct?
15  A.   That's right.
16  Q.   But he doesn't always have insight into his
17  behavior; is that right?
18  A.   Not always.
19  Q.   And it says: "He was sitting in the lobby
20  with headphones on singing very loudly."
21       Did I realize that?
22       MR. BARRINGER:  Objection to form.
23  Q.   (By Mr. Ellison) Or strike that.  Did I
24  read that correctly?
25  A.   You did.

**Page 126**

Q.   Do you remember that instance?
A.   No.
Q.   You don't remember what he was singing or
how he was behaving?
A.   No, I don't.
Q.   Further down, it says: "Mental Status
Examination."
     Did I read that correctly?
A.   Yes.
Q.   It says: "A little bit agitated, very loud
in his voice tone, for the most part logical and
goal-directed."
     Did I read that correctly?
A.   You did.
Q.   That was your observation and conclusion on
that date; is that right?
A.   That's correct.
Q.   Then it says: "Admits to perceptual
disturbances."
     Did I read that correctly?
A.   You did.
Q.   What did you mean by that?
A.   Hearing voices and seeing things,
hallucinations.
Q.   And that's what he told you?

**Page 127**

1   A.   That's what he told me.
2   Q.   Did you think he was telling you the truth
3   at that point?
4   A.   I didn't know him well enough to know.
5   Q.   But you recorded it because that's what he
6   told you; is that right?
7   A.   That's what he told me.
8   Q.   Under Assessment, it says: "Chronic
9   Paranoid Schizophrenia versus Schizo-affective."
10       Is that right?
11  A.   Right.
12  Q.   Schizo-affective disorder; is that correct?
13  A.   That's correct.
14  Q.   Does that reflect that at least at that
15  point in time, you still hadn't quite formulated a
16  view in your mind as to what his condition was?
17  A.   That's correct.
18  Q.   And you were considering chronic paranoid
19  schizophrenia versus schizo-affective disorder?
20  A.   Chronic paranoid schizophrenia was by
21  history.  That's what had been in other documentation,
22  as well as the bipolar.
23  Q.   You thought it might also be
24  schizo-affective disorder?
25  A.   I did.

**Page 128**

Q.   What's that?
A.   Schizo-affective is a combination of a
thought disorder with a mood disorder, so it's like
having schizophrenia and bipolar.
Q.   Do these conditions blend in some respects?
A.   They do.
Q.   There's a lot of overlap; is that right?
A.   A lot of overlap.
Q.   And again, this was one of the early times
you had seen David, and you were still trying to -- to
get a good handle on what his condition was; is that
correct?
A.   Second time I'd seen him.
Q.   Under Pharmacological, it says that you
talked with him about treatment and you again
restarted Seroquel; is that correct?
A.   That's right.
Q.   Okay.  I'm trying to get a sense of this.
Is what happened, David started on the medication but
then -- and was doing fine, but then lost the scrip
and went off it?
A.   It's hard to know that he started it
because then he said he'd lost the prescription, --
Q.   Right.
A.   -- so how did he ever start it if he didn't

Page 129

1  get it filled?
2      Q.   Fair enough.  So you're not sure whether he
3  used it at all; is that right?
4      A.   Right.
5      Q.   Yet you wrote -- wrote the phrase
6  "restarted" --
7      A.   Well, I started it before.
8      Q.   Right.
9      A.   Whether he took it or not . . .
10     Q.   Okay.  That's what you meant by that?
11     A.   Yeah.
12     Q.   And you did explain to him that -- that it
13 had sedating effects; is that right?
14     A.   Correct.
15     Q.   Would you have had an additional discussion
16 on this day about potential diabetes?
17     A.   That's with under the risk and benefits.
18 That's part of risk and benefits.  He wanted to focus
19 on the sedation factor because he doesn't like to be
20 sedated.
21     Q.   Do you think it's important that David be
22 sedated?
23     A.   Yes.
24     Q.   On a daily basis?
25     A.   Yes.

Page 130

    Q.   Even today?
    A.   Yes.
    Q.   You say that very quickly, very forcefully.
    A.   Yes.
    Q.   Is there a reason?
    A.   I think he's dangerous.
    Q.   Did you ever give him a sample starter pack
or anything like that that he may have used?  You
don't recall?
    A.   I don't recall.
    Q.   Would you have --
    A.   But if he had the availability to have a
prescription, it would not stand to reason to give him
samples.
    Q.   He --
    A.   That was for people that had nothing.
    Q.   In that he had some coverage and in that
you had written him a scrip, you would not have also
have given him samples; is that right?
    A.   Right.
    Q.   Okay.  I understand.
         Further down, it says you want him to come
in in a month and you note "prevent acute
decompensation."
         Did I read that correctly?

Page 131

1      A.   Right.
2      Q.   What's decompensation?
3      A.   Where he steadily loses his functional
4  ability and probably would end up in the hospital or
5  jail.
6      Q.   And that happens when you stop taking
7  medications; is that correct?
8      A.   Correct.
9      Q.   All right.
10         MR. ELLISON:  Let's take a quick break so
11 we can change the tape.
12         THE VIDEOGRAPHER:  We're off the record at
13 12:24.  This is the end of Tape 1.
14         (Recess from 12:24 p.m. to 12:28 p.m.)
15         THE VIDEOGRAPHER:  We are back on the
16 regard at 12:28.  This is the beginning of Tape No. 2
17 of the deposition of Dee Burke.
18         Q.   (By Mr. Ellison)  Ms. Burke, I should
19 have asked you before:  How did it come to pass that
20 David got assigned to you?
21     A.   I -- I would take the difficult clients, as
22 well as I did have a history of working in the prison
23 system.  So when David came out of prison, he got
24 assigned to me.
25     Q.   And that was the way it was done at

Page 132

Directions; is that right?  For the time that you were
there, based on your experience and history, the
harder clients came to you?
    A.   I got a lot of the harder clients.
    Q.   And David was one of the hardest; is that
fair?
    A.   He was one of them.
    Q.   Now, if I heard you right, during the
break, you said that whenever you met with David, it
was your custom and practice, in addition to having a
case manager -- a case manager in the room with you,
to leave the door open; is that right?
    A.   I left the door open.
    Q.   Is that uncommon, in your experience?
    A.   Very uncommon.  We were always supposed to
see clients with the door closed because of privacy.
    Q.   But David frightened you and the case
manager; is that correct?
    A.   I thought he was very unpredictable.
    Q.   And in that -- does that -- he did frighten
you, didn't he?
    A.   He did frighten me.
    Q.   It was his unpredictability that made him
frightening to you; is that right?
    A.   Right.