Page 133

1   Q.   And it was for your own safety that you
2   left the door open; is that correct?
3   A.   That's correct.
4   Q.   And the safety of your case manager; is
5   that correct?
6   A.   Right.
7   Q. · The next time you saw David was
8   November 20th, 2002; is that correct?
9   A.   23rd, I think.
10   Q.   I got --
11   A.   10-23.
12   Q.   I thought we did that one.
13   A.   Okay.  Then you're talking about 12-18-02?
14   Q.   I've got 11-20-02.
15   A.   Okay.  I don't have that one.
16   Q.   I'm going to mark this separate, then.
17        And forgive the highlighting on this
18   document.  I'm now going to show you what I'll mark as
19   Exhibit 3 which -- I'm sorry.  I misspoke.
20   MR. BARRINGER:  Here.
21   Q.   (By Mr. Ellison)  It was Dr. Desai who saw
22   you [sic] on that date.
23   MR. BARRINGER:  Is that the one you were
24   looking at?
25   MR. ELLISON:  Let me see.

Page 134

1   MR. BARRINGER:  Is that the one you're--
2   referring to?
3   MR. ELLISON:  Yes, sir.
4   Q.   (By Mr. Ellison)  Did you ever talk to --
5   strike that.
6        Who is Sangita, S-A-N-G-I-T-A, Desai,
7   D-E-S-A-I?
8   A.   Sangita Desai was a female psychiatrist at
9   Directions.
10   Q.   Did you ever talk with her about David?
11   A.   No.  We didn't discuss him.
12   Q.   Next time you saw David then was
13   December 18th, 2002; is that correct?
14   A.   That's what I have here.
15   Q.   This is right before Christmas; am I right?
16   A.   Right.
17   Q.   You noted that David is maintained on
18   lithium, Escaline, Depakote, and Seroquel.
19        Did I read that correctly?
20   A.   Lithium, Eskalith, Depakene, and Seroquel.
21   Q.   Depakene is a type of Depakote, right?
22   A.   It is.
23   Q.   It's a trade name?  Am I right?
24   A.   Depakene, I think is a generic; Depakote is
25   the trade.

Page 135

1   Q.   Brand?
2        And it says he does relatively well; is
3   that correct?
4   A.   Yes.
5   Q.   That assessment -- you wrote that because
6   that was your assessment December 18th, 2002; is that
7   correct?
8   A.   Yes.
9   Q.   And -- and that was different from your
10   previous assessment; am I correct?
11   A.   David was doing as well as David could do
12   at the time.
13   Q.   And is it your view that the medications,
14   including Seroquel, helped?
15   A.   Absolutely.
16   Q.   And if it was not your view, you would have
17   changed those medications; is that correct?
18   A.   That's correct.
19   Q.   Then you note he's "unwelcome in multiple
20   shelters."
21        Did I note that correctly?
22   A.   Yes.
23   Q.   And that is the -- the discussion you had
24   with me earlier; am I right?
25   A.   That's correct.

Page 136

1   Q.   Now, under Assessment, you've identified
2   Bipolar I.
3   A.   Yes.
4   Q.   You had concluded as of this date that in
5   fact it was Bipolar I?
6   A.   That's correct.
7   Q.   At least, that that was the best
8   classification you could come up with for his
9   condition?
10   A.   That was the best fit.
11   Q.   You don't have the antipersonality --
12   strike that -- antisocial personality disorder
13   identified there.
14   A.   We typically didn't put in Axis II.
15   Q.   Why?
16   A.   Because you really can't treat it with
17   medications.
18   Q.   There's nothing you can do for someone like
19   that, is there?
20   A.   Right.  I mean, it -- it's information that
21   might benefit the next practitioner, that --
22   Q.   Is your -- I'm sorry.  I'm having a
23   difficult time understanding this.  Is there someone
24   historical who had that disorder whose name you could
25   give me?  Are there any people who are known

Page 137

1 historically as --
2     A.   Adolph Hitler.
3     Q.   Adolph Hitler had the condition that David
4 has?
5          MR. BARRINGER:  Objection; form.
6     Q.   (By Mr. Ellison)  Is that your view?
7     A.   I think so.
8     Q.   Anyone else?
9          MR. BARRINGER:  Same objection.
10    A.   Mussolini, Stalin, --
11    Q.   (By Mr. Ellison)  David --
12    A.   -- Charles Manson.
13    Q.   Charles Manson?  What traits do David and
14 Charles Manson share?
15         MR. BARRINGER:  Objection; form.
16    A.   The -- the total disregard for societal
17 rules in that they will manipulate anyone to get what
18 they want.
19    Q.   (By Mr. Ellison)  Charles Manson is
20 the -- the -- strike that.
21         Who is Charles Manson?
22    A.   He killed several people back in the
23 Eighties -- Sixties?  Sixties.
24    Q.   And --
25    A.   Sharon Tate.  The Sharon Tate murders.

Page 138

1     Q.   And you see David and Charles Manson, based
2 on your care and treatment of David as well as what's
3 been reported about Charles Manson, as having the same
4 characteristics?
5     A.   Except David's not charismatic.
6     Q.   So David would not be as successful as
7 Charles Manson?
8          MR. BARRINGER:  Objection; form.
9     A.   Correct.
10    Q.   (By Mr. Ellison)  But -- but you see them
11 as sharing the same conditions, symptoms, and
12 motivations; is that right?
13    A.   Yes.
14         MR. BARRINGER:  Objection; form.
15    Q.   (By Mr. Ellison)  Further down under
16 Pharmacological, it says:  Risks, benefits, alternatives
17 discussed to include maintaining the medications he was
18 on; is that right?
19    A.   That's correct.
20    Q.   And as of that date, it was Seroquel 400
21 milligrams at bedtime; is that correct?
22    A.   That's correct.
23    Q.   Pretty much to help him sleep, right, as
24 well as maintain his bipolar --
25    A.   I'd say it was much more than to help him

Page 139

1 sleep.
2     Q.   If it were to help him sleep, it would have
3 been a lot lower than 400 milligrams, correct?
4     A.   I don't use it off label like that.  I
5 would have used a sleeping medication.
6     Q.   So you weren't prescribing Seroquel to help
7 David sleep.  You were prescribing it to help maintain
8 his bipolar; prevent the mood swings or at least
9 reduce the mood swings, and explaining to David that
10 it might make him drowsy?
11    A.   Right.  In the beginning.
12    Q.   Okay.
13    A.   They adjust to it.
14    Q.   So the drowsiness goes away?
15    A.   Yes.
16    Q.   The next time you saw David was on January
17 16th, 2003; is that correct?
18    A.   Yes.
19    Q.   It's a couple of weeks later, about a month
20 later; is that right?
21    A.   Right.
22    Q.   And take a look at the history and how he
23 presents.  He's doing good; is that right?
24    A.   He was doing fairly well.
25         MR. BARRINGER:  Objection; form.

Page 140

1     Q.   (By Mr. Ellison)  As well as David does; is
2 that right?
3     A.   Yes.
4     Q.   And in your view, that was because of the
5 medications he was on; is that correct?
6     A.   Yeah.  One of the best ways to ascertain if
7 David was doing better was his speech.
8     Q.   When he --
9     A.   Because he would always be extremely loud
10 with being, you know, rowdy.  And his use of the
11 language would be a little bit off color when he was
12 not doing well.  And in this -- this point, his speech
13 is normal.
14    Q.   What do you mean by "off color"?
15    A.   Derogatory, cursing.
16    Q.   What's pressured speech?
17    A.   Almost like, with David, he would actually
18 spit.  Spit would be coming out of his mouth as he --
19 as he talks.
20    Q.   Because of just, he's got a lot of saliva,
21 or is he talking so fast --
22    A.   No, it's just -- right.
23    Q.   I note that you said he denies obsessive,
24 intrusive, and persistent thoughts or compulsive
25 ritualistic acts.  Did I read that correctly?

Page 141

1    A.   You did.
2    Q.   Why would you -- would you ask David about
3  that sort of feeling and behavior?
4    A.   Yeah.  You're asking for
5  obsessive-compulsive disorder, anxiety disorders.
6    Q.   So it's part of the differential diagnosis;
7  is that right?
8    A.   Part of the differential diagnosis.
9    Q.   Again, you know bipolar disorder,
10  Bipolar I; is that right?
11    A.   Right.
12    Q.   And you're confident, at least as of this
13  date, that that's the best classification that the
14  DSM-IV has?
15    A.   Yes.
16    Q.   Further down under Instructions/
17  Recommendations, you note that David's still stable;
18  is that correct?
19    A.   "States he continues to be stable."
20    Q.   And that was your observation at that time;
21  is that right?
22    A.   Right.
23    Q.   And then further:  "Feels his medications
24  are okay from him -- for him, and keeps him out of the
25  hospital and jail."

Page 142

Did I read that correctly?
1    A.   That's right.
2    Q.   That's what David told you; is that right?
3    A.   Right.
4    Q.   That's why you recorded it; is that
5  correct?
6    A.   Right.
7    Q.   And was that your perception as well, that
8  his medications were okay for him?
9    A.   Yes.
10    Q.   And that his medications, including
11  Seroquel, were keeping him out of the hospital and
12  jail?
13    A.   Correct.
14    Q.   And that's why you prescribed them; am I
15  right?
16    A.   Right.
17    Q.   And you think, in retrospect, that was the
18  right thing to do; am I right?
19    A.   I do.
20    Q.   Further down it notes that -- and again,
21  you had the same discussion with him about his
22  medications, appetite, increased weight gain, diabetes
23  on this January two-thousand and third visit as you
24  did with all the prior visits; is that correct?

Page 143

1    A.   Every visit.
2    Q.   So I don't need to ask you about that
3  anymore, correct?
4    A.   No, that is -- that is routine with me.
5    Q.   All right.  Then it notes "lab work
6  ordered."  Is that correct?
7    A.   That's correct.
8    Q.   That was to monitor the lithium and
9  Depakote levels; is that right?
10    A.   As well as your lipids, your
11  cholesterol, --
12    Q.   And glucose, right?
13    A.   -- glucose, potassium, sodium.
14    Q.   What -- one of the issues with lithium is
15  that lithium can actually kill you if you get too
16  much; am I right?
17    A.   That's right.
18    Q.   It's called lithium toxicity; is that
19  right?
20    A.   That's correct.
21    Q.   Another thing you were checking was the --
22  whether there was enough lithium in David to be
23  therapeutic; is that right?
24    A.   That's correct.
25    Q.   So it was important to monitor that blood

Page 144

on a regular basis to make sure that you weren't going
to kill him, but that you were giving him enough to
treat him; is that right?
    A.   Right.
    Q.   And so David had, during the course of your
care and treatment, regular blood work ordered; is
that right?
        MR. BARRINGER:  Objection; form.
    Q.   (By Mr. Ellison)  You gave it --
    A.   David wasn't compliant with it.  It was
ordered.
    Q.   My question was a little different.
        That was it.  I asked you, you had ordered
it; is that right?
    A.   It would be ordered, yeah.
    Q.   And it was up to David whether he complied
or not; is that correct?
    A.   Correct.
    Q.   And he didn't; is that right?
    A.   Correct.
    Q.   Did you mention Tracy Mahaney as one of his
case workers?
    A.   Tracy was a supervisor.
    Q.   Okay.  What's the distinction?
    A.   She supervised the other case managers.

Page 145

1  She was not his direct case manager, but she might be
2  the case manager on call.
3      Q.  I see.
4      A.  And if he was unhappy with the current case
5  manager, then he would call her.
6      Q.  I see.  So she dealt with problems as well
7  as covered for others; is that right?
8      A.  Correct.
9      Q.  And that's why occasionally, we might see
10  Tracy's name and records in amongst the file that you
11  brought, which we've marked as Exhibit 1; is that
12  right?
13      A.  Correct.
14      Q.  Okay.  I believe the next time you saw
15  David was on March 13th, 2003.
16      A.  Right.
17      Q.  You check Exhibit 2?  Is it -- is that, in
18  fact, the right date?
19      A.  It is.
20      Q.  Do you have that record in front of you?
21      A.  I do.
22          MR. ELLISON:  Do you have it, Bob?
23      Q.  (By Mr. Ellison)  At the top, it says:
24  "His labs in February showed a low lithium and
25  Depakote level."

Page 146

1      Is that correct?
2      A.  Yep.
3      Q.  So that time, David, in fact, actually did
4  get his labs; is that right?
5      A.  He did.
6      Q.  Now, that wasn't -- that was based on your
7  reviewing of his labs, not something that David
8  reported to you; is that correct?
9      A.  Correct.
10      Q.  That entry, I should clarify.  Correct?
11      A.  Right.
12      Q.  And you identified, the next line -- I --
13  I -- well, I'll read the next line:  "David has a
14  long-standing psychiatric history, history of
15  noncompliance, and long history of complaints about
16  services."
17          Did I read that correctly?
18      A.  That's right.
19      Q.  That was based on both the records as well
20  as your understanding of him, right?
21      A.  Right.
22      Q.  And then it says:  "And at times being less
23  than honest regarding the circumstances he complains
24  about."
25      Is that right?

Page 147

1      A.  Right.
2      Q.  What do you -- and that was your
3  observation and conclusion as of that time; am I
4  right?
5      A.  Right.
6      Q.  What do you mean by "long history of
7  complaints about services"?
8      A.  He had fired his case managers in
9  Directions more than once, in this record, since the
10  1980s, I think, as well as complained about when he
11  was incarcerated, with his treatment there.
12      Q.  And in your view, those complaints weren't
13  true?
14      A.  I don't think they were all true.
15      Q.  Do you think David complained about
16  services to try to get people in trouble?
17      A.  I -- I think David would complain -- no, I
18  don't think he was trying to get people in trouble.
19      Q.  What do you think he was trying to do, if
20  anything?
21      A.  Get his way.
22      Q.  He didn't care whether someone got in
23  trouble or not?
24      A.  Right, that -- yeah.
25      Q.  He wanted his thing?

Page 148

1      A.  Right.
2      Q.  Okay.  So in order to try to get someone in
3  trouble, you would actually have to care about that
4  other human being; is that right?
5      A.  Absolutely, right.  Right.
6      Q.  And in your view, David simply doesn't care
7  about other human beings; is that correct?
8      A.  Right.
9      Q.  Further down, it says:  "As this ARNP" --
10  that would be you; is that right?
11      A.  That's right.
12      Q.  In fact, it's your signature on the bottom
13  of this document as well as the others that we've been
14  looking at; is that correct?
15      A.  Right.
16      Q.  "-- started to discuss his lab work with
17  him," -- and that was to explain to him that the
18  levels were too low?
19      A.  Right.
20      Q.  "-- he quickly escalated, became verbally
21  aggressive, and stated many times he was not going to
22  be a -- a guinea pig."
23          Did I read that correctly?
24      A.  Right.
25      Q.  Do you recall this incidence?

Page 149

1   A.  Oh, yeah.
2   Q.  Explain what happened, to the best of your
3   memory.
4   A.  He went from zero to a hundred immediately.
5   I mean, there was just no warning, no anything.
6   Q.  Had you seen David do that before?
7   A.  Out in the lobby or, you know, heard about
8   it, like with, downstairs -- we were on the second
9   level, so, you know, downstairs, you would hear about
10  him in the parking lot.  Or I'd hear from the case
11  managers when they would try and go to his home or
12  when he was in between places that he lived.  He had a
13  long history of knowing that he was difficult.  When
14  he was in Morton Plant Hospital, Yolanda from over
15  there would be calling and saying, you know, he was
16  difficult over there.
17      So it wasn't just in our facility.  He was
18  difficult in multiple facilities.
19  Q.  This was the first time you had witnessed
20  it firsthand?
21  A.  First time in my office that he had gone so
22  ballistic.
23  Q.  Were you glad Terry was there?
24  A.  Oh, yeah.
25  Q.  Do you think if Terry weren't, something

Page 150

would happen?
    A.  I think the chances would have been higher
for something to happen.
    Q.  By "something," what do you think may have
happened?
    A.  I think he --
        MR. BARRINGER:  Objection; form.
    A.  My fear, my office have a lot of plants, and
I collect lighthouses, different things.  I think he
might have destroyed the office.  I think that he
might have actually even hit me.
    Q.  (By Mr. Ellison) And further, it says:
"He started making derogatory remarks about Terry
Wallace, who is his case manager, and stated he
wanted to fire us all."
        Did I read that correctly?
    A.  Yep.
    Q.  Do you remember what the derogatory remarks
were?
    A.  Terry was African American.  So he was
using the N word, telling him he was worthless, that
he had never done anything for him, that he doesn't
help him, that he might as well not even be a case
manager, doesn't know why Directions even employed
him.  I mean, it's -- it went on and on.

Page 151

1   Q.  "He wanted to go to 'Dr. Karl Jones, not
2   some nurse practitioner that didn't know what she was
3   doing.'"
4       Did I read that correctly?
5   A.  Yep.
6   Q.  That's in quotes.
7   A.  That was his words.
8   Q.  And the reason you wrote that is because
9   that's what he said; is that correct?
10  A.  That's correct.
11  Q.  Is that one of the demeaning comments that
12  you were describing earlier?
13  A.  No, no.
14  Q.  They were worse?
15  A.  Well, he'd called me a bitch.
16  Q.  To your face?
17  A.  Yeah.
18  Q.  Anything else?
19  A.  Huh-uh.
20  Q.  Why would he call you that?
21  A.  Because I wasn't paying attention to him, I
22  guess, so he thought.
23  Q.  So he would do that, in your view, to get
24  attention?
25  A.  Oh, I think he was just angry.  He knew

Page 152

that --
    Q.  He just didn't care?
    A.  Yeah, he didn't care.  I wanted to increase
his lithium and he didn't want it increased.
    Q.  Anything else you remember about this
discussion, quote, unquote, with David on that day?
    A.  He fired us all.
    Q.  And left?
    A.  No.  Terry went and got the form where, you
know, you're stating that you don't want services
anymore.
    Q.  And that is included in the records --
    A.  Right.
    Q.  -- that you provided; isn't that correct?
    A.  Right.  And I -- and I explained to him
that, you know, I would give him enough medication so
that he could get his next appointment and that he was
not going to be allowed to return.
    Q.  And did he --
    A.  And at that point, he was not supposed to
be allowed to return to Directions.
    Q.  And -- and that's notwithstanding being
what you described earlier, as a class member; is that
correct?
    A.  Right.

