# EXHIBIT 4

1

**UNITED STATES DISTRICT COURT**

**MIDDLE DISTRICT OF FLORIDA**

**IN RE:  SEROQUEL PRODUCTS LIABILITY LITIGATION
MDL DOCKET NO. 1769**

**This document relates to:**

**Haller v. AstraZeneca LP, et al
(David D. Haller 6:07-cv-15733)**

**Livesay vs. AstraZeneca LP, et al
(Debra G. Livesay 6:07-cv-15752)**

**DEPOSITION OF NICOLE R. KEENE,
TAKEN AT THE OFFICES OF ESQUIRE DEPOSITION
SERVICES, SUITE 1515, 650 POYDRAS STREET, NEW
ORLEANS, LOUISIANA, ON THE 29TH DAY OF MARCH,
2008.**

**APPEARANCES:**

**REPRESENTING THE PLAINTIFFS:**

**BAILEY PERRIN BAILEY
ATTORNEYS AT LAW
BY:  JIM BRUZZESE, ESQ.
440 LOUISIANA, SUITE 2100
HOUSTON, TEXAS 77002**

**E-MAIL:  SEROQUELDEPOS@BPBLAW.COM
   (713) 425-7100**

**2**

```
1   REPRESENTING THE DEFENDANT:
2
3       FAEGRE & BENSON LLP
        ATTORNEYS AT LAW
4       BY:  STEVEN J. ELLISON, ESQ.
        2200 WELLS FARGO CENTER
        90 SOUTH SEVENTH STREET
5       MINNEAPOLIS, MINNESOTA 55402-3901
6       E-MAIL:  SELLISON@FAEGRE.COM
        (612)766-8672
7
            -AND-
8
        DECHERT LLP
9       ATTORNEYS AT LAW
        BY:  ANDREW R.C. GADDES, ESQ.
10      CIRA CENTRE, 2929 ARCH STREET
        PHILADELPHIA, PENNSYLVANIA 19104-2808
11
        E-MAIL:  ANDREW.GADDES@DECHERT.COM
12      (215) 994-2188
13
    REPORTED BY:
14
15
        RUBY M. WALLEN
16      CERTIFIED COURT REPORTER
17
18      EXAMINATION INDEX
19
20  EXAMINATION BY          PAGE
21
    MR. ELLISON.................6
22  MR. BRUZZESE..............167
    MR. ELLISON...............198
23  MR. BRUZZESE..............203
    MR. GADDES................204
24  MR. BRUZZESE..............270
    MR. GADDES................285
25
```

**4**

```
1   HALLER/KEENE 12.................179
    Chemistry 1/3/04
2   DHaller/Morton Plant Hospital-Med/01404
3   HALLER/KEENE 13.................180
    Lab results 5/18/07
4   DHaller/Labcorp/000094
5   HALLER/KEENE 14.................198
    LabCorp test results
6   DHaller/Pinellas County Sheriffs/00128
7   HALLER/KEENE 15.................201
    Pinellas County Sheriff's Office
8   Receiving Screening
    DHaller/Pinellas County Sheriffs/00032
9
    LIVESAY/KEENE 1.................205
10  RecordTrak Debra G. Livesay medical
    records/dLivesay/Directions for Mental Health
11  00001 to 0089
12
13
14
15
16
17
18
19
20
21
22
23
24
25
```

**3**

```
1
        EXHIBIT INDEX
2
3   EXHIBIT NO.          PAGE
4   HALLER/KEENE 1.................40
    Endorsement of Protective Order
5
    HALLER/KEENE 2.................40
6   Confidential Seroquel Medical Records
    DHaller/Directions for Mental Health
7   00003-00060
8   HALLER/KEENE 3.................41
    Facsimile Cover Sheet
9   Confidentiality Warning 3/26/08
10  HALLER/KEEN 4.................41
    Integrated Care Monitoring Form
11  Year:2007
12  HALLER/KEENE 5.................41
    Psychiatric Progress Note 6/28/07
13
    HALLER/KEENE 6.................43
14  Psychiatric Progress Notes 9/20/07
    David Haller
15
    HALLER/KEENE 7.................43
16  Psychiatric Progress Note 11/20/07
    David Haller
17
    HALLER/KEENE 8.................176
18  DHaller/Social Security Disability/00190
    Morton Plant Hospital
19
    HALLER/KEENE 9.................177
20  LabCorp Metabolic Panel 1/29/01
21  HALLER/KEENE 10.................178
    DHaller/Labcorp/00005
22  1/24/02 test results
23  HALLER/KEENE 11.................178
    DHaller/Labcorp/00007
24  4/22/02 test results
25
```

**5**

```
1       S T I P U L A T I O N
2
3
4
5        It is stipulated and agreed by and
6   between counsel for the parties hereto that
7   the deposition of the aforementioned witness
8   is hereby being taken under the Federal Rules
9   of Civil Procedure, for all purposes, in
10  accordance with law;
11       That the formalities of reading and
12  signing are specifically waived;
13       That all objections, save those as to
14  the form of the question and the
15  responsiveness of the answer, are hereby
16  reserved until such time as this deposition,
17  or any part thereof, may be used or sought to
18  be used in evidence.
19
20           * * * *
21
22       RUBY M. WALLEN, Certified Court
23  Reporter, in and for the Parish of Orleans,
24  State of Louisiana, officiated in
25  administering the oath to the witness.
```

**6**

1     NICOLE KEENE,
2  after having been first duly sworn by the
3  above-mentioned court reporter, did testify as
4  follows:
5  BY MR. ELLISON:
6     Q.   Good morning, ma'am.  Will you
7  state your name for the record?
8     A.   **Nicole Robichaux Keene.**
9     Q.   And where do you -- where is your
10  professional, your business address?
11     A.   **Right now, it is at 110 Veterans**
12  **Boulevard in New Orleans.**
13     Q.   And how are you employed?
14     A.   **I am employed as a clinical**
15  **psychologist and a psychiatric nurse**
16  **practitioner.  Both.**
17     Q.   And you understand that you are
18  being deposed today because two of your
19  patients, one of whom is David Haller, filed a
20  lawsuit claiming that a medication that you
21  and your colleagues provided to him, Seroquel,
22  caused him to develop diabetes.
23     Do you understand that?
24     A.   **Yes.  I do.**
25     Q.   Have you ever been deposed

**8**

1     Similarly, once I think I
2  understand your answer, I might say, oh, okay.
3  I get it, that sort of thing, and thus cut you
4  off.  Again, that makes her life miserable.
5     Will you do your best to let me
6  finish my question before you answer it today,
7  and that way you will know precisely what I am
8  asking?
9     A.   Yes.
10     Q.   And I assure you, I will try to
11  remember to extend the same courtesy to you.
12     Finally, if you need a break for
13  whatever reason during the deposition today,
14  will you just let me know.  And so long as
15  there is not a question pending, I will take a
16  break right then and there.
17     Fair enough?
18     A.   Yes.
19  MR. ELLISON:
20     Okay.  Counsel, let's just make a
21  statement on the record.  As I understand it,
22  although none of the three lawyers here were
23  involved in any of the discussions, it is our
24  collective understanding that we are allowed
25  four hours of deposition testimony, two and

**7**

1  before?
2     A.   No.
3     Q.   Oh, sorry you had to meet us this
4  way.  Let me run over a few of the ground
5  rules, then.
6     As you can see, the court
7  reporter at your right is transcribing
8  everything that we are saying, and she is
9  going to get real mad at me if we don't make
10  her job easy.
11     In ordinary conversation,
12  particularly as people get comfortable with
13  each other, they engage in a lot of shortcuts.
14  They nod their heads.  They say uh-uhs and
15  uhn-uhns.  That is really hard for her to take
16  down.
17     So will you do your best to
18  answer my questions audibly today?
19     A.   Yes.
20     Q.   Also, as conversation proceeds,
21  people become, as I said, more comfortable
22  with each other.  And you can kind of see
23  where I am going with my question, and you
24  will answer what you understand I am going to
25  be asking.

**9**

1  half to the defendant, one and a half to the
2  plaintiff, for the two cases.  One involves
3  David Haller.  One involves Debra Livesay.
4     And our collective understanding
5  on how to proceed is I will begin with general
6  questions and then turn to the specific care
7  and treatment of David Haller.
8     After I have completed
9  questioning, plaintiff's counsel will conduct
10  cross-examination related to David Haller.
11  Then I will do whatever follow-up there may be
12  until the questioning is completed, at which
13  point I will turn matters over to my
14  colleague, Andrew Gaddes, who also represents
15  AstraZeneca in these proceedings.
16     He will conduct general
17  questioning related to Debra Livesay, and then
18  upon conclusion, we will turn the matter over
19  to plaintiff's counsel for cross-examination
20  until questioning is resolved.
21     Is that your understanding?
22  MR. GADDES:
23     That is my understanding.
24  MR. BRUZZESE:
25     That is my understanding.  I

**(Pages 6 to 9)**

**10**

1　agree to that.
2　　MR. ELLISON:
3　　　Andrew?
4　　MR. GADDES:
5　　　Off the record a second.
6　　　(Off the record.)
7　　MR. ELLISON:
8　　　Let's go back on the record.
9　There is a question in at least one of our
10　minds as to the division of the time. We are
11　looking into that now. I am going to proceed
12　so as not to waste yours. Okay? Fair enough?
13　THE WITNESS:
14　　Fair enough.
15　MR. ELLISON:
16　　In terms of marking exhibits, we
17　have agreed that for David Haller, we will say
18　Haller/Keene and then do them numerically.
19　　Let's go back. I lost the train
20　of thought on the point I was previously
21　making. I am going to finish that.
22　　In terms of exhibits, we have
23　agreed that the deposition exhibits that
24　relate specifically to Mr. Haller will be
25　Keene -- will be Haller/Keene and then

**11**

1　numerically ordered.
2　　And then the deposition exhibits
3　relating to Debra Livesay will be
4　Livesay/Keene and then numerically ordered.
5　General deposition exhibits we will just do --
6　any general deposition exhibits we will just
7　do in numerical sequence.
8　　Is that your understanding?
9　MR. GADDES:
10　　It is.
11　MR. ELLISON:
12　　And yours as well?
13　MR. BRUZZESE:
14　　That is fine.
15　MR. ELLISON:
16　　To correct the time issue, again,
17　none of us were involved in the conversations.
18　And it sounds like I may have misread an
19　E-mail.
20　　Each side, as I understand it, is
21　allowed a total of four hours as to both
22　plaintiffs. Is that your understanding?
23　MR. GADDES:
24　　That is correct.
25　MR. ELLISON:

**12**

1　　And yours as well, Jim, based on
2　the E-mail that Andrew pulled up?
3　　MR. GADDES:
4　　　It is.
5　BY MR. ELLISON:
6　　Q.　I don't think we are going to go
7　anywhere near that long. Let me just tell you
8　in advance. And so the record is clear, the
9　witness looks shocked and appalled.
10　　**A.　So you are saying 16 hours is**
11　**total?**
12　　Q.　Total of eight.
13　　**A.　Total of eight for -- including**
14　**both. That is what I thought.**
15　　Q.　The grand total is eight.
16　　**A.　That's what I thought. Okay.**
17　　Q.　That is not what I thought.
18　　**A.　Okay.**
19　　Q.　You have never given a deposition
20　before. That is correct? And we have just
21　covered the ground rules. Have you ever
22　testified in a trial before?
23　　**A.　No.**
24　　Q.　You paused. Were you thinking
25　about that?

**13**

1　　**A.　I testified just right before I**
2　**left as a fact witness, I guess it was. It**
3　**would have been a trial. There was no jury or**
4　**anything.**
5　　Q.　Was it a judge?
6　　**A.　Yeah.**
7　　Q.　Where was this?
8　　**A.　This was in Florida.**
9　　Q.　When did you move from -- you
10　used to live in Florida. Right?
11　　**A.　I moved in December.**
12　　Q.　And it is in Florida you provided
13　care and treatment for David Haller. Is that
14　correct?
15　　**A.　Correct.**
16　　Q.　Yes?
17　　**A.　Correct. Yes.**
18　　Q.　You have never provided care and
19　treatment to David Haller in the State of
20　Massachusetts. Correct?
21　　**A.　Correct.**
22　　Q.　And I asked that because I
23　represent to you that is where he filed his
24　lawsuit. You have never provided care and
25　treatment to David Haller in the State of

**14**

1  Louisiana. Correct?
2      A.    Correct.
3      Q.    Was the case that you just
4  described in Florida?
5      A.    The one I testified in. Correct.
6      Q.    That is correct. And without
7  telling me confidential medical information
8  relating to that plaintiff in particular, what
9  was the case generally about?
10     A.    It involved criminal behavior on
11  his part and whether or not I thought it was
12  psychiatric-related.
13     Q.    Okay. That wasn't either of the
14  plaintiffs we are talking about today.
15  Correct?
16     A.    Correct.
17     Q.    Okay. Is that your only time you
18  have testified at a trial?
19     A.    Yes.
20     Q.    What did you do to prepare for
21  your deposition today, if anything?
22     A.    I read through the notes.
23  Basically, that is it.
24     Q.    And by "the notes," you are
25  referring to the record of the care and

**15**

1  treatment that you provided each of the
2  different plaintiffs?
3      A.    Correct. I also consulted my
4  supervising psychiatrist at the time that I
5  was treating both Debra Livesay and David
6  Haller.
7      Q.    And who is that?
8      A.    That is Dr. James Zenel.
9      Q.    Can you spell that for the court
10  reporter?
11     A.    J-A-M-E-S, Z-E-N-E-L.
12     Q.    And you said he was your
13  supervising physician?
14     A.    Correct.
15     Q.    You are a nurse practitioner. Is
16  that right?
17     A.    Yes, sir.
18     Q.    When were you first licensed?
19     A.    In '90 — I am sorry. In 2005.
20     Q.    That is in the State of Florida?
21     A.    Correct.
22     Q.    Do you have such a license here
23  in Louisiana?
24     A.    Yes.
25     Q.    When did you obtain that?

**16**

1      A.    Two months ago.
2      Q.    Congratulations.
3      A.    Thank you.
4      Q.    Is the role of a nurse
5  practitioner the same here in Louisiana as it
6  is in Florida?
7      A.    Similar. We have more -- we have
8  a broader scope of practice in Louisiana than
9  in Florida.
10     Q.    Let's focus on what a nurse
11  practitioner does in Florida. Okay? Do you
12  understand that?
13     A.    Uh-uh.
14     Q.    "Yes"?
15     A.    Yes.
16     Q.    Like I said, as we grow more
17  comfortable with each other, it is going to be
18  natural to answer questions that way. It is
19  incumbent on me to do my job, and that is why
20  I keep reminding you. Please don't take
21  offense. It sure isn't intended. Okay?
22     A.    Okay.
23     Q.    What is the role of a nurse
24  practitioner in Florida?
25     A.    Nurse practitioners work in

**17**

1  collaboration with psychiatrists in order to
2  provide medical care. There are various
3  sub-types or specialties of nurse
4  practitioners. One is a psychiatric nurse
5  practitioner, where we get training only in
6  psychiatry after our general nursing training.
7  We provide psychiatric evaluation and
8  medication management. We can also do
9  psychotherapy.
10          We have what we call a
11  collaborating physician as opposed to a
12  supervising physician, in reality is the
13  correct term, who we work under a protocol
14  with. The protocol specifies what we are
15  allowed to do in terms of medication
16  management.
17          In Florida we are allowed to
18  prescribe medications that are not controlled
19  substances. We are not allowed to provide
20  controlled substances in Florida, and we are
21  allowed to involuntarily hospitalize in
22  Florida, patients.
23     Q.    Do I correctly infer that you
24  specialize as a psychiatric nurse
25  practitioner?

18

1  A.  Correct. I am a psychiatric
2  nurse practitioner.
3  Q.  No other subspecialty?
4  A.  No.
5  Q.  And it was in that capacity that
6  you provided care and treatment for the
7  particular plaintiffs in this litigation.  Is
8  that correct?
9  A.  Yes.
10  Q.  Now, you said your supervising
11  physician was Dr. James Zenel?
12  A.  Zenel.
13  Q.  And did you have a collaborative
14  physician?
15  A.  I correct myself.  Supervising
16  physician and collaborating physician is
17  interchangeable.  It is really termed a
18  collaborating physician is the correct term.
19  Q.  Fair enough.  So it would be just
20  more proper, I guess, to call Dr. Zenel your
21  collaborative physician.
22  A.  Correct.
23  Q.  Fair enough.
24  A.  Yes.
25  Q.  Does the collaborative physician

19

1  have to sign off on prescriptions?
2  A.  No.
3  Q.  On your full authority, you can
4  prescribe medication as a nurse practitioner
5  in Florida.  Is that correct?
6  A.  Yes.
7  Q.  And that is what you did for the
8  plaintiffs in this litigation.  Is that
9  correct?
10  A.  Yes.
11  Q.  Do you remember when in 2005 you
12  got your license?
13  A.  No.
14  Q.  Let's come back to focus on what
15  you did --
16  A.  I may have it, my license.
17  Q.  Ms. Keene, if I heard you right,
18  you have suggested as you reached for your
19  purse that you might have your license on you.
20  Is that right?
21  A.  Perhaps.
22  Q.  Are you willing to peek?
23  A.  Sure.
24  I stand corrected.  I got it in
25  May 2006.

20

1  Q.  In what -- thank you.  I
2  appreciate that.  That is in Florida.  Right?
3  A.  Correct.
4  Q.  By the way, is that license still
5  active?
6  A.  Yes.  Until July.
7  Q.  Until July?
8  A.  Until July 31st.
9  Q.  Do you intend to maintain that
10  license?
11  A.  No.
12  Q.  No reason now that you are here
13  in New Orleans.  Right?
14  A.  Correct.
15  Q.  And you live in the New Orleans
16  area.  Is that correct?
17  A.  Correct.
18  Q.  I don't need your address, your
19  home address for the record.  We don't need to
20  make that semi-public, anyway.
21  You worked at Directions for
22  Mental Health, and I'll get into more details
23  on that in a minute, though, prior to May of
24  2006.  Isn't that correct?  Would it help --
25  the witness has hesitated.

21

1  Would it help refresh your memory
2  if you eyeballed one of the records that you
3  brought with you today?
4  A.  Yes.  This is probably my -- yes.
5  Q.  All right.  Let me ask you this:
6  Is there a state licensing board for nurse
7  practitioners?
8  A.  Yes.
9  Q.  Do they issue new licenses on an
10  annual basis?
11  A.  Yes.  And that might be the new
12  license.
13  Q.  So your memory is that it was in
14  2005 when you first got your license?
15  A.  Correct.
16  Q.  And the license that you just
17  looked at is the one from July of 2000 -- is
18  the one that expires in July of 2008.  Is that
19  right?
20  A.  Correct.
21  Q.  So what you looked at was your
22  current?
23  A.  Is my current.  You are right.
24  That is correct.
25  Q.  Fair enough.  So at this point,

22

1  your best memory is that you were licensed
2  some time in 2005.  Is that correct?
3      A.   Yes.
4      Q.   And it was in 2005 that you first
5  started at Directions?
6      A.   To my memory, yes.
7      Q.   Ms. Keene, at the beginning of
8  the dep, I should have told you something.  I
9  am really not trying to make this a memory
10  test.
11          If you don't know the answer to
12  one of my questions, please just say so.  I am
13  going to ask you to try to refresh your
14  recollection based on anything that you may
15  have brought with you today or, in fact,
16  anything else.  Okay?
17      A.   Okay.
18      Q.   You are looking at records you
19  brought with you today.
20      A.   I am looking at records for when
21  I started with David Haller.  I took him as
22  soon as I came on at Directions.  And yes.  It
23  was in July of 2005.
24      Q.   And as of then you were a
25  licensed --

23

1      A.   Yes.
2      Q.   -- nurse practitioner,
3  specialized in psychiatry.  Is that correct?
4      A.   Yes.
5      Q.   What was your full title at that
6  point?
7      A.   Psychiatric nurse practitioner.
8      Q.   Fair enough.  Thank you.  Let's
9  come back to what you did to prepare for the
10  deposition today.  Okay?
11      A.   Yes.
12      Q.   You said you looked at the files,
13  your medical files for the plaintiffs in this
14  case.  Is that correct?
15      A.   Uh-uh.
16      Q.   Yes?
17      A.   Yes.  Briefly.
18      Q.   You did not have copies of these
19  records with you.  Correct?
20          Let me ask it a different way.
21  You didn't bring those records with you when
22  you moved from Florida in December of 2007 to
23  New Orleans.  Correct?
24      A.   Correct.
25      Q.   How did you get copies?

24

1      A.   They were sent to me by Katie
2  Hamilton.
3      Q.   At Brown Greer?
4      A.   Of Brown Greer.
5      Q.   At no point did you contact your
6  former employer and ask for copies of any
7  medical records related to these plaintiffs,
8  did you?
9      A.   After I received the records and
10  spoke to Dr. Zenel, we went through the chart,
11  and he informed me that there were other notes
12  that had not been sent to me by Brown Greer.
13      Q.   And these are notes of treatment
14  that you provided one plaintiff, David Haller.
15  Is that correct?
16      A.   Correct.
17      Q.   Okay.  And you tendered copies of
18  the documents that you received from your
19  former employer relating to visits that were
20  not included in the stack that you received
21  from Brown Greer today.  Correct?
22      A.   Correct.
23      Q.   I have those here with me, and I
24  will ask you questions about that in a little
25  while.

25

1          Apart from the sum total of
2  records that you have described, did you look
3  at anything else to prepare for your
4  deposition?
5      A.   No.
6      Q.   You didn't do any independent
7  research?
8      A.   No.
9      Q.   You didn't go back and look at
10  any of the Seroquel labeling from the 2005
11  time frame?
12      A.   No.
13      Q.   Fair enough.  You said you talked
14  to Dr. Zenel.  Zenel?
15      A.   Yes.
16      Q.   When did you have that
17  conversation?
18      A.   About 10 days ago.
19  Approximately.
20      Q.   And was it just one conversation?
21      A.   Yes.
22      Q.   Did you initiate it?
23      A.   Yes.
24      Q.   Did you tell him that David
25  Haller had filed a lawsuit over Seroquel use?

**26**

1    A.    Yes.
2    Q.    Did you express a view as to the
3 propriety of such a lawsuit to Dr. Zenel?
4    A.    Can you ask that question --
5    Q.    Did you tell him you were stunned
6 to hear that David Haller would have filed a
7 lawsuit based on his medication?
8    MR. BRUZZESE:
9       Object to form.
10 BY MR. ELLISON:
11    Q.    He just made an objection for the
12 record, and he will do that from time to time.
13 I should say he may do that from time to time.
14 It is just for the record.  Okay?
15       I should ask you, you just met
16 plaintiff's counsel for the first time today.
17 Isn't that right?
18    A.    Yes.
19    Q.    He doesn't represent you in this
20 lawsuit.  Is that right?
21    A.    Correct.
22    Q.    And at the beginning of the
23 deposition, that was the first time you met
24 him.  Right?
25    A.    Correct.

**27**

1    Q.    And he asked you to sign the
2 written authorization associated with the
3 protective order in this case.  Is that
4 correct?
5    A.    Correct.
6    Q.    Describe your discussion with
7 Dr. Zenel.
8    A.    I simply asked him what I might
9 expect from today.  I knew that David Haller
10 had been involved in a lawsuit.  He had been
11 telling me about it for about a year and was
12 quite excited about it.
13    Q.    Was it the first time Dr. Zenel,
14 to your knowledge, had heard about it?
15    A.    No.  I had spoke to Dr. Zenel as
16 soon as I knew David Haller was involved with
17 it.
18    Q.    What do you remember about those
19 discussions?
20    A.    We were more concerned about the
21 patient's mental status, which was very stable
22 at the time.  He has a long history of very
23 unstable mood.  He is very sick patient.  He
24 had been very well controlled on the
25 medication.

**28**

1    Q.    By "the medication," you are
2 talking about Seroquel?
3    A.    About Seroquel.  Yeah.  And we
4 had been monitoring in conjunction with his
5 physician, his primary care doctor, the
6 glucose, the hemoglobin A1C, which is the
7 three-month level of blood glucose that kind
8 of determines whether or not your -- how bad
9 the diabetes is.  And it was within normal
10 range.  And we felt like he was well consented
11 as to the risks of Seroquel.  I had informed
12 him multiple times about the risks of Seroquel
13 to cause diabetes.
14    Q.    In fact, a number of your records
15 specifically identify a times when you had such
16 discussions.
17    A.    Correct.  We always give informed
18 consent.
19    Q.    And the reason that your records
20 reflect that is because you had those
21 discussions with him.  Is that correct?
22    A.    On multiple occasions.
23    Q.    You are aware that he was
24 diagnosed with diabetes before you ever saw
25 him.  Isn't that correct?

**29**

1    A.    I'd have to review my -- I didn't
2 do the initial intake on him.  So I have
3 inherited him.  So I wouldn't have had a full
4 medical -- I wouldn't have asked that question
5 directly when I inherited him.
6    Q.    But you, as a matter of course,
7 maintain contact with the primary care
8 physician to make sure that the labs were
9 getting done.  Isn't that correct?
10    A.    Correct.
11    Q.    And that is from the time you
12 first began seeing him.  Correct?
13    A.    Correct.
14    Q.    And the reason you were doing
15 that is because blood glucose was something
16 you were paying attention to during the time
17 that you were treating him with Seroquel?
18    A.    Right.  It is the standard of
19 care with any of the atypicals.
20    Q.    And it has been for the time you
21 were treating David Haller.  Isn't that
22 correct?
23    A.    Correct.
24    Q.    Now, you mentioned that you had
25 been consulting about the blood glucose levels

**30**

```
 1   with David Haller's primary care physician.
 2   Did I hear you right?
 3      A.    Yes.
 4      Q.    Who was that?
 5      A.    Let me review my notes.  We
 6   don't -- I didn't have any verbal
 7   conversations with him.  We just had -- I had
 8   the labs sent to me.
 9      Q.    You called their office and got
10   them to send you the lab results.  Is that
11   right?
12      A.    Or the labs were sent to me.
13   Yes.
14      Q.    Do you remember what the office
15   was?
16      A.    I do not.
17      Q.    Center for Digestive Care.  Does
18   that help?
19      A.    It sounds familiar.  But again, I
20   have hundreds of patients.  So that is not
21   going to help.
22      Q.    Fair enough.  Why don't I get to
23   that.
24      A.    Okay.
25      Q.    And if I show you something in
```

**31**

```
 1   the records, if it refreshes your recollection
 2   as we move along, will you let me know?
 3      A.    Okay.
 4      Q.    And if I heard you right, you
 5   said David Haller's glucose levels were within
 6   normal limits the entire time you were
 7   treating him.  Isn't that right?
 8      A.    They were slightly elevated
 9   initially.  Let me see.  The last time I saw
10   him, they were within normal limits.
11      Q.    Let's come back to what you did
12   to prepare for your deposition today.  Apart
13   from Dr. Zenel, did you talk with anyone else?
14      A.    Uh-uh.
15      Q.    No?
16      A.    No.
17      Q.    You didn't talk with Mr. Haller
18   about his -- about this deposition as opposed
19   to the lawsuit.  Correct?
20      A.    Not since I left Florida.  No.
21      Q.    He has not contacted you --
22      A.    No.
23      Q.    -- since his deposition.
24   Correct?
25      A.    No.
```

**32**

```
 1      Q.    That is correct?
 2      A.    Correct.
 3      Q.    And you haven't talked with
 4   anyone else about this deposition.  Is that
 5   correct?
 6      A.    Correct.
 7      Q.    Was it your custom and practice
 8   when Mr. Haller talked about his lawsuit to
 9   record it in your medical records?
10      A.    It is my custom and practice
11   to -- yeah.  Record anything that is relevant.
12      Q.    And you viewed that as relevant?
13      A.    Yes.  Because it affected whether
14   or not he was going to stay on the medication
15   that was keeping him stable.
16      Q.    We will get to that.  I am going
17   to ask you some questions now generally about
18   your practice back when you were in Florida
19   and your use of various antipsychotic
20   medication, including first generation and
21   second generation.  Okay?
22      A.    Uhm-uhm.
23      Q.    Do you understand that?
24      A.    Yes.
25      Q.    Like I said, it becomes natural
```

**33**

```
 1   as we go along.
 2            You began with Directions -- and
 3   can you give me the full name?
 4      A.    Directions for Mental Health.
 5      Q.    And you began with them in July
 6   of 2005.  Is that correct?
 7      A.    Correct.
 8      Q.    Can you describe the nature of
 9   your practice there?
10      A.    We see chronic mentally ill
11   patients who are either underinsured, Medicaid
12   or have no insurance.  And basically, I see --
13   primary population is bipolar patients,
14   schizophrenics, other mood disorders.  It is
15   an adult population.
16      Q.    And it was that way the entire
17   time you were at Directions?
18      A.    Yes.
19      Q.    Can you describe the people that
20   make up the practice there, the healthcare
21   providers?
22      A.    There are three physicians and
23   six nurse practitioners.
24      Q.    And they work together?
25      A.    Yes.  Well, we collaborate.  But
```

(Pages 30 to 33)

**34**

1  what do you mean by work together?
2      A.   Fair enough.  And like I should
3  have said at the beginning of the deposition,
4  during today I am bound to ask you questions
5  that may not even be in English.  If you don't
6  understand something I say, please just ask me
7  and I will rephrase it to the best of my
8  ability.  Okay?
9      A.   Okay.
10     Q.   Let me ask it this way:  Were
11 each of the nurse practitioners assigned
12 particular patients?
13     A.   Yes.  We all had our caseload.
14     Q.   Did you have a practice whereby
15 like once a week or once a month you all got
16 together and held a meeting and talked about
17 any particular patients?
18     A.   No.  We had an hour supervision
19 with Dr. Zenel a week that we talked about
20 patients if we needed to.
21     Q.   So Dr. Zenel, the collaborating
22 physician, you would meet with once a week?
23     A.   Correct.
24     Q.   And during that time, you would
25 talk about all the patients that were under

**35**

1  your care and treatment or just the ones that
2  were --
3      A.   Just the ones that I had issues
4  or concerns about.
5      Q.   And was it that way the entire
6  time you were there?
7      A.   Yes.
8      Q.   Can you identify the nurse
9  practitioners for me?
10     A.   Their names?
11     Q.   Let me run a couple by you.  Dee
12 Burke?
13     A.   Dee Burke was there for some
14 time.  She left.
15     Q.   Do you remember anyone else?
16     A.   Jackie Harrison.
17     Q.   Anyone else?
18     A.   Cheryl O'Martin.
19     Q.   Anyone else?
20     A.   Karen -- there was a Karen who
21 left.  And there was -- there is two other
22 girls whose names are alluding me right now.
23     Q.   Fair enough.  And of those nurse
24 practitioners, am I correct that Dee Burke and
25 you were the ones who dealt with David Haller?

**36**

1      A.   Yes.
2      Q.   No others that you remember?
3      A.   Correct.
4      Q.   You identified three physicians.
5  Dr. Zenel is one of them.  Correct?
6      A.   Correct.
7      Q.   And who are the other two?
8      A.   Dr. Desai and Dr. Scargle.
9      Q.   Could you spell that?
10     A.   S-C-A-R-G-L-E.
11     Q.   And am I right that Dr. Zenel and
12 Dr. Desai gave care and treatment to David
13 Haller during the time that he was seen by
14 folks at Directions?
15     A.   That Dr. Zenel and Dr. Desai did?
16     Q.   Correct.
17     A.   I would have to review my notes
18 to see.
19     Q.   Fair enough.  Let me ask it this
20 way:  During the time that you were dealing
21 with David Haller, Dr. Zenel was the one that
22 you consulted with.  Is that correct?
23     A.   Correct.
24     Q.   You didn't consult with Dr. Desai
25 during that time frame.  Is that right?

