# EXHIBIT 5

1

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

IN RE:  Seroquel Products Liability Litigation

MDL DOCKET NO. 1769

This Document Relates to:

Haller v. AstraZeneca, LP, et al
[David Haller 6:07-cv-15733]

Miami, Florida

July 15, 2008

10:05 o'clock a.m.

- - - - - - - - -

VIDEOTAPED DEPOSITION

OF

DAVID HALLER

- - - - - - - - -

JOB NO: 944396
Reported By:
Ellen J. Fehr, RPR
Notary Public, State of Florida
Esquire Deposition Services
Fort Lauderdale Office
Phone 954-331-4400

**2**

1   APPEARANCES:
2
    BAILEY, PERRIN, BAILEY, LLP
3   By:  ROBERT BARRINGER, ESQUIRE,
    440 Louisiana Street, Suite 2100
4   Houston, Texas  77002
    Appearing on behalf of the Plaintiff.
5
6
7   FAEGRE & BENSON, LLP
    BY:  STEVEN J. ELLISON, ESQUIRE,
8   2200 Wells Fargo Center
    90 South Seventh Street
9   Minneapolis, Minnesota  55402-3901
    612.766.1600
10  e-mail: sellison@faegre.com
    Appearing on behalf of the Defendant.
11
12  VIDEOGRAPHER:  Robert Pacheco
13
14
15
16
17
18
19
20
21
22
23
24
25

**3**

1                   I-N-D-E-X
2   WITNESS:                    PAGE:
3   DAVID HALLER
4   DIRECT EXAMINATION BY MR. ELLISON        4
5
6
7              E-X-H-I-B-I-T-S
8   EXHIBIT          FOR IDENTIFICATION
9   MDL HALLERD 6:07-15733
10
       1               77
11
       2               92
12
       3               99
13
       4               122
14
15
16
17
18
19
20
21
22
23
24
25

**4**

1              - - - - - -
2         Videotaped Deposition of DAVID HALLER, a
3   witness of lawful age, taken by the Defendant, for the
4   purpose of discovery and for use as evidence in the
5   above-entitled cause, wherein IN RE:  Seroquel Products
6   Liability Litigation, and This Document Relates to:
7   David Haller v. AstraZeneca, LP, et al. [David Haller
8   6:07-cv-15733], pending in the UNITED STATES DISTRICT
9   COURT, MIDDLE DISTRICT OF FLORIDA, ORLANDO DIVISION,
10  pursuant to notice heretofore filed, before ELLEN FEHR,
11  a Notary Public in and for the State of Florida at
12  Large, at Carlton Fields, P.A., 4000 International
13  Place, 100 Southeast Second Street, Miami, Dade County,
14  Florida, 33131-2114, on the 15th day of July 2008,
15  commencing at 10:05 o'clock a.m.
16             - - - - - -
17
18
19
20
21
22
23
24
25

**5**

1   Thereupon:
2       MR. BARRINGER:  I'm Robert Barringer here for
3   the plaintiff on behalf of the Bailey, Perrin &
4   Bailey firm.
5       MR. ELLISON:  Steven Ellison of Faegre &
6   Benson in Minneapolis representing AstraZeneca.
7       Will you swear the witness, please.
8   Thereupon:
9              DAVID HALLER
10      a witness named in the notice heretofore
11  filed, being a witness of lawful age, and being first
12  duly sworn in the above cause, testified under oath as
13  follows:
14            DIRECT EXAMINATION
15  BY MR. ELLISON:
16      Q   And you are David Duane Haller?
17      A   Yes, I am.
18  REDACTED
19
20
21
22
23
24
25

2 (Pages 2 to 5)

**6**

BY MR. ELLISON:

1
2  Q   Is that the same address —
3  A   I moved — I moved there on the 3rd.
4  Q   You moved on the 3rd —
5  A   Yes.
6  Q   — of July?
7  A   Yes.
8  Q   How far away is your new address from where
9  you were living when I took your deposition earlier this
10  year?
11  A   About a mile or two down the road.
12  Q   Are you living in an apartment?
13  A   I'm living in a duplex.
14  Q   Are you living with anyone?
15  A   Yes.
16  Q   With whom?
17  A   My roommate's name is Doris McCullough.
18  Q   Could you repeat that, please?
19  A   Doris McCullough, M-c-C-U-L-L-O-U-G-H.
20  Q   Is that Doris, D-O-R-I-S?
21  A   Yes.
22  Q   I take it Doris McCullough is a female?
23  A   Yes.
24  Q   And you have been living with Doris McCullough
25  since July 3rd —

**7**

1  A   Yes.
2  Q   — of this year?
3  A   Yes.
4  Q   Does anyone else reside in that duplex?
5  A   No.
6  Q   Now, as I understand what a duplex is, there's
7  two different living compartments in one building.  Is
8  that your understanding?
9  A   No, mine is different than that.
10  Q   What is your understanding?
11  A   I have a living room, open kitchen, two
12  bedrooms and a bathroom.
13  Q   Does someone else have those —
14  A   No.
15  Q   All right.  So you live in one - a one living
16  quarter house, a house that's intended for one group of
17  people, and there isn't a separate living quarters —
18  A   No.
19  Q   — for another, is that correct?
20  A   That's correct.
21  Q   And Doris shares your living space, is that
22  correct?
23  A   That's correct.
24  Q   Does anyone else live there?
25  A   No.

**8**

1  Q   Is anyone else staying there?
2  A   No.
3  Q   How did it come to pass that you met
4  Ms. McCullough?
5  A   Well, Doris McCullough used to live - live in
6  the park where I lived, and we were friends and we
7  decided to get a place for ourselves.
8  Q   How long have you known Doris McCullough?
9  A   About six months.
10  Q   And you met her in the trailer park —
11  A   Right.
12  Q   — where you used to live, is that correct?
13  A   Yes.
14  Q   Does Ms. McCullough work?
15  A   She's on disability.
16  Q   Do you know what the disability is?
17  A   I do not.
18  Q   You are unable to tell from looking at her
19  what the disability is?
20  A   Well, she has osteoporosis, but I don't know
21  if that's her reason to be on disability.  I don't know.
22  Q   I missed what you said.
23  A   I said she - she has osteoporosis, but I do
24  not know if that's her disability or not.
25  Q   How old is she?

**9**

1  A   She's 45.
2  Q   Do you know whether she worked before she went
3  on disability?
4  A   Yes.
5  Q   In what capacity?
6  A   She did waitress work in restaurants.
7  Q   She was a waitress —
8  A   Yes.
9  Q   — for restaurants?
10       Do you know where?
11  A   No, I don't.
12  Q   Do you know whether she has any medical
13  training?
14  A   Not as I know of.
15  Q   Do you know whether she has any legal
16  training?
17  A   Not as I know of.
18  Q   Have you talked with her about your lawsuit?
19  A   Not much.
20  Q   What have you told her?
21  A   Actually, I haven't told her anything, really.
22  Q   Well, you said not much.
23  A   Well, that's -- I told her I have a lawsuit,
24  but the basis of that, I didn't talk about.
25  Q   Did you tell her against whom you have this

3 (Pages 6 to 9)

10

1  lawsuit?
2    A   Well, I told her it was a - a very large
3  pharmaceutical company is what I told her.
4    Q   Did you tell her what the name is?
5    A   No, I did not.
6    Q   Have you had more than one discussion with
7  Ms. McCullough about your lawsuit?
8    A   No.
9    Q   Have you had any conversations with
10  Ms. McCullough about your deposition, either this one
11  today or the previous one we took?
12    A   No.
13    Q   You understand that the reason we're taking
14  your deposition today is because since your last
15  deposition, we have acquired many more medical records
16  that we didn't have before, do you understand that?
17    A   Yes.
18    Q   Do you have an intimate relationship with
19  Ms. McCullough?
20    A   No, I do not.
21    Q   Just friends?
22    A   Yes.
23    Q   And you have a stable relationship with her?
24    A   I believe so.
25    Q   You've only known her for six months though,

11

1  is that correct?
2    A   That's correct.
3    Q   Do you have any long-term stable relationships
4  at this point in time?
5    A   At this time I do not.
6    Q   You're still married, correct?
7    A   Correct.
8    Q   And Ms. McCullough is not your wife, correct?
9    A   That's correct.
10    Q   And your wife's name is?
11    A   Nardia Jakovenko.
12    Q   We spoke a little about her at the last
13  deposition, do you recall that?
14    A   Uh-huh.
15    Q   Yes?
16    A   Yes.
17    Q   You understand I need you, like the last time,
18  to answer out loud because the court reporter at your
19  right is transcribing everything that we're saying
20  today, you understand that?
21    A   I do.
22    Q   Does she still have the injunction against
23  you?
24    A   Yes.
25    Q   I take it no divorce petition has been filed

12

1  by either of you, is that correct?
2    A   That's correct.
3    Q   Do you understand what the basis of that
4  injunction is?
5    A   I don't - I can't recall what the injunction
6  is, it's been so long that I don't participate with her
7  anymore.  I just follow the court orders and stay away
8  from her.
9    Q   So you have no idea as to why --
10    A   No, I do not.
11    Q   -- there is an injunction against you?
12    A   I don't - I don't recall anything.
13    Q   You said that you follow the court orders.
14  What does the court order require --
15    A   I - I'm -- I'm allowed --
16    Q   Excuse me.  You have to allow me to finish the
17  question.  Again, our court reporter's taking everything
18  down and we both need to make her life easy, okay?
19    A   Okay.
20    Q   Do you understand what you have been ordered
21  not to do?
22    A   Yes.
23    Q   What's that?
24    A   Have no contact whatsoever.
25    Q   Are you supposed to maintain a distance away

13

1  from her?
2    A   Yes.
3    Q   How far?
4    A   I'm not sure.
5    Q   How can you follow the court order if you
6  don't know what it is?
7    A   Because I live in one area and she lives in
8  another, so I don't talk to her, I don't call her or
9  nothing.
10    Q   Where does she live?
11    A   She lives in Clearwater.
12    Q   Clearwater, Florida, is that correct?
13    A   Yes.
14    Q   What's her phone number?
15    A   I have no number.
16  REDACTED
17
18
19
20
21
22    Q   And that's in Clearwater, Florida?  Okay.
23      Do you recall threatening her?
24    A   I do not.
25    Q   You don't recall threatening to kill her?

4 (Pages 10 to 13)

14

```
1    A  No, I do not.
2    Q  Do you recall ever beating her?
3    A  I do not -- I do not.
4    Q  Did you ever?
5    A  No.
6    Q  You don't recall every laying a hand on her?
7    A  I do not.
8    Q  Do you recall being abusive to her in any way?
9    A  I do not.
10   Q  You don't recall saying anything inappropriate
11   to her?
12   A  I do not.
13   Q  And you don't recall threatening to kill her?
14   A  I do not.
15   Q  If the records reflect that that is the basis
16   of the injunction, would you have reason to dispute
17   them?
18   A  I would not.
19   Q  How far away is Dunedin from where we are, and
20   you understand we're in Miami today?
21   A  It's about at least four or five hours, I
22   believe.
23   Q  By what?
24   A  By - by car.
25   Q  How did you get here?
```

15

```
1    A  I - I arrived here by Greyhound Bus.
2    Q  You took a Greyhound Bus to get here today?
3    A  Uh-huh.
4    Q  Yes?
5    A  Yes.
6    Q  Did you pay for that yourself?
7    A  No, I did not.
8    Q  Who paid for that?
9    A  My law - attorney from the law firm.
10   Q  Do you know the name of the attorney?
11   A  I do not.
12   Q  Do you know where that law firm is located?
13   A  I believe it's in Houston, Texas.
14   Q  Do you know if it was the gentleman sitting at
15   your left --
16   A  I do not.
17   Q  -- Mr. Barringer?
18      Do you know how much the fare was?
19   A  I do not.
20   Q  How do you intend to get home?
21   A  Greyhound.
22   Q  What time does your bus leave?
23   A  Well, it says on the ticket 3:05.
24   Q  That's this afternoon?
25   A  Yes.
```

16

```
1    Q  So you won't be spending the night here in
2    Dune - in Miami, correct?
3    A  That's correct.
4    Q  I note that you brought a bag with you.  Do
5    you have any of your medications in that bag?
6    A  I do.
7    Q  Which medications do you have in your bag?
8    A  I have them all.
9    Q  Will you identify -- And those are the
10   medications that you're currently taking?
11   A  Yes.
12   Q  You don't have the Risperdal Consta in your
13   bag, correct?
14   A  No, I do not.
15   Q  And that's administered by injection, is that
16   correct?
17   A  Correct.
18   Q  At Directions, is that correct?
19   A  That's correct.
20   Q  Directions is where you go for your mental
21   health care?
22   A  That's correct.
23   Q  Do you know who the person you see at
24   Directions is today?
25   A  I see - I see -- I see a nurse practitioner.
```

17

```
1    Q  Her name is?
2    A  Julia Stanphill.
3    Q  That's S-T-A-N-P-H-I-L-L, correct?
4    A  Correct.
5    Q  And you've been seeing her since you stopped
6    seeing Nicole Keene in the Fall of 2007, is that
7    correct?
8    A  That's correct.
9    Q  And your last visit with Nicole Keene was on
10   November - was in November of 2007, correct?
11   A  I don't - I don't remember.
12   Q  You understand I took her deposition?
13   A  I do not.
14   Q  Have you seen her deposition transcript?
15   A  I have not.
16   Q  Have you looked at your own deposition
17   transcript?
18   A  Some of it.
19   Q  When did you look at it?
20   A  I don't recall.  I have - I have it at home.
21   Q  Did you look at it to prepare for your
22   deposition today?
23   A  I did not.
24   Q  And you don't remember how long ago it was
25   when you looked at it?
```

18

1   A   No, I do not.
2   Q   What were you looking for?
3   A   I wasn't looking for anything really.
4   Q   You just flipped through it?
5   A   Yeah.
6   Q   Why?
7   A   I was just curious.
8   Q   About what?
9   A   What was said and what was written and so on
10  and so forth.
11  Q   If the record reflects that you last saw
12  Nicole Keene on November 20th, 2007, would you have
13  reason to dispute that?
14  A   I would not.
15  Q   All right.  The record I'm referring to, it's
16  Bates numbered Directions for Mental Health Updated Meds
17  21, and we'll be talking a little more about that later.
18      What medications do you have in your bag?
19  A   I have my Reglin.
20      MR. BARRINGER:  I want to --
21  BY MR. ELLISON:
22  Q   Will you pull them out and set them in front
23  of you on the table?
24      MR. BARRINGER:  Let's -- I want to go off the
25  record for a moment before we do any of that.  I

19

1   want to make sure that he doesn't have anything
2   attorney-client privileged in there.
3       MR. ELLISON:  His medications are all I've
4   asked for.
5       MR. BARRINGER:  I know, but I don't want him
6   to bring out anything else.
7       MR. ELLISON:  I'm sitting opposite the table
8   from him, I can't see anything else.
9   BY MR. ELLISON:
10  Q   You understand that I've only asked for your
11  medications, correct?
12  A   Uh-huh.  Yes.
13  Q   You understand that?
14  A   Yes.
15  Q   And I am not asking for and I do not want you
16  to bring out any communication that your lawyer has
17  given you that contains legal advice, okay?
18  A   Okay.
19  Q   Do you understand that?
20  A   Yes.
21      MR. ELLISON:  Can we proceed, counsel?
22      MR. BARRINGER:  We can.
23  BY MR. ELLISON:
24  Q   All right.  Will you please pull out your
25  medications.

