# EXHIBIT 6

478

JOB NO. 99530

## UNITED STATES DISTRICT COURT
## MIDDLE DISTRICT OF FLORIDA
## ORLANDO DIVISION

IN RE:  Seroquel Products Liability Litigation
MDL DOCKET NO. 1769

This Document Relates to:

David Haller v. AstraZeneca, LP, et al.     Case No. 6:07-cv-15733
Eileen McAlexander v. AstraZeneca LP, et al. Case No. 6:07-cv-10360
Richard Unger v.  AstraZeneca LP, et al.    Case No. 6:07-cv-15812
Linda Whittington v. AstraZeneca LP, et al. Case No. 6:07-cv-10475

## ORAL DEPOSITION OF
## BRIAN R. TULLOCH, M.D., FRCP, FACP
## OCTOBER 15, 2008
## VOLUME 4

ORAL DEPOSITION OF BRIAN R. TULLOCH, M.D., FRCP, FACP,

produced as a witness at the instance of the Defendant and

duly sworn, was taken in the above styled and numbered cause

on Wednesday, October 15, 2008, from 5:05 p.m. to 9:10 p.m.,

before RENE WHITE MOAREFI, CSR, CRR, RPR in and for the State

of Texas, reported by machine shorthand, at Laminack, Pirtle &

Martines, 5020 Montrose Blvd., 9th Floor, Houston, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record herein.

**479**

1    A P P E A R A N C E S
2
FOR THE PLAINTIFF:
3       RUSS BRUDNER, ESQ.
         LAMINACK, PIRTLE & MARTINES
4       5020 Montrose Blvd., 9th Floor
         Houston, Texas  77006-6533
5       713.292.2750
6
FOR THE DEFENDANTS:
7       JANE THORPE, ESQ.
         BRENDAN KRASINSKI, ESQ.
8       ALSTON & BIRD, L.L.P.
         1201 West Peachtree Street
9       Atlanta, Georgia  30309-3424
         404.881.7000
10
11
12
13
14
15
16
17
18
19
20
21
22
23
24
25

**481**

EXHIBITS (cont'd.)

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 80 | Medical record dated 10-29-05 | 587 |
| 81 | Medical record dated 9-19-06 | 588 |
| 82 | Lab record dated 9-24-98 | 591 |
| 83 | Medical record dated 11-20-07 | 604 |

**480**

INDEX
PAGE

APPEARANCES................................ 479

BRIAN R. TULLOCH, M.D., FRCP, FACP

EXAMINATION
By Ms. Thorpe......................... 482
CORRECTION PAGE........................ 634
SIGNATURE PAGE........................ 635
REPORTER'S CERTIFICATION................. 636

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 63 | Expert Report of Brian Tulloch, M.D. re David Haller - withdrawn 482 | 483 |
| 64 | Haller time line | 482 483 |
| 65 | Expert Report of Brian Tulloch, M.D. re David Haller | 485 |
| 66 | Psychiatric Evaluation dated 10-1-02 | 500 |
| 67 | Medication Flow Sheet | 502 |
| 68 | Medication Flow Sheet | 509 510 |
| 69 | Correspondence | 509 |
| 70 | CD - Plaintiff, Eileen McAlexander (Deposition Transcript) | 510 |
| 71 | CD - Plaintiff, Linda Whittington (Deposition Transcripts) | 510 |
| 72 | CD - Plaintiff, Dived Haller (Medical Records and Deposition Transcript) | 510 |
| 73 | System review and progress note | 521 |
| 74 | Progress Note dated 2-25-03 | 521 |
| 75 | Progress Note dated 3-11-03 | 522 |
| 76 | Admission Nursing Consults | 523 |
| 77 | Medical record dated 10-21-85 | 550 |
| 78 | Surgical Assessment dated 8-26-00 | 553 |
| 79 | Progress Note dated 4-22-08 | 581 |

**482**

1       (Please refer to Volume 1 of the deposition
2  of Brian R. Tulloch, M.D., FRCP, FACP for the agreements
3  of counsel.)
4       (Exhibit Nos. 63 and 64 marked.)
5       BRIAN R. TULLOCH, M.D., FRCP, FACP,
6  having been duly sworn, testified as follows:
7       CONTINUED EXAMINATION
8  BY MS. THORPE:
9       Q. Dr. Tulloch, have you reviewed any documents
10 from AstraZeneca, company documents?
11      A. Not in large numbers. I have -- although as we
12 reviewed, that was a standard reference list that you
13 had there, so I -- I would defer to anybody else who's
14 read more. I haven't read a lot.
15      Q. Well, there are not any AstraZeneca documents
16 in Exhibit 4 --
17      A. That's correct.
18      Q. -- or Exhibit 16. Do you -- right?  I mean,
19 they're not in the stacks --
20      A. That's correct.
21      Q. -- that you --
22      A. I have not read them yet. I clearly will be
23 before we go to court.
24      Q. So you have not read any AstraZeneca documents
25 as of today?

483

1     A. As of today, that's right.
2     Q. So before forming your opinion in this case,
3  you did not review any AstraZeneca documents, right?
4     A. That's correct.
5     Q. Okay. All right. Let me show you your report
6  in the Haller case that's been marked as Exhibit 63.
7     A. Thank you.
8     Q. And I'm going to ask you if that's a true and
9  correct copy of the report that you prepared for the
10  Haller case.
11     A. Yes, ma'am.
12     Q. And then I'm going to show you what's been
13  marked as Exhibit 64 for identification and ask you if
14  this is the time line that was prepared for you by the
15  plaintiffs' lawyers and upon which you rely in this
16  case.
17     A. Yes, ma'am.
18     Q. Okay. Now, is Exhibit 63, your report,
19  factually and medically accurate?
20     A. To the best of my knowledge, yes, ma'am.
21     Q. And you prepared Exhibit 63?
22     A. Yes, ma'am.
23     Q. You were given all of the records -- medical
24  records that appear on page 16 of the spreadsheet on the
25  report?

484

1     A. Yes, ma'am.
2     Q. Can you mark for me, as you have in other
3  depositions, those medical records that you reviewed on
4  Mr. Haller? If it -- if it would help you, I can give
5  you another copy of the report.
6     A. Yeah, I think so, just an access to that page
7  that says "opinions related to" and then I can compare
8  the hospitals as they were listed.
9     Q. Here you go, Dr. Tulloch. If you would mark on
10  page 16 of the spreadsheet that is part of your report
11  that's been marked as Exhibit 63 those medical records
12  that you have reviewed on Mr. Haller.
13     A. Okay. What I'm going to do, as this particular
14  version of my report is missing, page 16, may I --
15     Q. Oh, well, let's -- let me mark another --
16  that's weird that it's missing.
17     A. That's okay.
18     Q. Let's make sure --
19     A. It stops at 15, that one. Here's a 16 and 17
20  on this. Shall I transcribe them over?
21     Q. Okay. Let's put -- if it's okay with
22  everybody, let's put the -- let's just get another
23  report. Somehow --
24     A. The one you gave me would do fine.
25     Q. I'm sure -- let me find one and check the --

485

1  let me check the pages so we make sure we have all the
2  pages.
3     A. Okay.
4     Q. Okay.
5     A. This one has 16 and 17. So why don't I give
6  you back the original 63. And you may want to put that
7  number on this version. How about that?
8     Q. Let's just mark another exhibit number and
9  let's start over clean and we'll be okay.
10     (Exhibit No. 65 marked.)
11     Q. (BY MS. THORPE) Okay, Doctor. I'm going to
12  show you what's been marked as Exhibit 65 for
13  identification. And can you tell me if that is a true
14  and correct copy of the report you prepared in the
15  Haller case?
16     A. Yes, ma'am.
17     Q. And that report contains accurate -- factually
18  accurate medical and scientific information?
19     A. Yes, ma'am.
20     Q. And you believe that it accurately states the
21  facts with regard to Mr. Haller in this case?
22     A. To the best of my knowledge, yes, ma'am.
23     Q. All right. I'm going to ask you to go to the
24  page 16 of the spreadsheet on the back of Exhibit 65 and
25  identify those records that you reviewed on Mr. Haller.

486

1     A. Thank you, ma'am. I will do that.
2     Okay, ma'am. I have all on the list of
3  page 16 and the first line of page 17. And not
4  immediately apparent to me -- but it may be listed under
5  somebody else's name -- is a Dr. Mouna Bacha, B-a-c-h-a,
6  who's on my list and isn't on page, either, 16 or 17.
7  As I say, it may be under Dr. Bellur Sreenath or some of
8  the other physicians.
9     Q. Okay. And so you did not read all of the
10  medical records that were given to you with regard to
11  Mr. Haller, right?
12     A. That's correct.
13     Q. And you did not read the deposition of the
14  plaintiff or any of the depositions of his treating
15  physicians before forming your opinions in this case?
16     A. That's correct.
17     Q. And you knew by not reading the complete set of
18  medical records on Mr. Haller that you could possibly
19  miss explanations for his weight gain other than his use
20  of Seroquel, right?
21     A. Yes, ma'am.
22     Q. And you knew that by not reading the medical
23  records of Mr. Haller you could miss explanations for
24  his diabetes other than Seroquel, correct?
25     A. Yes, ma'am. I would -- I would hope to pick up

3 (Pages 483 to 486)

**487**

1   most of those amongst his medical records, but I
2   acknowledge that things might have slipped through in
3   some of the depositions, yes, ma'am.
4        Q.  Well, you didn't read all of his medical
5   records, right?
6        A.  That's correct.
7        Q.  You knew that by not reading all of
8   Mr. Haller's medical records you could miss risk factors
9   or other cause for diabetes other than Seroquel,
10  correct?
11       A.  That's correct.
12       Q.  Now, before forming the opinions that you've
13  expressed in your report, you did not conduct your own
14  medical examination of David Haller, correct?
15       A.  No, ma'am, he was not offered to me, and I -- I
16  have discussed that before.
17       Q.  All right.  Well, we haven't talked about
18  Mr. Haller --
19       A.  Okay.
20       Q.  -- of course.  So right now I'm focusing on
21  Mr. Haller.
22            So before forming the opinions in your
23  report, you did not conduct a medical examination of
24  Mr. Haller, right?
25       A.  That's correct.

**488**

1        Q.  And you haven't done one since writing your
2   report, right?
3        A.  That's correct.
4        Q.  And before forming the opinions that you have
5   expressed in this case, you never met Mr. Haller, right?
6        A.  That is correct.
7        Q.  You have never spoken with him or asked to
8   speak with him, correct?
9        A.  That's correct.
10       Q.  You have never talked to Mr. Haller to take a
11  medical history, correct?
12       A.  That's correct.
13       Q.  In your clinical practice, you always take a
14  medical history, correct?
15       A.  If I'm asked to see the patient, yes, ma'am.
16       Q.  You have always done independent medical exams
17  of patients in court cases you've been involved in in
18  the past, correct?
19       A.  No, ma'am.  I cited the case of Zyprexa, which
20  we shared some days ago, and I mentioned that I was
21  given access to all but one of the patients in that
22  setting.
23       Q.  Okay.  I remembered that --
24       A.  Yeah.
25       Q.  -- you had been seeing some patients.

**489**

1        A.  Right, that's right.
2        Q.  Okay.  So -- so most of the time in the cases
3   you've testified in the past you have examined the
4   patient, correct?
5        A.  Well, I've had independent access to get an
6   independent history and had the ability to examine the
7   patients, that's correct, ma'am.
8        Q.  So your regular custom is that you would get a
9   history and see the patient when you were going to give
10  testimony in court about a patient, correct?
11       A.  That certainly was the case for Zyprexa.
12       Q.  And that's your regular practice?
13       A.  Well, it sounds as if I -- if I were to
14  acknowledge that, it would sound as if I see a lot of
15  patients before case reviews.  I -- I don't see all that
16  many.  And other than the Zyprexa case, I can't think of
17  any other patients that I'd given opinion on in court
18  that I had seen personally.  So --
19       Q.  Well, let me just ask it this way and
20  see if I can -- I'm a little confused, so let me just
21  start over.
22            Other than the one patient in a Zyprexa
23  case whom you did not take a history from and did not
24  see, have you ever given testimony in court about a
25  patient who you did not physically examine or take a

**490**

1   medical history from?
2        A.  Yes, ma'am.  If I refer you to Exhibit D and --
3        Q.  Okay.
4        A.  -- let me know when you're there.
5        Q.  I know what it is, so you can just --
6        A.  Okay.
7        Q.  -- talk away.
8        A.  Reference 1 was the Zyprexa case we've
9   discussed, and there was one case I did not see out of
10  probably five.  Reference 2 was Antonio Manuel Rodriguez
11  whom I did not have access to.  Reference 3 was David
12  Morieda whom I did not have access to.  Reference 4 was
13  Victoria Scott whom I did not have access to.  Reference
14  5 was Guy Patrick Carr whom I did not have access to,
15  and Reference 6 was Janell Martin whom I did not have
16  access to.  So I hope that clarifies that.
17       Q.  So what you're saying is in the past four
18  years, it has been your practice to give testimony
19  without examining the patient or taking a medical
20  history --
21       A.  Well, I like --
22       Q.  -- by and large, right?
23       A.  -- I like to see them when they're available.
24  A number of the names that I read to you were, in fact,
25  dead patients, so they weren't available for access.

491

1    Q. Okay. Well, that explains some of it.
2    A. And one of them was decorticate -- well, let me
3    use the common term. One was functionally a vegetable,
4    and another one was severely psychotic. So I think
5    where possible I try to obtain my own personal opinions
6    of the patients and take an independent history.
7    Q. And why do you like to do that?
8    A. Well, because it allows me to give -- to obtain
9    a personal opinion of the subject and to -- especially
10   if this is related to a diabetes or endocrine condition,
11   to make my own independent judgment.
12   Q. Do you sometimes find that you have questions
13   that you'd like answered that aren't contained within
14   the medical records that you review so that when you can
15   talk to the patient, you can try to get the missing
16   information?
17   A. It certainly does allow for a clearer picture,
18   yes, ma'am.
19   Q. Now, as to Mr. Haller, based on your report,
20   you are saying that the mechanism by which he got
21   diabetes was weight gain, right?
22   A. To the best of my knowledge, ma'am, yes.
23   Q. And so all the cases that you and I've been
24   talking about, your opinion is that Seroquel caused
25   weight gain that led to the development of diabetes;

492

1    is --
2         MR. BRUDNER: Objection, form.
3    Q. (BY MS. THORPE) -- that right?
4         MR. BRUDNER: I'm sorry.
5    A. As the best clinically supportable hypothesis,
6    yes, ma'am.
7    Q. (BY MS. THORPE) And as to Mr. Haller, you have
8    found no scientific evidence to support a conclusion
9    that Seroquel directly affects the -- his -- affected
10   his pancreas or the cells of his pancreas?
11   A. Yes, ma'am, there is, to my knowledge, no data
12   that would make that clear.
13   Q. And you -- as to -- let's just speak generally
14   for a moment.
15   A. Okay.
16   Q. As we sit here tonight, you know of no
17   scientific evidence that allows you to conclude that
18   Seroquel directly affects the pancreas or cells of the
19   pancreas or has any other direct effect on people to
20   cause diabetes, correct?
21   A. Yes, ma'am, we have covered that question in
22   other cases, and I think my answers from the other cases
23   would apply to this one.
24   Q. So you agree --
25   A. Yes.

493

1    Q. -- with my statement?
2    A. Yes. And -- but remember what I also said.
3    Seroquel is -- is part of a group of atypical
4    antipsychotics, at least one of which was shown to have
5    a direct effect. To my knowledge, nobody's looked for
6    Seroquel. So in agreeing that there's no data that I
7    know of, I also would point out that there could be data
8    if somebody looked. To my knowledge, nobody's looked.
9    Q. You don't have any data? All I can ask you
10   about is what you know, Dr. Tulloch.
11   A. Yes, ma'am. I have no data for Seroquel -- for
12   any direct action of Seroquel on measured indices within
13   the body other than weight gain.
14   Q. Okay.
15   A. Perhaps that clarifies it for us.
16   Q. All right. Now, I want to talk about the use
17   of Seroquel by Mr. Haller. Okay? So if you would look
18   at your specific comments about medical records in your
19   report, if you look at the fourth paragraph of your
20   comments regarding Mr. Haller in Exhibit 65, you'll see
21   that you say his first access to Seroquel is noted in
22   February of 2002. Do you see that?
23   A. One, two, three, four. My first -- my fourth
24   paragraph reads, "An early body weight is."
25   Q. Right. And the next sentence --

494

1    A. Okay. Yeah. Okay.
2    Q. Do you see that?
3    A. Yes, ma'am.
4    Q. You say his first access to Seroquel is noted
5    in February of 2002, right?
6    A. That's correct.
7    Q. Now, can you tell me what you mean by "access
8    to Seroquel"?
9    A. Well, to my view, it was a synonym for he was
10   first given Seroquel.
11   Q. Okay. Do you mean by saying that he had access
12   to Seroquel that you don't know whether or not
13   Mr. Haller, because of compliance problems, took the
14   drug?
15   A. That's a reasonable way of interpreting that
16   statement, yes, ma'am.
17   Q. You know that Mr. Haller is extremely mentally
18   ill, correct, from your review of the records?
19        MR. BRUDNER: Objection, form.
20   A. From my review of the records, that would seem
21   to be a reasonable statement, yes, ma'am.
22   Q. (BY MS. THORPE) And you would agree that there
23   are numerous references in the records that would
24   suggest that he's not been compliant with a number of
25   his therapies, including Seroquel, right?

495

1    A. I think that's a reasonable statement.

2    Q. So -- so that's why you carefully chose the

3    words that you chose in your report, that his first

4    access to Seroquel was February of 2002, correct?

5    A. I think that's a reasonable interpretation,

6    yes, ma'am.

7    Q. All right. What medical record did you rely

8    upon to obtain his first access to Seroquel?

9    A. Ma'am, I haven't looked at those records for

10   some months now, so it would take me a minute to find

11   them. I'm looking at the time line which doesn't have

12   that date. So I will have to go back to saying when

13   I -- when I dictated that, I had -- I had some knowledge

14   of those dates.

15       And as you can see, I didn't mention

16   that -- the dose because the knowledge I had of the

17   access to Seroquel did not include a date, and then I

18   mentioned that by May of 2003 there was a date that I

19   could trace.

20   Q. Well, Doctor, you will agree with me that

21   Exhibit 64, the time line, does not show an entry for

22   February of 2002 and -- as a time when Mr. Haller either

23   took Seroquel, was prescribed Seroquel, or had access to

24   Seroquel, correct?

25   A. I agree with that. That's pretty well what

496

1    I've said. I don't find it on the time line.

2    Q. Okay. So I would like you to tell me where you

3    got that from.

4    A. Okay.

5    Q. What's the best way to go about doing that?

6    A. May I leave -- that may take a long time

7    because it will be somewhere in the charts. And as I

8    mentioned, I was using two computers, reading the charts

9    off one computer because I did not print them and then

10   typing on the other computer. So may I leave that as

11   a -- as a question that I will bring to you?

12   Q. Tomorrow?

13   A. Because it -- well, no.

14   Q. Our last -- our last day is tomorrow, so --

15   A. Okay. Then I will bring to you when I have it.

16   I mean, just leave it that way.

17       I don't make statements without some

18   evidence, but -- but if you understand what I did was I

19   had -- and I'm holding up a disk -- I had a disk of his

20   clinical material on one computer and was typing on the

21   other computer. Somewhere in one of those disks is

22   information that led me to surmise that was his first

23   access.

24       So to answer your question with fact and

25   date, I would need to roll up all of his -- his medical

497

1    records and -- and look through for that relevant date.

2    And I don't think it's fair to you to promise it by this

3    time tomorrow.

4    Q. Okay. Well --

5    A. But I will bring it when I --

6    Q. -- I'm -- have every intention to be through

7    with this process tomorrow.

8    A. Yeah, that's reasonable.

9    Q. But I -- I will tell you, Doctor, that I can't

10   find a reference in my review of the medical records for

11   February of 2002, which is why I ask you that. And

12   so -- let me just ask you. You agree that it's very

13   important to know when Mr. Haller was taking Seroquel,

14   right?

15       MR. BRUDNER: Objection, form.

16   A. I agree with that. And I --

17   Q. (BY MS. THORPE) It's important to you for your

18   opinion?

19   A. I stand by my promise that when I find it, I

20   will -- I will share it with you. And I offered to you

21   the method by which I will seek that date. If it would

22   be easier for our discussion -- would it be easier to

23   move to the first recorded dose which we would agree is

24   available on the time line and where I have a dose and

25   that was 400 milligrams a day, which is available on the

498

1    17th of May on page 5 of the time line? Would -- would

2    that be easier?

3    Q. We can talk about that in just a second.

4    A. Okay.

5    Q. Let me just finish up on the -- on the February

6    2002 date.

7        So as we sit here right now, you cannot

8    tell me what medical record the February 2002 start date

9    for Mr. Haller taking Seroquel came from, right?