Page 153

1    Q.   How -- how could he -- he was subsequently
2    seen at Directions, correct?
3    A.   He was.
4    Q.   How could that happen?
5    A.   He was put back into my schedule and --
6    Q.   Were you happy to have David?
7    A.   Absolutely not.
8    Q.   Why not? For the reasons you've described?
9    A.   Because I had been told I would never have
10   to treat him again and that he would --
11   Q.   Were you happy?
12   A.   No.
13   Q.   No, when you heard you didn't -- he
14   wouldn't treat you -- strike that.
15        I cut you off. Forgive me.
16        Were you happy when you -- when he walked
17   out, having fired you?
18   A.   Not happy. Just -- it was -- it was --
19   Q.   Were you relieved in that --
20   A.   Yeah, I was relieved.
21   Q.   -- that you wouldn't have to treat him
22   anymore?
23   A.   Right.
24   Q.   Did you feel safer?
25   A.   He just ties up a lot of time that goes

Page 154

nowhere. It's just fruitless. So I don't know
that -- safer? I can't say that I felt safer.
     Q.   I see what you're saying.
          You felt like you were spinning wheels when
dealing with David, right?
     A.   Exactly. It was time that could have been
well-spent with somebody who really needed the help
and was willing to follow a treatment plan and wanted
to be helped.
     Q.   Did you see David --
     A.   It wasn't somebody just sucking resources.
     Q.   Did you see David as beyond redemption?
     A.   Yeah.
     Q.   You said "sucking resources." David does
not care what he's taking away from other people as
long as he gets it; isn't that correct?
     A.   Right. Right.
     Q.   I said "beyond redemption." Do you believe
David is unredeemable?
     A.   I don't think David will ever get better.
     Q.   I guess that's it, plain and simple.
     A.   Yeah.
     Q.   He refused treatment, refused to sign the
form. You sent him off with the scrips --
     A.   I did.

Page 155

1    Q.   -- and said goodbye?
2    A.   I did.
3    Q.   Now, none of the treatment plans are in
4    there, but I am going to show you a record that's
5    dated March 13th, 2003, which I have highlighted.
6         MR. ELLISON:  Bob, if you want me to, I'll
7    mark it separate, but I'll -- I should be able to
8    identify it sufficiently so that that's not necessary.
9    Q.   (By Mr. Ellison)  You see that date on
10   the bottom, which is highlighted?
11   A.   I do.
12   Q.   And that's your name under
13   Physician/Licensed Practitioner; is that right?
14   A.   It is.
15   Q.   And at the top, it says Treatment Plan
16   Review/Addendum; is that right?
17   A.   Uh-huh.
18   Q.   And then -- yes?
19   A.   Yes.
20   Q.   And then there's, underneath
21   Discharge/Transfer Plan, there is a lot of language
22   there; is that right?
23   A.   There is.
24   Q.   Will you read that, please.
25   A.   "David was given his lab results. He would

Page 156

not agree on a plan of treatment. Became threatening,
was loud verbally. He was given a prescription with
two refills and wants to go to Dr. Jones."
     Then he refused to sign the treatment plan.
     Q.   Based on what you described, you were
diplomatic in this treatment plan; is that right?
     A.   I thought I was.
     Q.   Is there -- strike that.
          MR. ELLISON:  I'm going to mark that
document, just for everyone's convenience, as
Exhibit No. 4. And again, the highlights on this are
mine.
          (Dee Burke Exhibit 4 was marked and is
attached hereto.)
     Q.   (By Mr. Ellison)  You did, in fact, see
David again; is that right?
     A.   I did.
     Q.   I should ask:  Was there ever a time when
you spoke to David on the phone that isn't reflected
in these records?
     A.   I don't talk to patients on the phone.
     Q.   It's the case managers that will deal with
that; is that right?
     A.   Right, or the medical assistants.
     Q.   Do you ever recall David talking about

## Page 157

1  having stomach problems during the time you were
2  treating him?
3  A.  I don't recall it but --
4  Q.  May have happened, just don't remember?
5  A.  Yeah.
6  Q.  If it's reflected in the records, you would
7  have no reason to dispute it?
8  A.  Right.
9  Q.  You don't remember David, in any particular
10  case, talking about that?
11  A.  I don't remember that.
12  Q.  Don't remember David ever talking about
13  being hospitalized because of stomach problems?
14  A.  I don't remember it.  I saw it in the
15  record.
16  Q.  And is this the record that we're talking
17  about?  You next saw David on December 19th, 2003; is
18  that correct?
19  A.  I don't have that one.  I have
20  December 20th, 2005.
21  Q.  I did it again.  That's Carol Corell.
22  It does appear that the next records on
23  that -- do you have an understanding of when David
24  came back to Directions?
25  A.  No.

## Page 158

1  Q.  Did you hear at some point, did you hear
2  "David Haller is back"?
3  A.  We were always hearing about David Haller.
4  Q.  What do you mean?
5  A.  He was -- he was -- the name just popped up
6  frequently because of the number of phone calls to the
7  agency.
8  Q.  Everyone in the office knew who David was?
9  A.  Right.
10  Q.  Anyone like him?
11  MR. BARRINGER:  Objection; form.
12  A.  That's -- yeah, that's not fair.  Do I have
13  to answer that?
14  Q.  (By Mr. Ellison)  If you want, I'll
15  withdraw it.  You want me to?
16  A.  Yeah.
17  Q.  You're reluctant to answer that question
18  because you think it's not professional for --
19  A.  I don't think we should -- it's not
20  professional.  We're not here to like or dislike any
21  of them.
22  Q.  Fair enough.  Was everyone afraid of him?
23  A.  Terry wasn't.  Terry went to Homeland
24  Security.  He was a big guy.  He wasn't afraid of him
25  at all.

## Page 159

1  Q.  Apart from Terry who -- strike it.
2  Terry, the case manager; is that right?
3  A.  Right.
4  Q.  And he is currently serving our country in
5  the Department of Homeland Security; is that correct?
6  A.  That's correct.
7  Q.  Were any of the other people who worked at
8  Directions not afraid of David?
9  A.  The female case managers did not like
10  working with David.  They felt threatened.  They felt
11  that they were at risk.
12  Q.  And the nurse practitioners as well?
13  A.  Not Carol, but Nicole.
14  Q.  Okay.  I'm looking at a record that's dated
15  November 12th, 2004, that discusses how David owns a
16  TiVo.  Do you know anything about that?
17  A.  No.
18  Q.  David never talked about how he spent the
19  money that Directions gave him or that he got from the
20  Government?
21  A.  No.
22  Q.  No?
23  A.  Not with me.
24  Q.  It's not your record.
25  A.  Yeah.

## Page 160

1  Q.  It's just among the records that -- that
2  Bob and I were provided in connection with your
3  deposition.
4  David ever talk to you about the legal
5  system?  Did he ever read from law books or quote?
6  A.  He told me that he was known as "the
7  attorney" when he was in prison.
8  Q.  Who told -- David told you that?
9  A.  Uh-huh.
10  Q.  Did he -- yes?
11  A.  Yes, he did.
12  Q.  Did David tell you anything else in that
13  regard?
14  A.  No.
15  Q.  Did he tell you whether he was engaged in
16  any correspondence course --
17  A.  He didn't tell me.  I just read that he
18  took a paralegal course.  I didn't remember that.
19  Q.  Did he ever talk with you about him
20  becoming a paralegal?
21  A.  No.
22  Q.  Do you see David as a lawyer?
23  A.  No.
24  Q.  If you were asked by the Florida Bar
25  licensing authority as to whether David could be a

Page 161

1  lawyer in the state of Florida, would you have a view
2  on that subject?
3      A.   I'd say no.
4      Q.   And why not?
5      A.   I don't think that he would be competent to
6  be an attorney.
7      Q.   When David would talk about the law, would
8  he quote large passages at you?  Would he -- strike --
9  oh, I should leave it the one question.
10         Would he quote large passages at you?
11     A.   I don't know about large passages, but he
12  would quote passages that didn't always ring true.  I
13  think he misquoted or manipulated it.
14     Q.   Did you see -- did David ever talk with you
15  about applying for disability or about filing lawsuits
16  against people?
17     A.   He was always suing.  He -- talking about
18  suing.  He was always talking about suing.
19     Q.   Do you know whether he actually filed
20  lawsuits before this one?
21     A.   Not that I'm aware of.
22     Q.   May have, just don't know?
23     A.   Yeah.  I don't know.
24     Q.   Wouldn't surprise you?
25     A.   Wouldn't surprise me.

Page 162

1      Q.   All right.  Let's look at the -- the next
2  visit you had with David is December 20th, 2005; is
3  that correct?
4      A.   Uh-huh, right.
5      Q.   It says:  "This is a 44-year-old white male
6  who has been a client here at Directions For Mental
7  Health since off and on for a number of years."
8          Did I read that correctly?
9      A.   That's right.
10     Q.   Did you talk with anyone before -- about
11  David before you saw him again?
12     A.   Yes, I did.
13     Q.   Who?
14     A.   James Zenel.
15     Q.   That was your supervisor, right?
16     A.   Yes.
17     Q.   Do you recall that discussion?
18     A.   Yes, I do.
19     Q.   Where did it occur?
20     A.   In his office.
21     Q.   When?
22     A.   The day before.  I don't know.  It was
23  right before I signed.
24     Q.   Right around --
25     A.   Because I had seen that he was on my

Page 163

1  schedule.
2      Q.   And who filled out your schedule?
3      A.   Oh, the front office people.
4      Q.   They would get the call, they would plug
5  them into the computer, and then you would have access
6  to your computerized schedule; is that right?
7      A.   Right.
8      Q.   And lo and behold, you are looking at
9  tomorrow, and you see David Haller's name on it?  Is
10  that what happened?
11     A.   Yes.
12     Q.   And then what did you do?
13     A.   I went to James Zenel.
14     Q.   How did you feel?
15     A.   I was angry.
16     Q.   Why?
17     A.   Because he had told me I would never have
18  to treat David again, in 2003.
19     Q.   And even though two years had passed, you
20  were still that angry?
21     A.   Yep.
22     Q.   And that was because David was that
23  difficult?
24     A.   Yes.
25     Q.   Was there anyone else present in that

Page 164

1  discussion you had with Dr. Zenel?
2      A.   No.  That was behind closed doors.
3      Q.   How long did it last?
4      A.   It was a good 30 minutes.
5      Q.   Tell me everything you remember about that
6  discussion.
7      A.   And I like Dr. Zenel.  This is not
8  personal.
9      Q.   Understood.
10     A.   I -- I went to him and asked him why David
11  Haller was back on my schedule, and he didn't have a
12  reason why he was back on my schedule.  And I went
13  back through the visit in 2003 where he had threatened
14  me, threatened Terry Wallace, and that he had told me
15  I would never have to deal with David again.
16     Q.   Did you threaten to quit?
17     A.   No.  No.
18         And he just -- he told me, he said, "Well,
19  that's a long time ago.  I really don't remember it."
20  And I told him that then his word meant nothing,
21  because he had promised me I would never have to deal
22  with David again.
23     Q.   Was that important to you?
24     A.   Yeah, it is.
25         So he apologized, and he says, "What do you

Page 165

1  want me to do?" And I said, "Give him to Don."
2     Q.   Don Davis?
3     A.   Yeah.  Because he's a male.  And I felt
4  that David really should be with a male.
5     Q.   Why?
6     A.   Because then he doesn't pull his antics,
7  usually, when he's with another male.
8     Q.   Do you -- was it your view that David was
9  demeaning to women, in particular?
10    A.   Oh, yes.  Yeah.
11    Q.   In what way?
12    A.   I don't think he has any regard for women.
13 He doesn't -- I don't think that --
14    Q.   I under- -- I'm --
15    A.   -- he considers them even human beings.
16    Q.   All right.  So men -- well, I'm confused.
17 My understanding, from your testimony earlier, was
18 that David has no regard for humans, period.
19    A.   That's true.
20    Q.   And he has, if I understand you correctly,
21 less regard for women?
22    A.   That's true.
23    Q.   So in your view, David perceives women as
24 subhuman?
25    A.   I don't -- I don't think he views them as

Page 166

1  anything but trash.
2     Q.   Okay.  And in that regard, you thought that
3  a male might at least be more capable of communicating
4  with David in a way that David was capable of
5  understanding?
6     A.   I think that David would be less likely to
7  try to intimidate a male.  I don't think that a male
8  would make it any more likely that he'd be compliant
9  or listen, because he had already proven that with
10 Terry Wallace in my office.  And yet at the same time,
11 he was very racial and Terry was African American, so,
12 I mean, I --
13    Q.   Was he racial to Terry's face?
14    A.   Oh, yes.  Yes, he was.
15    Q.   But he never threatened Terry physically?
16    A.   No.  Terry was a big guy.
17    Q.   Terry could have taken him out if he needed
18 to?
19    A.   Yeah.  David's a big guy, or used to be.
20 When I knew David, he was fair-sized.
21    Q.   David was overweight the entire time you
22 saw him; isn't that right?
23    A.   Absolutely.
24    Q.   Obese from the time you first saw him?
25    A.   Absolutely.  And if you look at the record,

Page 167

1  his cholesterol and his triglycerides were high the
2  entire time before he ever started these meds.
3     Q.   Do you question how David could possibly
4  sue AstraZeneca claiming that AstraZeneca was
5  responsible for his diabetes?
6     A.   I do question that.
7     Q.   Do you think it's wrong?
8     A.   Yes.
9     Q.   In your view, Seroquel has absolutely
10 nothing to do with his diabetes, correct?
11    A.   I don't think it's got a thing to do with
12 it.
13    Q.   That's based on your experience as well as
14 your knowledge of David and the treatment and care of
15 him?
16    A.   Correct.
17    Q.   What else do you remember about that
18 conversation with Dr. Zenel?
19    A.   He just told me to please go ahead and do
20 the evaluation and then pass him on to somebody else.
21 And I told Dr. Zenel that he very well knew me at this
22 point in time, that I don't do that.  Just because
23 someone's difficult, you don't pass that on to your
24 peers, but that if he -- if I was going to have to
25 take him back, that this time, he was going to comply

Page 168

1  with the treatment program or be gone.  And he needed
2  to agree to that, class member or not.
3     Q.   And that was reflected in the record that
4  you made of the visits you had with David on
5  December 20th, 2005; is that correct?
6     A.   It was, yes.
7     Q.   Now, this is the final record.  Before I
8  get into the text of this, it's your understanding you
9  likely provided care and treatment for David in 2006?
10    A.   I think so.  I -- you know --
11    Q.   You just have no record of that?
12    A.   I don't have any record of it.
13    Q.   I'm going to ask you:  If -- if it so
14 happens that you somehow come across any such record,
15 will you either let Bob -- well, better yet, will you
16 let Brown and Greer know that you have that record and
17 provide it to them?
18    A.   I would.
19    Q.   We -- like I said, we've been surprised,
20 throughout the course of this litigation, how things
21 have been coming in to the -- the lawyers in terms of
22 documentation.
23         Do you know who saw David after you?
24    A.   Nicole.
25    Q.   Okay.  Did you ever talk with Nicole about

Page 169

1  treating David before you left?
2      A.   Just the one time where he had frightened
3  her.
4      Q.   That's the only time?  You never went in
5  and said, "Hey, I need to give you the heads up about
6  this guy"?
7      A.   They always had the record.  The charts
8  were on your desk.
9      Q.   Okay.  So if she had questions, she could
10  come and say, "Boy, I was looking at this December
11  visit from 2005.  I wanted to talk with you about this
12  guy."  Right?
13     A.   Right.
14     Q.   Let's go back to the record, 12-20,
15  two-oh-five.  You have that in front of you?
16     A.   I do.
17     Q.   And, in fact, it's your signature on the
18  second page of this two-page document; is that
19  correct?
20     A.   Right.
21     Q.   It says: "The client was in St. Anthony's
22  and was just recently discharged."
23         St. Anthony's is what?
24     A.   It was a large tertiary hospital in
25  St. Pete.

Page 170

1      Q.   ALF, which, is in the next line, is
Assisted Living Facility?
2      A.   Right.
3      Q.   It says: "He states he does not want to be
at the ALF he was in, so he threatened suicide."
4         Is that right?
5      A.   Correct.
6      Q.   "He admits that he was not actually
suicidal but he was hoping they would not accept him
back."
7         Did I read that correctly?
8      A.   You did.
9      Q.   Did David tell you how he tried to fake his
suicide, as it were?
10     A.   I don't remember that.
11     Q.   Do you recall anything about David taking a
drug overdose?
12     A.   I don't.  I don't.
13     Q.   Did you believe David when he said he was
not really trying to commit suicide?
14     A.   Absolutely.
15     Q.   You see -- saw his story as just another
one of his ways of trying to manipulate people to get
his way?
16     A.   Right.

Page 171

1      Q.   It says: "Client states he is on Seroquel
2  300 milligrams."
3         What's QHS stand for?
4      A.   Every hour of sleep, meaning every night.
5      Q.   That's nighttime, right?
6      A.   Right.
7      Q.   And he's also getting Risperdal Consta.
8      A.   Right.
9      Q.   Risperdal Consta is an injectable form of
10  Risperdal; is that correct?
11     A.   It is.
12     Q.   And it too is an atypical antipsychotic; is
13  that right?
14     A.   That's correct.
15     Q.   And it too carries a risk, a risk, of
16  increased appetite, weight gain, diabetes, correct?
17     A.   Correct.
18     Q.   And then it says: "He thinks his last
19  injection was two weeks ago."
20         Is that correct?
21     A.   That's right.
22     Q.   Now, you did not initiate the prescription
23  for Risperdal Consta, did you?
24     A.   No.
25     Q.   It says, further down, that David was

Page 172

treated by Dr. Leyva, L-E-Y-V-A.
       Did I read that correctly?
   A.   That's correct.
   Q.   And "she is a pain in the butt."
       Did I read that correctly?
   A.   That's right.
   Q.   That's what David told you; is that right?
   A.   Right.
   Q.   And that's why you recorded it; am I right?
   A.   That's correct.
   Q.   So was it your understanding that Dr. Leyva
prescribed the Risperdal for him?
   A.   No.  St. Anthony's prescribed it.
   Q.   I see.
   A.   Whoever treated him there, which was
probably Dr. Hemsath.
   Q.   Can you spell that last name, please?
   A.   H-E-M-S-A-T-H.
   Q.   And what type of doctor is Dr. Hemsath?
   A.   He's a psychiatrist.  Randy Hemsath.
   Q.   Thank you.
       It says, further up, in the second
paragraph -- I'm sorry -- the first paragraph under
History: "He states that he has hypertension and is
on multiple medications."