**37**

1      A.   Correct.
2      Q.   Do I understand that Directions
3  also has licensed nurse practitioners as well?
4      A.   I am a licensed nurse
5  practitioner.
6      Q.   I am sorry.  I misspoke.  In
7  addition to nurse practitioners, there are
8  also nurses on staff.  Is that right?
9      A.   No.
10     Q.   Who gave David his Risperdal
11 shots?
12     A.   There is one injection nurse.
13 That is true.  Carlos.
14     Q.   What is Carlos' last name?  It is
15 in the records?
16     A.   Esteves.  Yeah.  It is in the
17 records.
18     Q.   And to the best of your memory,
19 was that constant during the time that you
20 were treating him?
21     A.   Yes.
22     Q.   Apart from the three physicians,
23 the six nurse practitioners and Carlos, were
24 there any other healthcare providers at
25 Directions?

(Pages 34 to 37)

38

```
 1      A.   No.
 2      Q.   Was it your custom and practice
 3  when you cared for patients to record your
 4  observations, diagnoses and discussions with
 5  patients in medical records?
 6      A.   Can you repeat that question?
 7      Q.   Yeah.  Did you make medical
 8  records while you were at Directions?
 9      A.   Yes.
10      Q.   You took notes of your care and
11  treatment of patients.  Is that right?
12      A.   Yes.
13      Q.   And in those notes, you recorded
14  any observations that you had of the patients.
15  Is that correct?
16      A.   Yes.
17      Q.   You also included any diagnoses
18  or matters discussed with patients in those
19  records?
20      A.   Yes.
21      Q.   And you did that in the ordinary
22  course of your professional practice.  Is that
23  correct?
24      A.   Yes.
25      Q.   And those were maintained on
```

39

```
 1  site?
 2      A.   Yes.
 3      Q.   Again, in the ordinary course of
 4  your professional practice?
 5      A.   Yes.
 6      Q.   And your colleagues did all this,
 7  too?
 8      A.   Yes.
 9      Q.   And you relied on both your and
10  your colleagues' medical records in the care
11  and treatment of your patients.  Is that
12  correct?
13      A.   Yes.
14      Q.   And you tried to be completely
15  accurate every time that you recorded
16  something in someone's medical record file.
17  Is that right?
18      A.   Yes.
19      Q.   And to your understanding, your
20  colleagues were as well.  Is that correct?
21      A.   Yes.
22      Q.   And if I understand correctly,
23  you brought records with you today.  Is that
24  right?
25      A.   Yes.
```

40

```
 1      Q.   Can you give me what you brought
 2  that relates to David Haller?
 3      A.   Here.
 4      Q.   You are handing me a set of
 5  documents that number 58 pages that bear a
 6  cover sheet and begin Directions for Mental
 7  Health 3 through Directions for Mental Health
 8  60.  Is that correct?
 9      A.   Yes.
10      Q.   And then you also brought with
11  you today three additional records that are
12  not Bates numbered, which I will mark as
13  separate exhibits.  Let's start with the
14  authorization that you signed.  I am going to
15  mark that Exhibit 1.
16          Jim, thanks.
17          Let the record reflect that I
18  just dumped coffee on my medical records, as
19  well as what I am going to mark as Exhibit 2.
20          (Off the record.)
21  BY MR. ELLISON:
22      Q.   I am going to mark the documents
23  you brought with you as Exhibit 2.  And again,
24  these will be Haller/Keene 2.
25          And the documents that you
```

41

```
 1  brought with you today that were not among
 2  those that you had and were provided to you by
 3  Brown Greer as Exhibit 3.
 4          And I think I will just mark
 5  those as a group exhibit for now.  No.  I am
 6  going to have to mark them separately.
 7  Exhibit 3 is a cover sheet dated March 26th.
 8          Exhibit 4 is an Integrated Care
 9  Monitoring Form dated April 6th, 2007.
10          Exhibit 5 is a psychiatric
11  progress note which appears to be dated June
12  28th, 2007.
13      A.   That was when the person printed
14  it up for me, it automatically defaulted to
15  the date she printed it.
16  MR. ELLISON:
17          The witness is referring to the
18  date which is crossed out in the upper
19  left-hand corner, March 26th, 2008, and the
20  date handwritten in is June 28th, 2007.
21  BY MR. ELLISON:
22      Q.   And, Ms. Keene, if I understand
23  you right, you asked about new records from
24  Dr. Zenel, and he said there were some.  He
25  ran those off.  Those are stored
```

42

1 electronically?
2   A.   They are in the process of going
3 fully electronic, so I don't know exactly
4 where they are in that process. I kept mine
5 electronically and a hard copy when I was
6 working there.
7   Q.   You did both?
8   A.   Uhm-uhm.
9   Q.   Yes?
10   A.   Yes.
11   Q.   Did you maintain the hard copy
12 records, or were those entered electronically
13 and then you got rid of the handwritten notes?
14   A.   I kept the handwritten notes in a
15 chart. There was a hard chart.
16   Q.   There is a hard copy chart as
17 well as an electronic chart. Is that correct?
18   A.   Correct.
19   Q.   And for your care and treatment
20 of your patients, you did both during the time
21 you were at Directions?
22   A.   Correct.
23   Q.   But it is your understanding that
24 they are moving to fully automated?
25   A.   Correct.

43

1   Q.   Now, if I asked you all of the
2 questions I did before about the main care and
3 treatment and recording in the ordinary course
4 of your professional practice, if I asked you
5 all of those questions about the electronic
6 process as the hard copy process, would your
7 answers be the same?
8   A.   Correct.
9   Q.   I am going to mark as Exhibit 6 a
10 psychiatric progress note from September of
11 2007, September 20th, 2007. I will mark as
12 Exhibit 7 a Psychiatric Progress Note dated
13 November 20th, 2007.
14     Do Exhibits 2 through 7,
15 overlooking the coffee stain, reflect all of
16 the documents you brought with you today
17 related to David Haller?
18   A.   Yes.
19   Q.   Let's once again come back to
20 your discussions with Dr. Zenel. If I
21 understand correctly, you from time to time
22 talked with him about David Haller's lawsuit.
23 Is that correct?
24   A.   I did on one occasion, when it
25 first came up.

44

1   Q.   And would it be better for you if
2 we waited until we looked at the medical
3 records individually to talk about that?
4   A.   That wouldn't be necessarily
5 reflected in the medical records, my
6 conversation with Dr. Zenel.
7   Q.   Fair enough. Can you tell me
8 what you remember of that conversation?
9   A.   I just remember asking if I
10 needed to get him off of the medicine because
11 of the lawsuit, and I told him that I had
12 offered to take David off of the medicine on
13 multiple occasions, but he refused to come off
14 of it because it worked so well for him.
15     And Dr. Zenel said as long as --
16 if there was informed consent and he was
17 stable, we were watching the blood glucose,
18 that there was no reason to take him off of
19 the medication just because of the lawsuit,
20 because that would have compromised his care.
21   Q.   Stopping the Seroquel would have
22 hurt him. Is that correct?
23     MR. BRUZZESE:
24       Objection to form.
25     THE WITNESS:

45

1       Stopping the Seroquel would have
2 hurt him.
3 BY MR. ELLISON:
4   Q.   Is that what you meant?
5   A.   I meant that stopping the
6 Seroquel would have hurt him.
7   Q.   David was suicidal from time to
8 time. Is that right?
9   A.   Not under my care. But I'd have
10 to review other people's records. I know by
11 representation that he was one of the most
12 difficult patients in our practice, which says
13 a lot.
14   Q.   We will get into that in more
15 detail in a minute.
16     About how many patients total did
17 you deal with when you were at Directions?
18   A.   Several hundred.
19   Q.   And most of those were bipolar
20 and schizophrenic. Is that correct?
21   A.   Depression and anxiety as well,
22 but we had a large bipolar --
23   Q.   Let's focus on bipolar disorder.
24 Okay? What is it?
25   A.   Bipolar disorder is a mood

**(Pages 42 to 45)**

**46**

1 disorder in which people have a range of
2 emotion. There is different types of bipolar
3 disorder. David suffered from the more severe
4 type, which is called --
5    Q.    Type I.
6    A.    Type I.
7    Q.    What characterizes Type I bipolar
8 disorder?
9    A.    Periods of mania in which people
10 become extremely aggressive, grandiose. They
11 can become delusional. Agitated, racing
12 thoughts, poor sleep, impulsive behavior,
13 self-destructive behavior, such as excessive
14 spending, sex sprees, reckless driving. And
15 racing thoughts, pressured speech.
16    Q.    Violence?
17    A.    And they can become very agitated
18 and violent. Yes.
19    Q.    Any other aspects of mania?
20    A.    In severe cases they can become
21 psychotic.
22    Q.    Did David become psychotic?
23    A.    Not under my care. But in
24 speaking with Dr. Zenel -- I did not see this
25 in my records. But in speaking with

**47**

1 Dr. Zenel, he did tell me that David had been
2 in the state hospital in the past, which would
3 suggest that he had -- was very severely sick,
4 ill and possibly psychotic. I am not sure
5 about that.
6    Q.    Do you know how many times he has
7 been arrested?
8    A.    No. I don't.
9    Q.    Do you know how many times he has
10 been convicted of crimes?
11    A.    No. I don't.
12    Q.    Do you know whether he is a
13 registered sex offender in Florida?
14    A.    No. I don't.
15    Q.    Did he ever talk with you about
16 his masturbating in front of children?
17    A.    No.
18    Q.    Did he ever talk with you about
19 his attempted rape?
20    A.    No.
21    Q.    Are all of those behaviors -- did
22 he ever talk to you about how he beat his dad
23 with a two-by-four?
24    A.    No.
25    Q.    He never told you about biting

**48**

1 and spitting on police officers?
2    A.    No. But those are all things
3 that by representation would not surprise me.
4 When I took care of David, he was extremely
5 stable. He never caused a problem at all.
6    Q.    And he was on Seroquel then.
7 Isn't that right?
8    A.    He was on Seroquel and Risperdal.
9    Q.    That was a fantastic medication
10 for him.
11    MR. BRUZZESE:
12       Object to form.
13    THE WITNESS:
14       Those two medications combined
15 kept him more stable than historically he had
16 ever been, from what my understanding was.
17 BY MR. ELLISON:
18    Q.    Did you ever look at his arms?
19    A.    Yes. Possibly. But I don't know
20 what you are referring to.
21    Q.    Do you recall eight or nine
22 four-inch long, half-inch thick scars from
23 suicide attempts?
24    A.    I do know he had scars on his
25 arms. Yes.

**49**

1    Q.    Do you remember learning about
2 him trying to kill himself by ODing on
3 medication between visits that he had with
4 you?
5    A.    He did have one suicide attempt.
6 Yes.
7    Q.    And that is even while he is on
8 medication. Correct?
9    A.    Yes.
10    Q.    Suicide and suicidal ideation are
11 aspects of depression. Isn't that correct?
12    A.    Which is another -- which is the
13 other pole of bipolar disorder.
14    Q.    Let's talk about depression.
15 What is depression? I am sorry. I should
16 qualify. What is depression in the context of
17 someone with bipolar disorder?
18    A.    Often after someone has a manic
19 episode, that will be followed by a severe
20 depressive episode in which people can become
21 very suicidal, self-destructive. Hopeless,
22 helpless, despondent. Problems with sleep,
23 appetite, concentration.
24    Q.    Do you have any idea what
25 percentage of the population that is bipolar

50

1 attempts to commit suicide?
2     A.   I have that information available
3 to me, but not off the top of my head.  No.
4     Q.   What is your best memory?
5     A.   Bipolar I?
6     Q.   Yes, ma'am.  Let me ask it this
7 way.  I will withdraw the previous question.
8          You would agree that
9 substantially more -- a substantial larger
10 percentage of bipolar patients attempt to
11 commit suicide than normal people in the
12 general population?
13     A.   Certainly.  With bipolar I.  Yes.
14     Q.   You agree it is substantially
15 more.  Is that right?
16     A.   Substantially more.  I don't know
17 the exact numbers.
18     Q.   You mentioned sleep in the
19 discussion related to both mania and
20 depression.  Let's focus on mania.  Inability
21 to sleep is both a symptom and a cause of
22 mania.  Isn't that correct?
23     A.   Correct.
24     Q.   One of the things you try to do
25 when you are trying to manage a bipolar

51

1 patient's care is to help control the sleep
2 patterns.  Isn't that correct?
3     A.   Yes.
4     Q.   And you had experiences with
5 patients when controlling their sleep through
6 medication dramatically improves their overall
7 management and care.  Is that correct?
8     A.   Yes.
9     Q.   We have talked about bipolar
10 disorder.  Let's talk about the treatment.  Do
11 you know what a first-generation antipsychotic
12 medication is?
13     A.   Yes.
14     Q.   What is that to your
15 understanding?
16     A.   Antipsychotics that had affinity
17 for more D2 receptors, which is the dopamine
18 receptor.  That affects the hallucinogenic
19 aspect of psychosis.  They have less affinity
20 for the serotonin receptors.  They have more
21 side effects because of their strong affinity
22 for D2 in certain parts of the brain that
23 caused the side effects.
24     Q.   Let's talk about that.  Are they
25 effective in controlling the symptoms of

52

1 bipolar?
2     A.   They are not -- yeah.  I mean,
3 type, generation 1.  Yeah.  I mean, they
4 control bipolar symptoms.
5     Q.   But if I heard you right, they
6 had substantial side effects.  Is that
7 correct?
8     A.   Yes.
9     MR. BRUZZESE:
10          Objection.  Form.
11 BY MR. ELLISON:
12     Q.   And one of those is tardive
13 dyskinesia.  What is that?
14     A.   Tardive dyskinesia is related to
15 the strong affinity for the dopamine receptor,
16 and the mesocortical -- the basil ganglia in
17 the brain, which is the motor pathways, and it
18 causes long-term, irreversible movement
19 disorders.
20     Q.   That is bad.  Right?
21     A.   Yes.
22     Q.   It can be permanent.  Correct?
23     A.   Yes.
24     Q.   It can dramatically impact a
25 patient's life.  Correct?

53

1     A.   Yes.
2     Q.   Other side effects?
3     A.   Of?
4     Q.   First generation.
5     A.   First generation, they can have
6 cardiac effects.  They can have other movement
7 disorder, akathisia.
8     Q.   What is that?
9     A.   Severe restlessness.  Feeling as
10 if you have constant ants in your pants.  You
11 can't sit still.  They can cause weight gain.
12 They can cause sudden death in some cases.
13     Q.   They have been associated with
14 diabetes.  Right?
15     A.   They have been associated with
16 diabetes in the past.  Yes.
17     Q.   And the present?
18     A.   I mean, yeah.  We don't use them
19 much in the present.
20     Q.   And the reason you don't use them
21 much is because a whole class of better
22 medications has come along.  Isn't that right?
23     MR. BRUZZESE:
24          Objection to form.
25     THE WITNESS:

**(Pages 50 to 53)**

**54**

1       We don't use them because of the
2   bad side effects.  Yes.  That are available --
3   that occur with them.
4   BY MR. ELLISON:
5       Q.    Have you told me of all of the
6   side effects of first generation that you
7   remember?
8       A.    **Yes.  I am sure there is more of**
9   **them.**
10      Q.    Can you give me some examples of
11  first-generation antipsychotics?
12      A.    **Haldol, perphenazine.  Those are**
13  **the two that I use the most.  Thiothixene,**
14  **Navane, Thorazine, phenelzine.**
15      Q.    And all of those have potential
16  side effects that you described.  Is that
17  right?
18      A.    **Yes.**
19      Q.    If I heard you right, you
20  prescribe, among others, Haldol.  Correct?
21      A.    **Sometimes I do.**
22      Q.    And you do that today.  Isn't
23  that correct?
24      A.    **Sometimes.**
25      Q.    So even though there are risks

**55**

1   associated with Haldol, which you have
2   described, you nonetheless, depending on a
3   particular patient's needs, have determined
4   that the benefits of the medication outweigh
5   those risks.  Isn't that correct?
6       A.    **Correct.**
7       Q.    When you decide what medication
8   best suits a plaintiff's needs, you don't
9   consult with plaintiff's lawyers who have
10  filed lawsuits against drug manufacturers.
11  Correct?
12      A.    **Correct.**
13      Q.    You rely on your care, your
14  training, your talent, your skill, your
15  expertise and consultation with your clients
16  and your education when you decide to
17  prescribe medication for a particular patient.
18  Isn't that correct?
19      A.    **Correct.**
20      Q.    From time to time would you
21  receive information from the various drug
22  manufacturers about their drugs?
23      A.    **Yes.**
24      Q.    And would you from time to time
25  meet with or talk with various drug

**56**

1   manufacturers about their medications?
2       A.    **Yes.**
3       Q.    You know that when they are
4   talking to you, they are trying to get you to
5   prescribe the medication.  Correct?
6       A.    **Correct.**
7       Q.    That is not a secret to you.
8   Isn't that right?
9       A.    **Correct.**
10      Q.    Have you ever relied on the sales
11  patter of a sales representative or anything
12  that a sales representative gave you or told
13  you to prescribe a particular medication for
14  any given patient?
15      A.    **I do rely on some of the data**
16  **that they -- some of the research that they**
17  **provide us with, but certainly not their sales**
18  **pitch.**
19      Q.    That is what I was asking.  They
20  would from time to time give you clinical
21  data.  Is that correct?
22      A.    **Uhm-uhm.**
23      Q.    Yes?
24      A.    **Yes.**
25      Q.    And you would rely on clinical

**57**

1   data.  Isn't that correct?
2       A.    **Yes.**
3       Q.    You wouldn't rely on their sales
4   pitch.  Correct?
5       A.    **Correct.**
6       Q.    You can't think of any
7   circumstance ever when you have relied on some
8   sales representative's sales pitch in
9   prescribing medication.  Is that correct?
10      A.    **Correct.**
11      Q.    And you wouldn't do that.  Isn't
12  that right?
13      A.    **Correct.**
14      Q.    It is your custom and practice to
15  stay abreast of developments with respect to
16  the medications that you prescribe.  Isn't
17  that correct?
18      A.    **Correct.**
19      Q.    And one of the ways you do that
20  is you review the PDR.  Is that right?
21      A.    **Correct.**
22      Q.    Do you review literature?
23      A.    **I review literature, continuing**
24  **education.**
25      Q.    Have you ever attended a

**(Pages 54 to 57)**

58

1  continuing education course that related to
2  atypical antipsychotics?
3      A.   **Multiple. Yes.**
4      Q.   Have they from time to time
5  talked about an association between diabetes
6  and atypical antipsychotics?
7      A.   **Yes.**
8      Q.   Do you remember when you first
9  attended such a seminar?
10     A.   **When I first attended a seminar?**
11     Q.   It would have been years ago.  Am
12  I right?
13     A.   **Yes.**
14     Q.   Before or around the time you
15  first started treating David Haller?
16     A.   **Probably around the time I was**
17  **treating him, my first seminar that wasn't**
18  **related to my own education.  Yes.**
19     Q.   Are you aware that the Food &
20  Drug Administration asked all manufacturers of
21  atypical antipsychotics to include a warning
22  of a possible association between weight gain
23  and diabetes and hyperglycemia and those
24  medications around September of 2003?
25     A.   **I know that the warning was**

59

1  there.  I didn't know the date.
2      Q.   And did you know the warning was
3  implemented around January of 2004?
4      A.   **I know it was there when I**
5  **started practicing.  The warning existed.**
6      Q.   So you were aware as of the time
7  you got your license in July of 2005 that
8  there was a possible association between
9  hyperglycemia, diabetes and weight gain and
10  atypical antipsychotics, including Seroquel.
11  Is that right?
12     A.   **Yes.**
13     Q.   You didn't keep that a secret
14  from your patients, did you?
15     A.   **No.**
16     Q.   No.  You spoke with them about
17  those risks when you were deciding whether or
18  not to prescribe a medication to a particular
19  patient.  Is that correct?
20     A.   **Correct.**
21     Q.   And even if that specific
22  discussion isn't reflected in the notes, that
23  doesn't mean it didn't occur.  Isn't that
24  right?
25     A.   **Correct.**

60

1      Q.   The notes that I am going to be
2  talking with you before -- or shortly that
3  relate to David Haller included language
4  related to the patient's education.  Am I
5  correct?
6      A.   **Correct.**
7      Q.   And it was your custom and
8  practice to include information in that
9  section that you discussed with your patient
10  in terms of the risks and benefits of the
11  medication that you are considering.  Correct?
12     A.   **Correct.**
13     Q.   And where it says you discussed
14  the risks associated with Seroquel with that
15  patient, even if it doesn't specifically say
16  diabetes, that was something as of the time
17  that you were licensed that you did discuss
18  with the patient.  Correct?
19     A.   **Correct.**
20     Q.   I have talked about atypical
21  antipsychotics.  Let's talk about them more
22  generally at this point.
23          Would you agree that atypical
24  antipsychotics, the second generation,
25  revolutionized the treatment of bipolar

61

1  disorder Type I?
2      A.   **I can't speak to that.  They**
3  **existed when I started practicing, so I didn't**
4  **treat them before.**
5          **From what I understand, they did**
6  **tremendously help the treatment for Bipolar I.**
7  **There are other classes that also work very**
8  **well.**
9      Q.   Let's start with atypical
10  antipsychotics.  There are a number of drugs
11  in that class.  Am I right?
12     A.   **Yes.**
13     Q.   And that includes Seroquel.  Am I
14  right?
15     A.   **Yes.**
16     Q.   You began prescribing Seroquel
17  when you first got your license.  Isn't that
18  correct?
19     A.   **Yes.**
20     Q.   You still prescribe it today.
21  Isn't that right?
22     A.   **Yes.**
23     Q.   And the reason you prescribe it
24  is because you believe the benefits outweigh
25  the risks to any given patient.  Isn't that

**(Pages 58 to 61)**

**62**

1 correct?
2    A.   Yes.
3    Q.   Do you agree that it is important
4 to have a wide variety of different
5 medications within a class available?
6    A.   Yes.
7    Q.   And one of the reasons for that
8 is because patients react differently to the
9 different medications.  Am I correct?
10    A.   Yes.
11    Q.   And so it is important to have
12 different therapies available.  Am I right?
13    A.   Yes.
14    Q.   Is it your view that
15 second-generation atypical -- or atypical
16 antipsychotics are just as effective as the
17 first generation in dealing with the different
18 signs and symptoms of bipolar disorder?
19    A.   As I said before, I don't
20 necessarily use the first generations very
21 much for bipolar disorder.
22    Q.   So in your view, the second
23 generation are just as efficacious.  Is that
24 right?
25    A.   Yes.

**63**

1    Q.   And they have fewer side effects.
2 Am I correct?
3    A.   Yes.
4    Q.   And those side effects are
5 relatively mild compared to the condition for
6 which you are prescribing the medication.
7 Isn't that correct?
8    A.   Certainly, in the case of Bipolar
9 I.  Yes.  I would agree with that.
10    Q.   And you prescribe and do
11 prescribe atypical antipsychotics today.  Is
12 that correct?
13    A.   Yes.
14    Q.   What conditions do you prescribe
15 atypical antipsychotics to treat?
16    A.   Schizophrenia, any other
17 psychotic disorder and bipolar disorder.
18    Q.   You don't use it off label, do
19 you?
20    A.   It is used off label, and I do
21 sometimes use it off label.
22    Q.   But that is not how you were
23 using it with David Haller.  Correct?
24    A.   No.  Correct.
25    Q.   He needed it for his bipolar.

**64**

1 Right?
2    A.   Right.
3    Q.   That is why you prescribed it.
4 Am I correct?
5    A.   Correct.
6    Q.   And you said there were other
7 therapies in addition to first-generation and
8 second-generation atypicals that you from time
9 to time use in the treatment of bipolar.
10    A.   Correct.
11    Q.   Did I understand you correctly?
12    A.   Yes.
13    Q.   Which ones?
14    A.   Lithium and the anticonvulsants,
15 such as Depakote.
16    Q.   Do you also use Lamictal?
17    A.   Yes.  It is an anticonvulsant.
18    Q.   Under what circumstances would
19 you prescribe lithium?
20    A.   Somebody who has a classic
21 Bipolar I who is extremely responsible, able
22 to keep up with regular blood levels and are
23 going to be taking the medication consistently
24 and monitor its side effects, because lithium
25 does have a risk of -- it has a low -- a

**65**

1 narrow therapeutic index and risk of toxicity
2 and possible death.
3    Q.   So if I understood you correctly,
4 it has got a narrow window when it works, and
5 it can kill you?
6    A.   Uh-uh.
7    Q.   Yes?
8    A.   Correct.
9    Q.   David Haller was on lithium prior
10 to the time you saw him.  You were aware of
11 that.  Correct?
12    A.   Correct.
13    Q.   And it didn't work well for him.
14 Correct?
15    A.   Correct.
16    Q.   Part of the reason was he was
17 extraordinarily noncompliant with his
18 medications.  Correct?
19    MR. BRUZZESE:
20        Objection to form.
21    THE WITNESS:
22        I would have to review the
23 records in detail to know that.  But he is a
24 person that -- a noncompliant person, and that
25 is why he was on a long-acting injectable.

66

1    Q.    Because you didn't have to trust
2 him to take his medications every day.  Is
3 that correct?
4    A.    Correct.
5    Q.    By "injectable," you are
6 referring to the Risperdal.  Am I correct?
7    A.    Correct.
8    Q.    And when I was asking you about
9 the risks of diabetes, weight gain, and
10 hyperglycemia associated with Seroquel -- as
11 to the atypical antipsychotics, that includes
12 Seroquel.  Is that correct?
13    A.    Yes.  And Risperdal.
14    Q.    You were telling me about the
15 anticonvulsants.  Under what circumstances do
16 you prescribe those?
17    A.    I see the anticonvulsants, like
18 Depakote, work extremely well with very
19 agitated patients.  They also have risks of
20 severe side effects, too, including blood
21 dyscrasias --
22    Q.    Blood what?
23    A.    Blood dyscrasia.  Lowering white
24 blood cell count and possible problems with
25 that, with lowering your white blood cell

67

1 count and also can cause liver failure.
2    Q.    Is that leukopenia?
3    A.    Thrombocytopenia is the word I
4 was looking for.  Yes.
5    Q.    That is low platelet count, isn't
6 it?
7    A.    Yes.  And all of the blood cells
8 can be lowered with Depakote.
9    Q.    And that is bad.  Right?
10    A.    Correct.  Yes.
11    Q.    What can happen to you?
12    A.    Well, you can get infections.
13 You can bleed out.  You can get opportunistic
14 infections.  You can die.
15    Q.    You can die.  Is that right?
16    A.    Yes.
17    Q.    But even though that the two
18 categories of medications you described,
19 lithium and Depakote, have potentially fatal
20 side effects, they are nonetheless important
21 in your care and treatment of bipolar
22 patients.  Isn't that correct?
23    A.    Definitely.
24    Q.    And you prescribe them today.
25 Isn't that right?

68

1    A.    Yes.
2    Q.    And that is because you believe
3 that the risks of those medications are
4 outweighed by the benefits for that particular
5 patient, in consultation with that patient.
6 Am I correct?
7    A.    Correct.
8    Q.    Now, I asked you about off-label
9 a moment ago.  Do you recall those questions?
10    A.    Yes.
11    Q.    And if I heard you right, you do
12 from time to time prescribe atypical
13 antipsychotics off-label.  Is that correct?
14    A.    Correct.
15    Q.    For what conditions?
16    A.    Bipolar Type II.  Sometimes -- I
17 rarely use them for depression, but they do
18 tend to have some antidepressant effects.
19    Q.    Sedating?
20    A.    Sedating.  Also, for sleep.
21    Q.    Under what circumstances would
22 you prescribe a second-generation atypical, or
23 an atypical antipsychotic, for someone who has
24 depression as opposed to Bipolar Type I or II?
25    A.    If they are having severe

69

1 problems with sleep.  If their SSRIs or
2 antidepressant is subtherapeutic.  It would be
3 augmenting.  It wouldn't be a first line of
4 treatment.  If they have concomitant anxiety,
5 something like Seroquel is very good.
6    Q.    And that is based on your
7 experience with medications.  Is that correct?
8    A.    Correct.
9    Q.    So even though the drug hasn't
10 been formally approved by the FDA for what you
11 have described, you have nonetheless
12 determined based on your own experience that
13 prescribing Seroquel for those conditions is
14 beneficial to the patients.  Isn't that
15 correct?
16    A.    Yes.  And it is within the
17 standard of care.  You know, it is not just me
18 that does it.
19    Q.    I am sorry.  That is based on the
20 collective experience --
21    A.    Correct.  Yes.
22    Q.    -- of yourself as well as the
23 people that you practice with, as well as the
24 colleagues in the profession.  Isn't that
25 correct?

**(Pages 66 to 69)**

70

1    A.   Yes.
2    Q.   And you agree that off-label
3 prescriptions are an important and necessary
4 part of your care and treatment of some
5 patients. Correct?
6    A.   Correct. Yes.
7    MR. BRUZZESE:
8       Object to the form.
9 BY MR. ELLISON:
10   Q.   Side effects of atypical
11 antipsychotics. You said they were less than
12 the first generation. What are they that you
13 are aware of?
14   A.   I am sorry. Side effects of the
15 second generation?
16   Q.   Yes, ma'am.
17   A.   Of atypicals. Well, certainly
18 weight gain, which can cause dyslipidemia and
19 possible diabetes.
20   Q.   And you have known about that
21 from the time you were licensed. Correct?
22   A.   Sure. Yes. They do have the
23 potential to cause movement disorders and
24 tardive dyskinesia, just at a much less rate.
25 They can cause prolactin elevations, which can

71

1 interfere with -- can cause osteoporosis.
2 They can cause -- I am thinking right now.
3    Q.   That is fine. You have told me
4 the ones you remember right now.
5    A.   Yeah.
6    Q.   But on the whole, you would agree
7 that their side effect profile for atypicals
8 is better for second generation than it is for
9 first generation. Is that correct?
10   A.   Yes.
11   Q.   And side effect profiles differ
12 even within a particular class of medication.
13 Is that correct?
14   A.   Yes.
15   Q.   And in your belief, the Seroquel
16 side effect profile is such that you maintain
17 it as an active and available therapy in your
18 arsenal for your care and treatment of
19 patients. Isn't that correct?
20   A.   Yes.
21      (Off the record.)
22 BY MR. ELLISON:
23   Q.   Did I correctly hear that you
24 don't prescribe Seroquel anymore because of
25 litigation concerns?

72

1    A.   I prescribe it a lot less than I
2 used to.
3    Q.   And that is because of lawsuits
4 associated with Seroquel?
5    A.   Yes.
6    Q.   What do you mean?
7    A.   Lawyers going on TV and asking
8 people if they have ever gotten diabetes from
9 being prescribed Seroquel.
10   Q.   Have you seen ads like that?
11   A.   Yes.
12   Q.   Are you concerned that you are
13 going to be named as a defendant in a lawsuit
14 based on the care and treatment you have
15 provided a particular patient?
16   A.   Yes.
17   Q.   You are concerned that because of
18 the plaintiff lawyers' advertisements related
19 to the medication, that you are going to
20 become a target in litigation. Therefore, for
21 that reason, you are not prescribing the
22 medication that you believe is efficacious.
23 Isn't that correct?
24   MR. BRUZZESE:
25      Objection to form.