20

1       MR. ELLISON:  Let the record reflect that he
2   has set a black satchel on the table and is
3   unzipping it, and has removed in what appears to be
4   a grocery bag, a bag full of medications.
5       MR. BARRINGER:  Objection, form.
6       MR. ELLISON:  What's wrong with the form?
7       MR. BARRINGER:  Your characterization as a
8   baggage full.  It does not appear to be a baggy
9   full.
10      MR. ELLISON:  Well, we can count them.
11  BY MR. ELLISON:
12  Q   Have you removed all of your medications from
13  the bag?
14  A   Uh-huh.
15  Q   Yes?
16  A   Yes.
17  Q   And how many are there on the table?
18  A   Ten of them.
19      MR. ELLISON:  And we'll quibble about whether
20  that constitutes a full bag or not, counsel?
21      MR. BARRINGER:  Yes.
22  BY MR. ELLISON:
23  Q   All right.  Ten different medications,
24  correct?
25  A   Correct.

21

1   Q   And you take those medications every single
2   day, is that correct?
3   A   That's correct.
4   Q   And you need to take those medications in
5   order to stay healthy, correct?
6   A   Correct.
7   Q   And that includes mental health medications,
8   correct?
9   A   Correct.
10  Q   Separate and apart from the Risperdal
11  injections that you get, is that correct?
12  A   Correct.
13  Q   You understand Risperdal carries a risk of
14  diabetes, correct?
15  A   I am.
16  Q   And you've known that since you first started
17  taking Risperdal, isn't that correct?
18  A   That's incorrect.
19  Q   When did you first learn?
20  A   When I first read about it from the pharmacy.
21  Q   Okay.
22  A   I was curious.
23  Q   So if Dr. Keene - or Nicole Keene testified at
24  her deposition that she had multiple conversations with
25  you in which she explained the risk of diabetes,

6 (Pages 18 to 21)

22

1    hyperglycemia and weight gain in association with
2    Risperdal, you would dispute that, correct?
3        A   I would.
4        Q   And if her medical records reflect that you
5    had multiple conversations with her in which she
6    explained to you the risk of hyperglycemia, weight gain
7    and diabetes in association with the use of Risperdal,
8    you would disagree?
9        A   Yes.
10       Q   And if I asked you those same questions in
11   relation to Seroquel, again you would disagree?
12       A   Yes.
13       Q   And if she had those - explained those risks
14   to you, and you told her, and her records reflect and
15   she testified that you told her you wanted to stay on
16   your Risperdal and you wanted to stay on your Seroquel,
17   you would say that she was lying, is that correct?
18       A   I would.
19       Q   Let's go through the medications that you take
20   today.  Pick up a bottle and tell me what's on it.
21       A   Well, I can't pronounce this one here.
22       Q   Will you pass it to me?
23       MR. ELLISON:  Let the record reflect he's
24   handing me a bottle of medication.
25

23

1    BY MR. ELLISON:
2        Q   Metoprolol, did I read that right?
3        A   I guess.  I can't pronounce it.
4        Q   Okay.  According to this label, you take it
5    once - one tablet by mouth twice per today, is that your
6    understanding?
7        A   That's correct.
8        Q   This was prescribed by Dr. Mona Bacha, is that
9    correct?
10       A   That's correct.
11       Q   And when did you last fill this prescription,
12   do you know?
13       A   I don't recall.
14       Q   If the record says this was dispensed on
15   July 7th, 2008, would you have a reason to dispute it?
16       A   I would.
17       Q   I'm saying if it says on the bottle that it
18   was dispensed on July 7th, 2008, you would dispute that?
19       A   I would because I've been taking it for so
20   long.
21       Q   If the - it says the orig -- At least on the
22   face of the bottle, it says that the original
23   prescription was on April 7th, 2008, okay?
24       A   Okay.
25       Q   Does that sound like when you first started

24

1    it?
2        A   I've been on it a long time, so I can't tell
3    when I last went on it.
4        Q   Okay.  But if the bottle says that you got the
5    doses that are in here, and I'm shaking it and it's
6    rattling, and it appears to me to be full, recognizing
7    that counsel quibbles with my definition of the word, it
8    says on the bottle that it was dispensed July 7th, 2008,
9    and that would be not the prescription but the pills
10   that are in this bottle.  Do you understand the
11   difference?
12       A   Yes.
13       Q   You wouldn't dispute that --
14       A   No.
15       Q   -- correct?
16       A   No.
17       Q   That is correct?
18       A   That's correct.
19       Q   Okay.  And you obtained this prescription at
20   Medicine Shoppe in Dunedin, Florida, is that correct?
21       A   That's correct.
22       Q   What do you take Meto, M-E-T-O-P-R-O-L-O-L,
23   for?
24       A   That's for blood pressure.
25       Q   You have high blood pressure, isn't that

25

1    correct?
2        A   That's correct.
3        Q   For as long as you remember, isn't that right?
4        A   Correct.
5        Q   Do you know what your most recent blood
6    pressure --
7        A   I do not.
8        Q   Will you pass me another bottle, please?
9            And this is "Amlodipidine."  Excuse me,
10   Amlodipine, if I'm pronouncing it right.  It's
11   A-M-L-O-D-I-P-I-N-E, correct?
12       A   Correct.
13       Q   What do you take this for?
14       A   That's also for blood pressure.
15       Q   And this was prescribed by Dr. Mona Bacha,
16   correct?
17       A   Correct.
18       Q   Dispensed at The Medicine Shoppe pharmacy in
19   Dunedin, Florida, on July 10th, 2008, correct?
20       A   Correct.
21       Q   And you take one tablet of this medication by
22   mouth per day, is that correct?
23       A   Correct.
24       Q   You do -- You follow your doctor's
25   instructions about the medicines you take, correct?

26

1    A   Yes.
2    Q   Your doctor says you take one pill per day,
3  you only take one pill per day?
4    A   Correct.
5    Q   I forgot to ask you, apart from the deposition
6  transcript, did you look at anything to prepare for your
7  deposition today?
8    A   No, I did not.
9    Q   I'm going to ask the question carefully so I
10  want you to listen to it.  I am not asking you about
11  whether you met or talked with your lawyers to prepare
12  for your deposition today, you understand that?
13    A   I understand.
14    Q   Did you talk to anyone other than your lawyers
15  to prepare for your deposition today?
16    A   I did not.
17    Q   Did you talk to your mom?
18    A   No, I did not.
19    Q   That's Gosselin Haller, correct?
20    A   Yes.
21    Q   She lives around Pittsburgh, Pennsylvania,
22  correct?
23    A   That's correct.
24    Q   Have you told anyone that you're taking -
25  being deposed today?

27

1    A   I told Doris, my roommate.  My mom knows.
2    Q   How does your mom know?
3    A   Well, when I was talking to my attorney, they
4  were going to depose my mom, as well.  I don't know
5  when.
6    Q   And that's why you think your mom knows that
7  you are being deposed today?
8    A   Yes.
9    Q   Did you look at any of your medical records?
10    A   I did not.
11    Q   Did you look at any of your medications to
12  prepare for today?
13    A   I did not.
14    Q   Did you talk to any of your health care
15  providers?
16    A   I did not.
17    Q   Now, I'm going to ask you about conversations
18  that you had with your lawyers in meeting with your
19  lawyers.
20      Now, I want to make sure you understand that I
21  don't want to know what the content, in other words,
22  what was talked about between you and your lawyers,
23  okay?
24    A   Okay.
25    Q   Did you talk to your lawyers in connection

28

1  with your deposition?
2    A   I did not.
3    Q   You just met with Mr. Barringer this morning,
4  a few minutes before the deposition?
5    A   I - I -- I had a phone call notifying me where
6  the deposition was going to be taken and what time and
7  so on and so forth.
8    Q   Again, I don't want to know anything about the
9  contents, but you were told to come for a deposition, is
10  that correct?
11    A   That's correct.
12    Q   Was there a second conversation where someone
13  talked with you about how you were going to get here?
14    A   Yes.
15    Q   Okay.  Was that a lawyer, or was it someone
16  else?
17    A   That - that was my lawyer.
18    Q   Okay.  And then there was a third discussion
19  this morning that you had with Mr. Barringer, is that
20  correct?
21    A   That's correct.
22    Q   Were there any other discussions about your
23  deposition?
24    A   No.
25    Q   Okay.  Let's come back to the medications

29

1  you're taking.  Will you hand me the third bottle,
2  please.
3      I'd like you to hold this up in front of the
4  camera, this third bottle of medication.  Will you hold
5  that.  And what medication is that?
6    A   That's Seroquel.
7    Q   Seroquel, correct?
8    A   Correct.
9    Q   The medication that my client provided,
10  correct?
11    A   Correct.
12    Q   Will you hand me that bottle?
13      This says take one tablet by mouth at bedtime,
14  correct?
15    A   Correct.
16    Q   And this was dispensed by The Medicine Shoppe
17  pharmacy on June 25th, 2008, correct?
18    A   Correct.
19    Q   And it originally was prescribed in the
20  beginning of June, 2008, correct?
21    A   Correct.
22    Q   You've been - and have been on Seroquel for
23  many years, correct?
24    A   Correct.
25    Q   It says Dr. Zenel, James Zenel, Z-E-N-E-L,

8 (Pages 26 to 29)

30

1  prescribed this to you, is that correct?
2      A  Well, he didn't personally, my nurse
3  practitioner did.
4      Q  Julie Stanphill did, correct?
5      A  Correct.
6      Q  And there are 30 tabs in this original
7  prescription, correct?
8      A  Yes.
9      Q  And these are 100-milligram tablets, correct?
10     A  Correct.
11     Q  And you took this medicine last night before
12 you went to bed, correct?
13     A  Correct.
14     Q  And you're going to take it again tonight --
15     A  Correct.
16     Q  -- before you go to bed, isn't that correct?
17     A  Correct.
18     Q  100 milligrams of Seroquel, correct?
19     A  Correct.
20     Q  And that's even though you claim that Seroquel
21 caused you to get diabetes, correct?
22     A  Correct.
23     Q  You're using this very medicine today even
24 though you think it hurts you in terms of causing or
25 contributing to your diabetes, correct?

31

1      A  Correct.
2      Q  Why?
3      A  I am now being told that I need to be weaned
4  off the medication.  So after taking it so long, I've
5  been on such large doses, they don't want to stop it and
6  have - have any complications of getting off the
7  medication.
8      Q  They are afraid that you're - you're going to
9  become more unstable if you stop the Seroquel, correct?
10     A  No.
11     Q  If Nicole Keene wrote that down in her medical
12 records that they are afraid of decompensation, in other
13 words, that you might become homicidal or suicidal, you
14 would dispute that?
15     A  Yes.
16     Q  But you'll leave it to your doctors as to why
17 they decided or they agreed to pull you off Seroquel,
18 correct?
19     A  Correct.
20     Q  This is refillable, isn't that correct?
21     A  Correct.
22     Q  You said they were weaning you off Seroquel,
23 correct?
24     A  Correct.
25     Q  The we being your health care providers?  Am I

.32

1  right?
2      A  Correct.
3      Q  You started being weaned off Seroquel, as you
4  put it, in November of last year, isn't that correct?
5      A  Correct.
6      Q  How many months ago was that?
7      A  Eight months.
8      Q  And you've got another refill on this, isn't
9  that correct?
10     A  Correct.
11     Q  They're - they're taking about a year to wean
12 you off Seroquel, isn't that right?
13     A  About right.
14     Q  Do you think that's the usual period of time
15 to get someone off Seroquel?
16     A  No, but I - I will say that I see my doctor
17 appointment once a month or every two months.
18     Q  And you think that the reason they're weaning
19 you off Seroquel this slowly has nothing to do with your
20 mental health?
21     A  I don't know.
22     Q  But you still, even though you're being weaned
23 off Seroquel, will continue taking Risperdal injections,
24 isn't that correct?
25     A  Correct.

33

1      Q  And you will have those injections every two
2  weeks for as long as you can tell into the future,
3  correct?
4      A  Correct.
5      Q  For the rest of your life, isn't that right?
6      A  Correct.
7      Q  And the reason you take Seroquel and the
8  reason you take Risperdal is because these medications
9  stabilize you, isn't that correct?
10     A  Correct.
11     Q  And that's your bipolar disorder, is that
12 right?
13     A  Correct.
14     Q  Before -- I'll get to that in a minute.  I'm
15 going to set the Seroquel down behind those for now.
16     Q  You haven't been incarcerated since 2002,
17 correct?
18     A  Correct.
19     Q  You started taking Seroquel around that time,
20 correct?
21     A  In 2004.
22     Q  It's your testimony that you started Seroquel
23 in 2004?
24     A  Yes.
25     Q  If your prescription records show that you

9 (Pages 30 to 33)

34

1    started it earlier, would you have reason to dispute it?
2    A  No.
3    Q  Okay.  We'll just say since you started
4    Seroquel then, okay?  You have not been incarcerated
5    since you started Seroquel, correct?
6    A  Correct.
7    Q  You have not molested any children since you
8    started Seroquel, correct?
9    A  Correct.
10   Q  You have not masturbated in front of children
11   since you started Seroquel, is that correct?
12   A  Of course.
13   Q  You have not taken a two-by-four to anyone's
14   head, like you did your father when you were young,
15   since you started Seroquel, correct?
16   A  Correct.
17   Q  In fact, you've not acted overly aggressively
18   to anyone since you started Seroquel, isn't that
19   correct?
20   A  Correct.
21   Q  Your health care providers told you that
22   Seroquel was responsible for helping your mental state,
23   correct?
24   A  Correct.
25   Q  Let's go through your other medications.

35

1        Can you hand me the third bottle, please.
2        This is Rozerem, R-O-Z-E-R --
3    A  Rozerem.
4    Q  Rozerem, thank you.
5        Eight milligrams, isn't that correct?
6    A  Correct.
7    Q  And you were instructed by Dr. Mona Bacha to
8    take one tablet of Rozerem every day, is that correct?
9    A  Every night, yes.
10   Q  And what's that for?
11   A  Sleep.
12   Q  Why do you take sleep medication?
13   A  I - I - I -- I've contacted a lot of problems
14   sleeping and falling asleep and staying asleep.
15   Q  Do you have an understanding of whether a lack
16   of sleep can cause or contribute to mania?
17   A  I do not.
18   Q  No health care provider has ever told you that
19   one of the important management aspects of treating
20   bipolar disease is to help establish regular sleep
21   patterns?
22   A  I do not.
23   Q  When did you last see Dr. Bacha?
24   A  Sometime in May.
25   Q  Do you consider Dr. Bacha your primary doctor?