10   A. That's correct.

11   Q. And is it true, Doctor, that you -- for dates

12   that the patient was on Seroquel for -- for anybody you

13   looked at, you went through the medical records and

14   found the dates that they were on Seroquel?

15   A. That's correct.

16   Q. You did that -- you didn't just look at the

17   time line that's been marked --

18   A. No, ma'am.

19   Q. -- as Exhibit 64, correct?

20   A. No. As I mentioned, I -- I did read the

21   charts. I listed the charts that I read. I found

22   another one that is on my list and which we don't have

23   on page 16. And then as I put my -- my thoughts

24   together, I worked in the manner which we have just

25   described.

499

1    Q. Okay. And you agree that the time line doesn't
2  show the February 2002 date -- the time line that's been
3  marked as Exhibit 64?
4    A. That's correct.
5    Q. All right. Now -- and you are -- strike that.
6      You are confident that your report is not
7  mistaken as to the February 2002 date?
8    A. Ma'am, all of us do the best we can. To the
9  best of my knowledge, there will be a referral from
10  which I got that information. But with the time line as
11  our only current linear reference -- linear, I mean
12  linear in time -- the best data I can offer to you will
13  be page 5 of the time line dated May the 17th.
14    Q. Well, let's look at the page that has the first
15  entry for Seroquel in the time line. What -- what day
16  is that?
17    A. Well, I would start with page 5 -- well, no.
18  There's one of January of -- 28th of '03 and there's one
19  in December 18 of '02. I'm looking at page 4.
20    Q. Okay. So the time line -- I'm sorry.
21    A. And then page 3 I don't see any referral to
22  Seroquel.
23    Q. The time line that's been marked as Exhibit 64
24  says that -- has the first entry for Mr. Haller getting
25  Seroquel as December 18, 2002, correct?

500

1    A. That's correct, ma'am, page 4.
2    Q. And in looking at the time line, the
3  plaintiffs' law firm gives you no document number or
4  identity of a doctor who prescribed it or any kind of
5  description of the particular medical record, correct?
6    A. That's correct.
7    Q. In fact, it just says current medications,
8  colon, Seroquel and then in brackets, illegible R.N.
9  signature, correct?
10    A. Yes correct.
11    Q. Do you know if this December 18, '02 entry is
12  correct on the time line that's been marked as
13  Exhibit 65?
14    A. I can't vouch for that without looking back at
15  the pharmaceutical records that relate to when he first
16  got a supply of Seroquel. Again, if it becomes -- well,
17  let me leave that statement right there.
18      (Exhibit No. 66 marked.)
19    Q. (BY MS. THORPE) Doctor, I'm going to show you
20  what's been marked as Exhibit 66 for identification,
21  which is a medical record dated October 1, 2002. And
22  I've highlighted the sentence about Seroquel because
23  it's a multipage document.
24    A. Okay. Thank you.
25    Q. My first question is: Have you ever seen this

501

1  document that's been marked as Exhibit 66?
2    A. What I have for Exhibit 66 is from Directions
3  For Mental Health, a psychiatric evaluation by a nurse
4  practitioner labeled Dee Burke. It's dated October the
5  1st of '02. And on page 5 it's referred that doctor --
6  Ms. Burke refers, "We'll work with Seroquel as we adjust
7  the medication." So that is a referral to Seroquel in
8  October of '02.
9    Q. Now, did you read this document that's been
10  marked as Exhibit 66 before you formed your opinions in
11  this case?
12    A. If Dee Burke's name is on that list, I will
13  have, yes, ma'am.
14    Q. Does that mean yes?
15    A. And Directions For Medical Health -- yes, I did
16  read -- Directions For Mental Health is on my list, yes,
17  ma'am.
18    Q. Okay. So is it -- do you stand by your report
19  when you say that his Seroquel use began in February of
20  2002 or do you believe it was -- your report was
21  mistaken on that point?
22    A. Ma'am, again, neither of us have a dose or a
23  time. What we have here is a statement by Ms. Burke
24  that says, "We'll work with Seroquel as we adjust his
25  medication." 2000 -- this is October 2002.

502

1      The -- as I recall, the first reference I
2  could find -- but it was vague and may have been a
3  phrase like this -- was to February of 2002. And as I
4  promised, I -- when I find it, I will share it.
5      But what we have here is a nurse
6  practitioner who refers to working with this man's
7  administration of Seroquel but we do not have a dose and
8  we do not have a time at which it was started.
9    Q. Okay. So you're -- you continue to believe
10  that your statement in your report is correct?
11    A. To the best of my knowledge, ma'am. Now, I
12  don't have perfect recall. I generally try to choose
13  chapter, time, and verse where I can find it. And as
14  you had noted, the wording that I chose for that
15  particular date was access to Seroquel, implicating --
16  implying that I really wasn't certain what date he'd
17  been on -- what dose he'd been on -- at that time.
18    Q. Okay. But you agree with me that your analysis
19  of Mr. Haller is premised on him beginning Seroquel on
20  February 2, 2002, right?
21    A. Yes, ma'am.
22      (Exhibit No. 67 marked.)
23    Q. (BY MS. THORPE) And I'm going to show you
24  what's been marked as Exhibit 67 for identification and
25  ask you if you've ever seen this record which comes from

503

1  the Directions For Mental Health chart.
2  A. Yes, ma'am. As I mentioned, I did go through
3  the chart for Directions For Mental Health. And I'm
4  looking at Exhibit 107, which is page -- I don't see it.
5  Well, let's -- the Bates number would be 350.
6  Q. And if you look at this document, you see that
7  Mr. Haller was prescribed Seroquel in a starter pack
8  kind of arrangement beginning on October 1, 2002, right?
9  A. Yes, ma'am.
10  MR. BRUDNER: Objection, form.
11  Q. (BY MS. THORPE) And you will agree with me
12  that the time line that's been marked as Exhibit 64 and
13  your report failed to indicate that Mr. Haller commenced
14  Seroquel use in October of 2002, right?
15  A. Yes, ma'am. And as I mentioned, because I -- I
16  got the impression it had actually started some months
17  before that in February of '02, but there's no doubt
18  that this looks like it was an initiation.
19  Q. So you would agree that your report was
20  mistaken when it said that he began using Seroquel in
21  February of 2002?
22  A. I will agree to that statement until I can
23  prove anything -- and until I produce a reference that
24  contradicted it, yes, ma'am.
25  Q. And you'll agree that the time line that you

504

1  rely on from the plaintiffs' firm that's been marked as
2  Exhibit 64 is mistaken as to when he commenced Seroquel
3  use?
4  A. Yes, ma'am, it does not include that particular
5  date.
6  Q. The date of October 2002, right?
7  A. 10-1-02, that's correct.
8  Q. Now, the -- I think you've -- well, strike
9  that.
10  Before forming your opinion in this case,
11  you did not know what dose of Seroquel Mr. Haller was on
12  until May of 2003, correct?
13  A. That's correct.
14  Q. And you didn't know -- strike that.
15  Assuming that he began at the date you said
16  in your report of February of 2002, you didn't know what
17  dose he was on all during 2002, correct?
18  A. That's correct.
19  Q. And you didn't know what dose of Seroquel
20  Mr. Haller was on for the first five months of 2003,
21  right?
22  A. That's correct.
23  Q. So is it correct, sir, that the dose of
24  Seroquel that Mr. Haller was on during the first year
25  and three months that he was on Seroquel was unimportant

505

1  to you in forming your opinions in this case?
2  A. I -- I think that's -- that may not be correct.
3  What I was trying to do was be as fair as I could in my
4  statement of facts. I was trying to find the broadest
5  time that he had access to Seroquel. So at least if
6  there was any changes in body weight, they could be
7  ascribed to whatever was current on his medication at
8  the time. So I would rather have his presence on
9  Seroquel were it -- were it possible so that any weight
10  change would be ascribable to whatever was -- could be
11  explained.
12  As I've said earlier, what I was trying to
13  do was give the best reference of the facts available in
14  this case.
15  Q. Well, you had no idea what dose of Seroquel
16  Mr. Haller was on until May of 2003, correct?
17  MR. BRUDNER: Objection, form.
18  A. That's correct. And that's the way I word it,
19  that his first access to Seroquel was, as I believed, in
20  February of '02 and the dose recorded in May was
21  400 milligrams. So that was why I made the statement
22  the way I did.
23  Q. (BY MS. THORPE) So whatever happened with
24  Mr. Haller's weight between the time he started Seroquel
25  and the time -- until May of 2003, your opinion as to

506

1  those events during that time frame would not depend on
2  the dose of Seroquel he was on because you didn't know
3  what it was, right?
4  A. That's correct.
5  Q. In the first paragraph on the second page of
6  your report, you say -- you see where the sentence
7  begins in January 2006? It's the second sentence of the
8  first paragraph.
9  A. Okay. I've got it.
10  Q. Okay. So you say, "In January 2006 this" --
11  referring to Seroquel -- "was increased to 50 milligrams
12  for two weeks," right?
13  A. No, ma'am.
14  Q. I'm sorry. Referring to Risperdal.
15  A. I think if you go back two lines, you'll find
16  it's not Seroquel.
17  Q. You're right. I'm sorry. I really don't want
18  to talk about this sentence particularly. I'm trying to
19  get you oriented to 2006.
20  A. Okay.
21  Q. So you're saying -- in the first paragraph on
22  the second page of your report, you're saying in January
23  2006 Risperdal was increased to 50 milligrams per two
24  weeks, right?
25  A. Yes, ma'am. I would go back to the first

507

1  sentence because that will be clearer for you. In
2  December the 5th, he was given another atypical
3  antipsychotic. This was Risperdal. And it was started
4  as 1 milligram three times a day with an intramuscular
5  injection every three weeks --
6      Q. Right.
7      A. -- of 37.5 milligrams, yes, ma'am.
8      Q. And in January of 2006, that was -- the
9  Risperdal prescription was increased to 50 milligrams
10  per two weeks, right?
11     A. So it was increased both in strength and in
12  frequency, yes, ma'am.
13     Q. Then the next sentence says, "By March" -- and
14  by that you mean by March of 2006, right?
15     A. That's correct.
16     Q. -- "the Seroquel dose was increased to
17  600 milligrams a day."
18        And this dose was continued to the last
19  chart entry on August 26, 2007, correct?
20     A. That's correct.
21     Q. Now, when did Mr. Haller stop taking Seroquel?
22     A. To my belief, he was still on Seroquel in
23  August of 2007. But let me check that.
24        Yes, ma'am. I believe if we work from the
25  time line on page 61, certainly at that stage he was

508

1  getting 300 milligrams of Seroquel and 60 tablets, the
2  implication there being that he was taking two a day.
3  So that would be 600 milligrams.
4      Q. Okay.
5      A. And I do not have any reference on the flow
6  sheet that Seroquel was terminated. I -- I know that
7  there are later charts that are being sent to us all the
8  time. I'm sure you're getting them the same as I. So
9  that could be checked on the next batch of updating
10  charts that comes from Florida.
11     Q. Have you received any charts on any of the
12  plaintiffs that we've been talking about for the last
13  few sittings of your deposition, either Ms. McAlexander,
14  Ms. Whittington, Mr. Unger, or Mr. Haller since we
15  started this process?
16     A. Yes, ma'am.
17        I'm sorry for the delay. It took me a
18  while to dig them up. I -- I got this -- I haven't got
19  through all of them. But as you can see, the date is
20  quite recent. And what you're looking at is updated
21  charts on three of the patients we've been discussing.
22     Q. Okay.
23     A. And I hand them over. I --
24     Q. I'm sorry.
25     A. I haven't gone through them all yet myself, so

509

1  we will share them in our interest.
2      Q. Okay. Well, let me go ahead and mark them.
3        MR. BRUDNER: Are these your copies?
4        THE WITNESS: They're my only copies.
5        MR. BRUDNER: Yeah, let's -- let me make
6  copies of that.
7        MS. THORPE: Okay. There are three disks
8  here, too, though.
9        MR. BRUDNER: Okay.
10       MS. THORPE: I mean, I don't mind having a
11  copy of the record -- a copy of the letters, but I think
12  we should go ahead and mark the disks and then have the
13  court reporter copy them just like she did unless you
14  can burn them.
15       MR. BRUDNER: I think I can. But let me --
16  I know you want to mark them.
17       MS. THORPE: I mean, I don't mind you
18  taking them after I mark them and --
19       MR. BRUDNER: Let's do that.
20       MS. THORPE: Does that make sense?
21       MR. BRUDNER: Yeah, let's do that.
22       MS. THORPE: Okay.
23       (Exhibit Nos. 68 and 69 marked.)
24     Q. (BY MS. THORPE) Doctor, I'm going to show you
25  a collective exhibit that's been marked as Exhibit 69,

510

1  which consists of three letters dated October 9, 2008,
2  sending you various materials in the Linda Whittington
3  case, the Eileen McAlexander case, and the David Haller
4  case. Did I correctly describe Exhibit 69?
5      A. Yes, ma'am, these are what I've just shared
6  with you.
7      Q. Yes. And then I'm going to mark three disks
8  that you've also brought with you today that are the --
9  are the records that are described in the letters that
10  have been marked as Exhibit 69, correct?
11       (Exhibit Nos. 70 through 72 marked.)
12     A. Yes, ma'am.
13     Q. (BY MS. THORPE) And these disks have been
14  marked -- these disks have been marked as Exhibits 70,
15  71, and 72, correct?
16     A. Yes, ma'am.
17     Q. All right. Let's just -- would you like to
18  take them?
19       Doctor, I'm going to show you what's been
20  marked as Exhibit 68 for identification and ask you if
21  that is a record from Directions For Mental Health that
22  you've reviewed.
23     A. Yes, ma'am. It's Directions For Mental Health,
24  yes, ma'am.
25     Q. And Exhibit 68 shows that Mr. Haller was on

9 (Pages 507 to 510)

511

1    Seroquel at least through May 20th of 2008, this year,
2    correct?
3        A. Yes, ma'am.
4        Q. And your report fails to indicate that he
5    continued to be on Seroquel through -- through at least
6    that point in time, correct?
7        A. Well, what I said was -- and this dose was
8    continued until his last chart entry, which was the last
9    chart entry available to me at the time I was -- I was
10   relating to that patient on August the 26th. Now, if we
11   have data since then --
12       Q. Of 2007?
13       A. Of 2007, yeah.
14           If we have data since that and we -- I have
15   just shared with you some material I got six days ago.
16   Clearly, my report will be continuously updated as this
17   more recent data becomes available.
18       Q. Well, Exhibit 68 is a medical record that was
19   part of the Directions For Mental Health records that
20   you reviewed, right?
21       A. Yes, ma'am.
22       Q. So it's not a new record?
23       A. No. But -- but when I was doing that report,
24   the last chart entry which I found -- and I stated as
25   such -- was August 2007.

512

1        Q. Okay. And this information that's contained on
2    Exhibit 69 about Mr. Haller taking Seroquel in May of
3    2008 is not contained in the time line that's been
4    marked as Exhibit 64, right?
5        A. That's correct, yeah.
6        Q. So we know that based on -- on your report and
7    these documents that Mr. Haller was taking Seroquel when
8    he was compliant and he wasn't always compliant between
9    October of 2008 and -- excuse me. Let me start that all
10   over.
11           You've agreed that Mr. Haller didn't always
12   take his medicine, right?
13       A. That's correct.
14       Q. Didn't always take his Seroquel, right?
15       A. Yeah.
16       Q. Right?
17       A. Yes, ma'am.
18       Q. But the time frame in which he had
19   prescriptions for Seroquel ran -- based on these records
20   that you have before you -- from October of 2002 to --
21   all the way through May of 2008, correct?
22       A. That's correct.
23       Q. And I know you haven't read Mr. Haller's
24   deposition, right? Right?
25       A. That's correct.

513

1        Q. But he testified in July of this year that he
2    was still taking Seroquel. You didn't know that when
3    you formed your opinions in this case?
4        A. That's correct.
5            MR. BRUDNER: Objection, form.
6        A. I left -- I left the -- from the wording of my
7    report, I left it open that certainly our last time I
8    had data, August 2007, he seemed -- he was still on
9    Seroquel at the dose of 600 milligrams a day.
10       Q. (BY MS. THORPE) All right. So what I want to
11   now get you to focus on is the third paragraph in your
12   report, sort of the -- where you express your opinion on
13   a reasonable probability on the second page.
14       A. Yes, ma'am.
15       Q. You say in your report, don't you, sir, that
16   based on reasonable medical probability, the excess
17   weight gain experienced following the administration of
18   the atypical antipsychotic Seroquel was a cause of his
19   developing diabetes, right?
20       A. Yes, ma'am.
21       Q. Now -- and just before that sentence, you say
22   that the main detectible relationship between Seroquel
23   and abnormal glucose physiology therefore seem to be
24   following a 21-pound weight gain when clearly abnormal
25   sugars are registered, right?

514

1        A. That's correct, ma'am.
2        Q. So you're saying that the -- excess weight
3    gain that Mr. Haller had, in your opinion, was a
4    21-pound weight gain, right?
5        A. That's all I could find, yes, ma'am.
6        Q. Okay. So what do you mean when you say "that's
7    all I can find"?
8        A. Well, as I've shared, we do not have accurate
9    recording of body weight every time he sees a physician
10   for psychiatric basis. On the other hand, my patients
11   are weighed every time they come to see me.
12           So when I make a statement like that, I
13   say -- I'm implying that in this particular
14   subspecialty, which is psychiatric care of patients, the
15   body weight is not followed as avidly as it is in other
16   subspecialties of internal medicine. That was the only
17   relevance for that.
18       Q. All right.
19       A. That's very different. When I'm teaching
20   students, I focus down. The weight is very important
21   when you're looking at all the risk factors for
22   diabetes, hypertension, et cetera.
23       Q. Well, Mr. Haller had a lot of caregivers, many
24   of whom were not psychiatrists, right?
25       A. Yes, ma'am.

10 (Pages 511 to 514)

515

1    Q. For example, he had extensive gastrointestinal
2  care by internal medicine folks, right?
3    A. Yes, ma'am.
4    Q. And focusing on this -- focusing on your method
5  of analyzing the medical records for a minute,
6  Dr. Tulloch, did you go through his charts looking for
7  places after Seroquel where he gained weight -- after he
8  started taking Seroquel where he gained weight?
9    A. Ma'am, what I tried to do was get the best
10 available data, in other words, get an idea of how
11 stable his body weight had been prior to Seroquel and an
12 idea of how stable his body weight had been after
13 Seroquel and then try to analyze what the trends had
14 been.
15       And may I refer you back to the second
16 paragraph, if you wish, or we can go back to it. And
17 what I did there was essentially say --
18   Q. Can you identify the paragraph for me so I know
19 exactly what you're looking at?
20   A. We're looking at the page that starts on
21 December the 5th.
22   Q. Okay.
23   A. And we're looking at the paragraph below that.
24   Q. Got it.
25   A. And essentially what I'm trying to do is just

516

1  discuss, you know, what are the issues behind this man
2  developing abnormal blood sugar.  And so I tried to
3  analyze that.  And I said, "In reviewing the
4  relationship between his weight and the onset of
5  abnormal blood sugar, there's evidence for weight gain,"
6  and I give the weight gain and I give the dates and then
7  he was diagnosed with abnormal blood sugar.
8    Q. Okay.  So let's -- let's --
9    A. Let me finish.  Well -- because I then went on
10 and said, "Soon after the initiation of Metformin and
11 presumably an appropriate diet, his weight was reduced
12 once again to 218."
13       So what I'm trying to do is say, you know,
14 this is what happened.  We're not -- it would be
15 inappropriate to -- to put all of the coals in one
16 basket.  There were many things going on in this man.
17 And once his sugar had been diagnosed, his weight came
18 back to quite a reasonable approximation to its previous
19 value.  I'm not saying it's ideal for his height, but to
20 his previous value.
21       And the last sentence of that -- last
22 phrase of that paragraph says, "And thenceforth, the
23 remained -- the weight remained fairly stable while his
24 sugars remained under excellent control."
25       So this man was well cared from -- from the

517

1  point of view of getting his blood sugars under control.
2    Q. So -- I have a really simple question.
3    A. Okay.
4    Q. What you're saying is the good evidence of his
5  weight gain is from January of 2001 when he weighed
6  230 pounds --
7    A. Uh-huh.
8    Q. -- to May of 2004 when you found a weight at
9  251 pounds --
10   A. That's correct.
11   Q. -- right?
12       So -- so the excess weight gain you're
13 talking about in this case is a 21-pound weight change
14 that you believe occurred from January 2001 to May of
15 2004, right?
16   A. That's correct.
17   Q. And your opinion to the extent that you blame
18 Seroquel for anything in Mr. Haller is based upon that
19 21-pound weight gain --
20   A. Yes, ma'am.
21   Q. -- right?
22   A. Yes, ma'am.
23       And may I read into -- the contents of the
24 next sentence because what I then say is, "Whatever
25 happened, they got his weight back down again."  And as

518

1  the last phrase of my second paragraph says, "After
2  that, his sugars were pretty well-controlled."
3    Q. Right.  But -- but -- let me just be sure that
4  I'm absolutely clear, Dr. Tulloch.  Your opinion that
5  Seroquel caused Mr. Haller to develop diabetes is based
6  on the 21-pound weight gain between January of 2001 and
7  May of 2004, correct?
8    A. That's correct.
9    Q. Now, you drew the 230 pounds in January 2001
10 from the time line that's been marked as Exhibit 64; is
11 that right?
12   A. I believe so, yes.
13   Q. Did you verify the weights in the time line?
14   A. Ma'am, as I said, I believe I did when I went
15 through those disks.  But I did not print them out.
16 I've mentioned that already.
17   Q. Okay.  All right.
18   A. So the best I have to give you in the way of
19 written data is what we have in the time line.
20   Q. All right.  And then the -- so the 230 pounds
21 on January 2001 appears --
22   A. Page 3.
23   Q. -- on page 3.  And the 251 pounds is on a May
24 4th entry on what page?
25   A. 2004.  I'll tell you when I find it.