Page 173

1    Did I read that right?
2    A.    Right.
3    Q.    You didn't believe him, so you called the
4  assisted living facility?
5    A.    Well, I also wanted to see what -- what was
6  he on.
7    Q.    What was he really on?
8    A.    You know, which ones are the medications?
9    Q.    "His case manager, Jana Hooper, J-A-N-A,
10  Hooper" --
11    A.    Right.
12    Q.    -- "is with this client per this ARNP's
13  request as this client is well-known to this ARNP and
14  has being abusive towards staff in this facility to
15  include threatening behavior in the past."
16    Did I read that correctly?
17    A.    You did.
18    Q.    And you've described that circumstance
19  fully before; is that right?
20    A.    Correct.
21    Q.    Nothing to add to that?
22    A.    No.
23    Q.    "David states the medications are working,
24  that he is less agitated, his mood is good, and he
25  feels better since starting the injections."

Page 174

1    Did I read that correctly?
2    A.    Correct.
3    Q.    Then you note: "He has only received one
4  injection."
5    A.    Right.
6    Q.    Did I read that correctly?
7    A.    Correct.
8    Q.    Did you have a view as to whether it was
9  the medications he was on before the injection or the
10  injection that were working for him?
11    A.    Typically, Risperdal Consta doesn't start
12  really working until third injection.
13    Q.    So it was your --
14    A.    So I'd have to say the previous meds.
15    Q.    So you were thinking it was the Seroquel
16  that was working?
17    A.    Right.
18    Q.    Further down, under Mental Status: "David
19  is flat, disheveled, overweight."
20    Did I read that right?
21    A.    Uh-huh.
22    Q.    Yes?
23    A.    Yes, you did.
24    Q.    "There have been signs of psychotic
25  process."

Page 175

1    Did I read that correctly?
2    A.    Right.
3    Q.    "Disorganized behavior has been observed.
4  Thinking is tangential. Vocabulary and fund of
5  knowledge indicate cognitive functioning in the
6  borderline range -- range. Insight into illness is
7  poor."
8    Did I read that correctly?
9    A.    You did.
10    Q.    And that was because that was your --
11  strike that. You wrote that because that was your
12  observation and conclusion at the time; is that right?
13    A.    That's correct.
14    Q.    Do you recall what signs of psychotic
15  process had been present at that time?
16    A.    The disorganized thinking.
17    Q.    Along the lines of what we talked about
18  before?
19    A.    Correct.
20    Q.    Further down under Instructions/
21  Recommendations and Plan -- do you see that?
22    A.    I do.
23    Q.    -- it says: "I told this client he must
24  comply with recommendations if he wants to be seen."
25    And that's -- you wrote that because that's

Page 176

what you told him; is that right?
    A.    Exactly.
    Q.    As you described before; am I correct?
    A.    Right.
    Q.    "I then talked to him about the
effectiveness of Risperdal Consta."
    Did I read that correctly?
    A.    Correct.
    Q.    Risperdal Consta is an effective
medication; is that correct?
    A.    It is.
    Q.    Was this -- does this reflect your
discussion that it was probably not the single
injection of Risperdal Consta --
    A.    Correct.
    Q.    Okay.
    A.    As well as he wanted to stop taking
injections.
    Q.    Period?
    A.    Right. And when they get injections, you
can hold them more accountable. You know if they're
showing up for the injections or not.
    Q.    The reason -- or strike that.
    One of the reasons you would prescribe an
injectable medication is because a patient wasn't

## Page 177

1  compliant with oral medication; is that correct?
2    A.  Exactly.
3    Q.  You could actually bring him in there and
4  physically put the medicine in his body; is that
5  correct?
6    A.  That's right.
7    Q.  So you'd know he was taking it; isn't that
8  right?
9    A.  Right.
10    Q.  That's also important in dangerous
11  patients; is that correct?
12    A.  That's correct.
13    Q.  And David was one such patient; am I right?
14      MR. BARRINGER:  Objection; form.
15    A.  He is.
16    Q.  (By Mr. Ellison)  He was and is, is your
17  expectation --
18    A.  He was and is.
19      MR. BARRINGER:  Objection; form.
20    Q.  (By Mr. Ellison)  And then you wrote: "His
21  argument of not being able to get here does not stand as
22  he can take a cab."
23      Did I read that correctly?
24    A.  That's correct.
25    Q.  David came up with an excuse as to why it

## Page 178

1  would be hard for him to get the injections?
2    A.  He did.
3    Q.  And you looked him in the eye and said,
4  "That's not right"?
5    A.  That's correct.
6    Q.  And then you said:  "I also went over that
7  he had just told me that the medications were
8  working."
9      Did I read that correctly?
10    A.  You did.
11    Q.  And that medication you were talking about
12  was Seroquel; isn't that right?
13    A.  Right.
14    Q.  And you told him that on that date; is that
15  correct?
16    A.  I did.
17    Q.  And that's why you wrote that down?
18    A.  Right.
19    Q.  You did recommend that he continue the
20  Risperdal Consta injections; is that correct?
21    A.  I did.
22    Q.  As well as Risperdal twice a day orally; am
23  I correct?
24    A.  That's right.
25    Q.  So he --

## Page 179

1    A.  For 30 days.
2    Q.  For 30 days.
3      As well as other medications; is that
4  correct?
5    A.  Correct.
6    Q.  And then further down, you told David --
7  strike that.
8      It says:  "I told David that as long as he
9  is cooperative and follows recommendations, I will see
10  him, but if he is not, then I won't."
11      Did I read that correctly?
12    A.  You did.
13    Q.  And that -- you wrote that because that's
14  what you told David; is that right?
15    A.  Exactly.
16    Q.  Now, the next page talks about client
17  education.  Beginning on the preceding, it says:  "The
18  client is educated on the indication, dosage, and
19  potential side effects of the medications and gives
20  voluntary, verbal, informed consent."
21      Did I read that correctly?
22    A.  You did.
23    Q.  And if I asked you the same question as I
24  have before about discussions regarding increased
25  appetite, weight gain, and diabetes, your answers here

## Page 180

1  would be the same, correct?
2    A.  Correct.
3    Q.  In other words, you talked about it; David
4  said okay.  Correct?
5    A.  That's right.
6    Q.  "We discussed alternative to treatment to
7  include no treatment."
8      Did I read that correctly?
9    A.  You did.
10    Q.  And what would the alternative to no
11  treatment have been for David?
12    A.  He would have been hospitalized or in jail.
13    Q.  So there really is no alternative to -- for
14  David to -- to treatment?
15      MR. BARRINGER:  Objection; form.
16    A.  They always have a choice.
17    Q.  (By Mr. Ellison)  You -- okay.  Fair
18  enough.
19      David could choose to use medication or
20  David could choose not to use medication, and to be
21  either incarcerated or involuntarily committed; is
22  that correct?
23      MR. BARRINGER:  Objection; form.
24    A.  That was -- that was all documented in the
25  past.

Page 181

1  Q.  (By Mr. Ellison)  And that was your
2  perception and view as -- as of December 2005; is
3  that correct?
4  A.  It was.
5  Q.  Have you seen David since December of 2005?
6  A.  Oh, I -- I probably saw him in the
7  facility.  Like I said, I think I saw him in 2006, but
8  I could be wrong.
9  Q.  You have no record of having any discussion
10  with David since December of 2005; is that correct?
11  A.  That's correct.
12  Q.  And you've not talked to David in a
13  nonprofessional capacity at any point in time; is that
14  correct?
15  A.  That's correct.
16  Q.  You've never sent him a Christmas card or
17  done anything to keep in touch with David, have you?
18  A.  No.
19  MR. BARRINGER:  Objection; form.
20  Q.  (By Mr. Ellison)  You laughed when I asked
21  you if you had ever sent him --
22  A.  Well, that -- that is a huge
23  nonprofessional behavior.  You don't talk to your
24  clients outside of the facility.  You don't have
25  relationships with them.

Page 182

1  Q.  And you would avoid having such a
2  relationship with David; is that correct?
3  A.  Absolutely.
4  Q.  From time to time, do you ever give
5  patients your cell phone number?
6  A.  Never.
7  Q.  And the reason for that is what?
8  A.  Just the boundary issue.  It's totally
9  unprofessional.  They don't need my cell phone number.
10  They have the facility to call if they have problems.
11  Q.  But if a psychiatrist, from time to time,
12  gave out his or her cell phone number to a patient in
13  order to address potential emergencies, you would not
14  have any criticism of that psychiatrist --
15  A.  Yes, I would.
16  Q.  You would?
17  A.  That's what 911 is for.
18  Q.  All right.  So in your view, it's either
19  the office or the emergency; is that correct?
20  A.  That's right.
21  Q.  Fair enough.
22  MR. ELLISON:  Can we take a quick break?
23  MR. BARRINGER:  Let's go off the record.
24  Is that what you want to do?
25  MR. ELLISON:  Yep, yeah.

Page 183

1  THE VIDEOGRAPHER:  We're off the record at
2  1:11.
3  (Recess from 1:11 p.m. to 1:18 p.m.)
4  THE VIDEOGRAPHER:  We're back on the
5  record.  The time is 1:18.
6  MR. ELLISON:  Ms. Burke, I wanted to thank
7  you, and I'm sure my colleague will, as well, for
8  coming in on a Saturday to meet with us.  I know we've
9  covered an awful lot of material.  I'm going to
10  reserve the right to meet with you again and talk with
11  you about any records that we have not received that
12  we might receive in the future because, for the
13  reasons that we've discussed, and -- and Bob and I
14  have discussed, it just seems that we're missing
15  materials, as you acknowledge, that seemed to come
16  from places that we've already gotten what we were
17  told were complete records for.
18  Do you agree with that, Bob?
19  MR. BARRINGER:  I agree.
20  MR. ELLISON:  Subject to that reservation,
21  I'm going to pass the witness at -- at this point in
22  time.  And again, thank you.
23
24
25

Page 184

1  EXAMINATION
2  BY MR. BARRINGER:
3  Q.  Hi, Ms. Burke.  My name is Robert
4  Barringer.  I represent David Haller in a matter in
5  which he has filed a lawsuit against AstraZeneca
6  claiming injuries as a consequence of his taking
7  Seroquel.  Do you understand who I represent?
8  A.  I do.
9  Q.  Okay.  I'm going to unfortunately go over
10  some of the same material.  I mean, obviously, we're
11  working with the same set of documents, but I'm going
12  to try to not ask the same questions.
13  A.  Okay.
14  Q.  So while my delivery of the questions may
15  seem a little disjointed, it's because I -- I'm trying
16  not to repeat ground that's already been covered.  Do
17  you understand that?
18  A.  I do.
19  Q.  If at any time I ask you a question that
20  seems disjointed and you need me to clarify or -- or
21  anything like that, would -- will you let me know?
22  A.  I will.
23  Q.  What kind of nurse practitioner are you?
24  A.  I'm a psychiatric nurse practitioner.
25  Q.  Okay.  Do you, as a psychiatric nurse

Page 185

1   practitioner, do you treat diabetes?
2      A.   I do not.
3      Q.   Do you, as a nurse practitioner, do you
4   diagnose diabetes?
5      A.   I do not.
6      Q.   Do you, as a nurse -- nurse practitioner,
7   functioning as nurse practitioner, and as part of your
8   education, have you become familiar with diabetes?
9      A.   I have.
10     Q.   Okay.  Do you know what Type II diabetes
11  is?
12     A.   I do.
13     Q.   Can you explain to the jury what your
14  understanding of Type II diabetes is?
15     A.   It's insulin-resistant diabetes where the
16  pancreas no longer puts out enough insulin or any
17  insulin at all in order to regulate the glucose.
18     Q.   And although you don't diagnose diabetes,
19  do you know how Type II diabetes is diagnosed?
20        MR. ELLISON:  Form.
21     A.   Through lab work.
22     Q.   (By Mr. Barringer)  Do -- do you know
23  whether or not Type II diabetes is an acute disease?
24        MR. ELLISON:  Form.
25     A.   I'm -- clarify that.  What do you mean,

Page 186

acute?
    Q.   (By Mr. Barringer)  Sure.
    A.   You mean something that's just going to
stay in place for a certain amount of time and leave?
    Q.   Yes, ma'am.
    A.   No.  It stays, although some people do
become where they don't have to take shots anymore if
they lose weight.
    Q.   Do you know whether or not Type II diabetes
is a progressive disease?
    A.   I understand that it's a progressive
disease untreated.
    Q.   Okay.  And -- and you use the term
"untreated."  Do you know whether or not Type II
diabetes is a progressive disease, even if it is
treated?
        MR. ELLISON:  Form.
    A.   I think it can be.
    Q.   (By Mr. Barringer)  What risks are associated
with Type II diabetes -- Type II diabetes, as you
understand it?
        MR. ELLISON:  Form, foundation.
        You can answer.
    A.   Cardiovascular disease, the loss of
eyesight, kidney disease, and death.

Page 187

1      Q.   (By Mr. Barringer)  Do you know whether
2   or not amputations have been associated with
3   suffering -- with one suffering from Type II
4   diabetes?
5      A.   I think there have been.
6      Q.   Are those pretty serious risks, in your
7   opinion as a nurse practitioner?
8      A.   They are.
9      Q.   Prior to prescribing a drug to -- one of
10  your patients, do you weigh the risks associated with
11  the drug of which you are aware against the benefits
12  you hope to achieve by prescribing the drug to the
13  patient?
14     A.   I do.
15     Q.   When you prescribed Seroquel to Mr. Haller
16  on 10-2002, what benefits did you hope to achieve by
17  prescribing Seroquel to him?
18     A.   I hoped for him to have more mood
19  stability, a higher level of functioning within the
20  community, the ability to start making better choices,
21  and to be less risk to society and to himself.
22     Q.   And -- and you again saw Mr. Haller in
23  December of 2005; is that correct?
24     A.   I did.
25     Q.   And had you -- by that point in time, had

Page 188

your assessment changed of Mr. Haller?
    A.   No.
    Q.   Is it important to have accurate
information about the risks associated with the drugs
that you use in order for your risk benefit analysis
to work properly?
    A.   Yes.
    Q.   If your source for information regarding
the risks associated with the drug you prescribed are
downplayed, could that be dangerous for your patients?
    A.   It could.
    Q.   Earlier it was mentioned that -- that you,
on occasion, have been a speaker for two drug
companies named Bristol-Myers and Janssen.
    A.   That's correct.
    Q.   Do you develop the materials for which you
speak?
    A.   No.
    Q.   Okay.  Are those materials provided to you
by the drug companies themselves?
    A.   They are.
    Q.   Have you, on occasion, ever been a speaker
for AstraZeneca?
    A.   No.
    Q.   Do you know how AstraZeneca handles what

**Page 189**

1  information a speaker discusses as it pertains to a --
2  a speaking engagement?
3  MR. ELLISON: Form, foundation.
4  A. Can you repeat that?
5  Q. (By Mr. Barringer) Certainly. Since you
6  have experience speaking on behalf of pharmaceutical
7  companies, my question is --
8  MR. ELLISON: Form.
9  Q. (By Mr. Barringer) Strike that. Is it --
10  MR. ELLISON: Sorry.
11  MR. BARRINGER: That's all right.
12  Q. (By Mr. Barringer) Is it fair to say
13  that you have experience speaking on topics on
14  behalf of Bristol-Myers and Janssen?
15  A. I do.
16  Q. And as your experience as a speaker for
17  those companies, have you come across other
18  individuals who have spoken on behalf of AstraZeneca
19  on various topics?
20  A. I have.
21  Q. Are you familiar with the way that those
22  speakers have acquired the information that they speak
23  about?
24  A. Through the company.
25  Q. And -- and which speakers do you know that

**Page 190**

1  worked for AstraZeneca?
2  A. Kim Latrell and Richard Petty.
3  Q. And -- and how do you know those
4  individuals?
5  A. Through seeing them and meeting with them
6  at the different dinners, as well as Kim Latrell and I
7  both trained with Bristol-Myers Squibb. We were both
8  speakers. And at one point, so was Richard Petty, who
9  is her husband.
10  Q. And no relation to Tom Petty?
11  A. No.
12  Q. Okay. Did you, on occasion, discuss with
13  Ms. Latrell the product Seroquel?
14  A. We've discussed all the atypicals.
15  Q. And you mentioned something called dinner
16  programs. Did you, on occasion, attend dinner
17  programs sponsored by AstraZeneca?
18  A. I have.
19  Q. Do you -- sitting here today, do you recall
20  the number of dinner programs that you have attended
21  that are --
22  A. Less than --
23  Q. -- that have been sponsored by AstraZeneca?
24  A. Less than five.
25  Q. Okay. While you were at Directions For

**Page 191**

1  Mental Health, did you at times have pharmaceutical
2  sales reps visit you in your office?
3  A. We did.
4  Q. At times, during those pharmaceutical sales
5  reps encounters, did they involve a lunch program
6  where you would receive lunch and they would get an
7  opportunity to speak to you?
8  A. Correct. We did.
9  Q. And during those, do you recall how many
10  lunch programs from AstraZeneca that you -- you
11  attended?
12  A. I don't know. There was a lot of times
13  there was lunch programs, and I didn't even know who
14  was sponsoring it.
15  Q. And at these lunch programs, did -- on
16  occasion, are you handed materials, whether it's a
17  clock or a prescription pad or a notepad, from
18  pharmaceutical reps?
19  A. Not usually.
20  Q. Okay. Do -- at times at these meetings and
21  presentations, were you sometimes handled -- handed
22  case studies or studies regarding the medications
23  themselves?
24  A. That would, yes.
25  Q. Okay. Would -- were the drug

**Page 192**

1  representatives one source for information to acquire
2  case studies and -- and -- and studies regarding
3  pharmaceutical products?
4  A. They were.
5  Q. And did you review, on occasion, those case
6  studies and studies handed to you by the
7  pharmaceutical sales rep?
8  MR. ELLISON: Form.
9  A. I did.
10  Q. (By Mr. Barringer) Did you, as a nurse
11  practitioner, receive information directly from the
12  drug companies at times, maybe to your -- your house
13  or through your office address?
14  A. I don't remember getting things directly
15  from the pharmaceutical companies.
16  Q. Do you recall ever receiving any letters
17  regarding warnings about pharmaceutical products from
18  any drug company?
19  A. Not at my home.
20  Q. What about at work?
21  A. We did when olanzapine first started having
22  difficulties. I do remember those.
23  Q. And when -- what year do you recall that
24  olanzapine had those difficulties?
25  A. It was 2001, 2002.