73

1    THE WITNESS:
2       I prescribe it much less than I
3 used to. And also, I am with a different
4 population right now. So it is not as
5 indicated in the population.
6 BY MR. ELLISON:
7    Q.   What is the population you are
8 dealing with now?
9    A.   I am dealing with children and
10 adolescents, and they are much less severe.
11 They are not as severely mentally ill.
12   Q.   And it is just not Seroquel. It
13 is Zyprexa, too?
14   A.   Yes.
15   Q.   And Risperdal?
16   A.   Correct.
17   Q.   One of the reasons you have
18 chosen not to prescribe that medication
19 anymore, those medications as much, is because
20 you were concerned about being sued in
21 litigation based on all of the lawyer
22 advertising that you have seen. Correct?
23   MR. BRUZZESE:
24      Objection to form.
25   THE WITNESS:

**(Pages 70 to 73)**

**74**

1     Correct.
2  BY MR. ELLISON:
3    Q.  Don't you think that is
4  unfortunate?
5    A.  Yes.
6    Q.  And the reason you think it is
7  unfortunate is because these patients are
8  really sick, and they need those medications.
9  Isn't that right?
10    A.  Correct.
11    MR. BRUZZESE:
12       Object to form.
13  BY MR. ELLISON:
14    Q.  Is it correct that it would
15  dramatically affect your ability to treat
16  bipolar patients if atypical antipsychotics
17  were withdrawn from the market based on those
18  lawsuits?
19    A.  Yes.
20    Q.  That would be very saddening to
21  you and your patients. Isn't that correct?
22    A.  Yes.
23    Q.  Because they need those
24  medications. Correct?
25    A.  Yes.

**75**

1    Q.  And it is important to you as
2  someone who provides care and treatment for
3  bipolar patients that atypical antipsychotics
4  be available to you as a therapeutic
5  alternative. Correct?
6    A.  Yes.
7    Q.  You would agree it is essential?
8    A.  Yes.
9    Q.  You said that very quickly. And
10  the reason you did that is because you do
11  believe sincerely that it is very essential?
12    A.  It is extremely essential. Yeah.
13  They save lives.
14    Q.  You have patients that you
15  believe might kill someone if they don't take
16  atypical antipsychotics?
17    MR. BRUZZESE:
18       Objection to form.
19    THE WITNESS:
20       I have patients that I believe
21  would kill themselves or potentially kill
22  someone. Yes.
23  BY MR. ELLISON:
24    Q.  And that included David Haller.
25  Correct?

**76**

1    A.  Based on what I had known about
2  David prior to my inheriting him, yes. He
3  never displayed any of those behaviors while I
4  was treating him.
5       Other than he did have a suicide
6  attempt in one period, but never acted out
7  aggressively in the office the way that he had
8  been known to do.
9    Q.  And you believe that it was the
10  atypical psychotics, Seroquel and Risperdal,
11  he was taking that helped him in that respect.
12  Correct?
13    A.  Yes.
14    Q.  And prevented him from either
15  killing himself or someone else. Right?
16    A.  Yes.
17    MR. ELLISON:
18       Let's take a quick break. We
19  have been going for about an hour and 15
20  minutes.
21       (Off the record.)
22  BY MR. ELLISON:
23    Q.  Ms. Keene -- and I say Ms. Keene.
24  I am going to say Dr. Keene. You have been
25  very gracious with me. And I apologize for my

**77**

1  manners.
2       I understand you have a Psy.D
3  degree. Is that right?
4    A.  Correct.
5    Q.  And that when you are caring for
6  and treating patients, they appropriately
7  address you as Doctor. Is that right?
8    A.  Not at Directions. At
9  Directions, I kept it under just my nurse
10  practitioner, because it was confusing to the
11  patients.
12    Q.  In terms of distinguishing
13  between you and --
14    A.  The medical doctors. Correct.
15    Q.  But you have your Psy.D. Is that
16  right?
17    A.  Correct.
18    Q.  And here in Louisiana, in your
19  care and treatment, you go by Doctor. Is that
20  right?
21    A.  Correct. Yes.
22    Q.  For purposes of the deposition,
23  although I frankly would be more comfortable
24  calling you Doctor, do you want me to continue
25  to call you Ms. Keene?

**(Pages 74 to 77)**

78

1    A.   Please call me Ms. Keene since we
2  are just talking about my care as a nurse
3  practitioner.
4    Q.   Fair enough.  I will do my best
5  to ascribe to your modesty, as it were.  Just
6  one follow-up question.
7       Am I correct that but for those
8  plaintiffs' advertisements that you said you
9  have seen on TV in which they say if you used
10  Seroquel and you have diabetes, call 1-800
11  blank blank blank, but for those
12  advertisements, you would still be prescribing
13  atypical antipsychotics just as actively as
14  you were before for the patient population of
15  Type I bipolar disorder?
16    MR. BRUZZESE:
17       Objection.  Form.
18    THE WITNESS:
19       Yes.  I can't say that my
20  prescribing practices have changed because of
21  that.  Here and now, like I say, I am not
22  treating that population anymore, so I am
23  using a lot less.  I am a lot more weary about
24  it because of the lawsuits.
25  BY MR. ELLISON:

79

1    Q.   I hear you.  And it makes you
2  pause.  Is that right?
3    A.   Yes.
4    Q.   Do you understand from a medical
5  and scientific perspective that there is a
6  difference between an association and
7  causation?  Correct?
8    A.   Correct.
9    Q.   And it is a much higher hurdle
10  for causation.  Isn't that correct?
11    A.   Correct.
12    Q.   In order to determine whether
13  something is a cause of something else, you
14  have to have rigorous randomized clinical
15  studies and that sort of thing.  Is that
16  correct?
17    A.   Correct.
18    Q.   You don't know whether that has
19  been done as to whether atypical
20  antipsychotics cause diabetes.  Correct?
21    A.   I don't know.  But I — no.  I
22  don't know.
23    Q.   You have not undertaken a review
24  of the medical literature to determine
25  whether, in fact, atypical antipsychotics

80

1  actually cause diabetes as opposed to
2  ordinarily associated with diabetes.  Is that
3  correct?
4    A.   My understanding is that it is
5  just associated with diabetes.  And it would
6  be unethical to do a randomized control trial
7  to try to induce diabetes in somebody.
8    Q.   And it is based on that
9  association that you passed on risks to your
10  patients, and have since you were licensed in
11  2005.  Correct?
12    A.   Correct.  Yes.
13    Q.   Now, you have not formed any
14  specific opinions.  Correct?  As to whether
15  Seroquel, in fact, caused diabetes in any
16  given patient.  Correct?
17    A.   I am sorry.  Can you repeat the
18  question?
19    Q.   Let me ask it this way:  In order
20  to determine whether Seroquel caused someone's
21  diabetes, you would need a lot of information.
22  Correct?
23    A.   Correct.
24    Q.   You would want to know their
25  family history.  Right?

81

1    A.   Correct.
2    Q.   David Haller was adopted.  Right?
3    A.   I'd have to review the records to
4  know that.
5    Q.   I represent to you that at least
6  he told me in his deposition that he, in fact,
7  was adopted.  Is that correct?
8    A.   Okay.
9    Q.   Obesity places someone at risk of
10  diabetes.  Correct?
11    A.   Correct.
12    Q.   Do you know what David Haller's
13  weight was before he ever started Seroquel?
14    A.   I'd have to look at the records.
15  You want me to look at them?
16    Q.   You bet.
17    A.   245.
18    Q.   You are flipping.  Let me ask it
19  this way.
20    A.   Okay.
21    Q.   In order to determine whether
22  Seroquel caused someone's diabetes, you would
23  want to know what their weight was before they
24  ever used Seroquel.  Correct?
25    A.   Correct.

82

1    Q.    Smoking.  Isn't that correct?
2  You would want to know that.  Correct?
3    A.    Correct.
4    Q.    You would want to know about drug
5  abuse.  Isn't that correct?
6    A.    Correct.
7    Q.    You would want to know about
8  alcohol abuse.  Isn't that correct?
9    A.    Correct.
10    Q.    You would want to know what
11  medications they were on.  Correct?
12    A.    Correct.
13    Q.    A lot of the medications,
14  including some you have already identified,
15  carry a risk of weight gain, hyperglycemia,
16  hyperlipidemia and diabetes.  Correct?
17    A.    Correct.
18    Q.    And you have not undertaken to
19  find out any of that information with regard
20  to either of the plaintiffs we are talking
21  about today.  Correct?
22    A.    Say that last question.
23    Q.    You have not undertaken to
24  determine any or all of that information for
25  either of the plaintiffs we are talking about

83

1  today.  Correct?
2    A.    Whether or not they had risk
3  factors?
4    Q.    My ultimate question is going to
5  be you don't have any specific opinions as to
6  whether Seroquel actually caused the
7  diabetes --
8    A.    Correct.
9    Q.    -- for either of these
10  patients --
11    A.    Correct.
12    Q.    -- isn't that correct?
13        And in order to answer that
14  question, you would have to do a lot of those
15  things, many of which we just identified, and
16  you haven't done that.  Correct?
17    A.    It is standard of care to do it.
18  So I am looking to my notes to see if it was
19  done.
20    Q.    It is standard of care to
21  determine whether or not for purposes of a
22  lawsuit a particular medication more likely
23  than not to a reasonable degree of medical
24  certainty, in fact, caused someone's
25  condition?

84

1    A.    No.  I am sorry.  I thought you
2  were talking about assessing the risk factors.
3    Q.    Let me come back.  And I am
4  asking you essentially a question about the
5  lawsuit.
6    A.    Okay.
7    Q.    The plaintiffs' lawyers hasn't
8  asked you to form specific opinions in this
9  case.  Correct?
10    A.    No.
11    Q.    For purposes of testifying at
12  trial.  Correct?
13    A.    Correct.
14    Q.    You have not been asked by the
15  plaintiffs' lawyers if you would be willing to
16  come to Florida for a lawsuit.  Is that
17  correct?
18    A.    No.
19    Q.    That is correct?
20    A.    Correct.
21    Q.    Okay.  And you have not been
22  asked whether you would be willing to act as
23  an expert in this litigation.  Correct?
24    A.    Correct.
25    Q.    Let's talk about David Haller, if

85

1  we could.  And you know, it is easier for me
2  if you could hand me back what we marked as
3  Exhibit 2.  I am sorry?
4    A.    I am not digging through it.
5    Q.    Oh, no.  Again, if you need to
6  look at it.  But what I want to do, I happen
7  to have Page 60, the Bates number, Directions
8  for Mental Health 60.  I want to make sure I
9  put it in the right place in your stack.
10    A.    Okay.
11    Q.    Now I am going to hand it back to
12  you.
13    A.    Okay.
14    Q.    But I am going to steal
15  Exhibit 7, which are the documents that you
16  brought with you today.  And I would like to
17  talk about your care and treatment of David
18  Haller in particular.  Okay?
19    A.    Yes.
20    Q.    Do you have those records in
21  front of you?
22    A.    Yes.
23    Q.    He was not unknown to Directions
24  before you began caring and treating for him.
25  Isn't that correct?

86

1    A.    Correct.
2    Q.    I understand that he first came
3  to Directions around October of 2002. Is that
4  correct?
5    A.    The initial evaluation that I
6  have is from 2003.
7    Q.    Can you turn to what is Bates
8  numbered Page 60. The last page, it should be
9  of the stack which we have previously marked
10 Exhibit 2 and you have in front of you.
11   A.    Okay.
12   Q.    There is a date on that bottom
13 right-hand corner of October 1st, 2002.
14   A.    That is the original treatment
15 plan? Okay.
16   Q.    And that is when he first came to
17 Directions, to your knowledge. Is that right?
18   A.    According to these records, that
19 is the first date of record. Yeah.
20   Q.    And the physician, licensed
21 practitioner who is treating him at that point
22 in time was Dee Burke?
23   A.    Correct.
24   Q.    The TX team member, what does
25 that stand for?

87

1    A.    Treatment team member.
2    Q.    And who is that, Patricia
3  Crawford?
4    A.    Clifford. She is the mental
5  health provider that did his initial intake,
6  according to this.
7    Q.    And would you turn to the page
8  that is Bates numbered Directions for Mental
9  Health 54?
10   A.    Where are you seeing the numbers?
11   Q.    Bottom left-hand corner. I am
12 sorry. This one is here. This is 59.
13   A.    I am sorry.
14   Q.    I am just explaining the Bates
15 numbers. If you could turn to 54.
16   A.    Okay.
17   Q.    This was the first consult that I
18 was able to find. Do you have one that is
19 before that?
20   A.    No.
21   Q.    Let's just go through this
22 quickly. Again, the document is Bates
23 numbered 54. It is dated March 13th, 2003.
24 Am I correct?
25   A.    Correct.

88

1    Q.    Do you know what a Bates number
2  is?
3    A.    No.
4    Q.    That is that number that we came
5  up with, which we tack on the bottom left-hand
6  corner of most of these pages --
7    A.    Okay.
8    Q.    -- so that we can kind of keep
9  track of things as we talk about them.
10   A.    Okay.
11   Q.    I am going to be referring to
12 those Bates numbers, both to help you for
13 organizational purposes as well as for our
14 record, the court reporter, so we know which
15 documents within Exhibit 2 we are talking
16 about.
17   A.    Okay.
18   Q.    Okay. It starts -- do you know
19 Carol Corell?
20   A.    No.
21   Q.    That is the --
22   A.    She was there.
23   Q.    That is the nurse practitioner
24 that treated him originally?
25   A.    Correct. I didn't know her. She

89

1  was there before I was.
2    Q.    You reviewed these records in
3  your care and treatment of him. Isn't that
4  correct?
5    A.    Yes.
6    Q.    To figure out who this patient
7  was that you were being asked to see. Is that
8  right?
9    A.    Yes.
10   Q.    Let's go through the history. It
11 says, "This is a 41-year-old white male who
12 has been a client here at Directions since
13 10/02 and is diagnosed Bipolar I and Alcohol
14 Dependence."
15           Is that correct? I read that
16 right?
17   A.    Correct.
18   Q.    "David has a long-standing
19 psychiatric history, history of noncompliance
20 and long history of complaints about services
21 and at times being less than honest regarding
22 circumstances he complains about."
23           Did I read that correctly?
24   A.    Correct.
25   Q.    Was that consistent with your

(Pages 86 to 89)

90

1   observations during your care and treatment of
2   David?
3       A.   Correct.
4       Q.   And you found him less than
5   honest regarding circumstances he was
6   complaining about?
7       A.   Yes.
8       Q.   In what respect, if you can
9   remember?
10      A.   Specifically, about this lawsuit.
11      Q.   What did you find him being less
12  than honest about this lawsuit?
13      A.   He was very excited about the
14  lawsuit and the possibility of getting money
15  from it. And kept talking about how he wants
16  to sue Seroquel, but didn't want to come off
17  the medication. And since he had already had
18  the diabetes, he didn't want to -- he didn't
19  think he needed to come off the medication.
20  It just seemed that he was really manipulating
21  the system, in my opinion.
22      Q.   So in your view, you found him
23  less than honest, because you thought it was
24  wrong for him to sue the manufacturer of
25  Seroquel and still stay on the mediation?

91

1       A.   If he thought it was harming him.
2   Yes.
3       Q.   You didn't think it was harming
4   him, did you?
5       A.   No.
6       Q.   Did you find him being less than
7   honest in any other capacity?
8       A.   There was a question about him
9   taking Artane. Yeah. There was some
10  questions -- if my memory serves me correct,
11  which it has been a while since I treated him.
12       But there was a question about
13  him taking Artane, which is a medication, and
14  his use of this particular medication, whether
15  he was using it for some side effects that
16  could cause a little bit of euphoria.
17      Q.   Artane is used to help control
18  Parkinson-like symptoms. Isn't that correct?
19      A.   Correct.
20      Q.   And those are symptoms that he
21  associated at least with one of the
22  medications he was using. Correct?
23      A.   Correct.
24      Q.   Risperdal. Is that right?
25      A.   Correct. Yes.

92

1       Q.   You don't have any view as to
2   whether or not the Parkinson-like symptoms he
3   was having, in fact, related to Risperdal. Is
4   that correct?
5       A.   It is possible that they were
6   related to Risperdal.
7       Q.   But you think he may have been
8   taking the Artane to get high?
9       A.   Correct.
10      Q.   And not for the symptoms.
11  Correct?
12      A.   Correct. Yes.
13      Q.   Let's go further down. It says,
14  "His mother took him to a psychiatrist when he
15  was five due to hyperactivity. He was on
16  Ritalin from age five to 12. After that he
17  was on Mellaril."
18       That is a first-generation
19  antipsychotic. Is that correct?
20      A.   Correct.
21      Q.   And it carries all the risks that
22  we described earlier. Isn't that correct?
23      A.   Correct.
24      Q.   "In 1987 he was in jail and
25  diagnosed with bipolar." Did I read that

93

1   right?
2       A.   Correct.
3       Q.   Were you aware of that?
4       A.   Now that I refreshed my memory.
5   Yes.
6       Q.   Do you know what he was in jail
7   for?
8       A.   No.
9       Q.   Has he ever threatened you?
10      A.   No.
11      Q.   Has he ever made an inappropriate
12  sexual advance to you?
13      A.   No. Like I said, he was very
14  stable when I took care of him.
15      Q.   You would see such things as an
16  aspect of his disease?
17      A.   Yes.
18      Q.   Let's go back to the record. "He
19  reports feeling on top of the world at times,
20  then depressed. The patient reports mood
21  swings which switch over a few weeks with
22  racing thoughts, which cause difficulty
23  sleeping. Reports poor concentration, reports
24  periods of hypersexuality, wild spending
25  sprees, cleaning excessively, increased

94

1   irritability.  The patient is frequently told
2   to stop talking so fast or so much.  Reports
3   starting projects and not finishing them."
4        Did I read that right?
5        A.   Yes.
6        Q.   Classic bipolar disorder.
7   Correct?
8        A.   Correct.
9        Q.   No question about the diagnosis.
10  Am I correct?
11       A.   Correct.  In my mind.  But the
12  next sentence is --
13       Q.   Well, the patient denies any
14  clear manic episodes.  Correct?
15       A.   Correct.  Yes.
16       Q.   Now, you wouldn't expect the
17  patient to have clear perception as to what he
18  or she's behavior is like.  Correct?
19       A.   It is not uncommon for them to
20  not have very good insight.
21       Q.   And you would agree that David
22  Haller has poor insight.  Correct?
23       A.   Yes.
24       Q.   Let's go down to the middle
25  paragraph.  This is in October -- March of

95

1   2003.  Correct?
2        A.   Correct.
3        Q.   You see the paragraph beginning,
4   "He feels very good on Eskalith."
5        A.   Yes.
6        Q.   What is Eskalith?
7        A.   It is a form of lithium.
8        Q.   "He feels very good on Eskalith,
9   lithium, Seroquel and Depakote."  Isn't that
10  correct?
11       A.   Correct.
12       Q.   "But he complains of stomach
13  pains for which his MD cannot find a cause."
14       Did I read that correctly?
15       A.   Yes.
16       Q.   And then it says, "He doesn't
17  want to stay on Seroquel because he sleeps
18  fine without it."
19       Did I read that correctly?
20       A.   Yes.
21       Q.   "And that he wanted to stop it to
22  see if it would stop his stomach pain."
23       Did I read that correctly?
24       A.   Yes.
25       Q.   Now, were you aware of this

96

1   information when you were providing care and
2   treatment to David?
3        A.   No.  I mean, the record was
4   there, but at the time that I took him, this
5   was not an issue anymore.
6        Q.   Fair enough.  He needed the
7   Seroquel regardless?
8        A.   Right.
9        Q.   Correct?
10  MR. BRUZZESE:
11       Objection to form.
12  BY MR. ELLISON:
13       Q.   "David's first psychiatric
14  encounter was when he was five years old, when
15  was seen outpatient for hyperactivity.  At age
16  12 he had his first inpatient stay.  He has
17  had about eight inpatient stays.  He was in
18  Arcadia from February to September of 1992."
19       Did I read that right?
20       A.   Yes.
21       Q.   What is Arcadia?
22       A.   My understanding, it is the state
23  hospital.
24       Q.   "His last inpatient stay was in
25  2003.  He attempted suicide once by cutting

97

1   his wrist."
2        Did I read that correctly?
3        A.   Yes.
4        Q.   Smokes a pack and a half of
5   cigarettes per day.  Right?
6        A.   Yes.
7        Q.   Now, in your experience do people
8   tend to underestimate, or shall I say,
9   understate the amount they smoke?
10       A.   Possibly.
11       Q.   The amount they drink?
12       A.   Sometimes.  Yes.
13       Q.   Would you expect David to?
14       A.   I mean, he is not a very reliable
15  historian, but I can't say for certain that he
16  underestimates his cigarette or alcohol use.
17       Q.   Fair enough.  Under past alcohol
18  history, "He began drinking at 21, which
19  became a problem.  He is a recovering
20  alcoholic."  Isn't that correct?
21       A.   Uh-uh.
22       Q.   Yes?
23       A.   Yes.
24       Q.   Legal History, "He has been
25  arrested about 30 times."

(Pages 94 to 97)

98

1       Did I read that right?
2   A.   Yes.
3   Q.   And this is as of March of
4 2003 --
5   A.   Correct.
6   Q.   -- correct?
7       "And he has been in juvenile
8 detention after hitting his father with a
9 two-by-four."
10      Did I read that correctly?
11  A.   Correct.
12  Q.   "He was in prison in 1986 for
13 lewd and lascivious."
14      Did I read that right?
15  A.   Correct.
16  Q.   Do you remember talking to him
17 about any of his prison stays or any of his
18 convictions?
19  A.   No.
20  MR. BRUZZESE:
21      Objection. Form.
22 BY MR. ELLISON:
23  Q.   That is not something you would
24 raise in a meeting with him?
25  A.   Not unless it was relevant to

99

1 what was going on. We typically met for 15
2 minutes and discussed the medications and how
3 they were working and his day-to-day function,
4 which this wasn't related at the time I was
5 seeing him.
6   Q.   You didn't know about, further
7 down under Social/Developmental History, he
8 was arrested for attempted rape at 12 years of
9 age?
10  MR. BRUZZESE:
11      Objection to form.
12  THE WITNESS:
13      Like I said, having that
14 historical information was one thing. But we
15 didn't -- it wasn't relevant to the day-to-day
16 issues that I was treating him for, so we did
17 not discuss it. No.
18 BY MR. ELLISON:
19  Q.   Fair enough. Under Medical
20 History on the next page, which is Bates
21 numbered 55.
22  A.   55.
23  Q.   He is five, six. Correct?
24  A.   Uh-uh.
25  Q.   Yes?

100

1   A.   Correct. Yes.
2   Q.   226 pounds. Is that correct?
3   A.   Correct.
4   Q.   That is not petite. Right?
5   A.   Correct.
6   Q.   It is obese. Correct?
7   A.   Correct.
8   Q.   Further down under
9 Instructions/Recommendations, it says
10 "Discontinue Seroquel." Isn't that correct?
11  A.   Correct.
12  Q.   And you would understand from
13 this record that he went off Seroquel for a
14 time pursuant to Ms. Corell's instructions.
15 Correct?
16  A.   Correct. Presumably because of
17 the stomach pain is what I am reading.
18  Q.   You don't know whether his
19 stomach pain had anything to do with his
20 Seroquel. Correct?
21  A.   Correct. Although it said that
22 he thought it did.
23  Q.   He is not a doctor, is he?
24  A.   No.
25  Q.   And you would agree that he has

101

1 poor insight and judgment. Correct?
2   A.   Correct.
3   Q.   You wouldn't rely on him to make
4 a medical determination as to whether Seroquel
5 was causing his tummy problems. Correct?
6   A.   Correct.
7   Q.   Now, would you turn to what is
8 Bates numbered 52? Do you have that in front
9 of you?
10  A.   Yes.
11  Q.   At the top it is dated March
12 29th, 2005. Is that correct?
13  A.   Correct.
14  Q.   And it is signed by a Don Davis,
15 nurse practitioner. Correct?
16  A.   Correct.
17  Q.   Do you know Don?
18  A.   Yes.
19  Q.   One of your colleagues at
20 Directions whose name escaped you when we
21 talked about that earlier?
22  A.   Yes. Actually, he had left. I
23 took his place, so he wasn't working when I
24 was there.
25  Q.   And did you take his patients,

**102**

1  too?
2      A.    Yes.
3      Q.    Is that how David Haller came
4  into your care?
5      A.    Actually, I think David ended up
6  with Dee Burke.  And then when Dee left, I
7  took David.
8      Q.    You didn't take David because
9  none of the other nurse practitioners were
10  willing to see him, did you?
11      A.    No.  But —
12      Q.    You paused and you said "but."
13  David was not a favorite patient.
14      A.    Correct.
15      Q.    He was difficult.  Is that
16  correct?
17      A.    Correct.
18      Q.    How was he difficult?
19      A.    When I inherited him, I remember
20  having several conversations with Dee Burke
21  about his behavior and him having rage,
22  outbursts in the waiting room and being very
23  abusive towards staff.
24      Q.    In what regard?
25      A.    Just verbally abusive.  Not

**103**

1  physically abusive.
2      Q.    What would he say that you heard?
3      A.    Just calling people names.  I
4  can't recall exactly.
5      Q.    Do you know if he ever threatened
6  any of the staff?
7      A.    I don't know if he did anything
8  of severe threat.
9      Q.    I didn't say severe.  Do you know
10  if he threatened —
11      A.    I don't know for sure.
12      Q.    Any other reasons why he was not
13  a favorite patient?
14      A.    Just based on what I was being
15  told was just his behavior was belligerent and
16  abusive.
17      Q.    I asked you questions about
18  threats to you.  Do you know whether he ever
19  threatened any of your colleagues?
20      A.    I don't know that for sure.
21      Q.    Do you know whether he ever made
22  any inappropriate sexual advances towards any
23  of your colleagues?
24      A.    I don't know that for sure.
25      Q.    You said "for sure."

**104**

1      A.    I don't know that.  If it is in
2  the records, it may have come up.  It may have
3  been told to me, but I don't remember.
4      Q.    Like I said, this isn't a memory
5  game.  I am just asking if you do remember.
6  And if you don't — and we will go through
7  this.  I will ask if there is something that
8  refreshes your memory, let me know.  Okay?
9      A.    Okay.
10      Q.    I represented to you that I
11  didn't see any record that spoke of a specific
12  threat.
13      A.    Okay.
14      Q.    But if you see something that
15  suggests there may have been --
16      A.    Right.
17      Q.    -- let me know.  Okay?
18      A.    Right.
19      Q.    At this point it says he has been
20  seeing a Dr. Jeter at the top under History.
21  Did I read that right?
22      A.    Yes.
23      Q.    Do you know Dr. Jeter?
24      A.    Dr. Jeter, I think, was briefly
25  at Directions.  It looks like there was a gap

**105**

1  in records.  Yes.  There is a big gap in
2  records for a year and a half.  So he must
3  have seen Dr. Jeter after Carol.
4      Q.    Do you know where David was
5  during that time frame where there is a gap?
6      A.    Dr. Jeter worked at Directions.
7  I am assuming he was at Directions.
8      Q.    I am sorry.  You recognize that
9  there is a gap in the records that Directions
10  has for David.  Is that correct?
11      A.    Yes.
12      Q.    Do you know whether David was
13  even getting treated during that gap?
14      A.    Well, it is saying he has been
15  seeing Dr. Jeter, who worked at Directions.
16  So I am assuming he was being treated at
17  Directions and the records aren't here.
18      Q.    Fair enough.  So there may be
19  more Directions records that we haven't seen?
20      A.    Correct.
21      Q.    Right.  So the record is clear, I
22  am going to reserve the right to talk with the
23  witness as a matter of formal statement, in
24  the event that there are records that relate
25  to the care and treatment of David that would

**106**

1  be appropriately directed to this witness.
2        So Dr. Jeter was at Directions?
3  A.   Correct.
4  Q.   I am with us now.  Did he work
5  there at any point in time while you were
6  there?
7  A.   No.
8  Q.   But this is, again, a couple of
9  months before you start.  Am I right?
10  A.   Yes.
11  Q.   It says, "He is on Eskalith,
12  lithium carbonate."  Two forms of lithium.  Am
13  I right?
14  A.   Yes.
15  Q.   Depakote.  Am I right?
16  A.   Yes.
17  Q.   And Seroquel 400 milligrams at
18  bedtime.  Right?
19  A.   Yes.
20  Q.   So he is on Seroquel now in 2005.
21  Is that right?
22  A.   Correct.
23  Q.   "He reports that the combination
24  of medications are helping.  Reports no severe
25  mood swings, nor psychotic symptoms.  No

**107**

1  suicidal or violent thoughts.  Appetite and
2  sleep good.  Denies side effects from the
3  medicine."
4        Did I read that correctly?
5  A.   Correct.
6  Q.   This is a note that you would
7  have taken a look at and reviewed prior to
8  your care and treatment of David or
9  contemporaneously with your care and treatment
10  of David.  Correct?
11  A.   Correct.
12  Q.   So you would understand at least
13  from this record that David had reported
14  Seroquel and his other medications were
15  helping him.  Correct?
16  A.   Correct.
17  Q.   Further down Don Davis has an
18  instruction.  Says to continue his
19  medications, and in particular, Seroquel at
20  400 milligrams at bedtime.  Am I right?
21  A.   Correct.
22  Q.   If you would turn to what is
23  Bates numbered 51.
24        Do you have that in front of you?
25  A.   Yes.