36

1    A  For medical, yes.
2    Q  For medical.  For the mental health it's
3    Directions, correct?
4    A  Correct.
5    Q  What type of doctor is Dr. Bacha?
6    A  Internal medicine.
7    Q  And you've been seeing Dr. Bacha for some
8    time?
9    A  Yes.
10   Q  That's B-A-C-H-A.
11       When do you expect you will see Dr. Bacha
12   again?
13   A  Sometime in August.
14   Q  Do you have an appointment set up?
15   A  Yes.
16   Q  When do you next go to Directions again?
17   A  Well, I - I -- I was supposed to go today but
18   doing the depositions, I couldn't go to Directions
19   today, so I have to make an appointment.
20   Q  How often do you go to Directions?
21   A  About every - every 90 days.
22   Q  You schedule your own appointments?
23   A  Well, no, I usually get a follow-up one after
24   I'm done with the first one.
25   Q  So when you're at the appointment, they will

37

1    schedule you for another appointment 90 days out, is
2    that correct?
3    A  Correct.
4    Q  Was there a time when you needed to be seen by
5    a mental care health provider more frequently than every
6    three months?
7    A  No.
8    Q  It's your testimony that you saw a physician
9    every three months and you didn't need to see them on a
10   more regular basis?
11   A  That's correct.
12   Q  Or -- Okay.
13       If the records reflect otherwise, you would
14   dispute them?
15   A  Yes.
16   Q  Do you think your memory is better than what
17   the records say?
18   A  No.
19   Q  You don't think your memory is more reliable
20   than the records, do you?
21   A  No.
22   Q  Then why would you dispute the records;
23   because you don't like what they say?
24   A  I've been -- I've been going to Directions
25   since 2000 and back in 1985 also, and I've always gone

10 (Pages 34 to 37)

**38**

1 every 90 days. I don't change and say, oh, I'm having a
2 problem and I run to Directions. Usually I - usually --
3    Q   You go to the hospital, right?
4    A   No.
5    Q   The emergency room, correct?
6    A   I rarely go to the emergency room for mental
7 health reasons.
8    Q   What about the time you cut your arms all up?
9    A   I did that in prison.
10    Q   You did that in prison?
11    A   Yes.
12    Q   Okay. You weren't at Directions then --
13    A   No.
14    Q   -- right?
15        And you couldn't go to Directions because you
16 were in prison?
17    A   Correct.
18    Q   Was that because -- Was that the - the felony
19 where you masturbated --
20    A   No, it was not.
21    Q   -- in front of the children?
22    A   Incorrect.
23    Q   Which one was it?
24    A   My stalking charge.
25    Q   Stalking. Who were you stalking?

**39**

1    A   I didn't actually stalk anybody, but I - I was
2 arrested for it.
3    Q   You pled guilty, right?
4    A   Yes.
5    Q   What did you plead guilty, to stalking whom?
6    A   My next door neighbor.
7    Q   Who is your next door neighbor?
8    A   Her name was Lisa Nucci.
9    Q   N-U-C-C-I?
10    A   Yeah.
11    Q   Yes?
12    A   Yes.
13    Q   What's her address?
14    A   I don't have it.
15    Q   What was her last address?
16    A   I do not know.
17    Q   Well, she was your neighbor. What was your
18 address then?
19    A   I don't - I don't recall that either.
20    Q   How long ago was this?
21    A   1997.
22    Q   1997. And you don't remember it?
23    A   No.
24    Q   How long did you serve in prison for that
25 stalking charge?

**40**

1    A   24 months.
2    Q   That's two years, correct?
3    A   Correct.
4    Q   And did you do that time?
5    A   Yes.
6    Q   Where did you serve that time?
7    A   I served part of it in Miami, some places in -
8 in Daytona.
9    Q   And you got moved around because your mental
10 health, isn't that right?
11    A   Correct.
12    Q   And you were threatening people, isn't that
13 correct?
14    A   Incorrect.
15    Q   If the records show otherwise, you wouldn't
16 have reason to dispute it?
17    A   No.
18    Q   That is correct?
19    A   That's correct.
20    Q   All right. Your arms are scarred from a
21 suicide attempt, correct?
22    A   Correct.
23    Q   And that attempt occurred prior to your using
24 Seroquel, isn't that right?
25    A   No.

**41**

1    Q   When did that suicide attempt that resulted in
2 the scarring --
3    A   It took place in 2001.
4    Q   You have to let me finish. Okay?
5        When did that suicide attempt take place?
6    A   It took place in incarceration during 2001.
7    Q   And you're absolutely certain it was in 2001,
8 correct?
9    A   Correct.
10    Q   Didn't you just say you thought you started
11 Seroquel in 2004?
12    A   Yeah, and I'm in 2001, so it's two years
13 difference, or three years difference.
14    Q   All right. So the suicide attempt - in which
15 you cut your arms with a razor blade, correct?
16    A   Correct.
17    Q   -- took place before you used Seroquel, isn't
18 that right?
19    A   That's correct.
20    Q   All right. Will you undo your shirt sleeves
21 so the video camera and the jury can see your arms,
22 please. And will you show --
23        Is the other arm scarred too?
24    A   No, it is not.
25    Q   All right. Will you show that up, please,

42

1  again. No, pull your sleeve up so that the entire
2  scaring -- And then rotate the arm.
3       Now, my memory is -- Actually, my sight says
4  that we've got about eight three-inch scars, and the one
5  on the top of your forearm looks like it's about half an
6  inch wide, is that right?
7       A    That's correct.
8       Q    And you -- Again, you took a razor blade to
9  your own arm, right?
10      A    That's correct.
11      Q    And that was in prison, correct?
12      A    Correct.
13      Q    You view that suicide attempt as an aspect of
14 your mental health condition, correct?
15      A    Correct.
16      Q    Part of your bipolar, isn't that right?
17      A    Part of it, yes.
18      Q    You had numerous suicide attempts over the
19 course of your life, isn't that correct?
20      A    I only had two.
21      Q    Do you recall telling a mental health care
22 provider when you were younger, that you tried to hang
23 yourself?
24      A    I do not.
25      Q    The second one that you're referring to or one

43

1  of the second ones resulted in you being hospitalized in
2  2005, isn't that correct?
3       A    Correct.
4       Q    You OD'd on pills, isn't that right?
5       A    Correct.
6       Q    And you viewed that suicide as an aspect of
7  your mental health disease, correct?
8       A    Correct.
9       Q    We've gone through four medications. Could
10 you hand me the fifth bottle, please.
11      And what is this medication that you handed
12 me? Do you need it again?
13      A    That's Artane.
14      Q    Artane?
15      A    Yes.
16      Q    A-R-T-A-N-E, correct?
17      A    Correct.
18      Q    What's this for?
19      A    Side effects.
20      Q    Side effects of what?
21      A    Of Risperdal and Seroquel.
22      Q    Side effects of Risperdal and Seroquel. What
23 side effects do you claim?
24      A    I get shaky.
25      Q    Shaky?

44

1       A    Yeah.
2       Q    What doctor told you that Seroquel and/or
3  Risperdal was responsible for you getting shaky?
4       A    Well, I never had that before, on any
5  medication I took before.
6       Q    Do you recall a doctor diagnosing you with
7  epilepsy when you were young?
8       A    No, I do not.
9       Q    Do you recall seeking Social Security
10 Disability?
11      A    Back in 1985, October.
12      Q    So you do recall 1985 October?
13      A    Yes.
14      Q    Do you recall telling the person who was
15 taking down the information for your claim that you had
16 epilepsy?
17      A    I do not.
18      Q    Have you ever been diagnosed with an organic
19 brain problem?
20      A    Not that I know of.
21      Q    If the records reflect that those were issues,
22 would you dispute them?
23      A    No.
24      Q    If I heard you right, you said that no doctor
25 has told you that either Risperdal or Seroquel was

45

1  responsible for your shaking, correct?
2       A    Correct.
3       Q    Why do you think they are?
4       A    Well, where else would they come from?  I
5  don't take - I don't take much Seroquel and Risperdal or
6  any type medications.  So all the other medications I
7  take are medical.
8       Q    Can you repeat that more slowly, please?
9       A    The medication I take today for mental health
10 is only two things, Risperdal and Seroquel. I don't
11 take no other drugs - any meds for my bipolar other than
12 those two.
13      Q    Why do you think it's those medications that
14 make you shake?
15      A    Because I didn't have them before.
16      Q    Before what?
17      A    Before I took on the Seroquel and Risperdal.
18      Q    When did you first start developing a shake?
19      A    I can't remember.
20      Q    If the records reflect that you had such a
21 tremor or a shake or they were concerned about
22 Parkinsonism in you many years before you started
23 Seroquel, would you have reason to dispute that?
24      A    No.
25      Q    So you really don't know why you take Artane,

| | 46 |
|---|---|
| 1 | correct? |
| 2 | A  I don't want the side effects from the |
| 3 | medication, that's all I know. |
| 4 | Q  Okay.  But you're not sure which medication, |
| 5 | correct? |
| 6 | A  I'm not. |
| 7 | Q  And no physician has told you which |
| 8 | medication, correct? |
| 9 | A  No, they have not. |
| 10 | Q  All right.  You take five milligrams of Artane |
| 11 | twice a day, isn't that correct? |
| 12 | A  Correct. |
| 13 | Q  This was prescribed by Dr. Zenel, is that |
| 14 | correct? |
| 15 | A  Zenel. |
| 16 | Q  Correct? |
| 17 | A  Correct. |
| 18 | Q  And that was dispensed in - on July 12th, |
| 19 | 2008, correct? |
| 20 | A  Correct. |
| 21 | Q  You got that one at Medicine Shoppe pharmacy |
| 22 | too, right? |
| 23 | A  Correct. |
| 24 | Q  Can you hand me the next medication. |
| 25 | You're handing me another bottle that has |

| | 47 |
|---|---|
| 1 | Medicine Shoppe on it, correct? |
| 2 | A  Correct. |
| 3 | Q  This is Vytorin, right? |
| 4 | A  Correct. |
| 5 | Q  And you were instructed by Dr. Bacha to take |
| 6 | one tablet per - by mouth per day, is that correct? |
| 7 | A  Correct. |
| 8 | Q  This was dispensed on July 7th, 2008, correct? |
| 9 | A  Correct. |
| 10 | Q  And you got this at Medicine Shoppe, correct? |
| 11 | A  All my medications come from Medicine Shoppe. |
| 12 | Q  The address is 938 Patricia Avenue, Dunedin, |
| 13 | Florida, 34698, correct? |
| 14 | A  Correct. |
| 15 | Q  And the phone number is (727) 733-0404, |
| 16 | correct? |
| 17 | A  Correct. |
| 18 | Q  What were you — What do you take Vytorin for? |
| 19 | A  Cholesterol. |
| 20 | Q  You have high cholesterol, correct? |
| 21 | A  Yes. |
| 22 | Q  You've had high cholesterol for as long as you |
| 23 | can remember, correct? |
| 24 | A  Yes. |
| 25 | Q  Do you recall what your latest cholesterol |

| | 48 |
|---|---|
| 1 | values are? |
| 2 | A  I do not. |
| 3 | Q  Do you have an idea of what they are? |
| 4 | A  I do not. |
| 5 | Q  Are you interested in what it is? |
| 6 | A  Well, right now I'm not because I'm doing -- |
| 7 | It's a lot better than what it was so -- |
| 8 | Q  It's a lot better than what it was? |
| 9 | A  Yeah. |
| 10 | Q  What do you mean by that? |
| 11 | A  Well, it's not as high or whatever now that I |
| 12 | do it, so it's doing - it's doing better than what it |
| 13 | was. |
| 14 | Q  Do you diet? |
| 15 | A  Yeah, lemon juice. |
| 16 | Q  What do you mean by that? |
| 17 | A  I drink lemon juice. |
| 18 | Q  Do you watch calories? |
| 19 | A  No. |
| 20 | Q  Your idea of diet is to drink lemon juice, is |
| 21 | that right? |
| 22 | A  Correct.  I lost - I lost 10 pounds already. |
| 23 | Q  Do you eat food? |
| 24 | A  Yes. |
| 25 | Q  What food do you eat? |

| | 49 |
|---|---|
| 1 | A  I'm - I'm  -- I'm not very picky. |
| 2 | Q  Have you changed your diet in any way apart |
| 3 | from drinking lemon juice? |
| 4 | A  No. |
| 5 | Q  When did you -- From when did you lose the |
| 6 | 10 pounds? |
| 7 | A  In the last month. |
| 8 | Q  So you're about 230 now? |
| 9 | A  No, 229. |
| 10 | Q  229, congratulations. |
| 11 | What did you have for dinner last night? |
| 12 | A  I had Arby's. |
| 13 | Q  What did you eat? |
| 14 | A  An Arby's beef and cheddar sandwich. |
| 15 | Q  Beef and cheddar sandwich? |
| 16 | A  Yes. |
| 17 | Q  Do you know what the calories are on that? |
| 18 | A  No. |
| 19 | Q  Did you have fries? |
| 20 | A  No. |
| 21 | Q  Shake? |
| 22 | A  No. |
| 23 | Q  Anything else with it? |
| 24 | A  A Diet Pepsi. |
| 25 | Q  What did you eat before that? |

13 (Pages 46 to 49)

50

1    A  I didn't eat anything.
2    Q  Did you have lunch?
3    A  No.
4    Q  Did you have breakfast?
5    A  No.
6    Q  You ate once a day?
7    A  I usually eat twice or three times a day.
8    Q  What did you eat this morning, if anything?
9    A  Nothing.
10   Q  Has any physician told you that Arby's beef
11   and cheddar might not be good for your diabetes?
12   A  They may have.
13   Q  But you've disregarded their instructions?
14   A  No.
15   Q  Correct?
16   A  I didn't disregard it. I just -- I had
17   something to eat for dinner so I had --
18   Q  You understood it, but you, nonetheless --
19   A  I was en route to Miami, Florida for
20   depositions here, and what else am I going to eat, say
21   oh, I'm not going to eat today at all and knowing good
22   and well I'm hungry?  Yes, I'm going to eat.  I'm not
23   going to deny myself food.
24   Q  My - my question was different, you understand
25   that?