519

1    Q. I think it's page 18, right?
2    A. Page 18 up at the top, yes, ma'am.
3    Q. Okay. Now, the January 15, 2001 weight, let's
4    focus on that first. Okay?
5    A. Uh-huh.
6    Q. All right? Are you with me?
7    A. Page 3 of the time line, yes, ma'am.
8    Q. Yeah. Mr. Haller was 5'6" tall, right?
9    A. Yes, ma'am.
10   Q. And if he weighed 230 pounds in 2001, he was --
11   he had a BMI of 37.1, correct?
12   A. That's right.
13   Q. He had a BMI of 37.1 before he ever started
14   taking Seroquel, correct?
15   A. Yes, ma'am.
16   Q. That's morbidly obese, isn't it?
17   A. We agreed on earlier patients, yes, ma'am.
18   Q. Yes. And he is only 40 years old, right?
19   A. Yes, ma'am.
20   Q. Now, I think we've agreed that he started
21   taking Seroquel in October of 2002, right?
22   A. That's the best evidence we have right now,
23   yes, ma'am.
24   Q. So your calculation of this weight gain, this
25   21-pound weight gain, is based on a weight on January

520

1    15, 2001, that is approximately two years before
2    Mr. Haller began taking Seroquel, correct?
3    A. Yes, ma'am. But it -- it's quite close to one
4    which is recorded in the time line on page 4, March the
5    13th of '03, which is within 4 pounds of -- of that
6    weight. So I think they're fairly close. But I refer
7    you to page 4.
8    Q. Okay. We'll come back to March 13, '03 --
9    A. Okay.
10   Q. -- in just a minute. All right?
11        But your calculation in your report is
12   based on a -- a weight that was recorded for Mr. Haller
13   two years before he started Seroquel?
14   A. Yes, ma'am. And which --
15   Q. You --
16   A. -- which was quite close to a date six months
17   after he started Seroquel, but maybe I shouldn't have
18   mentioned that until you address it.
19   Q. We can talk -- we can talk about that right
20   now.
21   A. Okay.
22   Q. Let's just -- let's just talk about that
23   weight. So -- so are you relying on the March 13, 2003
24   weight as a basis of your opinion that he had a 21-pound
25   weight gain?

521

1    A. No, ma'am, because that would be more. What I
2    was -- in my opinion, it would seem that his weight had
3    not changed a great deal between January of '01 and
4    March of '03. Those 4 pounds difference are not -- not
5    a major difference.
6        (Exhibit No. 73 marked.)
7    Q. (BY MS. THORPE) I'm going to show you what's
8    been marked as Exhibit 73 for identification, which is a
9    medical record dated February 11, 2003, and ask you to
10   look at the second page and tell us what weight is shown
11   two days before -- or two -- one month before the March
12   13th day.
13   A. Thank you, ma'am. I have March the 28th of --
14   well, no, that's the date -- okay. On the front of
15   Exhibit 73, I have February the 11th of '03. And on the
16   second page, I have a date that looks like 213 or 243,
17   depending on whether that's a 4 or a 1. And I have a
18   very high blood pressure.
19   Q. So you say you can't tell if that's a 243 or a
20   2 --
21   A. 13.
22   Q. 213?
23   A. Yeah, could be either.
24        (Exhibit No. 74 marked.)
25   Q. (BY MS. THORPE) And then I'm going to show you

522

1    the document that's been marked as Exhibit 74 for
2    identification, which is a medical record dated February
3    25, '03, just less than a month before the March 13, '03
4    weight that is marked as 226. What's the weight shown?
5    A. That one definitely is 243 pounds, ma'am.
6    Q. Right. So less than a month before this record
7    that you're pointing us to of March 13, '03, he weighed
8    how much?
9    A. 243.
10   Q. Okay. So -- so you think he -- is it your
11   opinion that he dropped from 243 pounds on February --
12   what's the date?
13   A. That looks like 11 -- no, that's the date --
14   February the 25th.
15   Q. Okay. Is it your opinion, sir, that between
16   February 25, '03, when he weighed 243 pounds, he then
17   dropped, in less than three weeks, down to 226 pounds?
18   A. No, ma'am. I think if there's ever a
19   discordant weight, one has to accept that one of the
20   scales is wrong or one of the transcriptions is wrong.
21   That's what I said earlier. What I try to do is give a
22   broader review and the best average weights.
23   Q. Okay.
24        (Exhibit No. 75 marked.)
25   Q. (BY MS. THORPE) I'm going to show you what's

523

1  been marked as Exhibit 75 for identification and ask you
2  if that's a March 11, '03 weight for Mr. Haller.
3      A. Yes, ma'am, I see March the 11th and I see -- I
4  see 46, the 2 in front of it is -- is -- I think we
5  would need to assume.
6      Q. You would be surprised if it wasn't 246 pounds,
7  correct?
8      A. I think that's reasonable, yeah.
9      Q. So two days before this entry on the time line
10  of March 13, 2003 of 226, a medical record we've marked
11  as Exhibit 75 shows him weighing 246 pounds, correct?
12      A. That's reasonable, ma'am, yes.
13      Q. So now we have three medical records all right
14  around March 13, 2003, showing him at 246 -- or 243 to
15  246, right?
16      A. Yes, ma'am, I'll -- I'll accept that.
17      Q. And then --
18          (Exhibit No. 76 marked.)
19      Q. (BY MS. THORPE) -- I'm going to show you a
20  record dated May 17, 2003, that's been marked as
21  Exhibit 76 for identification, which is just a couple of
22  months after the March 13, 2003 date.  And can you tell
23  me what the weight is on that date?
24      A. Thank you, ma'am.  It's dated 5-17, and that
25  date is -- that weight -- body weight is 246.  And it

524

1  matches quite well with the time line on page 5 of a
2  weight of 246, yeah.
3      Q. So you would agree with me that more likely
4  than not, the entry on March 13, 2003, on the time line
5  of 226 pounds is an error?
6      A. I think that's a reasonable statement, ma'am.
7  The numbers you brought up are quite reasonably
8  concordant with the time line date of -- weight of 246
9  dated May the 17th, '03.
10      Q. All right.  So -- so let's go back to where we
11  were at the beginning.  Your 21-pound weight gain is
12  based on a weight of 230 pounds on January 15, 2001,
13  right?
14      A. That's correct.
15      Q. And that weight was measured approximately two
16  years before Mr. Haller began taking Seroquel, correct?
17      A. That's correct.
18      Q. You have no idea how much Mr. Haller weighed
19  just before he started taking Seroquel, correct?
20      A. That's correct.
21      Q. You don't know how much Mr. Haller weighed a
22  month before he took Seroquel, right?
23      A. Ma'am, we've made the statement we don't know
24  his weight.
25      Q. You didn't -- so, correct?

525

1      A. That's correct.
2      Q. You don't know two months before he took
3  Seroquel, correct?
4      A. That's correct.
5      Q. You don't know eight months before he took
6  Seroquel what he weighed, correct?
7      A. We said -- yes, ma'am, two years was what we
8  said.
9      Q. You have no weights at all on your chart for
10  Mr. Haller for the year 2002, the year he started taking
11  Seroquel, correct?
12      A. That's correct.
13      Q. You have no weights at all on -- in your report
14  for 2002, the year he started taking Seroquel, correct?
15      A. That's correct.
16      Q. You don't know what Mr. Haller weighed when he
17  started taking Seroquel?
18      A. That's correct.
19      Q. He could have weighed 251 pounds when he
20  started taking Seroquel, correct?
21      A. That's possible.
22      Q. You just -- you just don't know one way or the
23  other?
24      A. We don't know.
25      Q. So your weight gain calculation is based on two

526

1  numbers, 230 and 251, and the first one is not a
2  reliable indicia, the 230, of what he weighed just
3  before he started taking Seroquel, correct?
4      A. I think that's reasonable, yes, ma'am.
5      Q. You think my statement is reasonable?
6      A. Yes.  Oh, yes.
7      Q. You agree that the 230 pounds of January 15,
8  2001, is not a reliable indicia of what Mr. Haller
9  weighed just before he started taking Seroquel, correct?
10      A. Yes, ma'am.  We -- we've just made that
11  statement.
12      Q. Okay.  I just wanted to be sure the answer was
13  clear.
14      A. Okay.  Yeah.
15      Q. You would agree with me, sir, that when you
16  don't know how much Mr. Haller weighed just before he
17  started taking Seroquel, it would be purely speculative
18  to say how much weight he gained while he took Seroquel?
19      A. Ma'am, I think I made the statement on the best
20  available evidence.  But -- and I also pointed out that
21  fairly soon after that weight of 251, some combination
22  of his life was able to get his weight back down to 218.
23  So --
24      Q. You're just saying he lost weight while he was
25  on Seroquel, right?

13 (Pages 523 to 526)

527

1    A. He lost weight during those -- after he was
2  diagnosed with diabetes and put on Metformin while he
3  was still on Seroquel. The subsequent dates recorded
4  were down in the region of 218, yes, ma'am.
5    Q. Okay. So you agree with me that it is purely
6  speculative to say how much weight he gained while he
7  was on Seroquel?
8    A. Well, I would say it was on the best available
9  evidence. But I -- I think if you wish to use those
10  other phrases, that's reasonable, too.
11    Q. Okay. So you do agree it's speculative?
12    A. Yeah.
13    Q. Yes?
14    A. Yes, ma'am.
15    Q. Okay. In truth, Dr. Tulloch, you can't say
16  what Mr. Haller's weight gain was because you don't know
17  how much he weighed just before he started taking
18  Seroquel, correct?
19        MR. BRUDNER: Objection, form, asked and
20  answered --
21    A. Ma'am --
22        MR. BRUDNER: -- a number of times.
23    A. -- we have reviewed these issues at some
24  length, and I've told you I went on the best available
25  evidence I had.

528

1    Q. (BY MS. THORPE) But you agree with my
2  statement?
3    A. Yes, ma'am.
4        MR. BRUDNER: Same objection.
5        MS. THORPE: Did you get that answer?
6        THE REPORTER: Uh-huh.
7    Q. (BY MS. THORPE) All right. Your report says
8  that Mr. -- if you look at the fourth paragraph on the
9  second page, that Mr. Haller developed insulin requiring
10  diabetes. Do you see that?
11    A. Yes, ma'am. Let me go back to that. That's
12  taken out of context. What I had meant to say and
13  somewhere in the context of these comments is that once
14  a patient has developed type 2 diabetes, the natural
15  history of type 2 diabetes is slow deterioration from
16  responding to one oral medication to two oral
17  medications, three oral medications, and ultimately to
18  insulin requirement.
19        This man did not have insulin requiring
20  diabetes. The phrase above that says, actually, he was
21  very well-controlled. So I would not -- the words I was
22  developing was once somebody developed type 2 diabetes,
23  they will ultimately lead to be on insulin. And I think
24  I refer you back to some of the long introduction on
25  diabetes.

529

1        So he did not have insulin requiring
2  diabetes, and that's the context of the paragraph above
3  that. And if you're reading that as that he had insulin
4  requiring diabetes in the time which we were discussing,
5  that's incorrect.
6    Q. Okay. Well, I just read the sentence. It
7  says, "However, having developed insulin requiring
8  diabetes, Mr. Haller will continue to suffer the
9  relentless and gradual loss of beta cell function."
10    A. Yeah.
11    Q. And so what you're telling me is that
12  Mr. Haller did not develop insulin requiring diabetes,
13  correct?
14    A. He had developed type 2 diabetes, the natural
15  outcome which is to require insulin. But at the time
16  that we were discussing this man's care, which is in the
17  paragraph above that, he was actually well-controlled
18  and the statement says that.
19    Q. In fact, he -- his diabetes is completely
20  controlled by diet today, correct?
21    A. My belief is that he was given Metformin. I
22  would need to look at --
23    Q. Why don't you look at your time line.
24    A. The most recent data that we have -- no --
25  well, your question related to today. And what we have

530

1  is some data --
2    Q. You don't know?
3    A. -- neither you nor I have looked at.
4    Q. All right.
5    A. But certainly if we eyeball his weights and his
6  sugars over the subsequent months, there have been more
7  well-controlled blood sugars and -- and also weights
8  than there have been poorly controlled sugars and
9  weights.
10    Q. Let me -- let me ask you to look at page 58 of
11  the time line, entry January 12, 2007.
12    A. Yes, ma'am.
13    Q. There it's indicated that he is controlling his
14  diabetes with diet, correct?
15    A. Yes, ma'am, on the right-hand paragraph of
16  page 58.
17    Q. Right. And then if you look at April 6, 2007,
18  close to the end of your time line, still on diet
19  controlled diabetes, correct?
20    A. Yes, ma'am.
21    Q. And although you did not read his deposition,
22  he testified this summer that he is still on diet
23  control and is not taking any medications.
24        MR. BRUDNER: Objection, form.
25    Q. (BY MS. THORPE) So --

14 (Pages 527 to 530)

531

1    A. I think that --

2    Q. -- you don't know about that because you didn't

3    read the depo, right?

4    A. That's correct. But what I did say was, in the

5    paragraph above, his sugar stabilized with evidence of

6    good glucose control measured with hemoglobin A1c values

7    essentially in the normal range. And the last page of

8    the time line, page 62, was a hemoglobin A1c which is

9    within the normal range. So those statements do match

10   up.

11   Q. According to your -- the time line that's been

12   marked, the vast majority of the time since his

13   diagnosis with diabetes he's been on no medicine of any

14   sort for his diabetes. Would you agree with that?

15   A. Yes, ma'am. He was given Metformin for a

16   while. When he came off it, I don't know, but certainly

17   his care and the measured sugars were physiologically

18   normal with a few exceptions.

19   Q. A number of his doctors have questioned -- or

20   have said he has borderline diabetes. What does that

21   mean to you?

22   MR. BRUDNER: Objection, form.

23   A. We spent some time defining that. And I don't

24   know of such a phrase -- impaired glucose -- let me come

25   back. I think borderline diabetes is -- is not

532

1    something in the American Diabetes Association referral

2    rate. And as we said earlier, the diagnosis of diabetes

3    should not be on somebody's chart unless he had

4    fulfilled the criteria. For all of the medical/legal

5    ramifications, you really don't want to do that because

6    of the insurance rates that they would have to pay, et

7    cetera.

8    And so if the man had impaired glucose

9    control, I would encourage a medical student or a

10   learner doctor to use the words "impaired glucose

11   control." I do not believe borderline diabetes is a

12   good phrase to have in anybody's chart.

13   Q. (BY MS. THORPE) Okay. So you disagree with

14   those doctors who say he has borderline diabetes, his

15   treating doctors?

16   A. Yeah.

17   MR. BRUDNER: Objection, form.

18   A. I think that's -- either he has diabetes or he

19   doesn't have diabetes. And if one -- if he had

20   fulfilled the criteria, which I believe he had, one

21   would use diabetes type 2 well-controlled with diet if

22   he wasn't taking Metformin.

23   Q. (BY MS. THORPE) All right. Let me direct your

24   attention to the paragraph that we've been talking about

25   that has the phrase about insulin requiring diabetes.

533

1    A. Yes, ma'am.

2    Q. Do you see that?

3    And what you're describing there are

4    complications of diabetes, right?

5    A. Yes, ma'am.

6    Q. And you have this same paragraph in every

7    report that you've written on plaintiffs in this

8    litigation, correct?

9    A. Yes, ma'am.

10   Q. It is -- it's basically cut and pasted into

11   each report, right?

12   A. Yes, ma'am.

13   Q. And you are just simply reciting the

14   complications that can occur with diabetes without an

15   individualized analysis of the likelihood of those

16   complications in a particular plaintiff, right?

17   A. I think that's reasonable.

18   If I refer you back to my introduction on

19   the natural history of type 2 diabetes, on the best

20   available evidence, there is a progressive loss of beta

21   cell function, and they -- the normal -- most patients

22   lose the ability to respond to oral medication over 5 to

23   15 years. And this paragraph essentially picks up

24   those -- that -- that natural history.

25   Q. Well --

534

1    A. The phrasing that I'm referring to is under

2    studies addressing impact of treatment on diabetes

3    complications.

4    Q. We haven't gotten to all the other causes of

5    diabetes yet in Mr. Haller. But you understand that the

6    complications from diabetes that you describe in this

7    paragraph, the specific complications, could be solely

8    caused by preexisting obesity before Seroquel, years of

9    smoking before Seroquel and during Seroquel use,

10   metabolic syndrome before Seroquel use, hypertension

11   before Seroquel use, hypertension that has been

12   uncontrolled, all of those things could cause the kinds

13   of complications that you're describing in this

14   paragraph?

15   MR. BRUDNER: Objection.

16   A. Yes, ma'am.

17   Q. (BY MS. THORPE) Okay. And you would agree

18   that it would be scientifically and medically impossible

19   to separate -- to look at a complication and say that it

20   came from the diabetes as opposed to it came from the

21   hypertension or the metabolic syndrome or the smoking or

22   the obesity, right?

23   A. That's correct, ma'am. And that's why we have

24   shared the analogy of the camel's -- the final straw in

25   the camel's back in previous discussions. And this

535

1  would be a good time to review a similar conclusion.
2  **Q. Can you tell me what you mean by that?**
3  A. As I see this man's natural history, he had all
4  of the conditions which you have just described. He had
5  a period of weight gain during which time his blood
6  sugars became abnormal. After that he received
7  excellent dietary advice, which he seems to have adhered
8  to. It was at least 20 pounds of weight he gained. If
9  you look in the time line in places, even better weight
10  loss. I said weight gain, I mean loss.
11  So he went up to 251 pounds. He then came
12  down. And for essentially the duration of the time of
13  his care that relates to this time line, his blood
14  sugars were well-controlled.
15  **Q. Well, I'm -- what I'm trying to understand,**
16  **though, is -- is really related to complications of**
17  **diabetes, and I want to be sure that we're -- we're**
18  **actually on the same page on this.**
19  A. Okay.
20  **Q. When someone is a smoker and has metabolic**
21  **syndrome and has hypertension and has morbid obesity,**
22  **any of those conditions could lead to the kinds of**
23  **complications that you're describing in this fourth**
24  **paragraph of your report, correct?**
25  MR. BRUDNER: Objection, form.

536

1  A. Yes, ma'am.
2  **Q. (BY MS. THORPE)  So -- so if -- if you were**
3  **asked to say in someone like Mr. Haller that those**
4  **complications came from the diabetes instead of coming**
5  **from the fact that he was obese from the time he was 40**
6  **and a chronic smoker and had uncontrolled hypertension**
7  **and so on, you wouldn't be able to scientifically or**
8  **medically distinguish that this complication came from**
9  **diabetes and this complication came from all these other**
10  **problems; is that right?**
11  A. No, ma'am. I think we've shared in a number of
12  contexts over these cases that it -- in essence, the
13  complications are additive. The -- if there's one of
14  those conditions, the rates of progression are at one
15  level. If there's two complications, the rates of
16  progression with age become higher, almost
17  logarithmically higher, and each risk factor becomes
18  additive.
19  **Q. But you couldn't sort out --**
20  A. No.
21  **Q. -- which one --**
22  A. No.
23  **Q. -- caused what, right?**
24  A. That's correct.
25  **Q. Okay.**

537

1  A. No. Basically what we're looking at -- when --
2  you're using the word "complications" and to make it
3  more specific, let's go to what these guys mostly die
4  from. They die from stroke and heart attack. And what
5  you enumerated were all the risk factors of stroke and
6  heart attack. And diabetes multiplies those with a
7  fairly significant multiplication factor. But all the
8  others are contributing factors.
9  **Q. And, in fact, if you're a smoker and you have**
10  **high blood pressure and you're really very obese, you**
11  **can die of stroke and heart attack, right?**
12  A. That's correct.
13  **Q. It can solely cause you to die of stroke and**
14  **heart attack, right?**
15  A. Yes, ma'am. And what I said was if they
16  developed diabetes, that rate of progression increasing
17  with age is multiplied by another factor upwards.
18  **Q. But you wouldn't be able to look at a given**
19  **individual and say his death was due to the effect of**
20  **the diabetes or the effect of, you know, 20 years of**
21  **smoking cigarettes or his obesity, right?**
22  A. That's correct.
23  MR. BRUDNER: Objection, form.
24  **Q. (BY MS. THORPE)  Okay.**
25  A. Each risk factor is additive.