Page 193

1  Q.   Do you recall when warnings regarding
2  Seroquel came out regarding hyperglycemia and
3  diabetes?
4     A.   Very shortly --
5        MR. ELLISON: Form, foundation.
6        Go ahead.
7     A.   Very shortly after that, I do believe.
8     Q.   (By Mr. Barringer) Do you recall any
9  changes to the label that -- to the -- to Seroquel
10 regarding hyperglycemia and diabetes?
11    A.   I do.
12    Q.   Okay. Do you recall when those occurred?
13    A.   No.
14    Q.   Did you -- sometimes people attend
15 continuing medical education courses as part of
16 maintaining their license -- licensure. Did you have
17 to do that in Florida?
18    A.   We did.
19    Q.   Did you ever attend any
20 AstraZeneca-sponsored continuing medical education
21 courses?
22    A.   I go to the psych conference, and different
23 symposiums were sponsored by different drug companies.
24 I'm sure AstraZeneca did some of those.
25    Q.   Do you recall -- you indicated that

Page 194

sometimes, you received free information off of the
Internet. Do you recall that testimony?
    A.   Right.
    Q.   Did you receive any course programs that
you can use to review pharmaceutical product
literature and get CME credit online?
    A.   No. Mine is through continuing education
units. It's not sponsored by any pharmaceutical
company.
    Q.   Okay. Did you ever receive -- strike that.
        Have you ever gone to the AstraZeneca
website with respect to Seroquel on the Internet?
    A.   To download information for the patient.
    Q.   And do you recall when that occurred?
    A.   No.
    Q.   Did that occur in the last two years?
    A.   No.
    Q.   Did that occur in the last --
    A.   It was in the beginning.
    Q.   Did that occur in the last four years?
        MR. ELLISON: Form.
    A.   2000 to 2002, I probably used it.
    Q.   (By Mr. Barringer) Do you ever recall
attending drug company-sponsored, round-table
meetings in which drug companies pay doctors to

Page 195

1  speak regarding a -- a specific topic?
2        MR. ELLISON: Form, foundation.
3     A.   For AstraZeneca or for any --
4     Q.   (By Mr. Barringer) Any -- any of them.
5     A.   Yes.
6     Q.   Okay. Do you recall ever attending such
7  round-table groups on -- involving AstraZeneca?
8     A.   No.
9     Q.   Okay. Do your colleagues -- strike that.
10       The -- the colleagues that you have
11 associated with and that you're -- that you've
12 befriended as a -- a nurse practitioner specializing
13 in psychiatry, do they attend the same conferences
14 typically that you do?
15    A.   Some of them.
16    Q.   Okay. And do they also have pharmaceutical
17 sales reps visit their office, that you're aware of?
18    A.   Yes.
19    Q.   And -- and these are colleagues that go to
20 these round-table discussions?
21    A.   Right.
22    Q.   When you were at Directions For Mental
23 Health, about how many sales representatives would you
24 see on a weekly basis?
25    A.   On a weekly basis?

Page 196

    Q.   Uh-huh.
        MR. ELLISON: In general, Bob, or just --
        MR. BARRINGER: Just in general.
    A.   Ten.
    Q.   (By Mr. Barringer) Do you recall how
many of those office visits involved AstraZeneca
employees on a weekly basis?
    A.   When Bob Costan [phonetic] was our rep, we
saw him at least weekly. After he left, we didn't see
him very often. They'd mail the -- they'd come in and
see how many samples we needed and mail the product.
    Q.   And -- and did you sometimes -- you used
the word "samples." Can you explain to the jury what
a sample is?
    A.   A sample is the actual medication.
Typically, depending on the dosing, is how it's
packaged, so that we can start people on medications,
especially those that don't have any kind of
insurance, until we can get them onto patient
assistance.
    Q.   Okay. And do you recall Bob Costa? Am I
saying his name properly?
    A.   Consta -- Costan, yeah.
    Q.   Constan? Do you remember if Bob Constan
ever provided starter packs? Have you ever heard of

Page 197

1    that term, "starter pack"?
2        A.   We do have starter packs, but I don't think
3    when Bob was the rep, those were available yet.
4        Q.   Okay. When you titrated Mr. Haller from 50
5    to 100 to 200 to 300 and then to 400, how did
6    Mr. Haller obtain the necessary dosage to titrate up?
7        A.   Through a prescription.
8        Q.   Okay. So you wrote a prescription that
9    would allow for one pill of 50, one pill for 100, two
10   pills of 100, I'm assuming, to get 200, and the such?
11       A.   Yeah, right.
12       Q.   Is that the way it would occur?
13       A.   Right.
14       Q.   Okay. And would that have been on the pink
15   sheet with respect to the --
16       A.   It would.
17       Q.   And in your review of the records, did you
18   see your prescription record regarding the pink sheet
19   of Exhibit 1 and 2?
20       A.   You mean a copy of the prescription?
21       Q.   Yes.
22       A.   No.
23       Q.   Okay. At Directions For Mental Health, was
24   there typically a way -- strike that.
25           Did -- at Directions For Mental Health, did

Page 198

1    you typically retain a copy of the prescription that
2    was written and -- and handed to the patient?
3        A.   No.
4        Q.   And -- and is that true for the pink sheets
5    as well?
6        A.   It's true.
7        Q.   Okay. What -- if -- if one were to obtain
8    a medication at Directions For Mental Health that
9    wasn't a pink sheet prescription, how would you have
10   identified it in the record?
11       A.   White. It's pink or white.
12       Q.   Okay. If -- if there -- it says there was
13   an indication for Seroquel, but it does not indicate
14   pink or white, do you know whether or not the patient
15   was attaining it through the pink source or from the
16   white source?
17       A.   There is a way to know, but not on these
18   records.
19       Q.   Okay. And what is the way to know?
20       A.   Through the financial, how it -- how it's
21   being paid for.
22       Q.   Okay.
23       A.   We would be billed by Eckerd, and his name
24   would have popped up on the billing.
25       Q.   Okay. And before you today, you don't have

Page 199

1    any billing records; is that correct?
2        A.   I don't.
3        Q.   Do you -- are you familiar with the way the
4    billing records track who was prescribed a medication
5    and then subsequent -- subsequently went to Eckerd and
6    got it filled?
7            MR. ELLISON:  Form.
8        A.   Clarify that.
9        Q.   (By Mr. Barringer) Sure. I'll withdraw the
10   question.
11           My question is, is:  Are you familiar
12   enough with the billing records to know whether or not
13   they track the actual patient who got the prescription
14   filled?
15       A.   I believe they do.
16       Q.   Okay.
17       A.   I -- I think Eckerd did.
18       Q.   Do you know whether or not when Eckerd
19   invoiced Directions For Mental Health, whether or not
20   it would identify the patient and the prescription?
21       A.   I think it did.
22       Q.   Okay. When you see sales representatives
23   that come out to see you from various drug companies
24   to inform you about important changes to prescribing
25   information for the -- the drug -- strike that.

Page 200

1            MR. ELLISON:  You've been hanging around me
2    too long, Bob.
3            THE WITNESS:  He needs a drink.
4            MR. BARRINGER:  Off the record.
5            (An off-the-record discussion occurred.)
6            THE VIDEOGRAPHER:  Let's go off the record.
7    Off the record at 1:37.
8            (Recess from 1:37 p.m. to 1:39 p.m.)
9            THE VIDEOGRAPHER:  Back on the record at
10   1:39.
11       Q.   (By Mr. Barringer) Do you expect for the
12   sales representatives that come out to see you from
13   the various drug companies to inform you about
14   important changes to the prescribing information for
15   the drug they are promoting?
16       A.   I do.
17       Q.   Do you expect for the drug representatives
18   that come out to visit you to be truthful and to give
19   you balanced information about the drugs they are
20   promoting?
21       A.   I do.
22           MR. ELLISON:  Form.
23       Q.   (By Mr. Barringer) And in my last question,
24   I use the term "balanced." What do you understand that
25   term to mean?

Page 201

1  A.  The risk and the benefits.
2  Q.  What I would like to show you is going to
3  be marked as Exhibit . . .
4     MR. ELLISON: 5.
5     MR. BARRINGER: 5.
6     (Dee Burke Exhibit 5 was marked and is
7  attached hereto.)
8     MR. BARRINGER: Here, I'll let you see it
9  first because I only have one copy.
10    MR. ELLISON: Back atcha.
11  Q.  (By Mr. Barringer)  What I'd like to show you
12  is a document entitled "Managing Weight Gain and
13  Diabetes in Schizophrenia, A Patient Case Study From the
14  files of Michael J. Reinstein, M.D."  It is marked as
15  Confidential.  AZSER 10427473 through 478.
16     Do you recognize this document?
17  A.  No.
18  Q.  Is this, based on your memory and
19  experience of receiving case studies from
20  pharmaceutical representatives, is -- does this format
21  look familiar to you?
22  A.  I'll be real honest with you:  If they gave
23  us case studies, I didn't look at them.
24  Q.  Okay.  Can you go to the -- page 4 of this
25  particular case study?

Page 202

1  A.  Uh-huh.
2  Q.  And it says -- can you read for the record
3  what the Seroquel Dosing Regime indicates?
4  A.  Right here --
5  Q.  Yes, ma'am.
6  A.  -- where the:  "Olanzapine therapy was
7  discontinued due to weight gain and the development of
8  diabetes.
9     "Seroquel was initiated at 150 milligrams
10  for one week.
11     "The Seroquel dose was then increased to
12  300 milligrams per day where it remains."
13  Q.  Okay.  And did you ever recall the
14  pharmaceutical sales representatives indicating such a
15  dosing regime to you?
16  A.  No.
17  Q.  Do you -- can you read into the record the
18  response to Seroquel, the bullet points following
19  that?  Just underneath it.
20  A.  All of these?
21  Q.  Yes, ma'am.
22  A.  Okay.  "The patient has shown a positive
23  response to Seroquel, becoming more spontaneous, more
24  interested in his surroundings, and has demonstrated
25  improved interactions with others.

Page 203

1     "Blood glucose levels were brought under
2  control, permitting the substitution of an oral
3  hypoglycemic agent for insulin treatments.
4     "Metabolic stability was maintained,
5  allowing the patient to discontinue the hypoglycemic
6  agent and return to a normal diet.
7     "Not only did the patient not gain weight
8  with Seroquel, he lost approximately 8 of the 10
9  pounds gained while on olanzapine.
10     "Our laboratory data revealed a
11  normalization of serum glucose levels which is valid
12  proof of improvement of diabetes and metabolic
13  stabilization.  His psychotic symptoms were
14  well-controlled, including the negative symptoms.  The
15  patient lost weight, 8 pounds, and is very pleased
16  about this.  He is also relieved that he no longer has
17  to take daily insulin injections."
18  Q.  Do you recall claims by AstraZeneca
19  pharmaceutical sales reps along those lines?
20  A.  No.
21  Q.  Okay.  Do you see the -- the quote by
22  Dr. Reinstein in the right-hand column?  Could you
23  read that into the record.
24  A.  "We have found Seroquel to be ideal in
25  patients who have problems with weight gain and, due

Page 204

1  to this, the development of diabetes.  In this
2  patient, once olanzapine was discontinued and Seroquel
3  was started, the weight was lost, the diabetes
4  resolved, and the patient was able to stop taking
5  hypoglycemic medication.  In our experience, weight
6  gain is not an issue with Seroquel, unlike some other
7  antipsychotic medications."
8     I can see where that would be true.
9  Q.  Ms. Burke, does this document appear to
10  claim that Seroquel reverses diabetes and weight loss
11  caused by Zyprexa?
12     MR. ELLISON:  Form, foundation.
13  A.  No, that isn't how I would read into that
14  at all.
15  Q.  (By Mr. Barringer)  Okay.  How would you
16  read into it?
17  A.  I would read that in this particular
18  patient, that he had improvement on those issues.
19  Q.  Did you ever attend, in one of your
20  meetings sponsored by AstraZeneca, a meeting by
21  Dr. Reinstein?
22  A.  No.
23  Q.  Do you -- do you have -- have you ever met
24  Dr. Reinstein?
25  A.  No.

Page 205

1    Q.   Have you ever heard of him?
2    A.   No.
3    Q.   Okay.  When you read an article like this,
4  do you generally assume the author is qualified to
5  conduct a study by virtue of the fact that someone
6  chose to publish it?
7    A.   No.
8        MR. ELLISON:  Form, foundation.
9    Q.   (By Mr. Barringer)  Would it surprise you
10  that AstraZeneca chose to put their Seroquel logo on a
11  study and hand it out to doctors as an indication to you
12  that the author is qualified to conduct or author the
13  study?
14       MR. ELLISON:  Form, foundation.
15   A.   I'm not following that.
16   Q.   (By Mr. Barringer)  Sure.  Let me ask it
17  again.  I'll withdraw the last question.
18       MR. ELLISON:  Can I have that, please, just
19  to look at?  Thank you.
20   Q.   (By Mr. Barringer)  Isn't -- the fact that
21  AstraZeneca put their Seroquel label and their name on
22  this case study, does that lead to, in your mind,
23  whether or not the author is qualified to conduct or
24  author the case study?
25       MR. ELLISON:  Form.

Page 206

1    A.   No.
2    Q.   (By Mr. Barringer)  Okay.  What weight, in
3  your opinion, does the AstraZeneca logo have with
4  respect to case studies when pharmaceutical
5  representatives hand it to you?
6        MR. ELLISON:  Form, foundation.
7    A.   Weight?
8    Q.   (By Mr. Barringer)  And here, I'm not
9  talking about body -- body weight.  I'm talking
10  about --
11   A.   Well, I know.  I'm --
12       MR. ELLISON:  He's saying does
13  AstraZeneca's logo on that make it more authoritative,
14  in your eyes.
15       Is that what you're asking?
16       MR. BARRINGER:  Essentially.
17   A.   No, I would -- I would think it would be
18  the reverse, that you would hope that the person would
19  be the authority and that they did the research of the
20  medication.
21   Q.   (By Mr. Barringer)  All right.
22   A.   Does that make sense?
23   Q.   Yes.
24   A.   Okay.
25   Q.   And is it fair to say -- is it fair to say

Page 207

1  that you don't know what opinion -- strike that.
2      -- Is it fair to say that you haven't read any
3  e-mails regarding Dr. Reinstein originating from
4  AstraZeneca employees; is that correct?
5    A.   Never heard of him.
6    Q.   You indicated that you -- strike that.
7        When did you begin your health care
8  practice?  Was it in 2000 as a nurse?
9    A.   No.  No, I've been a nurse since 1979, and
10  I became a nurse practitioner in 1997.
11   Q.   Okay.
12   A.   I started Directions in 2000.
13   Q.   Okay.  What I'd like to hand you is -- let
14  me mark this Exhibit 6.
15       (Dee Burke Exhibit 6 was marked and is
16  attached hereto.)
17       MR. ELLISON:  Let me get the Bates numbers.
18       MR. BARRINGER:  Sure.
19   Q.   (By Mr. Barringer)  It's a "Clinical
20  Study, The Weight Profile of Seroquel Over The Long
21  Term, Authors Brecher M, et al.  Title:  The
22  long-term effect of quetiapine, in quotes, Seroquel,
23  monotherapy on weight in patients with
24  schizophrenia."
25       It's Bates labeled Confidential, AZSER

Page 208

1  10417174.
2        MR. ELLISON:  10417?
3        MR. BARRINGER:  174 through AZSER 10417181.
4  You want to see it?
5        MR. ELLISON:  Yeah.  Thanks.
6  I've handed it to the witness, Bob.
7        MR. BARRINGER:  Okay.
8        MR. ELLISON:  Thank you.  Just needed the
9  Bates number.  Did you want her to look at that?
10       MR. BARRINGER:  Yeah, go ahead.  I'm
11  looking for my notes on it.
12   Q.   (By Mr. Barringer)  Do you recognize this
13  document?
14   A.   No.
15   Q.   Do you recall being handed documents such
16  as -- studies from the pharmaceutical -- AstraZeneca
17  pharmaceutical sales representatives?
18       MR. ELLISON:  Form, foundation.
19   A.   No.
20   Q.   (By Mr. Barringer)  So in all the
21  meetings that you attended, they never handed you
22  case studies or studies like this?
23   A.   No.  They were slides, slide presentations.
24   Q.   Do you recall the names of the slide
25  presentations?