**108**

1  Q.   This is dated -- this is a
2  document that is called a Psychiatric Progress
3  Note.  Is that correct?
4  A.   Correct.
5  Q.   July 21st, 2005.  Am I right?
6  A.   Correct.
7  Q.   Is this -- can you look at this
8  and determine who wrote this?  Is this
9  Dr. Zenel's record?
10        It says, "I am seeing him today
11  for emergency evaluation because he recently
12  had a medical hospitalization, and he is
13  currently out of psychiatric medications."
14        Did I read that correctly?
15  A.   Yes.
16  Q.   This is right around the time you
17  became involved in David's care.  Am I right?
18  A.   Yes.
19  Q.   And if I heard you right, your
20  collaborative physician was Dr. Zenel.  Am I
21  right?
22  A.   Yes.
23  Q.   Would Dr. Zenel see David?  And
24  if it would refresh your memory to look at the
25  note you wrote, which is Bates numbered 50, go

**109**

1  ahead and do so.
2  A.   Yes.  Dr. Zenel saw him on 7-21.
3  Q.   So is it your understanding that
4  the 7-21-05 partial record is Dr. Zenel's
5  record, and it is based on or in follow-up of
6  this visit with Dr. Zenel that David had on
7  July 21st, 2005, that he comes into your care.
8  Am I correct?
9  A.   Correct.
10  Q.   Okay.  Let's go through this
11  Dr. Zenel visit.  "I mentioned that he was
12  seeing him for emergency evaluation because of
13  the recent medical hospitalization and the
14  psychiatric medications. "
15        Did I read that correctly?  Right
16  at the top.
17  A.   Currently out of psychiatric
18  meds.  Yes.
19  Q.   And then a couple lines down in
20  the second paragraph, it says, "While in the
21  hospital his lithium and Depakote doses were
22  lowered."  Correct?
23  A.   Correct.
24  Q.   And that was what we just talked
25  about, his lithium and Depakote doses were in

110

1  the last record. Am I correct?
2     A.   **Yes. Correct.**
3     Q.   And so that was a change in his
4  medication regimen while he was in the
5  hospital. Right?
6     A.   **Correct.**
7     Q.   "Since discharge the patient
8  states he has had mood swings, irritability,
9  some racing thoughts, and he definitely notes
10 the change in the lower dose of medications."
11        Did I read that correctly?
12    A.   **Correct.**
13    Q.   "He says he would like either to
14 get back on his old dosage or to do something
15 different, if necessary."
16        Did I read that correctly?
17    A.   **Correct.**
18    Q.   And then it says, "We discussed
19 treatment alternatives, and since I do not
20 have blood work available on his renal or
21 liver function, nor do I have any medication
22 blood levels, he agreed to increase the
23 Seroquel."
24        Did I read that correctly?
25    A.   **Correct.**

111

1     Q.   Now, this is Dr. Zenel's plan.
2  Am I correct?
3     A.   **Correct.**
4     Q.   But the blood work he is talking
5  about you understood related to, among other
6  things, the glucose levels, as we talked about
7  earlier. Am I right?
8     A.   **Correct.**
9     Q.   And the reason you are doing
10 glucose is because this is an atypical
11 antipsychotic and you are aware of the
12 association, or you and your colleagues are
13 aware of the association between atypicals,
14 weight gain, hyperglycemia and diabetes.
15 Correct?
16    A.   **Correct.**
17    Q.   Then it says, "The patient was
18 insistent that he needed something to help him
19 during the day if he had significant
20 agitation."
21        Did I read that correctly?
22    A.   **Correct.**
23    Q.   "And we agreed on Seroquel low
24 dose." And PRN, what does that stand for?
25    A.   **As needed.**

112

1     Q.   As needed. Am I correct?
2     A.   **Correct.**
3     Q.   It is not quite clear to me from
4  that record what Dr. Zenel ordered, because it
5  is a partial record. It is a partial record.
6  Correct?
7     A.   **Correct.**
8     Q.   So let's look to your note which
9  is Bates numbered 50. Do you see that?
10    A.   **Correct.**
11    Q.   The date on top of this is July
12 25, 2005. Correct?
13    A.   **Correct.**
14    Q.   This is the record that you made
15 of the very first visit you had with David.
16 Am I right?
17    A.   **Correct.**
18    Q.   That is your name on the bottom,
19 Nicole Keene. Am I correct?
20    A.   **Correct.**
21    Q.   Let's start at the top under
22 Notes. "Patient here for first appointment
23 with this provider." Is that correct?
24    A.   **Correct.**
25    Q.   And "this provider" being you.

113

1  Am I right?
2     A.   **Correct.**
3     Q.   "Seen by Dr. Zenel July 21st,
4  2005." Am I right?
5     A.   **Correct.**
6     Q.   And then its says, "Awaiting
7  dictation." Am I correct?
8     A.   **Correct.**
9     Q.   "Records received from Dr. Yamani
10 indicating patient recently hospitalized for
11 kidney stones and increased liver enzymes."
12 Am I correct?
13    A.   **Yes.**
14    Q.   Does looking at that refresh your
15 memory as to whether you knew at the time he
16 had diabetes?
17        Let me ask it this way: You
18 wrote that the blood work reflected increased
19 liver enzymes for a reason. Right? Yes?
20    A.   **Probably related to the Depakote.**
21    Q.   Not necessarily diabetes?
22    A.   **No.**
23    Q.   Fair enough. "Dr. Zenel lowered
24 the lithium carbonate from 600 to 300 at
25 bedtime and Depakote from 500 to 250 twice a

**114**

1  day." Am I right?
2      A.    Correct.
3      Q.    If I understand correctly, that
4  was in response to the increased liver
5  enzymes. Correct?
6      A.    Correct.
7      Q.    It had nothing to do with
8  Seroquel. Correct?
9      A.    Correct.
10     Q.    "Seroquel increased from 400 to
11  600 milligrams at bedtime." Am I correct?
12     A.    Correct.
13     Q.    And that is a therapy for his
14  bipolar. Am I correct?
15     A.    Correct.
16     Q.    And that you were aware that
17  Dr. Zenel had done that, and it was your
18  understanding that Dr. Zenel had done that in
19  part because the patient specifically asked
20  for it. And you and Dr. Zenel agreed that
21  that was the right medication for him. Am I
22  right?
23     A.    Correct. Yes. Because they had
24  to decrease the Depakote because of the liver
25  enzymes, so we needed to increase coverage.

**115**

1      Q.    And then further down it says,
2  "Seroquel mildly effective." Am I correct?
3      A.    Yes.
4      Q.    Now, this visit is, what, four
5  days after the previous visit?
6      A.    Yes.
7      Q.    Takes a while for an increased
8  dosage in Seroquel to take effect. Isn't that
9  correct?
10     A.    Correct.
11     Q.    Couple of weeks. Am I right?
12     A.    Correct.
13     Q.    You had noted there had even been
14  some mild effectiveness and a slight increase
15  over those four days. Am I correct?
16     A.    Correct.
17     Q.    And that is with respect to
18  Seroquel. Am I right?
19     A.    Correct.
20     Q.    Further down under -- right above
21  "lab tests reviewed." What are the first two
22  words? I am sorry. Right here.
23     A.    "Release signed for
24  Dr. Sareneth" --
25     Q.    "Dr. Sareneth to obtain labs"?

**116**

1      A.    To obtain labs, yes.
2      Q.    Okay. Because you wanted to get
3  those labs from the doctor. Is that right?
4      A.    Yes.
5      Q.    Now, I note the next one.
6  "Dr. Zenel ordered labs July 21st, 2005." Is
7  that right?
8      A.    Correct.
9      Q.    And David didn't do it, didn't
10  authorize it. Is that correct?
11     A.    Correct. Yes. Did not follow
12  up. So I was getting the ones from the
13  hospital.
14     Q.    Now, under the Medication
15  Prescribed, we have got Eskalith, lithium
16  carbonate, Depakote and Seroquel. Am I
17  correct?
18     A.    Yes. Correct.
19     Q.    And you have got a follow-up in a
20  month. Am I correct?
21     A.    Correct.
22     Q.    Now, the next time you saw David
23  was on, am I correct, January 18th, 2006. It
24  is Bates numbered 45, if that helps. Again,
25  it is Bates numbered 45.

**117**

1      A.    That is the next record that I
2  have.
3      Q.    Let's walk through it, and if
4  this refreshes your memory, let me know. Do
5  you have that one in front of you?
6      A.    Yes.
7      Q.    It says, "This 43-year-old
8  disabled separated male who has been in
9  treatment since September 2002 with a
10  diagnosis and history of bipolar disorder and
11  substance abuse."
12          Did I read that generally
13  correctly?
14     A.    Yes.
15     Q.    Then it says under the next line,
16  or two lines over, "He was seen by this
17  provider on one occasion prior to a recent
18  hospitalization at Morton Plant after a severe
19  overdose on medication."
20          Did I read that correctly?
21     A.    Correct.
22     Q.    "He was subsequently seen in this
23  clinic by Dee Burke and is returning to care
24  with this provider," that would be you,
25  "today."

**(Pages 114 to 117)**

118

1       Did I read that correctly?
2       A.    Correct.
3       Q.    Does seeing that portion of this
4 record refresh your memory as to the care and
5 treatment history of David for that time
6 frame?
7       A.    A little bit. But we are missing
8 a lot of records.
9       Q.    So there are additional records
10 during the time and care that you provided for
11 David that we, for whatever reason, don't have
12 from Directions?
13      A.    Correct. Because the records are
14 missing for a three-month -- for a six-month
15 period from the middle of 2005 to the
16 beginning of 2006. That is when Dee Burke was
17 seeing him.
18      Q.    Do you know how long David was in
19 the hospital?
20      A.    It doesn't say in here?
21      Q.    I couldn't find it.
22      A.    No. I don't know. I don't
23 remember.
24      Q.    All right. Well, with that
25 said --

119

1       A.    No. It wouldn't have been that
2 long. I know Dee was seeing him in that time
3 period.
4       Q.    The same reservation as to
5 missing documents that I made before.
6       Now, in the interim, do you
7 recall talking with Dee Burke about David?
8       A.    Correct. This is when the
9 conversation came up that I had talked to you
10 about before, about inheriting him and him
11 being very unstable.
12      Q.    Further down it says, "He has a
13 history of becoming severely abusive to
14 providers in this facility."
15      Did I read that correctly?
16      A.    Correct.
17      Q.    Have you fully described what you
18 mean by severely abusive, or does this refresh
19 your memory as to other things that you were
20 aware of when you wrote that?
21      A.    My understanding was that he
22 would become very verbally abusive, name
23 calling. That was my understanding. Again, I
24 did not experience that with David.
25      Q.    Demeaning? Yes?

120

1       A.    Again, I don't recall specifics.
2 But my understanding was that he was just very
3 aggressive. And -- yeah.
4       Q.    So if I want to find out how he
5 actually acted to the staff, I should go talk
6 to Dee Burke?
7       A.    Probably. Yes. She is the one
8 that gave me that information. So it is
9 really third-hand for me.
10      Q.    If I want to know if he
11 threatened her, I should talk to Dee?
12      A.    Correct.
13      Q.    Do you know where she is?
14      A.    She in Tennessee now. I don't
15 know where.
16      Q.    Nowhere in particular, no place
17 specific?
18      A.    They can find her at Directions.
19      Q.    Walking on Beall?
20      A.    I don't know.
21      Q.    Then it says, "He is currently
22 taking Risperdal Consta 50 milligrams."
23      Did I read that right?
24      A.    Correct.
25      Q.    That is the injection. Correct?

121

1       A.    Correct. Dee started him on
2 that.
3       Q.    And Dee started him on that, to
4 your knowledge, because he wasn't complying
5 with his Risperdal orally. Correct?
6       MR. BRUZZESE:
7       Objection. Form.
8       THE WITNESS:
9       Correct.
10 BY MR. ELLISON:
11      Q.    And that was a consistent
12 problem, maintaining a regular medication
13 regimen. Isn't that right?
14      A.    Correct.
15      Q.    Then it says, "Seroquel 300
16 milligrams, Artane and Risperdal."
17      Did I read that correctly?
18      A.    Correct.
19      Q.    So he is on a number of different
20 medications. Is that correct?
21      A.    Yes.
22      Q.    And apart from the Artane,
23 Risperdal, both orally and by injection, and
24 the Seroquel are for his bipolar. Is that
25 right?

122

1    A.    Correct.
2    Q.    He says that his mood has been
3  stable. Is that correct?
4    A.    Correct.
5    Q.    And you don't know whether David
6  had already been diagnosed with diabetes as of
7  this date?
8    A.    I don't have that written in my
9  note that he is diagnosed with diabetes.
10    Q.    It says, "The patient complains
11  today that he is having sleep difficulty and
12  would like to increase his Seroquel as he used
13  to be on the 600 milligrams at bedtime."
14       Did I read that correctly?
15    A.    Correct.
16    Q.    So David specifically came in and
17  asked you to give him Seroquel. Is that
18  correct?
19    A.    Correct.
20    Q.    I should have asked you this
21  before. You talked with him at the very first
22  visit when you were continuing his Seroquel
23  about the risks of hyperglycemia, weight gain
24  and diabetes. Is that correct?
25    MR. BRUZZESE:

123

1       Object.
2  BY MR. ELLISON:
3    Q.    And David chose to take those
4  medications notwithstanding those risks.
5  Isn't that right?
6    A.    Correct.
7    Q.    And you believed then and you
8  believe now that that was the right medication
9  for him. Correct?
10    A.    Correct.
11    Q.    And that is why you prescribed
12  it. Am I right?
13    A.    Correct.
14    Q.    Now, let's come back to this
15  visit. David asks for more Seroquel.
16  Correct?
17    A.    Correct.
18    Q.    And that is because it is helping
19  him in his view. Is that correct?
20    A.    Correct.
21    Q.    And you agreed that that was
22  helping him. Isn't that right?
23    A.    Correct.
24    Q.    And that was notwithstanding
25  having had the discussion with him about the

124

1  potential side effects of weight gain,
2  hyperglycemia and diabetes. Am I correct?
3    A.    Correct.
4    Q.    He wants 600. He agrees that he
5  will increase it to 500. Is that correct?
6    A.    Correct.
7    Q.    You wanted to take it slow.
8  Isn't that correct?
9    A.    Correct.
10    Q.    And the reason was because on the
11  whole, at least in terms of his moods, he was
12  doing pretty well with the cocktail as it was.
13  Right?
14    A.    Correct.
15    MR. BRUZZESE:
16       Objection.
17  BY MR. ELLISON:
18    Q.    You didn't want to rock the
19  proverbial boat. Am I right?
20    A.    Correct.
21    Q.    Because we saw what happened
22  previously when his Depakote and his lithium
23  was lowered. Isn't that correct?
24    A.    Correct.
25    Q.    And this is following the OD. Do

125

1  you remember that?
2    A.    Correct.
3    Q.    The hospitalization. Correct?
4    A.    Correct.
5    Q.    So that informed your concerns
6  about changing in a dramatic way his
7  medications. Am I correct?
8    A.    Correct.
9    Q.    You wanted to stick with what was
10  working. Am I right?
11    A.    Correct.
12    Q.    Further down it says -- I just
13  had some questions about this -- "He is not
14  aggressive, but laughs when he is gently
15  confronted about previous aggressive
16  outbursts."
17       Did I note that?
18    A.    Correct.
19    Q.    That was your observation. Am I
20  right?
21    A.    Yes.
22    Q.    Do you remember what you meant?
23    A.    I meant that I questioned him
24  about the history that I had been given
25  verbally by his previous providers, trying to

126

1  test to see where he would go with it, and he
2  was not reactive whatsoever.  Not aggressive
3  whatsoever.  Was more trying to laugh it off
4  instead of being reactive or defensive about
5  it.
6       Q.    Did you view that as an
7  appropriate reaction, or did it strike as you
8  odd?
9       A.    I don't recall what my — how I
10  interpreted that.  I do know that I was — I
11  do recall feeling relieved that he was not
12  being aggressive, so —
13      Q.    Okay.
14      A.    So I thought it was a definite
15  change from what had been reported before.
16      Q.    You do note that his speech is
17  pressured and rapid.  Thought processes are
18  slightly circumstantial.  Did I read that
19  correctly?
20      A.    Yes.
21      Q.    So even though he is on those
22  medications, he is still not normal.  Am I
23  right?  Let me rephrase that.
24            Even though he is on those
25  medications, he is not functioning at what you

127

1  would consider to be a normal range.  Am I
2  right?
3       A.    He still has some mild symptoms,
4  according to this note.
5       Q.    Would you agree that David is a
6  very hard patient to treat?
7       A.    Yes.
8       Q.    And that not only -- and that is
9  in part because of the severity of his
10  condition.  Correct?
11      A.    Yes.
12      Q.    He has got Bipolar I really bad.
13  Right?
14      MR. BRUZZESE:
15            Objection to form.
16  BY MR. ELLISON:
17      Q.    It is also his history of
18  noncompliance with medications.  Correct?
19      A.    Correct.
20      Q.    And other complicating factors.
21  Correct?
22      A.    Meaning what?
23      Q.    Alcohol abuse?
24      A.    Correct.  Yes.
25      Q.    Life-style choices.  Correct?

128

1       A.    Correct.
2       Q.    Further down it says, "Low
3  average to borderline range IQ."
4            Did I read that correctly?
5       A.    Correct.
6       Q.    What do you mean by that?
7       A.    This is just a suggestion.  There
8  is nothing that was —
9       Q.    You didn't test him?
10      A.    No. I didn't test him.
11      Q.    You didn't perform any form of
12  psychological or psychiatric testing on him at
13  any point in time.  Correct?
14      A.    No.  This was just based on his
15  fund of knowledge and vocabulary, meaning that
16  he had below average —
17      Q.    To borderline range?
18      A.    To borderline, which is below 90
19  IQ.
20      Q.    And then it says, "Insight and
21  judgment are poor."  Isn't that correct?
22      A.    Yes.
23      Q.    Now, further down it says,
24  "Discontinue the oral Risperdal.  Increase
25  Seroquel to 500 milligrams and then continue

129

1  the Risperdal Consta at 50 milligrams."  Is
2  that correct?
3       A.    That is standard when you start
4  the Consta, you gradually taper them off the
5  oral Risperdal.
6       Q.    And you did that because you
7  thought injecting him would make sure that he
8  actually got the Risperdal.  Correct?
9       A.    Correct.  You have to keep them
10  on the oral for some time so that they have a
11  coverage before the injection kicks in.
12      Q.    Titrate him down.  Right?
13      A.    Uhm-uhm.
14      Q.    Yes?
15      A.    Correct.
16      Q.    Then at the bottom it says,
17  "Information was disclosed, and the client
18  participated in the discussion of the nature
19  of the proposed treatment, the potential
20  benefits and risks of the treatment, any
21  treatment alternatives that exist and their
22  benefits and risks, and the benefits and risks
23  of no treatment at all."
24            Did I read that correctly?
25      A.    Correct.

130

1    Q.    And those discussions included
2 the risks of hyperglycemia, diabetes and
3 weight gain?
4    MR. BRUZZESE:
5        Objection.
6 BY MR. ELLISON:
7    Q.    And then it says, "The client
8 voluntarily consented to the proposed
9 treatment and has capacity to offer consent."
10 Is that correct?
11    A.    Correct.
12    Q.    That means that David heard you
13 and said let's do it.  Right?
14    A.    Correct.
15    Q.    Now, will you please turn to
16 Bates No. 42?
17        Do you have that in front of you?
18    A.    Yes.  I think so.
19    Q.    This is the record of the next
20 visit.  Am I right?
21    A.    My next visit.  Yes.  Well, yes.
22    Q.    February 16, 2006.  Am I correct?
23    A.    Correct.
24    Q.    Again, that is Bates No. 42.
25    A.    Correct.

132

1 insomnia."
2        Did I read that correctly?
3    A.    Correct.
4    Q.    "He is having concerns about his
5 sleep."  Right?
6    A.    Correct.
7    Q.    And again, as we discussed
8 earlier, insomnia is both a sign and a cause
9 of mania.  Correct?
10    A.    Correct.
11    Q.    You wanted to control his sleep.
12 Am I correct?
13    A.    Correct.
14    Q.    You discussed increasing his
15 Seroquel for that purpose.  Am I correct?
16    A.    Correct.
17    Q.    As well as.  I mean, that was
18 part of his bipolar therapy.  Correct?
19    A.    Correct.
20    Q.    And then continuing on the
21 Consta.  Correct?
22    A.    Correct.
23    Q.    Under Meds Prescribed, you
24 increased his Seroquel to 600 milligrams.
25 Otherwise, everything else is the same.

131

1    Q.    You note he is taking Risperdal,
2 Seroquel and Artane and that as of then, he is
3 off the oral Risperdal.  Am I right?
4    A.    Correct.
5    Q.    Still you think -- well, you
6 wrote he seems to be doing relatively well on
7 the Consta.  Did I read that correctly?
8    A.    Correct.
9    Q.    That was your observation.  Am I
10 right?
11    A.    Correct.
12    Q.    "He states that he has not had
13 many aggressive outbursts and he is very
14 pleasant today."
15        Did I read that right?
16    A.    Correct.
17    Q.    "He reports doing much better and
18 is not feeling suicidal at all."
19        Did I read that correctly?
20    A.    Correct.
21    Q.    And the reason you wrote those
22 things is because that is what he told you.
23 Am I correct?
24    A.    Correct.
25    Q.    "He only complains of some middle

133

1 Right?
2    A.    Yes.
3    Q.    And the same paragraph about
4 information disclosed is included on the
5 bottom here.  Is that correct?
6    A.    Correct.
7    Q.    Again, you would have mentioned
8 the weight gain, hyperglycemia and diabetes.
9 Correct?
10    A.    Correct.
11    Q.    And he heard you and decided to
12 proceed with your recommended course of
13 treatment.  Correct?
14    A.    Correct.
15    Q.    Now, he saw -- can you look at
16 41.  He came to Directions for Risperdal
17 shots.  Correct?
18    A.    Correct.
19    Q.    On Bates No. 41, this is a record
20 that reflects his shot.  Am I right?
21    A.    These are out of order.  Yes.
22    Q.  -  It may have happened when I
23 dumped coffee on them.  Sorry about that.
24    A.    That is okay.  Yes.
25    Q.    The witness is laughing.  Over

**134**

1 Service Provider there is a signature. Do you
2 see that?
3    **A.   Yes.**
4    Q.   Do you recognize that?
5    **A.   That is Carlos' signature.**
6    Q.   And you don't recall his last
7 name?
8    **A.   Esteves.**
9    Q.   So he had come and seen Carlos.
10 You paused and covered your mouth.
11    **A.   I am not positive if that is**
12 **Carlos' handwriting.**
13    Q.   Well, if it means anything, I
14 found a stamp later on in Bates No. 23 that
15 says Esteves.
16    **A.   Is that the same signature?**
17    Q.   I don't know.
18    **A.   I know that Carlos was the nurse.**
19 **There was a nurse that came before Carlos,**
20 **too, though.**
21    Q.   You are not sure who it was, but
22 the practice I have right. He would come in
23 to see an LPN. The LPN would stick him?
24    **A.   Correct.**
25    Q.   And give him the Risperdal.

**135**

1 Correct?
2    **A.   Correct.**
3    Q.   He needed that every two weeks.
4 Am I right?
5    **A.   Correct.**
6    Q.   The next visit I have with you is
7 June 2006.
8    **A.   Do you have a number?**
9    Q.   I am sorry. 34.
10    **A.   Okay.**
11    Q.   Is, in fact, June 1, 2006 the
12 first time you saw him?
13    **A.   Yes.**
14    Q.   And it says, "He is doing
15 extremely well on the current medication and
16 has had no aggressive outbursts at this clinic
17 since being on the Consta." Am I correct?
18    **A.   Correct.**
19    Q.   And the medication you are
20 talking about is the Consta Seroquel. Am I
21 correct?
22    **A.   Correct.**
23    Q.   "He denies depressed mood or
24 mania or symptoms. He reports having a
25 fiancee."

**136**

1      Did I read that correctly?
2    **A.   Correct.**
3    Q.   And he is able to have and
4 maintain relationships, it looks like, while
5 he is on Seroquel. Is that correct?
6    **A.   Correct.**
7    Q.   And the reason you noted that is
8 because that was a difference. Am I correct?
9    **A.   Correct.**
10    Q.   He had not been able to maintain
11 relationships with other people. Is that
12 correct?
13    **A.   Correct.**
14    Q.   And then it says, "He reports
15 doing much better and is not feeling suicidal
16 at all." Is that correct?
17    **A.   Correct.**
18    Q.   And that is in spite of a history
19 of severe OD on medication. Is that correct?
20    **A.   Correct.**
21    Q.   And it was your understanding
22 that he OD'd on the meds to try to kill
23 himself. Is that correct?
24    **A.   Correct.**
25    Q.   And then it says, "He is sleeping

**137**

1 well on the Seroquel 600 milligrams at
2 bedtime." Am I right?
3    **A.   Correct.**
4    Q.   So, in other words, he is
5 functioning within a normal range while he is
6 on these meds. Am I right?
7    **A.   Correct. And I think what is**
8 **really obvious, is a good indication, is the**
9 **mental status exam where I said he waited over**
10 **two-and-a-half hours in the waiting room for**
11 **my appointment and was very calm and**
12 **cooperative, which is not what he would have**
13 **done before.**
14    Q.   And that is really hard to do if
15 you are as severe a bipolar patient as he is.
16 Is that correct?
17    **A.   Correct.**
18    Q.   And that is not his fault. That
19 is the condition. Am I right?
20    **A.   Correct.**
21    Q.   So the fact that he was able to
22 wait for over two-and-a-half hours for his
23 appointment, stay calm and relaxed, is a sign
24 to you that this medication regimen is just
25 what David needs. Correct?

138

1    A.    Correct.
2    Q.    Now, you note that his lipids are
3 slightly elevated. Did I read that correctly?
4    A.    Correct.
5    Q.    And were you concerned with that?
6 Did you know at that point whether that
7 related to his diabetes?
8    A.    Well, the lipids and the diabetes
9 are a little different. One is dyslipidemia
10 and the other one is related to glucose.
11    Q.    I understand. But you see both
12 as part of an overall metabolic syndrome.
13 Correct?
14    A.    Yes. Yes. Yes.
15    Q.    And you often see one with the
16 other. Am I correct?
17    A.    Correct.
18    Q.    Let's look down under Meds
19 Prescribed. It says, "Continue the Seroquel."
20 In other words, keep everything as is. Right?
21    A.    Correct.
22    Q.    Under Education it says, "The
23 patient is aware of the risk of Seroquel and
24 lipids and possible diabetes. He wishes to
25 stay on the medication despite these risks."

139

1        Did I read that correctly?
2    A.    Correct.
3    Q.    And this is dated June 2006.
4    A.    Correct.
5    Q.    As of June 2006, had you started
6 seeing the advertisements from plaintiffs'
7 lawyers on television saying if you have used
8 Seroquel and have diabetes, give us a call,
9 1-800. Do you remember?
10    A.    I don't remember when I saw them.
11    Q.    So you didn't necessarily make a
12 specific notation of a discussion with
13 Seroquel -- of a connection between Seroquel
14 and diabetes because of an advertisement from
15 plaintiffs' lawyers that you had seen on TV?
16    A.    No. I mean --
17    Q.    Can you think of a reason why you
18 started specifically identifying a Seroquel
19 discussion in your records when you hadn't to
20 that point?
21    A.    Probably I was just getting a
22 little bit more comfortable with my notes,
23 honestly.
24    Q.    Fair enough. But the absence of
25 such a notation in prior records, as we

140

1 discussed, doesn't mean you didn't have it?
2    A.    No.
3    Q.    That is correct?
4    A.    Correct.
5    Q.    But as you sit here today, you
6 don't remember making a specific notation as
7 to Seroquel and risks of diabetes in records
8 because of a concern from based on the
9 lawyer's ads you may have seen?
10    A.    No.
11    Q.    Do you remember when you may have
12 started first seeing those lawyer ads you
13 referenced?
14    A.    No.
15    Q.    I should ask the question. The
16 reason you wrote, "The patient is aware of the
17 risks of Seroquel and lipids and possible
18 diabetes in June of 2006," is because you had
19 had numerous discussions as of that date with
20 David Haller about the risks of Seroquel on
21 lipids and possible diabetes. Correct?
22        MR. BRUZZESE:
23            Objection. Form.
24        THE WITNESS:
25            According to these notes. Yes.

141

1 BY MR. ELLISON:
2    Q.    And according to your memory.
3 Isn't that right?
4    A.    Yes. But again, I saw several
5 hundred patients, and this was a typical --
6 that is how I did it every time. It was just
7 a standard of care.
8    Q.    You have no reason to think you
9 did it differently with David. Correct?
10    A.    No.
11    Q.    And you believe the reason you
12 wrote that is because you had that discussion
13 with him. Correct?
14    A.    Correct.
15        MR. BRUZZESE:
16            Objection. Form.
17 BY MR. ELLISON:
18    Q.    Then it says, "He wishes to stay
19 on the medication despite these risks."
20        Did I read that correctly?
21    A.    Correct.
22    Q.    "David said I know that it might
23 cause diabetes. I know it might worsen
24 diabetes. I want to stay on the Seroquel."
25        MR. BRUZZESE:

142

```
 1        Objection.  Form.
 2   BY MR. ELLISON:
 3        Q.    Is that right?
 4        A.    According to these notes.
 5        Q.    You keep saying, "According to
 6   these notes."
 7        A.    I don't remember.  I don't
 8   remember specific discussions with him.
 9        Q.    Would you have written it --
10        A.    No.  No.
11        Q.    The reason you wrote it is
12   because that is what he said.  Correct?
13        A.    Correct.
14        MR. BRUZZESE:
15        Objection to form.
16   BY MR. ELLISON:
17        Q.    Next time you see David is
18   October 6th, 2006.  Is that correct?
19        A.    I am out of order.
20        Q.    It is -- sorry.  It is Bates
21   numbered 24.  Are you sure they are out of
22   order?  I think it is just a matter of a bunch
23   of injection notes.
24        A.    Okay.  Maybe I am putting them
25   out of order as we go.  It is Bates No. 24?
```

143

```
 1        Q.    Yes.
 2        A.    Okay.  It seems like there would
 3   have been one in between this.  I was supposed
 4   to see him in two months.  It seems like there
 5   should have been an August note in there.
 6        Q.    You would agree we don't have it
 7   in the stack?
 8        A.    We don't have it.
 9        Q.    Let's jump to the October one.
10        A.    Okay.
11        Q.    Do you have it in front of you?
12        A.    Yes.
13        Q.    Bates No. 24.  October 6, 2006.
14   It says he is taking Risperdal, Seroquel and
15   Artane.  Correct?
16        A.    Correct.
17        Q.    Just like he was before.  Am I
18   right?
19        A.    Correct.
20        Q.    "He reports he was hospitalized
21   because he presented to the ER with stomach
22   problems, gastroparesis, and they sent him to
23   the psych unit."
24        Did I read that correctly?
25        A.    Correct.
```

144

```
 1        Q.    "He states that his medications
 2   were kept the same, and he was discharged."
 3        Did I read that correctly?
 4        A.    Right.
 5        Q.    Do you have an understanding of
 6   why Morton Plant would send him to the psych
 7   unit for stomach problems?
 8        A.    Probably based on his history
 9   that he was a severe psych patient, and they
10   may have thought it was psychogenic.
11        Q.    In other words, they didn't find
12   a biological reason for his tummy problems?
13        A.    That is what it looks like here.
14   Yeah.
15        Q.    Had you personally observed any
16   instance where he manifested physical symptoms
17   that you attributed to his mental condition?
18        A.    Not that I recall.
19        Q.    But that is imminently believable
20   to you?
21        A.    It is possible.  Yes.
22        Q.    Further down it says, "He does
23   not want to come off the Artane, which he is
24   aware can cause GI problems."
25        Did I read that correctly?
```

145

```
 1        A.    Correct.
 2        Q.    "As he states that it helps with
 3   tremors from Risperdal."
 4        Did I read that correctly?
 5        A.    Correct.
 6        Q.    And it was your perspective at
 7   the time that he may be somewhat disingenuous
 8   about why he wanted to stay on Artane.  Is
 9   that right?
10        A.    That was --
11        Q.    Your perception?
12        A.    -- a hunch.  Yes.  Correct.
13        Q.    Now, further down under
14   Assessment, you have got, "Hypertension,
15   diabetes mellitus, diet control and
16   dyslipidemia."
17        Did I read that correctly?
18        A.    Correct.
19        Q.    So as of October 2006 at the
20   latest, you had started identifying
21   affirmatively his diabetes on your records.
22   Is that correct?
23        A.    Correct.  But I think we are
24   missing a note.
25        Q.    May have done it earlier?
```

146

1    A.    Yeah. I think August. We are
2 missing August.
3    Q.    But as you sit here, you don't
4 remember when you found out David might have
5 diabetes. Is that correct?
6    A.    No. It would have happened with
7 lab reports that we didn't have records of,
8 either.
9    Q.    You have ordered labs, though.
10 Is that right?
11    A.    Yeah. Labs are there. We just
12 don't have copies of the records.
13    Q.    Notwithstanding his diabetes, you
14 decided to continue him on the same
15 prescription regimen, including 600 milligrams
16 of Seroquel at bedtime. Is that right?
17    A.    Correct.
18    Q.    And again, under Education you
19 wrote, "Patient is aware of the risks of
20 Seroquel on lipids and possible diabetes. He
21 wishes to stay on the medication despite these
22 risks."
23        Did I read that correctly?
24    A.    Correct.
25    Q.    And you had another conversation

147

1 about an association between Seroquel and
2 lipids and diabetes on October 6, 2006 with
3 David. Is that correct?
4    A.    Correct.
5    Q.    And notwithstanding -- and you
6 told him that there was a risk. Right?
7    A.    Correct.
8    Q.    And he told you he wanted to stay
9 on the medication despite the risks. Right?
10    A.    Correct.
11    Q.    Now, do you know when David filed
12 his lawsuit?
13    A.    No. I don't. I think I made
14 note when he told me he filed his lawsuit.
15    Q.    Let's turn, January 12th, 2007.
16 Bates numbered 17.
17    A.    Okay.
18    Q.    Got it in front of you?
19    A.    Yes.
20    Q.    Three lines down. "He is taking
21 Risperdal, Seroquel and Artane."
22        Did I read that correctly?
23    A.    Yes.
24    Q.    Same regimen. Right?
25    A.    Yes.