51

1    A  Your question was you should not have had the
2    Arby's roast beef with cheddar.  Don't have anything and
3    your diabetes will be fine, or go ahead and eat the beef
4    and cheddar and have all kinds of medical complications
5    with diabetes or whatever.
6    Q  That wasn't my question at all, sir.
7    A  No, but it certainly - it certainly led to
8    that.
9       Don't eat the beef and cheddar because you
10   know what it could cause, the calories and all and so
11   forth.  My doctors don't tell me to cut my calories all
12   up and don't eat nothing.  I do have to eat.  I eat - I
13   eat just as much - about as regular as you do.
14   Q  Sir, I didn't ask a question.
15   A  Yeah, but you're telling me - you're trying to
16   tell me disregard, don't - don't - don't listen to the
17   doctors.  The doctor didn't tell me not to eat.
18      So if I'm - if I'm en route somewhere and all
19   I have to eat is something out of Arby's, then I'm going
20   to go to Arby's and eat.  Or if I go to Checkers, I'm
21   going to go to Checkers and get something to eat,
22   regardless of what it's supposed to be.  I'm not going
23   to deny myself food.
24   Q  You understand I asked a totally different
25   question?

52

1    A  But you sometimes, have you ever disregarded
2    your doctor's advice about your diabetes.  Well, my
3    doc - my doctor ain't going to - ain't going to be there
4    to feed me.
5    Q  Sir, have your physicians told you --
6    A  They have told me nothing, zero.
7    Q  You seem angry.
8    A  Yeah, because you're leading the questions
9    like I got all the medication I'm taking and if I don't
10   follow what the doctor tells me to do -- My doctors
11   don't tell me what to eat, they tell me to eat.
12   Q  Sir, I didn't go over the deposition ground
13   rules at the beginning of the day because you're
14   represented by counsel, who, no doubt, has explained the
15   rules to you, and I had taken your deposition in March
16   of this year, so I didn't think it was necessary.
17      But let's make sure then, notwithstanding
18   given the narrative you've just issued, that we - that
19   you understand the rules, okay?
20      You -- Fair enough?
21   A  Uh-huh.
22   Q  Yes?
23   A  Yes.
24   Q  You have to answer my questions audibly, you
25   understand that?

53

1    A  I do.
2    Q  And under the Federal Rules of Civil
3    Procedure, which are involved because you chose to file
4    a lawsuit, I am allowed to ask you questions, and you
5    must give me answers to the questions I ask, okay?
6    A  Okay.
7    Q  Please listen to my questions carefully, okay?
8    Will you do that?
9    A  I will.
10   Q  Let's try again.
11      Did your physicians tell you to stay away from
12   fast food because --
13   A  No, he did not.
14   Q  -- of your diabetes, correct?
15   A  No, he did not.
16   Q  Do you have an understanding of whether it's
17   healthier for you to stay away from fast food because of
18   your diabetes?
19   A  No, I do not.
20   Q  Did you receive any instruction about diabetes
21   and management of diabetes at any point in time from any
22   health care provider?
23   A  I did not.
24   Q  Is it Dr. Bacha that treats you for your
25   diabetes today?

14 (Pages 50 to 53)

54

1      A   She treats me for other things.
2      Q   Who treats you for diabetes?
3      A   Nobody.
4      Q   Why not?
5      A   I have no idea.
6      Q   Do you think you need treatment for your
7   diabetes?
8      A   I think -- I feel my diabetes is under
9   control.
10     Q   And you've done that with diet, correct?
11     A   Correct.
12     Q   And you also take walks, isn't that correct?
13     A   That's correct.
14     Q   Do you take your blood sugar every day?
15     A   No, I do not.
16     Q   For how long have you not been taking your
17  blood sugar?
18     A   About a month now.
19     Q   Did you take it beforehand?
20     A   Yes.
21     Q   Why have you not taken your blood sugar in a
22  month?
23     A   Well, my glucose machine that I have has a
24  battery and the battery went dead, so I don't have one.
25     Q   Have you talked with any physician about

55

1   getting a new battery?
2      A   I have not.
3      Q   Where can you get a battery?
4      A   I have no idea.
5      Q   Do you have that glucometer at home?
6      A   I do.
7      Q   Does your glucometer have a memory?
8      A   It doesn't work without the battery, so I
9   don't know what it has on it.
10     Q   Does it keep track of your blood glucose
11  levels?
12     A   It does.
13         MR. ELLISON:  Counsel, we'll make a formal
14  request to at least see what those readings are.
15     A   I don't have the machine anymore now, I - I -
16  I threw it away.
17  BY MR. ELLISON:
18     Q   You threw away the machine, sir?
19     A   With a dead battery, it ain't nothing to me,
20  and I don't know where to get a battery for it so I just
21  got rid of it.
22     Q   When did you first get it?
23     A   Oh, let's see.  Back in 2004 or 2005.
24     Q   Around the time you were diagnosed with
25  diabetes?

56

1      A   Yes.
2      Q   And you took your blood sugar on a daily
3   basis?
4      A   I did.
5      Q   Until about a month ago?
6      A   Yes.
7      Q   And how long ago did you throw away your
8   glucometer?
9      A   July the 3rd.
10     Q   Did anyone, at any point in time, tell you
11  that you needed to preserve evidence relating to your
12  diabetes?
13     A   No, they did not.
14     Q   Do you have an understanding of whether, when
15  you file a lawsuit, you have an obligation to keep
16  evidence?
17     A   I do not.
18     Q   And your glucometer would show what your blood
19  sugars were on a daily basis up until about a month ago,
20  correct?
21     A   Correct.
22     Q   But you threw that away?
23     A   I got rid of it.
24     Q   And the only reason you got rid of it was
25  because the battery was dead, correct?

57

1      A   Correct.
2      Q   You don't see your diabetes then as a problem
3   today, is that right?
4      A   As I -- I feel it's under control.
5      Q   Do you recall what your last blood sugar
6   reading was?
7      A   I do not.
8      Q   Do you recall having a discussion with Nicole
9   Keene in November of last year in which you told her
10  that your HB1AC was a 5 - in the 5 to 6 range?
11     A   I do not.
12     Q   Do you have an understanding of whether your
13  blood sugar is in the normal range?
14     A   I do not.
15     Q   But you believe it is because you don't - you
16  think it's under control, correct?
17     A   I do, correct.
18     Q   And it's so under control you don't see a
19  physician for it, is that right?
20     A   Correct.
21     Q   And today you don't have any diabetes-related
22  problems, correct?
23     A   I do not.
24     Q   That is correct?
25     A   That's correct.

15 (Pages 54 to 57)

58

1     Q   And that's been for about the past month,
2  isn't that correct?
3     A   Yes.
4     Q   Will you hand me the next bottle of
5  medication, please?
6         You're handing me a bottle of Prevacid,
7  correct?
8     A   Correct.
9     Q   30 milligrams, isn't that right?
10    A   Correct.
11    Q   One capsule daily by mouth, right?
12    A   Correct.
13    Q   And this is Dr. Bacha, is that correct?
14    A   Correct.
15    Q   Dispensed on July 7th, 2008?  Does that sound
16 right?
17    A   Correct.
18    Q   And that's for tummy problems?
19    A   Acid reflux.
20    Q   Acid reflux, thank you.
21        Does that trouble you every night?
22    A   I don't have a problem with it, but I do have
23 bits of heartburn and so on and so forth because the
24 acid reflux causes it.
25    Q   Can you explain to me what acid reflux is?

59

1     A   I can't - I can't -- I can't explain it to
2  people, no.
3     Q   Tell me what your understanding is.
4     A   I don't even know -- I don't even - don't
5  know.  All I know is that's what they give it to me for.
6  I'm diabetic so I got - I got -- I got a gastroparesis,
7  gastritis, as well.
8     Q   You said acid reflux, am I right?
9     A   And I don't know exactly what that is.
10    Q   Okay.  But you take the pill anyway, am I
11 right?
12    A   It helps.
13    Q   Because you rely on what your doctors tell
14 you?
15    A   Well, I don't have heartburn anymore.
16    Q   And you attribute that to the medicine,
17 correct?
18    A   Yes, I do.
19    Q   Has any doctor told you not to eat late at
20 night?
21    A   I don't eat late at night.
22    Q   When do you usually eat?
23    A   I eat about 5 o'clock in the evening.
24    Q   Okay.  Will you hand me the next bottle,
25 please?

60

1         Oh, by the way, you get the Prevacid at The
2  Medicine Shoppe, correct?
3     A   All the medications are from Medicine Shoppe.
4     Q   Right.  This is Reglin, is that correct?
5     A   Correct.
6     Q   What you've just handed me, which I believe is
7  the seventh medication, which was dispensed June 30th,
8  2008, is that correct?
9     A   Correct.
10    Q   Again prescribed by Dr. Bacha, is that right?
11    A   Correct.
12    Q   You take one tablet three times per today,
13 correct?
14    A   Correct.
15    Q   And these are 10-milligram tablets, is that
16 correct?
17    A   Correct.
18    Q   And you take this for the gastroparesis.
19    A   And nausea and so forth.
20    Q   Nausea, is that right?
21    A   Yes.
22    Q   That -- You sometimes get nauseous when you
23 eat, is that right?
24    A   Yes.
25    Q   Do you get nauseous if you don't eat?

61

1     A   No.
2     Q   There is a label on this Reglin that says:
3  Call your doctor immediately if you experience new or
4  worsening feelings of anxiety, sadness, depression,
5  restlessness or confusion, is that correct?
6     A   I don't know.
7     Q   You've never looked at the warning labels --
8     A   No.
9     Q   -- that are on the bottles?
10        This one also says -- Strike that.
11        Do you still drink alcohol?
12    A   I do not.
13    Q   When was the last time you drank alcohol?
14    A   1985.
15    Q   Okay.  Can you hand me the ninth bottle of
16 medication, please?
17        The medication you're handing me is called
18 Ecotrin, is that correct?
19    A   Correct.
20    Q   And this is a type of aspirin, am I right?
21    A   Yes.
22    Q   Is it your understanding that Ecotrin is by
23 prescription only?
24    A   That's not -- That's incorrect.
25    Q   Okay.  So you bought this over-the-counter --

62

1    A   Yes.
2    Q   -- is that correct?
3        How often do you take it?
4    A   One - one - once a day.
5    Q   Do you take this pursuant to your doctor's
6    instruction?
7    A   Yes.
8    Q   And why -- Which doctor?
9    A   Dr. Bacha.
10   Q   Is it pronounced Bacha?
11   A   Yeah.
12   Q   Thank you.
13       What's this for?
14   A   She wants me to take an aspirin regimen every
15   day because of my high cholesterol causes problems,
16   heart problems and so forth.
17       She wants to nip it at the bud before it gets
18   too far with the cholesterol, so I don't have any heart
19   attacks or any plaque going down the middle of my heart.
20   Q   So you take this because she thinks - your
21   doctor thinks you may be at risk for a heart attack?
22   A   Yeah, with by - with high cholesterol and all.
23   Q   Okay. So you understand that high cholesterol
24   can give rise to a risk of heart attacks?
25   A   Excuse me?

63

1    Q   High cholesterol can cause heart attacks, is
2    that --
3    A   That is what I was told.
4    Q   And that's your understanding?
5    A   Yes.
6    Q   All right. Can you hand me the tenth bottle
7    of medication. That one is empty, am I right?
8    A   This is empty.
9    Q   Can you hand it back to me, please, or hand to
10   it me, I should say.
11       This is a bottle of Artane, am I right?
12   A   Uh-huh.
13   Q   Yes?
14   A   Yes.
15   Q   This one says that it was dispensed in --
16   A   That was never - that was never filled for a
17   long time. It's an empty bottle.
18   Q   In April of 2006, isn't that right?
19   A   Correct.
20   Q   So this is simply an empty bottle, is that
21   right?
22   A   Yes.
23   Q   We already talked about the Artane that you
24   take every day, is that correct?
25   A   Right.

64

1    Q   I'm going to hand that back to you. I'm going
2    to hand actually all your medications back to you, and
3    I'm going to leave the Seroquel right up there, okay.
4        Now, you recall me asking some questions about
5    the labeling of these?
6    A   Uh-huh, yes.
7    Q   You see that there are - and let the record
8    reflect that I'm physically showing Mr. Haller - three
9    warning labels on the side of this.
10   A   Okay.
11   Q   Do you see that?
12   A   Yes.
13   Q   And have you ever read those before?
14   A   Yes.
15   Q   When did you read them?
16   A   The first time I get them.
17   Q   So, do you do that every time you get the
18   medication?
19   A   Yes.
20   Q   Now, when you go to Medicine Shoppe, they also
21   give you a pamphlet, a brochure, correct?
22   A   I don't get those.
23   Q   How is your medicine dispensed?
24   A   It's dispensed by Medicine Shoppe but I only
25   get one thing that says what the medication was used

65

1    for, what - the warnings and so on and so forth.
2    Q   Do you read that?
3    A   I - I -- I do read it, but I don't get one
4    every time I go to The Medicine Shoppe to get my
5    medication. They give it to me one time.
6    Q   Okay. So you got one of those for Seroquel?
7    A   Uh-huh.
8    Q   Yes?
9    A   Yes.
10   Q   What did you do with that?
11   A   I don't know what I did with it.
12   Q   Do you still have it?
13   A   I don't know if I do or not.
14   Q   Have you looked for it?
15   A   No.
16   Q   Has anyone at any point in time told you to go
17   back and look at your house or your home and see if you
18   have any information --
19   A   No, they did not.
20   Q   -- relevant to this lawsuit?
21   A   I do not.
22   Q   At no point in time?
23   A   No.
24       MR. ELLISON:  Counsel, we'll talk about this
25   later, okay?