538

1  **Q. Well, you agree you wouldn't be able to**
2  **separate out, though, that the diabetes caused the heart**
3  **attack or the stroke from all of the other causes like**
4  **obesity, smoking, hypertension, and so on, right?**
5  MR. BRUDNER: Objection, form.
6  A. For a large vessel disease, that's correct.
7  For small vessel disease, that's not correct. Usually
8  the correlation between changes in the eye and the
9  kidney correlate best with abnormal blood sugar.
10  They're accelerated with high blood pressure, but those
11  relate most to sugar.
12  **Q. (BY MS. THORPE)  Okay. So as the large vessel**
13  **disease, you agree with my statement?**
14  A. Without any doubt, yes, ma'am.
15  **Q. All right. Now, for example, your report says,**
16  **"Subsequent to his diagnosis of diabetes, Mr. Haller has**
17  **demonstrated coronary artery disease and suffered a**
18  **myocardial infarction."**
19  **So you would agree with me that you can't**
20  **say that his coronary artery disease and his myocardial**
21  **infarction were caused by his diabetes, right, his**
22  **well-controlled diabetes?**
23  A. You're asking me to say solely. Clearly, the
24  diabetes was a contributing factor. But all of the
25  other issues which you listed would other -- would also

539

1 be contributing factors.
2  Q. And you wouldn't be able to say that the
3 smoking and the preexisting obesity and the hypertension
4 and the metabolic syndrome and all the things that he
5 had, you wouldn't be able to rule them out as sole
6 causes of his heart attack or his coronary artery
7 disease, correct?
8  A. That's correct, ma'am. And you may remember
9 with the very first case we discussed, I was extremely
10 reluctant to proportion blame in any percentage for just
11 that reason. These risk factors are additive.
12  Q. So you agree you can't rule them -- preexisting
13 obesity, impaired glucose tolerance, metabolic syndrome,
14 smoking, and so on, you can't rule them out as sole
15 causes of his heart attack and his coronary artery
16 disease, correct?
17   MR. BRUDNER: Objection, form.
18  A. I'm having to listen to your sentence very
19 carefully. I think we're in agreement when we say the
20 risk factors are additive.
21  Q. (BY MS. THORPE) That's not --
22  A. If I understand --
23  Q. -- my question.
24  A. I know, I'm trying to understand what you're
25 getting at.

540

1  Q. And --
2  A. If we're asked -- if A plus B plus C equals
3 D -- because I'm trying to be very simple -- and when a
4 patient gets to D something bad happens, A was not the
5 sole cause of D, B was not the sole cause of D, and C
6 was not the sole cause of D. Are you -- that's the way
7 I'm trying to make -- state --
8  Q. All right. Let me -- let me --
9  A. If D was a heart attack and the risk factors
10 were A plus B plus C and the heart attack occurred at --
11 at the age of, say, 45, maybe -- would -- if -- if
12 you're trying to get me to explain -- I think we're on
13 the same wavelength, it's just a matter of -- please
14 rephrase your question --
15  Q. Let me just --
16  A. -- so I can understand what you're getting at.
17  Q. Let me just ask you some general questions --
18  A. Okay.
19  Q. -- and maybe they will elicit this.
20   We have agreed that metabolic syndrome,
21 hypertension, hyperlipidemia, impaired fasting glucose,
22 obesity, smoking, family history, psychosis, sedentary
23 lifestyle are all causes of diabetes, right?
24  A. Yes, ma'am.
25  Q. Before forming your opinion with regard to any

541

1 of the plaintiffs in these cases, you didn't try to
2 quantify the contribution that these causes made, right?
3  A. That's correct.
4  Q. To the development of diabetes, correct?
5  A. That's correct.
6  Q. And you have not -- strike that.
7   As to all the -- the plaintiffs in these
8 cases, the only basis for your opinion that Seroquel
9 caused the development of diabetes is its temporal
10 relationship with weight gain and the weight gain's
11 temporal relationship with the development of diabetes,
12 right?
13   MR. BRUDNER: Objection, form.
14  A. Yes, ma'am, I -- I think that's the best
15 available data that we can obtain --
16  Q. (BY MS. THORPE) Okay.
17  A. -- in these cases, yes, ma'am.
18  Q. All right. And you have said as to all of the
19 plaintiffs that you've looked at that they would get
20 diabetes at some point in time even if they had never
21 taken Seroquel, right?
22  A. Given the risk factors which they carried, yes,
23 ma'am.
24  Q. All right. And I think what you're saying is
25 that you believe that Seroquel somehow accelerated the

542

1 development of the diabetes because of the weight gain?
2  A. That's to the best of my interpretation, yes,
3 ma'am.
4  Q. Have you found any -- have you attempted to try
5 to quantify that acceleration in any way?
6  A. No, ma'am. I -- I mentioned -- I thought the
7 best -- best way to handle that was to look at the data
8 that was available and see how well they correlated.
9 And in these cases which we --
10  Q. You're talking about the medical facts?
11  A. Right.
12  Q. Okay.
13  A. The best correlation is -- is with the temporal
14 relationship to the weight gain and the appearance of
15 abnormal blood sugar.
16  Q. And you're talking about in these specific
17 contexts that we've been talking about?
18  A. Four patients we've been discussing, yes,
19 ma'am.
20  Q. All right. How do you distinguish between a
21 patient with impaired glucose tolerance, hypertension,
22 hyperlipidemia, a family history of diabetes and
23 obesity, a smoker, the kind of people we've been talking
24 about in these cases who gain 40 pounds, and then a
25 patient -- let me start that over because it's too



543

1    complicated.
2         How do you distinguish between a patient
3    with the various causes we've been talking about like
4    hypertension, hyperlipidemia, obesity, smoking, impaired
5    glucose tolerance who gained, let's say, 40 pounds and
6    then is diagnosed with diabetes from a patient who has
7    all of those things and takes Seroquel and gains
8    40 pounds and then is diagnosed with diabetes. What's
9    the difference between those two patients?
10        A. Okay.
11        MR. BRUDNER: Objection, form.
12        A. In that case, in my view, the best available
13   evidence is that the Seroquel was one of the list. As
14   I've said earlier, another atypical has a direct effect
15   on insulin physiology. I have not in any way found
16   evidence that Seroquel has that effect, but it comes
17   from a family that have that feature.
18        So my own personal belief, which I would
19   not tender as evidence, is that there's possibly
20   something in there that Seroquel's doing to insulin
21   resistance to further accelerate the appearance of
22   abnormal sugar. I don't want to go on record to say
23   that. That's my --
24        Q. (BY MS. THORPE) You haven't gotten the
25   science -- basis for that?

544

1         A. No. So the best thing I've been able to do was
2    take a dispassionate view. These were his sugars, these
3    were his body weights, then he took Seroquel, then these
4    were his sugars, these were his body weights, and
5    Seroquel is probably a contributing factor. And I come
6    back to the camel and the straw and the saddle. I do
7    not denigrate the number of other inhabitants of that
8    saddle, and you have enumerated them very nicely.
9         Q. All right. So -- let's see. Okay. So let me
10   go back to the start here.
11        So with regard to Mr. Haller, besides
12   Seroquel, was anything else a cause of his weight gain?
13        A. I'm waiting for some dates.
14        Q. You know, we've already talked about dates.
15   I'm just -- whatever -- you've opined some amount of
16   weight gain, so -- so what -- you know, have you -- have
17   you found any other causes of his weight gain other than
18   Seroquel in your review of his -- of his records?
19        A. I think we touched on all the others earlier.
20   This man was psychotic, this man was hypokinetic and --
21        Q. What is hypokinetic, sedentary?
22        A. Less active, less -- sedentary. Okay.
23        Q. Okay.
24        A. Kinesis is activity.
25        We don't know anything about a family

545

1    history with this man. I understand he was adopted. So
2    I think you've enumerated the list, and I will agree
3    with your list.
4         Q. Okay. So -- so you think that he was -- other
5    causes of his weight gain were his sedentary lifestyle
6    and his underlying psychosis, correct?
7         A. Yes, ma'am.
8         Q. Anything else?
9         A. That's all I can think of at this time.
10        Q. Can you rule out these causes, the psychosis
11   and the sedentary lifestyle, as the sole causes of any
12   weight gain that he had while he was on Seroquel?
13        A. I -- I can't rule out as sole causes. But as
14   I've said, if Seroquel --
15        Q. You can't --
16        A. Well, Seroquel was there and Seroquel
17   contributed to the weight gain at the time when his
18   blood sugars were noted to be abnormal. I'm also on the
19   record in your presence this day as saying his blood
20   sugars became well-controlled and he also lost weight on
21   Seroquel in subsequent months. So clearly, this man
22   either had altered circumstances or listened to advice
23   to lose weight and was able to bring that to bear.
24        Q. What -- what method did you use to rule out his
25   sedentary lifestyle and his psychosis as sole causes for

546

1    his weight gain?
2         A. No, ma'am, I -- I -- my main reason for
3    believing that the Seroquel was -- was the final straw
4    was that the -- the Seroquel administration was present
5    at the time when he made that weight gain and had the
6    diagnosis of diabetes.
7         As I've said a moment ago, having -- he --
8    having got the diagnosis and being given advice and also
9    initial administration of Metformin, his subsequent
10   sugars were reflective of excellent blood sugar control
11   and his subsequent body weights were substantially lower
12   than 251 pounds.
13        Q. Is it fair to say with regard to all of the
14   plaintiffs in these cases that you have not attempted to
15   rule out other causes for their weight gain as -- strike
16   that.
17        Is it fair to say with regard to all of the
18   plaintiffs in these cases that you have not ruled out
19   other causes for their weight gain?
20        MR. BRUDNER: Objection, form.
21        A. Ruled out other causes. Ma'am, what I tried to
22   share with the Court was my belief that these risk
23   factors are additive and that any medication which
24   accelerates weight gain would accelerate the onset of
25   diabetes in somebody who had multiple risk factors for

547

1   that condition.
2       Q. (BY MS. THORPE) I know. But tell me how
3   you -- how did you rule out other explanations for the
4   weight gain other than Seroquel?
5       A. I didn't feel I had to because I acknowledged
6   that they were all there. Let me go back to the simple
7   analogy A plus B plus C arriving at D. Without --
8   without A plus B, then the addition of C would not reach
9   D at least in the time that we were discussing.
10      Q. So is it --
11      A. And I left earlier the analogy that a man might
12  inherit diabetes with his family, develop it at the age
13  of 25 if all the risk factors were adverse to his
14  circumstance and develop it at 105 if all things went
15  right for him. It's still the same man, it's still the
16  same gene pool.
17          And my belief, which I'm trying to bring
18  out with each of these cases, was that this particular
19  atypical accelerated the weight gain and, therefore,
20  brought the arrival of type 2 diabetes much closer to
21  this man. And this man's a good example. He -- he
22  gained a certain amount of weight. Though sugar was
23  noted to be abnormal, he received advice and Metformin
24  for a period of time, and after that his weight improved
25  and his sugars normalized.

548

1           I feel that the arrival of Seroquel was
2   something that tipped that -- that border into diabetes,
3   and then his response to medical advice or whatever else
4   contributed to his weight gain was associated with
5   excellent blood sugar control. I tried to acknowledge
6   both aspects of that.
7       Q. Okay.
8       A. As I said earlier, I tried to be fair.
9       Q. Okay. I have a very short and easy question.
10      A. Okay.
11      Q. And I listened to your response.
12      A. Okay.
13      Q. Is it fair to say that as to all of these
14  plaintiffs, you did not rule out alternative causes for
15  their weight gain because you did not feel that you
16  needed to or had to?
17      A. I think that's reasonable, yes, ma'am.
18      Q. Now, you undertook to -- to find at least one
19  weight for Mr. Haller before he took Seroquel, right?
20      A. Yes, ma'am.
21      Q. And so let's go back to that January 15, 2001
22  weight. Okay? You would agree that it is important to
23  understand whether Mr. Haller has been obese for many
24  years before he ever started taking Seroquel, correct?
25      A. That's correct.

549

1       Q. And if he had been obese for many years before
2   taking Seroquel, you would agree that he would be at
3   very high risk of developing diabetes, correct?
4       A. That's correct.
5       Q. How did he get to be so large at age 40 at
6   230 pounds? How did he get to be so large?
7       A. Well, I think we've shared earlier -- and let
8   me refer you to page 3 of the time line, so at least
9   we're on -- looking at similar numbers.
10          If we look at page 3 of the time line,
11  we'll find that in '96 and '97 he was, in fact, about
12  60 pounds lighter than in January of 2001. So clearly,
13  during that period of time, there was a 60-pound weight
14  gain for whatever the reasons we discussed. And this
15  would be where calories in -- were going in were greater
16  than the calories burned.
17      Q. Right.
18      A. And then -- and then we discussed -- well,
19  then, I go on to our discussions from sometime ago.
20      Q. Right. So how did he gain that 60 pounds?
21      A. I believe he gained it by taking in more
22  calories than he burned.
23      Q. So he -- you know, we've got a jar of candy
24  sitting here, he ate lots of candy and he ate lots of
25  food or he didn't exercise or what happened to this man

550

1   that caused that -- that -- that large weight gain?
2           MR. BRUDNER: Objection, form.
3       A. The answer's yes. He took in more calories
4   than he burned. I don't have any information on how.
5   Some people eat more when they're depressed, some people
6   eat more when they're in particular sets of
7   circumstances. All we're judging is the facts, and the
8   facts are reflective of a 60-pound weight gain between
9   January of '97 and January of 2001.
10      Q. (BY MS. THORPE) And I'm going to show you --
11  let me just --
12          (Exhibit No. 77 marked.)
13      Q. (BY MS. THORPE) I'm going to show you what's
14  been marked as Exhibit 77. And this is a record from
15  1985. And if you look at the bottom of the page, can
16  you tell us what Mr. Haller's weight was in 1985?
17      A. Thank you, ma'am. I'm looking at 10-21-85, and
18  the vital signs in the bottom are 5'4" in height, weight
19  150 pounds.
20      Q. Okay. So -- so you don't have that early
21  weight of 1985 on your chart that's been marked as
22  Exhibit 64, right?
23      A. That's correct.
24      Q. And you don't have that in your report
25  either --

551

1    A. That's correct.
2    Q. -- right?
3        So he actually went from 150 pounds to --
4  in 1985 to 230 pounds in January of 2001, a gain of
5  80 pounds over about 16 years, right?
6    A. Yes, ma'am.
7    Q. And because you did not interview Mr. Haller or
8  have him fill out a questionnaire or take a medical
9  history from him, you really can't have any specificity
10 about what was causing that weight gain during that
11 period of time, correct?
12       MR. BRUDNER: Objection, form.
13   A. That's correct, ma'am.
14   Q. (BY MS. THORPE) So you -- that's not a normal
15 weight gain, right?
16   A. Weight gains of that magnitude, regrettably,
17 are surprisingly common --
18   Q. Common maybe --
19   A. -- in -- in our patients.
20   Q. -- but it's not normal, right?
21   A. We -- now speaking generally, we are trying
22 very hard to review -- to reduce the sort of stimuli
23 that cause this kind of weight gain by starting them in
24 schools, but I'm speaking generally.
25       In this case the answer is yes, it's not a

552

1  normal weight gain. However, as you're probably aware,
2  we shared -- stated earlier, for most depressed and
3  psychotic patients, weight gain can be a fairly
4  significant problem, and we've shared that this man had
5  those diagnoses, so it would fit with his diagnoses.
6    Q. Right. So before he took Seroquel, he had a
7  much, much bigger weight gain than he ever had during
8  the entire time that he was taking Seroquel, correct?
9    A. That's correct.
10       MR. BRUDNER: Objection, form.
11   Q. (BY MS. THORPE) What -- other than the fact
12 that -- that he took Seroquel during the period of time
13 between October 2002 and to today's date, what
14 distinguishes his changes in weight on Seroquel from the
15 kinds of changes in weight he had before Seroquel?
16       MR. BRUDNER: Objection, form.
17   A. I tried to explain that a moment ago. The main
18 issue with this man was that the weight gain that we
19 referred to anteceded the diagnosis of type 2 diabetes.
20 So that to me was what made the relevance of this
21 particular man.
22       MR. BRUDNER: When you get to a stopping
23 point, can we take a little break?
24       MS. THORPE: I've got one more thing and
25 then I'll be happy to --

553

1        MR. BRUDNER: All right.
2        MS. THORPE: -- happy to take a break.
3        (Exhibit No. 78 marked.)
4    Q. (BY MS. THORPE) All right. I'm going to show
5  you what's been marked as Exhibit 78 for identification.
6  And this is a record that's dated August 26, 2000, from
7  Columbia St. Petersburg Medical Center. And if you look
8  in the middle of the page, can you tell us what Mr. --
9  doctor -- Mr. Haller's weights were in August of 2000?
10   A. Thank you, ma'am. I have St. Petersburg
11 Medical Center, 8-26-2000. I have a height and a
12 weight.
13   Q. It's kind of in the middle of the page.
14   A. Okay. Top right, there's a height and a weight
15 with nothing. Middle right, there's a height of 5'6"
16 and a weight of 220 pounds.
17   Q. Okay. So -- and that weight which is on
18 Exhibit 78 is not on your time line or in your report,
19 correct?
20   A. That's correct.
21   Q. All right. You can just put it down there.
22       MS. THORPE: All right. This would be a
23 good time for a break.
24       (Short recess from 6:59 to 7:07.)
25   Q. (BY MS. THORPE) So after Mr. Haller started

554

1  taking Seroquel, did you make any effort to find out
2  what things might have contributed to any changes in
3  weight that he had after starting Seroquel?
4    A. Yes, ma'am. And I tried to touch on that
5  with -- in the third paragraph. However, soon after the
6  diagnosis of diabetes was established, his weight
7  returned to the previous level, his sugars stabilized
8  with evidence of good glucose control.
9        So basically somebody -- one have to assume
10 the patient himself -- got his act under control. His
11 sugars remain normal, his weight improved, and the
12 sugars remained -- sugars and body weight remained
13 relatively stable from the point of view of abnormal
14 sugars for the balance of this report.
15       And then we've shared that I now have some
16 new data which would bring his clinical condition up
17 into the -- into this 2008 year.
18   Q. Well, I understand that you're saying that in
19 your report you said that after he got diabetes his
20 weight went down?
21   A. Uh-huh.
22   Q. That's what you're basically saying?
23   A. Yes, ma'am.
24   Q. But what I'm asking you is: Did you make any
25 effort to find out what was going on in his life after

555

1  he started taking Seroquel that would affect his weight?
2      A. No ma'am. As I shared, I did not interview
3  this man. Clearly, if it would help his case, help the
4  case before we come to trial, I will request that I -- I
5  do interview him. And -- and then I hopefully will have
6  some of that information for you.
7      Q. Tell me what pattern of weight gain Seroquel
8  causes in your mind.
9      A. Ma'am, I don't have any pattern in my mind. I
10  shared earlier some risk ratios which are out there in
11  the literature for weight gain amongst all of the
12  atypicals, and I think I shared that for Seroquel it
13  varies from as low as a risk ratio of 1.2 to as high as
14  4.85. And I'm giving those numbers to the best of my
15  memory.
16      Q. And you also said you're not an expert in
17  analyzing those studies, right?
18      A. That's exactly right. And I think as a
19  clinician, I just have to acknowledge that this group of
20  medications, with two exceptions, has been associated
21  with weight gain and diabetes. If I find a patient that
22  was on Seroquel and suffered from weight gain and
23  diabetes, I have to acknowledge all of the other risk
24  factors, but I have in all intellectual honesty to
25  include Seroquel as the cause for his weight gain and

556

1  diabetes just because it's -- it's out there in the
2  literature as a result.
3      And as I shared earlier, my task in
4  lecturing the psychiatrists, as I have been requested to
5  do on some times, was basically to acknowledge that the
6  atypicals may or may not have their advantages. But
7  amongst the family of atypicals, there are two that are
8  not associated with weight gain and diabetes, and we've
9  mentioned one is Abilify and the other one's Geodon.
10      And so as an endocrinologist, my role
11  amongst the psychiatrists is to encourage them to
12  consider the side effects of their medication and choose
13  appropriately.
14      Q. Well -- and in fact, Doctor, you're familiar
15  with the consensus statement from the ADA, the American
16  Psychiatric Association, right?
17      A. Yes, ma'am, I -- I looked at that and I looked
18  at the data and I looked at the subsequent data and I
19  think they were very -- they were very conservative.
20  But I did look at that, yes, ma'am.
21      Q. You -- are you saying that you agree or you
22  disagree with the consensus statement?
23      A. If you look at some of the studies that have
24  come since then -- and, again, I read this as a lay
25  person in the field of statistics -- I believe the