Page 209

1    A.   No.
2    Q.   Do you recall the contents of the slide
3    presentations?
4    A.   Not really.
5    Q.   Do you ever recall AstraZeneca saying that
6    Seroquel had a favorable weight profile?
7    A.   Absolutely not.
8    Q.   If you can turn to the page that ends in
9    175, and just to familiarize that, the Bates number is
10   a way to -- fancy name for page number that attorneys
11   use.  It's in the lower right-hand corner.
12       MR. ELLISON:  You said 75?
13       MR. BARRINGER:  Yeah, 175.
14       MR. ELLISON:  Forgive my reach, ma'am.
15       THE WITNESS:  That's all right.
16       MR. ELLISON:  This one right here.
17       THE WITNESS:  Okay.
18       MR. BARRINGER:  Yeah.  Thank you.
19       MR. ELLISON:  You bet.  You betcha.
20       MR. BARRINGER:  Thank you.
21   Q.   (By Mr. Barringer) Can you -- can you
22   read into the record where it says:  "Favorable
23   weight profile unaffected by higher doses of
24   Seroquel in this study."
25   A.   ". . . unaffected by higher doses of

Page 210

Seroquel in this study."  Yeah.
Q.   Did I read that correctly?
A.   You did.
Q.   Okay.  Can you read the bullet points
underneath that?  Because I can't read them from here.
A.   "Seroquel did not result in clinically
significant mean weight gain at any dose.
        "No correlation between higher doses and
long-term mean weight changes."
Q.   And weight is an important aspect when
you're treating something -- somebody with an atypical
antipsychotic; is that correct?
A.   With any medication, not just the atypical
antipsychotics.
Q.   Okay.  If you can turn to page 4, it's
Bates labeled 177.
A.   Okay.
Q.   And can you read the conclusion that is
indicated right here?
A.   "These results indicate that long-term
weight changes with quetiapine monotherapy are minimal
and potentially beneficial and do not appear to raise
the medical concerns associated with some other
atypical agents."
Q.   Do you recall AstraZeneca pharmaceutical

Page 211

1    sales representatives indicating that over the
2    long-term use, that Seroquel had such a conclusion?
3    A.   No.
4        MR. ELLISON:  Form, foundation.
5    Q.   (By Mr. Barringer) Did you yourself, in
6    your clinical experience, come to the same
7    conclusion?
8        MR. ELLISON:  As?
9    Q.   (By Mr. Barringer) As to what this author
10   did in his -- in his paper, based on your experience?
11   A.   My experience with the medication has been
12   that it does not cause the weight gain that olanzapine
13   does.
14   Q.   Okay.  And I don't believe his conclusion
15   refers to olanzapine.
16   A.   It does not.  But it says some other
17   atypical agents.
18   Q.   Okay.  All right.  And if you can look to
19   the -- the Bates number ending in 178.
20   A.   Okay.
21   Q.   It says:  "Weight gain is associated with
22   increased mortality in a wide range of conditions
23   including hypertension, coronary heart disease,
24   cerebrovascular disease, Type II diabetes mellitus,
25   various cancers, sleep apnea, and respiratory

Page 212

problems."
        Did I read that correctly?
A.   Where are you reading it?
Q.   In the second full paragraph.
A.   Okay.
        MR. ELLISON:  I'll stipulate that you read
it correctly.
A.   You did.
Q.   (By Mr. Barringer) So as a nurse
practitioner, does it appear that there is no
question that the issue of weight gain associated
with second-generation antipsychotics is a serious
issue?
        MR. ELLISON:  Form, foundation.
A.   Weight gain, whether it's from medication
or not and can be part of the illness, can lead to
this.
Q.   (By Mr. Barringer) Okay.  Can you go to
page 180, under the Key Points?  I know it's
difficult to read because that's just the way it
printed out.
A.   Uh-huh.
Q.   Can you read into the record the third
bullet point.
A.   "Long-term monotherapy with quetiapine is

Page 213

1  associated with a potentially normalizing effect on
2  weight with a tendency towards weight gain in
3  underweight patients and weight loss in severely obese
4  patients."
5      Q.   Is that something that, in your clinical
6  experience, that you have found to be true?
7      MR. ELLISON: Form, foundation.
8      A.   I -- I've seen weight loss.  I don't know
9  that I'd attribute it to the medication or that
10 they're feeling better.  Weight gain and -- and the
11 underweight, no.  The underweight seem to stay
12 underweight.
13     Q.   (By Mr. Barringer) Has it been your
14 experience as a nurse practitioner in a clinical
15 setting that only underweight patients gain weight
16 as a side effect of Seroquel?
17     MR. ELLISON: Form.
18     A.   I don't see underweight people gaining
19 weight.
20     Q.   (By Mr. Barringer) Okay.  So that would
21 not be what you've seen in your clinical practice?
22     A.   I have not seen that.
23     Q.   Okay.  Have you seen the opposite:
24 Severely obese patients actually lose weight as a side
25 effect of Seroquel?

Page 214

1      A.   I have, but I am not going to say it's due
2  to the Seroquel.  It may be due that they're feeling
3  better and practicing a better lifestyle.
4      Q.   Can you turn to the last page under
5  References.
6      A.   Okay.
7      Q.   Can you look at No. 19?
8      A.   Okay.
9      Q.   Does that article reference a Dr. --
10     A.   Reinstein.
11     Q.   -- M.J. Reinstein?
12     A.   It does.
13     MR. ELLISON:  You're killing me, Bob.  I
14 have to break out the reading glasses.
15     MR. BARRINGER:  On the -- especially on the
16 reference page.
17     THE WITNESS:  Yes, it's very small.
18     Q.   (By Mr. Barringer)  And, uh --
19     Okay.  Strike -- withdraw my last "and,
20 uh."
21     And is it fair to say that you don't know
22 who "L.A." under No. 5, Reference 5, L.A. --
23     A.   L.A. Arvanitis?  Arvanitis?  I don't know
24 who that is.
25     Q.   Do -- do you know whether or not she has

Page 215

1  had conversations with AstraZeneca -- strike that.
2  Strike that.
3      Do you know who that author is?
4      A.   I have no idea who -- I didn't even know it
5  was a "she."
6      Q.   Okay.
7      A.   I do know some of them.
8      Q.   Okay.  Fair enough.
9      MR. ELLISON:  Are you done with that
10 exhibit, Bob?
11     MR. BARRINGER:  I am.
12     MR. ELLISON:  I just want -- and the
13 reference was 19?
14     MR. BARRINGER:  19, uh-huh.
15     MR. ELLISON:  Thank you.
16     Q.   (By Mr. Barringer)  Okay.  Doctor, I'm
17 going to hand you a document that has been marked as
18 AZSER 4867379.  It has a beginning Bates label of 79
19 and ends with 380.  No, I'm sorry.  Strike that.
20 Has a beginning Bates label 4867379 and ends with
21 4867380.
22     MR. ELLISON:  Are you going to mark this?
23     MR. BARRINGER:  I am.
24     MR. ELLISON:  This will be 7?
25     MR. BARRINGER:  Yeah.

Page 216

1      (Dee Burke Exhibit 7 was marked and is
2  attached hereto.)
3      MR. ELLISON:  The -- the whole document,
4  even this?
5      MR. BARRINGER:  Well, the -- the -- the top
6  part is actually the authentication aspect of the
7  document, where it came from.
8      MR. ELLISON:  Fair enough.  That one didn't
9  have a Bates number.
10     MR. BARRINGER:  Right.  So if you'll put
11 that on top.
12     MR. ELLISON:  Right here?
13     MR. BARRINGER:  Yes, that's fine.
14     Q.   (By Mr. Barringer)  Doctor, please take a
15 look at the first e-mail in time from John Travers dated
16 March 2nd, 2001.
   REDACTED

| Page 217 | Page 218 |
|---|---|
| REDACTED | REDACTED |

**Page 218**

19      Q.  And -- and when I handed you Exhibit 6,
20  that was the Brecher study --
21      MR. ELLISON:  Form, foundation.
22      Q.  (By Mr. Barringer) -- that they're related
23  to in this e-mail.  Do you understand that?  And what
24  I --
25      A.  Well, now that you're telling me.

**Page 219**

1      Q.  Okay.  What I'd also like to show you is
2  that earlier -- strike that.
3      Ms. Burke, earlier you said you felt that
4  there was an association with Seroquel with respect to
5  dose.  Do you recall that?
6      A.  Yes.
7      Q.  And what association do you attribute to
8  Seroquel and dose?
9      A.  It's my understanding that the more recent
10  research is showing there is the potential for weight
11  gain with increased dosing.
12      Q.  Okay.
13      MR. ELLISON:  If I could interject, Bob:
14  I'm going to object on foundation and move to strike
15  everything that was just read into the record from an
16  e-mail the witness hasn't testified she's ever seen
17  before and was involved in the conversation.
18      MR. BARRINGER:  Well, it's for background
19  information purposes.
20      MR. ELLISON:  So you want her to read it to
21  educate herself's --
22      MR. BARRINGER:  Just on who the parties are
23  involved.
24      MR. ELLISON:  Again, I'm going to -- based
25  on that representation -- and I appreciate that -- I

**Page 220**

1  will nonetheless move to strike because the content of
2  that e-mail had absolutely nothing to do with the --
3  the subject that you apparently offered it for.
4      With that said, that's for the record.
5      MR. BARRINGER:  Okay.  So noted.
6      Q.  (By Mr. Barringer)  What I'd like to have
7  you take a look back at is, under Key Point No. 3 on
8  Bates label 10417180 of Exhibit 6, can you read that
9  into the record.
10      A.  The "Long-term monotherapy with
11  quetiapine . . ."?
12      Q.  Yes.
13      A.  ". . . is associated with a potentially
14  normalizing effect on weight, with a tendency towards
15  weight gain in underweight patients and weight loss in
16  severely obese."
17      MR. ELLISON:  Didn't we just read that?
18      MR. BARRINGER:  Yeah, that's --
19      THE WITNESS:  I did.
20      MR. BARRINGER:  I'm sorry.
21      MR. ELLISON:  Do you need a break, Bob?
22      MR. BARRINGER:  No.
23      Q.  (By Mr. Barringer)  It's the second
24  bullet point.
25      A.  Okay.

Page 221

1    Q.    I'm sorry.
2    A.    All right.  "Long-term quetiapine
3   monotherapy showed no overall effect on weight across
4   the BMI spectrum, with 95 percent clients encompassing
5   zero weight change in all BMI categories apart from
6   the severely obese BMI greater than 35 kilograms per
7   meter squared in whom weight loss was observed.  Any
8   weight changes with quetiapine therapy showed no
9   association with dose or gender."
10    Q.    And -- and back in 2000 when you were
11   working at Directions For Mental Health, do you recall
12   whether or not any pharmaceutical sales representative
13   said that there was no dose relationship between
14   increasing the dose of Seroquel with weight gain?
15    A.    No.
16    MR. ELLISON:  Form, foundation, asked and
17   answered.
18   REDACTED
19
20
21
22
23
24    Q.    (By Mr. Barringer)  And you don't know
25   who Mr. -- who that e-mail is from; is that correct?

Page 222

1    A.    I have no idea.
2    Q.    And again, it's not in the normal course of
3   your business to get involved in internal e-mails at
4   AstraZeneca; is that correct?
5    A.    Not at all.
6    Q.    Would it surprise you that John Travers, at
7   the time of that e-mail, was the senior director of
8   clinical research for the central nervous system at
9   AstraZeneca?
10    A.    I wouldn't have any knowledge of that.
   REDACTED




   MR. ELLISON:  Form.
   REDACTED

Page 223

1    Q.    (By Mr. Barringer)  Okay.  All right.
2    MR. ELLISON:  Bob, do you have much more?
3   If you do, I'd like to run to the rest room.
4    MR. BARRINGER:  Sure.  Let's take a break.
5    MR. ELLISON:  Thanks.
6    THE VIDEOGRAPHER:  We are off the record at
7   2:07.
8    (Recess from 2:07 p.m. to 2:12 p.m.)
9    THE VIDEOGRAPHER:  We're back on the record
10   at 2:12.
11    Q.    (By Mr. Barringer)  Ms. Burke, I showed
12   those -- the case study and the clinical study back
13   about the time you began your employment at Directions
14   For Mental Health, and --
15    MR. ELLISON:  Form.
16    Q.    (By Mr. Barringer)  -- and so are --
17   receiving clinical studies like that, is that something
18   that was common by the AstraZeneca pharmaceutical sales
19   representatives during that time period?
20    MR. ELLISON:  Form.
21    A.    I don't recall ever getting a study such as
22   that --
23    Q.    (By Mr. Barringer)  Okay.
24    A.    -- from an AstraZeneca representative.
25    Q.    Now, you indicated earlier that you were --

Page 224

1   one of the sources of information that you relied on
2   was the nurse practitioner side effect manual.  Do you
3   recall that?
4    A.    It's the Nursing Drug Handbook.
5    Q.    Okay.  And did you receive a copy of that
6   each and every year?
7    A.    I bought it every year.  Still do.
8    Q.    Okay.  And was it common practice back
9   in -- for you to review each and every drug that you
10   prescribe out of that handbook?
11    A.    It was.
12    Q.    And as the side effects listed, would you
13   relay those side effects to your patients?
14    A.    I copied it and gave it to them.
15    Q.    Okay.  And if you -- if a side effect was
16   not listed in that handbook, would you inform them of
17   other potential side effects?
18    MR. ELLISON:  Form, foundation.
19    A.    I did.
20    Q.    (By Mr. Barringer)  Okay.  And how did
21   you become aware that Seroquel may cause weight
22   gain?
23    A.    Saw it clinically sometimes, but very
24   rarely, and after the olanzapine lawsuit, then they
25   were all under investigation, all of the atypical

Page 225

1  antipsychotics.
2  Q.  Okay.  And do you recall when that
3  olanzapine lawsuit began?
4  MR. ELLISON:  Form.
5  A.  I don't.
6  Q.  (By Mr. Barringer)  Okay.  Was that about
7  the same time that you began associating Seroquel
8  with weight gain?
9  MR. ELLISON:  Form, foundation.
10  Q.  (By Mr. Barringer)  Or strike that.
11  Did you ever associate Seroquel to have --
12  to have the propensity to cause weight gain?
13  MR. ELLISON:  Form.
14  A.  I think that it can increase appetite, and
15  depending on what the client does with that, can cause
16  weight gain.
17  Q.  (By Mr. Barringer)  So is it fair to say in
18  your clinical experience, that you felt that there was
19  an indirect relationship -- strike that -- that Seroquel
20  caused an increase in appetite?
21  A.  It can.
22  (Dee Burke Exhibit 8 was marked and is
23  attached hereto.)
24  Q.  (By Mr. Barringer)  Okay.  This is a --
25  what I'm going to hand you is a -- it's a -- marked as

Page 226

Confidential.  I don't know why it's marked
Confidential, but it's AZSER 10376363.  It's entitled
"AstraZeneca Important Drug Information, January 30th,
2004.  Dear Health Care Provider."
Do you ever recall receiving a letter that
looked similar to that?
A.  I don't, but I'm sure I did.
Q.  Do you recall that on or about January 30th
of 2004, of being informed of the possibility of
diabetes and hyperglycemia being associated with
Seroquel?
MR. ELLISON:  Form, foundation.
A.  I remember being made aware of the risk of
the weight gain, which then is associated with
Diabetes Type II, and that all of the atypical
antipsychotics had absorbed that into their label.
Q.  (By Mr. Barringer)  And do you know when
that occurred?
A.  It was when Abilify was going for their
bipolar indication.
Q.  Okay.  And do you know when Abilify went
for their bipolar indication?
A.  It was -- it was probably about this time.
Q.  Do you recall when Abilify became available
on the market?

Page 227

1  A.  I think it was 2001, 2002.
2  Q.  Okay.  And about how many -- how long after
3  it came on the market did they go for the bipolar
4  indication?
5  A.  One to two years.  I -- they were probably
6  going for it from the beginning, but I think it got
7  FDA approval like around 2003-2004.
8  Q.  Okay.  And -- and the reason I ask is, was
9  2003-2004 about the time that you associated this
10  increase in appetite with Seroquel?
11  MR. ELLISON:  Form, foundation.
12  A.  More so with olanzapine.  That's when the
13  issues were coming out with olanzapine.
14  Q.  (By Mr. Barringer)  Okay.  With respect
15  to this letter, if you can take a look at the first
16  sentence of the second page of this letter, do you
17  see that it says:  "AstraZeneca remains committed to
18  providing you with the most current product
19  information available for the management of your
20  patients"?
21  A.  Yes.
22  Q.  Did I read that correctly?
23  A.  You did.
24  Q.  Do you -- strike that.
25  What number is that?

Page 228

A.  8.
(Dee Burke Exhibit 8A was marked and is
attached hereto.)
(REPORTER'S NOTE:  Exhibit 8A was mismarked
as an additional Exhibit 8 by Mr. Barringer and was
referred to in the record as "Exhibit 8."  I have left
all references as spoken, but I re-marked the physical
exhibit as 8A.)
Q.  (By Mr. Barringer)  Now, this does not --
is not marked as Confidential, but it needs to be
marked as Confidential.  I'm going to identify it as
AZSER 7016902, two pages, with the ending Bates
label 7016903.  It's a e-mail record from Sumie
Ishiguro to Martin Brecher dated September 17th,
2002.  Subject line:  "Effect of Seroquel on
Diabetes Mellitus."
Doctor, for the record, I'll represent to
you that Sumie Ishiguro was a representative of a
company called Fujisawa -- that's F-U-J-I-S-A-W-A --
and that Fujisawa was the distributor of Seroquel in
Japan, at all times relevant.  Do you understand that?
A.  I do.
MR. ELLISON:  Form.

REDACTED

58 (Pages 229 to 232)

| | Page 229 |
|---|---|
| 1 | REDACTED |
| 2 | |
| 3 | |
| 4 | |
| 5 | |
| 6 | |
| 7 | |
| 8 | |
| 9 | |
| 10 | |
| 11 | |
| 12 | |
| 13 | |
| 14 | |
| 15 | |
| 16 | |
| 17 | |
| 18 | |
| 19 | |
| 20 | |
| 21 | |
| 22 | |
| 23 | |
| 24 | |
| 25 | |

Page 230

REDACTED

8   MR. ELLISON: It may be because you're
9  trying to expedite things, Bob, --
10   MR. BARRINGER: I -- I -- I know.  I know.
11  It is.
12   MR. ELLISON: -- but that's not what the
13  doc. says.

REDACTED

Page 231

REDACTED

Page 232

REDACTED

25   MR. ELLISON: Objection; form, foundation.

Page 233

REDACTED

15   Q.   (By Mr. Barringer) Do you know of any study
16   involving any atypical antipsychotic where they're doing
17   a double blinded controlled study to determine whether
18   or not it causes diabetes mellitus?
19        MR. ELLISON: Foundation.
20   A.   I'm sure those studies have taken place,
21   especially since olanzapine. I don't know of any one
22   ongoing right now.
23   Q.   (By Mr. Barringer) Okay. Now, you
24   yourself, have you ever conducted a study?
25   A.   No.

Page 234

1    Q.   Have you ever participated --
2    A.   Well, no, that's a lie. Yes, I did --
3    Q.   Okay. What --
4    A.   -- during my thesis.
5    Q.   Okay. And when was that?
6    A.   '96.
7    Q.   Okay. And what did the -- what was your
8    study of your thesis on?
9    A.   Sexual abuse in gang membership.
10   Q.   Okay. Did it have anything to do with
11   atypical antipsychotics?
12   A.   No.
13   Q.   Okay. Have you ever been involved in a
14   study involving a pharmaceutical product?
15   A.   Yes.
16   Q.   Okay. And -- and was that part of your
17   thesis as well?
18   A.   No.
19   Q.   Okay. And -- and what pharmaceutical
20   product were you a part of?
21   A.   I don't know what -- it was double blind.
22   I have no idea. We had a research unit on one of the
23   hospitals where I was director of nursing.
24   Q.   Okay. And do you know whether or not -- do
25   you know what the -- the product was used for?