148

1    Q.    "He states that he had a
2 colonoscopy done and it was normal, but he
3 continues to state he has a history of
4 gastroparesis, which is not substantiated by
5 medical records I have received."
6        Did I read that correctly?
7    A.    Correct.
8    Q.    What do you mean by -- and you
9 wrote that because that was your observation
10 of what he told you on or about that date.
11 Right?
12    A.    Yes. I was concerned about the
13 Artane causing gastroparesis, which was -- my
14 concern was that that is why he was having the
15 stomach problems.
16    Q.    Okay. And as a result of that,
17 you contacted his GI doctor to get him or her
18 to sign off on his continued use of Artane?
19    A.    Correct.
20    Q.    Then further it says, "He is
21 involved in a lawsuit regarding diabetes
22 mellitus related to Seroquel and Risperdal."
23        Did I identify that correctly?
24    A.    Correct.
25    Q.    And you wrote that because that

149

1 is what he told you on or about that date?
2    A.    Correct.
3    Q.    Did you express any views to him
4 on whether it made any sense for him to sue
5 the manufacturers of Seroquel and Risperdal?
6    A.    I remember having a conversation
7 with him about how the medication was
8 obviously helping him. He agreed that it was
9 helping him significantly, that he had been
10 more stable in the time I was treating him
11 than he had ever been.
12    Q.    Do you think it is wrong for him
13 to sue us?
14    A.    Yeah.
15    Q.    Okay. And the reason you think
16 it is wrong is because you believe as a
17 professional that he needs this medication,
18 that he benefits from it, regardless of any
19 risk of diabetes, weight gain. Correct?
20    A.    Correct. Yes.
21    MR. BRUZZESE:
22        Object to form.
23 BY MR. ELLISON:
24    Q.    And you think it is important
25 that AstraZeneca be able to provide Seroquel

**150**

1 to your patients who may need it.  Isn't that
2 correct?
3    A.   Yes.
4    Q.   The next line you wrote was, "He
5 has been given clear informed consent in this
6 regard and does not want to come off the
7 medications."
8       Did I read that correctly?
9    A.   Correct.
10    Q.   And at the bottom -- and the
11 reason you wrote that is because you once
12 again had another discussion with him, which
13 you have described, and he said that even
14 though he was suing AstraZeneca, he wanted to
15 continue using Seroquel.  Correct?
16    A.   Correct.
17    Q.   And that is notwithstanding
18 knowing about the risks of diabetes,
19 hyperglycemia, potential lipids and weight
20 gain.  Right?
21    A.   Correct.
22    Q.   You note that at the bottom of
23 the page again.  Isn't that correct?
24    A.   Correct.
25    Q.   I am running out of time.  I have

**151**

1 lots of more questions that I would ask you
2 about a bunch of records.  I am going to jump
3 now though to one of the records that you
4 brought with you today, which is Exhibit 7.
5       And again, Ms. Keene, I would ask
6 you questions about virtually every visit you
7 have, because you have made a lot of notes,
8 and there is a lot going on there.  But if I
9 can jump ahead to November of 2007.  If you
10 need to look, go ahead.
11       But you essentially maintained
12 him on the same medication regimen which was
13 working so well for him up and until November
14 20th, 2007.  Am I correct?
15    A.   Correct.
16    Q.   And November 20th, 2007 is
17 shortly before you moved to New Orleans.  Is
18 that correct?
19    A.   Yes.
20    Q.   And that is the circumstances by
21 which you stopped caring for David Haller.  Am
22 I correct?
23    A.   Correct.
24    Q.   You have no idea how he is doing
25 today.  Correct?

**152**

1    A.   No.
2    Q.   The last contact you had with him
3 was November 20, 2007.  Am I right?
4    A.   Correct.
5    Q.   "He has been doing remarkably
6 well on the current medication with no
7 exacerbation of symptoms since I started
8 seeing him in 2005."  Is that correct?
9    A.   Correct.
10    Q.   And you wrote that because that
11 was your observation and conclusion.  Correct?
12    A.   Correct.
13    Q.   And that is why you kept him on
14 the same meds the whole time.  Am I right?
15    A.   Yes.
16    Q.   He notes today, however, that he
17 wants to get off his Seroquel because of the
18 class action law suit he is in against
19 Seroquel re:  Diabetes."
20       Did I read that correctly?
21    A.   Correct.
22    Q.   So he told you that he wanted to
23 stop taking Seroquel because of his lawsuit.
24 Isn't that correct?
25    A.   Correct.

**153**

1    Q.   "And his lawyer suggested that he
2 stop the medication if he wants to win a
3 settlement."
4       Did I read that correctly?
5    A.   Yes.
6    Q.   You wrote that because that is
7 what he told you in November of 2007.  Am I
8 correct?
9    A.   Yes.
10    Q.   David told you that his lawyer
11 had told him that if he wants to win a
12 settlement in this case, he is going to have
13 to stop taking his medication.  Is that
14 correct?
15    A.   Correct.
16    MR. BRUZZESE:
17       Object to form.
18 BY MR. ELLISON:
19    Q.   Do you need to be licensed in
20 Florida in order to prescribe medications?
21    A.   Yes.
22    Q.   Do you need to have a medical
23 license of some form in the State of Florida
24 in order to tell a patient to stop a
25 medication?

**(Pages 150 to 153)**

154

1    A.    I guess anybody can give an
2  opinion. But, yeah. I would hope.
3    Q.    Does it interfere with your care
4  and treatment, your medical caring of your
5  patients when their lawyers are telling them
6  to stop taking medications that you believe
7  are necessary for them?
8    A.    Yes.
9    Q.    And do you think as a medical
10 professional that plaintiffs' lawyers may be
11 creating public health risks by telling
12 patients like David who are potentially
13 homicidal and potentially suicidal to stop
14 taking medications that have worked for them
15 for the entire time you have been treating
16 them, just so they can win money in their
17 lawsuit?
18    MR. BRUZZESE:
19       Objection to form.
20    THE WITNESS:
21       Without a doubt.
22 BY MR. ELLISON:
23    Q.    Do you see telling one of your
24 patients to stop taking a medication that you
25 prescribe as interfering with your practice of

155

1  medicine?
2    A.    Yes.
3    Q.    And you would agree, then, that
4  the plaintiffs' lawyers who told David to stop
5  taking the Seroquel that had worked for him
6  for years interfered with your care and
7  treatment, your medical care and treatment of
8  David Haller. Correct?
9    MR. BRUZZESE:
10       Object.
11    THE WITNESS:
12       Yes.
13 BY MR. ELLISON:
14    Q.    "He was strongly advised to
15 remain on his medication due to its
16 effectiveness."
17       Did I read that correctly?
18    A.    Yes.
19    Q.    Let me jump up. I read you about
20 the settlement. You note, "We have had this
21 discussion on multiple occasions." That is
22 about staying on Seroquel while he has sued
23 AstraZeneca. Is that correct?
24    A.    Correct.
25    Q.    "And he has been given full

156

1  informed consent about the medication."
2       Did I read that right?
3    A.    Correct.
4    Q.    "And he has consistently stated
5  that he wants to continue the Seroquel due to
6  efficacy."
7       Did I read that correctly?
8    A.    Correct.
9    Q.    And you wrote that because that
10 is what he told you. Correct?
11    A.    Correct.
12    Q.    Consistently. Correct?
13    A.    Correct.
14    Q.    "He is more stable now than he
15 has been in several years."
16       Did I read that correctly?
17    A.    Correct.
18    Q.    "He was strongly advised to
19 remain on his medication due to its
20 effectiveness."
21       Did I read that correctly?
22    A.    Correct.
23    Q.    "As his diabetes is well
24 controlled with recent labs reflecting HGA1C
25 of 5.7 and lipids within normal limits."

157

1       Did I read that correctly?
2    A.    Correct.
3    Q.    And you wrote that because that
4  was your observation and conclusion and
5  recommendation at the time. Is that right?
6    A.    Correct.
7    Q.    HGA1C of 5.7 is normal range.
8  Correct?
9    A.    Correct.
10    Q.    Under plan, "Again, I have
11 advised against coming off of the medication
12 due to risk of decompensation."
13    A.    Correct.
14    Q.    Did I read that correctly? That
15 risk of decompensation, by that you mean he
16 could get --
17    A.    Sick.
18    Q.    Really sick. Right?
19    A.    And suicidal, homicidal.
20    Q.    Like the last time they monkeyed
21 with his meds. Right?
22    A.    Correct.
23    Q.    "However, patient wishes to
24 pursue this route."
25       Did I read that right?

(Pages 154 to 157)

158

1　　A.　　Correct.
2　　Q.　　That is because his lawyer told
3　him to stop taking the meds.  Correct?
4　　MR. BRUZZESE:
5　　　　Objection.
6　BY MR. ELLISON:
7　　Q.　　And he told you that it was
8　because his lawyer told him to stop his meds.
9　Correct?
10　　A.　　Correct.
11　　Q.　　Did he ever tell you who his
12　lawyer was?
13　　A.　　No.  He may have, but I wouldn't
14　remember.  And I wouldn't put that in the
15　note.
16　　Q.　　Would you have maintained a
17　separate note?
18　　A.　　No.
19　　Q.　　Why wouldn't you have put it in
20　the note?
21　　A.　　I don't think I knew it.
22　　Q.　　Fair enough.
23　　A.　　Yeah.
24　　Q.　　That is all I need.  "We will
25　thus begin to taper the Seroquel very slowly."

159

1　　　　Did I read that correctly?
2　　A.　　Correct.
3　　Q.　　Against your recommendation he
4　decided to stop.  Is that correct?
5　　A.　　Correct.
6　　Q.　　You can't force a patient to take
7　any medication.  Correct?
8　　A.　　No.  If he had wanted to stop, he
9　would have just stopped.
10　　Q.　　Unless when he is Baker Acted.
11　Am I right?
12　　A.　　Correct.
13　　Q.　　That means involuntarily
14　committed.  Correct?
15　　A.　　Correct.
16　　Q.　　David wasn't in that
17　circumstance.  Correct?
18　　A.　　Correct.
19　　Q.　　Because Seroquel had been working
20　so well for him.  Correct?
21　　A.　　Correct.
22　　Q.　　So even though you disagreed with
23　his decision to stop Seroquel, you decided to
24　taper it off very slowly.  Am I correct?
25　　A.　　Correct.

160

1　　Q.　　And that was so you could see if
2　the change hurt him.  Right?
3　　A.　　Correct.
4　　Q.　　And again, you note you talked
5　again about the risk of diabetes and Seroquel
6　and that he still maintained that he wanted to
7　use it as he weaned off of it really slowly.
8　Is that correct?
9　　A.　　Right.
10　　Q.　　You have got him decrease
11　Seroquel to 400 milligram?
12　　A.　　450.
13　　Q.　　450.  Thank you.  At bedtime.
14　And that your next follow-up was going to be
15　three months.  Is that right?
16　　A.　　I wasn't going to follow up with
17　him.
18　　Q.　　It says three months and then
19　transfer to new provider.
20　　A.　　And that was because -- yeah.
21　That was because we didn't have any
22　appointments for that long.
23　　Q.　　Let me ask it this way:  You
24　were -- your suggestion was that David's next
25　follow-up, whoever it was going to be, was at

161

1　three months.  Correct?
2　　A.　　Yeah.
3　　Q.　　So you were going to keep him on
4　450 milligrams for about three months.  Is
5　that correct?
6　　A.　　Correct.
7　　Q.　　That is a really slow taper.
8　Isn't it?
9　　A.　　Correct.
10　　Q.　　But the reason you wanted it that
11　slow is because David is really sick without
12　his medication.  His Seroquel had worked so
13　wonderfully for him, and you were concerned
14　and seriously believed it possible that the
15　withdrawal of Seroquel could cause David
16　significant problems.  Correct?
17　　A.　　Without a doubt.
18　　MR. BRUZZESE:
19　　　　Object to form.
20　BY MR. ELLISON:
21　　Q.　　You were concerned he could
22　become homicidal again.  Correct?
23　　A.　　Yes.  Correct.
24　　Q.　　And you were concerned he might
25　become suicidal again.  Correct?

(Pages 158 to 161)

162

1   A.   Correct.
2   Q.   Among all of the other symptoms
3 we have talked about. Is that right?
4   A.   Correct.
5   MR. ELLISON:
6        Let's go off the record.
7        (Off the record.)
8 BY MR. ELLISON:
9   Q.   Ms. Keene, I just want to ask you
10 a couple of questions about your background.
11 You are a college graduate?
12   A.   Yes.
13   Q.   Where did you go?
14   A.   My nursing degree was at LSU, New
15 Orleans.
16   Q.   When did you get that?
17   A.   1993.
18   Q.   I didn't ask you your age.
19   A.   Well, I said don't ask me about
20 my memory.
21   Q.   Have you been to school since
22 then?
23   A.   Yes.
24   Q.   Where?
25   A.   I went to Baylor University to

163

1 get my doctorate in psychology, and then I
2 went to the State University of New York for
3 my master's in psychiatric nursing.
4   Q.   So you have a doctorate in
5 psychology?
6   A.   Yes.
7   Q.   And that is a Ph.D.?
8   A.   It is a Psy.D.
9   Q.   And you also have a master's in
10 psychiatric --
11   A.   Nursing. Which is the nurse
12 practitioner.
13   Q.   And when did you obtain your
14 Ph.D.?
15   A.   2004.
16   Q.   A couple years after that?
17   A.   Yeah.
18   Q.   And your master's was a couple
19 years after that. Is that about right?
20   A.   I think my Psy.D was in 2004, if
21 my memory serves me correctly. My nurse
22 practitioner was 2005, if my memory serves me
23 correctly.
24   Q.   And do you have any education
25 past that?

164

1   A.   No.
2   Q.   Do you hold any positions with
3 any professional associations?
4   A.   No.
5   Q.   You do from time to time, as you
6 mentioned, attend CMEs?
7   A.   Correct.
8   Q.   That is continuing medical
9 education?
10   A.   Yes.
11   Q.   And you have attended a number
12 that relate to bipolar disorder?
13   A.   Correct.
14   Q.   And you have attended some in
15 which the risks of diabetes and atypical
16 antipsychotics have been discussed. Is that
17 correct?
18   A.   Yes.
19   Q.   You just don't as you sit here
20 remember the specific dates. Is that correct?
21   A.   I just came back from one at
22 Harvard two weeks ago.
23   Q.   And that is another --
24   A.   In Boston.
25   Q.   -- one. Is that correct?

165

1   A.   Correct.
2   Q.   Have you ever spoken at any of
3 those seminars?
4   A.   No.
5   Q.   Have you ever spoken at any
6 professional seminars?
7   A.   No.
8   Q.   Authored any articles or
9 publications?
10   A.   Yes.
11   Q.   Relating to bipolar disorder?
12   A.   Relating to Geodon and cardiac
13 conduction, but not bipolar. Not specifically
14 about that.
15   Q.   Geodon is an atypical
16 antipsychotic that you've prescribed. Is that
17 correct?
18   A.   Yes.
19   Q.   And that is for bipolar. Is that
20 correct?
21   A.   Correct. Yes.
22   Q.   And was that published?
23   A.   Yes.
24   Q.   In what?
25   A.   Journal of Psychiatric Medicine.

166

1    Q.   Were you the lead author?
2    A.   No.
3    Q.   You worked with colleagues?
4    A.   My colleague collected the data.
5    I wrote the entire article.
6    Q.   You did the work?
7    A.   I did all the work.
8    Q.   Your colleague got the name on
9    it?
10   A.   The MD got the first authorship.
11   Q.   And who is that MD?
12   A.   Dr. Woodburn Levy.
13   Q.   Any other articles that you have
14   written?
15   A.   Yes. But not -- it was all
16   psychology stuff. Nothing psychiatric.
17   Q.   Anything relating to bipolar?
18   A.   No.
19   MR. ELLISON:
20        As I said, I have more questions
21   about the documents, given time constraints.
22   But subject to the reservations that I
23   expressed earlier, I am done for now. And I
24   thank you very much for coming on a Saturday.
25   I will turn you over to opposing counsel for

167

1    cross-examination at this point.
2    BY MR. BRUZZESE:
3    Q.   We are back on. Good afternoon.
4    Ms. Keene, my name is Jim Bruzzese. We met
5    earlier. I have the pleasure of now being
6    able to ask you a few follow-up questions. I
7    won't be as long, I assure you. I just got a
8    few, but related to the testimony you have
9    given already.
10   A.   Okay.
11   Q.   To begin with, you had testified
12   earlier that you thought that the Seroquel had
13   worked so well for David Haller in his
14   situation. And I specifically want to know in
15   what way you thought the Seroquel was working
16   for him.
17   A.   Okay.
18   Q.   Which symptoms you thought it was
19   addressing.
20   A.   I think the combination of
21   Seroquel and Risperdal was working. But
22   specifically the Seroquel, I think, was
23   certainly helping a lot with the raciness, the
24   pressured speech, the agitation, the sleep,
25   which if that is impaired, causes much more

168

1    agitation and can precipitate more mania.
2    Mainly those things. It has an anti-anxiety
3    effect, too, which I think was beneficial to
4    him.
5    Q.   I think if we look at the chart
6    on Page 54, this is an entry -- the heading is
7    Carol Corell. Am I pronouncing that right?
8    A.   Yes.
9    Q.   Corell. We talked about this
10   entry earlier today. About midway down the
11   history, it starts with the paragraph, "He
12   feels very good on the medications."
13        Do you see that?
14   MR. ELLISON:
15        Do you got a Bates number?
16   BY MR. BRUZZESE:
17   Q.   Bates No. 54. This paragraph, it
18   says, "He does not want to stay on Seroquel as
19   he sleeps fine without it." This date is
20   March 13, 2003. I think you stated you were
21   not employed at this location at this time.
22   Correct?
23   A.   No, sir.
24   Q.   Do you know why he was initially
25   prescribed Seroquel from the Directions

169

1    facility?
2    A.   For bipolar. I don't know why he
3    was initially started on it. But presumably,
4    because of all of the symptoms I just
5    indicated, which are classic for bipolar.
6    Q.   Counsel asked you some questions
7    about the second generations or atypical
8    antipsychotics as a class. And when we refer
9    to those, do you know what drugs we are
10   talking about?
11   A.   Yes. You want me to name them?
12   Q.   Sure. Tell me what ones you
13   know.
14   A.   Paliperidone, Risperdal, Geodon.
15   And these are all the class, I mean the --
16   Q.   Brand names.
17   A.   Brand names. Seroquel, Abilify.
18   I think that is it.
19   Q.   Is Clozaril one?
20   A.   Clozaril. Yeah.
21   Q.   So within this group of
22   atypicals, are you -- do you have an opinion
23   as to within the group, in relation to the
24   side effects of sedation or other side effects
25   or reasons for prescribing one over the other,

170

1  do you have an opinion as to which ones
2  typically are more sedating?
3      A.   Yes.
4      Q.   What is your opinion?
5      MR. ELLISON:
6          Object to the form.
7      THE WITNESS:
8          Zyprexa and Seroquel are the more
9  sedating ones.
10 BY MR. BRUZZESE:
11     Q.   Are any of these on the opposite
12 end of that?
13     A.   If any of them are more
14 activating you mean?
15     Q.   Correct.
16     A.   The Abilify. Geodon, maybe.
17     Q.   Do you have any opinions about
18 which of these in this class carry a higher
19 risk of weight gain associated with its use?
20     A.   The data indicates that the
21 Seroquel and Zyprexa, the histamine that
22 presumably causes the sedation and the weight
23 gain.
24     MR. ELLISON:
25         I will insert a form objection.

171

1  The question was do you have an opinion. But
2  go ahead.
3  BY MR. BRUZZESE:
4      Q.   What is your opinion of which of
5  these class of drugs carry a higher risk of
6  weight gain?
7      MR. ELLISON:
8          Thanks, Jim. Form.
9      THE WITNESS:
10         The higher risk of weight gain is
11 associated with Zyprexa and Seroquel, the two
12 that cause sedation, presumably by the same
13 mechanism.
14 BY MR. BRUZZESE:
15     Q.   Is it also your opinion that the
16 Zyprexa and Seroquel are also on the higher
17 end of risk factors for diabetes?
18     MR. ELLISON:
19         Form.
20     THE WITNESS:
21         I think the data is starting to
22 pan out for the other ones, too, though.
23 Risperdal. But those two are the most -- the
24 ones that have gotten the most exposure, for
25 sure.

172

1  BY MR. BRUZZESE:
2      Q.   When you are prescribing a
3  medication for one of your patients, do you
4  conduct a risk/benefit analysis for that drug?
5      A.   Yes.
6      Q.   And it is geared specifically for
7  that patient?
8      A.   Yes.
9      Q.   So if you had a patient who was
10 saying to you he is diabetic or had elevated
11 enzymes, why would you pick the more sedating
12 or more weight gain carrying risk drug over
13 one of the ones that are less?
14     A.   For lots of reasons. Some of
15 the -- the other ones, a lot of people can't
16 tolerate them as well. There is a lot higher
17 incident of akathisia, which is a very
18 miserable side effect, with Abilify. It just
19 causes this horrible feeling of inner
20 restlessness.
21         Geodon has cardiac risks and
22 doesn't work, in my opinion. And they don't
23 have the anti-anxiety effect that tends to
24 help these clients tolerate their stressors a
25 little bit better.

173

1      Q.   When you began working at
2  Directions, was that the first facility that
3  you ever prescribed any atypical
4  antipsychotics?
5      A.   I prescribed briefly in a private
6  practice, Florida Behavioral Medicine.
7      Q.   And you prescribed atypicals?
8      A.   Yes.
9      Q.   How long did you work there?
10     A.   I worked there for a total of
11 three years. But I was prescribing only for
12 about six months, I think.
13     Q.   And I think you said you don't
14 prescribe anymore, or is it that you don't --
15 prescribe much less now?
16     A.   No. I prescribe much less. I am
17 with children and adolescents, and so we don't
18 use a whole lot of atypicals.
19     Q.   The class of patients has
20 changed?
21     A.   Yeah. The class of patients has
22 changed. They are certainly not as sick as
23 the patients at Directions. Directions had a
24 very sick population.
25     Q.   With respect to David Haller, do

**174**

1  you know when he first started getting
2  Seroquel prescribed to him by Directions?
3      A.   I don't. There is mention that
4  he was a client of Directions all the way back
5  to 1997. Dr. Zenel mentioned that.
6      Q.   Let's look at the medication flow
7  sheets you have got in here beginning on Bates
8  Page 3 through 8.
9      A.   Now, these are going to be --
10  every time he leaves the facility and comes
11  back, there is a new medication flow sheet.
12  So you only have them from 2003.
13      Q.   So he was being seen before 2003,
14  and there would be a sheet that is missing
15  from this chart?
16      A.   Yes.
17      Q.   Do you know whose MD name is
18  initialed here under the very first entry that
19  we do here?
20      A.   It looks like Carol, this Carol
21  Corell person. That is what it looks like to
22  me.
23      Q.   You are not familiar with her --
24      A.   I don't know.
25      Q.   -- initials or signatures?

**175**

1      A.   No. I am kind of going based on
2  the correspondence and notes.
3      Q.   You testified earlier today that
4  you were interested in the lab results, I
5  guess the glucose levels, for Mr. Haller,
6  because he was on an atypical antipsychotic.
7  Were those lab reports sent to your attention?
8      A.   Yes.
9      Q.   And are they in your chart?
10      A.   No.
11      Q.   Are they in a physical chart at
12  Directions?
13      A.   Yes.
14      Q.   Do you recall any of the lab
15  results?
16      A.   I don't offhand. I have -- I
17  think I started indicating when there was some
18  elevations, but I didn't put the actual
19  record. Now, Exhibit 3 -- Exhibit 7, I had
20  them send me over a flow sheet. But this flow
21  sheet, it didn't date back -- it was only the
22  most recent one. It didn't backdate to 2003.
23      Q.   Well, I see there is a section
24  under Fasting Blood Glucose and the date.
25      A.   Right.

**176**

1      Q.   I can't read any results in that
2  column, can you? Or in that row.
3      A.   I don't think I can. There is a
4  result. I can't read it. I can't read it.
5  It looks like it is within normal limits. But
6  the line down -- oh, this looks like the
7  fasting glucose is 102.
8      Q.   And do you have a date on there?
9      A.   It is in '07.
10      Q.   Let me show you what I marked as
11  Exhibit 8. This is a lab result. I am sorry.
12  I should read into the record where I am
13  reading this from. This is from the Social
14  Security records, Page 190.
15      A.   Okay.
16      Q.   And do you see a glucose reading
17  on that lab result?
18      A.   Yes.
19      Q.   And what is that?
20      A.   108.
21      Q.   Is that normal?
22      A.   It is slightly elevated. It is
23  fasting.
24      Q.   Is it in the normal range from --
25  let's see. What does it say is the normal

**177**

1  range over here? Can you read that?
2      A.   56 to 110. So this is a
3  different range than usual.
4      Q.   And the date on that lab?
5      A.   1995. Is that what it reads?
6      Q.   Let me see that. Yes.
7      A.   1995.
8      Q.   So in 1995 a lab that we have
9  shows a normal glucose. Correct?
10      A.   Well, actually, their range is
11  saying 108 is normal, but that is not a
12  normal.
13      Q.   Do you know what the normal range
14  was in 1995?
15      A.   They might have changed it since
16  then. But under 100 is -- we don't want it
17  over 100 for fasting.
18      Q.   Okay. I am going to show you what
19  I marked Exhibit No. 9. I am getting this
20  from the county sheriff's Page 23 record.
21  This is also a lab?
22      A.   Okay. In 2001.
23      Q.   It is a 2001 lab. And what was
24  the glucose reading?
25      A.   94.

178

1    Q.    Is that a normal reading?
2    A.    Yes.
3    Q.    I am going to show you what I am
4  marking Exhibit 10 to the deposition.  It is
5  another lab.  Do you see the date on that one?
6    A.    Okay.  76.
7    Q.    I am sorry.
8    A.    76.
9    Q.    Is the blood glucose level.
10  Correct?
11    A.    Yes.
12    Q.    And what is the year?
13    A.    2002.
14    Q.    I am going to show you what is
15  marked Exhibit No. 11, which is also a 2002
16  lab result.
17    A.    79.
18    Q.    And that is also a normal
19  reading?
20    A.    Yes.
21    MR. ELLISON:
22        Bates number, Counsel?
23  BY MR. BRUZZESE:
24    Q.    April -- the fasting result on
25  this is April 22, 2002.  Correct?

179

1    A.    Yes.
2    Q.    These are fasting?
3    A.    Yes.
4    Q.    And this is from lab work Page 7.
5        I am showing you Exhibit 12.
6  This is from Plant -- Morton Plant Hospital,
7  Page 1404.  And this is a 2004 record.
8  Correct?
9    A.    But I am not sure that this is
10  fasting.
11    Q.    I am sorry.
12    A.    Usually, if it is from Morton
13  Plant, they are not going to be --
14    Q.    They are not going to be fasting?
15    A.    Well, it just depends.  If they
16  got it on admit, it is not going to be a
17  fasting one.
18    Q.    This is January -- that is
19  January what?
20    A.    2004.
21    Q.    And what is the glucose reading
22  here?
23    A.    121.  But it doesn't indicate it
24  was fasting.
25    Q.    We know that -- do you know

180

1  whether or not David Haller was on Seroquel at
2  this time?
3    A.    In 2004, according to this, he
4  was at one point, but was taken off of it.
5    Q.    Let's go to Pages 3 through 8 of
6  your chart.
7    A.    Okay.
8    Q.    And look at that prescription
9  record.
10    A.    Okay.
11    Q.    Do you see how this Seroquel has
12  entries and the months?
13    A.    Yeah.  According to this, yes.
14  What date are we talking about?
15    Q.    The time periods that are
16  reflected in those medicine flow charts, do
17  you see any gaps where he didn't go back and
18  refill his Seroquel or it wasn't prescribed?
19    A.    No.  This is more consistent than
20  the notes.  This is helpful.  No.
21    Q.    So in 2004 was David Haller on
22  Seroquel?
23    A.    Yes.
24    Q.    I will show you Exhibit 13.  This
25  is a 2007 lab.  This is from lab report

181

1  Page 9.
2    A.    Yes.
3    Q.    And it is showing an elevated
4  glucose as well.  Correct?
5    A.    Correct.
6    Q.    This is the most current lab I
7  have.
8    A.    That is the one reflected on the
9  flow sheet.
10    Q.    That is still elevated?
11    A.    This tells me it was not a
12  fasting one, the Morton Plant one.
13    Q.    Why does it tell you that it is
14  not a fasting result?
15    A.    Well, because it has gone down
16  over time.
17    Q.    And do you know what kind of
18  medications he is on or diet controls he is on
19  for his diabetes?
20    A.    I am sure he is not compliant
21  with the diet.  As far as I last knew, I don't
22  think he was on any medication.
23    Q.    Why are you sure he is not
24  compliant with his medications?
25    A.    With his diet?

182

1    Q.    Or diet.
2    A.    **Because he has a history of**
3 **noncompliance with his medications.**
4    Q.    But in your records -- and I
5 guess some of the things you have said today
6 when you were responding to counsel's
7 questions were, "Well, let me see. It is in
8 the chart." Does that mean that if it is in
9 the chart, that you can rely on that
10 information?
11    A.    **That means that is the best thing**
12 **I can go by, because I certainly don't**
13 **remember specifics this far out.**
14    Q.    If it is not in your chart, do
15 you know it to be true one way or the other?
16    MR. ELLISON:
17        Form, foundation.
18    THE WITNESS:
19        Can you give me a specific?
20 BY MR. BRUZZESE:
21    Q.    Well, specifically, you have
22 mentioned numerous times in your chart that he
23 is compliant with his medication regimen. Do
24 you recall that?
25        If it is in there, do you mean

183

1 you have talked to him and he says that he is
2 taking his meds as prescribed?
3    A.    **If it says that he says he is**
4 **taking his meds as prescribed, that means it**
5 **says he is taking his meds as prescribed.**
6    Q.    What does it mean in your chart?
7    A.    **Just give me a note, and I will**
8 **tell you.**
9    Q.    Page 17.
10    A.    Okay.
11    Q.    Under the Subjective paragraph.
12    A.    Okay.
13    Q.    It begins, "He has been" --
14    A.    Okay.
15    Q.    "He has been complying with his
16 meds here." It says, "He has not had any
17 aggressive outbursts lately." That is a
18 sentence that I have seen numerous times in
19 different entries of yours.
20    A.    **Well, you'd have to show me the**
21 **numerous ones.**
22    MR. ELLISON:
23        Form.
24    THE WITNESS:
25        I see it here. Okay.