17 (Pages 62 to 65)

|  | 66 |
|---|---|
| 1 | Let the record reflect that my colleague is |
| 2 | nodding. |
| 3 | MR. BARRINGER: Yeah, we'll talk about it. |
| 4 | BY MR. ELLISON: |
| 5 | Q   Are you taking, apart from the Risperdal, any |
| 6 | other medications beyond those that we talked about so |
| 7 | far? |
| 8 | A   I'm not. |
| 9 | Q   You have every intention tonight, when you get |
| 10 | home, to open that bottle of Seroquel, pull out one of |
| 11 | those 100-milligram tablets, put it in your mouth and |
| 12 | swallow it, isn't that correct? |
| 13 | A   Yes. |
| 14 | Q   Do you believe that your mental health |
| 15 | condition today is good? |
| 16 | A   Yes. |
| 17 | Q   And do you attribute that to your mental |
| 18 | health medications, correct? |
| 19 | A   And - and awareness. |
| 20 | Q   You have learned more about bipolar disorder, |
| 21 | correct? |
| 22 | A   Yes. |
| 23 | Q   Do you seek counseling today? |
| 24 | A   No, I do not. |
| 25 | Q   When was the last time, if ever, that you've |

|  | 67 |
|---|---|
| 1 | had counseling? |
| 2 | A   It's been a long time. |
| 3 | Q   But the folks at Directions provide some type |
| 4 | of counseling, correct? |
| 5 | A   Yes. |
| 6 | Q   And they allow you to ask questions if you |
| 7 | have questions, correct? |
| 8 | A   Yes. |
| 9 | Q   And they have taught you, over the years that |
| 10 | you've been going there, a lot about your disease, isn't |
| 11 | that correct? |
| 12 | A   That's correct. |
| 13 | Q   You understand how important it is to maintain |
| 14 | your medications, correct? |
| 15 | A   Correct. |
| 16 | Q   And that's important because it controls the |
| 17 | symptoms of your disease, isn't that right? |
| 18 | A   Correct. |
| 19 | Q   And you follow your doctor's instructions -- |
| 20 | A   I do. |
| 21 | Q   -- correct? |
| 22 | Do you agree that it's easier for you to |
| 23 | follow your doctor's instructions when you're taking |
| 24 | your mental health medications? |
| 25 | A   Yes. |

|  | 68 |
|---|---|
| 1 | Q   Do you like yourself better when you're taking |
| 2 | your medications? |
| 3 | A   Yes. |
| 4 | Q   What feelings go away when you're taking your |
| 5 | medications? |
| 6 | A   A little agitation. |
| 7 | Q   You're not as agitated, correct? |
| 8 | A   Correct. |
| 9 | Q   You don't feel violent, correct? |
| 10 | A   No. |
| 11 | Q   You do when you're not taking your |
| 12 | medications -- |
| 13 | A   Yes. |
| 14 | Q   -- is that correct? |
| 15 | And you've hurt people when you've not been |
| 16 | taking your medications -- |
| 17 | A   Yes. |
| 18 | Q   -- correct? |
| 19 | A   Correct. |
| 20 | Q   You've hurt some really bad, correct? |
| 21 | A   Yes. |
| 22 | Q   Do you recall attacking a police officer and |
| 23 | crushing his testicles? |
| 24 | A   No, I do not. |
| 25 | Q   If the records reflect that, would you have |

|  | 69 |
|---|---|
| 1 | reason to dispute that? |
| 2 | A   No. |
| 3 | Q   You would agree that that was the sort of |
| 4 | behavior you did before you took your mental health |
| 5 | medications, correct? |
| 6 | A   Correct. |
| 7 | Q   You've not done that since you've been on |
| 8 | Seroquel -- |
| 9 | A   No. |
| 10 | Q   -- and Risperdal, correct? |
| 11 | A   Correct. |
| 12 | Q   You also agree that before you were on |
| 13 | Seroquel and Risperdal, you used to expose yourself to |
| 14 | children, isn't that correct? |
| 15 | A   Right. |
| 16 | Q   You're accused of attempting to rape a woman, |
| 17 | isn't that correct? |
| 18 | A   Right. |
| 19 | Q   And you found a high school girl and followed |
| 20 | her and ended up exposing yourself to her too, isn't |
| 21 | that correct? |
| 22 | A   Correct. |
| 23 | Q   You've not done any of that since you've been |
| 24 | taking Seroquel -- |
| 25 | A   No. |

70

1   Q   -- correct?
2       That is correct?
3   A   Correct.
4   Q   Do you have a job?
5   A   No, I do not.
6   Q   You're on disability, is that correct?
7   A   Correct.
8   Q   That's because of your bipolar, isn't that
9   right?
10  A   I don't know why I'm - why I'm on.  It's been
11  so long, I don't remember.
12  Q   But if the --
13  A   I didn't know they went to bipolar then when I
14  filed for it.
15  Q   Will you repeat that, please?
16  A   I did not have -- I - I was not diagnosed
17  bipolar when I filed for disability.
18  Q   Let me broaden it then.  You understand you're
19  on disability because of your mental health condition,
20  correct?
21  A   It's incorrect, because I didn't file under
22  mental health.
23  Q   If you have no idea as to why you're on
24  disability --
25  A   I have no --

71

1   Q   Sir, you need to let me --
2   A   I was not even diagnosed bipolar until later,
3   later in 1987.  I filed for disability back in 1985.
4   Q   So if the disability report - Well, fair
5   enough.
6       Do you remember those questions about epilepsy
7   I asked you?
8   A   Yes.
9   Q   And you denied it?
10  A   Yes.
11  Q   Do you recall seeking disability on the basis
12  of epilepsy?
13  A   No, I do not.
14  Q   And mental retardation?
15  A   No, I do not.
16  Q   I'm going to show you a record, I won't mark
17  as an exhibit, just to refresh your memory.  It's dated
18  Bates number D Haller Social Security Disability
19  Norristown 161.
20      Do you see on the top, it says Disability
21  Report.  Okay.  I'm handing it to the witness.
22  A   Uh-huh, I see it.
23  Q   It does say Disability Report --
24  A   Yes.
25  Q   -- correct?

72

1   A   Yes.
2   Q   There's a big box in the middle, do you see
3   that?
4   A   I do.
5   Q   And it says Disability, Reason for Disability,
6   am I correct?
7   A   I don't see that.
8   Q   If you'll hand it back to me, I'll point.
9   Well, I highlighted it.
10      Do you see:  What - what is your disabling
11  condition.
12      Did I read that correctly?
13  A   Yes.
14  Q   Your name's right up above it, right?
15  A   Correct.
16  Q   And it says:  Mental retardation and epilepsy,
17  isn't that correct?
18  A   Yes.
19  Q   Does that refresh your memory as to why you
20  sought disability, sir?
21  A   I guess so.
22  Q   Does it refresh your memory as to whether
23  you've told someone you have epilepsy?
24  A   I never had any seizures, so I don't recall.
25  Q   You don't recall ever having seizures?

73

1   A   No.
2   Q   What about tremors?
3   A   No.
4   Q   I'm going to go now --
5       MR. ELLISON:  We've been going about an hour.
6   Do you want to take a break?
7       MR. BARRINGER:  No, let's go through.
8       MR. ELLISON:  I'm happy to proceed if you have
9   no objection, Mr. Haller.
10      THE WITNESS:  No objections.
11      MR. ELLISON:  You want to keep going?
12  BY MR. ELLISON:
13  Q   Do you recall me asking you some questions
14  about how your mental health problems manifested when
15  you were younger and prior to your being treated?
16  A   Yes.
17  Q   Okay.  Do you recall being admitted to the
18  Woodville State Hospital Adolescent Center from the
19  children's unit at St. Francis Hospital?
20  A   I do.
21  Q   And that would have been around April of 1977,
22  is that correct?
23  A   I believe so.
24  Q   How old were you then?
25  A   I was about 12.

19 (Pages 70 to 73)

74

1    Q   Have you seen any of the records from the
2    Woodville State Hospital?
3    A   No, I have not.
4    Q   Do you recall why you were there?
5    A   I do not.
6    Q   If it said -- If the record which is Bates
7    Numbered Norristown 119 shows that you were voluntarily
8    committed there, would you have reason to dispute that?
9    A   Yes.
10   Q   What would your basis for disputing it --
11   A   I'm sorry, I mean no.
12   Q   You would say no?  Okay.
13       Did you used to tease kids?
14   A   I don't recall.
15   Q   If the record so reflects, you wouldn't
16   dispute it?
17   A   No.
18   Q   Do you see that -- You don't know whether you
19   did that, is that right?
20   A   I do not.
21   Q   So you don't know whether that's an aspect of
22   your illness?
23   A   No, I do not.
24   Q   Do you recall threatening teachers, peers and
25   adults at the hospital?

75

1    A   I do not.
2    Q   If the record so reflects, would you dispute
3    it?
4    A   No.
5    Q   Do you recall being prescribed Mellaril?
6    A   Yes.
7    Q   What is Mellaril?
8    A   It's an antipsychotic.
9    Q   So in fact, you first started getting -- Was
10   that your first antipsychotic?
11   A   I believe not.
12   Q   All right.
13   A   I've been on Ritalin before.
14   Q   You've been on Ritalin before, is that
15   correct?
16   A   Excuse me?
17   Q   Let me rephrase the question.  You used the
18   term antipsychotic to describe Mellaril, am I right?
19   A   Correct.
20   Q   And then you told me you were on another
21   antipsychotic, which you called Ritalin, is that right?
22   A   Correct.
23   Q   You don't know whether Mellaril or Ritalin
24   are, in fact, antipsychotics, you were just taking them
25   for your mental health, correct?

76

1    A   Correct.
2    Q   Okay.  Do you know when you started Ritalin?
3    A   I do not.
4    Q   Do you recall how old you were when you
5    started Ritalin?
6    A   I do not.
7    Q   How old were you in 1977?
8    A   I was 16, I guess.
9    Q   Okay.
10   A   I'm just guessing.
11   Q   And you first -- Well, when were you born?
12   A   1961.
13   Q   '77, sounds like 16 to me, okay?
14   A   Yeah.
15   Q   We'll assume 16.
16       Why were you given Mellaril?
17   A   I don't know.
18   Q   But you understood it was for your mental
19   health?
20   A   Yes.
21   Q   Why do you remember Mellaril?
22   A   I don't know.
23   Q   Do you recall telling a health care provider
24   that Mellaril ruined your life?
25   A   I do not.

77

1    Q   Okay.  Do you recall being admitted on
2    October 21st, 1985, to the Morton Plant Hospital in
3    Clearwater, Florida?
4    A   I don't recall.
5        MR. ELLISON:  All right.  Well, let's see if
6    this record refreshes your memory a little bit.
7        The Bates number is DHaller Social Security
8    Disability Norristown 47.
9        I'm handing a copy to your counsel.  I'm going
10   to mark it as Exhibit 1.
11       (Thereupon, said document was marked as
12   Defendant's Exhibit Number 1 HallerD 6:07-15733 for
13   identification by the reporter.)
14   BY MR. ELLISON:
15   Q   Norristown 47 through 49, this is a three-page
16   document, sir.  I'm handing Exhibit 1 to you.  Take as
17   much time as you need to look at it.
18       When you've had sufficient time, let me know.
19   I'm just going to take you through a couple of lines in
20   here on the first page, I think.  No, first and second.
21       Do you need more time?
22   A   No.
23   Q   All right.  The date on the top of this is
24   October - October 21st, 1985, am I right?
25   A   Yes.

78

1     Q   Let's go through the first paragraph. It
2   says: This patient was admitted through the emergency
3   room.
4         If you were 16 — Rather, if you were born in
5   1961, in 1985 you're how old?  25ish?
6     A   Yeah. Yes.
7     Q   Do you recall being admitted through the
8   emergency room around that age?
9     A   I do not.
10    Q   It says that:  The patient admits to
11  alcoholism and drug abuse and drug dependence of
12  prescription drugs.
13        Did I read that right?
14    A   Uh-huh, yes.
15    Q   Now, you were an alcoholic, am I correct?
16    A   Yes.
17    Q   It says:  Drug abuse.
18        Did I read that right?
19    A   Yes.
20    Q   What drugs did you abuse?
21    A   I never did street drugs, I never did those.
22    Q   My question was different.  What drug —
23    A   Right.
24    Q   — what drug did you abuse?
25    A   I don't - I don't recall.

79

1     Q   But it's your testimony you never did street
2   drugs?
3     A   I never have.
4     Q   Crack?
5     A   Never.
6     Q   What if the records reflect that you told the
7   police officer you were using crack?
8     A   That would be - that would be incorrect.
9     Q   Okay.  Drug dependence of prescription drugs.
10        Did I read that correctly?
11    A   Yes.
12    Q   What drugs have you been dependent on?
13    A   I can't recall.
14    Q   It says:  Currently it is Valium.
15        Did I read that right?
16    A   Yes.
17    Q   Do you remember taking Valium?
18    A   No, I do not.
19    Q   Do you remember being dependent on it?
20    A   I do not.
21    Q   So this portion of the record does nothing to
22  refresh your memory?
23    A   No.
24    Q   That is correct?
25    A   That is correct.

80

1     Q   It says the patient's 23, am I right?
2     A   Correct.
3     Q   And you had just gotten out of jail.
4         Did I read that correctly?
5     A   Yes.
6     Q   Let me see if this refreshes your memory.
7         It says that you were in the county jail
8   because of assault on a police officer.  He states:  He
9   grabs the officer's testicles after the officer was
10  choking him, and he states he told the officer to quit
11  and he didn't.
12        Did I read that correctly?
13    A   Correct.
14    Q   Does that refresh your memory about you
15  grabbing a police officer's —
16    A   It does not.
17    Q   — testicles?
18    A   It does not.
19    Q   You don't remember being in jail because you
20  had assaulted a police officer?
21    A   I do not.
22    Q   So this is all news to you?
23    A   Yes.
24    Q   Further down under current medications it
25  says: Other medication have been tried, and he states

81

1   he was on Mellaril 400 milligrams when he was 12.
2         Did I read that right?
3     A   Yes.
4     Q   And do you remember me asking you if you ever
5   told a health care provider if Mellaril ruined your
6   life, and you said no, or I don't recall?
7     A   I don't recall.
8     Q   The next line says:  And claims that this
9   Mellaril has ruined his life.
10        Did I read that right?
11    A   Yes.
12    Q   Does looking at this record reflect - refresh
13  your memory about any such conversation?
14    A   It does not.
15    Q   The last page has a name on it, George
16  Kantzler, DO, Doctor of Osteopathy.
17        Do you recall telling Dr. Kantzler that
18  Mellaril had ruined your life?
19    A   I do not.
20    Q   Now, further down under musculoskeletal, do
21  you see that?
22    A   I'm looking.
23    Q   Very first line in musculoskeletal.
24    A   I don't see it.
25    Q   You see where it says review -- It's the first

**82**

1  page, sir.  Under review of systems, which is right
2  below your current medications --
3    A   Okay.
4    Q   -- a couple of lines down, it says
5  Musculoskeletal, do you see that?
6    A   I see it.
7    Q   It says:  The patient states he does have a
8  tremor.
9        Did I read that correctly?
10   A   Yes.
11   Q   Does looking at this document refresh your
12 memory --
13   A   It does not.
14   Q   -- as to whether you told your health care
15 providers --
16   A   It does not.
17   Q   -- as early as October of 1985 that you, in
18 fact, had a tremor, correct?
19   A   I don't recall.
20   Q   This doesn't refresh your memory?
21   A   No.
22   Q   This is, in fact, more than 20 years before
23 you had Seroquel, correct?
24   A   Correct.
25   Q   Turn to the next page.  Several lines down

**83**

1  there's a section that says Neurological.
2        Do you see that?
3    A   I do not.
4        MR. ELLISON:  Bob, can you find it and point
5  to it, or shall I just reach over?
6        MR. BARRINGER:  Neurological is right here.
7  BY MR. ELLISON:
8    Q   Thank you, counsel.  It says:  Motor exam.
9        Did I read that right?
10   A   Yes.
11   Q   There is an involuntary tremor present.
12       Did I read that correctly?
13   A   Yes.
14   Q   Okay.  Does this refresh your memory as to
15 whether you've had a tremor --
16   A   It does not.
17   Q   -- for more than two decades prior to your
18 using Seroquel?
19   A   It does not.
20   Q   You don't remember talking to any doctors
21 about an involuntary tremor more than 20 years before
22 you ever used Seroquel?
23   A   I do not.
24   Q   Do you deny that you did?
25   A   I'm not denying I did, but I don't recall it.