557

1  risks -- there are some risks which are higher than
2  those acknowledged in the consensus statement.
3      Q. So you're saying you disagree with the
4  consensus statement?
5      A. I think it's a bit conservative, yes, ma'am.
6      Q. So the consensus statement indicates that
7  Abilify and Geodon have not been studied as much as --
8      A. That's correct.
9      Q. -- the other atypical antipsychotics, correct?
10      A. That's correct.
11      Q. So you realize that there are limitations of
12  the data on Abilify and Geodon, correct?
13      A. I agree with that.
14      Q. So -- but nevertheless, with the limitations of
15  the data and the fact that those drugs have not been
16  studied as much as the other antipsychotics, is it your
17  testimony here that you undertake to make
18  recommendations to psychiatrists about what
19  antipsychotics they should prescribe for their patients?
20      A. No, ma'am. What I said was to the best of my
21  belief, these were the abnormalities associated with the
22  atypicals with the exception of Abilify and Geodon. And
23  the side effects had not been as resoundingly
24  ascribed -- the side effects of weight gain and diabetes
25  has not been so resoundingly ascribed to Abilify and

558

1  Geodon.
2      Q. And you're aware that when a patient is as sick
3  as some of these plaintiffs that you've -- whose
4  charts you'd reviewed, as mentally ill as they are --
5      A. Yes, ma'am.
6      Q. -- the psychiatrists who are treating them need
7  to have many different available pharmaceutical products
8  that can address their individual needs. You agree with
9  that?
10      A. I agree. And I would not denigrate the need to
11  obtain psychiatric equilibrium in these patients, yes,
12  ma'am.
13      Q. And you know that the psychiatrists have to --
14  just as you do as an endocrinologist, the psychiatrists
15  have to weigh the risks and benefits of the drugs that
16  they are prescribing for their patients, correct?
17      A. Yes, ma'am, any good physician would spend some
18  time doing that.
19      Q. And you are not sitting here tonight
20  criticizing that assessment of the risks and benefits of
21  the -- of the pharmaceutical products available for the
22  treatment of any of these plaintiffs by their treating
23  psychiatrists?
24      A. Absolutely, ma'am. I -- I --
25      Q. Absolutely not or absolutely --

559

1    A. I'm an endocrinologist. I would not feel it
2  appropriate, and certainly I would not wish to impose an
3  endocrinologist's view on a psychiatrist's choice of his
4  psychiatric medication.
5    Q. And in the case of Mr. Haller, for example,
6  you're aware that in his diagnosis of
7  diabetes, his psychiatrist made the decision to continue
8  him on Seroquel and a number of other drugs after his
9  diagnosis, right?
10   A. Yes, ma'am.
11   Q. And you would not have any criticism that you
12 would offer of his caregivers for continuing him on
13 Seroquel, right?
14   A. I agree with that and --
15   Q. And you're —
16   A. Yes.
17   Q. And you're aware that this is a man who on
18 multiple occasions has tried to commit suicide, right?
19   A. Yes, ma'am.
20   Q. And you're aware that he has been arrested on
21 30 different occasions. That's in the medical records,
22 right?
23   A. I knew he'd been arrested, ma'am. I had not
24 realized the numbers were as high as that. Yeah. Wow.
25   Q. Were you aware that he had been incarcerated

560

1  for over nine and a half years?
2    A. Yes, ma'am.
3    Q. And you understand that in someone -- you
4  understand that his mental illness dates back to his
5  childhood, right?
6    A. Yes, ma'am.
7    Q. And in someone like that, you understand how
8  important getting his treatment right is both from a
9  psychiatric perspective and also from his endocrinology
10 perspective, right?
11   A. I would advance that to say from the society
12 perspective, because if he's out there and psychotic,
13 the imposition on society behavior is potentially a
14 problem.
15   Q. Right. Somebody could get hurt?
16   A. Somebody could get hurt, yes, ma'am.
17   Q. He could get hurt and somebody else could get
18 hurt, right?
19   A. Yes, ma'am.
20   Q. Right. Now, getting back to the questions
21 about patterns of weight gain, is it -- can you tell me
22 how much weight you would expect Seroquel to cause
23 someone to gain?
24   A. No, ma'am. As -- I've tried to be general
25 in -- in referring to those risk ratios. And I -- I

561

1  remember numbers as low as 1.2 risk ratio to as high as
2  4.85. So these -- clearly, in some studies there was
3  quite a lot of weight gain, in others there was not a
4  great deal.
5    And so I -- I think it would be unwise to
6  advance a conclusion that -- that any particular number
7  would be. In these patients --
8    Q. Well, let me just ask you this: Are you
9  equating a relative risk with the amount of weight
10 gained?
11   A. No, ma'am, what I'm -- I'm -- no, they're not.
12 What I was saying was the numbers in those studies go
13 from what I read as a low risk to a high risk. That
14 does not relate to the actual quantity of the individual
15 patient because clearly there's a whole spectrum of
16 weight gain to each of these medications on patients.
17 Some patients don't gain weight on these medications.
18   Q. My question for you is: Do you know from your
19 review of the literature how much weight gain is
20 associated with the use of -- of Seroquel?
21   A. No.
22   Q. Do you know over what period of time weight
23 gain can occur with Seroquel?
24   A. Yes, ma'am, I -- I have seen some data on that.
25 I know the maximum weight gain is early up to six weeks

562

1  and thereafter, and I know that the weight gain can be
2  further over the next months up to a year. And we have
3  an example here of somebody who gained about 20 pounds
4  in weight associated with the initial administration of
5  Seroquel and then subsequent to that actually started
6  losing weight despite being on a fairly good dose of
7  Seroquel.
8    Q. Well, let me just stop you here because you --
9  you have acknowledged that you don't know what his
10 weight was when he started Seroquel or even for two
11 years before he started Seroquel, correct?
12   A. Yes, ma'am.
13   Q. So you don't know what his weight gain was on
14 Seroquel in the first year that he was on the drug,
15 right?
16   A. That's correct.
17   MR. BRUDNER: Objection, asked and
18 answered.
19   Q. (BY MS. THORPE) So -- so the pattern that
20 you're describing with Seroquel is you're saying that
21 weight gain occurs up to six weeks? Is that -- did I
22 hear you right?
23   A. I'm referring to some data -- let me not go on
24 record with that. Let me say that weight gain has been
25 associated with these medications. My understanding was

563

1 that substantial amounts of weight gain have been
2 recorded as early as six weeks and that weight gain
3 continued over the next 52 weeks.  But I would not wish
4 to quantify that until I had data that I could share
5 with you.
6 Q. Okay.  What are --
7 A. What I'm quoting is --
8 Q. -- you relying on?
9 A. -- from my memory, yeah.
10 Q. Where did you get it from?
11 A. Ma'am, I would have to go into -- I would have
12 to refer to the pile of references that I have shared
13 with you and say somewhere in there.  And if you require
14 a chapter and verse, I would need to share it with you
15 when I've had some time to find them.
16 Q. Well, I guess I'm going to ask you, you know,
17 what you're relying on for the pattern of weight gain.
18 So I am asking you that question.
19       MR. BRUDNER:  Objection, form, asked and
20 answered.
21 Q. (BY MS. THORPE)  I may have a shorter way of
22 doing this.  Let me just ask you if you agree with
23 something.
24 A. Okay.
25 Q. And then if you don't, then we'll go back to

564

1 this.  Okay?
2       I'm going to hand you Dr. Wirshing's
3 response to a similar question.
4 A. Okay.  I think that would be --
5 Q. On page 50 and 51 of his deposition in this
6 case.  And I've highlighted it.  And if you could just
7 read it and tell me if you agree with it.
8 A. Okay.
9 Q. Maybe . . .
10 A. What I understand was the question related to
11 weight gain.  The -- Dr. Wirshing's answer --
12 Q. It keeps going on the next page.
13 A. -- is on page 45.  And it relates to initially
14 a fairly linear increase that begins with the
15 introduction of the drug, then moves to a plateau at a
16 certain time downstream.  The slope of the plateau is
17 related to the ultimate time to the plateau.  In other
18 words, the steeper the plateau, the more retracted and
19 the longer period of time.
20 Q. It goes on one more page.
21 A. So said another way, the more weight you're
22 going to gain, the faster you demonstrate the increase
23 at first.  But on average, say, quetiapine shows a
24 weight shift of about 9 pounds that will demonstrate it
25 in the first couple of months of treatment.  And the

565

1 drug that's going to cause a 50-pound weight gain, they
2 won't reach a plateau until after six months.
3       So what we have there is a couple of months
4 would be 60 days and six months would be 180 days.
5 Okay.
6 Q. So do you agree with what Dr. Wirshing said --
7 A. I think that's a reasonable statement --
8 Q. -- on page 50 and --
9 A. -- of the literature, yeah.
10 Q. So you agree that after Seroquel ingestion in
11 those people who are going to gain weight, according to
12 Dr. Wirshing, it's about a 9-pound weight gain?
13 A. But in some patients it could be much more and
14 those --
15 Q. He doesn't say that, Doctor.  I'm asking you if
16 you agree with what Dr. Wirshing said.
17 A. Yes, ma'am, I agree with that, yes.
18 Q. And you agree that Seroquel causes about a
19 9-pound weight gain and then there is a plateau achieved
20 after the first couple of months of treatment?
21 A. Yes, ma'am.  And that's what Dr. Wirshing says.
22 Q. And then the plateau means that the weight
23 remains stable after that initial weight gain of about 9
24 pounds?
25 A. Yes, ma'am.

566

1 Q. And you agree with that?
2 A. Yes, ma'am.
3 Q. So in your -- in -- let's talk about the Haller
4 case for a minute.  Before doctor -- excuse me.  Strike
5 that.
6       Before Mr. Haller took Seroquel, we've
7 agreed that between January of 1997, which is on your
8 time line, and January of 2001, a four-year period, he
9 gained 58 pounds, right?
10 A. Yes, ma'am.
11 Q. And we know before he took Seroquel, even
12 looking at a longer, broader period from 1985 to 2001,
13 he gained 80 pounds, right --
14 A. Yes, ma'am.
15 Q. -- over about a 16-year period?
16       We know that between January of '01 when he
17 weighed 230 pounds and May of '04, a period of only
18 three years -- well, strike that.  I'll come back to
19 that.
20       Before Mr. Haller took Seroquel, if you
21 plotted on a graph his -- his weights, that 80-pound
22 weight gain --
23 A. Yes, ma'am.
24 Q. -- you would agree that there would be a line
25 going upward with a positive slope, right?

23 (Pages 563 to 566)

567

1    A. Yes, ma'am.
2    Q. And more probably than not in a person who
3    has -- whose weights form that kind of line with a
4    positive slope, you would expect that person to continue
5    to gain weight whether or not they took Seroquel, right?
6    A. Yes, ma'am.
7    Q. Now, let me -- let me direct your attention
8    to -- I want you to look at Exhibit 73, which is his --
9    gives you a weight for Mr. Haller on February 11, 2003,
10   right?
11   A. Yes, ma'am.
12   Q. And he weighed 243 pounds then?
13   A. Yes, ma'am.
14   Q. Now, you note in your report that in 2003 he
15   was on 400 milligrams of Seroquel a day, right?
16   A. That's correct.
17   Q. So focusing on 2003, the first full year that
18   he was on Seroquel, Mr. Haller dropped to 236 pounds,
19   right?
20   A. Yes, ma'am, we have a -- a weight of -- I'm
21   going back on the time line. Page 5 we have a weight of
22   246 on May of '03, 247 in June of '03, 236 in August of
23   '03, and on the time line I have another discordant
24   weight there. There's a second weight at 228 -- 222.
25   And on November the 8th, weight of 246. So there's been

568

1    some oscillation in weights during that year, yes,
2    ma'am.
3    Q. Well, you'll agree that between February 11th
4    of 2003 and August 28th of 2003, while he was on
5    Seroquel, he lost a little over 20 pounds, right?
6    A. That's correct, ma'am. And then by December of
7    '03, I have a weight of 251.
8    Q. Right. So he lost 20 pounds during the first
9    year and a half he was on Seroquel, right?
10   A. Uh-huh.
11   Q. Correct?
12   A. Yes, ma'am.
13   Q. He didn't gain weight during the first year and
14   a half he was on Seroquel, correct?
15   A. That's correct.
16   Q. And then after a year and a half, he went up
17   in -- between August of 2003 to December of 2003 to
18   251 pounds, right?
19   A. That's correct.
20   Q. And what is his closest blood sugar to that
21   251-pound weight in December of '03?
22   A. Maybe the best one we have is from January the
23   1st where there's a sugar of 138. That's probably the
24   closest.
25   Q. Okay. That's over a month --

569

1    A. Uh-huh.
2    Q. -- after the weight of 251 is recorded, right?
3    A. That's correct.
4    Q. And so -- so do you ascribe the weight loss
5    that he had during the approximately year and a half he
6    was on Seroquel of about 20 pounds to his Seroquel?
7    A. Ma'am, it could be due to random fluctuation.
8    Q. Do you ascribe -- so do you think it's random
9    fluctuation?
10   A. It's certainly -- weight loss is not -- is not
11   associated with any of the atypical antipsychotics that
12   I was aware of. So if it went -- if he went down while
13   he was on Seroquel, I would assume I would look for
14   other factors.
15   Q. So weight loss, you would say, would be more
16   probably than not due to random fluctuation but weight
17   gain you would not conclude was due to random
18   fluctuation?
19   A. Well, if the weight gain --
20   Q. Is that correct?
21   A. Well, remember what I said a moment ago, which
22   was if the weight gain led up to the diagnosis of
23   diabetes and he was on an atypical antipsychotic, in
24   this case Seroquel, my best available evidence from
25   the -- from my interpretation of the literature, which

570

1    is that -- the atypicals are a risk factor for diabetes,
2    the atypicals are a risk factor for weight gain -- would
3    be that those would have been contributing factors.
4    Q. So -- so in this man he lost weight for the
5    first year and a half after he went on Seroquel, right?
6    A. Yes, ma'am.
7    Q. And are you attributing his weight gain between
8    August of 2003 and December of '03 to Seroquel?
9    A. I believe it would be one of the factors.
10   Again, as I mentioned earlier, because it is a risk
11   factor associated with both weight gain and diabetes
12   from the literature, yes, ma'am.
13   Q. And so even though you said you agreed with
14   Dr. Wirshing that the weight gain would be about
15   9 pounds in the first two months of taking Seroquel, you
16   are saying in this man the weight gain that occurred in
17   over a four-month period, a year and a half after he's
18   been on the drug, is attributable to --
19   A. Could reasonably attributable to the side
20   effect of the medication, yes, ma'am.
21   Q. And between August of 2003 and December of
22   2003, are there any holidays that occur in which people
23   eat a lot of food?
24   A. Remember, I did not grow up in the United
25   States, but an American will tell you that there is

24 (Pages 567 to 570)

571

1    Thanksgiving in there somewhere.  Where I grew up we
2    didn't have Thanksgiving, but that's okay.
3        Q.  And there's also Christmas, right?
4        A.  Yes, ma'am.
5        Q.  And so how do you rule out the fact that this
6    man overindulged in the holiday season and that is --
7    accounts for his weight gain between August and December
8    of 2003?
9        A.  Yes, ma'am.  I accept Thanksgiving as a
10   possibility.  The date that I have for 251 pounds is
11   December the 1st, which is on the wrong side of
12   Christmas.  But I can accept that any of the other --
13   let me call them seasonal factors would be in there as
14   well.
15           And as we go back to my previous
16   discussion, I don't single out the atypicals as being
17   the sole cause of weight gain or the sole cause of
18   diabetes.  They're one of the contributing factors.  And
19   I believe more likely than not this would apply to this
20   man.
21       Q.  In your report you did not include the weight
22   gain that you are describing between August of 2003 and
23   December of 2003 as the weight gain that is the basis of
24   your opinion, did you?
25       A.  No, ma'am, I did not split it out like that.

572

1        Q.  No?
2        A.  No.
3        Q.  And this weight gain that you're describing
4    between August of 2003 -- strike that.
5            Isn't it fair to say, sir, that as a
6    medical and scientific matter, you can't blame weight
7    gain on -- on Seroquel when an equal amount of weight
8    loss occurred while the patient was on Seroquel?
9        A.  I agree with that, ma'am.  And I -- I put
10   that -- a little bit of that in my -- in my report.  I
11   said soon after the diagnosis of diabetes was
12   established, his weight returned to his previous level.
13   So I acknowledge that he was on Seroquel for the
14   duration of what I referred to, yes, ma'am.
15       Q.  You agree that before Mr. Haller had diabetes
16   during this time period in 2003 but while he was on
17   Seroquel he lost 20 pounds?
18       A.  Yes, ma'am.
19       Q.  You agree with that?
20       A.  I agree with that.
21       Q.  You agree that a weight loss during the first
22   year that a person like Mr. Haller was on Seroquel is
23   not the pattern you would expect to see if Seroquel
24   caused weight gain?
25       A.  Yes, ma'am.

573

1        Q.  You agree in the second year that he was on
2    Seroquel -- let's go to 2004 -- that his weight went up
3    and then came back down to where he was shortly after
4    starting Seroquel?
5        A.  Yes, ma'am.
6        Q.  You'll agree that in January of 2004, he was at
7    243 pounds just like he was in February of '03, right?
8        A.  Yes, ma'am.
9        Q.  And in May of 2004, a -- after having been on
10   Seroquel for a little over a year and a half, he's at
11   251 pounds, right?
12       A.  Yes, ma'am.
13       Q.  And by September of -- 2nd of 2004, he has
14   dropped down to 228 pounds, correct?
15       A.  Yes, ma'am.
16       Q.  So he's lost 23 pounds during the second year
17   that he's on Seroquel, right?
18       A.  That's correct.
19       Q.  He lost 20 pounds in the first year he's on
20   Seroquel and 23 in the second year, right?
21       A.  Yes, ma'am.
22       Q.  You agree that after he got diabetes, he lost
23   23 pounds while he was on Seroquel in 2004, right?
24       A.  Yes, ma'am, we agreed on that.
25       Q.  And that's not the kind of pattern you would

574

1    expect to see if Seroquel caused weight gain, right?
2        A.  Well, what one cannot do is -- is omit the --
3    as I was saying earlier, omit the possibility that he
4    understood what the diagnosis of diabetes meant and
5    responded to advice to use a reduction in caloric
6    intake.
7        Q.  Did you see any indication in his medical
8    records that he was compliant with diets that were
9    prescribed to him?
10       A.  No, ma'am.  But if I see a major weight loss
11   after the diagnosis of diabetes and the administration
12   of Metformin -- some people can lose weight on
13   Metformin --
14       Q.  Can --
15       A.  -- quite readily.  In fact, it's been used as a
16   weight-loss facilitant.
17       Q.  Have you seen any doctor who attributed his
18   weight loss to Metformin in his entire medical record?
19       A.  No, ma'am.  But I've seen weight loss with
20   Metformin -- well, a combination of the diagnosis of
21   diabetes and the administration of Metformin.
22       Q.  Can you think of any reason having reviewed
23   this man's medical records why he might have ups and
24   downs in his weight besides Metformin?
25       A.  Well, we've -- we've acknowledged that his

25 (Pages 571 to 574)

575

1  caloric intake and his exercise were sometimes
2  discordant and that there were periods of both weight
3  gain and weight loss.
4          But as I said earlier, I thought on the
5  maximum medical probability when he went through a
6  period of weight gain on Seroquel and followed by the
7  diagnosis of diabetes, that the two could more likely
8  than not be related, particularly as the atypicals are
9  associated with a risk for development of diabetes.
10      Q.  We've already agreed --
11      A.  And -- and in many of my patients when I
12  explain to them the importance of their diagnosis and
13  what it would do to their risks for morbidity, I often
14  do see significant weight loss, again, associated with
15  the advice about diet and with the administration of
16  Metformin.
17      Q.  So is it -- is it your understanding based on
18  your review of Mr. Haller's medical records that his
19  adherence to his diet is why his weight went up and down
20  the way it did?
21      A.  No.  What I had -- what I had tendered was that
22  following the diagnosis of diabetes, his sugar improved
23  and he lost significant weight.  My contention is more
24  likely than not he was given advice on caloric -- a
25  choice of diet and choice of caloric restriction and --

576

1  and given Metformin, which has been associated with
2  weight loss.  And those three more likely than not were
3  contributing factors to his period of weight gain and
4  the -- as we said earlier, as the fact that his blood
5  sugar then became quite well-controlled.
6      Q.  So your testimony, sir, is having reviewed
7  these medical records on Mr. Haller, the only
8  explanation that you can give for his weight loss is his
9  adherence to the recommendations of his doctor to follow
10  the diet and taking Metformin?
11      A.  And the administration of Metformin, yes,
12  ma'am.  Not the only --
13      Q.  That's it?
14      A.  -- in my view that was a reasonable medical
15  probability.
16      Q.  Is there -- is there anything else that you can
17  think of as you sit here today that would account for
18  his periods of weight loss after he was diagnosed with
19  diabetes?
20      A.  Not -- not to my knowledge at this time.
21      Q.  Now, we've talked about 2003, we've talked
22  about 2004.  Let's talk about 2005.
23      A.  Okay.
24      Q.  He was on Seroquel in 2005, right?
25      A.  Yes, ma'am.