Page 235

1    A.   I don't know anything about it. I just
2    know we had a research unit where there was double
3    blind studies ongoing.
4    Q.   Okay. And did -- okay. Did you yourself
5    participate in the --
6    A.   No.
7    Q.   Is it fair to say that you never have been
8    involved in developing a protocol for a study?
9    A.   I had to develop my own protocol for my
10   study.
11   Q.   Involving -- is it fair to say that you've
12   never been involved in developing a protocol involving
13   a pharmaceutical product?
14   A.   That's true.
15   Q.   Okay. Is it fair to say that you've never
16   had any FDA -- strike that.
17        Is it fair to say that you've never had any
18   experience with the FDA regulatory authority?
19   A.   Oh, outside of being a speaker. I mean,
20   the FDA -- you know, what's happening now with PhRMA,
21   that's been my involvement with the FDA.
22   Q.   Okay. Now, what -- when you say with
23   what's happening now with PhRMA, what do you mean by
24   that?
25   A.   As of January, they're not even -- reps

Page 236

1    aren't even going to be able to bring us a pen with a
2    name on it or Kleenex with a name on it.
3    Q.   Okay. And do you have an opinion as to
4    that?
5    A.   I do.
6    Q.   And what is that opinion?
7    A.   I think it's ridiculous.
8    Q.   And why is it ridiculous?
9    A.   Because I find it hard to believe that a
10   professional would prescribe a medication because they
11   have a pen with the name of Seroquel or Zyprexa or
12   anything on it, or that a Kleenex box is sitting on a
13   cabinet with the name of Lunesta.
14   Q.   Okay.
15   A.   It's going to kill community mental health
16   centers' budgets.
17   Q.   And does that upset you?
18   A.   It does.
19   Q.   Because you're passionate about your job,
20   correct?
21   A.   I am.
22   Q.   Would it surprise you that AstraZeneca has
23   the policy of disclosure of their studies on their
24   websites?
25   A.   No.

Page 237

1       MR. ELLISON:  Form.
2       Q.   (By Mr. Barringer)  You've indicated that you
3   have visited the AstraZeneca website; is that correct?
4       A.   I have gone to the AstraZeneca website.
5       Q.   Have you gone to the AstraZeneca websites
6   to look up studies?
7       A.   No.
8   REDACTED
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

Page 238

REDACTED

8       Q.   (By Mr. Barringer)  Sure.
        A.   They had very well-controlled studies.

REDACTED

15           MR. ELLISON:  Form, foundation.
    REDACTED

18      Q.   (By Mr. Barringer)  What else would you
19  like to know?
20      A.   How the -- how the study was even set up,
21  you know, how they picked their subjects.  What was
22  their family histories?  These folks have a very high
23  propensity for diabetes to begin with before they were
24  ever put on any of these medications.
25      Q.   Uh-huh.  And -- and do you believe that the

Page 239

1   individuals at AstraZeneca are competent enough to
2   develop studies on -- on their product?
3           MR. ELLISON:  Form, foundation.
4       A.   I would hope so.  I think we have the
5   safest medications in the world.
6           MR. BARRINGER:  What I'm going to attach is
7   what I believe to be a long e-mail with attachments.
8           (Dee Burke Exhibit 10 was marked and is
9   attached hereto.)
10      Q.   (By Mr. Barringer)  I'm going to identify
11  the article.  It's from Sumie Ishiguro to Ronald
12  Leong regarding -- the subject line:  "Regarding
13  November 2002 Seroquel Dear Doctor Letter," Bates
14  labeled AZSER 7302765 through AZSER 7302778.
15          And I'm going to -- want you to look at
16  the -- the attachment, which is the November 2002 Dear
17  Doctor Letter, to speed things up.  Take a look at
18  that for me.
19          May I approach you?
20      A.   Yeah.
21      Q.   Because it's my only copy.
22      A.   Okay.
23      Q.   I want to be able to -- and let me know if
24  you're picking me up behind you.
25          It says:  "Since February 2001, when

Page 240

1   Seroquel was launched, 13 cases (including 1 death) of
2   hyperglycemia, diabetic ketoacidosis, and diabetic
3   coma of which causality to the drug could not be ruled
4   out, have been reported (estimated number of patients
5   who used Seroquel by the end of September 2002 was
6   approximately 130,000)."
7           Did I read that correctly?
8       A.   You did.
9       Q.   It says:  "Contraindications and
10  Precautions were revised and Warnings was added to the
11  package insert, because serious cases have reported
12  though hypoglycemia" [sic] "was added in the
13  Precautions to draw attention in July of 2002.
14          "This drug should be cautious -- cautiously
15  administered with strict attention to the following
16  instructions.
17          "If adverse reaction as above is confirmed,
18  please contact the person in charge of Drug
19  Information of Fujisawa which is the marketing company
20  of Japan."
21          Did I read that correctly?
22      A.   You did.
23      Q.   Under No. 1, the title says:  "Seroquel
24  must not be administered to patients with diabetes
25  mellitus or a history of diabetes mellitus."

Page 241

1   Did I read that correctly?
2   A.   You did.
3   Q.   It says, under 2: "During the
4   administration of Seroquel, the patient must be
5   carefully observed with blood -- with measurement of
6   blood glucose."
7   Did I read that correctly?
8   A.   You did.
9   Q.   And it says, under Subsection 3:
10  "Information on these adverse reactions should be
11  sufficiently explained to the patients and their
12  families."
13  Did I read that correctly?
14  A.   You did.
15  Q.   Do you recall in 2002 whether -- whether or
16  not AstraZeneca or its pharmaceutical representatives
17  ever indicated to you that there had been 13 adverse
18  reports regarding diabetic ketoacidosis and a death
19  as -- as it relates to Seroquel not being ruled out?
20  MR. ELLISON:  Form, foundation.
21  A.   No.
22  Q.   (By Mr. Barringer)  Okay.  Back in 2002, did
23  the AstraZeneca pharmaceutical sales representative ever
24  indicate that a -- a -- a warning label change was being
25  added to their product line in Japan?

Page 242

MR. ELLISON:  Form, foundation.
A.   I remember the product warning in this
country, not anything about Japan.
Q.   (By Mr. Barringer)  Do you believe that
the Japanese should be more protected than
Americans?
MR. ELLISON:  Form, foundation.
A.   No.
Q.   (By Mr. Barringer)  If a warning like that
had existed in 2002, would you have told David Haller
about the possibility of contraindications with Seroquel
in diabetes?
MR. ELLISON:  Form.
A.   David Haller was told about
contraindications with his medication.
Q.   (By Mr. Barringer)  Okay.  We'll get to
that in a second.
And -- and sitting here today, do you
specifically recall -- do you specifically recall
warning David about getting blood glucose measurements
as a result of taking Seroquel?
A.   Not as a result of taking Seroquel:  As a
result of his illness, his lifestyle, and the fact
that he was on three medications that can cause weight
gain.

Page 243

1   Q.   Back in 2002, did you ever ask any
2   AstraZeneca employee as to whether or not Seroquel can
3   cause diabetes?
4   A.   No.
5   Q.   Do you recall whether or not any
6   pharmaceutical sales representative ever indicated to
7   you that there was no causal relationship between
8   Seroquel and diabetes-related conditions?
9   A.   No one has ever told me that.
10  Q.   Let's go to your first visit with David
11  Haller.
12  MR. ELLISON:  This is Exhibit 2?
13  MR. BARRINGER:  Exhibit 2, uh-huh.
14  Q.   (By Mr. Barringer)  And the date of the
15  office visit was 10-1-2002; is that correct?
16  A.   That's correct.
17  Q.   This office visit lasted 60 minutes; is
18  that correct?
19  A.   That's correct.
20  Q.   And this is the first time that you ever
21  met David Haller; is that correct?
22  A.   That's correct.
23  Q.   And on this office visit, he was not on
24  Seroquel; is that correct?
25  A.   That's correct.

Page 244

Q.   In other words, he didn't present to you
being on Seroquel?
A.   He did not.
Q.   Under Recommendation/Pharmacological
Management and Plan, it says: "Risks, benefits, and
alternatives were discussed with this client.  He
admits to continuing mood swings and knows that even
though he has . . . the most stable on the medication
regime, he is currently compliant with, he is open to
suggestions of other medications, and we reviewed
Zyprexa, Tegretol, and Seroquel."
What is Tegretol?
A.   It's an anticonvulsant, in the same family
as Depakote, with a potential for more side effects.
Q.   Okay.  And what is Zyprexa?
A.   Zyprexa is an atypical antipsychotic.
Q.   And what -- and -- and at this point in
time, there are other atypical antipsychotics on the
market; is that correct?
A.   That was correct.
Q.   In fact, during that time period, Abilify
was on the market; is that correct?
A.   I don't recall that we had Abilify
available to us yet.
MR. BARRINGER:  Let's go ahead and go off

Page 245

1  the record to change tapes.
2      THE VIDEOGRAPHER: We are off the record at
3  2:38. This is the end of Tape 2.
4      (Recess from 2:38 p.m. to 2:41 p.m.)
5      THE VIDEOGRAPHER: We're back on the record
6  at 2:41. This is the beginning of Tape No. 3 of the
7  deposition of Dee Burke.
8      Q.  (By Mr. Barringer) Okay. Do Zyprexa,
9  Tegretol, and Seroquel, are -- are they used to treat
10  personality disorders?
11     A.  No.
12     (Dee Burke Exhibit 11 was marked and is
13  attached hereto.)
14     Q.  (By Mr. Barringer) I want to hand you
15  what is going to be marked as Exhibit 11. It's
16  entitled "Consensus Development Conference on
17  Antipsychotic Drugs and Obesity and Diabetes." It's
18  from the Diabetes Care, Volume 27, No. 2, February
19  of 2004. Have you ever seen this document before?
20     A.  I don't think so.
21     Q.  Okay. Do you often -- do you subscribe to
22  Diabetes Care?
23     A.  No.
24     Q.  Are you familiar with the American Diabetes
25  Association?

Page 246

1      A.  I am.
2      Q.  Are you familiar with American Psychiatric
3  Association?
4      A.  I am.
5      Q.  Are you -- are you familiar with the
6  American Association of Clinical Endocrinologists?
7      A.  I knew that they've got an association. I
8  don't have any knowledge of it.
9      Q.  Okay. And you yourself aren't holding
10  yourself out as an expert in endocrinology; is that
11  correct?
12     A.  Not at all.
13     Q.  Okay. And are you familiar with the North
14  American Association for the Study of Obesity?
15     A.  Yes.
16     Q.  Okay. If you can turn to Table 1, I
17  believe my last question to you was: During this time
18  period that you saw David on 10-2002, was Abilify
19  available on the market? And in Table 1, it said that
20  there is -- assuming that the table is accurate, it
21  says that the year Abilify was approved was in 2002.
22     A.  Uh-huh.
23     Q.  Is that your recollection as to when
24  Abilify was approved?
25     A.  It was. I don't know when in 2002.

Page 247

1      Q.  Okay. Was Geodon available for --
2      A.  It was.
3      Q.  -- during the 10-2002?
4      A.  Right.
5      Q.  And -- and do you have experience in
6  prescribing Geodon?
7      A.  Yes. In fact, I speak for Pfizer as well
8  for Geodon.
9      Q.  Okay. So is that a third pharmaceutical
10  company that you speak for?
11     A.  Yes.
12     Q.  And how -- and tell me about the
13  relationship there with respect to -- strike that.
14     Do you get paid to speak on behalf of
15  Pfizer?
16     A.  I do.
17     Q.  Do you recall how much you, since 2000,
18  how -- or since you began speaking with Pfizer, how
19  much you've been paid?
20     A.  I just started speaking with them in the --
21  since moving to Tennessee.
22     Q.  Are both Geodon and Abilify used to
23  treat schizo-affective or schizophrenic patients?
24     A.  Geodon has label indications for bipolar
25  mania as well as schizophrenia, but nothing as far as

Page 248

maintenance. Abilify has progressively gotten more
and more indications, first coming out with only
schizophrenia, later getting the bipolar indication
and bipolar maintenance, children indication. It's
gotten more indications than any of the others at this
point in time.
     Q.  Okay. Do you feel that -- strike that.
     In your clinical experience, have you
noticed any weight gain associated with Geodon?
     A.  There have been a few that have alleged
they gained weight on it.
     Q.  Now, when you say "a few," who are you
referring to?
     A.  To clients.
     Q.  Okay. And about how many clients do you
currently treat?
     A.  Oh, wow.
     Q.  That are associated during this time period
that you're prescribing Geodon?
     A.  When I was at Directions, I had 1,000
clients. Here in Tennessee, on my caseload, there's
probably 600.
     Q.  Okay. And have you had associated weight
gain with Abilify?
     A.  With children.

Page 249

1  Q.  What about adults?
2  A.  One or two.
3  Q.  Okay.  Now, when you testify about your
4  clinical experience, you haven't done any actual
5  studies on your clinical population, have you?
6  A.  No.
7  Q.  You're -- you're testifying based on your
8  feeling as to what is occurring; is that correct?
9      MR. ELLISON:  Form.
10  A.  That's correct.
11  Q.  (By Mr. Barringer)  In other words, you don't
12  have a database with collected information where you can
13  do statistical analysis on your patients, do you?
14  A.  We took weights.
15  Q.  Okay.  We'll get to that.
16      How much, on -- 10-1-2002, did David
17  Haller weigh?
18  A.  I don't know.
19  Q.  Would you normally weigh a patient?
20  A.  We didn't back then.  We have since become
21  to weigh patients.
22  Q.  Was weight not important back in 2002?
23  A.  It was always important.
24      MR. ELLISON:  Form.
25  Q.  (By Mr. Barringer)  Did the

Page 250

pharmaceutical sales representatives regarding
Seroquel indicate to you that you should monitor
one's weight while they were -- while a patient was
on Seroquel?
    MR. ELLISON:  Form.
    A.  I don't remember them talking about us
monitoring weight.
    Q.  (By Mr. Barringer)  Do you recall, back
in 2002, whether or not -- strike that.
        Do you recall, back in 2002, 10-1-2002,
whether or not pharmaceutical sales representatives
indicated to you that you needed to track blood sugar
glucose levels in patients being prescribed Seroquel?
        MR. ELLISON:  Form.
    A.  I don't recall that.
    Q.  (By Mr. Barringer)  Okay.  If they had
back in 2002, would you have relayed that
information to the patient, that they needed to
monitor their weight?
        MR. ELLISON:  Form, foundation.
    A.  I always told them they needed to monitor
their weight.
    Q.  (By Mr. Barringer)  Okay.  Back in 2002,
would you have stressed that even more so if a
pharmaceutical sales representative had -- detailing

Page 251

1  Seroquel had said, "Hey, when you put a person on
2  Seroquel, you need to watch his weight"?
3      MR. ELLISON:  I object.  Form and
4  foundation.
5  A.  Not necessarily Seroquel.  Any of them.
6  Q.  (By Mr. Barringer)  Okay.  Would you
7  have, back in 2002, indicated to the patient that
8  they needed to control their metabolic -- strike
9  that -- monitor their glucose levels if they were
10  being prescribed Seroquel?
11      MR. ELLISON:  Form, foundation.
12  A.  I had already done it with David because of
13  the lithium and Depakote.  That's why the lab work was
14  ordered.
15  Q.  (By Mr. Barringer)  But you did not do
16  that for -- on -- as the basis for Seroquel; is that
17  correct?
18      MR. ELLISON:  Form, foundation.
19  A.  Not just Seroquel.
20  Q.  (By Mr. Barringer)  okay.
21  A.  It was all of his meds and his illness.
22  Q.  And his illness.  Okay.
23      And then in the next office visit, you saw
24  him on 10-23-2002?
25  A.  I did.

Page 252

Q.  Okay.  And between 10-1-2002 and
10-23-2002, is it fair to say you don't know whether
or not Mr. Haller actually took the product as
prescribed?
    A.  I would say he hadn't taken the product at
all because he'd lost the prescription.
    Q.  Okay.  And sitting here today, you don't
recall whether or not a sample was provided to
Mr. Haller; is that correct?
    A.  I would have been given the samples.  Given
that I wrote a pink prescription, I would not have
given him samples.
    Q.  Okay.  Okay.  Is it possible that you gave
him a sample and you didn't write it down?
        MR. ELLISON:  Form.
    A.  No.
    Q.  (By Mr. Barringer)  And this meeting
lasted 15 minutes; is that correct?
    A.  The second one?
    Q.  Yes.  10-23-2002.
    A.  Yes.
    Q.  Okay.  And how much did he weigh on this
date?
    A.  I don't know.
    Q.  And the next time you saw Mr. Haller was on

Page 253

1   11-20-2002; is that correct?
2       A.   No, that wasn't me.
3           MR. ELLISON:  It was Desai.
4           MR. BARRINGER:  Oh, we both -- we did --
5   both did that one.
6       Q.   (By Mr. Barringer)  Okay.  The next time
7   you saw this patient was on 12-18-2002?
8       A.   It was.
9       Q.   Okay.  And how long did that office visit
10  last?
11      A.   15 minutes.
12      Q.   Okay.  And at this point in time,
13  Mr. Haller was supposed to be taking Seroquel; is that
14  correct?
15      A.   He was.
16      Q.   And do you know whether or not he ever got
17  his prescriptions filled?
18      A.   I didn't do the readout, but he said he was
19  taking his medication.
20      Q.   Okay.  And you rely on your -- on your
21  patients to determine whether or not they're taking
22  their medicine, correct?
23      A.   Patients and case managers and family.
24      Q.   You have no way of actually forcing a
25  patient to take their pills at home?