184

1 BY MR. BRUZZESE:
2    Q.    Page 24, which is the visit
3 before that one.
4    A.    Okay.
5    Q.    I think it is the exact same
6 wording. Do you see that?
7    A.    Yes. Okay.
8    Q.    So what I am saying, he has been
9 compliant with his meds, what does that mean
10 to you? Because you are the one that put that
11 here.
12    A.    **Right. That means to me that I**
13 **don't have any indication that he hasn't been**
14 **compliant. That he has shown up for his**
15 **injections consistently, and that is his**
16 **compliance since he has been stable. Prior to**
17 **his not -- prior to his being stable, he had a**
18 **long history of noncompliance is what I guess**
19 **I was referring to.**
20    Q.    That may be something that you
21 had put down in your chart at one point, then
22 realized it was true on the subsequent visit.
23 Just kind of cut and pasted. Is that correct?
24    MR. ELLISON:
25        Form.

185

1    THE WITNESS:
2        If I felt like it was consistent,
3 something consistent that was ongoing, it may
4 have been something that I just repeated.
5 BY MR. BRUZZESE:
6    Q.    Well, let's talk about some other
7 consistent language in your chart. If you go
8 to Page 12, under the Education heading.
9    A.    Okay.
10    Q.    It says, "The patient is aware of
11 the risks of Seroquel and Risperdal on lipids
12 and possible diabetes. And he is also aware
13 of the risk of EPS and possible TD. He wishes
14 to stay on the medication despite these
15 risks."
16        This language I have seen in a
17 few of your charts as well. Correct?
18    MR. ELLISON:
19        Form, foundation.
20 BY MR. BRUZZESE:
21    Q.    If it is here, then it is
22 something that you went over with the patient.
23 Is that correct?
24    A.    Uh-uh.
25    MR. ELLISON:

**(Pages 182 to 185)**

186

1        Answer, please.  You got to
2  answer out loud.
3  BY MR. BRUZZESE:
4      Q.    I am sorry.  I need a yes or no.
5      A.    Yes.
6      Q.    The indication, then, is that on
7  this visit, on April 6th, 2007, you again went
8  over the risks of Seroquel with David Haller.
9  Correct?
10     A.    It was something we talked about
11 repeatedly.  Yes.
12     Q.    But since it is specifically in
13 this chart, you specifically talked about it
14 on this date.  Correct?
15     A.    Correct.
16     Q.    And then if you go to Page 37 of
17 your chart, under the Education section, I
18 don't see that language.
19         Now, I think counsel had asked
20 you a little bit earlier about whether or not
21 you had these conversations with David Haller
22 on each and every visit.  And I think you had
23 indicated that you did go over the risks and
24 benefits of your medications.  And I
25 understand that.

187

1        So in this instance, because it
2  is not in the chart, it does not necessarily
3  mean that you didn't go over it with him.
4  Correct?
5      A.    Well, in this instance it says we
6  discussed the risks and benefits of his
7  treatment.
8      Q.    So at this particular visit, you
9  didn't necessarily go into great depth about
10 the risk of diabetes with Seroquel.  You just
11 talked about the risks and benefits of those
12 medications.  Correct?
13 MR. ELLISON:
14         Form and foundation.
15 Mischaracterizes her testimony.
16 THE WITNESS:
17         Not necessarily.  No.
18 BY MR. BRUZZESE:
19     Q.    What was the difference in your
20 Education discussion on this visit versus the
21 visit we talked about just before?
22     A.    It was more an issue of
23 documentation, education.
24     Q.    And the documentation is
25 information that you were able to provide to

188

1  the patient?
2      A.    No.  Documenting my education.
3      Q.    All right.  There are a number of
4  visits prior to this visit where there is not
5  the Seroquel specifically mentioned under this
6  Education section.
7      A.    Right.
8      Q.    Do you know why you began putting
9  it just after this visit?
10     A.    Probably because my education in
11 all of my notes would show a lot more specific
12 education.  It is just a matter of developing
13 as a clinician.
14     Q.    You had learned more about the
15 specific risks at this point in your career?
16     A.    No.
17     Q.    Then your education how?
18     A.    No.  I developed more as a
19 clinician, meaning that I put more the
20 specific risks in my notes, and that applies
21 to all medications.  It doesn't mean that it
22 wasn't discussed before.  It just means the
23 way I documented it was different.
24     Q.    In fact, this was something that
25 you put as an education note in other

189

1  patients' charts as well.  Correct?
2      A.    What was in education?
3      Q.    The mention of Seroquel.
4      A.    Yes.
5      Q.    Risk of diabetes.  Correct?  It
6  wasn't just David Haller's chart?
7      A.    Correct.
8      Q.    On a typical visit, under the
9  Subjective, you would get an assessment of
10 your patient.  Is that correct?
11     A.    Yes.
12     Q.    And how would you do that, just
13 speaking with him?
14     A.    And observing behavior.
15     Q.    Then you would make notations
16 during the visit on a sheet?
17     A.    Yes.
18     Q.    And the notations would later be
19 translated into some of the findings in the
20 subjective portion?
21     A.    Correct.
22     Q.    And then some of it would be in a
23 dialogue with the patient?
24     A.    Correct.
25     Q.    Now, how much time did you spend

(Pages 186 to 189)

190

1  talking with the patient?
2      A.    Fifteen-minute visits.
3      Q.    Well, I am talking specifically
4  to get the information you need for the
5  subjective findings.
6      A.    I think it varied.  Can you ask
7  the question again?
8      Q.    I would like to know, I guess,
9  how in-depth you go in discussions with your
10 patients about how well they are doing on the
11 current medication regimen.
12     A.    In-depth.  And I ask about their
13 mood, their sleep, their agitation.  In his
14 case particularly, I asked about his agitation
15 level.
16     Q.    And would you ask him about his
17 agitation level on every visit?
18     A.    I can't remember.
19     Q.    Is it one of the routine
20 questions that you go over with patients such
21 as David Haller?  Was mood and agitation a
22 concern for you with David Haller?
23     A.    Yes.
24     Q.    So since it was a concern for
25 you, was it something that you would address

191

1  in every visit?
2      A.    Yes.  Presume -- yes.
3      Q.    And would you talk about how well
4  his medications were working for him on every
5  visit?
6      A.    Yes.  That was the purpose of the
7  visit.
8      Q.    How much time would you spend
9  doing that?
10     A.    Again, it would vary.  Are you
11 talking about with David Haller?
12     Q.    Yes.
13     A.    I don't remember.  We have 15
14 minutes, so I would talk usually the 15
15 minutes about his meds and the mood.  That is
16 what he was there for.
17     Q.    Would you go over any lab results
18 with him?
19     A.    If they were available.  Yes.
20     Q.    When do you develop your plan
21 that is addressed in each of your chart
22 entries?  Is it during your meeting with the
23 patient?
24     A.    Yes.
25     Q.    It is something you discuss with

192

1  the patient?
2      A.    Yes.
3      Q.    And I think several comments in
4  here were -- I saw -- read language in here
5  several times where he agreed to this or he
6  agreed to that.  Is it something you would get
7  your patients to agree to, your plan?
8      A.    Like getting labs and stuff.
9  Yes.
10     Q.    Or to trading up or down
11 medications?
12     A.    Yes.  As opposed to -- yeah.  As
13 opposed to them not being -- risk of not being
14 compliant.  Yes.
15     Q.    So in addition to discussing
16 this, you would get them to agree to it or
17 talk to you about their concerns they would
18 have?
19     A.    Yes.
20     Q.    Did David ever talk to you about
21 concerns about the medications he was on?
22 Let's talk about medications other than
23 Seroquel.
24     A.    He talked about the akathisia or
25 the tremors with the Risperdal.  I remember

193

1  that.  And that is the only thing I can
2  recall.
3      Q.    He talked to you about the
4  medication that was being used to help the
5  tremors from the Risperdal?
6      A.    Well, he didn't like the tremors
7  from the Risperdal.  He said he had tremors.
8  And then he didn't want to get off the
9  medication that was used to help the tremors.
10 I was concerned about the side effect of the
11 medication he was using to help the tremors.
12 He wasn't.
13     Q.    And the concern was based -- was
14 it bowel related?
15     A.    Yeah.  It can cause
16 gastroparesis.  Patients have had to have
17 their colon resected.
18     Q.    Tremors is something that is a
19 side effect of Risperdal?
20     A.    It can be.  Yes.
21     Q.    Is it a side effect of Seroquel?
22     A.    Not as frequently.  It kind of
23 goes along with the akathisia, which Seroquel
24 does not have a whole lot of.
25     Q.    So on any given visit, you are

(Pages 190 to 193)

194

1 discussing medication with your patient. You
2 are discussing how well they are doing. You
3 are getting an assessment visually of certain
4 aspects of their character and their person?
5    A.   Yes.
6    Q.   You are marking all this down on
7 a sheet of paper. You are developing a plan.
8 You are talking to your patient about a plan.
9 You are getting your patient to agree to a
10 plan.
11    A.   Correct.
12    Q.   And then you are also going
13 through everything under the Education
14 portion?
15    A.   Correct.
16    Q.   And all this is happening in 15
17 minutes. Is that correct?
18    A.   Yeah. It is a tough job.
19    Q.   And all these other discussions
20 that David Haller had with you about Seroquel
21 and lawsuits and any other discussions, this
22 was all handled within a 15-minute period?
23    MR. ELLISON:
24       Form.
25 BY MR. BRUZZESE:

195

1    Q.   Is that correct?
2    A.   Right.
3    Q.   Counsel had asked you about
4 representatives from drug companies that come
5 to visit you in your clinics. Do you recall
6 AstraZeneca sales reps visiting you to detail
7 you on Seroquel?
8    A.   Yes.
9    Q.   And do you recall representatives
10 kind of giving you a marketing spiel on the
11 drug?
12    A.   Yes.
13    Q.   Is it your understanding that
14 they were trying to get you to prescribe
15 Seroquel over some of the other atypical
16 antipsychotics?
17    A.   All the drugs reps do that.
18    Q.   And they would try to reinforce
19 the idea that with Seroquel, your patients
20 would experience less weight gain?
21    MR. ELLISON:
22       Form. Foundation.
23    THE WITNESS:
24       I don't think they --
25 BY MR. BRUZZESE:

196

1    Q.   You don't remember anyone ever
2 saying that?
3    A.   No.
4    Q.   Do you remember them ever
5 comparing --
6    A.   If they would have said that, I
7 would have said no. That is not true. I
8 don't think anybody denies that it causes
9 weight gain.
10    Q.   Yes. But did the sales rep ever
11 talk to you in terms of Seroquel being on the
12 lower end of the offenders of weight gain?
13    MR. ELLISON:
14       Form. Asked and answered.
15    THE WITNESS:
16       No. My impression is that they
17 are well aware that it causes weight gain.
18 BY MR. BRUZZESE:
19    Q.   Your impression is what?
20    A.   That the drug reps I interacted
21 with are well aware that it causes weight gain
22 and wouldn't have said something so ludicrous.
23 That it can cause weight gain or is associated
24 with it.
25    Q.   Have you ever performed any

197

1 pharmaceutical research on any of these
2 atypical antipsychotics or any kind of drugs?
3    A.   No.
4    Q.   Do you treat patients for
5 diabetes in any way?
6    A.   No.
7    Q.   But you do treat patients that
8 are diabetic?
9    A.   Correct.
10    Q.   And with those patients, do you
11 communicate with the medical provider that is
12 treating for the diabetes?
13    A.   If it is something that is out of
14 the ordinary, I will communicate with them
15 verbally. I didn't communicate with David
16 Haller's primary care verbally because there
17 was no real severe indication of severe
18 symptoms of any sort.
19    Q.   If we could take just a minute, I
20 wanted to look at the Exhibit 7, the new chart
21 page.
22       (Off the record.)
23 BY MR. ELLISON:
24    Q.   I just have a couple follow-up,
25 Ms. Keene.

198

1    A.    Okay.
2    Q.    My colleague, plaintiffs'
3 counsel, showed you a couple of labs and
4 suggested that these labs related to times
5 when he was on Seroquel. The first one, which
6 he marked as Exhibit 8, is from 1985. Do you
7 see those dates?
8    A.    Yes.
9    Q.    And the second one he showed you
10 is Exhibit 9, which is January 29th, 2001.
11    A.    Correct.
12    Q.    Okay.
13    A.    We don't have any --
14    Q.    Well, let me show you a couple he
15 didn't show you. The first is dated September
16 23rd, from 1998. That falls in the window
17 between the two. I will hand it to you. I am
18 marking it as Exhibit 14.
19          I will show you another sheriff's
20 record from 1998. September 23rd which is
21 Bates numbered Sheriff's Office 128. I marked
22 that Exhibit 14. The date on that is
23 September 24th, 1998. Is that correct?
24    A.    Yes.
25    Q.    The glucose level is 128. Isn't

199

1 that right?
2    A.    Yes.
3    Q.    That is outside of the normal
4 range, even as of then. Isn't that correct?
5    A.    Correct. Yes.
6    Q.    And you have no reason to believe
7 he was on Seroquel as of that date. Is that
8 correct?
9    A.    No.
10    Q.    And the question arises as to
11 whether this is a fasting glucose or not.
12 Isn't that right?
13    A.    Yes.
14    Q.    There is a time for when the
15 blood was collected on this. Isn't that
16 right?
17    A.    Correct.
18    Q.    It says 4:00 o'clock in the
19 morning. Isn't that right?
20    A.    Correct.
21    Q.    Now, do you have any reason to
22 believe -- let me back up. You have
23 experience in Florida. Isn't that correct?
24    A.    Correct.
25    Q.    And you have dealt with Pinellas

200

1 County jail before. Is that correct?
2    A.    Correct.
3    Q.    That is a correctional facility
4 that you are familiar with. Correct?
5    A.    Correct.
6    Q.    Do you have any reason to believe
7 that the correctional facility is letting
8 their inmates run over to McDonald's at 4:00
9 o'clock in the morning for a Big Mac?
10    A.    No. I think that is probably a
11 fasting glucose.
12    Q.    You have no reason to think that
13 is anything other than a fasting glucose.
14 Correct?
15    A.    Correct.
16    Q.    That is, to your knowledge,
17 before he was on Seroquel. Right?
18    A.    Correct.
19    Q.    Let me show you another one that
20 plaintiffs' counsel didn't show you. Again,
21 Exhibit 8, the date is 1985. Exhibit 9, the
22 date is January 29th, 2001.
23    A.    Correct.
24    Q.    I just showed you one from 1998.
25 I am going to show you another document which

201

1 I will mark Exhibit 15, which is dated January
2 either 15th or 13th, 2001, which in either
3 case comes before the January 29th, 2001
4 record marked as Exhibit 9. Right?
5    A.    Correct.
6    Q.    I am showing you this one. You
7 have this one in front of you?
8    A.    Yes.
9    Q.    There is a weight and a height at
10 the bottom of this January 2001 note. Is that
11 correct?
12    A.    Correct.
13    Q.    And you have no reason to think
14 he was on Seroquel in January 2001. Is that
15 correct?
16    A.    Correct.
17    Q.    The height is five, six. Is that
18 right?
19    A.    Correct.
20    Q.    The weight is 230 pounds. Is that
21 Correct?
22    A.    Correct.
23    Q.    Is that petite?
24    A.    No.
25    Q.    Now, that is obese. Isn't that

**202**

1  right?
2      A.    **Correct.**
3      Q.    So he was obese before he ever
4  was on Seroquel. Correct?
5      A.    **Correct.**
6      Q.    And he was having elevated blood
7  sugars prior to his ever using Seroquel. Is
8  that right?
9      A.    **As far as we know.**
10     Q.    Do you have an understanding of
11  what your fasting blood glucose level needs to
12  be before it is considered diabetic?
13     A.    **Fasting, it is supposed to be**
14  **like under 109. We don't like it that high.**
15     Q.    And he has got 125. Is that
16  right?
17     A.    **Right.**
18     Q.    So in your view, he was diabetic
19  before he ever used Seroquel. Correct?
20     A.    **As far as we can tell. If he**
21  **wasn't on Seroquel back then. Yes.**
22     MR. ELLISON:
23         I have nothing further.
24  BY MR. BRUZZESE:
25     Q.    Ms. Keene, counsel introduced

**204**

1      A.    **Yes.**
2      Q.    The good news is we are well on
3  the downward slope now. I am not going to
4  repeat the general questions that Mr. Ellison
5  and Mr. Bruzzese asked you, because those
6  questions were asked for both Ms. Livesay's
7  case and Mr. Haller's case. So I am going to
8  going straight through to Ms. Livesay's
9  medical records.
10     A.    **Okay.**
11     Q.    You'll note I violated the
12  lawyers' code, and I don't have a blue blazer
13  on.
14         Do you understand I represent
15  AstraZeneca as well?
16     A.    **Yes.**
17     Q.    I am here to ask you questions
18  about a former patient of yours, Debra
19  Livesay.
20     A.    **Yes.**
21     Q.    And you treated Debra Livesay
22  while you were at Directions for Medical Care?
23     A.    **Yes.**
24     Q.    And you have not treated Debra
25  Livesay since you left Directions for Medical

**203**

1  Exhibit 14, which has a glucose reading of 128
2  on it.
3      A.    **Correct.**
4      Q.    You speculated as to whether or
5  not this is fasting or not. But do you know
6  one way or another whether this is a fasting
7  result or not?
8      A.    **Of course not. No.**
9      MR. BRUZZESE:
10         That is all I have.
11         (Off the record.)
12     MR. ELLISON:
13         It is our thought that we wait
14  until the very end to do the Rule 30 (E)
15  reservation or waiver of signature stuff. So
16  let's just move on.
17     MR. GADDES:
18         I am going to shoot -- off the
19  record.
20         (Off the record.)
21  BY MR. GADDES:
22     Q.    Good afternoon, Ms. Keene.
23     A.    **Good afternoon.**
24     Q.    My name is Andrew Gaddes. We met
25  this morning, I believe.

**205**

1  Care?
2      A.    **Correct.**
3      Q.    You have before you what the
4  court reporter has kindly marked for us as
5  Livesay/Keene Exhibit 1. Does that appear to
6  be a copy of Ms. Livesay's chart from
7  Directions for Medical Care?
8      A.    **Yes.**
9      Q.    Is that a chart that you used in
10  the treatment of Ms. Livesay?
11     A.    **Yes.**
12     Q.    And there are various notes in
13  the chart by you. Would those have been notes
14  that you made in the course of the treatment
15  of Ms. Livesay?
16     A.    **Yes.**
17     Q.    And would you have made those
18  notes at or about the time that you treated
19  Ms. Livesay?
20     A.    **Yes.**
21     Q.    And the chart that you have
22  before you would be a copy of the chart that
23  would have been kept in the ordinary course of
24  business at Directions for Medical Care?
25     A.    **Correct.**

**206**

1   Q.    Why don't we jump right into the
2   records, then.  If you turn to Bates number --
3   you also see we have this conveniently Bates
4   numbered.  I did bring a clip this time, if
5   that helps organize it.  We will do the best
6   we can.
7         If you jump to Bates numbered
8   Page 15.
9   A.    Okay.
10  Q.    Does this appear to be a record
11  dated February 17, 2006?
12  A.    Yes.
13  Q.    If you flip to the last page of
14  that record, which is Page 18, is that, in
15  fact, your signature at the end of the record?
16  A.    Yes.
17  Q.    Is this, in fact, a record of the
18  first visit you had with Debra Livesay?
19  A.    Let me just make sure.  Yes.
20  Q.    Do you recall how Ms. Livesay
21  came to be a patient of yours?
22  A.    She was transferred -- or I took
23  her on after her previous provider had left
24  Directions.
25  Q.    So she had previously been a

**207**

1   patient of Directions?
2   A.    Correct.
3   Q.    And she was transferred to you
4   when one of her previous providers at
5   Directions left?
6   A.    Correct.
7   Q.    Because she was -- this was the
8   first time you were seeing her, did you
9   actually take a medical history of her at this
10  time?
11  A.    Yes.
12  Q.    And was that based on information
13  she provided you orally?
14  A.    Yes.
15  Q.    And I notice it says at the top
16  of Page 15, "60 minutes." Does that mean you
17  spent an hour going over this with her?
18  A.    Yes.
19  Q.    And also because she was a new
20  patient for you, would you have glanced
21  through her previous records at Directions for
22  Medical Care?
23  A.    Yes.
24  Q.    So you could understand her prior
25  health history there?

**208**

1   A.    Yes.
2   Q.    And does it say under History of
3   Presenting Illness, "The patient began
4   treatment with Don Davis in 1999"?
5         Did I read that correctly?
6   A.    Yes.
7   Q.    Does that suggest to you that she
8   was first seen in Directions for Medical
9   Care -- Directions for Mental Health around
10  1999?
11  A.    Yes.
12  Q.    And Don Davis, I think you said,
13  was an advanced registered nurse practitioner?
14  A.    Yes.
15  Q.    And by the way, that title,
16  advanced registered nurse practitioner, that
17  is a title you actually have to do quite a bit
18  of work to get, isn't it?
19  A.    Yes.
20  Q.    It is not something they hand out
21  on the street down there in Florida?
22  A.    No.
23  Q.    It also goes on to say, "She was
24  followed through this clinic through August
25  2005, at which time she states she obtained

**209**

1   health insurance and followed up with
2   medication management with her primary care
3   physician, Dr. Robert Kazuba."
4         Did I read that correctly?
5   A.    Yes.
6   Q.    So Ms. Livesay was actually
7   seeing other medical health professionals?
8   A.    Yes.
9   Q.    And were you aware that she was
10  seeing other medical health professionals?
11  A.    Yes.
12  Q.    For example, she had her primary
13  care physician here.  Is that correct?
14  A.    Yes.
15  Q.    And presumably she was receiving
16  medication from her primary care physician?
17  A.    Yes.
18  Q.    And she also had had a pain
19  specialist?
20  A.    Yes.
21  Q.    And presumably she was receiving
22  medical care and prescriptions from her pain
23  specialist?
24  A.    Yes.
25  Q.    The record goes on to state, "Her

**(Pages 206 to 209)**

**210**

1  diagnosis at that time was depressive disorder
2  NOS."
3        Did I read that correctly?
4     A.    Where are we?
5     Q.    It is the same paragraph.
6     A.    I am sorry.  Correct.
7     Q.    "Her diagnosis at that time was
8  depressive disorder NOS."
9        Did I read that correctly?
10    A.    Yes.
11    Q.    What does the NOS stand for?
12    A.    Not otherwise specified.
13    Q.    And what does that mean?
14    A.    That it doesn't meet full
15  criteria for major depressive disorder, but
16  she had some depressive symptoms.
17    Q.    But, in fact, after this meeting,
18  if you turn to Page 3, did you, in fact,
19  diagnose her with major depressive disorder?
20    A.    Yes.
21    Q.    And, in fact, did you say major
22  depressive disorder severe?
23    A.    Yes.
24    Q.    Is major depressive disorder a
25  serious illness?

**211**

1     A.    Yes.
2     Q.    And often requires treatment
3  with medication.  Is that right?
4     A.    Yes.
5     Q.    And if patients with major --
6  severe major depressive disorder go untreated,
7  can that have a serious effect on their life?
8     A.    Yes.
9     Q.    Can they be at risk for suicide?
10    A.    Yes.
11    Q.    Can it affect their interaction,
12  social interactions?
13    A.    Yes.
14    Q.    Can it affect their family
15  relationships?
16    A.    Yes.
17    Q.    Can it affect their health?
18    A.    Yes.
19    Q.    Can it affect their ability to
20  sleep properly?
21    A.    Yes.
22    Q.    And were these concerns you had
23  with Ms. Livesay?
24    A.    Yes.
25    Q.    And you would have taken those

**212**

1  into consideration when you were prescribing
2  medication for her?
3     A.    Yes.
4     Q.    The record goes on to state that
5  "she was treated with Serzone, Seroquel and
6  Klonopin, which she states worked extremely
7  well for her."
8        Did I read that correctly?
9     A.    Yes.
10    Q.    So before she came to you, she
11  was actually being treated with Seroquel?
12    A.    Yes.
13    Q.    And she said that had worked
14  extremely well for her?
15    A.    Yes.
16    Q.    And you would have noted that
17  down because that was something she
18  specifically told you?
19    A.    Yes.
20    Q.    In the next paragraph, the second
21  sentence reads, "She states she has been on
22  Lexapro, Elavil and Effexor, all of which have
23  not worked."
24        Did I read that correctly?
25    A.    Yes.

**213**

1     Q.    Is it unusual for patients with
2  mental illnesses to be treated with several
3  different medications?
4     A.    Yes.  No.  It is not unusual.  It
5  is common.
6     Q.    And also, when patients come to
7  see you, do different patients react
8  differently to different kinds of medications?
9     A.    Yes.
10    Q.    And so is one of the jobs that
11  you have when you see patients to find what
12  combination of therapy is appropriate for each
13  individual?
14    A.    Yes.
15    Q.    And did you work hard to try to
16  do that with Ms. Livesay?
17    A.    Yes.
18    Q.    And were you satisfied you did a
19  good job?
20    A.    I need to get to the rest of the
21  notes to answer that.  Okay.
22    Q.    Okay.  Let's read on.
23    A.    I think I did.  Yes.
24    Q.    It goes on to say, "She complains
25  she has been taken on and off medications and

**(Pages 210 to 213)**

**214**

1  that none of them work and continues to states
2  this throughout the rest of the interview.
3  However, at the end of the interview, she
4  breaks down in tears and acknowledges that she
5  stopped taking her Lexapro two weeks ago,
6  because, quote, 'I thought I could do without
7  it,' close quote."
8       Did I read that correctly?
9    A.   Yes.
10   Q.   Is it important for patients to
11  take the medicine that you prescribe for them?
12   A.   Yes.
13   Q.   And why is that important?
14   A.   **Because they are not something**
15  **that you can just take PRN. They have to be**
16  **in your system in order for them to have**
17  **adequate blood levels and the cascade of**
18  **reactions that actually work on the mood**
19  **effect.**
20   Q.   If a patient stops taking their
21  medication, their mental illness can
22  resurface?
23   A.   Correct.
24   Q.   If you go down to the next
25  paragraph, it states, "She presents today

**215**

1  extremely depressed. She is feeling hopeless,
2  extremely anhedonic with poor concentration,
3  appetite and energy. She is having suicidal
4  thoughts without plan or intent. She
5  ruminates excessively and sleeps only about
6  two hours of fitful sleep per night."
7    A.   Yes.
8    Q.   Would that have been information
9  she told you at this interview?
10   A.   Yes.
11   Q.   And is it of a concern to you
12  that Ms. Livesay was having suicidal thoughts?
13   A.   Yes.
14   Q.   And that is something you take
15  seriously when prescribing medication for
16  that?
17   A.   Yes.
18   Q.   It goes on to say, "She states
19  that her symptoms have progressed over the
20  past year in the context of multiple social
21  stressors, including the fact that she has had
22  some chronic pain problems."
23       Did I read that correctly?
24   A.   Yes.
25   Q.   Do you recall that Ms. Livesay

**216**

1  did have chronic pain problems?
2    A.   Yes.
3    Q.   And that she was receiving
4  medication for those pain problems?
5    A.   Yes.
6    Q.   If you turn over the page to Page
7  2, and the first full paragraph on Page 2
8  states, "She's very despondent during today's
9  interview."
10       Did I read that correctly? The
11  first full paragraph.
12   A.   Yes.
13   Q.   And after the next sentence, does
14  it also state that she does have some anxiety?
15   A.   Yes.
16   Q.   You mentioned earlier today that
17  you do prescribe Seroquel off-label sometimes?
18   A.   Yes.
19   Q.   And you have done in the past?
20   A.   Yes.
21   Q.   And you continue to do that?
22   A.   Yes.
23   Q.   And I believe you also said that
24  you have prescribed it for depression. Is
25  that correct?

**217**

1    A.   Yes.
2    Q.   And in particular, you said you
3  have prescribed it for depression associated
4  with sleep problems and anxiety.
5    A.   Yes.
6    Q.   And, in fact, Ms. Livesay did
7  have depression and she did have sleep
8  problems and she did have anxiety. Is that
9  correct?
10   A.   Yes.
11   Q.   And so you did prescribe her
12  Seroquel?
13   A.   Yes.
14   Q.   In looking back, do you think
15  that was an appropriate prescription for her
16  at this time?
17   A.   Yes. Based on this presentation.
18  Yes.
19   Q.   And if you go down to the
20  Substance Abuse History, does Ms. Livesay have
21  a history of cigarette smoking?
22   A.   Yes.
23   Q.   What was her history of cigarette
24  smoking?
25   A.   She reported one to two packs a

**(Pages 214 to 217)**

218

1  day.
2      Q.     Under the Medical History, can
3  you tell me what medical history Ms. Livesay
4  presented with?
5      A.     It says she was diagnosed with
6  non-Hodgkin's lymphoma.  She has chronic back
7  pain related to three back surgeries.  She has
8  peripheral neuropathy to her left foot, calf
9  and leg.  The history of migraine headaches
10  and ulcers.  She has had one head injury that
11  resulted in head trauma and initial seizures,
12  but has not had seizures since that time, and
13  she was told by one neurologist that they were
14  pseudo-seizures.  She thinks she might have
15  also had seizures in the context of taking
16  high doses of Prozac.
17      Q.     What kind of medication is
18  Prozac?
19      A.     Antidepressant.
20      Q.     If you turn to Page 3, under the
21  heading Comprehensive Mental Status
22  Examination, if you look at the last sentence
23  of -- the last two sentences of the first
24  paragraph, it reads that "she is extremely
25  tearful and despondent during the interview.

219

1  She initially tells me one story about why her
2  meds aren't working, but then acknowledges
3  that she has not been taking her medication
4  for the last couple of weeks."
5          Did I read that correctly?
6      A.     Yes.
7      Q.     Is it important to you that
8  patients provide you with an accurate
9  information about what medicines they are on?
10      A.     Yes.
11      Q.     And is it important that they
12  take those medicines as you prescribe them?
13      A.     Yes.
14      Q.     And so what did you diagnose
15  Ms. Livesay with at this time?
16      A.     Major depressive disorder
17  recurrent, severe.
18      Q.     And what medication did you
19  prescribe for her at this time?  And I think
20  we can find that on Page 18.
21      A.     She was resumed on her Lexapro,
22  and I started Seroquel 100 milligrams at night
23  to assist with sleep.  And that is it.
24      Q.     On the Page 18 there is a
25  statement, "She has been on Klonopin in the

220

1  past.  We will not resume that.  There was a
2  question in the past of doses of opiates she
3  was using for chronic pain in combination with
4  the Klonopin, unless Klonopin was discontinued
5  previously."
6          Did I read that correctly?
7      A.     Yes.
8      Q.     Do you recall what the question
9  was there?
10      A.     I don't.  But it is probably in
11  the previous record about that.
12      Q.     At the bottom of the page, there
13  is a statement, "The patient was engaged in a
14  discussion of the risks and benefits of the
15  proposed treatment, the risks and benefits of
16  the alternative treatments and the risks and
17  benefits of no treatment at all.  She is
18  competent to give informed consent and is
19  agreeable to today's treatment plan."
20          Did I read that correctly?
21      A.     Yes.
22      Q.     And would that discussion have
23  included a discussion of the risks of weight
24  gain, diabetes and hyperglycemia that have
25  been associated or alleged to be associated

221

1  with Seroquel?
2      A.     In addition to other risks of the
3  meds.  Yes.
4      Q.     If you could turn to the next
5  visit, which is Page 14.  I think you go
6  forward.
7      A.     Page 14?
8      Q.     Yes.
9      A.     Okay.
10      Q.     Is this a record of a visit March
11  8, 2006?
12      A.     Yes.
13      Q.     And this was the next visit you
14  had with Ms. Livesay?
15      A.     Yes.
16      Q.     And the second sentence, does it
17  read, "She is currently taking Lexapro and
18  Seroquel, which is working to alleviate her
19  mood symptoms"?
20      A.     Yes.
21      Q.     So it appears that the Seroquel
22  is working at this time?
23      A.     Yes.
24      Q.     And it is helping her?
25      A.     Yes.