**84**

1    Q   So you don't dispute that you did, you just
2  don't remember it?
3    A   I don't remember, no.
4        MR. ELLISON:  That's all I need for that,
5  thank you.  He's handing the exhibit back to me.
6  BY MR. ELLISON:
7    Q   Do you recall me asking you a lot of questions
8  about one of the symptoms of your bipolar disorder,
9  hypersexuality?
10   A   Uh-huh.
11   Q   Yes?
12   A   Yes.
13   Q   And we talked about the convictions and the
14 behaviors that you engaged in that led to convictions,
15 am I correct?
16   A   Correct.
17   Q   Do you remember me asking you questions about
18 pornography during your last deposition?
19   A   I do not.
20   Q   Did you used to read pornography?
21   A   Yes.
22   Q   How much?
23   A   Not much.
24   Q   What do you mean by not much?
25   A   A little bit here and there.

**85**

1    Q   Do you remember telling the Social Security
2  Administration that one of your daily activities --
3  Strike that.
4        Do you remember filling out a daily activities
5  questionnaire with the Social Security Administration?
6    A   I do not.
7    Q   You don't remember identifying pornography as
8  one of those activities on your daily activities --
9    A   I do not.
10   Q   -- questionnaire?
11       But you agree that you used to read
12 pornography --
13   A   Yes.
14   Q   -- prior to your taking Seroquel, is that
15 correct?
16   A   Yes.
17   Q   Do you today?
18   A   No.
19   Q   Who is Martin LeHew?
20   A   He was a roommate of mine years ago.
21   Q   Were you intimate?
22   A   No.
23   Q   Where did you and he live together?
24   A   Clearwater.
25   Q   Was he older?

86

1    A   Yes.
2    Q   About how much older?
3    A   A few years.
4    Q   By how many years?
5    A   I don't know exactly.
6    Q   Could you spell that?
7    A   What?
8    Q   Martin's last name.
9    A   I don't even now how to spell it.
10   Q   How do you pronounce it?
11   A   I know it's pronounced LeHew, but I'm not sure
12   how to spell it.
13       MR. ELLISON: Let's try L-E-H-E-W, or L-E
14   capital H-E-W, is what appears to be on this.
15   BY MR. ELLISON:
16   Q   When was the most recent contact you had with
17   Mr. LeHew?
18   A   I don't recall.
19   Q   In '85 you were about 24, is that correct?
20   A   About that.
21   Q   Mr. LeHew was then about 40 years old, does
22   that sound right?
23   A   I guess.
24   Q   Did he do all the cooking and cleaning?
25   A   No.

87

1    Q   Do you recall telling a health care provider,
2    in 1985, that he did all the cooking and cleaning?
3    A   I do not.
4    Q   Do you recall identifying him to your health
5    care providers as your main contact?
6    A   I do not.
7    Q   If the records so reflect, would you dispute
8    it?
9    A   No.
10   Q   Did you used to set fires to large homes and
11   businesses?
12   A   No.
13   Q   Do you recall telling a health care provider,
14   in 1985, December 19th, 1985, that you set fires to
15   large homes and businesses?
16   A   I do not.
17   Q   And you deny ever doing that?
18   A   Yes.
19   Q   Have you ever seen the mental health care
20   records?  So the record's clear and so plaintiff's
21   counsel knows I'm not fooling around, it's Social
22   Security Disability Norristown 00122.
23       Now, you were, again, 23 or 24 around that
24   time, is that right?
25   A   I guess.

88

1    Q   1985, is that correct?
2    A   I guess.
3    Q   I don't want you to guess, sir, I want you to
4    be certain for me.  You're smiling.
5    A   I'm not certain.
6    Q   Okay.  We talked about the instance where you
7    were convicted or charged with attempted rape.  We
8    talked about -- And that's one.
9        Second, we talked about the masturbation
10   charge that led to your prison time, correct?
11   A   Correct.
12   Q   And we talked about a third time where you
13   followed that high school girl by the grocery store, do
14   you remember that?
15   A   I remember.
16   Q   And you hid in the woods, am I right?
17   A   Correct.
18   Q   All that took place after 1985, am I right?
19   A   No.
20   Q   Okay.  Do you recall telling a health care
21   provider, in 1985, that you had flashed yourself several
22   times in public?
23   A   I do not.
24   Q   That's Norristown 122 and 123.
25       You don't recall that?

89

1    A   No.
2    Q   Do you deny you did it?
3    A   No.
4    Q   Was that regular behavior for you - for you
5    then?
6    A   I don't - I don't think so.
7    Q   Did you attribute that urge to your mental
8    health disorder?
9    A   I don't recall.
10   Q   Do you have any idea why you were doing it?
11   A   I do not.
12   Q   Did you used to bang your head against bars?
13   A   Yes.
14   Q   When would you do that?
15   A   I did that in the year 2002 in prison.
16   Q   And also in 1986, right?
17   A   I don't recall in 1986.
18   Q   Do you remember seeing Dr. Richard Frank in
19   January of 1986, Bates numbers Norristown 98?
20   A   I do not.
21   Q   No?  But if you told him that you had banged
22   your head against bars, you have no reason to dispute
23   that, would you?
24   A   No, I would not.
25   Q   Okay.  Why -- Why would you bang your head

90

1   against bars?
2       A   I don't - I don't know.
3       Q   Were you — What were you trying to do?
4       A   I don't know.
5       Q   Were you trying to kill yourself?
6       A   Maybe.
7       Q   You're not sure?
8       A   I'm not sure.
9       Q   You said the most recent time you did that was
10  in 2002, is that correct?
11      A   Yes.
12      Q   That's before you were using Seroquel, am I
13  correct?
14      A   Correct.
15      Q   And you've not done that since you started
16  Seroquel —
17      A   No.
18      Q   — correct?
19          Would you cut yourself when you banged your
20  head on the wall or the bars?
21      A   Yes.
22      Q   Would you bleed?
23      A   Yes.
24      Q   A lot?
25      A   I guess so.

91

1       Q   Would you get medical treatment?
2       A   No.
3       Q   Now, do you recall telling a doctor or do —
4   Well, do you remember me asking you if you were given
5   Artane for Parkinsonism, and you said no?
6       A   I don't recall.
7       Q   No, I mean when we were talking a little while
8   ago, I asked you that question.  You said no, it was
9   because of the medications.  Do you remember that?
10      A   Yes.
11          MR. BARRINGER:  Steve, you want to go off the
12  record?
13          MR. ELLISON:  Yeah, let's take a quick break.
14          MR. BARRINGER:  Sounds good.
15          THE VIDEOGRAPHER:  Going off video record,
16  11:25 a.m.
17          (Thereupon, a brief recess was taken.)
18          THE VIDEOGRAPHER:  We're now back on the video
19  record, 11:34 a.m.
20  BY MR. ELLISON:
21      Q   Mr. Haller, before the break I was asking you
22  questions about whether you were given Artane for
23  possible Parkinsonism, namely the tremor.  Do you
24  remember that?
25      A   Yes.

92

1       Q   And you said no, that it was because of the
2   side effects of the medications you're on today, right?
3       A   The best way to answer that is I don't recall
4   them telling me that.
5       Q   You don't - you don't recall?
6       A   No.
7       Q   But it's your belief that that's the case?
8       A   Yes.
9           (Thereupon, said document was marked as
10  Defendant's Exhibit Number 2 HallerD 6:07-15733 for
11  identification by the reporter.)
12  BY MR. ELLISON:
13      Q   Let me see if this document refreshes your
14  memory related to your tremor and Parkinson's.
15          And I'm going to show you what I've marked
16  Exhibit 2, which is Bates numbered Social Security
17  Disability Norristown 11.  The date on this is an — The
18  hospitalization admission date is June 25th, 1986.  I've
19  already made a copy to counsel.  Let me take you
20  through this.
21          You see the number 3?
22      A   I do.
23      Q   History of present illness, do you see that
24  there?
25      A   Yes.

93

1       Q   This is under Psychiatric History, am I
2   correct?
3       A   Yes.
4       Q   Right in the middle of that it says:  Due to
5   high blood pressure, he was given Hydrodiuril,
6   H-Y-D-R-O-D-I-U-R-I-L, 205 milligrams per day, correct?
7       A   Correct.
8       Q   And, in fact, you had high blood pressure as
9   early as June of 1986, am I correct?
10      A   Yes.
11      Q   Let's go up a few lines.  It says:  On
12  admission to RMC, the facility, he was placed on
13  suicidal precautions.
14          Did I read that right?
15      A   Yes.
16      Q   And you don't dispute that, do you?
17      A   No, I do not.
18      Q   He displayed uncooperative attitude, banging
19  his hands and head against grille door and hurting
20  himself.
21          Did I read that correctly?
22      A   Yes.
23      Q   And that's what you did, right?
24      A   Yes, I did.
25      Q   You had to be placed in restraints and placed

94

1  on medication.
2      Did I read that correctly?
3    A  Yes.
4    Q  In fact, you had to be put in restraints many
5  times in your life, isn't that correct?
6    A  Correct.
7    Q  You have not been in restraints since you've
8  been using Seroquel, correct?
9    A  Correct.
10    Q  He was medicated with Haldol and Pamelor.
11      Did I read that right?
12    A  Yes.
13    Q  And, in fact, you took those medications then,
14  am I right?  Did I read that right?
15    A  Yes.
16    Q  And you don't deny that, correct?
17    A  No.
18    Q  A couple of lines down, you say -- Right under
19  the blood pressure part, you see that?
20    A  Yes.
21    Q  It says:  He was also given Artane
22  two milligrams three times per day for possible
23  Parkinsonism.
24      Did I read that right?
25    A  Yes.

95

1    Q  Okay.  Do you recall telling a health care
2  provider that you had possible Parkinson's and - and
3  were taking Artane in 1986, 20 years before you ever
4  used Seroquel?
5    A  I don't recall.
6    Q  Do -- You don't deny it, though, do you?
7    A  No.
8    Q  Then it said:  While at RMC, skull series was
9  ordered.  The record also showed that he had an EEG done
10  on two occasions, which showed some abnormal tracings in
11  the temporal area.
12      Did I read that right?
13    A  Yes.
14    Q  Do you know what that means?
15    A  I do not.
16    Q  Now, again, this is 1986.  You're about 25,
17  okay?
18    A  Okay.
19    Q  Does that -- Have that date in your memory.
20      And if you'll turn the page to
21  Norristown 12 -- I'm sorry, let's start on Page 11
22  beforehand.
23      Do you remember telling your health care
24  provider, in and around June of 1986, that the folks at
25  Woodville, the hospital there, thought you were beyond

96

1  help?
2    A  I don't know where you're at.
3    Q  About four lines up, five lines from the
4  bottom.
5    A  On the first page?
6    Q  Yes, sir.
7    A  Okay.
8    Q  Did I read that right?
9    A  I'm still -- I'm still lost.
10    Q  Okay.  Never mind.  Let's go to the next
11  section.
12      When he was 17 years old, he got into a fight
13  with his father.  Do you recall getting into a fight
14  with your father that led to you --
15    A  Yes.
16    Q  And you served 18 months on an assault and
17  battery charge for hitting your dad, am I right?
18    A  Yes.
19    Q  Now, three lines down it says:  After this, he
20  was again involved in indecent exposure charges,
21  masturbating in front of two 13 year old girls.  He was
22  sent to jail in Pittsburg, Pennsylvania for 10 days and
23  transferred to Northern Community Mental Health Center,
24  where he spent six months for an evaluation.
25      Did I read that right?

97

1    A  Yes.
2    Q  Do you deny that that occurred?
3    A  No.
4    Q  Okay.  So this is another instance of you
5  masturbating in front of children, in addition to the
6  ones we've talked about, am I correct?
7    A  Correct.
8    Q  And there were more, am I right?
9    A  I don't recall.
10    Q  You attribute this to your mental health
11  disease, right --
12    A  Yes.
13    Q  -- this behavior, and you've not done any of
14  this since you've started using Seroquel, correct?
15    A  No.
16    Q  That is correct, right?
17    A  Yes.
18      MR. ELLISON:  Okay.  I'm done with Exhibit 2.
19  If you'll hand that back to me, please.
20  BY MR. ELLISON:
21    Q  Do you remember when I asked you a question
22  about trying to commit suicide by hanging yourself?
23    A  Yes.
24    Q  And you said you didn't do it?
25    A  I did not.

**98**

1   Q   Do you recall telling a health care provider,
2   on December 3rd, 1986, at Corrections Mental Health
3   Institution that you tried to hang yourself in the
4   county jail?
5   A   I do not.
6   Q   If Social Security Disability Norristown
7   Number 8 reflects that on December 3rd, 1986, you told
8   Harry McClarin, the senior psychologist, that you tried
9   to hang yourself in the county jail, you wouldn't
10   dispute it?
11   A   I don't recall it.
12   Q   You wouldn't dispute it, if that's what the
13   record shows, would you?
14   A   If the record shows it, no, I would not.
15       MR. ELLISON:  Did I give you the Bates number,
16   Bob?
17       MR. BARRINGER:  No, you did not.
18       MR. ELLISON:  The Bates number of that page is
19   DHaller Social Security Disability Norristown 8.
20   BY MR. ELLISON:
21   Q   You were adopted, right?
22   A   Yes.
23   Q   You don't know anything about your biological
24   parents' --
25   A   I do not.

**99**

1   Q   -- health history?
2   A   I do not.
3   Q   You were adopted when you were an infant, am I
4   right?
5   A   Six months old.
6   Q   Okay.  And you were physically abused by your
7   biological mother, is that correct?
8   A   No.
9   Q   If DHaller Option Center Number 12 says that
10   you told Carla DeGeneres (phonetically) -- I'm sorry,
11   one of Carla DeGeneres's staff that your biological
12   mother was physically abusive and that your adoptive
13   mother told you that you had bruises over a third of
14   your body as an infant, you would dispute that?
15   A   No.
16       MR. ELLISON:  Okay.  And the Bates number's
17   Option Center, Inc. Number 12.
18       Okay.  Since your deposition, we got updated
19   medical records from Directions.
20       Now, I'm going to show you what I'll mark as
21   Exhibit 3.
22       (Thereupon, said document was marked as
23   Defendant's Exhibit Number 3 HallerD 6:07-15733 for
24   identification by the reporter.)
25       MR. ELLISON:  Which, for the record, is Bates

**100**

1   numbered Directions For Mental Health Updated Meds
2   21.
3   BY MR. ELLISON:
4   Q   Do you have that record in front of you?  Sir,
5   do you have that record in front of you?
6   A   Yes.
7   Q   Okay.  You saw Dr. - Nicole Keene on
8   November 20th, 2007, isn't that correct?
9   A   Yes.
10   Q   And this was the last time you saw her,
11   correct?
12   A   Yes.
13   Q   And that's because she was moving, am I right?
14   A   Right.
15   Q   Do you know where she moved?
16   A   I do not.
17   Q   Do you know if she moved within the State of
18   Florida?
19   A   I do not.
20   Q   And, in fact, you were visiting Nicole Keene
21   as your primary mental healthcare provider, right?
22   A   Yes.
23   Q   She was the one who was treating you for your
24   mental health condition, correct?
25   A   Correct.