577

1      Q.  He continued to lose weight in 2005, right?
2      A.  Yes, ma'am.
3      Q.  During 2005 his dose of Seroquel went up to
4  600 milligrams, correct?
5      A.  Yes, ma'am.
6      Q.  That's a 200-milligram increase, right?
7      A.  Yes, ma'am.
8      Q.  He continued to lose weight on that increased
9  dose of Seroquel, correct?
10      A.  That's correct.
11      Q.  In February of 2005, he weighed 235 pounds,
12  correct?
13      A.  That's correct.
14      Q.  By November of 2005, he weighed 184 pounds,
15  correct?
16      A.  That's correct.
17      Q.  He lost 51 pounds during 2005 while he was
18  taking Seroquel, correct?
19      A.  Following the diagnosis of diabetes, yes,
20  ma'am.
21      Q.  If Seroquel caused weight gain, would you
22  expect a dose response, that is, the higher the dose of
23  Seroquel, the more the weight gain?
24      A.  I know that there's been some suggestion of
25  that in the literature.  On the other hand, there is

578

1  some suggestion that it may be unrelated to weight gain.
2  So all I could -- I would do in a situation like this is
3  record the facts.
4      Q.  You would agree here -- and this does not
5  support the notion that there is a dose response with
6  weight gain with Seroquel, correct?
7      A.  In this man, in this man, yes, ma'am.
8      Q.  And is it your testimony, sir, that during this
9  period of time his diabetes was under control?
10      A.  As I said, reasonable control, yes, ma'am.  A
11  perfect blood sugar control would be a sugar of 80 to
12  100.  That would be normal sugars.  We see some sugars
13  which are certainly well below a hundred.  There are --
14  is a phase in the mid -- well, towards the end of 2005
15  when they were in the low 100s, so 114, 119, 115.  But a
16  number of others -- there's a random one at 178 in -- in
17  November the 27th.  But many of the others were well
18  below 100, yes, ma'am.
19      Q.  So are you attributing his weight loss to the
20  fact of his diabetes or to the diet?
21      A.  Ma'am, you can lose weight with the development
22  of diabetes, but that's usually at a time when blood
23  sugars are in excess of the renal threshold.  Most
24  humans' renal threshold is between 180 and 200.  I do
25  not find numbers of blood sugar in excess of 180 to 200

**579**

1  on this man, so --
2  Q. So it's not your testimony --
3  A. -- the development of polyuria, polydipsia, and
4  weight loss as the basis for his type 2 diabetes does
5  not apply to this man.
6  Q. So his weight loss, you think, is just -- by
7  2005 it's not the Metformin, right?
8  A. No.
9  Q. You don't think -- you think he's just sticking
10  to his diet?
11  A. Somewhere he got religious.
12  Q. Okay. And he's sticking to his diet?
13  A. Yes, ma'am, that was what I was referring to.
14  I wasn't referring to God.
15  Q. So anybody you -- in your opinion, if someone
16  can go on a diet and stick to a diet, they can do it
17  when they're on Seroquel and lose weight, right?
18  A. We have that example in this case, ma'am, yes.
19  Q. All right. Then in 2006 Mr. Haller popped back
20  up to 245?
21  A. He does indeed.
22  Q. As of August 25th of 2006, right?
23  A. He does indeed, yes.
24  Q. Now, do you consider that that weight gain,
25  going back up to 245, do you attribute that to Seroquel?

**580**

1  A. Well, you know, I have to accept that it's one
2  of the factors that is associated with weight gain. We
3  have, however, agreed that on a fairly substantial dose
4  of Seroquel, this man has lost weight. So I would have
5  to say more likely than not Seroquel was a contributing
6  factor and that in the earlier states other factors were
7  dominant. If there's a weight gain associated with
8  Seroquel, I would have to tender that it was one of the
9  potential confounding factors, yes, ma'am.
10  Q. So -- so you're saying you do blame Seroquel
11  for his popping back up to 245?
12  A. What I said was it's one of the contributing
13  factors, yes, ma'am.
14  Q. What were the other contributing --
15  A. It's associated -- we -- we've established that
16  hypokinesis and excess intake of calories were two of
17  the other principal factors.
18  Q. So how much of the increased weight is due to
19  Seroquel and how much of it is due to the inactivity and
20  the --
21  A. I -- I don't think one could reasonably tend a
22  quantitation in that.
23  Q. As to any of the weight gains by any of the
24  plaintiffs in these cases, you cannot say how much of
25  the weight was due to Seroquel and how much was due to

**581**

1  diet and how much was due to lack of exercise or other
2  factors, correct?
3  A. That's correct.
4  MR. BRUDNER: Objection, form.
5  Q. (BY MS. THORPE) You agree that by November
6  14th of 2006, the end of the -- that year, he had
7  dropped back down to 225 pounds, another 20-pound weight
8  loss while he was on Seroquel?
9  A. Yes, ma'am.
10  Q. All right. Your last record for him is August
11  7th, right -- I mean, August of '07? Did I get that
12  right?
13  A. Ma'am, the last one I have in my -- in the time
14  line is actually back in April of '07, which is 244, on
15  page 60.
16  Q. No, I meant the last -- the last entry on your
17  time line is August 28, '07, right?
18  A. That's correct. And then I have shared with
19  you that two or three days ago I got a --
20  Q. Right, I understand that.
21  A. -- sheet with some updates, and I promise that
22  they'll be on the time line in due course.
23  Q. Okay.
24  (Exhibit No. 79 marked.)
25  Q. (BY MS. THORPE) I'm going to show you a

**582**

1  record -- medical record dated April 22, 2008, for
2  Mr. Haller, if you could tell us what that weight is.
3  A. Thank you, ma'am. I have a record here from
4  the office of Dr. Mouna Bacha -- was that lady we were
5  looking for -- in Turner Street, Clearwater, Florida,
6  and the date is April the 22nd of '08, and the weight is
7  230 pounds.
8  Q. Okay. So we know that he weighed 230 pounds in
9  January of 2001, right?
10  A. Yes, ma'am.
11  Q. And in April of 2008, still taking Seroquel, he
12  weighs 230 pounds, correct?
13  A. That's correct.
14  Q. You will agree that -- that throughout the time
15  he's been on Seroquel overall, he has no weight gain on
16  the drug, correct?
17  A. I'm not sure that that's a true statement.
18  We've taken two isolated dates and agreed that they are
19  identical, and I'm agreeing that that's identical.
20  Q. Well, you agree that every year that he was on
21  Seroquel he lost weight?
22  A. What I've agreed was that there was a period of
23  time when he was taking Seroquel when his weight hit
24  251, and that was about the time he was diagnosed with
25  diabetes. What I've also agreed with is that here we

583

1  are some years later and on April the 22nd of 2008,
2  which is beyond our time line because this is new
3  data -- and I will show you some even newer data than
4  that -- his weight was identical to a period -- similar
5  to a period when he was not taking Seroquel, yes, ma'am.
6      Q.  You agree with me that in every year, having
7  just gone through them meticulously, since he started
8  taking Seroquel, he had a major weight loss while he was
9  on the drug?
10      A.  Yes, ma'am.
11      Q.  And --
12      A.  I'll --
13      Q.  -- at the -- at the -- and he still -- as of
14  April 2008, you know he's still taking Seroquel,
15  correct?
16      A.  Yes, ma'am.
17      Q.  And he weighs the same thing that he weighed
18  two years before he started taking Seroquel, correct?
19      A.  I agree with that.
20      Q.  All right.  Now, you -- if you would look at
21  the second page of your time line at the top, you see a
22  note in the corner -- second page.  You're going past --
23      A.  Okay.
24      Q.  There's a bunch of bullets.
25      A.  Yes, ma'am.

584

1      Q.  You see the bolded bullet that says, "New onset
2  diabetes mellitus"?
3      A.  Yes, ma'am.
4      Q.  And that is August 6, 2004, correct?
5      A.  Yes, ma'am.
6      Q.  And that's when he was diagnosed with new onset
7  diabetes mellitus, correct?
8      A.  Yes, ma'am.
9      Q.  How much did he weigh in August of 2004 when he
10  was diagnosed with diabetes?
11      A.  On page 20 I have a weight of 225, which is
12  August 6th of '04.
13      Q.  All right.
14      A.  But at that same time, we have a blood sugar of
15  410 and a hemoglobin A1c of 10.3.  And what I mentioned
16  earlier becomes relevant to that weight.  Any time
17  somebody has a blood sugar well in excess of the renal
18  threshold, I would expect them to lose caloric -- to
19  lose body weight because of caloric wastage for the
20  reasons I've discussed earlier.
21      Q.  Okay.  So -- but between the time of his --
22  between -- strike that.
23          Between two years before he started taking
24  Seroquel and a weight -- and having a weight of
25  230 pounds and the time of his diagnosis with diabetes,

585

1  he lost weight, correct?
2      A.  Yes, ma'am.
3      Q.  He lost -- his weight went down five pounds,
4  right?
5      A.  Yes, ma'am.
6      Q.  Weight gain while he was on Seroquel did not
7  cause him to have diabetes, correct?
8      A.  What I tried to put together for my report was
9  a weight gain of 21 pounds, at which time there were
10  abnormal blood sugars registered.
11      Q.  But we've agreed that you can't use that
12  21-pound figure because --
13      A.  Yeah --
14      Q.  -- you --
15      A.  -- I agree with that.
16      Q.  Right.
17      A.  Okay.
18      Q.  So the weight gain while he was on Seroquel did
19  not cause him to have diabetes, correct?
20      A.  Ma'am, what I have to accept is from the
21  literature -- this man was on Seroquel and gained weight
22  but also lost -- when we look at the details, he also
23  lost weight.  From the literature there's a significant
24  risk of development of diabetes with the atypicals,
25  including Seroquel, and this man developed diabetes.  I

586

1  feel the two are related.
2          However, I will also accept with you at the
3  time of his diagnosis of diabetes, his weight was down
4  for the reasons we discussed, his blood sugar was 410.
5  And for a significant period of time, he would have lost
6  a -- quite a lot of weight through caloric wastage.
7      Q.  So weight gain while he was on Seroquel did not
8  cause him to have diabetes, correct?
9      A.  Okay.  I'll buy that.
10      Q.  All right.  Let's talk about the various causes
11  of his diabetes in -- you recall that we talked about
12  the Resnick paper that you relied on earlier?
13      A.  Yes, ma'am.
14      Q.  And you recall Mr. Haller at age 40 had a BMI
15  of 37.1, right?
16      A.  That's correct.
17      Q.  You would recall -- you will agree that -- and
18  I'll be glad to get the paper out again if you want.
19  But Dr. Resnick, who you rely on, said that weight gain
20  in somebody that obese does not increase the risk of
21  developing diabetes, right?
22      A.  Yes, ma'am.
23      Q.  And you would agree with that?
24      A.  Yes, ma'am.
25      Q.  Now, Mr. Haller -- you mentioned family history

587

1    of diabetes or you mentioned family history a while ago,
2    not --
3        A. No, ma'am.
4        Q. -- family history of diabetes.
5        A. To my -- best of my knowledge, this man was an
6    adopted child, and to the best of my knowledge, we do
7    not have any data on his family.
8        (Exhibit No. 80 marked.)
9        Q. (BY MS. THORPE)  I'm going to show you what's
10   been marked as Exhibit 80 for identification and ask you
11   if you've ever seen that record before.
12       A. This is a consultation by Dr. Joel Mabalot
13   dated 10-29-2005.  And it's a consultation for the
14   management of diabetes.
15       Q. And then if you'd look further down and tell me
16   if that record does not -- doesn't that record indicate
17   that he has a family history of diabetes?
18       A. I don't know where he got that from.  The
19   answer's yes, I see positive for diabetes.  But to the
20   best of my knowledge -- and since we last spoke, I was
21   flying in an airplane and I spent some time at least
22   going through the adoptive mother's deposition, which is
23   new since we last met.  And, in fact, she says he was an
24   adoptive child and they knew nothing about the father
25   and very little about the mother.

588

1        Q. Okay.
2        A. So where Dr. Mabalot got that data from I do
3    not know.
4        (Exhibit No. 81 marked.)
5        Q. (BY MS. THORPE)  I'm going to show you another
6    record that's been marked as Exhibit 81 for
7    identification and ask if you've ever seen that record
8    before.
9        A. Well, ma'am, what I would say is once one finds
10   one of them, then -- then these things go from --
11   because each consulting physician in the year 2006 reads
12   the report of the consulting physician in the year 2005.
13   So I think one would have to go back to the first of
14   those and then query it with the mother, and the mother
15   is still alive, so we can find out.
16       Q. Okay.  Well --
17       A. I would disagree with that.  If I understood
18   the -- the deposition of the mother, this is an adoptive
19   child and they definitely know nothing about the father
20   and they knew very little about the mother.
21       Q. Well, in --
22       A. So I would -- I would wish to identify the data
23   more firmly from the mother than -- than from material
24   which is passed on from -- from physician's note to
25   physician's note.

589

1        Q. Okay.  So you would agree -- so you can't
2    accept that he has the -- the risk factor or cause of
3    diabetes of family history based on what you read in the
4    deposition?
5        A. From what I understand from the mother's
6    deposition, that's not appropriate.
7        Q. Okay.
8        A. To have that in there is incorrect.
9        Q. And you will --
10       A. To the best of my knowledge.
11       Q. -- agree that it's really important that you
12   read these depositions so you can understand these risk
13   factors, right?
14           MR. BRUDNER:  Objection, form.
15       A. His deposition?
16       Q. (BY MS. THORPE)  No, just now I said isn't it
17   really important that you read the words or at least
18   talk to the people about the causes and -- the causes
19   and risk factors associated with the development of
20   diabetes --
21       A. Yes, ma'am.  We've shared that information --
22           MR. BRUDNER:  Objection --
23       A. -- yes, ma'am.
24           MR. BRUDNER:  -- form.
25       Q. (BY MS. THORPE)  All right.  And this

590

1    deposition of Mr. Haller's mother is the only one that
2    you've read before -- well, strike that.
3        A. Well, I --
4        Q. Strike that.  Let me ask the question.
5            You have not read a single deposition of
6    anybody in these cases before forming your opinions and
7    signing off on these reports, correct?
8        A. That's correct, I shared that with you the
9    first day.
10       Q. All right.  Now, if you look at page 3 of your
11   time line, you see that in September of 1998, Mr. Haller
12   had a glucose of 128, right?
13       A. Yes, ma'am.
14       Q. Did you review that lab?
15       A. You mean was it fasting or was it random?
16       Q. No.  I'm just asking you if you looked at the
17   labs.
18       A. Yeah, the data's there, yes.
19       Q. Then you've anticipated my next question.  Do
20   you know if it's fasting or not?
21       A. No, ma'am, no.
22       Q. Did you make an effort to figure out whether it
23   was fasting?
24       A. In -- in look -- to -- at the time I was
25   looking at the data available to me, that one is

29 (Pages 587 to 590)

591

1  discordant. As you see from -- in the time line pages 3
2  and 4, all of the others are well below a hundred. So
3  my best interpretation is that that would be nonfasting.
4  I could not find good reference to that in -- in the
5  original.
6      Q. Well, it's hard in the time line because there
7  are no medical records --
8      A. Right.
9      Q. -- cited, correct?
10      A. That's correct.
11      Q. But -- but my question to you is: Did you look
12  at the medical lab itself for that? Did you find it?
13      A. Yes, ma'am. What I -- what I said was I -- I
14  skim read all of those. I did not write them down, but
15  I -- I looked for that and then given the data which we
16  have shared assumed that that was potentially nonfasting
17  because all of the others either side of that were so
18  much below 100.
19      Q. Well, the -- if it were fasting, it would be at
20  a level that would lead to a diagnosis of diabetes?
21      A. We've shared that as well, yes, ma'am.
22      Q. Because it's over 126, right?
23      A. Yes, yes, ma'am.
24          (Exhibit No. 82 marked.)
25      Q. (BY MS. THORPE) I'm going to show you what's

592

1  been marked as Exhibit 82 for identification. And it's
2  this September 23, 1998 lab on Mr. Haller.
3      A. Oh, thank you.
4      Q. And I'd like you to look at, first of all,
5  where he was at the time that he had this test.
6      A. This is a gentleman residing in the Pinellas
7  County Jail. The title is Correctional Physicians
8  Services.
9      Q. All right.
10      A. It's in Clearwater, Florida, for Dr. Murray
11  and --
12      Q. Look at the collection time for the lab.
13      A. Okay. On the date I see a date collected and I
14  see '98, so . . .
15      Q. What's the -- what's the time next --
16      A. Let me read the numbers. 23 September nine
17  eight four dot oh, oh. So --
18      Q. A.m.?
19      A. A.m., right.
20          So if the nine eight relates to the year,
21  then although the numbers are all run together, it is
22  possible that's a 4:00 a.m. sugar.
23      Q. Yes, it says 4:00 a.m., does it not?
24      A. That's correct, that's correct.
25      Q. And to most people that means 4:00 a.m. in the

593

1  morning, right?
2      A. My --
3          MR. BRUDNER: Objection, form.
4      Q. (BY MS. THORPE) You would agree that that's a
5  fasting sugar, wouldn't you?
6      A. I agree it's a 4:00 a.m. sugar.
7      Q. And you would think --
8      A. We're looking at 128, yes.
9      Q. Yes. And you would think that in the jail they
10  weren't serving breakfast at 4:00 a.m.?
11      A. That's correct.
12      Q. All right. So --
13      A. On the other hand, he might have had a box of
14  candy. So it's -- it's particularly discordant compared
15  to all the other sugars. But, ma'am, I accept it's
16  taken at 4:00 a.m. and it's 128. It's a potential
17  interest as a fasting sugar.
18      Q. It would tell you that more probably than not
19  Mr. Haller had diabetes in September of 1998 before he
20  ever took Seroquel, wouldn't it?
21      A. Ma'am, I -- I have to -- this is where we come
22  into do we need one, do we need more. I have to point
23  out that that is -- that is bracketed by sugars that are
24  substantially different from that. This is taken in
25  1998, and three years later we're looking at sugars 79,

594

1  76, 97, 98, a sugar in '98 of 50 and a sugar after that
2  of 94.
3          So if there's one sugar discordant in a
4  long row of sugars which are not 128, I go back to a
5  different issue of what we discussed some days ago.
6  This is an example of when you need more than one sugar
7  to make a diagnosis because all of the other sugars are
8  so far away from 128.
9      Q. So you would agree that it is very, very
10  important to get confirmation of a diabetes test before
11  you conclude that somebody has diabetes?
12      A. If numbers are as discordant as this, then any
13  discordant values should be viewed in -- in for
14  alternative explanation.
15      Q. Look at your chart --
16      A. I said earlier -- and -- and if -- if you wish
17  to bring that out, we can talk about it. I said earlier
18  that in the trend of a patient who was slowly seeing a
19  rising blood sugar, when one became diagnostic and the
20  trend was in that direction, maybe a second value would
21  not be so important. In a setting like this where
22  bracketed sugars are so different, one would need to
23  know the circumstances of that particular value.
24      Q. You would agree that after the test that's been
25  marked as Exhibit 82 where he had the high of the 128

30 (Pages 591 to 594)

595

1  fasting, he did not have another glucose test until
2  2001, right?
3      A. That's correct.
4      Q. So three years went by before he had another
5  glucose test, right?
6      A. That's correct, ma'am.
7      Q. And this is a man who has diabetes now and is
8  controlling his blood sugars without any medications and
9  solely by diet, right?
10     A. That's correct.
11     Q. So he has glucose levels that are under a
12  hundred and he has diabetes, correct?
13     A. That's correct.
14     Q. So the fact that he has glucose levels that are
15  normal in 2001 does not mean that he didn't have
16  diabetes in 1998, correct?
17     A. What I said was they are bracketed by so many
18  normal values. I will accept that 128 raises the
19  possibility that he has diabetes, but in the absence of
20  a second one and in the presence of so many
21  non-128-level values, I would wish to consider that as a
22  discordant value.
23     Q. So you would throw it out as an outlier?
24     A. I wouldn't throw it out. I'd just say it's
25  discordant.

596

1      Q. Okay. What does --
2      A. But I would --
3      Q. -- that mean?
4      A. -- be reluctant in this case -- I would be
5  reluctant to make the diagnosis of diabetes on that date
6  because it is so discordant.
7      Q. And you would agree that you cannot rule out
8  that this man had diabetes as early as 1998?
9      A. I accept that. One discordant value in excess
10  of 126 raises the possibility that he might have
11  diabetes.
12     Q. And you cannot rule out that he had --
13  Mr. Haller had diabetes in September of 1998, correct?
14     A. On one discordant value, yes, ma'am.
15     Q. You agree with me?
16     A. I'm saying it's a discordant value, but I'm
17  agreeing --
18     Q. That's not my question.
19     A. -- it's in excess of 126.
20     MR. BRUDNER: I think he answered it the
21  first time.
22     MS. THORPE: No, he didn't.
23     Q. (BY MS. THORPE) Dr. Tulloch, my question to
24  you is whether you can rule out that Mr. Haller had
25  diabetes in September of 1998.