Page 254

1       A.   No.
2       Q.   Do you know how much Mr. Haller weighed
3   on -- on this particular day?
4       A.   I do not.
5       Q.   And is it your testimony, Ms. Burke, that
6   the risks, benefits, alternatives discussed to include
7   maintaining lithium 600 milligrams at night, Eskalith
8   450 in the morning, Seroquel 400 milligrams at night,
9   Depakene is 500 milligrams b.i.d., is it your
10  testimony that when you write that in your notes, that
11  you continue the warning regarding his weight and
12  to -- to follow his glucose levels?
13      A.   Right.
14      Q.   But you don't document that in -- in
15  your --
16      A.   I do anymore.  I didn't back then.
17      Q.   Okay.  Likewise, do you know what his blood
18  pressure was on that day?
19      A.   No.  I'll just offer that we didn't start
20  doing that until after the olanzapine, and then it
21  started becoming routine practice to take weights and
22  blood pressures.
23      Q.   Okay.  With respect to that, is that on or
24  about the same time that you learned of the possible
25  association between Seroquel --

Page 255

1           MR. ELLISON:  Form --
2       Q.   (By Mr. Barringer)  -- and -- and -- and
3   weight gain?
4           MR. ELLISON:  I'm sorry.  Form --
5       A.   No.
6           MR. ELLISON:  -- and foundation.  Misstates
7   her --
8       A.   It's when we learned about the metabolics
9   with olanzapine.
10          MR. ELLISON:  Misstates her testimony.
11          MR. BARRINGER:  Well, I was asking her
12  regarding if it was --
13          THE REPORTER:  What was your answer?
14      A.   I said it had to do with the metabolic
15  issues with olanzapine.
16      Q.   (By Mr. Barringer)  Did you learn about the
17  metabolic issues -- strike that.
18          When did you learn about the metabolic
19  issues with Seroquel?
20          MR. ELLISON:  Form, foundation, asked and
21  answered.
22      A.   Very closely after the olanzapine.
23      Q.   (By Mr. Barringer)  Okay.  Would the
24  olanzapine be a good marker as to when you -- you
25  became aware of the metabolic profile being

Page 256

1   associated with Seroquel?
2       A.   Yeah, because it became an issue with all
3   of them.
4       Q.   And -- and sitting here today, you don't
5   know what date, --
6       A.   I don't.
7       Q.   -- hard-and-fast date --
8       A.   No.
9       Q.   But is it fair to say that the -- strike
10  that.
11          Is that -- when you became aware of the
12  olanzapine instance, that's when you began to track
13  weight?
14      A.   Right.
15      Q.   You indicated that you had ordered blood
16  work on one occasion, --
17          MR. ELLISON:  Form.
18      A.   It was ordered on more than --
19      Q.   (By Mr. Barringer)  -- on 1-16 --
20      A.   -- one occasion.  He complied with it on
21  one occasion.
22      Q.   Fair enough.
23          What was the last -- what -- what was the
24  last date I was asking about?  Lost my train of
25  thought.

Page 257

1    A.   On -- you want the date of the lab work?
2    Q.   No, no.  The date of the office visit, the
3  last office visit.
4    A.   12-18-02 --
5    Q.   Okay.
6    A.   -- is the one I was just looking at.
7    Q.   Because I don't want to recap.
8        Okay.  On 12-18-0 -- -02, did you report
9  that you ordered lab work for this patient?
10   A.   Labs were ordered.
11   Q.   Okay.  And where does it indicate that on
12  12-18-02?
13   A.   It doesn't.
14   Q.   Okay.  On 11-20-2002, where does it
15  indicate that labs were ordered on that date?
16   A.   Dr. Desai has in here, on the medication
17  record, "blood work ordered."
18   Q.   Blood tests.  Okay.
19       And on 11-23-2002, does it indicate that
20  lab work needed to be reported?
21   A.   It doesn't in the note.  She's got it on
22  the medication administration record.
23   Q.   Okay.  And we'll get to that here in a
24  second.
25       Is the medication flow sheet record a

Page 258

better source to determine whether or not lab work
is --
     A.   Sometimes.
     Q.   -- ordered?
     A.   Sometimes.
     Q.   Okay.  On 1-16-2003, your office visit,
there is a handwritten note:  "Lab work ordered."
     A.   And labs were ordered, according to this as
well.
     Q.   And is that -- is that in your handwriting,
"Lab work ordered"?
     A.   Yeah.  I had to -- because I didn't type
it, so I added it handwritten.
     Q.   Okay.  And -- and how long did this office
visit last?
     A.   15 minutes.
     Q.   And do you know how much he weighed on that
particular date?
     A.   I don't.
     Q.   And then you saw -- there is a treatment
plan review addendum on 3-13-2003, I believe, with
your handwriting?
     A.   Correct.
     Q.   And is that your signature at the bottom of
the page?

Page 259

1    A.   It is.
2    Q.   Under Treatment Compliance, does it say the
3  client is compliant with his meds?
4    A.   Can I see that?
5    Q.   Yeah.  This is not --
6        MR. BARRINGER:  Did you not attach that?
7        MR. ELLISON:  Are you -- are you referring
8  to Exhibit 4?
9        MR. BARRINGER:  I am referring to
10  Exhibit 4.  Thank you.
11       MR. ELLISON:  Fair enough.  Here it is.
12       THE WITNESS:  Okay.
13   Q.   (By Mr. Barringer)  Did I read that right?
14  "Client is compliant with meds," on Treatment
15  Compliance?
16   A.   Uh-huh.  Yeah.  That's not what I wrote,
17  though.  Mary Zenel wrote that.
18   Q.   Okay.  And who is Mary Zenel?
19   A.   She was an administrative assistant.
20   Q.   Okay.
21   A.   Okay?  They would fill these out, and then
22  we would add.  So this is what I've added because he
23  was not compliant with his medications.
24   Q.   Okay.  But you didn't strike through it up
25  here on Treatment Compliance?

Page 260

     A.   No.  That -- we wouldn't do that.  You
don't strike through a record.
     Q.   Okay.  And under Treatment Plan
Modifications, it says:  "Extend treatment plan for
six months."  Is that correct?
     A.   Yes.
     Q.   So at this point in time, you wanted David
to continue treatment for at least six more months?
     A.   We did these every six months.  They would
be updated.
     Q.   So -- okay.  So the treatment plan, this
sheet would be completed every six months?  Is that
what that means?
     A.   Correct.  Correct.
     Q.   Okay.  And you know Dr. Jones?
     A.   I don't.
     Q.   Do patients sometimes not like their health
care providers?
     A.   Oh, frequently.
     Q.   And is it common for patients to want to
change their health care provider?
     A.   It's not common, but it's not that it
hasn't happened.
     Q.   Okay.  And Mr. Haller became threatening to
you on this particular date; is that correct?

Page 261

1    A.   That's correct.
2    Q.   And is that part of his antisocial
3    behavior?
4    A.   I think it's part of his antisocial
5    behavior.
6    Q.   Okay. And you can't treat that with
7    atypical antipsychotics; is that correct?
8    A.   No, you cannot.
9    Q.   To say the least, David Haller was
10   difficult to treat because of this antisocial
11   behavior; is that correct?
12   A.   That's correct.
13   Q.   Okay. In the lab work that you ordered on
14   1-16-2003, when was that completed?
15   A.   It was collected on the 31st of January,
16   2003.
17   Q.   And does it indicate whether or not it was
18   a fasting sample?
19   A.   It says it was a fasting sample. Remember,
20   that's reported by the client, that they've fasted.
21   Q.   Okay. And does -- does it indicate his
22   cholesterol level?
23   A.   Cholesterol 260, which was in line with
24   back in the Eighties.
25   Q.   And the reference range for cholesterol has

Page 262

since changed; is that correct?
     MR. ELLISON: Foundation.
     A.   I think that still, they want you to be
below 200.
     Q.   (By Mr. Barringer) And does it indicate what
his glucose level was on that day?
     A.   80. His glucose was fine.
     Q.   Okay. If his glucose wasn't fine on that
particular day -- strike that.
          Is 80 within normal range?
     A.   Well within normal range.
     Q.   Now, in your -- is it fair to say -- strike
that.
          Is it fair to say that you haven't reviewed
all of Mr. Haller's medical records from other
doctors?
     A.   Have not.
     Q.   Is it fair to say that you don't know what,
outside of the Directions for Mental Health lab works,
you don't know what the results he may have gotten
elsewhere; is that correct?
     A.   Wouldn't have any idea unless it was sent
to us.
     Q.   Okay. And you -- and you haven't been
asked to review those documents in order to determine

Page 263

1    whether or not Mr. Haller indeed has diabetes; is that
2    correct?
3    A.   Correct.
4    Q.   And is it fair to say that you haven't
5    prepared a chart indicating his weight while he was on
6    Seroquel during the time that he was prescribed
7    Seroquel?
8    A.   I did not.
9    Q.   Okay. And is it also fair that you haven't
10   prepared a chart regarding his use of Seroquel as it
11   relates to his glycemia levels?
12   A.   There is no chart.
13   Q.   Okay.
14   A.   Okay. Just this lab work.
15   Q.   I'm just saying you haven't prepared
16   anything for this deposition?
17   A.   No.
18   Q.   Okay. If one were to make -- would you
19   agree with me that in order for one to determine
20   whether or not Seroquel played a role in Mr. Haller's
21   diabetes, that they would need to have access to all
22   of his medical records that are available?
23   A.   Correct.
24   Q.   On 3-13-2003, this was the office visit.
25   I'm looking at the initial exam consult. It said that

Page 264

the appointment -- well, there is an indication of
12:15 to 12:50. Is that the time period with which
you saw Mr. Haller on that date?
     A.   Yes.
     Q.   And if my math is right, that's 35 minutes?
     A.   Yep.
     Q.   And during this time period, he -- he
became verbally aggressive; is that correct?
     A.   He did.
     Q.   He was upset, was he not?
     A.   I guess he was upset.
     Q.   He didn't want to be a guinea pig; is
that -- is that fair?
     MR. ELLISON: Form, foundation.
     A.   He didn't want to abide by the lithium
readjustment.
     Q.   (By Mr. Barringer) Okay. And it says:
"And stated many times he was not going to be a
guinea pig."
          Is that correct?
     A.   That's what he said.
     Q.   Okay. And he was verbally abusive by
making derogatory remarks about Terry Wallace; is that
correct?
     A.   That's correct.

Page 265

1    Q.    And -- and he -- he didn't agree with being
2  treated by some nurse practitioner that didn't know
3  what she was doing; is that correct?
4    A.    That's how it ended.
5    Q.    Okay.  Did that upset you that he said that
6  comment?
7    A.    No.
8    Q.    Did it upset you that he wanted "to fire us
9  all," in quotes?
10   A.    No.
11   Q.    In fact, you were glad that he wanted to
12 fire you; is that correct?
13       MR. ELLISON:  Form.
14   A.    I just figured he wouldn't be sucking up
15 our resources, yeah.  I guess you could say I was
16 glad.
17   Q.    (By Mr. Barringer)  You -- you didn't
18 like Mr. Haller; is that -- is that a fair
19 statement?
20   A.    Wasn't -- no -- no.
21       MR. ELLISON:  Form.
22   A.    That's not fair.  I didn't like him or
23 dislike him.
24   Q.    (By Mr. Barringer)  You didn't want him
25 as a -- as a patient, though; is that fair?

Page 266

A.    Not after this incident.
Q.    And on this particular date, you -- you
provided Seroquel, is that correct, or at least a --
A.    I provided prescriptions.
Q.    Correct.  Let me reask the question so
you're fair enough.
     On this particular date, you gave him a
prescription for Seroquel; is that correct?
A.    And lithium and Eskalith and Depakote.
Q.    Right.  But the answer to my question is
yes, you provided him a prescription for Seroquel; is
that correct?
A.    Right.
Q.    Okay.  "He complains of GI disturbance when
it was Depakene and was blaming this ARNP for that"?
A.    Right.
Q.    Do you recall anything about the GI
disturbance that he was complaining about?
A.    Just an upset stomach, which Depakote,
Depakene, or valproic acid can cause.
Q.    Okay.  Do you know whether or not Seroquel
can cause an upset stomach?
A.    I've never had anyone complain of an upset
stomach from Seroquel.
Q.    Okay.  Do you know whether after this

Page 267

1  visit, that David Haller went to Dr. Karl Jones?
2    A.    I don't know.
3    Q.    Do you know where, after this visit, David
4  Haller went to?
5    A.    He ended up back with us in 2005.  In
6  between there, I don't really know.
7    Q.    Okay.  There is another -- I don't know if
8  we went over this one or not.  It is another Treatment
9  Plan Review/Addendum for Review No. 1, Fiscal Year
10 '05-'06.
11       MR. BARRINGER:  And I don't know -- have
12 you attached that one?
13       MR. ELLISON:  No.
14       MR. BARRINGER:  I'm going to attach it to
15 the record.  What number am I up to?
16       MR. ELLISON:  I don't know.
17       MR. BARRINGER:  13?  I think 13.
18       THE WITNESS:  11 . . .
19       MR. ELLISON:  I think 12.
20       THE WITNESS:  I think it's 12, too.
21       (Dee Burke Exhibit 12 was marked and is
22 attached hereto.)
23   Q.    (By Mr. Barringer)  Okay.  I'm going to hand
24 you that treatment plan.  Now, is this the -- similar to
25 the last treatment plan that we looked at?

Page 268

A.    It's the same format.
Q.    Okay.  And what -- under the first
subsection, what does it indicate in -- in the
handwritten notes?
A.    It starts out:  "Unable to assess at this
time.  Last seen in September.  Has been at
St. Anthony's and is in a new ALF.  He states he
wanted to change ALFs so he threatened suicide but was
not actually suicidal.  He must follow treatment plan
recommendations, be present and on time for all
appointments."
Q.    Okay.  Is it common for people to get
attention by committing suicide?
     MR. ELLISON:  Form, foundation.
A.    Common?  In a personality disorder, it
might be common.
Q.    (By Mr. Barringer)  Okay.  And -- and
Mr. Haller had a personality disorder, correct?
A.    He did.
Q.    And you can't treat personality disorders
with drugs; is that correct?
A.    That's correct.
Q.    Is that written in your handwriting?
A.    It is.
Q.    Okay.  And do you recall filling out this

Page 269

1   treatment plan?
2       A.   When I see it.
3       Q.   Okay.  And it says that he's to get another
4   one in six months; is that correct?
5       A.   That's correct.
6       Q.   Under Additional Comments, can you read
7   that in for the record?
8       A.   "Client must attend all scheduled
9   appointments.  Appointments not to exceed 90 days.
10  Failure to do so will result in case being closed and
11  referred to -- elsewhere."
12      Q.   And it's in -- did you type that?
13      A.   No.
14      Q.   Okay.  It's in all caps.  Do you know --
15  was it common for everybody to type in all caps?
16      A.   It was for this girl.  She's typed
17  everything in all caps.
18      Q.   Okay.  Do you put any sort of weight to --
19  to her typing in all caps as to be a warning?
20      A.   No.
21      Q.   Okay.  But you verbally instructed to
22  Mr. Haller that if he was noncompliant for any reason,
23  that you would terminate his treatment on that date;
24  is that correct?
25      A.   That's correct.

Page 270

1       Q.   And I believe your office last visit is
2   12-20-2005; is that correct?
3       A.   Right.  The date that he signed this
4   treatment plan.
5       Q.   Is that the date he signed it?
6       A.   It is.
7       Q.   And, in fact, that's the same date as your
8   last progress note that we have in our records
9   involving you; --
10      A.   Correct.
11      Q.   -- is that correct?
12      A.   Correct.
13      Q.   On -- under History, it says: "The client
14  states he is on Seroquel 300 milligrams QHSand.  He
15  arrives with Risperdal 37.5 Consta."
16           Do you see that in the middle there?
17      A.   I do, yes.
18      Q.   Do you know where he got the prescription
19  for Seroquel 300 milligrams QHSand on this particular
20  date?
21      A.   I don't.  I would assume it came from
22  St. Anthony's.
23      Q.   Do you know what -- what does "QHSand"
24  mean?
25      A.   QHS is -- I didn't put -- you know, I

Page 271

1   didn't space --
2       Q.   Oh, okay.
3       A.   -- between "and." "QHS and."
4           MR. BARRINGER:  See, Steve, when you get me
5   to hurry, I'm . . .
6           MR. ELLISON:  I don't think you're in a
7   hurry.  I think you're tired.
8           MR. BARRINGER:  No, I'm good.  I'm good.
9       Q.   (By Mr. Barringer)  And he arrived on
10  this particular day with Risperdal 37.5 mil- -- -5
11  milligrams Consta; is that correct?
12      A.   That's correct.
13      Q.   And that's an injectable form?
14      A.   It is.
15      Q.   And on that particular date, did you inject
16  Mr. Haller with Risperdal 37.5 Consta?
17      A.   I did.
18      Q.   Okay.  Under the Instructions, it says: "I
19  told this client he must comply with recommendations
20  if he wants to be seen."
21           Did I read that correctly?
22      A.   You did.
23      Q.   "I then talked to him about the
24  effectiveness of Risperdal Consta and that his
25  argument of not being able to get here does not stand

Page 272

1   as he can take a cab."
2           Is that correct?
3       A.   Right.
4       Q.   Were you hoping that he would be
5   noncompliant so you could release --
6       A.   No, I was hoping he'd be compliant;
7   otherwise, I wouldn't have given him an injection.
8       Q.   It says: "I also -- I also went over that
9   he had just told me that the medications were
10  working."
11           Did I read that correctly?
12      A.   You did.
13      Q.   As of this date, do you know how long he
14  had been on Risperdal 37.5 milligrams Consta?
15      A.   I think he had only had one injection, so
16  that would have been two weeks.  He'd have had his
17  first one two weeks prior.
18      Q.   Okay.  And I believe you -- you testified
19  earlier that it takes at least -- at least three
20  injections --
21      A.   Three injections.  Three injections.
22      Q.   -- before it kicks in; is that correct?
23      A.   Uh-huh.
24      Q.   Were you trying to replace Risperdal Consta
25  in lieu of Seroquel at this point in time?