222

1      MR. BRUZZESE:
2           Objection. Form.
3   BY MR. GADDES:
4      Q.   Did you feel that you were
5   treating -- Seroquel was helping her?
6      A.   Yes.
7      Q.   It goes on to say, "She still
8   complains of ongoing anhedonia and poor
9   motivation and energy. Her sleep is improved,
10  but remains suboptimal, getting about four
11  hours per night. She is much less tearful and
12  feels much less depressed. Her appetite is
13  improved and concentration is improved. She
14  notes that she is also much less irritable,
15  which she attributes to the Seroquel, as
16  previous trials of Lexapro alone did not
17  improve her irritability."
18          Did I read that correctly?
19     A.   Yes.
20     Q.   So does it appear that the
21  Seroquel is helping her?
22     A.   Yes.
23     Q.   However, it also says that her
24  sleep still remains suboptimal. Is that
25  correct?

224

1      A.   Yes.
2      Q.   The last sentence under the
3   heading Subject reads, "She thinks the meds
4   are working well."
5           Would she have told you that? Is
6   that something she would have told you?
7      A.   Yes.
8      Q.   So you would have recorded what
9   she was telling you at that time?
10     A.   Yes.
11     Q.   It goes on to say, "However, she
12  is still having difficulty sleeping on 200
13  milligrams of Seroquel. We will switch her to
14  Trazodone."
15          Did I read that correctly?
16     A.   Yes.
17     Q.   So did, in fact, you discontinue
18  Seroquel at this time?
19     A.   Yes.
20     Q.   And what did you switch her to?
21     A.   Trazodone.
22     Q.   Let's take a look at the next
23  visit, which is Page 11. Is this a record of
24  a visit dated June 22nd, 2006?
25     A.   Yes.

223

1      A.   Yes.
2      Q.   Did you, in fact, change her
3   dosages of medicines at this visit?
4      A.   Yes. I increased her Lexapro and
5   Seroquel.
6      Q.   And what was the reason for that?
7      A.   To get full remission. To get
8   full remission of depressive symptoms.
9   Increase the motivation, energy and help her
10  to sleep.
11     Q.   If you turn to Page 13. I
12  believe this is a record of a visit dated
13  March 29, 2006. Is that correct?
14     A.   Yes.
15     Q.   And this would be the next visit
16  you had with Ms. Livesay?
17     A.   Yes.
18     Q.   And do you continue the
19  medication regimen?
20     A.   Yes.
21     Q.   If you turn to Page 12. Is this
22  a record of a visit dated April 27, 2006?
23     A.   Yes.
24     Q.   Would this have been the next
25  visit you had with Ms. Livesay?

225

1      Q.   And if you read through the
2   Subjective paragraph, does it appear that
3   Ms. Livesay has taken a turn for the worst?
4      A.   Yes.
5      Q.   What has happened here?
6      A.   She is extremely sleep deprived.
7   Having severe anger outbursts and rage
8   episodes. She is overwhelmed. Having some
9   chronic pain issues. Yes.
10     Q.   And had she actually taken higher
11  doses of Lexapro than had been prescribed for
12  her?
13     A.   Yes.
14     Q.   Is that a problem when a patient
15  takes more medicine than has been prescribed
16  for them?
17     A.   Yes.
18     Q.   Why is that a problem?
19     A.   Well, because they can exceed
20  recommended doses. They can flip themselves
21  into mania. It can cause lots of side
22  effects. Interfere with their treatment.
23     Q.   Is this an issue or problem you
24  had had with Ms. Livesay of her
25  self-medicating?

**(Pages 222 to 225)**

226

1    A.   Yes.
2    Q.   It also goes on to say, "Her labs
3 came back with elevated lipids and glucose.
4 She is aware of this and was informed consent
5 about the risk of Seroquel.  Would like to
6 resume the Seroquel at higher doses."
7         Did I read that correctly?
8    A.   Yes.
9    Q.   Is that a discussion you had with
10 Ms. Livesay?
11   A.   Yes.
12   Q.   It also goes on to say, "She will
13 follow up with a PCP regarding the latter."
14        Did I read that correctly?
15   A.   Yes.
16   Q.   Is it your understanding that
17 Ms. Livesay was responsible to follow up with
18 her primary care physician about her glucose
19 levels?
20   A.   Yes.
21   Q.   And what, in fact, was the
22 glucose reading that she received?
23   A.   I don't have the record of it.
24   Q.   If you look under --
25   A.   I am sorry. I do.  101.

227

1    Q.   So she had a glucose of 101 at
2 this time?
3    A.   Actually, it looks like that was
4 a lab dated 2-06.
5    Q.   Had the previous records
6 suggested that the lab results were pending?
7    A.   Yeah.  You are right.  Yes.  You
8 are correct.
9    Q.   So even given that she had
10 elevated lipids and glucose and even though
11 you informed her of this and informed her of
12 the risks of Seroquel, she chose to continue
13 on her Seroquel medication?
14   A.   Yes.
15   Q.   And you thought this was
16 appropriate for her at this time?
17   A.   Yes.  Especially given her
18 decompensation.  And I changed her diagnosis,
19 too.
20   Q.   Yes.  I meant to ask you that.
21 You did change her diagnosis on this visit.
22 Is that correct?
23   A.   Yes.
24   Q.   How did you change her diagnosis?
25   A.   I am considering that she has a

228

1 bipolar disorder based on her reaction to
2 stopping the atypical — stopping the Seroquel
3 and based on her mood cycle and sleep
4 disturbance and anger outbursts.
5    Q.   This is the first time you had an
6 opportunity to see where she wasn't taking all
7 the medications that had been prescribed?
8    A.   Correct.
9    Q.   And so what medication did you
10 prescribe for her at this point?  What was the
11 medication regimen?
12   A.   I resumed the Seroquel at 200
13 milligrams.  I thought it was very important
14 that she — we get her to sleep.  That was my
15 main goal.  So I gave her the option of
16 increasing it by 100 milligrams each night as
17 tolerated.  Not to exceed 600 milligrams.
18   Q.   And you were concerned about
19 sleep.  Is that because sleep can dramatically
20 affect people's mental health?
21   A.   Yes.
22   Q.   It can make existing mental
23 health conditions a lot worse?
24   A.   Yes.
25   Q.   Did you add any medications at

229

1 this time?
2    A.   Yes.  Decreasing Lexapro and
3 started — I tried to add Cymbalta, which she
4 stated she had done well on in the past.
5    Q.   And I take it you rely upon a
6 patient when they are talking about previous
7 medication experience with you, to give you
8 accurate medication experience?
9    A.   Correct.  Yes.
10   Q.   Then if you look under Education,
11 it reads, "The patient was informed of the
12 risks of Seroquel to include metabolic
13 abnormalities such as diabetes and
14 dyslipidemia as well as EPS to include the
15 rare possibility of irreversible TD."
16        Did I read that correctly?
17   A.   Yes.
18   Q.   Does EPS means extrapyramidal
19 symptoms?
20   A.   Yes.
21   Q.   And does TD means tardive
22 dyskinesia?
23   A.   Yes.
24   Q.   And you discussed those earlier
25 with Mr. Ellison.  Is that correct?

230

```
 1     A.    Yes.
 2     Q.    So this, again, is a discussion
 3  you had with her explaining the risk of
 4  diabetes alleged to be associated with
 5  Seroquel?
 6     A.    Yes.
 7     Q.    And does your note reflect that
 8  she listened and understood these risks?
 9     A.    Yes.
10     Q.    In fact, it reads, "Information
11  was disclosed, and the client participated in
12  a discussion of the nature of the proposed
13  treatment, the potential benefits and risks of
14  the treatment and any alternatives that exist
15  and their benefits and risks and the benefits
16  and risks of no treatment at all.  The client
17  voluntarily consented to the proposed
18  treatment and has the capacity to offer
19  consent."
20         Did I read that correctly?
21     A.    Yes.
22     Q.    Again, this was not the first
23  time you discussed the risk of hyperglycemia
24  or diabetes with Seroquel, is it?
25     A.    No.
```

231

```
 1     Q.    If we can turn to the next
 2  record, Page 10.  Is this the record of a
 3  visit dated July 20, 2006?
 4     A.    Yes.
 5     Q.    Under Subjective, does it read,
 6  "She presents today extremely upset and is
 7  seen by this provider as an add-on due to her
 8  distress.  She is angry at the world and is
 9  frustrated about a message apparently left on
10  her phone machine regarding medication.  She
11  is complaining that her medications have
12  'never worked.  I have said that all along.'"
13  Never worked.  I have said that all along in
14  quotes.  "However, notes clearly indicate
15  otherwise."
16         Did I read that correctly?
17     A.    Yes.
18     Q.    And, in fact, we have already
19  seen several of her notes indicated that
20  medicines were working quite well.
21     A.    Yes.
22     Q.    Including Seroquel was working
23  well?
24     A.    Yes.
25     Q.    And the next sentence does go on,
```

232

```
 1  in fact, to say, "She currently feels the
 2  Seroquel is helping, but not the Lexapro,
 3  although she stated in the past that it has
 4  worked well."
 5     A.    Yes.
 6     Q.    The note goes on to say, "She
 7  reports that, quote, 'none of the doctors know
 8  what they are doing' close quote, referring to
 9  her pain management doctors, previous
10  clinicians at DMH and apparently this
11  provider.  She has offered to change ARNPs due
12  to her apparent dissatisfaction."
13         Did I read that correctly?
14     A.    Yes.
15     Q.    It goes on to say, "She declines,
16  but continues to split providers and office
17  staff."
18         Did I read that correctly?
19     A.    Yes.
20     Q.    What does that mean, she
21  continues to split providers?
22     A.    It is a defense mechanism in
23  certain character pathologies, where people
24  idealize with one provider and devalue the
25  next provider.  And it has to do with certain
```

233

```
 1  types of character pathologies.
 2     Q.    Is this common amongst patients
 3  with the kind of illness Ms. Livesay has?
 4     A.    Yes.  Probably speaks more to a
 5  personality component as well that I didn't
 6  put in the diagnosis.
 7     Q.    Is the inconsistency of her
 8  recollection of how medicines are working
 9  compared to the records something that is also
10  consistent with her mental health condition?
11     A.    Yes.
12     Q.    The next sentence states, "She is
13  very entitled."  What does that mean?
14     A.    She feels that she is owed
15  something.  She feels that she is owed special
16  treatment by her facility.
17     Q.    Was Ms. Livesay a difficult
18  patient?
19     A.    Yes.
20     Q.    Further down the page, it states
21  about four lines from the bottom, three lines
22  from the bottom, "She thinks the Cymbalta has
23  given her sores on her body and thus stopped
24  it as well (although she had previously been
25  on it with very good results, and I went
```

**(Pages 230 to 233)**

234

1 through extensive efforts to get an override
2 for her because the insurance would not cover
3 it, and she felt it was essential for her
4 functioning.)"
5         Did I read that correctly?
6     A.   Yes.
7     Q.   What had happened here?
8     A.   She is blaming the medicine for a
9 lot of things that don't seem to be related to
10 the medication.
11     Q.   And is her current statement
12 about the value of the medicines inconsistent
13 with previous records?
14     A.   Yes.
15     Q.   And also with her previous
16 statements about the medicine?
17     A.   Yes.
18     Q.   Did she ask to go back on Serzone
19 at this time?
20     A.   Yes.
21     Q.   And so what medication regimen
22 did you place her on at this time?
23     A.   We stayed on the Seroquel. I
24 stopped the Lexapro and Cymbalta, which were
25 the antidepressants, and started her on

235

1 Serzone, with a lot of informed consent about
2 liver damage that Serzone can cause. And that
3 was based on her insistence that was the only
4 medicine that has worked for her.
5     Q.   And you discontinued Lexapro and
6 Cymbalta at this time?
7     A.   Yes.
8     Q.   What dose of Seroquel?
9     A.   She is on 600 at this time.
10     Q.   And do you think that based on
11 the information she provided to you and this
12 patient's history, that this was the correct
13 medicine regimen at this time?
14     A.   I probably — I think, yeah. I
15 think the Seroquel was good. The Serzone, I
16 don't know if I would do that again.
17     Q.   It goes on to say under
18 Education, "The patient was informed of the
19 risks of Seroquel to include metabolic
20 abnormalities such as diabetes and
21 dyslipidemia as well as possible EPS to
22 include the rare possibility of irreversible
23 TD."
24         Did I read that correctly?
25     A.   Yes.

236

1     Q.   This shows again you had a
2 discussion with her about these risks?
3     A.   Yes.
4     Q.   If you turn to the next page,
5 Page 9. Is this a record of a visit dated
6 August 7, 2006?
7     A.   Yes.
8     Q.   And in the second --
9     A.   Wait. I am sorry. Yes.
10     Q.   In the second sentence, it
11 states, "She presents brighter and more
12 cheerful. Serzone was approved, and she
13 states she is doing significantly better on
14 it."
15         Did I read that correctly?
16     A.   Yes.
17     Q.   So is the medication regimen
18 working for her?
19     A.   At this point, according to her
20 report today, yes.
21     Q.   And did you continue the same
22 medication regimen?
23     A.   Yes.
24     Q.   So at this time she was on
25 Serzone 400 milligrams and Seroquel 600

237

1 milligrams?
2     A.   Yes.
3     Q.   And again, you state that she was
4 informed of the risks of metabolic
5 abnormalities, diabetes and dyslipidemia with
6 Seroquel?
7     A.   As well as orthostasis, because
8 she had been having some falls.
9     Q.   If you can turn to the next
10 record, Page 8. Is this a record of your
11 visit dated October 30, 2006 with Ms. Livesay?
12     A.   Yes.
13     Q.   It states in the third sentence
14 under Subjective that "she was found to have a
15 B-12 deficiency."
16         Did I read that correctly?
17     A.   Yes.
18     Q.   What is that?
19     A.   A vitamin deficiency that can
20 affect mood.
21     Q.   And why is that significant to
22 you in your practice?
23     A.   Because it can mimic psychiatric
24 problems.
25     Q.   And remember to keep your voice

**(Pages 234 to 237)**

238

1  up.
2      A.    I am sorry.  Because it can mimic
3  psychiatric problems and complicate the
4  picture.
5      Q.    Does it also -- does your record
6  also go on to say that she is receiving pain
7  management treatment?
8      A.    Yes.
9      Q.    For a back injury and peripheral
10  neuropathy?
11      A.    Yes.
12      Q.    In fact, she is taking morphine
13  and Percocet at this time?
14      A.    Yes.
15      Q.    I take it because she has other
16  providers, you only have information about
17  medication she is receiving from those
18  providers when she gives them to you?
19      A.    Correct.
20      Q.    So you are relying on the patient
21  to give you accurate information about pain
22  medication she is on?
23      A.    Correct.
24      Q.    Did you change her medicine
25  regimen at this time?

239

1      A.    I added -- let's see.  She is
2  still having problems with sleep, so I added
3  Rozerem, which is a sleep aid.
4      Q.    And again, does the Education
5  section of your record show that she was
6  informed about the risks of Seroquel to
7  include metabolic abnormalities such as
8  diabetes and dyslipidemia?
9      A.    Yes.
10      Q.    Under Follow-up, you state she
11  should follow up with you in two months.
12          Did I read that correctly?
13      A.    Yes.
14      Q.    Is it important that patients you
15  are treating for mental health follow up
16  regularly with you?
17      A.    Yes.
18      Q.    And that they come and see you
19  when they are supposed to come and see you?
20      A.    Yes.
21      Q.    But, in fact, when is the next
22  visit?
23      A.    According to the records we have,
24  it is not until -- actually, six months.
25      Q.    Almost six months?

240

1      A.    Yes.
2      Q.    Let's turn to that record now.
3  It is Page 7.  Is this a record of a visit
4  April 19, 2007?
5      A.    Yes.
6      Q.    What happened here at this visit?
7      A.    There may have been a missed
8  record here I am concerned about.  Because
9  usually, she wouldn't have had enough meds to
10  last her -- she wouldn't have had enough meds
11  six months without seeing me.
12      Q.    We are maybe missing a record?
13      A.    Yes.
14      Q.    And we talked about that earlier
15  on Mr. Haller's records.  And if there are
16  additional records, we reserve the right to
17  ask you about those if necessary.
18      A.    Right.
19      Q.    So the visit April 19, 2007, you
20  actually changed her medicine regimen at this
21  time?
22      A.    Yes.
23      Q.    And you decreased her Seroquel.
24  Is that correct?
25      A.    Yes.

241

1      Q.    Why did you decrease her
2  Seroquel?
3      A.    She had gained significant weight
4  and was noted to have noninsulin diabetes,
5  which was diet controlled at the time.  It
6  says Seroquel helped significantly at 600
7  milligrams, and she decompensates when she is
8  sleep deprived.  But we went ahead and
9  decreased it because of the weight gain.
10      Q.    So the Seroquel was still helping
11  her.  Is that right?
12      A.    Yes.
13      Q.    But because of the weight gain,
14  you made an assessment that you wanted to
15  taper off Seroquel at this time?
16      A.    Yes.
17      Q.    When it says that she has
18  noninsulin-dependent diabetes, would that have
19  been based on a report she gave you, a
20  self-report?
21      A.    It looks like -- yes.  Because I
22  don't have any new labs, it looks like.
23      Q.    In fact, you weren't treating her
24  for diabetes?
25      A.    No.

242

1 Q. And you didn't treat her for
2 diabetes?
3 A. No.
4 Q. And you don't know, in fact, what
5 her primary care physician has concluded with
6 respect to her diabetes, whether she has it or
7 not?
8 A. Correct.
9 Q. We talked about weight gain. Do
10 you take a -- when you were treating
11 Ms. Livesay, take a measurement of her weight
12 at each visit?
13 A. We tried to do that -- ideally,
14 we did it on each visit, but we don't always
15 do it on each visit. And there is usually a
16 graph, like I showed you on David Haller's
17 chart, but we don't have record of it. So I
18 can't tell you what the weight went from.
19 Q. So this could either be a
20 measurement or a self-report?
21 A. No. I would have -- if I wrote
22 it down on here, I took it. If I wrote it in
23 the note, I definitely took it. But usually
24 the weights, I would have more of them, and
25 they are on that flow sheet.

243

1 Q. Of course, you don't know what
2 her weight was before she came to Directions
3 for Mental Health?
4 A. Again, it would be on the flow
5 sheet.
6 Q. Before she came to be treated at
7 the Directions for Mental Health, you wouldn't
8 have a record?
9 A. No. I wouldn't have that. No.
10 Q. So you wouldn't know whether, in
11 fact, she had a higher weight than this before
12 she came to be treated at Directions for
13 Mental Health?
14 A. No.
15 Q. You wouldn't know that?
16 A. No. That wouldn't have been in
17 the history I took.
18 Q. You have said that atypical
19 antipsychotics, I believe, are associated --
20 have been associated with some weight gain.
21 Is that right?
22 A. Yes.
23 Q. Other medicines that are also
24 used to treat mental health have been
25 associated with weight gain?

244

1 A. Yes.
2 Q. SSRIs might be associated with
3 weight gain?
4 A. Yes. Definitely.
5 Q. Medications that Ms. Livesay was
6 on have been associated with weight gain other
7 than Seroquel?
8 A. Yes.
9 Q. And pain medications can also be
10 associated with weight gain. Is that fair?
11 A. Yes. I don't know the extent of
12 that. Just because I don't prescribe them.
13 Q. So what was the medication
14 Ms. Livesay was placed on at this time?
15 A. Well, what I was trying to do is
16 I was trying to decrease the dose of Serzone
17 and then add the Trazodone to it. Decrease
18 the dose of Seroquel so I could add the
19 Trazodone. I could have less of the Seroquel
20 if that was causing weight gain and still
21 address her sleep. So I added Trazodone to
22 the Seroquel, using both of them.
23 Q. Under Objective, and Medications
24 in specific, does it say that Ms. Livesay was
25 taking Percocet, Flexeril and Imitrex as well?

245

1 A. Yes.
2 Q. And she was receiving those from
3 another provider?
4 A. Yes.
5 Q. And again, you don't know whether
6 she was receiving other medications in
7 addition to those?
8 A. Correct. Yes.
9 Q. Let's turn to the next record on
10 Page 6. Is this a record of a visit May 10,
11 2007?
12 A. Yes.
13 Q. Was Ms. Livesay having difficulty
14 at this time complying with your directions as
15 to what medicines she should take?
16 A. Yes.
17 Q. What had happened?
18 A. She claimed that I had taken her
19 off of all her medication, and that was not
20 the case. And I do recall her discussing this
21 and complaining about my taking her off all of
22 the medication to her therapist. I never took
23 her off of all her medication. So she was
24 very confused.
25 Q. Had she, in fact, discontinued

**(Pages 242 to 245)**

**246**

1  Seroquel all together?
2     A.   Yes.
3     Q.   Did she begin having sleep
4  problems again?
5     A.   Yes.  Without the Seroquel.  She
6  stopped her Serzone on her own.
7     Q.   Is that a bad thing for her to
8  stop her medication?
9     A.   Yes.  Definitely.
10    Q.   In the middle it states that "her
11  PCP had placed her on Lexapro."
12        Did I read that correctly?
13    A.   Yes.  And he also put her on
14  Klonopin with all of those pain meds.
15    Q.   So she was taking a lot of
16  medications at this time?
17    A.   Yes.
18    Q.   Is it a concern when patients
19  take too many medications?
20    A.   Yeah.  She is on three opiates
21  and a benzodiazepine.
22    Q.   Did you ever have any discussions
23  with Ms. Livesay whether she was opiate
24  dependent?
25    A.   Yes.  Yes.  We did have the

**247**

1  discussion.  I don't think that I have that --
2  that was certainly a consideration I had.  I
3  don't see that I documented that.
4     Q.   Do you know whether her other
5  physicians had diagnosed her with addiction to
6  opiates or narcotics?
7     A.   I think she may have carried that
8  diagnosis from the beginning.  No.  I am
9  sorry.  I was thinking of something else.  No.
10  I don't know if any of the other physicians
11  had diagnosed her with that.
12    Q.   And if we go to the bottom of
13  Subjective, it states, "She was given written
14  instructions on the current medication
15  schedule to avoid further confusion, and this
16  was also discussed with her therapist, Chris
17  Edwards, to reinforce medication
18  instructions."
19        Did I read that correctly?
20    A.   Yes.
21    Q.   Chris Edwards, we haven't come
22  across that name in Ms. Livesay's records yet.
23  Who is Chris Edwards?
24    A.   Chris Edwards was her counselor.
25    Q.   And what role did Chris Edwards

**248**

1  have?
2     A.   She just did individual
3  psychotherapy with her for about an hour
4  every -- I don't know how frequently, but
5  every couple weeks, I think.
6     Q.   Had she seen Chris Edwards -- is
7  Chris Edwards a woman?
8     A.   Yes.
9     Q.   Had she been seeing Ms. Edwards
10  before she was treated by you?
11    A.   Yes.
12    Q.   And Ms. Edwards is at Directions
13  for Mental Health?
14    A.   Yes.
15    Q.   Did you decrease the Seroquel
16  dosage at this time?
17    A.   I decreased it, but we resumed
18  it, because she had stopped it.
19    Q.   But again, under Education, "The
20  patient was informed of the risks of Seroquel
21  to included metabolic abnormalities such as
22  diabetes and dyslipidemia"?
23    A.   Yes.
24    Q.   Can we turn to the next record,
25  please, Page 5.  August 2, 2007.  Is this a

**249**

1  record of a visit that you had with
2  Ms. Livesay August 2, 2007?
3     A.   Yes.
4     Q.   And did you discontinue Seroquel
5  at this time?
6     A.   Yes.
7     Q.   And did you discontinue Serzone
8  and Trazodone as well?
9     A.   Yes.
10    Q.   So what medicine was she left on
11  at this time?
12    A.   Well, she had discontinued all
13  those, or she says her primary care physician
14  had done that and placed her on Zoloft.
15    Q.   Do you know Dr. Kazuba?
16    A.   No.  I do not.
17    Q.   Dr. Kazuba is her primary care
18  physician?
19    A.   Yes.
20    Q.   Do you know Dr. Gibson, her pain
21  management physician?
22    A.   No.
23    Q.   This was the last visit I have in
24  the medical records.  Do you recall seeing her
25  after the August 2, 2007 visit?

**250**

1    A.    I don't. It says, though, to
2  follow up in three months, because she was
3  going to have back surgery. And I was gone by
4  then. That is probably my last record.
5    Q.    You don't know -- and you haven't
6  treated Ms. Livesay since that date?
7    A.    No.
8    Q.    So you wouldn't know anything
9  about her medical condition today or how she
10 is being treated?
11   A.    No. It looks like, again, she
12 had found her miracle drug with her primary
13 care physician, Zoloft. She had a history of
14 finding a drug that is a miracle, and then it
15 not working for her. She is very inconsistent
16 with her reports.
17   Q.    Sometimes she would tell you she
18 had a fantastic drug, and yet -- and she
19 needed to go to that drug, when, in fact, she
20 said a different drug before was fantastic?
21   A.    Right. Right.
22   Q.    So she was changing, giving you
23 inconsistent information about what medicines
24 worked for her?
25   A.    Constantly. Yes.

**251**

1    Q.    I want to, as part of -- one of
2  the collaborating physicians, I think you said
3  you worked with James Zenel. Z-E-N-E-L.
4    A.    Yes.
5    Q.    And would he have been the
6  collaborating physician on Ms. Livesay's case?
7    A.    Yes.
8    Q.    And how did he fit into the
9  treatment of Ms. Livesay?
10   A.    I am not sure that I discussed
11 Ms. Livesay specifically with Dr. Zenel. She
12 was a difficult patient, but certainly not the
13 most difficult patient. I don't recall any
14 specific -- any specific conversations about
15 her with him.
16   Q.    Did Ms. Livesay ever discuss her
17 lawsuit against AstraZeneca with you?
18   A.    No.
19   Q.    Were you aware that she had a
20 lawsuit against AstraZeneca before you heard
21 about this deposition?
22   A.    No.
23   Q.    I think you said before that you
24 have had experience with at least one of your
25 patients who had discontinued his Seroquel

**252**

1  medication because of the recommendation of
2  his plaintiff's attorney. Is that correct?
3    A.    Yes.
4    Q.    When you first started seeing
5  Ms. Livesay, you would have looked through her
6  previous medical records. Is that fair?
7    A.    Yes.
8    Q.    To get an idea about the patient?
9    A.    Yes.
10   Q.    Let's look at a few of those now.
11 I promise I am not going to keep you much
12 longer. If we flip all the way back to Page
13 53, does this appear to be an initial
14 psychiatric evaluation dated July 6, 1999?
15 Page 53.
16   A.    Yes. It is a psychiatric
17 evaluation. I need to look at the medical
18 record to see if there is anything further
19 back. It looks like she -- it looks like she
20 was opened and closed several times,
21 because -- I think this is 2007. There is
22 something from 2001. That is the furthest
23 back I see.
24   Q.    And is this -- from just a brief
25 review of the medical records, does this

**253**

1  appear to be the first psychiatric evaluation
2  she had at Directions for Mental Health?
3    A.    Based on what I am looking at
4  right now. Yeah.
5    Q.    And who, in fact, performed this
6  psychiatric evaluation?
7    A.    Don Davis.
8    Q.    Don Davis, an advanced registered
9  nurse practitioner?
10   A.    Yes.
11   Q.    And I think you testified this
12 morning that Mr. Davis had left before you
13 arrived at Directions for Mental Health?
14   A.    Correct. Yes.
15   Q.    And was Ms. Livesay one of his
16 patients that you inherited?
17   A.    Yes. Well, she had stopped
18 seeing both of us and was being treated by her
19 primary care in the interim. She was closed
20 from Directions and then came back to me. So
21 she was seeing a primary care. She was
22 getting psych treatment by her primary care
23 for a period of time between seeing Don Davis
24 and myself.
25   Q.    Does that make treatment of a

**(Pages 250 to 253)**

254

1 patient complicated, by the way, when she is
2 seeing multiple providers for mental health
3 issues?
4    A.    Yes.
5    Q.    Is that not an ideal situation?
6    A.    No.
7    Q.    It is not an ideal situation?
8    A.    It is not an ideal situation.
9 Correct.
10   Q.    Under Identifying Data, it
11 states, "She is" -- about halfway down that
12 paragraph.  It states, "She is currently on
13 Prozac 20 milligrams daily and Xanax 0.5
14 milligrams up to three times a day as needed
15 for anxiety.  This has been prescribed on and
16 off for quite some time now.  Prozac for
17 several years, Xanax approximately six months
18 by her medical doctor."
19          Did I read that correctly?
20   A.    Yes.
21   Q.    So she was actually being treated
22 for mental illness before she came to
23 Directions for Mental Health?
24   A.    Yes.
25   Q.    And does this show that she also

255

1 had a history of anxiety?
2    A.    Yes.
3    Q.    If you turn to the next page,
4 Page 54, under Current Symptoms it states,
5 "She has had a longstanding problem with
6 sleep.  She has difficulty staying asleep for
7 more than an hour or two as well as anxiety
8 recently."
9          Did I read that correctly?
10   A.    Yes.
11   Q.    So again, she has had a long
12 history of sleep problems.  Is that right?
13   A.    Yes.
14   Q.    Let's move forward to Page 52.
15   A.    Okay.
16   Q.    Is this a record of a visit she
17 had July 27, 1999 --
18   A.    Yes.
19   Q.    -- with Mr. Davis?
20   A.    Yes.
21   Q.    And what medication does
22 Mr. Davis have Ms. Livesay on at this time?
23 Under Recommendation.
24   A.    Serzone.
25   Q.    What dosage of Serzone is she on?

256

1    A.    100 in the morning and 200 at
2 night.
3    Q.    I am going to skip records of the
4 visit September 7, 1999 and November 13, 1999.
5 Did you see records for those visits?
6    A.    Yes.
7    Q.    And let's jump to February 29,
8 2000.
9    A.    Okay.
10   Q.    That is Bates numbered Page 49.
11   A.    Yes.
12   Q.    What medication does Mr. Davis
13 have Ms. Livesay on at this time?
14   A.    Serzone 400.
15   Q.    So he is continuing with his
16 medication regimen?
17   A.    Yes.
18   Q.    Let's skip forward now past her
19 May 25, 2000 visit to the August 17, 2000
20 visit on Page 47.
21   A.    Okay.
22   Q.    Do you see that?
23   A.    Yes.
24   Q.    So do you have before you the
25 record of the August 17, 2000 visit?