**101**

1   Q   And you understand she was deposed in this
2   lawsuit?
3   A   I do not.
4   Q   All right.  It says:  This is a 43 year old
5   disabled, separated male who's been in treatment since
6   September of 2002, with a diagnosis of Bipolar I
7   Disorder and a history of substance abuse.
8       Did I read that correctly?
9   A   Yes.
10   Q   And you don't deny any of that, right?
11   A   No.
12   Q   He has been doing remarkably well on the
13   current medication with no exacerbation of symptoms
14   since I started seeing him in 2005.
15       Did I read that right?
16   A   Yes.
17   Q   You don't deny it, correct?
18   A   No.
19   Q   And that's what she told you, correct?
20   A   Correct.
21   Q   That you had been doing remarkably well on the
22   current medications with no exacerbation of symptoms
23   in - since she saw - first started seeing you in 2005,
24   correct?
25   A   Correct.

26 (Pages 98 to 101)

102

1    Q    Now, let's read this next line very carefully.
2         He notes today, however, that he wants to get
3    off his Seroquel because of the class action lawsuit he
4    is in against Seroquel, re: diabetes, and his lawyer
5    suggested that he stop the medication if he wants to win
6    a settlement.
7         Did I read that correctly?
8    A    Yes.
9    Q    You don't deny that, do you?
10   A    No, I do not.
11   Q    And, in fact, you told Dr.— Excuse me.
12        You told Nicole Keene, on November 20th, 2007,
13   that your lawyer had suggested that you stop Seroquel if
14   you wanted to win a settlement, correct?
15   A    Correct.
16   Q    Did your lawyer tell you that you needed to
17   stop Seroquel if you want to get a settlement in this
18   case?
19   A    No, I do not.
20   Q    So Nicole Keene was lying?
21   A    Yes.
22   Q    Why would she lie?
23   A    I have idea.
24   Q    All right. So it's your testimony that no
25   lawyer has told you that you need to stop Seroquel —

103

1    A    Correct.
2    Q    — if you're going to get a lawsuit
3    settlement, correct?
4    A    Correct.
5    Q    You looked at your counsel as you were
6    answering that; why?
7    A    I don't know why, I just did.
8    Q    You're smiling. Why?
9    A    Why?
10   Q    Why are you smiling, sir?
11   A    I can't do that? Is it a crime?
12   Q    It's not a crime, sir, but in my view it's an
13   inappropriate reaction to my question. Do you disagree?
14   A    No.
15   Q    Okay. It is your testimony, and I want you to
16   look right in the camera there for me, I want you to
17   tell the jury that Nicole Keene is lying and that no
18   lawyer ever told you that you have to stop Seroquel if
19   you're going to get any money from AstraZeneca.
20   A    I did not say that.
21   Q    Then what would you say, sir?
22   A    I don't know what I would say, but I just -
23   I - I misquoted myself in a lot -- I believe I was wrong
24   in my statement.
25   Q    Okay. So your lawyer did tell you that you

104

1    need —
2    A    No. The lawyer did not tell me that.
3    Q    How was your statement wrong, sir?
4    A    I - I -- I said something that I - that wasn't
5    correct, and I stood by me, that's the actual statement
6    I received.
7    Q    Who did you —
8    A    I was told that it may look better or may be a
9    better idea if you got off the Seroquel because of
10   diabetes.
11   Q    And you told Dr. Keene that, correct?
12   A    Yes.
13   Q    What lawyer told you that it would —
14   A    I don't know.
15   Q    Who were you talking to, sir?
16   A    I don't remember.
17   Q    Were you on the phone?
18   A    Yes.
19   Q    And were you called by a lawyer?
20   A    As I remember, yes.
21   Q    And what day was that?
22   A    I don't remember.
23   Q    How do you know if it was your lawyer —
24   A    I don't.
25   Q    — if you don't remember who it was?

105

1    A    I don't.
2    Q    All right. Let's look at this again, shall
3    we?
4         He notes today, however, that he wants to get
5    off his Seroquel because of the class action lawsuit he
6    is in against Seroquel, re: diabetes, and his lawyer
7    suggested that he stop the medication if he wants to win
8    a settlement.
9         Did I read that correctly?
10   A    Yes.
11   Q    Okay. Do you deny telling Nicole Keene, on
12   November 20th, 2007, that your lawyer had suggested that
13   you stop the medication if you want - if you wanted to
14   win a settlement in this lawsuit?
15   A    I misquoted myself.
16        THE REPORTER: I'm sorry, I didn't hear you.
17        MR. ELLISON: He said, I misquoted myself.
18   BY MR. ELLISON:
19   Q    What do you mean you mis—
20   A    I told her something that I didn't have
21   factual basis on.
22   Q    What does that mean?
23   A    In other words, I told her something just to
24   tell her about Seroquel.
25   Q    What do you mean by that, sir?

106

1    A    I told her something out of the ordinary
2    that - that didn't actually happen or did not take place
3    or never had happened, just so she would give up the
4    Seroquel.
5    Q    So you're saying you were lying to your own --
6    A    Yes.
7    Q    -- health care provider --
8    A    Yes.
9    Q    -- correct?
10   But the jury should believe you that you --
11   A    Yes.
12   Q    -- in fact, did not tell Nicole Keene, on
13   November 20th, 2007, that your lawyer told you to stop
14   taking Seroquel if you wanted to win money in this
15   lawsuit?
16   A    No.
17   Q    You never told that to Nicole Keene?
18   A    I exaggerated.
19   Q    What do you mean you exaggerated?
20   A    I - I -- I told her something just to get off
21   Seroquel.
22   Q    Because in her view, Seroquel was helping you,
23   right?
24   A    Yes.
25   Q    And you -- It's your testimony today that you

107

1    made up the story about your lawyer telling you to stop
2    Seroquel if you wanted to get - win a settlement in this
3    lawsuit because you just needed some reason to tell
4    Dr. - Nicole Keene, rather, that - for why you needed to
5    get off Seroquel, is that right?
6    A    Correct.
7    Q    Okay. Why did you think you needed to get off
8    Seroquel?
9    A    I - I was tired of taking it so long.
10   Q    You got tired of taking it?
11   A    Yes.
12   Q    I'd like you to look at the camera.
13   A    And I even tried to get off Risperdal, but
14   they threatened to take all my medications and change
15   them all if I got off the Sero - off the Risperdal.
16   Q    And that's because the medicines were helping
17   you, right?
18   A    No, not necessarily.
19   Q    Okay.
20   A    You can't count on medication. Medication is
21   only - is only so much - can do so much. The rest of
22   the part is on you, how you handle yourself, how well
23   you understand your bipolar and so on and so forth.
24   I was able to learn to know my triggers, know
25   where my offsets are, what they triggered my bipolar.

108

1    So I could actually work with Nicole Keene,
2    with Julia Stanphill, or any doctor I worked with in
3    mental health. I was able to work with them because I
4    took time to understand and learn about my disability I
5    have. And through that, I'm able to get angry, stop and
6    think before I act or react.
7    So all - all the questions regarding you
8    haven't done this since taking Seroquel, well, that's -
9    that's a fact. Seroquel must be a miracle drug. Maybe
10   put everybody in the world who is on bipolar on Seroquel
11   because that medicine is so wonderful.
12   Q    Let's see --
13   A    I - I -- I never had any problems with any of
14   my medications I've taken. I took - I took Lithium.
15   I've taken Librium. I've taken Mellaril. I've taken
16   Thorazine. I've taken Prolixin, all those medications,
17   but none of them all of a sudden said, now you've taken
18   this medication, your bipolar will disappear, you won't
19   have it no more.
20   It doesn't happen like that. Someone who
21   learns about your dis - the disability they have and
22   learns to work with it and understand what it is and so
23   on and so forth, you can be able to take any medication
24   in the world and have no problems whatsoever with it.
25   Q    Sir, there's no question pending.

109

1    A    No, but I have been sitting here for the last
2    maybe 10, 20, 30 minutes now --
3    Q    And you'll --
4    A    -- and you seem like you're bragging about or
5    giving to Seroquel more credit than it's due. You're
6    not giving credit to the person who stops and learns
7    about, myself being bipolar, what caused me to go do the
8    things I did when I did - when I went off my - on the
9    medication.
10   The medication only is a help aide. It only
11   helps as long as you are able to understand it. You
12   understand it more, the better it is for you, because
13   you can take any medication. It don't have to be
14   Seroquel, it don't have to Risperdal, it don't have to
15   be whatever. If you take time to learn about your
16   illness, you can help your - your - the person you're
17   working with.
18   Nicole Keene got me to the point where I - I
19   was able to walk in her office -- Most people went to
20   Directions, go to Directions and see Dr. Keene or
21   whoever the doctor is in psychiatry and spend 30 minutes
22   and get nowhere. They get a whole - a bundle of
23   medications put on them.
24   But I - I go to Nicole Keene's office, five
25   minutes, how's things been going at home. Well, I've

28 (Pages 106 to 109)

110

1   been going real good at home doing such and such and
2   such. Keep it up, you're doing real well. Five minutes
3   later, I'm out of the office and done.
4        Most people are doing 30 minutes with the
5   psychiatrist, and they have case managers that work with
6   them on an everyday basis. I didn't have that. They
7   said I was not qualified for such a case manager.
8        So, I don't - I don't -- I don't want to give
9   these medications of Seroquel, or whatever the
10  medication is, any, any, you know, pat on the back, say
11  you're doing a wonderful job, medication, keep it up,
12  they won't have no more episodes of agitation, they
13  won't have no more mood swings.
14       I'll always have mood swings and it will never
15  change.
16       MR. BARRINGER: Mr. Haller, let's get back to
17  the deposition. Let Mr. - the attorney for
18  AstraZeneca to ask his questions.
19       MR. ELLISON: Do you need a break, sir?
20       THE WITNESS: No.
21  BY MR. ELLISON:
22   Q   All right. Let - let -- You told me what you
23  think of your medications. Let's look at what your
24  health care provider thought of your medications. We've
25  already gone over it, but apparently a reminder is

111

1   warranted.
2        It says: He has been doing remarkably well on
3   the current medication with no exacerbation of symptoms
4   since I started seeing him in 2005.
5        Did I read that right?
6    A   I don't even know where you're at.
7    Q   Second line, sir, we just read it.
8    A   Okay.
9    Q   Further down it says: He is more stable now
10  than he has been in several years.
11       Did I read that correctly?
12   A   Yes.
13   Q   He was strongly advised to remain on his
14  medication due to its effectiveness.
15       Did I read that correctly?
16   A   Yes.
17   Q   That's what Nicole Keene told you, correct?
18   A   Correct.
19   Q   And that's what she told you she thought your
20  medications were doing for you, correct? Correct, sir?
21   A   Correct.
22   Q   All right. Let's jump back.
23       You -- You've told me a number of different
24  things about the conversation that you had with Nicole
25  Keene about the lawyers telling you you needed to get

112

1   off Seroquel if you wanted to win a settlement, and I
2   just want to make sure I have them straight.
3        It's your testimony that you were exaggerating
4   to Nicole Keene and that the lawyer just told you it
5   might help your case if you tried to get off Seroquel,
6   is that right?
7    A   Correct.
8    Q   And that's your sworn deposition testimony --
9    A   Yes.
10   Q   -- is that correct?
11       You really didn't say you had no chance of
12  getting a settlement, but that it would help your case
13  if you stopped taking Seroquel, correct?
14   A   Yes.
15   Q   And he told you that it would hurt your case
16  if you stayed on Seroquel, correct?
17   A   Yes.
18   Q   And which lawyer told you that?
19   A   I don't know. I don't remember.
20   Q   I want you to look at the camera.
21   A   I do not know who the attorney was, and if I
22  did know the attorney's name, I could not remember today
23  because it was so long ago we talked about -- We're
24  talking about 2007 of November.
25       A lot of things go on in my days, so I don't

113

1   remember names or places or things all the time. I
2   don't recall.
3    Q   Well, are you --
4    A   So how about - how about getting to a true
5   question you're trying to ask. Let's get to the
6   question.
7    Q   Well, the true question is --
8    A   Why would you tell someone that when you get -
9   when I'm on a telephone. People says things on the
10  station --
11       MR. ELLISON: Counsel, your client's voice is
12  agitated. His arms are moving around.
13       THE WITNESS: Because he's beating his question - he's been
14  beating his question like a dead dog.
15       MR. ELLISON: He's talking over me and he
16  needs to take a break.
17       THE WITNESS: He's beating his question like a
18  dead dog.
19       MR. ELLISON: Do you need to take a break?
20       MR. BARRINGER: Let's take a break.
21       MR. ELLISON: Let's go off the record.
22       THE VIDEOGRAPHER: Going off video record,
23   11:57 a.m.
24       THE WITNESS: He's beating his question like a
25  dead dog.

29 (Pages 110 to 113)

114

1   MR. ELLISON: Keep typing. If he keeps
2   talking, I want you to keep typing, madam reporter.
3   THE WITNESS: And I want you to do --
4   MR. BARRINGER: Mr. Haller, I'm going to
5   instruct you to keep quiet right now. Let's go
6   take a walk.
7   THE WITNESS: I mean, I'll file a lawsuit
8   against you next.
9   MR. ELLISON: Are you threatening me, sir?
10  THE WITNESS: No. I'm - I'm going to file a
11  lawsuit against you next for mental abuse.
12  MR. ELLISON: Mental abuse?
13  THE WITNESS: Yes.
14  (Thereupon, a brief recess was taken at
15  11:58 o'clock a.m.)
16  MR. ELLISON: Let's go back on.
17  THE WITNESS: For the record, please.
18  THE VIDEOGRAPHER: We're now back on the video
19  record, 12:10 p.m.
20  MR. ELLISON: There - there is no question yet
21  pending, and I am about to ask you one.
22  THE WITNESS: I know you will -- I know you
23  do. I just want to apologize for earlier, I was a
24  little frustrated.
25

115

1   BY MR. ELLISON:
2   Q   Sir, if you need a break for whatever reason
3   during the course of the deposition, as I told you, I
4   think at the beginning, as well as I told you at the
5   beginning of last deposition, please say so and we'll
6   take a break, okay?
7   A   Okay.
8   Q   As long as there's no question pending.
9   A   Okay.
10  Q   Sir, you would agree that what you had before
11  was an outburst?
12  A   Yes.
13  Q   And you recognize that that is an aspect of
14  your bipolar disorder --
15  A   Yes.
16  Q   -- correct?
17      And that's one of the reasons why you take
18  medications, is that correct?
19  A   Correct.
20  Q   And those medications help you control your
21  behavior, isn't that right?
22  A   Yes.
23  Q   Now, I want to ask you about this conversation
24  that you had with Dr. Keene, okay?
25  A   Okay.