597

1      MR. BRUDNER: Objection, asked and
2  answered.
3      A. Ma'am, what I tried to do is make the best
4  interpretation of the available data. I've shared with
5  you that this single number which is discordant was
6  taken in jail. We're assuming that at 4:00 a.m. he was
7  fasting. We have no right to assume that. He might
8  have had a large candy half an hour before that.
9      A single discordant value reading, 128, in
10  a supposed fasting circumstances could be the following:
11  A, it might have not been fasting; and B, it might have
12  been discordant. And I'm pointing out that in a setting
13  like this with so many other values that were way away
14  from 128, my -- I would be naive to use that single
15  figure for the diagnosis of diabetes.
16     Q. (BY MS. THORPE) Okay. None of those things
17  answer my question.
18     A. I --
19     Q. My question's a yes or no answer. Can you rule
20  out that Mr. Haller had diabetes in September of 1998?
21     MR. BRUDNER: Objection, asked and
22  answered.
23     A. I cannot rule it out. On the other hand, I
24  would not make a diagnosis of diabetes on a single
25  value --

598

1      Q. (BY MS. THORPE) Okay.
2      A. -- in -- bracketed by such discordant values.
3      Q. Okay. You agree that Mr. Haller had
4  hypertension before he was taking Seroquel, right?
5      A. Yes, ma'am.
6      Q. And you agree that that hypertension at times
7  has been uncontrolled --
8      A. Yes, ma'am.
9      Q. -- correct?
10     You agree that hypertension can cause
11  diabetes?
12     A. Yes, ma'am.
13     Q. You know that scientists have quantified the
14  risk of developing diabetes in those who are hypertense?
15     A. Yes, ma'am.
16     Q. You haven't searched out and studied the
17  literature to quantify the contribution of hypertension
18  to Mr. Haller's diabetes?
19     A. That's correct.
20     Q. You know that -- I apologize if I've asked you
21  this. But you know that Mr. Haller would have developed
22  diabetes whether or not he took Seroquel, right?
23     A. I think there's a significant probability of
24  that, yes, ma'am.
25     Q. You would agree that to a reasonable degree of

599

1    medical probability he would have developed diabetes?
2        A. Yes, ma'am.
3        Q. Whether or not he took Seroquel?
4        A. Yes. We've shared that.
5        Q. Okay.
6        A. And I go back to my analogy of all the factors
7    he might have developed at the age of 25, none of the
8    factors he might have developed at the age of 105, and
9    the variables in between to a degree drive what actually
10   happens to that patient.
11       Q. How did you rule out hypertension as the sole
12   cause of Mr. Haller's diabetes?
13       A. Because he had so many other factors.
14       Q. So the presence of other potential causes means
15   that you can't rule -- that -- that you are able to rule
16   hypertension out as the sole cause?
17       A. Yes, ma'am, to a reasonable medical
18   probability, yes.
19       Q. All right. You know that Mr. Haller was a
20   long-time alcohol abuser, right?
21       A. Yes, ma'am.
22       Q. You know that alcohol abuse is a cause of
23   diabetes, correct?
24       A. Alcoholic pancreatitis is a cause of diabetes,
25   yes, ma'am.

600

1        Q. You know that poor diet is a cause of diabetes,
2    right, or can be a cause of diabetes?
3        A. No, ma'am, I -- I think that's -- excess
4    calories would probably be a better way of saying
5    that --
6        Q. Okay.
7        A. -- yeah.
8        Q. Mr. Haller certainly had a few excess calories?
9        A. Yes.
10           MR. BRUDNER: Objection, form.
11       Q. (BY MS. THORPE) And alcohol can contribute to
12   that picture, right?
13       A. I corrected you for a reason, because the acute
14   effect of alcohol is to drop blood sugar. So where we
15   make a statement like you made earlier, alcohol --
16   binges of alcohol intake can cause pancreatitis and
17   inflammation of the pancreas can lead to the progressive
18   loss of the cells that make insulin. So there's one of
19   the mechanisms that alcohol can cause diabetes even
20   though it causes a lowering of blood sugar.
21       Q. All right. And alcohol abuse can also lead to
22   gastritis, right?
23       A. The acute effect of alcohol on the stomach is
24   to irritate it immediately.
25       Q. And can lead to gastritis?

601

1        A. An irritated stomach is gastritis, yes, ma'am.
2        Q. You will agree that there's a lot of evidence
3    that Mr. Haller had a sedentary lifestyle?
4        A. I believe so, yes, ma'am.
5        Q. He throughout this record says things like he's
6    not going to exercise, he doesn't participate in
7    physical activities, and so on, right?
8        A. Yes, ma'am.
9        Q. A sedentary lifestyle is a cause of diabetes,
10   right?
11       A. Is a contributing cause, yes, ma'am.
12       Q. And you know that scientists have studied and
13   quantified the risk of diabetes in people who have a
14   sedentary lifestyle?
15       A. Yes, ma'am.
16       Q. But you haven't searched out and studied the
17   literature to quantify the contribution of that
18   contributing cause to Mr. Haller's diabetes, right?
19       A. That's correct.
20       Q. Contemporaneously with Seroquel, you know that
21   Mr. Haller was taking Depakote and Lithium?
22       A. Yes, ma'am.
23       Q. Do you understand that Depakote and Lithium are
24   associated with weight gain?
25       A. I knew that Depakote was. I did not know that

602

1    Lithium was. It is a sedating substance. It's in the
2    same family as sodium, which is the main component of
3    salt, but it is a sedating substance. And it's used in
4    folk with manic-depressive psychosis, which is one of
5    the words for bipolar, and sedation in these folks
6    certainly could lead to weight gain.
7        Q. Have you determined what contribution either
8    Lithium or Depakote made to whatever was happening to
9    Mr. Haller's weight?
10       A. No, ma'am, I believe it would be one of the
11   components on the saddle of the camel, but I do not
12   believe one can with reasonable medical probability
13   ascribe accurately numbers to each of those components.
14       Q. So you can't parse out what contribution in
15   terms of number of pounds that Depakote or Lithium or
16   Seroquel made in Mr. Haller?
17       A. That's correct.
18       Q. You have indicated in your report that you
19   think it would be prudent for physicians to avoid where
20   possible the use of medications that are associated with
21   weight gain and dyslipidemia to minimize the risk of the
22   patient developing drug-induced diabetes, correct?
23       A. Yes, ma'am.
24       Q. Now, you're aware that patients have to take
25   steroids from time to time that are associated with

603

1   increases in blood sugar, right?
2       A. Yes, ma'am.
3       Q. People have asthma and they — or COPD and they
4   have to take medications, right?
5       A. Yes, ma'am.
6       Q. And those medications can increase blood sugar,
7   correct?
8       A. Yes, ma'am.
9       Q. And you would never advise a physician when a
10  patient had a condition like that not to take that drug,
11  right?
12      A. On the contrary, ma'am, I -- I do both --
13  advise both physicians and patients to seek all
14  alternative measures before they consider the use of
15  glucocorticoids.
16      Q. But if they have to do it, based on the risk
17  and benefits of their breathing condition, that's —
18  from time to time that decision has to be made and from
19  time to time you acquiesce in that decision, right?
20      A. Absolutely. If it's a matter of life and
21  death, it's quite reasonable.
22      Q. Right. And similar — and we've talked about
23  how psychiatrists have to make those same decisions
24  about pharmaceutical therapies for people who have
25  psychoses, right?

604

1       A. Yes, ma'am.
2       Q. Now, you know that doctors have to decide in a
3   patient like Mr. Haller what is the best regimen of
4   drugs that will help them be under control mentally and
5   not, you know, risk harm to themselves or to others and
6   they have to weigh that against other risks of the drug
7   therapies, right?
8       A. Yes, ma'am.
9       MR. BRUDNER: Objection.
10      A. It's called a risk-benefit analysis, and it's a
11  reasonable -- a reasonable step for any physician making
12  a decision on medication.
13      (Exhibit No. 83 marked.)
14      Q. (BY MS. THORPE) All right. I'm going to show
15  you what's been marked as Exhibit 83 for identification,
16  and I'd like you to look at the first paragraph entitled
17  subjective.
18      A. Thank you, ma'am. This is a psychiatric
19  progress note by a nurse practitioner, Nicole Keene.
20  And it states in the second -- second sentence, "He
21  wants to get off his Seroquel because of the class
22  action lawsuit he is in against Seroquel and diabetes."
23      Do you want me to go on?
24      Q. Yes.
25      A. Okay. "His lawyer suggested that he stop the

605

1   medication if he wants to win a settlement. We have had
2   this discussion on multiple occasions, and he has been
3   given full informed consent about the medication and has
4   consistently stated he wants to continue Seroquel and
5   Risperdal due to efficacy. He is now more stable than
6   he has been in several years. He was strongly advised
7   to remain on his medication due to its effectiveness as
8   his diabetes is well-controlled with recent labs giving
9   a hemoglobin A1c of 5.7, et cetera, within normal
10  limits."
11      Q. And lipids within normal limits, right?
12      A. Yes, ma'am.
13      Q. So you would agree, Doctor, that lawsuits and
14  lawyering should not play any role in assessing
15  risk/benefit in a patient like this with a mental
16  illness like Mr. Haller has?
17      A. I think that's a reasonable statement, ma'am.
18  One makes medical decisions on the best medical data.
19      Q. And you would agree that lawyers should not
20  have advised this patient to stop taking Seroquel. That
21  would be overstepping the bounds of lawyering, right?
22      MR. BRUDNER: Objection, form.
23      A. I -- I don't know where the patient or the
24  nurse practitioner got that data from, but it's
25  certainly something that one might discourage.

606

1       Q. (BY MS. THORPE) If true, you would think it
2   was the wrong thing for the lawyers to do, right?
3       MR. BRUDNER: Objection, form.
4       A. Ma'am, I'm -- I'm not inclined to -- to judge.
5   I try to educate all concerned in a setting like that
6   and hope for a more happy outcome.
7       Q. (BY MS. THORPE) And as an endocrinologist, you
8   yourself would not dare to advise those doctors who were
9   taking care of him to — from a psychiatric perspective
10  to take him off of Seroquel, would you?
11      A. Ma'am, I -- I think I mentioned earlier what I
12  try to do is give them the best information available.
13      Q. Right. You wouldn't have advised them to
14  take — you wouldn't step outside of your role as an
15  endocrinologist and advise the psychiatrist to take him
16  off of Seroquel, correct?
17      A. Ma'am, that's correct. What I would do is try
18  to give them the best available data on all of the
19  atypical antipsychotics and their relation to my field
20  and allow them to make the decision.
21      Q. Dr. Tulloch, by my count, you have about 32
22  articles on the list of articles that's attached to your
23  report in all of these cases —
24      A. Yes, ma'am.
25      Q. — correct?

607

```
 1        You agree that's approximately --
 2    A. Yes, ma'am.
 3    Q. -- right?
 4    A. Uh-huh.
 5    Q. You agree that you have not comprehensively
 6  reviewed the medical literature on Seroquel; is that
 7  right?
 8    A. Oh, absolutely, ma'am. I -- I came in here and
 9  introduced myself as a busy clinical endocrinologist.
10        I summarized my reason for being in this
11  case was interest in the field because it's clearly a
12  field that I've spent some time advising psychiatrists
13  from an endocrine viewpoint, and I added a personal
14  contact with the people concerned because I've been duck
15  hunting with these gentleman for the last 25 years. So
16  those are unusual reasons for being in this particular
17  setting.
18    Q. You are good friends with the plaintiffs'
19  lawyers?
20    A. Yes, ma'am, for my sins.
21    Q. That's -- so -- so the articles that you've
22  read on this -- well, let me ask you this.
23        Have you read all 32 articles on the list?
24    A. I pretty well reviewed the conclusion --
25  summary conclusions of most of those, yes. I mean,
```

608

```
 1  "all" is a sweeping statement.
 2    Q. Well, no, I meant of the 32. Have you read all
 3  of the 32 articles?
 4    A. Pretty well, yes, ma'am.
 5    Q. Okay.
 6    A. But --
 7    Q. But no more?
 8    A. "Read" means looking at the conclusions,
 9  looking at the summaries --
10    Q. Okay.
11    A. -- looking at where they fitted in. In fact, I
12  showed you evidence of ones I've been busy on, I
13  scribble on.
14    Q. Okay.
15    A. So you can go through that.
16    Q. All right. So you'll agree that you've read
17  only a small portion of the literature on Seroquel and
18  diabetes?
19    A. I think that's a reasonable statement, yes,
20  ma'am.
21    Q. And you've only read a small portion of the
22  literature on Seroquel and weight gain?
23    A. Yes, ma'am. Much of that was summarizing, but
24  that's absolutely right.
25    Q. I'm sorry. I don't understand what you mean,
```

609

```
 1  "much of that was summarizing."
 2    A. What -- what happens now in the medical
 3  literature is we are seeing more and more original
 4  articles which are actually not original. They are
 5  summaries of the literature in a field. And you've just
 6  chosen a couple.
 7        So what you'll find in some of the more
 8  modern medical journals are original article -- articles
 9  purported to be original which are summarizing articles
10  of a whole field, and there are some examples of the --
11  of those summarizing articles in here.
12        We talked about one which was the consensus
13  conference where folk looked at everything available up
14  until that time, physicians from several different
15  subspecialties, and tried to come to a reasonable
16  conclusion so that the rest of us might be advised. And
17  some of the more sweeping reviews of all the available
18  data I've read more intimately.
19    Q. And you agree that you've only read a
20  small portion of the literature?
21    A. Of course, yes, ma'am.
22    Q. And you have not looked at, for example, all of
23  the epidemiology on Seroquel, correct?
24    A. That's right, ma'am. I said earlier I would
25  bow to the expertise of someone in that field.
```

610

```
 1    Q. And it looked like to me that the only -- going
 2  through your list, that the only epidemiology that you
 3  had on your list was that by Smith, Citrome, Guo,
 4  Leslie, and Sernyak?
 5    A. I think that's --
 6    Q. Do you think that's right?
 7        MR. BRUDNER: Object.
 8    A. I think that's reasonable, but I reserve the
 9  right to go through this list and check them.
10    Q. (BY MS. THORPE) Well, you can check -- you can
11  look at the list now and see if I'm right.
12    A. No, in the interest of time, I'll agree with
13  you, no problem.
14    Q. Okay. No reservation of rights? Really, I
15  want you to tell me if there's anything I've left off.
16  That's why we've come together.
17    A. That's right.
18    Q. And I went through the list and -- but that was
19  me, but I want to know your opinion, not what --
20    A. That's fine. I'll accept that. I did,
21  however, leave in my last paragraph that I reserve the
22  right to supplement my opinions pending the review of
23  additional information and I refer to that.
24    Q. Okay. And I've told you, like, ten times that
25  if you do I expect you to tell your lawyer -- the lawyer
```

611

1  who's here and -- or some other lawyer and then I get a
2  chance to talk to you about it.  You understand --
3      A.  Who will be --
4      Q.  -- that, right?
5      A.  -- beholden to tell you, ma'am, yes.
6      Q.  Now, how did you come to that group of
7  epidemiologic studies?  You understand that's not all of
8  them, right?
9      A.  I understand that's not all of them, ma'am.
10  I -- I started with a background of many of the
11  summarizing articles which had already come my way for
12  the Zyprexa case which was current about nine months
13  ago.
14      Q.  Was this --
15      A.  I then went to the Index Medicus, which is now
16  on the computer, and I googled quetiapine and the topics
17  that we've been discussing, in other words, quetiapine
18  and diabetes, quetiapine and pancreatitis, quetiapine
19  and weight gain, and I looked for the data that was new
20  from when I sat down for the Zyprexa case.  So --
21      Q.  Did you start out with a list of the 32
22  articles, articles you pulled together for Zyprexa?
23      A.  Those were the ones that I shared with the
24  legal team.  Well, that's my contribution.  I assume, as
25  you said, this is a standard list, so there must be a

612

1  contribution by others.  And then as I mentioned,
2  literature is changing all the time, so before we come
3  to court, I will go back to the Index Medicus and search
4  once again.
5      Q.  I guess what I'm -- I'm not being clear.
6  But --
7      A.  Okay.  Sorry.
8      Q.  -- you have -- no, it's my fault.  I mean, I'm
9  just not saying it clearly.
10          You have a -- a small portion of the
11  epidemiologic literature on your list?
12      A.  Yes, ma'am.
13      Q.  So I'm trying -- you agree with that?
14      A.  Yes, ma'am.
15      Q.  So I'm trying to figure out how you picked
16  these ones.
17      A.  I believe that they came up -- they were --
18  they were what was there on Zyprexa plus what came up
19  when I ran that search.
20      Q.  Okay.  You don't have any explanation for how
21  you missed the rest of the --
22      A.  No.  Well, I knew Dr. Wirshing was going to be
23  present in this context, and I did not feel I needed to
24  compete with him.
25      Q.  You agree that without reviewing all of the

613

1  studies dealing with Seroquel and diabetes, you cannot
2  form a scientifically valid opinion that Seroquel is a
3  cause of diabetes or weight gain?
4      A.  Ma'am, I think you're holding me to a very high
5  standard.  I think it's appropriate when I say more
6  likely than not -- and when I am led to understand that
7  means 51 percent -- if I've looked at summarizing
8  articles which review the data and which come up in any
9  reasonable medical search of the equivalent of Index
10  Medicus, that I've got a pretty good handle on the
11  literature.  Now, whether it's 51 percent of the
12  literature or 57 percent of the literature or 99 percent
13  of the literature, I would not hold out that it's
14  99 percent of the literature, but I feel it's a
15  reasonable review of available data.
16      Q.  Well, you're not saying --
17      A.  And I started off by saying I'm not an expert
18  in epidemiology, ma'am.
19      Q.  Well, how do you know -- I'm not just talking
20  about the epidemiology.  You only read a portion of the
21  literature in general on Seroquel and diabetes, right?
22      A.  That's correct.
23      Q.  And how do you know that you didn't fail to
24  consider important data before you formed your opinion
25  unless you make an effort to comprehensively review the

614

1  literature?
2      A.  Ma'am, in my view, I looked at the summarizing
3  articles which covered most of the area I believed I was
4  making an opinion on.
5      Q.  And by what method did you evaluate the
6  limitations of the data that you reviewed?
7      A.  I looked at the available data in English.  I
8  did not look at the French data.  I did not look at the
9  Russian data.  I did not look at the Chinese data.  So
10  I -- I'll accept that my limitations remain to the
11  English literature.
12      Q.  Well, you didn't look at all of the English
13  literature on Seroquel?
14      A.  No.  I looked for the summarizing articles
15  which reviewed, and then many of them say somewhere in
16  the thing we reviewed the literature to such-and-such a
17  date, and those are summarizing articles.
18      Q.  You would agree that reviewing a summary of an
19  article is not the same thing as reviewing the methods,
20  reviewing the results, reviewing the tables of data, and
21  reviewing the limitations of the article, the authors of
22  the article's report and peer-reviewed studies, correct?
23      A.  I accept that.
24      Q.  And before you formed your opinion that
25  Seroquel causes diabetes, you did not review, for

615

1  example, the Barner study, did you?  It's not on your
2  list?
3       A.  If it's not on my list, then I didn't review
4  it.  Hopefully, I reviewed a summarizing article that
5  will have included it in its literature, yes, ma'am.
6       Q.  You can't tell me what the merits of that
7  article are or the demerits of that article, can you?
8       A.  No, ma'am.
9       Q.  And you don't know what population was studied
10  in that article, do you?
11       A.  No, ma'am, I've not read the literature.  I
12  don't have any data --
13       Q.  All right.
14       A.  -- on it.
15       Q.  And you didn't review the three articles by
16  Gianfresco before you formed your opinions in this case,
17  correct?
18       A.  That's correct.
19       Q.  You didn't review any of the clinical study
20  reports that are listed on your reliance list?  Let's --
21  open up to page 16 on your report -- actually, not
22  page -- I'm used to saying page 16.  Let's go to the --
23  let's go to page 3.
24            If you look at the top of page 3 of the
25  spreadsheet on your report, it says, "A Multicenter,

616

1  Randomized, Placebo-Controlled Parallel-Group,
2  Double-Blind, Phase III Study to Compare the Efficacy
3  and Safety of Quetiapine Versus Placebo as Adjunct
4  Therapy with Mood Stabilizers for the Treatment of
5  Alcohol Dependence in Patients with Bipolar Disorder."
6            You didn't read that, did you?
7       A.  No, ma'am.
8       Q.  You didn't read any of the clinical study
9  report synopses that are contained in this spreadsheet,
10  right?
11       A.  Those AstraZeneca in-house studies I have not.
12  I did not read them at the time of this.  I looked at
13  these -- these data which we've shared.
14       Q.  The ones that have been marked as Exhibits 4
15  and 16, right?
16       A.  That's correct.
17       Q.  And so similarly, if you go to -- well, let
18  me just ask you this.
19            You -- you have not read the Studies 125,
20  126, or 127 that are randomized control trials involving
21  Seroquel?
22       A.  Can you ascribe these to which page or which --
23       Q.  No, I'm just asking you.  They are -- they are
24  studies that are part of this litigation.
25       A.  Yeah.