Page 273

1    A.   That would have been my goal if he had
2  stayed with me, only because of compliance issues.
3    Q.   A few lines down, it says: "I told David
4  that as long as he's cooperative and follows
5  recommendations, I will see him, but if he is not,
6  then I won't."
7        Did I read that correctly?
8    A.   Yep.
9    Q.   "He states okay and then left with his case
10 manager.  The client is aware to abstain from alcohol,
11 illicit drugs, OTC preparations not approved by this
12 ARNP, to limit nicotine, caffeine, and to follow a
13 healthy diet."
14       Did I read that correctly?
15   A.   Yep.
16   Q.   "The client is aware of the different
17 facilities in the area for emergencies."
18       Did I read that correctly?
19   A.   You did.
20   Q.   "The client is aware of the suicide hotline
21 phone number and knows in extreme emergency, 911 can
22 be called for assistance."
23       Did I read that correctly?
24   A.   That's true.
25   Q.   "The client is aware that DMH is not an

Page 274

emergency facility."
         Did I read that correctly?
     A.   That's right.
     Q.   "The client is educated on indication --
indications, dosage, and side effects of the
medications and gives voluntarily verbal informed
consent.  We discussed alternative to treatment to
include no treatment.  The client agrees to
plan/regime today.  The treatment plan was reviewed
and signed."
         Did I read that correctly?
     A.   You did.
     Q.   Did you weigh him on this date?
     A.   I wouldn't have been the one to weigh.  Our
nurse was the one that was supposed to weigh.
     Q.   Okay.  Where would that note be held?
     A.   In the -- in nursing notes.
     Q.   Okay.  Is that separate and apart from your
progress notes?
     A.   It is.
     Q.   Okay.  So if -- if we go back through
this -- the voluminous records of Exhibit 1 and we see
where the facility began to measure weights, is that
about the time, based on your guess, that you would
have began warning patients regarding the possible

Page 275

1  association between Seroquel and diabetes?
2        MR. ELLISON:  Form, foundation.
3    A.   I never would have warned the patients of
4  potential of Seroquel with diabetes.  What I learned
5  the client about, whether it be olanzapine, Risperdal,
6  Seroquel, Geodon, that there are potential side
7  effects and risks and what those risks are.  And one
8  of the risks is an increase in appetite.
9        What they do with that is their choice.  If
10 they binge eat and eat bad and they don't exercise,
11 they're going to gain weight and most likely will
12 develop Diabetes Type II and what then that in details
13 [sic].  The fact remains that people with bipolar
14 illness and schizophrenia have a very high propensity
15 for cardiovascular problems and diabetes and weight
16 gain and poor diet and poor lifestyle.
17       So you have to weigh the benefits of this
18 or anything else versus the consequences.  What -- you
19 know, there is a quality versus quantity of life.
20 Chances are some of these folks are going to develop
21 diabetes whether they're medicated or not.
22   Q.   If a pharmaceutical sales representative
23 for AstraZeneca told you that Seroquel can cause
24 diabetes, would -- or is associated with diabetes,
25 would you have relayed that information to your

Page 276

patients?
     A.   I would.
         MR. ELLISON:  Form, foundation.
     A.   However, they were relayed the information
of the potential for the weight gain which can cause
diabetes, so in a roundabout way, they were always
educated on that.
     Q.   (By Mr. Barringer)  And sitting here
today, did -- do you recall any pharmaceutical sales
representatives ever discussing Seroquel and
diabetes with you?
     A.   No.
         MR. ELLISON:  Form, foundation.
     Q.   (By Mr. Barringer)  Let's talk about the
medication flow sheet.  You pulled out two pages of the
Medication Flow Sheet that you indicated some
involvement on.
     A.   Uh-huh.
     Q.   Okay.  Can -- I want to make sure I can get
those pages.  It's Exhibit 2, part of Exhibit 2; is
that correct?
     A.   Correct.
         MR. ELLISON:  First couple of pages.
     Q.   (By Mr. Barringer)  First couple of pages.
         When Mr. Haller was under your care and

Page 277

1  treatment, how often did you recommend him to come in
2  and -- and -- and see you?
3      A.   At -- at first, every four weeks.  When he
4  returned in 2005, it was every eight weeks.
5      Q.   Okay.  And on 10-1-2002, what -- under the
6  Medication Flow Sheet, what did you prescribe on that
7  date?  What -- can you read that into the record?
8      A.   Yeah.  Seroquel 100 milligrams, one-half
9  tonight, then one QHS, then two, then three, then four
10  QHS. Depakote 500 milligrams, two QHS. Eskalith, 450
11  CR in the morning.  Lithium 300, two QHS.
12      Q.   Okay.  Under the Seroquel, does it say
13  quantity?  Does it indicate a quantity?
14      A.   It says 120.
15      Q.   Okay.  And -- and you did not provide a
16  refill; is that correct?
17      A.   No refills.
18      Q.   And it says -- there is an SF column with
19  "Pink, forward slash, White."  What does that mean?
20      A.   The pink prescriptions were coming out of
21  our budget.  White came out of whatever insurance they
22  had.
23      Q.   Okay.  And what does the "SF" stand for?
24      A.   I'm not really sure.
25      Q.   Okay.  And on 10-15-2002, was David Haller

Page 278

supposed to appear?
    A.   He was.
    Q.   And did he -- did he appear?
    A.   He was a no-show.
    Q.   Okay.  And you saw, again, Mr. David Haller
on 10-23-2002?
    A.   Correct.
    Q.   And what was the prescription for Seroquel
on that date?  Can you read that into the --
    A.   100 milligrams tonight, two second night,
three third night, then four QHS.
    Q.   You also prescribed Depakote?
    A.   Depakote again, 500 milligrams two QHS,
Eskalith, 450 CR in the morning, lithium 300 two QHS.
    Q.   Okay.  And so on 10-23-2002, the quantities
of Seroquel would have been 120?
    A.   Again, right.
    Q.   And the -- and the dosage of that pill
would have been 100 milligrams; is that correct?
    A.   Correct.
    Q.   Again, on 11-20-2002, it says --
    A.   Dr. Desai saw him.
    Q.   Oh, okay.  On the 11-1-2002, on the
10-15-2002, and the 10-23-2002, are those your
initials under the M.D. name?

Page 279

1      A.   It -- correct.
2      Q.   Okay.  On 12-18, there's an entry
3  indicating prescriptions for lithium, Eskatathe [sic],
4  Depakote, or --
5      A.   Depakene.
6      Q.   -- Depakene, Seroquel?
7      A.   Right.
8      Q.   And is that your name listed under the M.D.
9  name on --
10      A.   It is.
11      Q.   Okay.  It's some sort of squiggly line and
12  going straight --
13      A.   Yeah, it's bad.
14      Q.   Okay.
15      A.   I must have been tired that day.
16      Q.   And you -- you prescribed Seroquel of 200
17  milligrams two QHS; is that correct?
18      A.   Right.
19      Q.   And for 60 pills; is that correct?
20      A.   That's correct.
21      Q.   On January 16th, there is an indication on
22  the medical flow sheet with the initials DB.  Is --
23  are -- are those your initials?
24      A.   They are.
25      Q.   Indicates that labs were ordered on that

Page 280

particular day; is that correct?
    A.   That's correct.
    Q.   It indicates that Seroquel was prescribed
to Mr. Haller; is that correct?
    A.   Right.
         There was also blood work ordered by
Dr. Desai back in November that he didn't comply with.
    Q.   And that's on 11-20-2002?
    A.   That's correct.
    Q.   And -- and is it your testimony that the
"B test --
    A.   Blood test.  Yeah, that's Dr. --
    Q.   Is that what "B test" means?
    A.   Yeah, that's Dr. Desai.
    Q.   Do you know what, under the Comments
section, what it says under "B test"?  Did you write
that?
    A.   You talking about here with her name,
"Desai"?
    Q.   Is that her name?
    A.   Yeah.
    Q.   Okay.  So Dr. Desai didn't put it under the
M.D. name?
    A.   That's what that is over there, as well.
    Q.   Okay.

Page 281

1     A.   Okay.  And then she wrote out her name and
2  "blood test."
3     Q.   On 3-10-03, is -- what does it say under
4  that?  Can you --
5     A.   "Continue above meds, except change
6  Depakene to Depakote."
7     Q.   Okay.  And is that your initials?
8     A.   It is.
9     Q.   So you gave him, Mr. Haller, another
10 prescription Seroquel for 200, two QHS, 60 pills?
11    A.   Correct.
12    Q.   With a same refill quantity of two?
13    A.   Right.
14    Q.   So from 1-16 to 3-10-03, Mr. Haller had the
15 ability to go two months without coming back to you --
16       MR. ELLISON:  Form.
17    Q.   (By Mr. Barringer) -- with respect to
18 the Seroquel?
19       MR. ELLISON:  Sorry.  Form, foundation.
20    A.   He's always got the ability not to come
21 back.  Whether he is supposed to or not was another
22 issue.
23    Q.   (By Mr. Barringer) I'm sorry.  Let me --
24 you're right.  Bad question.
25       On 1-16-2002 -- 1-16-2003, you prescribed

Page 282

Seroquel to Mr. Haller with two refills, correct?
   A.   Right.
   Q.   And was that two refills to cover two
months worth of prescriptions?
   A.   It's so I didn't have to write it when I
saw him next time, okay?  But not that he was supposed
to go three months without being seen.
   Q.   But he would have had access based on the
prescriptions --
   A.   He could -- he could maintain being on meds
if he didn't show.
   Q.   Okay.  And on 3-10-2003, the same thing
occur with reference to the refills?
   A.   It does.
   Q.   Okay.  And underneath the 3-10-2003, is
that your handwriting where it says -- I guess it says
10-10?
   A.   I'm not sure what that is.  That's
Dr. Zenel -- I mean, Mary Zenel wrote it.  I don't
know what it pertains to.
   Q.   Okay.  And then let me see the one, your
last one.
       MR. ELLISON:  The 1-22-05?
       MR. BARRINGER:  Yeah -- yeah, yeah, yeah,
that time period.

Page 283

1        MR. ELLISON:  Do you need it?
2        MR. BARRINGER:  Yeah.  I have all of them
3  bunched together.
4     Q.   (By Mr. Barringer) Okay.  On 12-20-2005,
5  do you have that medication flow sheet in front of
6  you?
7     A.   I do.
8     Q.   Okay.  What does it say with respect to
9  Seroquel?
10    A.   300 milligrams one QHS, quantity 30 with
11 two refills.
12    Q.   And that's your signature?
13    A.   It is.
14    Q.   Okay.  And at this point in time, there is
15 a "W," and that indicates what?
16    A.   White prescription.
17    Q.   Okay.  And what does the blue mean?
18    A.   Patient assistance.  Meaning they had to go
19 to the person who was in charge of trying to help
20 people get the medications through the pharmaceutical
21 company on the patient assistance.
22    Q.   Okay.  So at least at this time, David
23 wasn't using the resources of Directions For Mental
24 Health to obtain medications?
25    A.   Right.  He had Medicaid.

Page 284

   Q.   Okay.  And under Comments section, does
it -- does it indicate anything regarding Seroquel?
   A.   Under Comments?  No.
   Q.   Okay.  What -- what -- what is listed under
the Comments section?
   A.   That I gave him his 37.5 milligrams of
Consta, and that it's going to next time be increased
to 50 milligrams.
   Q.   Okay.  And that was a -- you indicated that
you saw this -- you think -- believe that you saw this
patient in 2006, correct?
   A.   I thought I did.
   Q.   Okay.  With -- would you have used the same
medication flow sheet procedures --
   A.   Yeah.
   Q.   -- and -- and initialed off on the
prescriptions if you saw him in 2006?
   A.   I would have.
   Q.   Okay.
       MR. BARRINGER:  This is going to be
Exhibit 13.  Well, it's actually part of Exhibit 1.
Steve, if you don't mind, what I'd like to do is talk
about the medication flow sheet, pages of which are in
Exhibit 1 and pages of which are in Exhibit 2.
       MR. ELLISON:  I have no problem with that.

Page 285

1    MR. BARRINGER: Okay.
2    Q. (By Mr. Barringer) Do you see -- yeah.
3    Do you see, on -- on the two pages after
4 the 12-20-2005 during the time period of 2006,
5 anywhere where your initials are on those medication
6 flow sheets?
7    A. No.
8    Q. And would it have been your practice to
9 sign off on the medication flow sheet if you would
10 have prescribed a -- a patient medication?
11    A. Yes. And there would have been a note as
12 well.
13    Q. Have you ever been -- I don't know if this
14 question has been asked. Have you ever been asked to
15 be a speaker on behalf of AstraZeneca on the product
16 Seroquel?
17    A. No.
18    MR. BARRINGER: I have no further
19 questions. I'll pass the witness.
20
21    FURTHER EXAMINATION
22 BY MR. ELLISON:
23    Q. I just have a couple of follow-ups.
24    Ms. Burke, I'm kind of confused. I think
25 you may have clarified it, at least to some extent,

Page 286

and it may be clear in your mind, but the timing of
when you knew there was a risk of increased appetite,
weight gain, diabetes, is really important to this
litigation. I asked you some questions at the
beginning, including those related to the very first
visit that you had with Mr. Haller, and you said that
as of that visit, which was in 2002, you understood
that there was a risk of increased weight, diabetes,
hyperglycemia, metabolic process, the works, as of
October 2002 from the first time you saw David Haller;
is that correct?
    A. I think that is correct.
    Q. Okay. And then Bob asked you some
questions trying to pin down when you learned that
there was a -- a label change in association with
Seroquel, olanzapine, and/or diabetes. Do you recall
that testimony?
    A. Kind of.
    Q. Okay. What I -- what I need to know is,
when did you learn there was this risk -- strike that.
    Did you know, as of the time that you were
treating David Haller -- strike that.
    Did you believe that, as of the time you
were -- began treating David Haller in October of
2002, that atypicals such as Seroquel might cause

Page 287

1 someone's appetite to increase which could then lead
2 to metabolic problems, diabetes, and hyperglycemia?
3    MR. BARRINGER: Objection; form.
4    A. That's true.
5    Q. (By Mr. Ellison) Okay. It had nothing to do
6 with when Dear Health Care Provider letters were sent or
7 when plaintiffs sued Eli Lilly for Zyprexa or anything
8 like that; is that right?
9    A. No. That's just when we became more
10 conscious, I think.
11    Q. Your practices began to change when you saw
12 that plaintiffs' --
13    A. Exactly.
14    Q. -- lawyers started suing people over this;
15 is that right?
16    A. Right.
17    MR. BARRINGER: Objection; form.
18    Q. (By Mr. Ellison) Am -- am I wrong?
19    A. That's true.
20    Q. Okay. But again, so that the record is
21 absolutely clear, you believed that there was a risk
22 associated with appetite increase, which could lead to
23 weight gain, diabetes, or metabolic process with all
24 atypicals that were available at the time, including
25 Seroquel, as of the very first time you saw David

Page 288

Haller in October of 2002, correct?
    A. All of them except Geodon.
    Q. Fair enough.
    A. And I don't remember aripiprazole being out
at that point, but --
    Q. And -- and at this point, you're not aware
of the data; is that right?
    A. I'm not.
    Q. Okay. And -- and my colleague showed you a
bunch of documents that included e-mails to people in
Japan and portions of communications that related to
some things. Suffice it to say you had never seen any
of those documents that he showed you before; is that
correct?
    A. I had never seen them.
    Q. Not one of those makes a darn bit of
difference in your mind as to the propriety of the
treatments you gave David Haller; is that correct?
    A. Not at all.
    MR. BARRINGER: Objection; form.
    Q. (By Mr. Ellison) You looked back,
notwithstanding what my colleague showed you, and
you believe, with conviction, that each and every
time you prescribed Seroquel, that was the exact
right thing to do; is that --

Page 289

1    A.  I do.
2    Q.  And looking back, you wouldn't change an --
3  a thing, even if you knew any of the information that
4  was included in each and every one of the exhibits
5  that he marked, correct?
6       MR. BARRINGER:  Objection; form.
7    A.  Not only looking back, looking forward.  I
8  still prescribe the same way.
9    Q.  (By Mr. Ellison)  Do you think it would
10 be good for Mr. Haller to be on Seroquel today?
11      MR. BARRINGER:  Objection; form.
12   A.  I wouldn't -- I don't know.  I haven't seen
13 him in two years.  I can't say.
14   Q.  Fair enough.
15      MR. BARRINGER:  I got a couple recross.
16      MR. ELLISON:  All right.
17
18         FURTHER EXAMINATION
19 BY MR. BARRINGER:
20   Q.  Back in 2002, if Geodon was on the market
21 at that point in time, would that have been a --
22 alternative for Mr. Haller?
23   A.  No.
24   Q.  Okay.  Why not?
25   A.  Because it wasn't effective with the way

Page 290

they did it.  It wasn't till after it was out five
years that they finally found how to use the drug
appropriately.
   Q.  With respect to Abilify, would it have been
available to Mr. Haller, assuming that on 10-2002,
that it was on the market?
   A.  I think with where we were wanting to go
with him and his signs and symptoms, no, because one
of his complaints was insomnia, which aripiprazole can
actually promote.  So given the choice between
Seroquel, Risperdal, and Zyprexa -- and he had quoted
that he had already failed Risperdal -- Seroquel was
the better choice.
   Q.  Would you have changed your habits in 2002
regarding the documentation and monitoring of -- of
the patient if the pharmaceutical sales representative
said you needed to monitor specifically to watch for
metabolic profile on the patients that you prescribe
atypical antipsychotics?
      MR. ELLISON:  Form, foundation.  Also --
   A.  I don't rely on the drug reps to tell me
how to practice.
      MR. BARRINGER:  Thank you, very much.
      MR. ELLISON:  Ms. Burke, pursuant to
Federal Rule of Civil Procedure 30E, you have the

Page 291

1  right to review the transcript; within 30 days, make
2  whatever changes you deem appropriate, and then return
3  it to the court reporter, or you can waive that right.
4  All I need is a statement on the record.
5       THE WITNESS:  I'll waive that right.
6       MR. ELLISON:  Bless your heart.  We're
7  done.
8       THE VIDEOGRAPHER:  This concludes the
9  deposition at 3:30.
10      (Proceedings concluded at 3:30 p.m.)
11      FURTHER THIS DEPONENT SAITH NOT
12
13      /SIGNATURE WAIVED/
14      DEE BURKE
15
16
17
18
19
20
21
22
23
24
25

Page 292

STATE OF TENNESSEE  )
COUNTY OF SUMNER    )
   I, Deborah K. Watson, Registered
Professional Reporter and Notary Public in and for the
State of Tennessee, at Large,
   DO HEREBY CERTIFY the foregoing proceedings
were taken at the time and place set forth in the
caption thereof; the witness therein was duly sworn on
oath to testify the truth; the proceedings were
stenographically reported by me in shorthand; and the
foregoing proceedings constitute a true and correct
transcript of said proceedings to the best of my
ability.
   I FURTHER CERTIFY I am not a relative or
employee or attorney or counsel of any of the parties
hereto, nor a relative or employee of such attorney or
counsel, nor do I have any interest in the outcome or
events of this action.
   IN WITNESS WHEREOF, I have hereunto affixed
my official seal and signature this 20th day of
August, 2008, at Goodlettsville, Sumner County,
Tennessee.

                    Deborah K. Watson, RPR
                    Notary Public at Large
                    State of Tennessee
                    My Commission Expires: 10/11/2008