257

1    A.    Yes.
2    Q.    Under the third paragraph for
3 Medical/Psychiatric Services, it reads,
4 "Overall she is doing well, but has more
5 problems now with sleep at night.  She has
6 difficulty sleeping, falling asleep and
7 nightmares when she does."
8          Did I read that correctly?
9    A.    Yes.
10   Q.    So she is continuing to have this
11 sleep problem?
12   A.    Yes.
13   Q.    "She continues on her Serzone 400
14 milligrams.  She also is on Elavil 100
15 milligrams prescribed by her medical doctor,
16 which she takes at bedtime as well."
17          Did I read that correctly?
18   A.    Yes.
19   Q.    What is Elavil?
20   A.    Elavil is a tricyclic
21 antidepressant that is sometimes used
22 off-label for sleep, but has potential for
23 severe cardiac problems and can be dangerous
24 in overdose.
25   Q.    And suggests that the Elavil was

258

1  prescribed for her by her medical doctor?
2  A.  Yes.
3  Q.  It doesn't actually say who that
4  medical doctor is, though?
5  A.  Correct.
6  Q.  Under Recommendation, does
7  Mr. Davis continue her on Serzone?
8  A.  Correct.  Yes.
9  Q.  400 milligrams?
10  A.  Yes.
11  Q.  And does he also add Klonopin at
12  this time?
13  A.  Yes.
14  Q.  Why does he add Klonopin?
15  A.  For sleep and anxiety.
16  Q.  So she is still having sleep and
17  anxiety problems?
18  A.  Yes.
19  Q.  You will see there are records
20  for September 2000 and November 2000.  Am I
21  correct?
22  A.  Yes.
23  Q.  We will skip those, though.
24  A.  Okay.
25  Q.  There is also a record for

259

1  January 25, 2001.  Is that correct?
2  A.  Yes.
3  Q.  And for April 5, 2001?
4  A.  Yes.
5  Q.  The April 5, 2001 record is at
6  Page 43.  Do you have that before you?
7  A.  Yes.
8  Q.  Is she reporting, Ms. Livesay
9  reporting, an increase in anxiety at this
10  time?
11  A.  Yes.
12  Q.  What medication is she on at this
13  time?
14  A.  Serzone and Klonopin.
15  Q.  And was she actually seen by
16  someone different now?
17  A.  She is being seen — yeah.  By a
18  new nurse practitioner.
19  Q.  And is that Jackie Harrison?
20  A.  Yes.
21  Q.  And is Jackie Harrison an
22  advanced registered nurse practitioner?
23  A.  Yes.
24  Q.  Let's go to the next record, Page
25  42.  Is Page 42 a record of the April 23, 2001

260

1  visit?
2  A.  Yes.
3  Q.  Is she back seeing Mr. Davis at
4  this time?
5  A.  Yes.  Apparently, Jackie just saw
6  her in lieu of Mr. Davis.
7  Q.  And what medication does
8  Mr. Davis prescribe for her at this time?
9  A.  Continue with the Serzone and
10  Klonopin.  It looks like the Serzone was
11  working good for her, but it had big problems
12  with liver issues.  I think that is why she
13  was taken off of it.
14  Q.  And there is another visit in
15  June 26, 2001.  Do you see that?
16  A.  Yes.
17  Q.  And then a visit in August 28,
18  2001.  Do you also see that?
19  A.  Yes.
20  Q.  If you look under Medical and
21  Psychiatric Services, her August 28, 2001
22  visit, the second paragraph states, "She feels
23  overall everything is going well with the
24  exception that she still has problems with
25  sleep and is feeling sleep deprived."

261

1  Did I read that correctly?
2  A.  Yes.
3  Q.  A little further down it also
4  states, "She also has had some accompanying
5  nightmares, and she feels overall the sleep
6  and the nightmares are due to just the stress
7  that has been going on with her ex-husband."
8  Did I read that?
9  A.  Yes.
10  Q.  So she is continuing to have
11  these sleep and nightmare problems?
12  A.  Yes.
13  Q.  In fact, she was placed on
14  Seroquel at this time?
15  A.  Yes.
16  Q.  And is this the first record we
17  have seen with her being prescribed Seroquel
18  at Directions for Mental Health?
19  A.  Yes.  August of 2001.
20  Q.  What does Mr. Davis say he is
21  placing her on Seroquel for and what dose?
22  A.  Sleep and anxiety at 25 to 50
23  milligrams at night.
24  Q.  This is, of course, an off-label
25  prescription of Seroquel?

(Pages 258 to 261)

262

1    A.    Yes.
2    Q.    Does Mr. Davis say he spoke to
3 her about the fact that it was off-label?
4    A.    Yes.
5    Q.    In fact, does it read, "The
6 expected benefits and possible side effects
7 and risks discussed with her to include the
8 fact that this will be an off-label
9 indication, but it should help with the above
10 symptoms."
11       Did I read that correctly?
12    A.    Yes.
13    Q.    So Mr. Davis actually discussed
14 with Ms. Livesay the fact that he was
15 prescribing Seroquel off-label?
16    A.    Yes.
17    Q.    And presumably she consented to
18 that?
19    A.    Yes.
20    Q.    If we turn to the next visit,
21 Page 39.  Is this a record of a visit October
22 9, 2001?
23    A.    Yes.
24    Q.    And with the beginning of the
25 second sentence, it reads, "She is continuing

263

1 on Serzone, Seroquel and Klonopin.  Last month
2 the Seroquel was new for the use of sleep and
3 anxiety.  She reports that the nightmares have
4 stopped, and her sleep is much better with the
5 medication.  She denies any problems with side
6 effects and is pleased with the results."
7       Did I read that correctly?
8    A.    Yes.
9    Q.    So is the Seroquel working for
10 her?
11    A.    Yes.
12    Q.    And it is helping?
13    A.    Yes.
14    Q.    Let's skip a couple of visits and
15 jump forward to September 12, 2002, which is
16 Page 35.  Do you have that in front of you?
17    A.    Yes.
18    Q.    We skipped a couple of visits in
19 the meantime, didn't we?
20    A.    Yes.
21    Q.    And on the third sentence under
22 Medical/Psychiatric Services reads, "She
23 continues on Seroquel, Serzone and Klonopin.
24 She states that unfortunately she was laid off
25 her job a month ago.  In that month she did

264

1 have increased anxiety, disturbed sleep and
2 some depressed moods, but was rehired recently
3 and starts her new job on Monday."
4       And does it go on to say, "She
5 still has some difficulties falling asleep."
6    A.    Yes.
7    Q.    Does it also say the Seroquel did
8 work well for her?
9    A.    Yes.
10    Q.    And did Mr. Davis increase her
11 dose of Seroquel at this time?
12    A.    Yes.  To 50 – 50 to 75
13 milligrams.
14    Q.    And that is a slight increase in
15 her Seroquel dosage?
16    A.    Yes.
17    Q.    And what was that to help with?
18    A.    Sleep.
19    Q.    Let's skip forward.  There is a
20 visit in December 5, 2002.  Do you see that?
21    A.    Yes.
22    Q.    After that there is a visit,
23 February 27, 2003.  Do you also see that?
24    A.    Yes.
25    Q.    In the February 27, 2003 visit,

265

1 does Ms. Livesay in the first paragraph report
2 that her medications are working well?
3    A.    Yes.
4    Q.    And that would include Seroquel?
5    A.    Yes.
6    Q.    And there is another visit in May
7 22, 2003.
8    A.    Yes.
9    Q.    And the visit in August 19, 2003?
10    A.    Yes.
11    Q.    And then the August 19, 2003
12 visit, does Ms. Livesay also say that Seroquel
13 and her medications are working well?
14    A.    Yes.
15    Q.    And then there is a visit
16 December 2, 2003.
17    A.    Yes.
18    Q.    And a visit in February 27, 2004.
19 Is that correct?
20    A.    Yes.
21    Q.    So Ms. Livesay is being seen
22 fairly regularly at Directions for Mental
23 Health at this time?
24    A.    Yes.
25    Q.    Is it important for patients with

266

1 mental illness to be seen regularly?
2   A.   Yes.
3   Q.   At the bottom of Page 29, the
4 February 24, 2004 record, it states that
5 Ms. Livesay is to follow up in three months or
6 sooner if necessary?
7   A.   Yes.
8   Q.   The next page I have is a blank
9 page. Is that what you have as well?
10   A.   Yes.
11   Q.   But then Page 27 is a record of a
12 visit of May 18, 2004. Is that correct?
13   A.   Yes.
14   Q.   So does that appear to be the
15 next three-month visit?
16   A.   Yes.
17   Q.   And does it say that she is
18 taking Seroquel, Klonopin and Serzone with
19 good effects and no complaints of side
20 effects?
21   A.   Yes.
22   Q.   And is she still on Seroquel at
23 50 to 75 milligrams?
24   A.   Yes.
25   Q.   And she is still on Klonopin at

267

1 this time?
2   A.   Yes.
3   Q.   And the entire time you treated
4 Ms. Livesay and that she was being treated by
5 Mr. Davis here, it appears she was on several
6 medications for her mental illness?
7   A.   Yes.
8   Q.   And there is another visit in
9 August 2004. Do you see that?
10   A.   Yes.
11   Q.   And then in November 10, 2004,
12 there is a handwritten note of a visit. Do
13 you see that?
14   A.   Yes.
15   Q.   And under Notes do I read
16 correctly in the November 10, 2004 visit that
17 she is on Serzone, Seroquel and Klonopin and
18 is doing well?
19   A.   Yes.
20   Q.   And this would have been based on
21 reports from the patient?
22   A.   Yes.
23   Q.   And then we will skip the visit
24 that is February 15, 2005. Do you see that
25 visit?

268

1   A.   Yes.
2   Q.   And turn to the visit May 10,
3 2005 on Page 23. Do you see that?
4   A.   Yes.
5   Q.   And is she still on Serzone and
6 Seroquel at this time?
7   A.   Yes.
8   Q.   The note states, "She is
9 currently on Serzone and Seroquel, although
10 out of Seroquel lately. Has not taken
11 Klonopin in two months. Lately more stress."
12         Did I read that correctly?
13   A.   Yes.
14   Q.   Has she self-changed her
15 medications at this point?
16   A.   Yes.
17   Q.   Does the note also go on to say
18 she reports poor sleep?
19   A.   Yes.
20   Q.   And that her moods are somewhat
21 depressed?
22   A.   Yes.
23   Q.   So did Mr. Davis increase her
24 Seroquel medication at this time?
25   A.   Yes. To 100 milligrams at night.

269

1   Q.   And is this the last visit that
2 you can see in the chart, May 10, 2005, before
3 you saw Ms. Livesay on February 17, 2006?
4   A.   Yes. Let me make sure. Yes.
5   Q.   So she went a period of almost --
6 or some nine months without seeing you guys at
7 Directions for Mental Health?
8   A.   Correct.
9       (Off the record.)
10 BY MR. GADDES:
11   Q.   Back on the record. We talked --
12 at different points in time, we talked about
13 lab results and including glucose readings
14 today. Do you recall that?
15   A.   Yes.
16   Q.   And I believe you said that the
17 standard of care was you monitored those,
18 generally monitored the lab results for
19 glucose?
20   A.   Yes.
21   Q.   And that is something you did for
22 Ms. Livesay as well?
23   A.   Yes. But we don't have the
24 records in here.
25   MR. GADDES:

270

1    It remains for me to say, I thank
2 you very much, Ms. Keene, for coming in. I
3 know it has been a long day so far in
4 answering my questions. I hope that it has
5 been a tolerable day. I will pass you at this
6 point to Mr. Bruzzese, and I reserve any
7 questions for rebuttal.
8    Jim?
9 BY MR. BRUZZESE:
10   Q.    Okay. Ms. Keene, I am Jim
11 Bruzzese again. I am here again before you
12 today. I have even fewer questions to follow
13 up for you with.
14   I will bring your attention to
15 Page 7 of your chart. This is a visit counsel
16 asked you about in which you began to decrease
17 the Seroquel in Ms. Livesay's regimen.
18   A.    Okay.
19   Q.    And you added Trazodone.
20   A.    Yes.
21   Q.    I think you said you added
22 Trazodone for the sleep issues that
23 Ms. Livesay was having. Correct?
24   A.    Correct.
25   Q.    You are taking her -- you are

271

1 decreasing the Seroquel. I think it says in
2 here that you are decreasing the Seroquel
3 because she states that the weight gain is
4 intolerable. It adds to her back pain when
5 she has the weight. Right?
6    A.    Right.
7    Q.    She had gained a considerable
8 amount of weight by this visit. Correct?
9    A.    Right.
10   Q.    And so you were tapering -- you
11 are coming down off the Seroquel and adding
12 Trazodone for the sleep. But my question is
13 what are you now giving her for her bipolar
14 condition?
15   A.    She is still on Seroquel.
16   Q.    And you are reducing that?
17   A.    Correct.
18   Q.    Are you reducing it to
19 discontinue it?
20   A.    Ideally, not. I think eventually
21 that happens.
22   Q.    On this visit in April of 2007,
23 you decreased it to 500 milligrams for four
24 days, then 400 milligrams for eight days.
25 Then to 300 milligrams. Correct?

272

1    A.    Correct. She is supposed to stay
2 at 300 milligrams.
3    Q.    Then on Page 6, which is May of
4 2007, you decreased her again to 200
5 milligrams?
6    A.    Hang on. Okay. Correct.
7    Q.    You added the Trazodone, and then
8 on this visit you are increasing the
9 Trazodone?
10   A.    Correct.
11   Q.    She still carries a diagnosis of
12 the bipolar disorder. Correct?
13   A.    Rule out bipolar disorder.
14   Q.    On May of 2007 --
15   A.    Yes.
16   Q.    That is still there on the
17 diagnosis assessment?
18   A.    Uh-uh.
19   Q.    Then on Page 5, which is August
20 2007, you have discontinued the Seroquel?
21   A.    I think she discontinued the
22 Seroquel, or her primary care discontinued --
23 hang on. Let me go back. He stopped the
24 Serzone. I am not clear whether or not he had
25 stopped the Serzone, Seroquel and Trazodone.

273

1 It seems to me like she had just come back on
2 Zoloft alone. Yeah. Actually, she says she
3 was on Zoloft alone. So he stopped all that.
4    Q.    Well, Seroquel was a prescription
5 that you were writing. Correct?
6    A.    Correct.
7    Q.    And so now you have discontinued
8 writing it. Correct?
9    A.    Correct.
10   Q.    And at this visit in August 2007
11 now, have you completely ruled out bipolar?
12   A.    It looks like I am thinking more
13 of a personality component than that based on
14 this. But I am not exactly sure if that is
15 the case or not. This is my last note, so --
16   Q.    Tell me why it would be in the
17 visit in May and not in August, what would
18 have happened between there that you would
19 have left that out of the chart?
20   A.    If it remains a rule-out
21 diagnosis, that means I am thinking that that
22 is probably the case. But that means I
23 haven't, like, confirmed.
24   Q.    Is it fair to say by August 2,
25 2007, you have made up your mind and

274

1  determined that it is not bipolar?
2  MR. GADDES:
3       Object to form.
4  THE WITNESS:
5       Based on the note I left that out
6  and -- so according to the note, it would be
7  fair to say that. I am not sure that I was
8  convinced of that.
9  BY MR. BRUZZESE:
10  Q.    We talked earlier today that
11  basically you are relying upon your notes as
12  to what is actually -- more than what your
13  memory today is of August 2007?
14  A.    Yes.
15  MR. GADDES:
16       Object to form.
17  THE WITNESS:
18       I don't remember back to August
19  2007. And at this point, I am saying rule out
20  cluster B traits. I am basically saying -- I
21  am thinking she is borderline personality
22  disorder, which in a lot of people's minds is
23  a variant of bipolar disorder.
24  BY MR. BRUZZESE:
25  Q.    Do you recall how much weight she

275

1  gained while she was on Seroquel? When I say
2  "she," I mean Ms. Livesay.
3  A.    **Without the flow sheet, I don't**
4  **have the exact -- her pre-Seroquel weight. I**
5  **know she lost 20 pounds when she got off of**
6  **it, though.**
7  Q.    That is on Page 6. Right?
8  A.    Yes.
9  Q.    And there was also a notation
10  there about her fasting blood glucose level.
11  Do you see that?
12  A.    On Page 6?
13  Q.    Yes. The very last line under
14  Subjective, "Her labs came back with normal
15  liver enzymes and elevated FBG," fasting blood
16  glucose?
17  A.    Yes.
18  Q.    And cholesterol.
19  A.    Yes.
20  Q.    So at this point she has elevated
21  fasting blood glucose, and that is a concern
22  to you with this patient?
23  A.    Yes.
24  Q.    Is that part of the reason why
25  you would have taken her off the Seroquel?

276

1  A.    It looks like it is part of the
2  reason I was decreasing it. Yeah. And
3  because of her -- the weight gain, her pain,
4  her chronic pain. At this point I think her
5  care is really confusing, because she is on a
6  lot of pain medicine, which I think is kind of
7  confusing the picture to me.
8       I think I am concerned, too,
9  about respiratory. I think one of my concerns
10  is respiratory depression. With Seroquel, it
11  is not like an opiate. But it certainly
12  causes sleepiness. She is on three opiates,
13  benzodiazapine, Imitrex. I was concerned
14  about her being on too many antidepressants.
15  Q.    She was originally prescribed
16  Seroquel as a sleep aid anyhow. Correct?
17  MR. GADDES:
18       Object to form and foundation.
19  BY MR. BRUZZESE:
20  Q.    Look at Page 40 of your chart.
21  Are you there?
22  A.    No. Okay.
23  Q.    I have to correct myself. I said
24  it was a sleep aid. It says here under
25  Recommendation, "She will start now on

277

1  Seroquel 25 to 50 milligrams for sleep and
2  anxiety." Correct?
3  A.    Yes.
4  Q.    So she was never prescribed
5  Seroquel initially for bipolar or any kind of
6  psychosis or schizophrenia. Correct?
7  MR. GADDES:
8       Object to form.
9  THE WITNESS:
10       The initial prescription. No.
11  Was not --
12  BY MR. BRUZZESE:
13  Q.    This was off-label. Is that
14  right?
15  A.    Yes. Initially, it was
16  prescribed off-label.
17  Q.    In fact, it was always prescribed
18  off-label. Wasn't that correct?
19  MR. GADDES:
20       Object to form.
21  BY MR. BRUZZESE:
22  Q.    Was she ever diagnosed with
23  bipolar.
24  A.    She was diagnosed as rule out.
25  It was not a confirmed diagnosis. It was

**(Pages 274 to 277)**

278

1  certainly what it was presenting as.
2      Q.    Make it clear to us now.  Did you
3  ever diagnose her with bipolar mania or any
4  kind of bipolar condition?
5      A.    I diagnosed — no.  I never gave
6  a clear, absolute diagnosis of bipolar.  But
7  when you are ruling something out, you have to
8  treat what you are seeing.  When somebody
9  comes in psychotic, you have to treat the
10  psychosis before you decide what is causing
11  it.
12      Q.    Fair enough.  But you actually
13  deleted the rule-out concern in the last
14  record.  So you never did diagnose her with
15  bipolar mania.  Correct?
16      MR. GADDES:
17          Object to form.
18      THE WITNESS:
19          Not bipolar mania.
20  BY MR. BRUZZESE:
21      Q.    Any kind of bipolar condition?
22      A.    Which —
23      Q.    Are you saying today that you did
24  diagnose her with borderline bipolar?
25      A.    No.  Borderline personality is

279

1  what I was leaning towards in the last note,
2  which is different than bipolar.  A lot of
3  people see it as the same, as a variant of
4  bipolar.
5      Q.    So there was never a Seroquel
6  prescription that was, as indicated by
7  AstraZeneca or the -- I am sorry.
8          There was never a Seroquel
9  prescription for Ms. Livesay that was
10  on-label.  Correct?
11      MR. GADDES:
12          Object to form.
13      THE WITNESS:
14          When you are ruling something
15  out, it is considered on-label.  I am pretty
16  sure.  I could be wrong, but --
17  BY MR. BRUZZESE:
18      Q.    But I think we have gotten this
19  on record.  I am not sure.  Let's be clear.
20  Did you ever diagnose Ms. Livesay with bipolar
21  condition?
22      A.    Ultimately, according to this
23  last note, I took that off, and I am not
24  exactly sure what my thinking was on that day.
25  But apparently, I took off the rule-out for

280

1  some reason.
2      Q.    Actually, I want to get yes or no
3  on the answer.  Did you ever diagnose
4  Ms. Livesay with bipolar condition?
5      A.    No.  Not a firm diagnosis.
6      Q.    Your first visit with Ms. Livesay
7  is Page 15 to 18.
8      A.    Yes.
9      Q.    When you saw Ms. Livesay this
10  first time, she was on Seroquel at that time.
11  Correct?
12      A.    Yes.
13      Q.    And you continued the Seroquel
14  prescription.  Correct?
15      A.    Excuse me.  I am sorry.  Let me
16  just double-check my -- yes.
17      Q.    Were you continuing the
18  prescription for the same reasons that the
19  previous medical provider had prescribed it?
20      A.    Because she -- and because she
21  stated that it was helping her with her sleep,
22  anxiety.  And let me double-check my note
23  before I say anything that I don't mean to
24  say.  Yeah.  Yeah.
25          Because she was taking the

281

1  Seroquel and the Lexapro and had been doing
2  well with it, but I chose not to do the
3  Klonopin and the Serzone because of the side
4  effects.  Or not to resume them at the time.
5      Q.    Ms. Keene, if Ms. Livesay had
6  carried a diagnosis of bipolar condition or
7  schizophrenia or something that would be
8  on-label prescription for Seroquel, certainly
9  for a need of an atypical antipsychotic, would
10  you have looked to a different atypical to
11  prescribe for her?
12      A.    No.
13      MR. GADDES:
14          Object to form.
15      THE WITNESS:
16          Treat the symptoms.  Her symptoms
17  were anxiety and sleep problems and racing
18  thoughts.
19  BY MR. BRUZZESE:
20      Q.    Was it your conclusion that in
21  weighing the risks versus benefits of
22  continuing the Seroquel prescription for
23  Ms. Livesay, that the risks of continuing to
24  harm her blood glucose condition were
25  outweighed by the benefits that an atypical

**282**

1  antipsychotic would give to a patient that
2  needed it for sleep and anxiety?
3      A.    Yes.  But I am not exactly sure
4  that is why it was discontinued, though.  I
5  mean, I think a lot more of it had to do with
6  her being on so many opiates at the time.
7  That I was not able to fully assess what was
8  going on accurately towards the end of my
9  treatment.
10     Q.    Did you communicate with her
11  healthcare provider about discontinuing the
12  Seroquel, that was treating her for her
13  diabetic condition?
14     A.    No.  Not verbally.  You mean did
15  I talk to him about stopping it?
16     Q.    Yes.
17     A.    No.
18     Q.    But it was your decision to
19  discontinue the Seroquel?
20     MR. GADDES:
21          Object to the form.
22  BY MR. BRUZZESE:
23     Q.    Is that correct?
24     A.    I think it was just not resumed,
25  if I am not mistaken.  Let me go back.  No.

**283**

1  They stopped it.
2      Q.    Who is "they"?
3      A.    Her primary care physician,
4  Dr. Kazuba.  He stopped the Serzone.  Placed
5  her on Zoloft.  And she apparently at the end
6  of that note said that at this time, she is
7  happy with Zoloft alone.  So she was off of
8  it.
9      Q.    Did you have conversations with
10  Ms. Livesay about her weight gain?
11     A.    Yes.
12     Q.    And what was the nature of those
13  conversations?
14     A.    Well, certainly that I was
15  expressing to her it was causing more problems
16  for her back and her pain.  And so that was
17  the reason that we started tapering it back in
18  May.
19     Q.    Tapering the Seroquel?
20     A.    Tapering the Seroquel.  Yeah.
21     Q.    So her weight gain was a factor
22  in the risk/benefit analysis that you
23  conducted on continuing to stay off of the
24  Seroquel?
25     A.    To decreasing the Seroquel.

**284**

1      Q.    And then once it was stopped by
2  her medical provider, you did not renew it
3  again.  Correct?
4      MR. GADDES:
5          Object to the form.
6      THE WITNESS:
7          Yeah.  This last visit.  Well,
8  yes.  It was mainly based on her self-report
9  that she was doing good with the Zoloft alone.
10  Yes.
11  BY MR. BRUZZESE:
12     Q.    Is the same true of the elevated
13  blood glucose level?
14     MR. GADDES:
15          Same objection.
16     MR. BRUZZESE:
17          Is that a concern?
18     MR. GADDES:
19          Object to form.
20     THE WITNESS:
21          Yes.  It is a concern.  It is
22  always a concern.
23     MR. BRUZZESE:
24          That is it.  We are done.  Thank
25  you very much for your time.

**285**

1  BY MR. GADDES:
2      Q.    Ms. Keene, back again.  Take a
3  sip of water.  We are so close now.  We will
4  let you out of here so you can enjoy your
5  weekend.  Let's wrap up the best we can, a few
6  questions.
7          There was some questions by
8  counsel about weight gain.  We discussed that
9  a little bit.  I think as we discussed, you
10  don't know what her weight history was before
11  she came to Directions of Mental Health?
12     A.    Correct.
13     Q.    You also don't know what her
14  weight is now?
15     A.    Correct.  Not without the flow
16  sheet that we keep.
17     Q.    And it has been -- her last visit
18  I think we looked at was August 2007?
19     A.    Correct.
20     Q.    She has been off Seroquel for
21  quite a while now?
22     A.    Correct.
23     Q.    And you don't know what her
24  weight is now?
25     A.    No.

286

1  Q.  Also, it is fair to say there are
2  a number of things that can cause weight gain.
3  Is that correct?
4  **A.  Correct.**
5  Q.  In fact, other medications, as we
6  discussed, can cause weight gain.
7  **A.  Correct.**
8  Q.  Does a sedentary life-style cause
9  weight gain?
10  **A.  Yes.**
11  Q.  Ms. Livesay, does she lead a
12  sedentary life-style?
13  **A.  Yes.**
14  Q.  And she was on a number of
15  different medications?
16  **A.  Yes.**
17  Q.  And counsel asked you some
18  questions about Page 5 of the records.  It is
19  the last visit, August 2, 2007.  So if you
20  could turn to that just very briefly.
21  **A.  Yes.**
22  Q.  You have a statement under your
23  diagnosis here.  "Rule out cluster B traits."
24  I think you wanted to explain to us what that
25  means.

288

1  Q.  Now, when you have a diagnosis as
2  a medical professional of rule out bipolar
3  disorder, that is a significant diagnosis,
4  isn't it?
5  **A.  Yes.**
6  Q.  And a diagnosis of rule out
7  anything is important to a medical
8  professional?
9  **A.  Yes.**
10  Q.  Why is that important?
11  **A.  Because you have to address the**
12  **symptoms that are in front of you, and you**
13  **need to be addressing it correctly or you can**
14  **miss the big picture and have adverse**
15  **consequences.**
16  Q.  So you don't ignore the rule-out
17  diagnosis and hope for the best?
18  **A.  No.**
19  Q.  Now, on this record, August 2,
20  2007 again, Ms. Livesay was placed on Zoloft
21  by her primary care physician.  Is that right?
22  **A.  Yes.**
23  Q.  There was a statement I wanted to
24  read.  It says in the middle of the Subjective
25  Evaluation, "She consistently seems confused

287

1  **A.  Well, at this point it is —**
2  **obviously, I am struggling with the diagnosis,**
3  **with a firm diagnosis about her.  She clearly**
4  **has a lot of mood swings and a lot of unstable**
5  **character traits.  Based on the way that she**
6  **splits providers and going on and off meds,**
7  **idealizing one med and devaluing another one.**
8  **That sounds to me like a borderline**
9  **personality disorder which is under cluster B**
10  **traits.**
11  **Types of personality disorders,**
12  **we put them under different clusters.  And**
13  **cluster B is similar to — cluster B**
14  **encompasses borderline.  Borderline is thought**
15  **to be a variant of bipolar.  It is not going**
16  **to be something that you have in your**
17  **textbook, but that is kind of what is thought**
18  **in the field.**
19  Q.  And that is something based on
20  your experience?
21  **A.  Yes.**
22  Q.  Counsel asked you several
23  questions about the diagnosis, rule out
24  bipolar disorder.  Do you recall that?
25  **A.  Yes.**

289

1  about medication versus splitting providers in
2  that regard.  She is on multiple opiates and
3  benzos from pain management and reports that
4  they are now considering chlorohydrate for
5  sleep.  I advised her to check with her doctor
6  about the safety of these medications in
7  combination, as we have discussed at length
8  the risks of these in terms of respiratory
9  depression."
10  Did I read that correctly?
11  **A.  Yes.**
12  Q.  So she is on a lot of medicines
13  at this point?
14  **A.  Yes.**
15  Q.  And there are medicines being
16  provided by different prescribers?
17  **A.  Yes.**
18  Q.  And that is a concern to you?
19  **A.  Yes.**
20  Q.  And that is a concern you had
21  throughout her records?
22  **A.  Yes.**
23  Q.  One last question.  If you turn
24  to the previous page, Page 6 of the visit, May
25  10, 2007.  You have a record of the labs, lab

**(Pages 286 to 289)**

**290**

1  results here. Do you see that?
2   A.   Yes.
3   Q.   And does Ms. Livesay also have
4  high cholesterol?
5   A.   Yes.
6   Q.   Is high cholesterol a concern?
7   A.   Yes.
8   Q.   Why is high cholesterol a
9  concern?
10  A.   **Because it can cause coronary**
11  **artery disease.**
12  Q.   Again, is that something you
13  would leave to her primary care physician to
14  treat?
15  A.   Yes.
16  MR. GADDES:
17      Ms. Keene, I don't have any
18  further questions other than to say thank you
19  very much for coming in today, and it has been
20  a long day.
21      (Off the record.)
22  MR. ELLISON:
23      We need a statement. I will do
24  the honors. Ms. Keene, both lawyers are done.
25  All lawyers are done.

**292**

1      We will call that a waiver.
2  MR. BRUZZESE:
3      What was the last part?
4  THE WITNESS:
5      As long as you don't sue me.
6  MR. ELLISON:
7      And you were joking when you said
8  that, weren't you, Ms. Keene?
9  THE WITNESS:
10      Yes.
11  MR. ELLISON:
12      That is because we have spent a
13  long time together today. Is that right?
14  THE WITNESS:
15      Yes.
16  MR. ELLISON:
17      All counsel agree it is a waiver?
18  MR. GADDES:
19      Yes.
20  MR. BRUZZESE:
21      Yes.
22  MR. ELLISON:
23      We are done. Thank you.
24  (Whereupon, the taking of the testimony of the
25  witness was concluded.)

**291**

1      Pursuant to Federal Rule of Civil
2  Procedure 30 (E), you have 30 days from the
3  date that you receive the transcript to review
4  it and make any changes that you have to it,
5  whether they be transcription or otherwise,
6  and return the transcript to us.
7      Or you can waive that right. We
8  just need a statement on the record whether
9  you intend to exercise it or whether you
10  intend to waive it. Do you know what I mean?
11  THE WITNESS:
12      What are the consequences if I --
13  MR. ELLISON:
14      Nothing. You have the right to
15  get the transcript, take a look at it, review
16  it, determine if it is consistent with what
17  you meant to say. And then get it back to us.
18  Or you can say, trust the court reporter.
19  Take the transcript. Leave me alone. It is
20  up to you.
21  THE WITNESS:
22      Trust the court reporter. Take
23  the transcript -- leave the transcript. As
24  long as you don't sue me.
25  MR. ELLISON:

**293**

1      REPORTER'S CERTIFICATE
2
3
4      I, RUBY M. WALLEN, Certified Court
5  Reporter, do hereby certify that the
6  above-named witness, after having been first
7  duly sworn by me to testify to the truth, did
8  testify as hereinabove set forth;
9      That the testimony was reported by me
10  in shorthand and transcribed under my personal
11  direction and supervision, and is a true and
12  correct transcript, to the best of my ability
13  and understanding;
14      That I am not of counsel, not related
15  to counsel or the parties hereto, and not in
16  any way interested in the outcome of this
17  matter.
18
19
20
21
22  RUBY M. WALLEN
   CERTIFIED COURT REPORTER
   CSR NO. 78022
23
24
25