116

1   Q   If I recall correctly, you told me that you
2   made up some comment about your lawyers wanting you to
3   stop taking Seroquel because the lawsuit - just to give
4   her a reason, correct?
5   A   Yes.
6   Q   Okay. And that's your - off the record.
7   THE VIDEOGRAPHER: Going off the record,
8   12:12 p.m.
9   (Thereupon, a brief recess was taken.)
10  THE VIDEOGRAPHER: We're now back on video
11  record, 12:18 p.m.
12  MR. ELLISON: I apologize, Mr. Haller, for
13  that little technical issue that we just had, which
14  is what necessitated the break.
15  BY MR. ELLISON:
16  Q   We needed to take a break before because you
17  were becoming agitated, am I correct?
18  A   Yes.
19  Q   And, in fact, prior to the break you
20  threatened me, isn't that right?
21  A   Yes.
22  Q   And then you went and you met with your
23  lawyer, isn't that right?
24  A   That's correct.
25  Q   You talked with him for some time, isn't that

117

1   right?
2   A   That's correct.
3   Q   And after talking to your lawyer, you came
4   back in, correct?
5   A   Correct.
6   Q   And it's after talking to your lawyer that you
7   apologized, isn't that correct?
8   A   Yes.
9   Q   Now, let's go back to some of the other
10  discussions you've had with your lawyers. I'd like you
11  to look at Exhibit 3. I want to come back to this
12  portion that we were talking about.
13      Again it says: His lawyer suggested that he
14  stop the medication if he wants to win a settlement,
15  isn't that correct?
16  Q   I read that right?
17  A   Yes.
18  Q   You don't deny telling Nicole Keene that
19  that's what your lawyer told you, correct?
20  A   Right.
21  Q   Okay. And you -- It's your testimony and you
22  want the jury to believe that you have no memory at all
23  of what lawyer told you that, correct?
24  A   Correct.
25  Q   But it wasn't just the one conversation, you

30 (Pages 114 to 117)

118

1 had had a number of conversations with Dr. Keene about
2 this, correct?
3    A  Yes.
4    Q  Let's read on. It says: We've had this
5 discussion on multiple occasions.
6       Did I read that right?
7    A  Yes.
8    Q  So, you told Dr. Keene many times, or multiple
9 times, rather, that your lawyers had suggested that you
10 stop Seroquel if you wanted to win a settlement,
11 correct?
12    A  Correct.
13    Q  And even though you told Nicole Keene, on
14 multiple occasions, that your lawyers had told you you
15 needed to get off Seroquel if you wanted to win a
16 settlement, you want the jury to believe that you have
17 no memory at all of which lawyer or which lawyers told
18 you that, correct?
19    A  Correct.
20    Q  But you don't deny telling Nicole Keene that,
21 correct?
22    A  Correct.
23    Q  Further, it says: And he has been given full
24 informed consent about the medication and has
25 consistently stated that he wants to continue the

119

1 Seroquel and Risperdal due to efficacy.
2       Did I read that right?
3    A  I'm trying to find where you're at.
4    Q  Next line, sir. We have had this discussion
5 on multiple occasions --
6    A  Okay. I see it.
7    Q  Did I read that correctly?
8    A  Yes.
9    Q  And you don't deny that Nicole Keene had
10 the discussion with you on multiple occasions, correct?
11    A  Correct.
12    Q  And you don't deny that you had been given
13 full informed consent about Seroquel, correct?
14    A  Correct.
15    Q  That means that they had fully explained the
16 risks to you, correct?
17    A  Correct.
18    Q  And including the risk of waking,
19 hyperglycemia and diabetes, correct?
20    A  Correct.
21    Q  And you don't deny that you told her that
22 you - on multiple occasions, that you wanted to continue
23 the Seroquel due to efficacy because it worked, correct?
24    A  Correct. Nicole Keene also told me before --
25    Q  Sir --

120

1    A  -- that --
2    Q  Sir, there's is no question pending.
3    A  -- that --
4    Q  Sir, there is no question pending. I've been
5 very patient with your desire to express yourself. Your
6 counsel has asked that - that if we're not going to - to
7 finish quickly that we take a break, and I intend to
8 finish quickly, okay?
9       The way this works, once again, is I get to
10 ask questions, and you answer the questions. I don't
11 get to do speeches, you don't get to do speeches, fair
12 enough?
13    A  Fair enough.
14    Q  Let's move along.
15       Under plan, do you see that?
16       Again, I have advised coming off the
17 medication due to risk of decompensation.
18       Did I read that correctly?
19    A  Yes.
20    Q  In fact, Nicole Keene told you, on multiple
21 occasions, that - not to stop Seroquel because it would
22 hurt you, correct?
23    A  Correct.
24    Q  However, patient wishes to pursue this route,
25 and you told Dr. Keene that you wanted to stop Seroquel

121

1 because it hurt your chance at a settlement, correct?
2    A  Correct.
3    Q  And that's what your lawyer told you, right?
4    A  Correct.
5    Q  Further down under education, it says: The
6 patient is aware of the risk of Seroquel and Risperdal
7 and lipids and possible diabetes.
8       Did I read that right?
9    A  Yes.
10    Q  And, in fact, you were aware of the risk of
11 Seroquel and Risperdal and lipids and possible diabetes,
12 correct?
13    A  Yes.
14    Q  You were also aware of the risk of
15 extrapyramidal symptoms and possible tardive dyskinesia,
16 correct?
17    A  Correct.
18    Q  And you wished to stay on the medication
19 despite those risks, correct?
20    A  Correct.
21       MR. ELLISON: That's all with Exhibit 3.
22       I'm now going to show you Exhibit 4, which,
23 for the record, is Bates numbered Directions for
24 Mental Health Updated Med Number 12. This record's
25 dated March 5th of 2008. That's this year.

31 (Pages 118 to 121)

122

1   (Thereupon, said document was marked as
2 Defendant's Exhibit Number 4 HallerD 6:07-15733 for
3 identification by the reporter.)
4 BY MR. ELLISON:
5   Q   I'm handing you Exhibit 4. I'm handing a copy
6 to your counsel, as well.
7       Now, the date on the top of this is March 5th,
8 2008, correct?
9   A   Correct.
10   Q   Now, did you see someone at Directions on that
11 date?
12   A   I don't recall.
13   Q   Did you see Don Davis that date?
14   A   I don't recall.
15   Q   You may have, you just don't remember?
16   A   I just don't remember.
17   Q   Okay.  You did see someone at Directions in
18 March of 2008, correct?
19   A   Correct.
20   Q   But you don't remember whom?
21   A   I don't remember.
22   Q   All right.  It says:  The patient is today -
23 seen today for scheduled follow-up.
24       Did I read that right?
25   A   Yes.

123

1   Q   He reports doing well currently.
2       Did I read that right?
3   A   Yes.
4   Q   But continues to voice concern about his
5 weight and wants to decrease Seroquel dose.
6       Did I read that correctly?
7   A   Yes.
8   Q   As noted in previous progress notes, he is
9 involved in a class action suit and has been advised to
10 stop Seroquel to help support his case.
11       Did I read that correctly?
12   A   Yes.
13   Q   And, in fact, you told one of the Directions
14 health care providers that you were in the lawsuit on -
15 I should say, March 5th, 2008, and that your lawyer had
16 told you to stop Seroquel to help support your case, am
17 I correct?
18   A   Uh-huh.
19   Q   Yes?
20   A   Yes.
21   Q   Which lawyer told you that at that time?
22   A   I don't remember.
23   Q   So, am I right that more than one lawyer has
24 told you that you need to stop Seroquel --
25   A   I don't remember.

124

1   Q   -- in order to win a lawsuit?
2       You don't remember one lawyer, two lawyers, 18
3 plaintiff's lawyers?
4   A   No.
5   Q   Do you remember if it was more than one?
6   A   I don't recall.
7   Q   You don't - remember absolutely nothing about
8 that?
9   A   No.
10   Q   Okay.
11       Further down it says:  He states he is
12 concerned about his blood sugar but states he hasn't
13 been checking it.
14       Did I read that right?
15   A   Yes.
16   Q   Do you remember telling me that you had not
17 been checking your blood sugar for the last month?
18   A   Yes.
19   Q   In fact, you haven't been checking your blood
20 sugar since at least March of this year, correct?
21   A   Correct.
22   Q   Further, it says:  He states he does not
23 exercise regularly and does not intend to.
24       Did I read that correctly?
25   A   Yes.

125

1   Q   And is that what you told the health care
2 provider you saw at Directions on March 5th --
3   A   I don't recall.
4   Q   -- 2008?
5   A   I don't recall.
6   Q   How many times have you seen Julie Stanphill?
7   A   I've only seen her once so far.
8   Q   And that was on May 28th, 2008?
9   A   I believe so.
10   Q   You don't have reason to dispute it?
11   A   No.
12   Q   But you don't remember who the health care
13 provider was whom you saw right before Julie Stanphill?
14   A   No, I do not.
15   Q   Was it a man or a woman?
16   A   I don't remember.
17   Q   You don't -- This was March of this year.  You
18 don't even remember if it was a man or a woman?
19   A   No, I don't.
20       MR. ELLISON:  Mr. Haller, I'm done.
21       Do you have any questions, counsel?
22       MR. BARRINGER:  We're going to reserve our
23 right to ask questions for the time of trial.
24       MR. ELLISON:  All I need.  Thank you.
25       THE VIDEOGRAPHER:  Going off video record,

126

1  12:27 p.m.
2  MR. BARRINGER:  We'll read.
3  (Thereupon, said deposition is adjourned.)
4
5
6
7
8
9
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

128

1  CERTIFICATE
2  STATE OF FLORIDA  )
   ) SS.
3  COUNTY OF BROWARD  )
4  I, ELLEN J. FEHR, RPR, do hereby certify that
   pursuant to Notice of Taking Deposition in the
5  above-styled cause, that I was authorized to and did
   stenographically report the foregoing deposition as
6  hereinabove shown, and the testimony of said witness was
   reduced to computer transcription under my personal
7  supervision.
8  I further certify that the said deposition was
   taken at the time and place specified hereinabove, and
9  that I am neither of counsel nor solicitor to either of
   the parties in said suit nor interested in the event of
10  the cause.
11  I further certify that I have delivered the
   original copy of said deposition to Robert Barringer,
12  Esquire, to be retained by him pending further order of
   the court.
13
   WITNESS my hand and official seal in the City of
14  Fort Lauderdale, County of Broward, State of Florida,
   this 24th day of July, 2008.
15
16
17
18
19
20  _____
   ELLEN J. FEHR, RPR.
21
22
23
24
25

127

1  CERTIFICATE OF OATH
2
3  STATE OF FLORIDA  )
   ) SS.
4  COUNTY OF BROWARD  )
5
6  I, the undersigned authority, certify
7  that DAVID HALLER personally appeared
8  before me and was duly sworn.
9
10  WITNESS my hand and official seal this
11  24th day of July 2008.
12
13
14
15
16
17
18  _____
19  ELLEN J. FEHR, CSR, RPR, Notary
   Public - State of Florida at Large.
20  My Commission No. DD738209
   Expires:  1/11/2012
21
22
23
24
25

129

1  C E R T I F I C A T E
2
3  STATE OF FLORIDA)
4  COUNTY OF BROWARD)
5  I hereby certify I have read the
6  foregoing deposition by me given, and the
7  statements contained herein are true and correct
8  to the best of my knowledge and belief, with the
9  exception of any corrections or notations made on
10  the errata sheet, if one was executed.
11
12
13  Dated this___ day of _____, 2008.
14
15
16
17  _____
18  DAVID HALLER
19
20
21
22
23
24
25

130

```
 1
 2              ERRATA SHEET
     PAGE NO.  LINE NO.
 3   _____  _____  _____
 4   _____  _____  _____
 5   _____  _____  _____
 6   _____  _____  _____
 7   _____  _____  _____
 8   _____  _____  _____
 9   _____  _____  _____
10   _____  _____  _____
11   _____  _____  _____
12   _____  _____  _____
13   _____  _____  _____
14   _____  _____  _____
15   _____  _____  _____
16   _____  _____  _____
17   _____  _____  _____
18   _____  _____  _____
19   _____  _____  _____
20   _____  _____  _____
21   _____  _____  _____
22   _____  _____  _____
23   _____  _____  _____
24
     SIGNATURE_____         DATE_____
25
```

131

```
 1              ESQUIRE DEPOSITION SERVICES
                  515 East Las Olas Boulevard
 2                        13th Floor
                  Fort Lauderdale, Florida 33301
 3                     (954) 331-4400
 4                     July 24, 2008
 5   ATTENTION: David Haller
     C/O Bailey Perrin Bailey, LLP, Robert Barringer, Esq.
 6   440 Louisiana Street, Ste 2100
     Houston, Tx 77002
 7
     Re: Haller vs AstraZeneca
 8
     Please take notice that on July 15, 2008 you
 9   gave your deposition in the above-referred matter.
     At that time you did not waive signature. It is
10   now necessary that you sign your deposition.
     As previously agreed to, the transcript will be
11   furnished to you through your counsel.  Please
     read the following instructions carefully:
12   At page 130 of the transcript, you will find an
     errata sheet.  As you read your deposition, any
13   changes should be noted on the errata sheet,
     citing page and line number of said change.
14   DO NOT write on the transcript itself.  Once you
     have read the transcript and noted any changes, be
15   sure to sign and date the errata sheet and return
     these pages to your attorney.
16   If you do not read and sign the deposition within
     thirty (30) days, the original, which has already
17   been forwarded to the ordering attorney, may be
     filed with the Clerk of the court.  If you wish to
18   waive your signature, sign your name in the blank
     at the bottom of this letter and return it to us.
19
     Very truly yours,
20   ESQUIRE DEPOSITION SERVICES
     By: Ellen J. Fehr,
21   Registered Professional Reporter
     Notary Public
22   State of Florida at Large
23   I do hereby waive my signature,
24
25   cc: Steven J. Ellison, Esq., via transcript.
```

34 (Pages 130 to 131)