617

1       Q.  You've not read them?
2       A.  No, I have not.
3       Q.  You've not read a study by Vieta, which is a
4  published report in a peer-reviewed journal of a
5  randomized control trial on Seroquel, correct?
6       A.  That's correct.
7       Q.  You have not read the submission made by
8  AstraZeneca of all of its data on all metabolic
9  parameters regarding Seroquel, correct?
10            MR. BRUDNER:  Objection, form.
11       A.  That's correct.
12       Q.  (BY MS. THORPE)  If you look at beginning on
13  page 9, there are some references to depositions in this
14  spreadsheet.  You've not read any of those depositions,
15  right?  If you -- on page 9 it's, like, videotaped oral
16  deposition of David R. Brennan.
17       A.  Yes, ma'am, I think we've shared that I have
18  not looked at any of the depositions and --
19       Q.  Well, these aren't about Mr. Haller, these
20  are --
21       A.  Okay.
22       Q.  -- these are company people.  You haven't
23  read --
24       A.  Right.
25       Q.  -- any --

618

1       A.  No, ma'am.
2       Q.  -- company depositions?
3            And then you see after the deposition list
4  there are a list of documents with Bates numbers and
5  e-mails and letters and that kind of thing.  You haven't
6  read any of those?
7       A.  That's correct.
8       Q.  And you would not be the kind of expert who
9  would have a basis in your qualifications for analyzing
10  e-mail communications among people in a drug company,
11  right?
12            MR. BRUDNER:  Objection, form.
13       A.  That's correct.
14       Q.  (BY MS. THORPE)  If you turn in your report --
15  and this is true of every report that you've filed in
16  this case -- on the ninth page, the second paragraph,
17  you say, "Based on my review of documents produced by
18  AstraZeneca in this litigation, it is my opinion that
19  the company agents were aware as early as 1997 of the
20  association between Seroquel and weight gain"?
21       A.  Yes, ma'am.
22       Q.  You've reviewed no documents, right?
23       A.  No, that's not correct.  I have a document
24  about that time that relates to weight gain, but it's a
25  single document.  So that statement is correct.  I have

619

1 not viewed all of the numbers which we looked at, but I
2 did see one that related to weight gain. And, actually,
3 in that one -- and I did not bring it up when we were
4 discussing it -- that particular AstraZeneca person felt
5 that weight gain was dose related. And I let you off
6 that one. I didn't bring it up. But I can find that if
7 need be. But, anyway, yeah --
8     Q. Yeah, need be.
9     A. -- so I see some isolated ones.
10     Q. I need to know, Doctor, what documents --
11 AstraZeneca documents that you've reviewed. This --
12 this sentence says, "Based on my review of documents
13 produced by AstraZeneca in this litigation."
14         So -- so what are you talking about?
15     A. What I put most of my weight on was I looked at
16 the PDR which had their data and --
17     Q. Okay. That's not produced by AstraZeneca.
18     A. No. And that particular statement I will need
19 to find it for you, but I can bring it for you. I have
20 it -- an e-mail that -- that relates quite early to the
21 knowledge that the company agents were aware that weight
22 gain occurred.
23     Q. Okay. Describe the document. It's one
24 document?
25     A. One document. I was given --

620

1     Q. Is it the only AstraZeneca document you have --
2     A. That I've looked at, yeah, that's correct.
3     Q. Okay. And so you have that at your office?
4     A. I have that.
5     Q. And you'll bring that tomorrow?
6     A. I'll bring it.
7     Q. And I don't want -- what I don't want to happen
8 is if the -- I'm going to ask you tomorrow if the
9 lawyers have given you additional AstraZeneca documents.
10     A. No, ma'am.
11     Q. I want to know what you have now.
12     A. I have that document somewhere now, yeah.
13     Q. Okay.
14         MR. BRUDNER: Objection, form.
15     Q. (BY MS. THORPE) The next sentence says,
16 "Evidence also supports my opinion that AstraZeneca had
17 evidence that Seroquel was associated with glucose
18 dysregulation in 1999 and 2000."
19         What evidence do you have of that?
20     A. That, I don't have at this time. I had
21 discussed it with those colleagues in this field who are
22 in this litigation and -- and being given that in
23 information. I have not looked at the original data.
24     Q. So who did you talk to who gave you that
25 information, your colleagues in the field?

621

1     A. These were colleagues in this law firm, and
2 that was when I made -- that was what I put together at
3 that time.
4     Q. So a lawyer in this law firm, in Laminack,
5 Pirtle, or Tom and --
6     A. I have worked with a number of colleagues in
7 this field and a couple of nurse practitioners, so I --
8 I asked them what data they had available on what the
9 AstraZeneca scientists knew, because these guys are
10 sincerely honest and work together and this was the data
11 which they told me they had looked at. And as I say,
12 the -- to my memory, the 1997 e-mail I have available
13 somewhere and I will bring it for you.
14     Q. So the second sentence on this page of your
15 report that says, "Evidence also supports my opinion
16 that AstraZeneca had evidence that Seroquel was
17 associated with glucose dysregulation in 1999 and 2000"
18 is based on a conversation with someone in a law firm?
19     A. That's correct.
20     Q. It's not based on a document?
21     A. That's correct.
22     Q. And can you tell me the name of the person with
23 whom you had this conversation?
24     A. Not at this time, but I -- I can ask.
25     Q. Do you have notes of this conversation?

622

1     A. Not at this time.
2     Q. What do you mean by "not at this time"?
3     A. I don't keep notes of my conversations. I
4 mentioned earlier how I -- when I do the reports, I -- I
5 have -- I use the original document, then type from
6 that.
7     Q. But did you take notes of your conversations --
8 conversation or conversations with someone in the law
9 firm about evidence?
10     A. Information -- yes, ma'am, information which
11 was available within the AstraZeneca -- I'm sorry.
12 There's noise at the back. Let me stop.
13         Yes, I asked what information that was
14 available amongst the AstraZeneca scientists sharing
15 scientific information on early data.
16     Q. And did you take notes of that conversation?
17     A. No, ma'am.
18     Q. Did the person you were talking to -- was the
19 person you were talking to about this a lawyer or a
20 paralegal?
21     A. To the best of my knowledge, it was a -- both.
22 I had -- it was a conversation with a lawyer and a
23 paralegal.
24     Q. Tell me what the lawyer said to you.
25     A. It was words to that effect, that AstraZeneca

623

1 had some information that Seroquel was associated with
2 glucose dysregulation and the date was the date which I
3 wrote down.
4    **Q. Is there anything else you remember about that**
5 **conversation?**
6    A. No, ma'am. But when it -- when it matched with
7 literature like the one which I share here -- and this
8 is 12,000 patients, risk ratio for diabetes with
9 quetiapine, and it gives a risk ratio of 3.34 -- I
10 believe that that was a reasonable -- .
11    **Q. Can you identify --**
12    A. -- published data.
13    **Q. -- what you're talking about?**
14    A. Okay.
15    **Q. The name of the article.**
16    A. The article is by Francesca Cunningham. It's
17 called "Antipsychotic Induced Diabetes in Veteran
18 Schizophrenic Patients." It refers to 12,235 patients.
19    **Q. Okay. I didn't ask you that. I asked you for**
20 **the name of the article. That's all I need.**
21       MR. BRUDNER: Please don't interrupt.
22    A. Okay. Well, let me go on, then, because I have
23 to --
24    **Q. (BY MS. THORPE) No, there's no question --**
25       MR. BRUDNER: Please don't interrupt.

624

1       MS. THORPE: You know what, there's no
2 question on the floor. And as soon as I finish my
3 examination, you can sit here all night and talk to
4 Dr. Tulloch.
5       MR. BRUDNER: But there was when you
6 interrupted him.
7       MS. THORPE: No, there was not. There was
8 no question on the floor.
9       MR. BRUDNER: So you didn't ask a question
10 before you interrupted him?
11       MS. THORPE: I asked him for the name of
12 the article.
13       MR. BRUDNER: Okay. And then --
14    **Q. (BY MS. THORPE) Tell me what the answer to**
15 **that question should be, the name of the article.**
16       MR. BRUDNER: You can -- you can -- you can
17 object as to nonresponsive, but you've got to let him
18 answer.
19       MS. THORPE: I can object as non -- I do
20 object as nonresponsive --
21       MR. BRUDNER: But you don't --
22       THE REPORTER: One at a time.
23       MS. THORPE: I'm not going to waste my
24 time. It is -- and I'm not going to sit here while we
25 fill up the record with the doctor reading an article in

625

1 a nonresponsive way. It's outrageous. I've never seen
2 anything like it.
3       MR. BRUDNER: He can respond.
4       MS. THORPE: And it needs to stop.
5       MR. BRUDNER: You get to object --
6    **Q. (BY MS. THORPE) Doctor, what is --**
7       MR. BRUDNER: -- that it's nonresponsive.
8    **Q. (BY MS. THORPE) -- the name of the article?**
9       MR. BRUDNER: Don't answer. You get to
10 object that it's nonresponsive.
11       MS. THORPE: All right.
12       MR. BRUDNER: That's it. That's the way it
13 works.
14       MS. THORPE: Honey, I know. I've been
15 practicing law for 30 years.
16       MR. BRUDNER: That's -- that's fantastic.
17       MS. THORPE: All right.
18       MR. BRUDNER: I'm very impressed.
19    **Q. (BY MS. THORPE) So, Doctor, what's the name --**
20       THE REPORTER: One at a time.
21    **Q. (BY MS. THORPE) -- of the -- what's the name**
22 **of the article you have in front of you? Can you tell**
23 **me the name?**
24    A. Yes, ma'am, I gave it to you.
25    **Q. What's the name?**

626

1    A. And it's on the record.
2    **Q. Okay. Tell me the name.**
3    A. It's on the record.
4    **Q. I've forgotten. What's the name?**
5    A. Do you need it again?
6    **Q. Yes.**
7    A. Okay. The name was Francesca Cunningham. The
8 title was "Antipsychotic Induced Diabetes in Veteran
9 Schizophrenic Patients." And I was reading you the
10 component of that that related --
11    **Q. I did not ask --**
12       MR. BRUDNER: You're cutting him off.
13       MS. THORPE: Move to strike as
14 nonresponsive.
15       MR. BRUDNER: You get to do that after he's
16 finished with his answer.
17       MS. THORPE: No, I get to do it whenever I
18 want to.
19       MR. BRUDNER: We're shutting this down.
20 That's it tonight. Good night.
21       MS. THORPE: You are terminating this
22 deposition?
23       MR. BRUDNER: It's four minutes until 9:00
24 and you're --
25       MS. THORPE: Because you want the

627

1   witness --
2          THE REPORTER: One at a time.
3          MS. THORPE: You want the witness to read
4   the article out loud?
5          MR. BRUDNER: He can finish his answer.
6          MS. THORPE: So let me just get this clear
7   on the record. Your position is that when I asked the
8   doctor the name of an article, he then has the right to
9   read the article out loud?
10         MR. BRUDNER: Whatever his answer is --
11         MS. THORPE: That's your --
12         MR. BRUDNER: -- that's his answer.
13         MS. THORPE: -- position?
14     Q. (BY MS. THORPE) All right, Doctor. Go ahead
15  and read the article out loud. You can start at the
16  beginning. Read it out loud.
17     A. No, ma'am, I was not planning to read the
18  article as a whole. What I was planning to do --
19         MS. THORPE: I move to strike as
20  nonresponsive.
21         THE REPORTER: One at a time.
22         MR. BRUDNER: You get to do that after he's
23  finished with his answer.
24     A. -- to relate --
25         MS. THORPE: I don't need --

628

1          THE REPORTER: One at a time, please.
2      Q. (BY MS. THORPE) Go ahead and read the article
3   out loud.
4      A. Okay. The risk for quetiapine in this setting
5   was 3.34, and it related to the number of patients which
6   is 12,000. And carry on, ma'am.
7      Q. I want to know everything that happened in your
8   conversation with a lawyer that you used as the basis
9   for your report.
10     A. Okay.
11     Q. What -- and let me just ask it this way.
12         You say in your report that evidence
13  supports your opinion that AstraZeneca had evidence that
14  Seroquel was associated with glucose dysregulation in
15  1999 and 2000?
16     A. Yes, ma'am.
17     Q. The sole basis for your declaration in federal
18  court was the conversation you had with a lawyer and a
19  paralegal in this law firm; is that right?
20     A. Ma'am --
21         MR. BRUDNER: Objection, asked and
22  answered.
23     A. -- in that setting -- and what I supported it
24  with was evidence from published data which I read and
25  gave you the information.

629

1      Q. (BY MS. THORPE) All right. The article whose
2   name I asked you for, tell me the date of that article.
3      A. Ma'am, this dates to August of 2003 and it goes
4   back to time earlier.
5      Q. Right. The publication date that you have in
6   front of you is 2003, right?
7      A. That's correct, yes, ma'am.
8      Q. And your statement here is that evidence
9   supports my opinion that AstraZeneca had evidence that
10  Seroquel was associated with glucose dysregulation in
11  1999 and 2000, right?
12     A. That's correct.
13     Q. The only basis that you have for that statement
14  is something that a lawyer and a paralegal told you,
15  correct?
16     A. Yes, ma'am.
17         MR. BRUDNER: Objection, form, asked and
18  answered.
19     Q. (BY MS. THORPE) And I want to know every
20  single thing that the paralegal told you that supported
21  that statement.
22     A. Ma'am, what I told -- what I -- what I wrote
23  was what I was told in that setting.
24     Q. They said word for word this statement to you?
25     A. Yes, ma'am.

630

1      Q. And you -- so did you say, "Well, tell me:
2   What evidence do you have?" You just accepted what the
3   lawyer told you at face value --
4      A. I accept --
5      Q. -- and wrote it in a report that's being filed
6   in federal court?
7      A. I accepted that, and I said what I needed to do
8   was see the original data. And I promise you I will
9   have a view of that original data by the time we get to
10  court, yes, ma'am.
11     Q. All right. At the end of this paragraph, you
12  say, "Based on information available to me, AstraZeneca
13  did not provide accurate information about the risks of
14  weight gain, elevated triglycerides, and diabetes
15  associated with Seroquel ingestion to physicians in a
16  timely manner."
17         What was the information available to you
18  when you wrote this paragraph?
19     A. Again, I looked at -- you'll see that there are
20  a number of the PDR references here and the -- you'll
21  find that the side effects are not fully explained in
22  the PDRs which relate to the different dates and in my
23  view a more succinct explanation of abnormalities which
24  are present in the literature -- and I gave you an
25  example -- would have been more forthcoming in a

631

1  responsible drug company marketing through PDR.

2      **Q. Do you consider yourself an expert on labels?**

3      A. No, ma'am.  And I started off by saying I'm not

4  an expert in those fields, and I suspect that the Court

5  will be addressed by folk who are expertise in that

6  field.

7      **Q. And you don't know what the standards are that**

8  **apply -- that are applied by the FDA to what goes in a**

9  **label in a pharmaceutical product?**

10      A. No, ma'am, I -- I do -- I have not been on

11  an FDA board, no, ma'am.

12      **Q. And you do not know what the standards are as**

13  **to what goes in a label that goes out with a**

14  **pharmaceutical product, correct?**

15      A. No, ma'am. I know -- I know they're very

16  conservative because of the level of independent studies

17  which are required before a drug company can make a

18  claim, that's correct.

19      **Q. Have you ever drafted or commented on a label**

20  **that's been prepared to go with a pharmaceutical**

21  **product?**

22      A. No, ma'am.

23      **Q. Have you ever worked with the FDA in any**

24  **capacity to evaluate a label on a product?**

25      A. No, ma'am.

632

1      **Q. Have you ever published any article in the**

2  **peer-reviewed literature on labeling of pharmaceutical**

3  **products?**

4      A. No, ma'am.

5      **Q. What process or methodology did you use to**

6  **reach your conclusions about AstraZeneca's labeling?**

7      A. It was my view that the labeling should be as

8  informative as possible -- and this was a personal view.

9  I do not stand myself as an expert for the answers I've

10  given you -- that the physician -- as I've said, that a

11  physician planning to use this medication should have as

12  reasonable a review of data that might be both pro and

13  adverse to the patient so that the physician might make

14  a reasonably balanced judgment.

15      **Q. Do you understand that the labels for**

16  **pharmaceutical products are reviewed by the Food & Drug**

17  **Administration?**

18      A. Oh, yes, ma'am.

19      **Q. And do you know who at FDA examined the labels**

20  **that were used by AstraZeneca in connection with**

21  **Seroquel?**

22      A. No. I know there is a committee. I know that

23  colleagues of mine spent time on that committee. I have

24  not ever volunteered to be on that committee; I'm too

25  busy as a physician. But it is a balanced committee,

633

1  and the -- their conclusions are usually after adequate

2  discussion.

3      **Q. Do you -- do you believe that the people at FDA**

4  **and these colleagues of yours that you're describing**

5  **know more about putting the appropriate content with**

6  **regard to Seroquel in the label than you do?**

7      A. I think that's reasonable. I also reserve the

8  right to disagree with that opinion, but that's a

9  personal disagreement.

10      **Q. Would you agree -- strike that.**

11      A. May I interject?  It is getting time to go. If

12  you -- if you've been offered another evening, if you'd

13  like to spend that whole evening, that's fine.  If you

14  want to finish tonight, I'm happy to stay around.  But

15  we're all getting a little hypoglycemic.

16      **Q. Well, I'm happy to call it a night tonight.**

17      A. Okay.

18      **Q. I do want to come back tomorrow.**

19      A. Okay.

20      (Deposition adjourned at 9:10 p.m.)

21

22

23

24

25

634

1               CORRECTION PAGE

2  WITNESS NAME:  BRIAN R. TULLOCH, M.D., FRCP, FACP

   DATE:  10/15/2008

3

   PAGE LINE CHANGE       REASON

4  _____

5  _____

6  _____

7  _____

8  _____

9  _____

10  _____

11  _____

12  _____

13  _____

14  _____

15  _____

16  _____

17  _____

18  _____

19  _____

20  _____

21  _____

22  _____

23  _____

24  _____

25  _____

635

1          SIGNATURE PAGE

2

3      I, BRIAN R. TULLOCH, M.D., FRCP, FACP, have read the
   foregoing deposition and hereby affix my signature that
   same is true and correct, except as noted on the

4   correction page.

5

6      _____

      BRIAN R. TULLOCH, M.D., FRCP, FACP

7

8

9

   THE STATE OF TEXAS      )

10  COUNTY OF _____   )

11

      Before me _____ on this day

12  personally appeared _____ known to me
   [or proved to me on the oath of _____ or

13  through _____ (description of identity
   card or other document)] to be the person whose name is

14  subscribed to the foregoing instrument and acknowledged
   to me that he/she executed the same for the purposes and

15  consideration therein expressed.

      Given under my hand and seal of office this _____

16  day of _____, 2008.

17

18      _____

      NOTARY PUBLIC IN AND FOR

19      THE STATE OF T E X A S

20

   My Commission Expires:

21  _____

22

23

24

25

636

1   THE STATE OF TEXAS       )
   COUNTY OF HARRIS          )

2

3        REPORTER'S CERTIFICATION
   DEPOSITION OF BRIAN R. TULLOCH, M.D., FRCP, FACP

4            TAKEN OCTOBER 15, 2008

5

      I, RENE WHITE MOAREFI, Certified Shorthand Reporter

6   in and for the State of Texas, hereby certify to the
   following:

7      That the witness, BRIAN R. TULLOCH, M.D., FRCP,
   FACP, was duly sworn by the officer and that the

8   transcript of the oral deposition is a true record of
   the testimony given by the witness;

9      That the deposition transcript was submitted on
   _____ to the witness or the attorney for the

10  witness for examination, signature and return to Esquire
   Deposition Services, by _____;

11      I further certify that I am neither counsel for,
   related to, nor employed by any of the parties in the

12  action in which this proceeding was taken, and further
   that I am not financially or otherwise interested in the

13  outcome of the action.

      Certified to by me this _____ day of

14  _____, 2008.

15

16

17

18

19      _____

      RENE WHITE MOAREFI, CSR, CRR, RPR

20  CSR NO. 3070; Expiration Date: 12-31-08
   ESQUIRE DEPOSITION SERVICES, LLC

21  3401 Louisiana, Suite 300
   Houston, Texas 77002

22  (713) 524-4600

23

24

25