# EXHIBIT 9

1

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE: Seroquel Products Liability Litigation,
MDL DOCKET NO. 1769,

This document relates to:

Livesay v. AstraZeneca LP, et al.
(Debra G. Livesay 6:07-cv-15752)
      and
(David D. Haller 6:07-cv-15733)

_____/

*** CONFIDENTIAL TRANSCRIPT ***

VIDEOTAPED DEPOSITION OF DON DAVIS

Saturday, July 19, 2008
9:06 a.m. - 12:16 p.m.

INNISBROOK RESORT & GOLF CLUB
36750 US Highway 19 North
Palm Harbor, Florida  34683

-------------------------------------------

REPORTED BY:
MICHELLE OLSEN BADEN, RPR, FPR
Notary Public
State of Florida at Large
Esquire Deposition Services - Tampa, Florida
813-221-2535 (800-838-2814)

**2**

APPEARANCES:

JIM BRUZZESE, ESQUIRE
ROBERT BARRINGER, ESQUIRE
C/O K. Camp Bailey
BAILEY PERRIN BAILEY
440 Louisiana Street, Suite 2100
Houston, Texas 77002
713-425-7100

      Attorneys for Plaintiff

ANDREW GADDES, ESQUIRE
DECHERT LLP
2929 Arch Street
Philadelphia , Pennsylvania  19104-2808
215-994-4000

and

STEVEN J. ELLISON, ESQUIRE
FAEGRE & BENSON
3200 Wells Fargo Center, 1700 Lincoln Street
Denver, Colorado  80203
612-766-8672
      Attorneys for Defendant

Also Present:

Cliff Biram, III - Videographer

**3**

INDEX
                                  PAGE

Examination By Mr. Gaddes.................... 5, 129
Examination By Mr. Bruzzese.................83
Examination By Mr. Ellison.................131
Examination By Mr. Barringer.................157

Certificate of Reporter...........................161
Certificate of Oath.............................162

EXHIBITS

NO.   DESCRIPTION            PAGE

Livesay-Davis:

1  Set of records from Don Davis re:     16
   Treatment of Debra Livesay
2  Protective Order                   6

Haller-Davis:

3  Medical records for David Haller     136

**4**

      The videotaped deposition of DON DAVIS was taken pursuant to Subpoena by counsel for the Defendant on Saturday, July 19, 2008, commencing at 9:06 a.m. at INNISBROOK RESORT & GOLF CLUB, 36750 US Highway 19 North, Palm Harbor, Florida. 34683. Said deposition was reported by Michelle Olsen Baden, RPR, Notary Public, State of Florida at Large.
      - - - - - - - - - -

WHEREUPON:

      THE VIDEOGRAPHER:  This is Tape Number 1 in the videotaped deposition of Don Davis, In Re: Seroquel Products Liability Litigation, MDL Docket Number 1769.  This document relates to Livesay versus AstraZeneca LP, et al., Debra G Livesay 6:07-cv-15752 and Haller versus AstraZeneca LP, et al., David D. Haller 6:07-cv-15733, to be heard in the United States District Court, Middle District of Florida, Orlando Division.

      The deposition is being held at the Innisbrook Resort and Golf Club, located at 36750 US Highway 19, Palm Harbor, Florida.

      Today's date is July the 19th, 2008.  The time is 9:06.  The court reporter is Michelle Baden.  The videographer is Cliff Biram, III, on behalf of Esquire Deposition Services.

**5**

      Would counsel and all present please introduce yourselves, after which the court reporter will swear in the witness.

      MR. GADDES:  This is Andrew Gaddes.  We're representing AstraZeneca.

      MR. ELLISON:  Steve Ellison, also representing AstraZeneca in the Haller case.

      MR. BRUZZESE:  Jim Bruzzese representing Debra Livesay.

      MR. BARRINGER:  Robert Barringer representing David Haller.

      THE REPORTER:  Please raise your right hand.

      Do you solemnly swear or affirm that the testimony you give today in this matter will be the truth, the whole truth and nothing but the truth?

      THE WITNESS:  I do.

      DON DAVIS,

a witness, having been duly sworn to tell the truth, the whole truth and nothing but the truth, was examined and testified as follows:

      EXAMINATION

BY MR. GADDES:

      Q   Good morning, Mr. Davis.  My name is Andrew Gaddes.  We met a little earlier.  Before I start asking you questions, sit back and relax.  I just want to say a

**6**

1   couple of things for the record for us lawyers.
2        This deposition is being taken in two cases,
3   the Livesay and Haller case.  Counsel have agreed we
4   will comply with the stipulations we had for the
5   deposition of Nurse Practitioner Keene, in that the
6   questions that I ask in the Livesay case and counsel for
7   plaintiffs ask in the Livesay case will be used
8   generally in the Haller case to avoid duplication, so
9   that we don't have to go over the same kind of questions
10  again.
11       Also for the record, Mr. Davis has read the
12  Protective Order and has endorsed the Protective Order
13  and I'm going to attach that to the exhibit – to the
14  record as Exhibit 2.  Simply because I did them out of
15  order and I have a different Exhibit 1.
16       (Livesay-Davis Exhibit 2 was marked.)
17  BY MR. GADDES:
18  Q   So, once again, good morning, Mr. Davis.
19  A   Morning.
20  Q   You understand that you are here to testify in
21  two cases brought by patients of yours?
22  A   Yes.
23  Q   Have you had a deposition taken before?
24  A   Yes.
25  Q   How many times have you been deposed?

**7**

1   A   Once.
2   Q   What kind of case was that; do you recall?
3   A   I'm not sure how they classify it, but
4   allegation of malpractice, I guess.
5   Q   Were you a party in that case?
6   A   Yes, I was.
7   Q   Were you a defendant in that case?
8   A   Yes.
9   Q   Has that case been resolved?
10  A   Yes.
11  Q   How long ago?
12  A   Approximately five years ago, maybe longer.
13  Q   Was the case settled?
14  A   Yes.
15  Q   Were you the only defendant in that case?
16  A   I don't remember if I was the only one.
17  Q   And do you remember the caption of the case,
18  the name?
19  A   Caption?
20  Q   The name of the plaintiff?
21  A   It's going to take some thinking here.  No, I
22  can't remember – I don't want to say it wrong because I
23  don't remember it specifically.
24  Q   Do you remember where the case was brought?
25  Was it here in Florida?

**8**

1   A   Yes.
2   Q   And were you deposed here in Palm Harbor?
3   A   I was deposed in Clearwater.
4   Q   Do you remember the name of the lawyer who
5   represented you?
6   A   James Martin was one but that was secondary to
7   my in insurance that I had.  I can't remember the name
8   now but he was the attorney for the agency I was working
9   for, but I had malpractice insurance and somebody
10  representing me as well, but I do remember his name
11  because I have talked to him before.  But I can't
12  remember.  It's been a while since I talked to the other
13  person.
14  Q   Was Mr. – is Mr. Martin a local lawyer?
15  A   Yes.
16  Q   Do you know where his office is?
17  A   I believe it is in Tampa.
18  Q   And were you the only defendant in that case?
19  A   I think I probably was the only one.  I'm not
20  100 percent of that but primarily.
21  Q   Let me – I know you have been deposed before.
22  Did you testify at trial in the case?
23  A   No.
24  Q   Have you ever testified at a trial?
25  A   There was something that took place like – I

**9**

1   want to say 18 years ago, something like that.  I had
2   witnessed something.  I remember there being a jury
3   there, so I guess that constituted a trial.  It was a
4   long time ago.
5   Q   And what kind of case was that?
6   A   It was something against a patient and the
7   physician at that time.  I don't remember the details
8   because – it was maybe as much as 20 years ago.
9   Q   And you were just a fact witness?
10  A   I believe so.
11  Q   Well, since you have been deposed before, you
12  kind of know how this works unfortunately.
13  A   Sure.
14  Q   But let me go over a couple of things that
15  might make the day go more smoothly.  You're doing very
16  well at the moment.
17       Although this is being videoed, it also being
18  stenographically recorded; so it is very important that
19  we keep our responses verbal or oral so that we don't
20  just – when you answer don't just shake your head or
21  nod your head.
22       Is that okay?
23  A   That's correct.
24  Q   Also, it's important – when people engage in
25  conversations, sometimes they tend to speak over one

3 (Pages 6 to 9)

**10**

1  another.  You haven't done that this morning.  So, if
2  you could kindly let me wait until I finish my question
3  and only then answer.  Is that okay?
4     A    Yes.
5     Q    And I promise I'll try to wait until you
6  finish your answer and then ask my next question.
7        If you do not at any time understand my
8  question, you can't hear my question, my accent was
9  strange and you didn't quite catch the question, please
10  let me know.  I will be happy to restate the question
11  and I know other counsel here will be willing to do the
12  same.
13        Is that okay?
14     A    Yes, it is.
15     Q    If you do answer my questions, I will assume
16  that you heard and understood it.
17        Is that okay?
18     A    Yes.
19     Q    And you understand you are under oath today?
20     A    Yes.
21     Q    This is not an endurance contest.  If you feel
22  you want to take a break, let any of us counsel know and
23  we'll be happy to oblige.
24     A    Yes.
25     Q    Where were you born and raised, Mr. Davis?

**11**

1     A    Born in Baltimore, Maryland.  Raised in
2  Pinellas County.
3     Q    And could you tell us a little bit about your
4  educational background?
5     A    I completed high school.  Went to USF.
6  Started taking undergraduate courses in biology.
7  Steered off to go to Hillsborough Community College to
8  get an associate degree in nursing.  Went back to USF.
9  Went ahead and completed a bachelor's degree in nursing.
10  Then on -- waited a little while, worked for a couple of
11  years and then went back to USF and got my master's
12  degree and completed it in '97.
13     Q    So I understand you have an undergraduate
14  degree in nursing?
15     A    Correct.
16     Q    And you also have a master's degree?
17     A    Correct.
18     Q    And in nursing too?
19     A    Yes.
20     Q    And are you an advanced registered nurse
21  practitioner?
22     A    That's correct.
23     Q    Can you explain what an advanced registered
24  nurse practitioner is?
25     A    It's an extended role created to provide, I

**12**

1  guess, some relief for the physicians that -- in their
2  role, but it is autonomous for nursing, so there is
3  other things that they do.  But advanced degree, at
4  least in masters.  That's the minimum degree, although
5  people go on for a Ph.D., and you work in -- with a
6  protocol with a physician for medication management, but
7  you can work autonomously for a lot of different things,
8  and it is different from state to state as well.
9     Q    So, in Florida an advanced registered nurse
10  practitioner may prescribe medications?
11     A    Correct.
12     Q    Now, to become an advanced registered nurse
13  practitioner you actually have to do some work, right,
14  that is not something they hand out on the street
15  corner?
16     A    You have to complete all requirements of your
17  graduate school program and then some.
18     Q    Do you have a continuing medical education
19  requirement?
20     A    Yes, we do.
21     Q    And what are those?
22     A    It's a minimum of 24 contact hours every two
23  years with specific emphasis on now medication errors
24  and infection control or HIV type of education and
25  domestic violence.

**13**

1     Q    When did you become an advanced nurse
2  practitioner?
3     A    In '97 around March or April.
4     Q    What year did you complete your master's
5  degree?
6     A    Same time, 1997.
7     Q    Did you practice as a regular (sic) nurse
8  before being a registered nurse practitioner?
9     A    I practiced as a registered nurse before.  I
10  was an ARNP.
11        THE REPORTER:  Did you say I was a --
12        THE WITNESS:  A registered nurse.  He said
13  regular but I corrected him.  It's registered nurse.
14        Yes, I did.
15  BY MR. GADDES:
16     Q    Now, so why don't you take us through your job
17  history.  Just tell us where you worked at different
18  points in time after you graduated.
19     A    Which graduation?
20     Q    Start with the college graduation.
21     A    Okay.  The bachelor's degree in 1984, it was
22  an overlap because I tend to have usually two employers
23  at a time; so I'm thinking I still was finishing up USF
24  student health services, which was a clinic for the
25  college students at USF for medical -- not psychiatric

14

1  but medical issues. That completed around -- I'm hoping
2  again this is right around '84 -- no '87, rather. And
3  at the same time I was working at going to USF
4  psychiatry center to work. That is where I bridged from
5  one job to the next.
6      But the dates -- I would have to have my C.V.
7  in front of me for all of that, but the gist of it is
8  after around the time of USF and graduation when I got
9  my degree I tried -- I went to USF psychiatry center and
10 worked more of my years until I left there, because I
11 was there over seven, eight years. And at the same
12 time -- at the tail end of that employment I was working
13 on my graduate degree and finishing that, and went on to
14 a brief stay at a -- several months at interim jobs
15 until I went to the Harbor where I am for 11 years now
16 as an ARNP.
17     Q    Did you work at an institution called
18 Directions for Mental Health?
19     A    Yes, I did.
20     Q    When did you begin working at Directions for
21 Mental Health?
22     A    1998.
23     Q    Did you at some point leave Directions for
24 Mental Health?
25     A    Just recently.

15

1      Q    And what year did you leave Directions for
2  Mental Health?
3      A    2008.
4      Q    As a nurse practitioner, do you have a
5  specialty?
6      A    Specialty is in adult and children psychiatry,
7  psychiatric nurse, mental health nursing.
8      Q    So, for your entire career has your specialty
9  been mental health and psychiatric treatment?
10     A    No. Because I had a period of time where I
11 was working at USF and the college health where it was
12 more primary care as an RN at that time, not as an ARNP;
13 as an ARNP only in psych.
14     Q    So the bulk of your professional career has
15 been in psychiatric treatment?
16     A    Yes.
17     Q    So where do you practice now?
18     A    I continue to practice at the Harbor in
19 New Port Richey since '97 and I just recently became an
20 employee of ACTS, which is -- there are offices in Tampa
21 and Tarpon Springs. They are a dual diagnosis -- they
22 are a substance abuse primarily agency, which has a
23 multitude of programs, but the program I work at is in a
24 inpatient rehab. And I have been there actually under
25 representing Directions for seven years there, but now I

16

1  represent ACTS, the place that I actually work in the
2  billing for.
3      Q    What kind of patients do you see now?
4      A    I see primarily adult patients for -- if the
5  question is regarding like diagnosis or --
6      Q    Yes. What kind of illnesses do you treat
7  right now?
8      A    Okay. They range from depression, bipolar
9  disorder, schizophrenia, anxiety disorder, substance
10 abuse conditions, personality disorders.
11     Q    Let's go off the record for just a second.
12     THE VIDEOGRAPHER: Going off the record at
13 9:19.
14     (Recess taken from 9:19 a.m. to 9:23 a.m.)
15     THE VIDEOGRAPHER: And we are back on the
16 record at 9:23.
17 BY MR. GADDES:
18     Q    Mr. Davis, I am going to hand you a copy of
19 what the court reporter has kindly marked as Exhibit 1
20 to your deposition, which is a set of records -- of your
21 records for your treatment of Debra Livesay. Can you
22 confirm that what I have handed you appears to be a set
23 of records -- your records for the treatment of Debra
24 Livesay?
25     (Live-Davis Exhibit 1 was marked.)

17

1      THE WITNESS: Appears every one is but one.
2  There is one in there that is not mine.
3  BY MR. GADDES:
4      Q    And is that a note by Jacqueline Harrison?
5      A    Correct.
6      Q    I think you were impressed I knew that, right?
7  Okay. So --
8      A    Do I have to answer at that question?
9      Q    No, you don't. That is okay.
10     And do you recall treating Ms. Livesay?
11     A    Yes, I do.
12     Q    Now, the notes that I have handed you, were
13 these notes you made in connection with your treatment
14 of Ms. Livesay?
15     A    Yes.
16     Q    And did you make them at or about the time
17 that you treated her?
18     A    Yes.
19     Q    And were these kept in the records of
20 Directions for Mental Health?
21     A    Yes.
22     Q    And were they kept in the ordinary course of
23 business and made in the ordinary course of business --
24 in your usual course of business?
25     A    Yes.

5 (Pages 14 to 17)

18

1    Q    Let's turn to those then.  What was the first
2    date you saw Ms. Livesay?
3    A    7/6/99.
4    Q    So the first time you saw Ms. Livesay was in
5    July 6, 1999?
6    A    Correct.
7    Q    And did you make a preliminary psychiatric
8    evaluation report?
9    A    Yes.
10   Q    And Ms. Livesay was referred to you.  If you
11   turn to that report, sir, Ms. Livesay was referred to
12   you by her medical doctor?
13   A    Yes.
14   Q    And the first paragraph, if you could agree
15   with me, states:
16        "She was referred here by her
17        medical doctor.  He felt that due to
18        her situational stresses and her
19        history of depressed mood and anxiety,
20        that it would be appropriate for her to
21        be seen at a mental health facility."
22   Did I read that correctly?
23   A    Yes, you did.
24   Q    And was Directions for Mental Health a
25   specialist mental health facility?

19

1    A    Yes.
2    Q    And how, if you know, did Ms. Livesay come to
3    be your patient, particularly?
4    A    There was a randomly open schedule.  Got put
5    in my schedule since I had an opening for psychiatric
6    evaluation, is the best I can answer it.
7    Q    And, by the way, that is all we want, the best
8    of your recollection.
9        You mentioned earlier, when you were
10   describing for me how advanced registered nurse
11   practitioners practice in Florida, that they practice
12   under the supervision of a doctor.  Did I recall that
13   correctly?
14   A    Yes.
15   Q    And when you treated Ms. Livesay, would you
16   have had a, quote, "supervising" unquote, doctor?
17   A    Yes, I would.
18   Q    Who would that doctor have been?
19   A    James Zenel.
20   Q    And what would the protocol be?  How would
21   that work between your treatment of Ms. Livesay and his
22   supervision?
23   A    I meet with the patient and do the assessment
24   and initiate treatment, dictate.  That is how this
25   document gets formed, and then he does review our

20

1    psychiatric evaluations and then we meet for supervision
2    every week to discuss cases, and that is how we do it.
3    Q    So you would — essentially, you would treat
4    Ms. Livesay you would meet Ms. Livesay and you would
5    report back to Mr. Zenel or Dr. Zenel if there were any
6    issues?
7    A    Yes.
8    Q    When Ms. Livesay came to see you, was she
9    already on medication, sir?
10   A    Yes.
11   Q    What was show?
12   A    Prozac 20 milligrams daily.  Xanax
13   0.5 milligrams up to three times daily -- slow down?
14   Okay.
15        THE REPORTER:  Prozac 20 --
16        THE WITNESS:  Prozac 20 milligrams daily.
17   Xanax 0.5 milligrams up to three times daily as
18   needed for anxiety.
19   BY MR. GADDES:
20   Q    What kind of medicine is Prozac?
21   A    It's an antidepressant.
22   Q    And how about Xanax, what kind of medicine?
23   A    Antianxiety medication.
24   Q    The record reads the Prozac — that she had
25   been on Prozac for several years and Xanax for

21

1    approximately six months; is that correct?
2    A    Yes.  I was -- I looked back at the wrong part
3    of my paragraph.  I found it.  Yes.  Correct.
4    Q    So, by the time Ms. Livesay came to you, she
5    had actually had been treated for mental illness for
6    some time?
7    A    Yes.
8    Q    But because this was the first visit,
9    obviously you don't know how long she had been treated
10   for mental illness?
11   A    Not until I asked her.
12   Q    Well, do you know exactly when her first
13   treatment for mental illness was?  Is it possible for
14   you to say that?
15   A    No.  I don't remember.
16   Q    And that was really what I was getting to.
17   You don't know really her — other than what she told
18   you here, you don't know her full history of treatment
19   for mental illness?
20   A    That's correct.
21   Q    And also, you would not know all the different
22   medications that she had been treated for with her
23   mental illness, except to the extent that was stated in
24   this record?
25   A    Correct.

22

1    Q    If you go down to the bottom of the page, sir,
2  the last paragraph, second sentence reads:
3         "Her father died in 1990.  This
4         was a difficult time for her.  She had
5         a history of depression at that time as
6         well as other times in her life."
7         Did I read that correctly?
8    A    Yes, you did.
9    Q    So does that suggest that, at least,
10  Ms. Livesay had had a history of depression dating back
11  to 1990?
12   A    Yes.
13   Q    And if you turn to the next page, the first
14  sentence under "current symptoms" reads:
15        "She has had a long-standing
16        problem with sleep.  She has difficulty
17        staying asleep for more than an hour or
18        two as well as anxiety recently."
19        Did I read that correctly?
20   A    Yes, you did.
21   Q    So Ms. Livesay had a problem sleeping?
22   A    Yes.
23   Q    And during the course of your treatment was
24  that a recurrent problem for Ms. Livesay?
25   A    I have to go back through my notes to really

23

1  review that because it's been a while.
2    Q    We'll go through that.  Let me ask you about
3  sleep problems.
4         Can difficulty with sleep impact a patient's
5  mental health?
6    A    Yes, it can.
7    Q    In what way can that happen?
8    A    We see evidence of it in the mental status as
9  far as mood, anxiety, concentration, focus.
10   Q    So, a patient who is sleep deprived can suffer
11  mental problems?
12   A    Yes, we do see that.
13   Q    And if a patient has mental health problems,
14  lack of sleep can exacerbate those problems?
15   A    One more time, please.
16   Q    If a patient has mental health problems, lack
17  of sleep can make those problems worse?
18   A    Yes.
19   Q    Does Ms. Livesay also suffer from anxiety?
20   A    Yes.
21   Q    And can that affect a patient's mental health?
22   A    Yes.
23   Q    And how can that impact a patient's life?
24   A    Generalized overall affects quality of life in
25  the way they can handle stress, the way -- reduces their

24

1  effectiveness to handle stress, as well as just in life
2  in general, can affect concentration, focus, make them
3  more depressed.
4    Q    And did you think at the time that it was
5  important to treat the problems Ms. Livesay was having
6  with sleep?
7    A    Yes.
8    Q    And the problems she was having with anxiety?
9    A    Yes.
10   Q    On the same paragraph, a little lower down, it
11  states that:
12        "Her mood has been sad and tearful
13        at times."
14        Did I read that correctly?
15   A    Yes, you did.
16   Q    Was that significant to you?
17   A    Yes.
18   Q    Why would that be significant to you?
19   A    Being sad and tearful is a symptom of the
20  things we treat to try to avoid.  It's another issue of
21  quality of life.
22   Q    And a little further down it states:
23        "She has increased irritability
24        and anger."
25        Did I read that correctly?

25

1    A    Yes.
2    Q    Was that another symptom that Ms. Livesay was
3  presenting with?
4    A    Yes.
5    Q    And was that also significant to you?
6    A    Yes.
7    Q    Was that important in your treatment to know
8  that?
9    A    Yes.
10   Q    If you turn to the next page, sir, under
11  "medical history," did Ms. Livesay have a history of
12  hypothyroidism?
13   A    Yes.
14   Q    Had she also had a history of seizures?
15   A    Yes.
16   Q    And does your record record that she had been
17  on various seizure medications in the past?
18   A    Yes.
19   Q    Does the record also reflect that she had a
20  seizure once in connection with a high dose of Prozac?
21   A    Yes.
22   Q    Under "surgical history" does your record
23  record that Ms. Livesay had had back surgery in the
24  past?
25   A    Yes.

**26**

1  Q   And did she have chronic back pain?
2  A   Yes.
3  Q   Was that a problem for Ms. Livesay during your
4  treatment wither had?
5  A   I would have to refer back to my notes.
6  Q   Can chronic pain contribute to a patient's
7  mental illness?
8  A   Yes.
9  Q   And how can that contribute?
10  A   It can either cause or make depression worse,
11  anxiety worse.
12  Q   And if you turn to the next page in your
13  record, Mr. Davis, what did you diagnose Ms. Livesay
14  with at this point?
15  A   On this document it was mood disorder, rule
16  out adjustments over depressed mood rule out major
17  depression recurrent under Axis I.
18  Q   If I can just remind you, you speak very
19  quickly —
20  A   Repeat that?
21  Q   — and Michelle will stop us at some point,
22  and I have a tendency to do that and I have learned over
23  time to slow down, but if you can try and say it slow.
24  I think Michelle got the last one.
25  THE WITNESS: Did you get it? Okay.

**27**

BY MR. GADDES:
1
2  Q   What did you mean by diagnosis of mood
3  disorder?
4  A   Mood disorder, when I record that it would
5  include a variety of symptoms that would be — it would
6  include depression but it can also include mobility of
7  mood where there would be a change in mood more
8  frequently. It could include irritability and other
9  symptoms that she presented with, like poor sleep,
10  anxiety, but usually encompasses ups and downs and moods
11  and other associated symptoms.
12  Q   Can mood disorder be a serious illness?
13  A   Yes, it can.
14  Q   And how can mood disorder affect a patient's
15  life?
16  A   From — it would present with many symptoms
17  that will decrease likelihood of a person coping with
18  their life situation and making the right decisions and
19  overall feeling poorly. It can also lead to, if not
20  treated, as much as suicide attempts to completion of
21  suicide; so it is a very serious illness.
22  Q   And is this an illness that often needs
23  treatment with medication?
24  A   Yes.
25  Q   And in Ms. Livesay's case, did you determine

**28**

that she needed to be treated with medication?
A   Yes, I did.
Q   And, in fact, before you even saw her, other
physicians had treated her with medication as well for
her mental illness; is that correct?
A   Yes, it is.
Q   What do you mean by rule out adjustment
disorder with depressed mood?
A   When I include a rule out, it means that I'm
thinking other things as a diagnosis and I do probably
need more time with the patient to — more visits, more
opportunities to see under different circumstances, not
just even to get more information from this particular
visit, but to actually see her on a different day,
different time to see how she presents and other
information that she'll give me on future visits. If I
do feel like that those conditions, which could coexist
with a mood disorder too, or replace it, then I make
changes on further visits.
Q   And I meant to ask you that. In your
treatment of a patient, at times as you meet with them
more and get to know them more, do you sometimes adjust
your diagnosis of a patient?
A   Yes, I can.
Q   And is that usual practice?

**29**

A   Yes, it is.
Q   And, also, can a patient's diagnosis change
because their mental health condition changes over time?
A   Sometimes but usually we might — when the
symptoms change, we may call it a remission or — we
don't use the word "cure" in psychiatry too often, but
they may resolve; so that is more what happens.
Q   But you would not be surprised if records,
after you finished treating Ms. Livesay, from another
prescriber had a different diagnosis to the one that you
had?
A   Yes, that can happen.
Q   And so how did you — what was your treatment
plan for Ms. Livesay at this point?
A   Is it okay to read off what I have here
because —
Q   If you can summarize how you decided to treat
her.
A   It will only take a moment to look at it and
then I can summarize it for you. Okay.
All right. To answer your question, my
decision was to wean off the Prozac and the Xanax and
then she was to initiate a new treatment which was
Serzone and that particular drug was started at
50 milligrams twice daily for a week. Then

**30**

1  100 milligrams twice daily thereafter.

2  Q    And why did you decide to wean Ms. Livesay off

3  Prozac and Xanax?

4  A    Many times with these medications, if you stop

5  them abruptly you can have an adverse consequence.

6  Specifically Xanax can be serious.  It is not

7  recommended to be stopped abruptly.  The information on

8  the medication is that it is to be weaned off slowly

9  safely for the patient so that her central nervous

10  system in her body can acclimate to being off the

11  medication.  Prozac also being reduced, not as necessary

12  as Xanax would be, but those are why we do it.

13  Q    And why did you determine that Serzone would

14  be a more appropriate medication perhaps for Ms. Livesay

15  than Prozac or Xanax?

16  A    This particular medication is what we call a

17  dual action.  It has more than one mechanism to working

18  with depression and anxiety and at the time it was a

19  medication used and benefit -- people benefit from it

20  and maybe it would work a little bit better than Prozac.

21  And that is often what we do is to try to switch to

22  different medications to see what works best.

23  Q    And that is a question I also wanted to ask

24  you.  When you treat patients, do you have to experiment

25  with different medications with each patient?

**31**

1  A    At times we do.

2  Q    And do patients react differently to different

3  medications?

4  A    Yes, they do.

5  Q    So one medication like Serzone might work

6  better for one patient and another medication like

7  Prozac might work better for a different patient?

8  A    That's correct.

9  Q    And are you constantly balancing and trying to

10  find the right fit for each patient you treat?

11  A    Yes.

12  Q    And sometimes is that trial and error?

13  A    Yes.

14  Q    And is it also something you have to monitor

15  when you treat patients?

16  A    Yes.  That is how we determine whether it

17  works for them or not.

18  Q    And sometimes do you have to adjust doses

19  depending on things that are going on in the patients

20  life at the time?

21  A    At times, yes.

22  Q    When you prescribe medications, do you

23  undertake something called a risk-benefit analysis with

24  respect to the medications you prescribe?

25  A    Yes, I do.

**32**

1  Q    And is it fair to say that every medication

2  carries some risk?

3  A    Yes.

4  Q    And sometimes the risk of medication is

5  serious?

6  A    Yes.

7  Q    And some risks with medication can even

8  include death?

9  A    Yes.

10  Q    And, in fact, Serzone would be an example.

11  Serzone has its own set of risks; is that fair to say?

12  A    Yes.

13  Q    And some of those risks are serious?

14  A    Yes.

15  Q    However, you make an assessment, as you did

16  here, that the benefit for Ms. Livesay outweigh the

17  risks?

18  A    Yes.

19  Q    The next visit -- was the next visit you had

20  with Ms. Livesay July 27, 1999?

21  A    Yes.

22  Q    And towards the bottom of the first paragraph,

23  does it read:

24      "She has noticed the difference.

25  She is less tearful and less agitated

**33**

1  from the previous medications.  She

2  continues to still have problems with

3  anxiety and panic at that time and she

4  has had difficulty sleeping."

5  Did I read that correctly?

6  Q    So the Serzone seems to be helping at this

7  time?

8  A    Yes.

9  Q    But she is still having some problems with

10  anxiety and sleep?

11  A    Yes.

12  Q    So did you change her medications at this

13  time?

14  A    No.

15  Q    You kept her on Serzone at this time?

16  A    Yes.

17  Q    And did you increase the dose of Serzone?

18  A    The dose is 100 milligrams in the morning and

19  200 at bedtime.  The last visit was 100 milligrams twice

20  daily; so, apparently, yes.

21  Q    And is that just an example of what we were

22  talking about, because she was still having some

23  problems you adjusted her medications slightly?

24  A    Yes.

34

1    Q    Could you jump forward, please, to your
2    May 25, 2000, treatment note.
3    A    May 25, 2000, yeah. I have it.
4    Q    And in the interest of time we've skipped a
5    couple of records in between, a couple of treatments you
6    had with her in between, but — and do you have in front
7    of you the May 25, 2000, visit, sir?
8    A    Yes, I do.
9    Q    And does it state she reports that:
10        "She has been having an increased
11        anxiety attributed" — I think that is
12        a typo — "attributed it to stresses in
13        her life as she has recently injured
14        her vertebrae. She has herniated disks
15        in her neck and was under treatment.
16        She was also placed on prednisone,
17        which caused complications."
18        Did I read that correctly?
19    A    Yes.
20    Q    And so, Ms. Livesay, was having problems with
21    her disks in her neck at this time?
22    A    Yes.
23    Q    And the words used here stressor,
24    s-t-r-e-s-s-o-r; do you see that?
25    A    Yes.

35

1    Q    Is that a term that people treating mental
2    health sometimes use with respect to patients?
3    A    Yes.
4    Q    What is a "stressor" mean?
5    A    Sort of identifies a particular event
6    responsibility or something within their life that
7    elicits the feeling of stress, which can be a variety of
8    things. It is a negative thing to have stressors in
9    your life.
10    Q    So would I be correct in saying it's an event
11    that happens in someone's life that contributes to their
12    stress or their lack of mental well-being?
13    A    Yes.
14    Q    And that's something, as a treater, that you
15    may have to keep an eye on and you may have to adjust
16    medication for?
17    A    Yes.
18    Q    It also states that she was placed on
19    prednisone, which had caused some complications. Do you
20    recall, Mr. Davis, why she had been placed on
21    prednisone?
22    A    I can't remember specifically.
23    Q    That wasn't you that placed her on prednisone?
24    A    No.
25    Q    And she was seeing other physicians at the

36

1    same time she was seeing you?
2    A    I assume so because you have to get a
3    prescription for that.
4    Q    What kind of medicine is prednisone?
5    A    It is a steroid.
6    Q    And do steroids like prednisone also come with
7    their own set of risks?
8    A    Yes, they do.
9    Q    What kind of risks can prednisone come with?
10    A    There is a lot of side effects. When it
11    affects the immune system -- if you are using it, for a
12    variety of reasons it does reduce your immunity and can
13    risk you for opportunistic infections and things like
14    that, but it does affect mood and can cause depression
15    and can cause irritability.
16    Q    And when you say that prednisone has caused
17    complications, do you recall what you meant by that?
18    A    No, I don't.
19    Q    Reading a little further down, at the end of
20    that paragraph it states:
21        "Overall she feels that the
22        Serzone has helped, but she is still
23        having periods of anxiety and is
24        requesting some Atarax, A-t-a-r-a-x or
25        Vistaril, V-i-s-t-a-r-i-l, which she

37

1    has used in the past."
2        Did I read that, sir, correctly?
3    A    Yes, you did.
4    Q    And so, do I understand it that Ms. Livesay
5    was actually coming to you and requesting specific
6    medications at this time?
7    A    Yes.
8    Q    Is that unusual, that a patient you treat will
9    come and request specific medications from you?
10    A    No.
11    Q    And does this also suggest that Ms. Livesay
12    had been on Vistaril in the past?
13    A    Yes.
14    Q    What kind of medicine is Vistaril?
15    A    It is a -- categorized as an antihistamine,
16    but it is used for anxiety and irritability, sleep.
17    Q    And Atarax, what kind of medicine is Atarax?
18    A    Essentially the same thing.
19    Q    So, the Serzone was helping, but Ms. Livesay
20    was still having some problems with anxiety, is that a
21    fair summary?
22    A    Yes.
23    Q    And so did you adjust her medication to
24    account for that?
25    A    Take one moment to answer that. Yes, I did.

**38**

1 I added the Vistaril at 50 milligrams three times daily
2 as needed, which would be marked as "prn" for the
3 anxiety.
4    Q   Okay.  The next time you saw Ms. Livesay was
5 August 17, 2000; is that right?
6    A   Yes.
7    Q   And if you look at the third paragraph under
8 that treatment note, it states overall she is doing well
9 but has more problems now with sleep at night.  She has
10 difficulty sleeping, falling asleep and nightmares when
11 she does.
12      Did I read that correctly?
13    A   Yes.
14    Q   So, here, again, Ms. Livesay is still having
15 problems with sleep and nightmares?
16    A   Yes.
17    Q   And is that a concern for you for her mental
18 well-being?
19    A   Yes.
20    Q   The record also states she also is on Elavil.
21 Did I read that correctly?
22    A   Yes.
23    Q   And that had been prescribed by her medical
24 doctor, her PCP?
25    A   Yes.

**39**

1    Q   What kind of medicine is Elavil?
2    A   It is an antidepressant.
3    Q   So she was actually receiving — she was
4 seeing other physicians and receiving medication for her
5 mental health in addition to you?
6    A   Correct.
7    Q   Did you change her treatment regime at this
8 time?
9    A   I did make a change, yes.
10    Q   And how did you do that?
11    A   Added Klonopin 1 milligram at bedtime to help
12 with sleep and anxiety.
13    Q   What kind of medicine is Klonopin?
14    A   It's used for antianxiety purposes.  It is a
15 benzodiazepine.
16    Q   Let me ask you about that.  You mentioned the
17 word benzodiazepine?
18    A   Yes.
19    Q   What are benzodiazepines?
20    A   It's a category of medications that are, in
21 the field of psychiatry, used for anxiety.  There are
22 several included for that.
23    Q   And benzodiazepines, have benzodiazepines been
24 associated with addiction?
25    A   Yes.

**40**

1    Q   And is that a risk you have to balance out
2 when you prescribe a benzodiazepine?
3    A   Yes, I do.
4    Q   And, again, that would be part of the
5 risk-benefit analysis?
6    A   Yes.
7    Q   And did you also take Ms. Livesay off Vistaril
8 at this time?
9    A   Yes.
10    Q   Because despite the fact that she requested
11 Vistaril, she now reported that it was ineffective; is
12 that right?
13    A   Yes.
14    Q   And you referred Ms. Livesay to Chris Edwards
15 for counseling?
16    A   Yes.
17    Q   And who is Chris Edwards?
18    A   She is one of the staff members at Directions
19 who is the therapist that does provide that service.
20    Q   And you thought therapy would help Ms. Livesay
21 at this time?
22    A   Yes.
23    Q   Could you jump forward please — we'll skip a
24 couple of records, again in the interest of time — and
25 go to your January 25, 2001 record.

**41**

1    A   Okay.
2    Q   And if you look at the first paragraph, does
3 it appear that Ms. Livesay is still on Serzone,
4 400 milligrams and on Klonopin at this time?
5    A   Yes.
6    Q   Then I wanted to ask you about the next
7 paragraph.  It says there had been a statement sent
8 through with her being on Lorazepam and Klonopin at the
9 same time during the month of August and September.  Did
10 I read that correctly?
11    A   Yes.
12    Q   What is Lorazepam?
13    A   It is another benzodiazepine also called
14 Ativan.
15    Q   And that wasn't something you were
16 prescribing?
17    A   No.
18    Q   She was getting that from a different
19 physician?
20    A   Apparently.
21    Q   And do you recall what that statement would
22 have been, what would have been the problem with that?
23    A   When we see someone that is getting two
24 medications of the same classification, especially ones
25 that are addictive in nature, we have to pursue that and

11 (Pages 38 to 41)

42

1  find out why that is happening.  We don't normally do
2  that.
3      Q    Have you heard the term "splitting providers"
4  before?
5      A    I have heard -- I'm not sure -- I have heard
6  that terminology.
7      Q    Can you sometimes have a problem with a
8  patient seeing different prescribers and getting
9  different -- additional medications from different
10  prescribers and ending up with too many medications?
11     A    Yes.
12     Q    Were you aware that Ms. Livesay has in the
13  past had notes in her records of addiction to pain
14  medications?
15     A    I don't recall.  I have to look at the record.
16     Q    In the next paragraph -- well, just before at
17  the end of that paragraph it reads:
18          "She reports she has not filled
19          this prescription in months but there
20          was some Ativan prescribed by her
21          medical doctor due to the time period
22          when her brother was dying, but she
23          states she is only on the Klonopin.
24          She had never took the two together and
25          would like to continue with the current

43

1  medications."
2          Did I read that correctly?
3      A    Yes, you did.
4      Q    So she's telling you that she didn't take
5  these other meds?
6      A    Yes.
7      Q    And I assume you are relying upon what she's
8  telling you with respect to the medication she's taking
9  you?
10     A    Yes.
11     Q    And you rely upon patients to give you
12  accurate information about the medicines they are
13  taking?
14     A    Yes, I do.
15     Q    And that is important to your treatment?
16     A    Yes.
17     Q    In the next paragraph, it states that she had
18  unfortunately been hospitalized recently; do you see
19  that?
20     A    Yes.
21     Q    It says she was also hypokalemic.  Did I read
22  that correctly?
23     A    Yes.
24     Q    What does that mean for lay people?
25     A    That means a low potassium -- I'm thinking

44

1  kalemic.  I have to go back and wake up this morning
2  here.  Low potassium.
3      Q    And it goes on to say:
4          "When she was in the hospital they
5          gave her too much potassium, which
6          induced a mild heart attack."
7          Did I read that correctly?
8      A    Yes.
9      Q    So when she was in the hospital, she had had a
10  mild heart attack, according to the record?
11     A    According to the record.
12     Q    Can you turn to the next visit, which I
13  believe is April 5, 2001?
14     Q    And this was the note you mentioned was not
15  actually your note.  This was a note by Jacqueline
16  Harrison?
17     A    Yes.
18     Q    Is she another advanced nurse practitioner at
19  Directions?
20     A    Yes.
21     Q    Is she someone who helped you sometimes with
22  patients?
23     A    Yes.
24     Q    Was this an incident you might have been on

45

1  vacation and she would fill in for you?
2      A    Yes.
3      Q    And she is someone whose judgment you trust?
4      A    Yes.
5      Q    Does she still work at Directions; do you
6  know?
7      A    Yes, she does.
8      Q    And if you look at the first paragraph, was
9  Ms. Livesay reporting increased anxiety at this time?
10     A    Yes.
11     Q    And was that due to a new stressor in her
12  life?
13     A    I can't answer whether it was new but it does
14  appear from a stressor in her life.
15     Q    And the stressor would be that her ex-husband
16  has reentered her life?
17     A    Yes.
18     Q    And if you look under the next paragraph, it
19  states:
20          "She is complaining of feeling
21          anxious and also having anxiety dreams.
22          She states that she is troubled with
23          disruptive sleep."
24          Did I read that correctly?
25     A    Yes, you did.

46

1    Q    So she is still having this recurrent sleep
2    problem you guys are working with?
3    A    Uh-huh.  Yes, sorry.
4    Q    So did Nurse Practitioner Harrison change her
5    medicines at this time to account for that?
6    A    She increased the Serzone to 50 milligrams in
7    the morning and continued the 400 milligrams at bedtime.
8    Q    And does it also say that nurse practitioner
9    Harrison would have discussed the addictive properties
10   of Klonopin can Ms. Livesay?
11   A    Yes.
12   Q    And the next visit it looks like she came back
13   to you is April 23, 2001?
14   A    Yes.
15   Q    And you discuss in the first paragraph the
16   change of medication that she had undertaken with
17   Ms. Harrison?
18   A    Yes.
19   Q    Does Ms. Livesay report at this time that she
20   cannot tolerate the increase in Serzone?
21   A    Yes.
22   Q    So how did you deal with that in your
23   prescriptions for her?
24   A    She continued on a divided dose of -- the
25   morning dose remained at 50 milligrams but the evening

47

1    dose reduced to 350.
2    Q    And is she also still on Klonopin at this
3    time?
4    A    The Klonopin will stay at half milligram in
5    morning and 1 milligram at bedtime.
6    Q    By the way, I meant to ask you that earlier.
7    You're treating Ms. Livesay with a couple of different
8    medicines here; is that right?
9    A    Yes.
10   Q    And is that normal practice in psychiatric
11   care, that patients might be on one or two different
12   medications?
13   A    Yes.
14   Q    And sometimes more than that?
15   A    Correct.
16   Q    And is that to address different symptoms that
17   the patient is having?
18   A    Yes.
19   Q    And you are struggling all the time to try and
20   get a balance that fits that patient?
21   A    Yes.
22   Q    I notice in the assessment here it now states
23   "Depressive disorder-NOS."  What is that?
24   A    That is a condition where -- NOS is not
25   otherwise specified, where depression is looked at as

48

1    being more of the -- well, it centers more on depression
2    rather than a cycling or a mood changing disorder.
3    Q    We'll skip the next visit, which is June 26,
4    2001, and go to your August 28, 2001 note, please.
5    A    Okay.
6    Q    And you record here that she is still on
7    Serzone and still on Klonopin; do you see that?
8    A    Yes.
9    Q    And in the second paragraph it reads:
10           "She feels overall everything is
11           going well, with the exception that she
12           still has problems with sleep and is
13           feeling sleep deprived."
14           Did I read that correctly?
15   A    Yes.
16   Q    So she is still having this recurrent problem
17   with sleep?
18   A    Yes.
19   Q    And couple of sentences later it states:
20           "She also has had some
21           accompanying nightmares and she feels
22           overall the sleep and the nightmares
23           are due to just the stress that had
24           been going on with the ex-husband."
25           Did I read that correctly?

49

1    A    Yes.
2    Q    So she's still having this sleep and
3    nightmares?
4    A    Yes.
5    Q    And that was something you were concerned
6    about?
7    A    Yes.
8    Q    And so at this time did you also start
9    Ms. Livesay on Seroquel?
10   A    Yes, I did.
11   Q    And was this your first prescription of
12   Seroquel for Ms. Livesay that you recall?
13   A    For her -- yes.
14   Q    And what dose did you prescribe for her?
15   A    25 to 50 milligrams at bedtime for sleep and
16   anxiety.
17   Q    And so you are prescribing this for sleep and
18   anxiety?
19   A    Yes.
20   Q    And is that a low dose of Seroquel?
21   A    Yes, it is.
22   Q    Mr. Davis, have you heard the term before
23   "first-generation antipsychotic"?
24   A    Yes.
25   Q    And are first-generation antipsychotics the

50

1  same as typical antipsychotics?
2      A    Yes.
3      Q    Would an example of first-generation
4  antipsychotic be Haldol?
5      A    Yes.
6      Q    Would another one been Thorazine?
7      A    Yes.
8      Q    I'll try for three.  Would another one be
9  phenazine?
10     A    Phenazine or perphenazine, yes.  Phenazine,
11 no.
12     Q    I knew I shouldn't have tried for three.
13         So, with the first-generation antipsychotics,
14 have there been some problems with side effects in the
15 past with first-generation antipsychotics?
16     A    Yes.
17     Q    And have you seen patients who have had those
18 problems?
19     A    Yes.
20     Q    What kind of problems have people had with
21 first-generation antipsychotics in the past?
22     A    They have had quite a few, but I would say
23 primarily extrapyramidal symptoms, which would be things
24 like stiffening of their muscles, eyes rolling back,
25 tongue feeling thick.

51

1      Q    And can those extrapyramidal symptoms include
2  Parkinson-type symptoms?
3      A    Yes.
4      Q    And akathisia?
5      A    Yes.
6      Q    What is akathisia?
7      A    A sense of restlessness.  More almost like a
8  motor activity.  Type of feeling that one has to get up
9  and walk around and can't sit still.
10     Q    Have first-generation antipsychotics also been
11 associated with tardive dyskinesia?
12     A    Yes.
13     Q    And has that been associated with
14 first-generation antipsychotics?
15     A    Yes.
16     Q    And what is tardive dyskinesia?
17     A    It's a reversible condition which results in
18 involuntary motions and movements of the volunteer
19 muscles.  It is very distressing to the clients.
20     Q    And sometimes can tardive dyskinesia be
21 irreversible?
22     A    Yes.
23     Q    Can tardive dyskinesia be devastating for
24 patients' lives?
25     A    Yes.

52

1      Q    And these symptoms we discussed extrapyramidal
2  symptoms and tardive dyskinesia, can that lead to
3  noncompliance for patients?
4      A    Possibly.
5      Q    Which means they might stop taking the
6  medication?
7      A    And that would be a bad thing for people with
8  mental health conditions?
9      A    Yes.
10     Q    Have you also heard the term
11 "second-generation antipsychotic"?
12     A    Yes, I have.
13     Q    And would that be also known as an atypical
14 antipsychotic?
15     A    Yes.
16     Q    And did the second-generation antipsychotics
17 obviously come after the first-generation
18 antipsychotics?
19     A    Yes.
20     Q    And how do they differ from the
21 first-generation?
22     A    They are less incidence of all of the side
23 effects that we saw in the first-generation plus they
24 are more effi -- more effective.

53

1      Q    So they work better and they don't have as
2  much side effects?
3      A    Yes.
4      Q    So were they a good development in the
5  treatment of mental health?
6      Q    Were they an important step in the treatment
7  of mental health?
8      A    Yes.
9      Q    And have you used second-generation
10 antipsychotics?
11     A    Yes.
12     Q    And those second-generation antipsychotics
13 would include Seroquel?
14     A    Yes.
15     Q    Would they include Abilify?
16     A    Yes.
17     Q    Would it include Zyprexa?
18     A    Yes.
19     Q    Would it include Risperdal?
20     A    Yes.
21     Q    How about Clozaril?
22     A    Yes.
23         MR. GADDES:  Jim was looking at me wondering
24 when I was going to make a mistake with that list.

14 (Pages 50 to 53)

54

1    Q    So, you've used — have you used all of those
2    second-generation antipsychotics?
3    A    Yes, I have.
4    Q    And have they helped your patients?
5    A    Yes, they have.
6    Q    Do you still second-generation antipsychotics?
7    A    Yes, I do.
8    Q    And do they still help your patients?
9    A    Yes, they do.
10   Q    And do you still use Seroquel?
11   A    Yes, I do.
12   Q    And you still find that helpful for your
13   patients?
14   A    Yes, I do.
15   Q    And Seroquel, like these other
16   second-generation antipsychotics, was a good development
17   in the treatment of mental health?
18   A    Yes.
19       MR. BRUZZESE:  Objection; form.
20   BY MR. GADDES:
21   Q    Second-generation antipsychotics, of course,
22   also have been associated with risks; is that fair?
23   A    Yes.
24   Q    Is one of the risks of second-generation
25   antipsychotics have been associated with weight gain?

56

1    Q    And they carried that warning since early
2    2004; is that correct?
3    A    Best of my knowledge, yeah.
4    Q    And, as I say, that is a class warning; is
5    that correct?
6    A    Yes.
7    Q    And means that all the second-generation
8    antipsychotics like Abilify and Zyprexa and Seroquel all
9    carry that warning; is that right?
10   A    Yes.
11   Q    Your note goes on to say that you mentioned to
12   Ms. Livesay that one of the risks discussed with her
13   about Seroquel is that your prescription for it would be
14   off label.  Did I read that correctly?
15   A    Yes.
16   Q    So you told Ms. Livesay that you were
17   prescribing Seroquel off label to her?
18   A    Yes.
19   Q    Can you just explain what "off label" means in
20   lay terms?
21   A    Yes.  When you choose a medication that -- we
22   all know -- at least my impression is the FDA approves
23   it for a particular diagnosis, and Seroquel was approved
24   for bipolar -- well, at the time it was approved for
25   schizophrenia, I believe.  I don't think it was for

55

1    A    Yes.
2    Q    Is weight gain something that is associated
3    with a lot of medicines that are used to treat mental
4    health, in your experience?
5        MR. BRUZZESE:  Objection; form.
6        THE WITNESS:  I may not say a lot, but a fair
7    amount.  Maybe half of the meds we use.
8    BY MR. GADDES:
9    Q    And do you recall when second-generation
10   antipsychotics first became available, roughly?
11   A    Roughly around '96, '97, somewhere around
12   that.
13   Q    Okay.  Was Seroquel one of the later
14   second-generation antipsychotics to be introduced into
15   the market?
16   A    Yes.
17   Q    Was Zyprexa on the market before Seroquel, for
18   example?
19   A    I believe so.
20   Q    Was Clozaril on the market before Seroquel?
21   A    Yes.
22   Q    And second-generation antipsychotics also
23   carry a class warning relating to hyperglycemia and
24   diabetes; is that right?
25   A    Yes.

57

bipolar -- I don't remember the specific date on that,
but basically it was not approved for depressive
disorders, which is what she was diagnosed with, but I
choose medications when I feel like they would be of
benefit for a patient and explain that that is off
label.
    Q    And is off-label use fairly standard practice
in the treatment of mental health?
    A    Yes.
    Q    And is off-label use actually important for
the treatment of mental health?
        MR. BRUZZESE:  Objection; form.
        THE WITNESS:  I think so.
BY MR. GADDES:
    Q    In your experience, is off-label use important
for the treatment of mental health?
    A    Yes.
    Q    And is that because of the lack of available
medicines for certain conditions?
    A    Yes.
    Q    So you thought Seroquel here would help
Ms. Livesay in her mental health condition?
    A    Yes, I did.
    Q    And, as you look back, do you think that you
made a good decision prescribing her Seroquel?

58

1    A    Yes.
2    Q    And was 25 to 50 milligrams -- I believe I
3    asked you that -- a fairly low dose for Seroquel?
4    A    Correct.
5    Q    Do you recall what the dose for schizophrenia
6    would be, for example?
7    A    Ranges at least -- most of the times
8    300 milligrams and up to 800 milligrams.
9    Q    Could you turn to your next note. I think
10   your next visit was October 9, 2001. Did I read that
11   correctly?
12   A    Yes.
13   Q    And I just wanted to read a portion. It
14   states:
15            "She is continuing on Serzone,
16       Seroquel and Klonopin. Last month the
17       Seroquel was new for the use of sleep
18       and anxiety. She reports that the
19       nightmares have stopped and her sleep
20       is much better with the medication."
21       Did I read that correctly?
22   A    Yes, you did.
23   Q    So does it appear that Seroquel is helping
24   her?
25   A    Yes.

59

1    Q    And that your treatment plan appears to be
2    working at this time?
3    A    Yes.
4        MR. BRUZZESE: Objection; form.
5    BY MR. GADDES:
6    Q    It also says she denies any problems with side
7    effects and is pleased with the results. Did I read
8    that correctly?
9    A    Yes.
10   Q    So she thinks it is working for her as well?
11   A    Yes.
12   Q    And the last sentence in that paragraph says:
13            "Overall she is doing much
14       better."
15       Did I read that right?
16   A    Yes.
17   Q    So your treatment plan appears to be working
18   for her?
19   A    Yes.
20   Q    And you continue with the same plan; is that
21   right?
22   A    Yes.
23   Q    Okay. The next time she visited you was
24   January 2, 2002?
25   A    Yes.

60

1    Q    And, again, in the first paragraph you have a
2    note:
3            "Medications are Serzone, Seroquel
4        and Klonopin."
5        So you have her on the same regime?
6    A    Yes.
7    Q    And quote:
8            "She states the medications are
9        working well for her. Her moods have
10       been stable. She feels that overall
11       things are doing better for her."
12       Did I read that correctly?
13   A    Yes.
14   Q    And when you make a note like this, is this
15   because of something the patient told you?
16   A    Yes.
17   Q    So, Seroquel is working for her here as well?
18   A    Yes.
19   Q    And your treatment plan is working for her?
20   A    Yes.
21   Q    At the bottom of the page, it mentions that
22   you related to Ms. Livesay the black box warning now
23   with Serzone. Did I read that right?
24   A    Yes, you did.
25   Q    Do you recall what black box warning that

61

1    would have been?
2    A    At a certain point there were some issues with
3    liver, disease and damage with that particular
4    medication that came out after it was started; so once I
5    heard about it, I informed the client.
6    Q    And what does it mean when you have a black
7    box warning?
8    A    My interpretation is that it is a significant
9    side effect or concern above and beyond what might be a
10   rare or occasional problem, and that could be
11   life-threatening it could be something that could cause
12   other additional problems or higher risks; so it has to
13   be -- the client needs to know that.
14   Q    And this would be an example, again, of the
15   risk-benefit analysis. This would be an additional risk
16   for Serzone but, nevertheless, you felt the benefits of
17   the drug were outweighing that risk for Ms. Livesay?
18   A    Yes.
19   Q    Your next visit was March 27, 2002; is that
20   correct?
21   A    Yes.
22   Q    And at this time is she still on Serzone,
23   Klonopin and Seroquel?
24   A    Yes.
25   Q    And does is it state:

62

1    "Overall her medications are
2    working well for her."
3    A   Yes.
4    Q   "She feels her mood and affect has been
5    very stable."
6    A   Yes.
7    Q   And it goes on to say:
8        "She recently got a letter from
9    her ex-husband, which she felt was very
10   hostile and unusual for him, but she
11   states initially it got her angry but
12   she has dealt with it very well.  She
13   did not get upset.  She feels that she
14   has been able to deal with this stress
15   much better now."
16   Did I read that correctly?
17   A   Yes, you did.
18   Q   So a stressor came into her life and she
19   managed to handle it?
20   A   Yes.
21   Q   So is the Seroquel helping here?
22   A   Apparently.
23   Q   And your treatment plan is working?
24   A   Yes.
25   Q   If we turn to the next note, the next visit is

63

1    June 20, 2002; do you see that?
2    A   Yes, I do.
3    Q   And, again, she is still on Klonopin, Seroquel
4    and Serzone at this time?
5    A   Yes.
6    Q   And it reads:
7        "She states that the medications
8    have continued to work for her fine.
9    She is denying any problem with side
10   effects."
11   Did I read that correctly?
12   A   Yes.
13   Q   So the Seroquel is still working?
14   A   Yes.
15   Q   It is still helping her?
16   A   Yes.
17   Q   The next paragraph goes on to state that:
18       "She started a job working for
19   another physicians group."
20   A   Yes.
21   Q   Do you know what job she had with the
22   physician? Do you recall that?
23   A   She, I believe, worked clerical or with their
24   medical records.
25   Q   And the next visit was September 12, 2002?

64

1    A   Yes.
2    Q   And she is still on Seroquel, Serzone and
3    Klonopin at this time?
4    A   Yes.
5    Q   And does it read:
6        "She states that unfortunately
7    she was laid off her job a month ago.
8    In that month period she did have
9    increased anxiety, disturbed sleep and
10   some depressed moods but was rehired
11   recently and starts her new job on
12   Monday.  She claims she is out of that
13   crisis now.  She still has some
14   difficulty falling asleep.  The
15   Seroquel did work well for her."
16   Did I read that correctly?
17   A   Yes.
18   Q   So the Seroquel is working for her?
19   MR. BRUZZESE:  Objection.
20   THE WITNESS:  Yes.
21   BY MR. GADDES:
22   Q   But she has another stressor in her life at
23   this time?
24   A   Yes.
25   Q   And she had some problem with sleep and

65

1    anxiety?
2    A   Yes.
3    Q   And so did you up the dose of Seroquel
4    slightly?
5    A   Yes.
6    Q   And why would you have done that?
7    A   To see if a higher dose would give her more
8    benefit than the lower dose with these added stressors
9    and things that she's been experiencing.
10   Q   Is that, again, an example of what you do as a
11   mental health specialist, you may have to adjust doses
12   when different stresses happen in people's lives?
13   A   Yes, I do.
14   Q   And that is to keep them healthy?
15   A   Yes.
16   Q   And was the next visit December 5, 2002?
17   A   Yes.
18   Q   And, by the way, Ms. Livesay appears to be
19   seeing you roughly every three months, would that be
20   right?
21   A   Yes.
22   Q   And is it important that a patient comes and
23   sees you regularly?
24   A   Yes.
25   Q   And did you think that a regular visit was an

17 (Pages 62 to 65)

66

1  important thing for Ms. Livesay to have with you?
2      A   Yes.
3      Q   And why would that be?
4      A   In order to get just those kinds of things
5  from her, as far as her progress or lack of or any
6  adjustments that need to be made, and to be able to
7  early-on intervene rather than after something happens
8  and she gets worse, we typically see them about every
9  three months.
10     Q   And if you look at the first paragraph of your
11  December 5, 2002, treatment note, does it appear that
12  she had stopped taking Serzone on her own at this time?
13     A   Yes, she did.
14     Q   But you wanted her to go back on the Serzone?
15     A   Yes.
16     Q   Even though she wasn't reporting any adverse
17  events from going off it?
18     A   Yes.
19     Q   And why was it important that you wanted her
20  to get back on Serzone?
21     A   Because she had demonstrated a benefit from
22  these medications, including that particular one; and
23  that being off the medicine for a brief period of time
24  without any symptoms does not indicate that she doesn't
25  need the medication.  She could very likely have some

67

1  periods of remission without medications and we don't
2  want to take that chance, so she stays on the medicine.
3      Q   And can you turn, please, to your next visit
4  which is February 27, 2003?
5      A   Yes.
6      Q   And the first paragraph reads:
7          "She continues to be on Seroquel,
8      Serzone.  She reports that medications
9      are working well.  She continues to
10     take them as directed."
11         Did I read that correctly?
12     A   Yes.
13     Q   So she is still on Seroquel?
14     A   Yes.
15     Q   And it's still helping her?
16         MR. BRUZZESE:  Objection; form.
17         THE WITNESS:  Yes.
18  BY MR. GADDES:
19     Q   Is your plan still working for Ms. Livesay?
20     A   Yes.
21     Q   And does it appear that your treatment of her
22  with Seroquel is still helping her?
23         MR. BRUZZESE:  Objection; form.
24         THE WITNESS:  Yes.
25  BY MR. GADDES:

68

1      Q   At the bottom of this page it states:
2          "She will be seeing her primary
3      care physician tomorrow and recommended
4      that she get labs done including a
5      metabolic panel, CBC and liver
6      enzymes."
7          Did I read that correctly?
8      A   Yes.
9      Q   So you were recommending that she get some
10  labs at this time?
11     A   Yes.
12     Q   And why would you be recommending she should
13  get labs?
14     A   It is what we usually do with medications.  A
15  lot of medications to monitor, just the things that are
16  on those particular labs that are requested here.
17     Q   So you would recommend your patients get
18  regular labs done?
19         MR. BRUZZESE:  Objection; form.
20         THE WITNESS:  Yes.
21  BY MR. GADDES:
22     Q   And do you recommend to your patients, as a
23  matter of practice, that they get regular labs done?
24     A   Yes.
25     Q   And do those labs include metabolic panels?

69

1      A   Yes.
2      Q   And you rely upon the patient to go back to
3  their physician and get those labs done?
4      A   Sometimes that or they do it through the
5  agency -- agency I'm working at we order labs through
6  there too.  Either way.
7      Q   Was your next visit May 22, 2003?
8      A   Yes.
9      Q   And if you look at the first paragraph, does
10  it appear that Ms. Livesay was reporting that she was,
11  unfortunately, having some more back problems at this
12  time?
13     A   Yes.
14     Q   But does it also say, towards the bottom of
15  that paragraph:
16         "Overall she feels that the
17     medications are working"?
18     A   Yes.
19     Q   And do you also tell her at the bottom of that
20  page to get lab tests done before her next appointment?
21     A   Yes.
22     Q   The next visit I see is August 19, 2003.
23     Q   And it reads:
24         "She states overall her mood has

**70**

1   been stable."
2   Did I read that correctly?
3   A   Yes.
4   Q   And just before that it says:
5       "She feels the medications are
6   working well."
7   Did I read that correctly?
8   A   Yes.
9   Q   So does it appear that your treatment plan is
10  helping her?
11  A   Yes.
12  Q   The next visit I see is December 2, 2003?
13  A   Yes.
14  Q   And it reads:
15      "She continues to do quite well on
16  Seroquel, Serzone and Klonopin
17  combination. She is now back working
18  for the last six weeks" — bless you —
19  "she is working for a pharmacy now as a
20  pharmacy tech."
21  Did I read that correctly, other than the
22  "bless you"?
23  A   Yes.
24  Q   So the note here says that she is doing well
25  on Seroquel?

**71**

1   A   Yes.
2   Q   And that would have been something she told
3   you?
4   A   Yes.
5   Q   It also says she's working as a pharmacy tech.
6   Do you know what she was doing at the pharmacy, what her
7   job was?
8   A   I don't recall specifics.
9   Q   The next visit I see is February 24, 2004?
10  A   Yes.
11  Q   Does it, again, say that:
12      "She is currently on Serzone,
13  Seroquel and Klonopin taking regularly
14  with good effects and no complaints of
15  side effects."
16  Did I read that correctly?
17  A   Yes, you did.
18  Q   The next visit I see is May 18, 2004?
19  A   Yes.
20  Q   And does it again say that she is taking
21  Serzone, Seroquel and Klonopin with good effects and no
22  complaints of side effects?
23  A   Yes.
24  Q   And does it say that she continues to report
25  that she is doing well?

**72**

1   A   Yes.
2   Q   And your treatment plan is still working for
3   her?
4   A   Yes.
5   Q   The next visit I see is August 10, 2004. And
6   does it again says that she is taking those medications
7   with good effects and no complaints of side effects?
8   A   Yes.
9   Q   And does she still continue to report to you
10  that she is doing well?
11  A   Yes.
12  Q   So Ms. Livesay is stable at this point in time
13  on your regime?
14  A   Yes.
15  Q   The next record I have is a handwritten record
16  November 10, 2004, and as it is a handwritten record,
17  could you just read the first paragraph at the top for
18  me there?
19  A   I sure will:
20      "On Serzone Seroquel and Klonopin.
21  Doing well on patch from pain. Reports
22  after years of pain it's gone. Her son
23  is on Zoloft doing much better too.
24  Still seeing primary care physician.
25  Will get next rounds of labs soon."

**73**

1   Q   So, again, you are going to be getting a new
2   set of labs for her?
3   A   Yes.
4   Q   As that was your practice?
5   A   Yes.
6   Q   The next visit I see is February 15, 2005.
7   And it reads:
8       "Currently on Serzone, Seroquel
9   and Klonopin taking regularly. Reports
10  medications do help her mood."
11  Did I read that right?
12  A   Yes.
13  Q   "Still under PCP care for her chronic pain."
14  Did I read that correctly?
15  A   Yes.
16  Q   Does that help refresh your recollection that
17  she had chronic pain?
18  A   Yes.
19  Q   It also says she's on some other medicines; is
20  that right?
21  A   Yes.
22  Q   And those would include Neurontin?
23  A   Yes.
24  Q   What kind of medicine is Neurontin?
25  A   It is anti-seizure med but used for a variety

74

1   of medications -- variety of different diagnoses and
2   symptoms, on and off label.
3       Q    Is it sometimes used for mental health
4   conditions?
5       A    Yes.
6       Q    Does Neurontin carry its own set of side
7   effects as well?
8       A    Yes.
9       Q    And what other medicines is she on here?
10      A    Imitrex spray and Duragesic patch and
11  Percocet.
12      Q    What kind of medicines are those?
13      A    Imitrex is for migraine headaches. Duragesic
14  patch and Percocet are opiate-based meds for pain.
15      Q    The last record I have for you, sir, is
16  May 10, 2005. And if you look at the first paragraph,
17  does it state that she appears to have ran out of
18  Seroquel lately?
19      A    Yes.
20      Q    And does it also say that she stopped taking
21  Klonopin?
22      A    Yes.
23      Q    And does she appear to be more stressed now?
24      A    Reports more stressed -- well, she reports
25  that she had been more stressed.

75

1       Q    And in that first paragraph, is she also
2   reporting that she's having poor sleep?
3       A    Yes.
4       Q    And that her mood was somewhat depressed?
5       A    Yes.
6       Q    So she had stopped taking her Seroquel and
7   Klonopin and now she's depressed?
8       A    Yes.
9       Q    And she's having trouble sleeping?
10      A    Yes.
11      Q    And so did you increase her Seroquel at this
12  time, slightly?
13      A    Yes. It went up to 100 milligrams at bedtime.
14      Q    And is that still a low dose of Seroquel?
15      A    Yes.
16      Q    And this was the last visit you had with
17  Ms. Livesay; is that right?
18      A    The last progress note here, I assume so.
19      Q    I will represent to you that it is the last
20  record I have from you.
21      A    Yes. Yes.
22      Q    So would that be a reason this was your last
23  progress note with Ms. Livesay?
24      A    Yes.
25      Q    What happened there?

76

1       A    Continued her on Serzone 400 at bedtime.
2   Seroquel, as mentioned earlier, went up to
3   100 milligrams. She was due to come back in two to
4   three months.
5       Q    She treated with someone else after this?
6       A    Yes.
7       Q    Why did you stop treating Ms. Livesay?
8       A    I believe at the time in '05, that was when I
9   went to do a different assignment with Directions and I
10  didn't have -- I don't think -- I either cut out all or
11  most of my outpatient and was doing other things --
12  actually, I do recall now. That is when I went to work
13  full-time at the Harbor and I did reduce the number of
14  hours there to just a couple of hours a week.
15      Q    So Ms. Livesay was transferred to another
16  mental health specialist at Directions?
17      A    Yes.
18      Q    Do you know who that was, if you remember?
19      A    You know, at the time they all left my service
20  and I went on to do other things; so I don't remember
21  specifically who saw her next, but I know there were
22  other people that did her med management.
23      Q    And this -- you have not followed
24  Ms. Livesay's treatment after May 2005?
25      A    That is correct.

77

1       Q    And you don't know what has happened in her
2   health condition after May 2005?
3       A    That is also correct.
4       Q    But you do know that by the time she left you,
5   she was doing pretty well?
6           MR. BRUZZESE: Objection; form.
7           THE WITNESS: Yes. Overall she was, yes.
8   BY MR. GADDES:
9       Q    Well, what was your impression of how well she
10  was doing at the time she left you?
11      A    I think that she had demonstrated that the
12  medicines had helped overall for her, her anxiety and
13  depression and sleep, but unfortunately things happen
14  where supplies run out or if she comes off meds and then
15  her symptoms would return to some degree. But in
16  previous times we started back the meds and it worked
17  pretty well for her.
18          So I'd say that these were good choices of
19  meds for her. She just needed to stay on them
20  consistently and try to, like all of us do, avoid the
21  stressors in life there.
22      Q    And as you look back, do you think the
23  Seroquel helped Ms. Livesay?
24          MR. BRUZZESE: Objection; form.
25          THE WITNESS: Yes, I do.

78

BY MR. GADDES:

1
2    Q    Is it your impression that the Seroquel helped
3    Ms. Livesay?
4    A    Yes.
5    Q    And, as you look back, do you think that you
6    made the right decision prescribing her Seroquel?
7    A    Yes.
8    Q    And did you prescribe her relatively low doses
9    of Seroquel?
10   A    Yes.
11   Q    And there was no record of her reporting to
12   you, during the time you treated her, any high blood
13   sugars?
14   A    Not that I know of.  I don't recall.
15   Q    She had not reported to you by the time she
16   left that she had hyperglycemia?
17   A    Not that I recall.
18   Q    And she had not reported to you at the time
19   that she left you that she had diabetes?
20   A    Not that I can recall.
21   Q    Do you think Directions for Mental Health is a
22   good facility?
23   A    Yes, I do.
24   Q    And would you trust the judgment of the next
25   mental health specialist at Directions that treated

79

1    Ms. Livesay?
2    A    Yes.
3    Q    Are you satisfied you did a good job with
4    Ms. Livesay?
5    A    Yes.
6    Q    I just have a few other questions.
7         We talked about risk-benefit analysis before.
8    What are the different places that you learn about the
9    benefits and risks of medications?
10   A    My own reading of journals and attending
11   conferences, peer to peer communication.
12   Q    So you learn from people you are working with
13   who were also using the medicine, how they work and what
14   risks there are?
15   A    Yes.
16   Q    Do you also read the PDRs?
17   A    Yes, I do but sources that are better than
18   that as well.
19   Q    And what other sources?
20   A    Well, just journals and other research
21   articles rather than — I do read the inserts.  That is
22   what the PDR is is basically drug inserts. So I read
23   them too.
24   Q    So you keep up to speed on the inserts, which
25   would be the labeling?

80

1    A    Yes, I do.
2    Q    Is another source of information about the
3    risks and benefits of medication for you your own
4    clinical experience?
5    A    Yes.
6    Q    Is that an important source?
7    A    Very important.
8    Q    You may also get some questions from
9    plaintiff's counsel about sales representatives; so, I
10   apologize, I going being to ask you a few questions
11   about that.
12        From time to time, would you get visits from
13   sales representatives for AstraZeneca?
14   A    Yes, I do.
15   Q    And would you also get visits from sale
16   representatives of other companies?
17   A    Yes.
18   Q    Do all the pharmaceutical companies tend to
19   send sale represents to visit you?
20   A    Yes.
21   Q    And is that usual in the medical profession?
22   A    Yes.
23   Q    And when sales representatives visit you, you
24   understand that they are sales representatives, right?
25   A    Yes.

81

1    Q    And that they are not doctors?
2    A    Yes.
3    Q    And when you make prescription decisions, you
4    make them based on your own judgment; is that correct?
5         MR. BRUZZESE:  Objection; form.
6         THE WITNESS:  That's correct.
7    BY MR. GADDES:
8    Q    Well, do you base your judgement on what sale
9    representatives tell you to prescribe or do you
10   prescribe yourself?
11   A    I prescribe what I feel is right.
12   Q    And you base that on all the different sets of
13   knowledge you've told me you have?
14   A    Yes.
15   Q    I don't know if you get question — you are
16   going to get questions about diabetes, but can you just
17   confirm for me, you don't treat diabetes?
18   A    That is correct.
19   Q    You are not a specialist in diabetes?
20   A    That is also correct.
21   Q    You are not an endocrinologist?
22   A    That's correct.
23   Q    And Ms. Livesay never reported to you that she
24   had diabetes?
25   A    To the best of my knowledge.

21 (Pages 78 to 81)

82

1    Q    And you don't know what her treatment has been
2    with respect to blood sugars; is that right?
3    A    That's correct.
4    Q    That is something that would be another
5    physician's job, not yours?
6    A    Correct.
7    Q    You treated her for her mental health
8    condition?
9    A    Yes.
10   Q    And you are satisfied you did a good job?
11   A    Yes, I did.
12   Q    And you are satisfied you helped her?
13   A    Yes.
14   Q    And you satisfied that Seroquel helped her?
15       MR. BRUZZESE:  Objection; form.
16       THE WITNESS:  Yes.
17       MR. GADDES:  Mr. Davis, thank you very much.
18   I may have some questions for you after Mr. Bruzzese
19   asks you some questions.
20       MR. BRUZZESE:  I think we need to take a break
21   for the videographer; so let's go off the record.
22       THE VIDEOGRAPHER:  Going off the record 10:31.
23       (Recess taken from 10:31 a.m. to 10:39 a.m.)
24       THE VIDEOGRAPHER:  This is Tape Number 2 of
25   the continued videotaped deposition of Don Davis.

83

1    We're back on the record at 10:39.
2           EXAMINATION
3    BY MR. BRUZZESE:
4    Q    Good morning Mr. -- Mr. Davis?
5    A    Yes.
6    Q    My name is Jim Bruzzese.  We met earlier
7    today.  I have got some follow-up questions.  I'm going
8    to start off specifically with questions related to the
9    testimony you have given today that related to your
10   treatment and care of Debra Livesay.  I may have some
11   general questions as well following that.  And I
12   specifically want to address some of the testimony you
13   have already given right off.
14       And we'll -- you gave some testimony earlier
15   today in response to questions about first and
16   second-generation antipsychotics.  Do you recall that
17   testimony?
18   A    Yes.
19   Q    With we were talking about second-generation
20   antipsychotics or atypical antipsychotics, counsel read
21   off a list of names of different antipsychotics to you,
22   and I don't remember all of them that he mentioned but I
23   know a Zyprexa, Seroquel, there was Geodon, Abilify and
24   Risperdal.  Am I missing?
25   A    That sounds right.

84

1    Q    And he asked you where Seroquel fit into it,
2    in terms of where it came in in a timeline.  And do you
3    know if Seroquel was -- what medications of atypical
4    antipsychotics were on the market when Seroquel came?
5    A    Clozaril, Risperdal and Zyprexa.
6    Q    Did Geodon and Abilify come after Seroquel?
7    A    Yes.
8    Q    So Seroquel came in the middle of the pack; is
9    that right?
10   A    Sounds about right.
11   Q    Counsel asked you a number of questions about
12   the class-wide warning that was attached to all of the
13   atypical antipsychotics.  Do you recall that
14   testimony --
15   A    Yes.
16   Q    -- and the questioning?
17       Speaking in terms of that class of atypical
18   antipsychotics, you are aware that there is then a risk
19   of weight gain associated with use of atypical
20   antipsychotics?
21   A    Yes.
22   Q    And you are aware that there is a risk of
23   development of diabetes or hyperglycemia associated with
24   the use of atypical antipsychotics?
25       MR. GADDES:  Object to form.

85

1        THE WITNESS:  I am aware of the risk of weight
2    gain, as far as not aware of a direct relationship
3    between them but there's warnings appropriate to
4    that.
5    BY MR. BRUZZESE:
6    Q    You are aware of warnings on atypical
7    antipsychotics that are specifically related
8    hyperglycemia?
9    A    Yes.
10   Q    And to diabetes?
11   A    Yes.
12   Q    You gave some testimony earlier about using
13   different medications for different patients, because
14   certain patients may react more favorably or less
15   favorably to a certain medication and that is possibly
16   why you may alter the regimen that you prescribe; is
17   that correct?
18   A    Yes.
19   Q    Is it your understanding that drugs within a
20   class may -- even though they are basically the same
21   class of medications, may affect a patient differently?
22   A    Yes.
23   Q    Within the class of atypical antipsychotics,
24   there are side effects associated with them, some of
25   which may be more prevalent in one as opposed to another

22 (Pages 82 to 85)

86

1  atypical; is that correct?
2      A   Yes.
3      Q   Is sedation a side effect or symptom of using
4  some atypical antipsychotics?
5      A   Yes.
6      Q   Is sedation more prevalent in the use of
7  Seroquel than, say, Geodon or Abilify?
8      A   Yes.
9          MR. GADDES:  Object to form.
10 BY MR. BRUZZESE:
11     Q   Do you make a distinction — I guess if we
12 were to say, put those atypicals in a hierarchy with
13 regards to weight gain as a symptom or side effect of
14 the use, would you put Seroquel at the higher end, in
15 terms of an offender of weight gain on patients?
16     A   Less than higher. Some are below that. There
17 is others out there that are worse.
18     Q   Is Zyprexa worse with regard to weight gain?
19     A   Yes.
20     Q   And Abilify and Geodon and Risperdal, these
21 are less offensive to weight gain?
22         MR. GADDES:  Object to form.
23         THE WITNESS:  Tend to be less.
24 BY MR. BRUZZESE:
25     Q   So Seroquel would be on the higher end of

87

1  those?
2          MR. GADDES:  Object to the form; asked and
3  answered.
4          THE WITNESS:  Higher than -- I'm not sure what
5  you are --
6  BY MR. BRUZZESE:
7      Q   We talked about five atypical antipsychotics,
8  and you're saying that Zyprexa was the highest?
9      A   Yes.
10     Q   And then you mentioned Geodon and Abilify and
11 Risperdal being below Seroquel; so that would put
12 Seroquel second in terms of those five, correct?
13         MR. GADDES:  Object to form.
14         MR. ELLISON:  Form.
15         THE WITNESS:  That's correct.
16 BY MR. BRUZZESE:
17     Q   You gave some testimony earlier today about
18 conducting the risk-benefit analysis. Do you recall
19 that line of questioning?
20     A   Yes.
21     Q   And I believe that when you conduct that
22 risk-benefit analysis, you stated that you would
23 consider all of the risks and compare them to the
24 benefit of that drug with regard to that particular
25 patient before prescribing the medication; is that

88

1  correct?
2      A   That's correct.
3      Q   Giving those parameters, you would only be
4  able to weigh — make that risk-benefit analysis
5  correctly if you were aware of all of the risks
6  associated with the medication, correct?
7      A   Yes.
8      Q   And, conversely, also all of the benefits?
9      A   Yes.
10     Q   Over time, some drugs may be altered with
11 regard to the labeling such that they are now indicated
12 for additional uses, correct?
13     A   Are you talking about FDA approved additional?
14     Q   Correct?
15     A   Yes.
16     Q   In other words, a drug may be indicated for
17 use in one thing when it is on the market and then two
18 years later open up to another indication?
19     A   Oh, yes.
20     Q   And that would increase the benefit of that
21 drug in that analysis, correct?
22     A   Yes.
23     Q   The other side of that coin is a medication
24 may have some known risks at one time and then two or
25 three years later there are more risks in that labeling,

89

1  correct?
2      A   Correct.
3      Q   And that also would affect or make you
4  reevaluate the risk-benefit analysis on a patient with
5  regard to that drug; is that correct?
6      A   Yes.
7      Q   And you began prescribing Seroquel — did you
8  begin as soon as it became on the market?
9      A   I believe so.
10     Q   And so at the time that you were beginning to
11 prescribe Seroquel as a medication for your patients,
12 generally, you were aware — you conducted a
13 risk-benefit analysis only including the risks that were
14 known to you at that time?
15     A   Correct.
16     Q   I saw, as we went through some of the chart
17 entries today, that over time you would put some
18 notations in the chart at the bottom that would
19 specifically reference, you know, warnings that you gave
20 to your patients of side effects with regard to certain
21 medications or combinations thereof; is that right?
22     A   Correct.
23     Q   When we see a new one in here, is that because
24 you've become aware of it by that visit and it is
25 included in your chart entry?

90

1    A   Yes.
2    Q   I should have asked you this right off.
3  Before we met here today, have you talked to anybody
4  about this litigation or your deposition here today?
5    A   Yes.
6    Q   And who did you speak with?
7    A   I spoke to the people at Directions setting up
8  the -- getting charts and they informed me of that.  I
9  spoke to -- I don't know if this applies really -- the
10  company that sets this up, the Brown & Greer, people
11  like that.
12    Q   Did you speak to anybody about either of the
13  patients that you are here to testify about today?
14    A   Yes.
15    Q   And who did you speak to?
16    A   Dr. Zenel, James Zenel.
17    Q   And I had some questions about your
18  relationship with Dr. Zenel and his involvement here.
19  He was the supervising physician at Directions, correct?
20    A   Yes.
21    Q   Your supervising physician?
22    A   Yes.
23    Q   You talked a little bit about that today.  I
24  specifically want to know to what degree his involvement
25  was related to the prescriptions that you made for your

91

1  patients.  Did he oversee your prescriptions?
2    A   There is a protocol that we have between the
3  two of us.  That is part of the arrangement for being an
4  ARNP and working with a psychiatrist.  When I write a
5  prescription, his name is on the prescription as well as
6  mine, if that is what you are asking.
7    Q   Would Dr. Zenel have ever physically visited
8  with or seen Debra Livesay?
9    A   It's possible if he were one of the people
10  that would have covered for me and seen -- he also saw
11  patients there and had seen, on occasion, my patients if
12  I was not available.
13    Q   To your knowledge, Dr. Zenel did not see Debra
14  Livesay prior to your first treatment with
15  Debra Livesay; is that correct?
16    A   Not that I can recall.
17    Q   And if he had, similar to the entry in here by
18  the other provider, he might have had an entry in your
19  chart, correct?
20    A   He would have an entry in the chart.
21    Q   Would you have discussed with Dr. Zenel your
22  decision to prescribe Seroquel for Ms. Livesay?
23    A   Yes.
24    Q   And would he have had input into your decision
25  process?

92

1    A   Yes.
2    Q   Would it be noted in the chart somewhere or
3  would this be an off-chart conversation?
4    A   Off chart possibly during supervision or
5  something like that.
6    Q   Is this during these -- is it weekly meetings?
7    A   Weekly, yeah.
8    Q   You would discuss in these meetings with
9  Dr. Zenel your current care and treatment plans for
10  various patients that he was supervising?
11    A   Correct.
12    Q   And, at that time, do you recall right now
13  whether or not you actually had a conversation about
14  prescribing Seroquel for Ms. Livesay with Dr. Zenel?
15    A   I can't recall.
16    Q   And would that have been routine?
17    A   Yes.
18    Q   Is it presumed, then, that Dr. Zenel would
19  have okayed or agreed with your decision to prescribe?
20    A   Yes.
21       MR. GADDES:  Object to form.
22  BY MR. BRUZZESE:
23    Q   We went through the progress notes today and
24  your treatment of Debra Livesay, and throughout it, at
25  the bottom of every progress note there is a diagnosis

93

1  that over time -- specifically in the beginning, there
2  were -- there was a diagnosis of a mood --
3    A   Mood disorder NOS.
4    Q   That's correct.  Thank you.
5       THE REPORTER:  I'm sorry, mood disorder --
6       THE WITNESS:  NOS, not otherwise specified.
7  BY MR. BRUZZESE:
8    Q   And, in addition, you were ruling out
9  adjustment disorder with depressed mood and ruling out
10  major depression recurrent?
11    A   Correct.
12    Q   And then if we look at the entry for
13  November 30th, 1999 --
14    A   Okay.
15    Q   -- and this is approximately four months into
16  treatment of Debra Livesay?  You saw her first in July,
17  correct, of '99?
18    A   Yes.
19    Q   And in November, if you look at the diagnosis
20  or assessment, it still has the rule out adjustment
21  disorder, depressed mood and major depression recurrent?
22    A   Yes.
23    Q   The very next entry is February 29th, 2000?
24    A   Yes.
25    Q   And now we no longer have those ruling out

94

1  assessments, correct?
2      A  Yes.
3      Q  And at this point in your treatment, you are
4  centering on her mood disorder as the primary and
5  current assessment of her condition, correct?
6          MR. GADDES: Object to form.
7          THE WITNESS: Yes.
8  BY MR. BRUZZESE:
9      Q  You have now ruled out the other two that we
10  were considering or that you were considering?
11     A  That would be safe to say, yes.
12     Q  And as Counsel pointed out, later on this mood
13  disorder NOS changes too -- pardon me -- in April 23rd,
14  2001?
15         MR. GADDES: April 28, 2001, Jim. Nice to
16  know you make a mistake like I do.
17  BY MR. BRUZZESE:
18     Q  April 23rd, 2001, is the last entry I have
19  here with the depressive order NOS and the next --
20     A  Yeah -- let me know when you're ready.
21         MR. BRUZZESE: Talking about August 28, 2001,
22  or -- no you are right. My mistake Jim. Just
23  ignore me.
24         MR. BRUZZESE: Yes. Okay. April 23rd, 2001.
25         MR. GADDES: I just made another mistake.

95

1  That's okay.
2  BY MR. BRUZZESE:
3      Q  That is where we have it changing to
4  depressive disorder NOS?
5      A  Yes.
6      Q  And there is nothing else that you are trying
7  to rule out at this point?
8      A  That is correct.
9      Q  And this is your assessment for the remaining
10  time that you have treated Ms. Livesay, correct?
11     A  Yes, without going through every page here.
12     Q  In your first visit with Debra Livesay, we
13  just were there. This is July 6th, 1999. If you look
14  at the last page --
15     A  Marked Number 5?
16     Q  -- marked Number 5?
17     A  Okay. Go ahead.
18     Q  There is a prognosis there and you have
19  "prognosis good." That was -- did that ever change
20  over time?
21     A  Not that I can think of.
22     Q  And we talked about the fact that Seroquel, as
23  it was prescribed to Debra Livesay, was an off-label
24  prescription, correct?
25     A  Correct.

96

1      Q  At no time during your treatment of
2  Debra Livesay were you looking into schizophrenia as a
3  ruling out diagnosis?
4      A  That is correct.
5      Q  Or bipolar conditions of any kind?
6      A  I can't say bipolar, because I had at one
7  point thought of a mood disorder, which would be a type
8  of condition of bipolar, but not schizophrenia.
9      Q  And you ruled that out, correct?
10     A  Yes.
11     Q  Are schizophrenia and bipolar disorders more
12  severe psychiatric and mental conditions symptoms and
13  ailments for patients than sleep disorders?
14         MR. GADDES: Object to form.
15         THE WITNESS: Yes.
16  BY MR. BRUZZESE:
17     Q  It was common practice in your chart entries
18  to indicate that there was no suicidal thoughts or
19  ideations or intentions; is that correct?
20         MR. GADDES: Object to form.
21         THE WITNESS: Correct.
22  BY MR. BRUZZESE:
23     Q  And throughout your treatment of Debra
24  Livesay, it has been all the same where there has been
25  no suicidal thoughts or ideations, correct?

97

1      A  Correct. Whatever is in the notes.
2      Q  Counsel had asked you a question about the
3  August 17th, 2000, visit. In that visit, you
4  recommended that Debra Livesay see Chris Edwards, do you
5  recall that, for counseling?
6      A  Yes.
7      Q  And if you'll look at the very first visit
8  again, July of 1999?
9      A  Yes.
10     Q  We see that she was seeing Chris Edwards at
11  that time when you first saw Debra Livesay, wasn't she?
12     A  Yes.
13     Q  So she had even seen Chris Edwards before you
14  ever saw Debra Livesay; is that correct?
15     A  Yes.
16     Q  So this was just something you wanted her to
17  continue doing; is that correct?
18     A  That is correct.
19     Q  The chart entry for May 10th, 2005, this is
20  your last visit that we talked about?
21     A  Yes.
22     Q  Counsel had asked you a number of questions
23  about the fact that she had gone -- she had run out of
24  her Seroquel; do you recall that?
25     A  Yes.

98

1  Q   And that she had also stopped taking — is it
2  the Serzone or Klonopin?
3  A   Klonopin.
4  Q   It was Klonopin, and counsel had asked you
5  questions about the fact that she was now indicated in
6  the chart as having sleep problems again or increased
7  anxiety and sleep problems; is that correct?
8  A   Correct.
9  Q   I also wanted to inquire in this. She had
10 just been diagnosed with lymphoma — is that correct —
11 according to your chart?
12 A   Yes.
13 Q   And started treatment, either chemo or
14 radiation she was about to begin?
15 A   Correct.
16 Q   Do you think that is the kind of thing that
17 would lead to increased anxiety in a patient?
18       MR. GADDES:  Object to form.
19       THE WITNESS:  Very possible.
20 BY MR. BRUZZESE:
21 Q   Is that the type of thing that would make a
22 patient lose some sleep?
23       MR. GADDES:  Object to form.
24       THE WITNESS:  Possibly.
25 BY MR. BRUZZESE:

99

1  Q   Asking a few other questions about the
2  risk-benefit analysis that you conduct. You had talked
3  about some sources for your information that you take in
4  to be able to conduct that risk-benefit analysis as
5  accurately as possible. And you had mentioned that you
6  look at the PDR or package inserts for medications,
7  correct?
8  A   Correct.
9  Q   This is the labeling that comes with the
10 prescription medications?
11 A   Correct.
12 Q   But you said you put more emphasis on
13 journals; is that right?
14 A   I put emphasis on all of them.
15 Q   Equal or do you do one more than another?
16 A   I go with the labeling first because that is
17 based on research as well, and I just like to add to it
18 with everything I can know.
19 Q   And you also mentioned the clinical
20 experience?
21 A   Yes.
22 Q   Is this is how your patients have reacted to
23 medications in your own practice, correct?
24 A   Yes.
25 Q   And then counsel asked you some questions

100

about the sales reps that come to your office and you
said that you see sales reps or at least have in the
past seen sales reps on at least a fairly regular basis?
A   Yes.
Q   Do the sales reps bring you any information on
the medications?
A   Yes, they do.
Q   Is it all just marketing information or also
studies and trials, clinical information?
A   They do give us some studies. They often give
us actual journal studies that come from the journals
that we read.
Q   Do you factor any of the information that the
sales reps give you, in terms of journals and studies,
into your risk-benefit analysis?
A   Yes, I do.
Q   And do they speak with you about the
medications?
A   Yes, they do.
Q   So when they come in to promote a medication,
they are also wanting to sit down and talk to you about
the benefits of that medication, correct?
       MR. GADDES:  Object to form.
BY MR. BRUZZESE:
Q   Do you they talk to you about the risks of

101

medications?
A   Yes, they do.
Q   And when they're talking about the information
and giving you — when they're speaking to you about a
medication and giving you information on that
medication, you expect that you can rely upon it to be
accurate and true?
A   Yes.
       MR. GADDES:  Object to form.
BY MR. BRUZZESE:
Q   "Yes"?
A   Yes.
Q   Do you recall when the labeling changed for
Seroquel to include a warning of the hyperglycemia and
diabetes related information?
A   I do recall the label changing. I can't tell
you a specific time frame. Couple years ago at best.
Q   Counsel mentioned earlier that you recall
sometime in early 2004 receiving this information and
you had indicated that's correct?
A   Yeah, I think so.
Q   So it would be accurate to say that prior to
early 2004, a prescription made for Seroquel, you
weren't able to make that risk-benefit analysis with the
warning in mind?

102

1    MR. GADDES: Object to form.
2    THE WITNESS: I'm not sure what you mean
3  because there was a lot of just thoughts and things
4  that -- the new warning that came about, there was
5  still -- prior to that there was a lot of discussion
6  with weight gain and blood sugars and all of that.
7  But then it became more official, I guess, you might
8  want to call it that, but we still incorporated a
9  lot of the information prior to the warning.
10   BY MR. BRUZZESE:
11   Q    Prior to you receiving the warning, which
12 would have been PDR package inserts, that kind of thing,
13 that you said you relied upon; if it's not available
14 there, are you saying that it was in journals that
15 you've read?
16   A    Journals or other peer to peer communication
17 and through the conferences that I go to that come out
18 before a lot of times the -- these types of changes take
19 place officially.
20   Q    Counsel had asked you questions about whether
21 or not you knew who was caring for Debra Livesay after
22 your transfer within the unit -- is it Harbor?
23   A    No, this is for Directions.
24   Q    From Directions to where?
25   A    Oh, I misunderstood your question.  I see.

103

1  Ask your question again because I'm not sure.
2    Q    You were treating Debra Livesay and at one
3  point you stopped treating with Debra Livesay because
4  your role at Directions had changed?
5    A    Correct.
6    Q    And you were reassigned to another location?
7    A    Yes, through directions and also made changes
8  with the Harbor and going there full-time.
9    Q    Yeah.
10   A    Okay.  Sorry.
11   Q    And at that time -- I think we knew that was
12 sometime after the May 10th, 2005 treatment visit that
13 we've looked at today, correct?
14   A    Right.
15   Q    After that point, Debra Livesay was seen by
16 another health care professional at Directions?
17   A    I assume so.
18   Q    If a subsequent health care professional at
19 Directions had continued the treatment of Debra Livesay
20 and increased the Seroquel dosages to 100 milligrams to
21 300 milligrams, 600 milligrams that would not correspond
22 with what your assessment for the needs of Debra Livesay
23 would be; is that right?
24   MR. GADDES: Object to form and foundation.
25   THE WITNESS: I can only speak for the time

104

1  that I saw her and what the dose I thought was
2  appropriate.  I can't speak for when other people
3  see her at a later date what she might need.
4  BY MR. BRUZZESE:
5    Q    You testified today that you would trust the
6  subsequent health care provider at Directions, correct?
7    A    Trusting and -- well, if you're saying
8  trusting them, yes.  I do trust, to a certain degree,
9  that they all went through the same schooling and
10 experience that I have and will do the best job that
11 they can, but as far as changing the dose that is up to
12 the next person that sees them.
13   Q    And in your professional opinion, Debra
14 Livesay, at the time you stopped treating Debra Livesay,
15 did not need or require to be on dosages of Seroquel in
16 excess of 2 or 300 milligrams a day?
17   A    I had her on 100 milligrams.  I thought that
18 was best for her at the time.  I can't speak for after
19 she left my service.
20   Q    Is 100 milligrams, in your opinion, a low dose
21 of Seroquel?
22   A    Yes, it is.
23   Q    Did you also receive information about your
24 prescription medications in your weekly meetings with
25 your supervising physician?

105

1    A    Yes.
2    Q    Do you recall Dr. Zenel ever giving you a
3  handout or information about the risks of Seroquel?
4    A    I can't remember specifically something like
5  that.  I know we discussed the medications.  It's
6  possible.
7    Q    Do you recall if you had ever given
8  Debra Livesay samples of Seroquel?
9    A    I can't say that I specifically remember
10 giving her any, but it's possible I could have given her
11 samples.
12   Q    Would it have been noted in your chart?
13   A    It wouldn't necessarily be noted.  At times it
14 can be noted on a progress note, but it could be noted
15 on another piece of paper that is like an activities
16 log.  We do often write Seroquel samples, but it is not
17 always.  It's not 100 percent.  No one is that good.
18   Q    You testified earlier today that it was
19 routine of you to request and get lab work done on your
20 patients; is that correct?
21   A    Correct.
22   Q    -- I when going through the chart today, there
23 were two instances where you noted requests for lab work
24 on Debra Livesay.  Would you have had other requests
25 noted somewhere else?  Is there somewhere else where we

106

1  would see requests for lab work?
2     A   The two places that it would go would be at
3  the bottom of the progress note, which you have all in
4  front of you here. And then there is again that -- if
5  I'm using the right terminology, there were several
6  agencies -- I think it's the activity log. I don't know
7  if I saw one in here or not, but it's a listing of the
8  medications and doses, and I did see that in some of the
9  paperwork maybe not with hers, but on the right-hand
10 column we'll write lab requested too, but it might have
11 been with the other client. I don't know if I saw one
12 with her or not. If you pull it out --
13    Q   Do you have copies of any lab reports on Debra
14 Livesay?
15    A   Nothing in the paperwork that I have here.
16 That is what I'm referring to on the right column of the
17 medication flow sheets is what they call it.
18    Q   From what we see in the chart here, with
19 regard to lab work done on Debra Livesay, do you know
20 whether or not you actually physically saw any lab
21 results?
22    A   I can't recall today whether I have or not but
23 it is likely that I did.
24    Q   If there had been an issue with regard to
25 hyperglycemia in the lab results, would you have made an

107

1  indication of that in her chart?
2     A   Yes, I would.
3     Q   Do you know when or do you know if Debra
4  Livesay has developed diabetes?
5       MR. GADDES: Object to form.
6       THE WITNESS: Don't know that.
7  BY MR. BRUZZESE:
8     Q   Did you ever have any communications with a
9  primary care physician for Debra Livesay?
10    A   I cannot recall that.
11    Q   Would correspondence between yourself and
12 other healthcare providers for Debra Livesay be
13 incorporated into the chart?
14    A   Which healthcare? Are you talking outside of
15 the agency?
16    Q   Yes.
17    A   If one took place directly, I guess, it would
18 be recorded -- I would record it on my note.
19    Q   You testified earlier that you don't treat
20 patients with diabetes, but you are trained as a nurse-
21 practitioner and went through schooling with regards to
22 diabetic conditions in patients, correct?
23    A   Correct.
24    Q   Do you know when you first became aware of an
25 association between atypical antipsychotics and

108

1  diabetes?
2       MR. GADDES: Object to form.
3       THE WITNESS: Early on. Probably shortly --
4      no, somewhere around the time atypicals started
5      coming out, around the time of Zyprexa and Clozaril.
6  BY MR. BRUZZESE:
7     Q   Is it your recollection that when sales
8  representatives from AstraZeneca would come and speak to
9  you about Seroquel, that they would emphasize one of the
10 benefits of Seroquel as opposed to other atypicals as
11 being that Seroquel caused less weight gain than the
12 others?
13      MR. GADDES: Object to form.
14      THE WITNESS: I don't remember them saying
15     that specifically.
16 BY MR. BRUZZESE:
17    Q   Is there anything in particular that you
18 recall them constantly promoting about the drug,
19 Seroquel?
20      MR. GADDES: Object to form.
21      THE WITNESS: Ease of dosing. I think just
22     some of the things that were on the package
23     labeling. I can't tell you. Ease of dosing was one
24     that just came up to my mind as far as that.
25 BY MR. BRUZZESE:

109

1     Q   Do you recall them talking about the lack of
2  weight gain in patients using the use of Seroquel?
3     A   Recall -- ask me one more time, please.
4     Q   Do you recall AstraZeneca sales
5  representatives speaking to you about Seroquel and
6  emphasizing the lack of weight gain in patients using
7  Seroquel?
8       MR. GADDES: Object to form.
9       THE WITNESS: No.
10 BY MR. BRUZZESE:
11    Q   Are you aware that when the sales
12 representatives come to visit with you that they make
13 notations on the visits?
14    A   No.
15    Q   Well, I'm going to show you at this time a
16 number of what they call "Call Notes." The Call Notes
17 are the notations that I'm referring to that the sale
18 representatives make when they come to visit with you.
19 And it is encapsulating whatever amount of time they
20 spend with you into a short little sentence.
21      MR. GADDES: Object to form.
22 BY MR. BRUZZESE:
23    Q   And, specifically, this is a printout of a
24 number of visits that AstraZeneca -- various AstraZeneca
25 sales representatives that came to visit with you.

110

1   Okay?
2   A    Okay.
3   Q    And I want to point -- I want to draw your
4   attention now to a number of entries here related to --
5   A    I can't see what you are showing me here, it's
6   too far away.
7        MR. ELLISON:  You need to stay in front of the
8   camera, sir.
9        THE WITNESS:  Oh, okay.  Well, you need to move
10  so I can see it.
11       MR. ELLISON:  Jim, why don't you move around.
12       MR. BRUZZESE:  I'll move over here.
13  Q    You will see that we are on Page 1 of 43 on
14  these Call Notes, correct?
15  A    Yes.
16  Q    And do you see that on October 19th, 1999,
17  that a Robert Costin (phonetic), a representative from
18  AstraZeneca visited with you?
19  A    Yes.
20  Q    And part of the conversation in the Call Notes
21  was about the lack of weight gain associated with
22  Seroquel?
23  A    I see that.
24  Q    You see that on November 16th, 1999, Robert
25  visited with you, talked about lack of weight gain?

111

1   A    Yes.
2   Q    Switch now and have you look at Page 9 of
3   these Call Notes.  Do you see that an entry here for
4   November 26, 2002, where a Heather LeBlanc -- do you
5   recall Heather LeBlanc?
6   A    Yes.
7   Q    Where Heather visited with you, Don Davis?
8   A    Yes.
9   Q    And that the literature indicates that
10  Seroquel doesn't cause more weight gain at higher doses;
11  do you see that?
12  A    Yes.
13  Q    Do you recall that they would tell you that
14  you can dose higher and that there is no more weight
15  gain associated with that?
16  A    Yes.
17       MR. GADDES:  Object to form.
18  BY MR. BRUZZESE:
19  Q    It also says that she left you a copy of the
20  Brecher -- "left Brecher also."
21       Am I reading that correctly?
22  A    I see that there, yes.
23  Q    Do you recall ever receiving a study from
24  Brecher?
25  A    I can't remember at this point.

112

1   Q    On page 10 of these Call Notes, do you see
2   that Heather visited with you on December 9th, 2002?
3   A    Yes.
4   Q    And am I reading correctly when I say:
5        "Lack of weight gain at higher
6        doses.  Lack of EPS at higher doses."
7        Is it your understanding that the EPS is
8   extrapyramidal side effects?
9   A    Yes.
10  Q    Do you recall that these were things they were
11  talking about when they would come visit you?
12       MR. GADDES:  Object to form.
13       THE WITNESS:  Yes.
14  BY MR. BRUZZESE:
15  Q    Do you see down here that on December 11,
16  2002, there is an indication that they are talking about
17  the lack of weight gain associated with Seroquel?
18  A    Yes.
19  Q    On Page 15 of these notes?
20       MR. GADDES:  What was that last one, Jim?
21       MR. ELLISON:  December 1st (sic).
22       MR. BRUZZESE:  Yes.  That was December 11th,
23  the last one I read out.
24       MR. GADDES:  Object to form.
25  BY MR. BRUZZESE:

113

1   Q    On Page 11 now though, on June 10, 2003:
2        "Less weight gain compared to
3        Zyprexa."
4        Do you recall being told that?
5   A    Yes.
6   Q    "Long term data with Seroquel with
7        weight" -- sorry, I'm reading that but
8        I don't know --
9   A    I don't know what it means.
10  Q    There is a notation up here about library
11  grant paperwork.  Do you know what that is referring to?
12  A    No.
13  Q    Did you ever receive an honorarium check for a
14  case study from AstraZeneca?
15  A    It's possible.
16  Q    We have some discovery responses from
17  AstraZeneca that indicate a check for $250 was paid to
18  you January 7, 2003, as a professional speaker
19  honoraria; do you recall such a thing?
20       MR. GADDES:  Object to form.
21       THE WITNESS:  It is possible.  They have us
22  doing a variety of things.  All of them do.
23  BY MR. BRUZZESE:
24  Q    Do you know what you would have been speaking
25  about?

29 (Pages 110 to 113)

**114**

1    A   Usually -- if I remember the best I can, it
2  was probably an article or a research article that we
3  were asked to read and interpret and discuss and usually
4  a case study involving the use of this medication.
5    Q   Talking about case studies, I have a number of
6  case studies. These are -- I'm not sure what they are
7  exactly. I'm inquiring to you about what they might be.
8  There is activity titles here and you see the venues
9  were at various restaurants around, and so these would
10 have been probably informal meetings at a restaurant; is
11 that something that you would, from time to time, do?
12   A   Yes.
13      MR. GADDES:  Object to form.
14 BY MR. BRUZZESE:
15   Q   And were these events that you would present
16 at or were you just a participant at them?
17   A   I couldn't tell you one way or the other, but
18 often we could do either one of those; not as a specific
19 speaker, but a group of us will present each of our case
20 studies. We will have an assignment ahead of time to
21 bring to the meeting.
22   Q   Is that something that you would be paid for,
23 for doing?
24   A   Sometimes; sometimes not.
25   Q   Do you recall receiving more than one check

**115**

1  ever from AstraZeneca for your presentation work?
2    A   I can't say that -- I mean, it says that I
3  have got one. Maybe one or two at the most. It's been
4  a long time. I can't remember all the -- anything
5  recent.

REDACTED

16 BY MR. BRUZZESE:
17   Q   It is your understanding that atypical
18 antipsychotics have a tendency to increase weight in
19 patients, correct?
20   A   Some of them do, yes.
21   Q   So would it be proper or correct for a
22 representative of the drug company to be telling you
23 that it has a lack of weight gain?
24      MR. GADDES:  Object to form and foundation.
25      THE WITNESS:  Across the board it would be,

**116**

but there is cases where people do lose weight on
these medicines, even Seroquel.
BY MR. BRUZZESE:

REDACTED

**117**

REDACTED

   Q   Was it ever your impression that there was no
weight gain associated in your patients using Seroquel?
   A   No, not my impression.
      THE REPORTER:  Not -- I'm sorry.
      THE WITNESS:  Okay. Ask it again so I can
make sure --
      MR. BRUZZESE:  "No, not my impression."
   Q   Was it ever your impression that there was no
weight gain associated with your patients taking
Seroquel?



118

1   A   No, not my impression.

REDACTED

120

BY MR. BRUZZESE:

Q   You talked about the fact that these representatives would come and talk to you about dosing. "Ease of dosing," is that your words?

A   Yes.

Q   What do you mean by "ease of dosing"?

A   Well, just the product starting medications with ease of titration up and simplicity of just milligrams and things like that.

Q   Talking about the starter packs that they offered?

A   Yeah, that they were easy to use.

Q   And the multiple-dose pills to make it easier to factor into specific milligrams?

A   Yes, uh-huh.

Q   Do you recall the representatives requesting you to push the doses on Seroquel with patients?

MR. GADDES:   Object to form.

THE WITNESS:   What do you mean by pushing them?

BY MR. BRUZZESE:

Q   To increase dosages?

MR. GADDES:   Object to form.

THE WITNESS:   Not specifically push doses. It's up to me to do that. I don't --

119

REDACTED

Q   So at this point you knew that Abilify was less offensive to weight gain in patients than Seroquel?

MR. GADDES:   Object to form.

THE WITNESS:   Yes.

BY MR. BRUZZESE:

Q   In fact, you knew about that earlier, didn't you?

A   Yeah.

MR. GADDES:   Object to form.

121

BY MR. BRUZZESE:

Q   Do you recall the representatives requesting that you increase dosages of Seroquel in patients?

MR. GADDES:   Object to form.

THE WITNESS:   I just remember them going over the dosing and what is prescribed on the label. If anything, I sometimes will push doses or move them up based on the response of the client.

BY MR. BRUZZESE:

Q   Let me show you a number of Call Notes, then, specifically talking about increasing dosages?

A   Okay.

Q   Beginning on January 9th, 2002. This says Robert Costin again. Do you recall -- do you remember him?

A   Yes.

Q   Says "increased dose to max." Am I reading that correctly?

A   Yes.

Q   On Page 9 this is just talking about reinforcing efficacy at higher doses that was something that was a recurrent theme with representatives; is that correct?

A   Yes. All medicines.

REDACTED

**122**

REDACTED

BY MR. BRUZZESE:

Q    According to what the AstraZeneca's recommending as a recommended dosage for treatment; is that what you mean?

A    I mean, as in what -- the package insert, the range of the doses that go -- don't be afraid to go to the doses that are approved.  Some people tend to stay at the 25 and 50 and not get much benefit.

Q    And that is a very low dosage compared to what they have actually recommended in the package inserts,

**123**

correct?

A    Yes.

Q    That is something you were dosing Ms. Livesay at, correct?

A    Right.  My choice.

Q    And this is -- because it's off-label, you were doing it as a reduced amount?

A    Correct.

REDACTED

**124**

REDACTED

Q    What is the pines versus dones theory?

A    Well, pines is the Seroquel, that's what it's under, the molecule.  And dones is Risperdal.  They are both antipsychotic. They're the ends of the type of medication, name of the medication. They refer to two different types of molecules that are used in treating the antipsychotics that we have here; Seroquel, Risperdal.

REDACTED

BY MR. BRUZZESE:

Q    Did the AstraZeneca sales representatives ever organize or sit in on nurse practitioner meetings?

A    I can't recall anything like that.

Q    I have a note that I don't --

**125**

A    When you say "meetings" can you clarify what you mean by "nurse practitioner meetings."

Q    You mentioned earlier -- you testified to weekly meetings with your supervising physician, Dr. Zenel, correct?

A    Yes.

Q    Were all of the nurse practitioners present at that meeting?

A    No, just he and I.

Q    This is a one-on-one supervising meeting?

A    Correct.

Q    And each nurse practitioner would have such a meeting with their supervising physician?

A    Correct.

Q    Did the nurse practitioners meet together as a group?

A    You mean as far as within the agency?

Q    Yes.

A    No.  I can't recall anything like we would get together.  The medical staff meeting was all of us together, but not just the nurse practitioners.

Q    Do you recall AstraZeneca ever setting up a nurse practitioners meeting to talk to you about Seroquel?

A    It's possible but I mean -- what do you mean?

126

1   Outside of the agency?
2   Q   Yes.
3   A   Yes, there would be something like that that's
4   been arranged, yeah.
5   Q   Earlier you testified, when I asked you if you
6   would rely upon the information that the sales
7   representatives would tell you as being true and
8   accurate, and you said that that is something that you
9   would rely upon, correct?
10   A   Yes.
11       MR. GADDES:  Object to form.
12   BY MR. BRUZZESE:
13   Q   But you see in here in the Call Notes that
14   there are many times where they are coming to you
15   talking about a lack of weight gain and pushing dosages
16   with you, correct?
17       MR. GADDES:  Object to form.
18       THE WITNESS:  That is what is written on
19   there, yes.
20       MR. ELLISON:  Foundation.
21   BY MR. BRUZZESE:
22   Q   That is not something you would recall from
23   these meetings?
24   A   I don't hear the word or think of the word
25   "pushing doses" and things like that.

127

1   Q   And they are a long time ago?
2   A   Yeah, it's a long time ago.  And the weight
3   issue has been a topic for all kinds of medications.  So
4   it's hard for me to decipher out exactly what from five
5   years ago, four years ago what they were saying, but the
6   emphasis was on weight gain more than weight loss.
7   Q   Bear with me.  I may be winding up.
8       Mr. Davis, I have, in discovery responses, two
9   instances in which you had, I guess, requested
10   information from AstraZeneca either through sale reps or
11   otherwise, about the use of Seroquel and you received
12   responses and I want to ask you about those now.
13       One of them, the question was you wanted the
14   information on using Seroquel for generalized anxiety
15   disorder and bipolar disorder, but specifically about
16   the generalized anxiety disorder.  Do you recall making
17   such a request?
18   A   It's possible.  I don't recall specifically,
19   but I'm sure it could have happened.
20   Q   Do you recall getting a response to anything
21   like that?
22   A   Again, I can't say that I remember the
23   document in my hand but, yeah, I vaguely remember them
24   responding and I think they would have.
25   Q   Do you recall ever requesting information

128

1   where it says "would like information regarding Seroquel
2   causing abdominal pressure, bloating, swelling or
3   obstruction in bowel"?
4   A   Yes.
5   Q   You do recall that?
6   A   Yes.  That is one more unusual.
7   Q   Is that in response to your treatment of a
8   particular patient that was having such --
9   A   Yes.
10   Q   Was that Debra Livesay?
11   A   I don't believe so.  I think it was somebody
12   else.
13   Q   And for co-counsel's purposes, do you know if
14   it was David Haller?
15   A   No, I don't believe so.  I believe it was a
16   female patient.
17   Q   And do you recall the response that you
18   received to that inquiry?
19   A   I believe that I did get a response, but I
20   don't think there was any final determination if that
21   did or not.
22       MR. BRUZZESE:  Mr. Davis, I appreciate your
23   time that is all I have right now.
24       MR. GADDES:  I love it when Jim does that
25   look.  It means he's at the end.

129

1   Q   I just have a couple of very quick follow up.
2       FURTHER EXAMINATION
3   BY MR. GADDES:
4   Q   Counsel went through do a number of Call Notes
5   with you.  Do you recall that a number of those were
6   from 2006?
7   A   Yes.
8   Q   And you weren't treating Ms. Livesay in 2006?
9   A   No, I was not.
10   Q   Do you remember he also showed you Call Notes
11   from July 2005, and you weren't treating Ms. Livesay in
12   July 2005?
13   A   That's correct.
14   Q   And do you remember he also showed you Call
15   Notes from 1999?
16   A   Yes.
17   Q   And you were not treating Ms. Livesay in 1999?
18   A   I believe I started in 1999, wasn't I?
19   Q   When did you start?
20   A   I don't know what the notes were but I started
21   in '99 -- July of '99.
22   Q   Counsel has asked you a number of questions
23   and, as you look back, you still stand by your
24   prescriptions for Ms. Livesay?
25   A   Yes, I do.

33 (Pages 126 to 129)

130

1    Q   You are still satisfied you did the right
2  thing?
3    A   Yes.
4    Q   You did a good job?
5    A   Yes.
6    Q   And that Seroquel helped her?
7    A   Yes.
8    Q   Would it surprise you, after all of those
9  questions about weight gain, if Ms. Livesay actually
10 lost weight during the time you were treating her?
11   A   It is not surprising to see weight loss.  It
12 could be for a variety of reasons.
13   Q   And just remind us again.  The first time you
14 treated Ms. Livesay was July 1999; is that correct?
15   A   Yes, it was.
16   Q   And the very last time you treated her was
17 2005?
18   A   Yes.
19       MR. GADDES:  And then I think I just want to
20 thank you very much for coming and answering the
21 questions today.  We appreciate the time you spent
22 with us, and Jim also knows what I have that look it
23 means I'm coming to the end; so hopefully we can get
24 you out of here early.  Appreciate it.
25       And I think we probably want to go off the

131

1  record for a few minutes.
2        THE VIDEOGRAPHER:  Going off the record at
3  11:38.
4        (Recess taken from 11:38 a.m. to 11:48 a.m.)
5        THE VIDEOGRAPHER:  This is Tape Number 3 of
6  the continued videotape deposition of Don Davis.
7  We're back on the record at 11:48.
8                EXAMINATION
9  BY MR. ELLISON:
10   Q   Good morning, Mr. Davis.  I introduced myself
11 to you at the beginning of the deposition.  My name is
12 Steve Ellison and I too represent AstraZeneca.  I'm
13 going to be asking you questions this morning about the
14 Haller case.
15       And so that the record is clear, as my
16 colleague mentioned, we have stipulated that the general
17 questions that my colleague asked about your general
18 knowledge and practice and such would apply in the
19 Haller case as well.  So let me put it to you:  If I
20 were to ask you the exact same questions that my
21 colleague did, subject to the objections plaintiff's
22 counsel did, would your answers be the same?
23   A   Yes.
24   Q   And if plaintiffs' counsel were to ask you the
25 exact same question that his colleague did, subject to

132

our objections, would your answers be the same?
   A   Yes.
   Q   You said you went to USF.  This case was filed
in Massachusetts.  What is USF?
   A   What is USF?
   Q   What does it stand for?
   A   University of South Florida.
   Q   You are not licensed to practice in
Massachusetts, correct?
   A   That's correct.
   Q   And you provided no care or treatment for
Ms. Livesay or David Haller in the Commonwealth of
Massachusetts, correct?
   A   Correct.
   Q   Did you talk to anyone about your deposition?
   A   Dr. James Zenel.
   Q   When did you have that discussion with him?
   A   When I first found out that I was being
deposed.
   Q   How long was that — ago was that?
   A   I'm going to say a month or two ago when you
all started requesting that we — it has not been beyond
probably that.
   Q   About I month or so ago?
   A   Yeah.

133

   Q   Was it just the one conversation?
   A   No.  I had more than one because he was
deposed but then he told me he was going to have to but
then he didn't have to but that was general just talking
about that.  But I didn't see him or talk to him about
that.
   Q   I'm confused.  To your knowledge, Dr. Zenel
has been deposed?
   A   He told me that he also had but then he didn't
have to go.  He told me that he was — he informed me
because he got the first notification that I was going
to be have to do this and then on in a consecutive
conversation sometime later on he said you'd have to go
too, but then he said he didn't have to go.
   Q   Did you discuss with him the patients
involved?
   A   I discussed with him the first one, Debra, but
not the second one.
   Q   The second one being David Haller?
   A   Yes.
   Q   Do you know who David Haller is?
   A   I can't remember him.
   Q   Do you have any memory of him at all, apart
from the medical records that you may have looked at in
connection for today?

134

1    A    That's correct. I don't remember him other
2    than just I believe one entry I made. I saw him one
3    time.
4    Q    And, in fact, you did review the charts for
5    both Debra Livesay and David Haller in preparation for
6    your deposition today; is that correct?
7    A    I reviewed David Haller very briefly, just a
8    quick scan to see when I saw him. I didn't look through
9    every page or anything like that.
10   Q    But as to Ms. Livesay, you did review the
11   chart?
12   A    I looked, yeah, a little more thoroughly. I
13   had it in my possession a lot longer.
14   Q    Was Dr. Zenel the only person you spoke with
15   about your deposition?
16   A    When you say "spoke with" I mentioned to the
17   Harbor that I was going to be deposed; I let them know
18   about that, but that is extent of it.
19   Q    Nothing about the substance?
20   A    No.
21   Q    Did you talk about the substance of your
22   deposition with Dr. Zenel?
23   A    Briefly.
24   Q    Tell me what you remember about that.
25   A    It was a very brief conversation. He said

135

1    that you are being deposed. This is the person. And I
2    just remember that she did fairly well when I treated
3    her. She seemed to be doing well, and I was surprised
4    that this was occurring, and then that was about the
5    extent of it.
6    Q    By "this occurring" you were surprised that
7    she filed a lawsuit, correct?
8    A    Correct.
9    Q    Complaining about the quality of her care?
10   A    Filing a lawsuit is all I knew. I don't know
11   the specifics to her complaint but I was surprised to
12   hear that.
13   Q    Apart from the charts that we just identified,
14   did you look at anything to prepare for your deposition?
15   A    No.
16   Q    And you did not speak with plaintiffs' counsel
17   or defense counsel, for that matter, prior to your
18   deposition today?
19   A    That's correct.
20   Q    You met all four of us for the very first time
21   this morning, am I right?
22   A    Correct.
23   Q    Now, you mentioned Dr. Zenel was the
24   supervisor in your care and treatment of Debra Livesay.
25   Was Dr. Zenel assigned to you generally for the time

136

that you were there?
A    I worked – while I worked there, he was there
the whole time as my medical director and supervisor and
protocol physician.
Q    Did you ever have a different physician, apart
from Dr. Zenel, whom you viewed as your supervisor?
A    I have had others but not at Directions.
Q    And I'm going to ask – the questions I'm
going to ask are about your time at Directions, okay?
A    No, I did not have anybody else.
Q    You said ACTS?
A    A-C-T-S, abbreviation.
Q    Thank you. And what does the abbreviation
stand for?
A    I can't tell you at this point. Alcohol
Community Treatment Services, I believe, something to
that – I should know but –
Q    I'm now going to show you what I have marked
as Exhibit 3. Should the issue ever arise in the future
as to the need for confidentiality, we'll refer to the
first two exhibits that were marked as Livesay-Davis
Exhibits, and the Exhibit 3 will be Haller-Davis.
(Haller-Davis Exhibit 3 was marked.)
BY MR. ELLISON:
Q    I'm handing to you records that you brought

137

with you today related to David Haller, correct?
A    Yes.
Q    And during the break I put two tabs at
specific pages. You can leave it there for now. Do you
see those tabs?
A    Yes, I do.
Q    Those are the records I want to ask you about
today. Okay. And I marked those for our convenience so
that we can expedite this process.
     You, yourself, do not have a file of records
related to David Haller; is that correct?
A    Correct.
Q    You did not bring records with you when you
left Directions and went to Harbor, correct?
A    Correct.
Q    You did not have any David Haller records at
Harbor or at your home or anywhere else, correct?
A    That's correct.
Q    The only records that you received related to
the care and treatment of David Haller were provided to
you by a firm named Brown & Greer; is that correct?
A    Correct.
Q    You have not received records from plaintiffs'
counsel, correct?
A    Correct.

35 (Pages 134 to 137)

138

1  Q   You have not received records from defense
2  counsel, correct?
3  A   Correct.
4  Q   You had never spoken to David Haller about
5  this litigation, correct?
6  A   That is correct.
7  Q   And, again, you don't even remember the guy,
8  correct?
9  A   Correct.
10  Q   Don't remember what he looked like?
11  A   Correct.
12  Q   Don't remember what his condition was, for
13  which he sought treatment as at Directions, correct?
14  A   Correct.
15  Q   You don't know how he's doing today, correct?
16  A   That is correct.
17  Q   Either in terms of his mental health or his
18  physical condition, correct?
19  A   Correct.
20  Q   Do you know someone named Dee Burke?
21  A   Yes.
22  Q   Who is Dee Burke?
23  A   She is a nurse practitioner like myself.
24  Q   Do you know where she is?
25  A   She is up north.  You know, one of the mid --

139

1  I forgot.  Either North Carolina or --
2  Q   Tennessee maybe?
3  A   Tennessee, yeah, somewhere else.  She
4  relocated up north.
5  Q   Do you keep in touch with her at all?
6  A   I saw her recently at a psychiatric congress
7  that was held, the last one that they had.
8  Q   Do you have her contact information?
9  A   I do have a phone number for her, yes.
10  Q   Do you happen to have that on you?
11  A   Actually, I do.  It is in my cell phone.
12  Q   Will you please check your cell phone and --
13  A   I've got to turn it on though.
14  Q   Thank you.
15  A   Be a minute here.
16      What would you like to know?
17  Q   Do you have her address?
18  A   No, I just have a phone number.
19  REDACTED
20
21  Q   Excellent.  Thank you.  You can save your
22  battery by turning it off, if you'd like.
23  A   Yeah.  I'll turn it off so it doesn't
24  interfere.
25  Q   Do you recall, during the first portion of

140

your deposition, my colleague, Mr. Gaddes, asked you a
number of questions related to the generation and
maintenance of medical and psychiatric records?
A   Ask that one more time.  That was a long
question there.
Q   Do you remember him asking you about how you
made records and what you did with them when you were
done making them?
A   You mean as in the progress notes and all of
that.
Q   Sure?
A   Yes.
Q   Ordinary course of business, used that phrase?
A   Yes.
Q   If I were to ask you all of those same
questions, would your answers all be the same as to
David Haller too?
A   Yes, it would.
Q   You don't recall ever hearing from other
colleagues, such as Dee Burke or Nicole Keene -- strike
that.
    Nicole Keene took over after you, am I
correct?
A   I think so.  I can't -- I know that she had
care -- took care of this patient.  I can't tell if she

141

was the next person in line or not, because I don't have
the record and I wasn't there.
Q   And you haven't met whoever took over the care
of David Haller after --
A   No, I don't remember.
Q   -- after you left Directions, correct?
A   Correct.
Q   Do you ever recall Dee Burke complaining about
a patient named David Haller, in terms of being abusive?
A   I can't say -- I cannot recall a specific
name.  I think I do -- I have some vague thoughts of her
having some difficult patients that she's brought to our
attention, but I can't be more specific than that.
Q   Fair enough.  First question I want to ask you
is about a record which is tabbed -- for the record, it
is Bates Numbered D. Haller Directions for Mental
Health, updated meds 1-2 and it's dated March 5th, 2008.
I believe it is the second record or the second tab.
A   The date -- can you tell me the date again,
please.
Q   March 5th, 2008.
A   This is Tab 329.
    MR. BARRINGER:  It's the first tab.
    THE WITNESS:  Well, he said the second.
    MR. ELLISON:  I did.

142

1    THE WITNESS: All right. March 5th, '08? Is
2  that what you're referring to?
3  BY MR. ELLISON:
4    Q    Yes, sir. Do you see that?
5    A    I do have that in front of me right now.
6    Q    There's a signature at the bottom.  Do you see
7  that?
8    A    Yes.
9    Q    Do you recognize that signature?
10    A    No, I do not.
11    Q    That is not your signature?
12    A    That's correct.
13    Q    Let's move on to the first tab up from the
14  bottom.
15    A    That, I recognize.
16    Q    Date on this record is March 29th, 2005; am I
17  correct?
18    A    Yes.
19    Q    And this is a progress note, correct?
20    A    Yes.
21    Q    There is a signature at the bottom; am I
22  right?
23    A    Yes.
24    Q    Is that your signature?
25    A    Yes, it is.

143

1    Q    And this purports to record a — what occurred
2  at an office visit with David Haller, correct?
3    A    Yes.
4    Q    Is it your practice to dictate progress notes?
5    A    No, it is not.  These were typed and printed.
6    Q    You typed them your own self?
7    A    Yeah.  We had a software program and a
8  computer that just typed them all up and then they
9  printed them for us.  This is not dictated.
10    Q    Fair enough.  Did you do that usually around
11  the time that you cared for a patient?
12    A    Yes. We do the same -- right after.
13    Q    Right after?
14    A    Yeah.  Right after we see them, we type them
15  and print them.
16    Q    So this record, as well as the other records
17  we've talked about today, both for Haller as well as
18  Livesay were prepared right around the time or right
19  after the visits, correct?
20    A    Correct.  The initial psyche eval, though,
21  that is being dictated.  That was -- the one that's from
22  July of '99, that is dictated by a service.  But we
23  later on had access to a computer and we could just type
24  in our notes and print them.
25    Q    And the initial psychiatric visit you are

144

referring to related to Ms. Livesay?
  A    Correct.
  Q    I would like to ask you about this note.
David Haller was not a patient assigned to you, is that
correct?
  A    Correct.
  Q    There is a period, prior to March of 2005, for
which we -- for whatever reason -- have a gap in the
Directions records.  And I ask that you accept that.  My
colleague and I are of the same view.  My colleague
being Mr. Barringer across the table.
       You have no memory of ever seeing David Haller
prior to March of 2005, correct?
  A    That is correct.
  Q    Do you remember seeing Mr. Haller in March
of 2005?
  A    I don't remember seeing him.
  Q    Well, we'll go through this record and see if
it refreshes your recollection.  If I heard you right,
you did look at this record prior to your deposition; is
that right?
  A    Yes, I did look at it.
  Q    Didn't refresh your memory at all?
  A    No.  No.
  Q    Okay.  Do you know -- what were the

145

circumstances under which Mr. Haller came to see you
this day, if you can tell me?
  A    I can't tell you the specifics, no.  I would
not be able to.  Other than the speaking generalities
that I was available and whoever he saw wasn't.
  Q    For whatever reason?
  A    For whatever reason.
  Q    Vacation or something like that?
  A    Anything like that.
  Q    Would it have been your custom and practice to
take a look at Mr. Haller's chart prior to treating him?
  A    Yes.
  Q    Do you have reason to think you didn't do that
in connection with this March 29th, 2005, visit?
  A    No.
  Q    Let's go through it.  It says:
       "This is a 43-year-old male being
       seen at Directions since" -- and no
       date, correct?
  A    Right.
  Q    And you have no idea when Mr. Haller first
started treating at Directions, correct?
  A    The only -- at this -- only way I could
determine is by looking at the chart and it just was not
typed in.

37 (Pages 142 to 145)

146

1  Q   Fair enough.
2      The diagnosis is identified as bipolar
3  disorder, correct?
4  A   Yes.
5  Q   Type I, right?
6  A   Correct.
7  Q   That is a very serious mental illness,
8  correct?
9  A   It can be.
10     MR. BARRINGER:  Objection; form.
11 BY MR. ELLISON:
12 Q   Well, you tell me.  Is it a serious mental
13 illness?
14 A   It is a significant serious mental illness.
15 Whether or not it presents that way depends on the
16 patient at the time.
17 Q   And, in this regard, you don't know, as you
18 sit here today, what Mr. Haller's mental history and
19 physical history had been, correct?
20 A   That's correct.
21 Q   In order to answer questions about that, you
22 would have to go back and look at the chart, correct?
23 A   Correct.
24 Q   And you would essentially read what someone
25 else has written in there; is that right?

147

1  A   That is correct.
2  Q   And, also, same question as to his
3  medications.  You don't know what he was on previously,
4  correct?
5  A   Correct.
6  Q   You would look at the medical records,
7  correct?
8  A   Yes.
9  Q   And you would only be able to read what was
10 listed there, correct?
11 A   Correct.
12 Q   It was your custom and practice to rely on
13 medical records in connection with the care and
14 treatment of your patients, am I right?
15 A   Correct.
16 Q   And as you sit here, you don't have any reason
17 to doubt the veracity of either Mr. Haller's chart or
18 Ms. Livesay's chart, correct?
19 A   That's correct.
20 Q   It says he had been seeing Dr. Jeeter
21 (phonetic).  Did I read that right?
22 A   Correct.
23 Q   Do you know who that is?
24 A   A psychiatrist that was employed by
25 Directions.

148

1  Q   Do you know is Dr. Jeeter's first name?
2  A   I'm drawing a blank right now.  He wasn't
3  there that long.
4  Q   Do you know where he is?
5  A   No.
6  Q   Further, it says he is on Eskalith CR
7  450 milligrams q.a.m..  What does q.a.m. stand?
8  A   Q morning, am, every morning.
9  Q   What is Eskalith?
10 A   It's a lithium time released product.
11 Q   One form of lithium, correct?
12 A   Yes.
13 Q   And lithium is the first line -- one of the
14 first line therapies for treatment of bipolar Type I,
15 correct?
16 A   Correct.
17 Q   But that's not the only form of lithium he was
18 on at the time you saw him, correct?
19 A   Correct.
20 Q   He was also using Lithium Carbonate
21 600 milligrams at bedtime, correct?
22 A   Correct.
23 Q   So we have two different forms of lithium, am
24 I right?
25 A   Yes.

149

1  Q   He is also using Depakote, am I correct?
2  A   Yes.
3  Q   That is antiepileptic, am I right?
4  A   Yes.
5  Q   It's also used in the care and treatment of
6  bipolar disorder, correct?
7  A   Correct.
8  Q   500 milligrams twice a day, am I right?
9  A   Correct.
10 Q   And then further, Seroquel, 400 milligrams at
11 bedtime, am I correct?
12 A   Yes.
13 Q   So he was on four different medications --
14 strike that.
15     Did he tell you this information when you saw
16 him?
17 A   I can't recall if he specifically told me, but
18 I do ask him to tell me the names of medications.  I
19 also refer to the chart.
20 Q   Okay.  It is your custom and practice, when
21 you see a patient, particularly one you are not
22 regularly following to ask them what they are on, am I
23 right?
24 A   Yes.
25 Q   It is also your custom and practice to ask the

38 (Pages 146 to 149)

150

1  patient how they feel they are doing on the medications
2  that they are on, am I correct?
3      A   Yes.
4      Q   You have no reason to doubt that you did that
5  for Mr. Haller, correct?
6      A   Yes.
7      Q   That is correct?
8      A   Yes, I did that for him.
9      Q   But if I heard you right, you are not sure
10  whether the medication information came from Mr. Haller
11  or his chart, but it would have been one of the two, am
12  I correct?
13      A   Likely both.
14      Q   Okay. He reports that the combination of
15  medications are helping. Did I read that correctly?
16      A   Yes.
17      Q   And you wrote that because that is what he
18  told you, am I correct?
19      A   Yes.
20      Q   Further, it says he reports no severe mood
21  swings nor psychotic symptoms, no suicidal or violent
22  thoughts. Did I read that correctly?
23      A   Yes, you did.
24      Q   And you wrote that because that is what he
25  told you; am I correct?

151

1      A   Yes.
2      Q   Do you know whether he had severe mood swings
3  in the past?
4      A   Only way to know is to look at the chart or
5  ask him but I can't tell from my note.
6      Q   Do you know whether he had psychotic symptoms
7  in the past?
8      A   I can't tell from other than what was written
9  here.
10      Q   Okay. You don't know, as you sit here?
11      A   Yeah, I don't know.
12      Q   You don't know whether he had suicidal
13  thoughts in the past?
14      A   Thing is I don't know unless I ask him and
15  then I report that on the chart at that time. Can I say
16  at this point right now? Either I'd have to refer to
17  the chart or ask him and then it would have to be
18  written right here for me to answer that question.
19      Q   Fair enough because you only saw him once,
20  right?
21      A   Correct.
22      Q   Further it says:
23          "Denies side effects from the
24          meds."
25          Did I read that correctly.

152

1      A   Yes.
2      Q   And you wrote that because that's what he told
3  you, am I right?
4      A   Correct.
5      Q   "Mental Status: Dressed appropriately,
6          pleasant and interactive, mood neutral,
7          affect neutral, thoughts clear,
8          relevant and organized. No evidence of
9          suicidal or violent ideations or
10          intentions assessed or voiced."
11          Did I read that correctly?
12      A   Yes, you did.
13      Q   And you wrote that because that was your
14  observation of him at the time, am I correct?
15      A   Yes.
16      Q   "No signs or symptoms of psychosis."
17          Did I read that correctly?
18      A   Yes.
19      Q   "No outward signs of anxiety assessed."
20          Did I read that correctly?
21      A   Yes.
22      Q   And you wrote that because that was your
23  observation and conclusion at the time, am I correct?
24      A   Correct.
25      Q   "Social judgement is intact, vocabulary

153

1  and fund of knowledge indicate
2  cognitive functioning in the normal
3  range. Insight into illness is
4  normal."
5          Did I read that correctly?
6      A   Yes.
7      Q   And you wrote that because that was your
8  observation of him at the time, am I correct?
9      A   Correct.
10      Q   He is doing pretty good, correct?
11          MR. BARRINGER: Objection; form.
12          THE WITNESS: Yes.
13  BY MR. ELLISON:
14      Q   How would you characterize how he was doing?
15      A   Stable.
16      Q   Do you know whether he was unstable before?
17      A   Only way to tell would be to read the chart
18  and if I wrote it in here I could tell you today.
19      Q   Was it your assessment that his medications
20  were working?
21      A   Yes.
22      Q   Further down under "Instructions,
23  Recommendations and Plan" you are keeping him on the
24  exact same medications he was on; is that correct?
25      A   Correct.

154

1    Q    And the reason you did that is because you
2    thought those medications were working for him, am I
3    correct?
4    A    Correct.
5    Q    Further it says to "get valproic acid and
6    lithium levels." Did I read that correctly?
7    A    Yes, you did.
8    Q    So did you — strike that.
9         Do you remember what that means? Were you
10   telling him to get labs or was that something you were
11   writing for yourself or the person who regularly saw
12   him?
13   A    I would be writing that for him to go get
14   those labs done before his next visit.
15   Q    Why is it important to get lithium levels?
16   A    Because lithium levels can become toxic and
17   that is dangerous; so the only way to tell is by labs,
18   which is the most definitive way; and then by any kind
19   of side effects or things that he might be experiencing.
20   But it's typically done for that because very narrow
21   therapeutic index with that drug.
22   Q    And that means that there is a particular
23   range in which lithium works; am I correct?
24   A    Correct.
25   Q    And if you get too high out of that range,

155

1    lithium will kill you, am I correct?
2    A    Yes, it can.
3    Q    And that is something you tell patients,
4    correct?
5    A    Yes.
6    Q    Custom and practice to do that, right?
7    A    Yes.
8    Q    No reason to think you didn't do that with
9    Mr. Haller, am I correct?
10   A    That's correct.
11   Q    And, in fact, you have every reason to think
12   you did because you told him to go get his lithium
13   checked, am I correct?
14   A    Correct.
15   Q    Further, it says:
16        "The risks and benefits of the
17        recommended treatment were discussed
18        with the patient who understood and
19        accepted the recommendation."
20        Did I read that correctly?
21   A    Yes.
22   Q    And this is on March 29th, 2005, am I right?
23   A    Yes.
24   Q    One of the medications that you talked with
25   him about was the Seroquel he was on; am I correct?

156

1    A    Correct.
2    Q    And as of March 2005, as you testified
3    earlier, you were aware of a risk of weight gain,
4    hyperglycemia or diabetes in connection with all
5    atypical antipsychotics including Seroquel?
6         MR. BARRINGER:  Objection; form.
7         THE WITNESS:  Yes.
8    BY MR. ELLISON:
9    Q    Correct?
10        MR. BARRINGER:  Objection; form.
11        THE WITNESS:  Yes.
12   BY MR. ELLISON:
13   Q    And that is a risk you would have discussed
14   with Mr. Haller, am I correct?
15        MR. BARRINGER:  Objection; form.
16        THE WITNESS:  Correct.
17   BY MR. ELLISON:
18   Q    Do you have reason to think wouldn't have?
19   A    No.
20   Q    If Mr. Haller had told you he had diabetes,
21   would you have recorded it?
22   A    Yes.
23   Q    Why?
24   A    Because that's a relevant medical condition
25   and has a lot of ramifications for his health, including

157

1    choices of meds I might give for him or any interactions
2    with the meds he might be providing.
3         MR. ELLISON:  My colleague rightly reminds me
4    that because of the discussion related to Call
5    Notes, we are going to designate the entire
6    transcript as "confidential."
7         Do you all understand that?
8         MR. BARRINGER:  Yes.
9         MR. ELLISON:  Fair enough.
10        Mr. Davis, I'm finished. I'll turn you over to
11   my colleague at this point, if he has any questions.
12                    EXAMINATION
13   BY MR. BARRINGER:
14   Q    Mr. Davis, I do have a few questions.
15        The time period in question regarding the
16   records, I believe, is between March 13th of 2003 and
17   January 7th of 2005. Were you employed by Directions
18   for Mental Health during that time period?
19   A    Okay. The dates again, just one more time.
20   Q    The dates were March 13th, 2003 through
21   January 7th of 2005.
22   A    Yes, I was.
23   Q    And sitting here today, you don't have any
24   specific recollection of ever seeing Mr. Haller during
25   that time period; is that correct?

**158**

1  A   That's correct.
2  Q   If -- if one were to look at the billing
3  records, it appears as though some treatment at
4  Directions for Mental Health occurred.  You can't
5  testify, sitting here today, about those visits if you
6  were actually seeing the patient during that time
7  period, correct, today?
8  A   Ask that question again.
9  Q   I'll strike that last question.
10     The billing records indicate that there was
11  some sort of treatment going on for Mr. Haller during
12  that time period of March 2003 to January of 2005.
13     Without those records, you would not be able
14  to testify as to -- if, indeed, you treated him during
15  that time period, you would not be able to testify about
16  his treatment today; is that correct?
17  A   That is correct.
18  Q   Sitting here today, do you specifically, on
19  March 29th, 2005, remember discussing with Mr. Haller
20  about the side effects of diabetes?
21  A   I couldn't comment on that today.  I don't
22  remember.
23  Q   You don't remember; is that correct?
24  A   You are asking me if I remember specifically
25  what I said; no, I do not.  I would have to go by my

**159**

1  note.
2  Q   And sitting here today, do you specifically
3  remember talking about hyperglycemia being associated
4  with Seroquel back on March 29th, 2005?
5  A   No, I do not.
6  Q   Sitting here today, do you have a specific
7  recollection of discussing weight gain with Mr. Haller
8  back on March 29th of 2005?
9  A   No.
10  Q   Now, there was some mention of complaints of
11  quality of care by Ms. Livesay and Mr. Haller that I
12  believe were suggested by opposing counsel.  Have you
13  been sued in this action?
14  A   No.
15  Q   Do you know if Directions for Mental Health
16  have been sued in this action?
17  A   I have no knowledge of that.
18  Q   Have you read the legal complaint with respect
19  to Ms. Livesay's or Mr. Haller's actions that they filed
20  in this case?
21  A   No.
22  Q   Do you know what they are complaining about in
23  their cases?
24  A   No, not specifically.
25     MR. BARRINGER:  Okay.  I have no further

**160**

questions.  I pass the witness.
   MR. ELLISON:  I just have one housekeeping
matter.  I believe I neglected to identify the
record March 29th, 2005, by Bates number.  It is D.
Haller Directions for Mental Health 00052.
   MR. GADDES:  Unfortunately, you had to put
your glasses on to do that.
   MR. ELLISON:  I had to put my reading glasses
back on to do that.
   Mr. Davis, pursuant to Federal Rule of Civil
Procedure, 30(e), you have the right to review the
transcript and make whatever changes that you have
within 30 days of receipt thereof or you can waive
that right and trust our court reporter to have
transcribed everything that occurred today here
accurately.
   I just need a statement from you on the record
one way or the other.
   THE WITNESS:  Okay.  I'll waive it today.
   MR. ELLISON:  Thank you.  We're finished.
   THE VIDEOGRAPHER:  Going off the record at
12:16.
   (At 12:16 p.m., no further questions were
propounded to the witness.)

**161**

CERTIFICATE OF REPORTER

STATE OF FLORIDA      )
COUNTY OF HILLSBOROUGH )

   I, Michelle Olsen Baden, RPR, certify that I was
authorized to and did stenographically report the
deposition; that a review of the transcript was not
requested; and that the foregoing pages are a true and
complete record of my stenographic notes taken during
said deposition.

   I further certify that I am not a relative,
employee, attorney, or counsel of any of the parties,
nor am I a relative or employee of any of the parties'
attorneys or counsel connected with the action, nor am I
financially interested in the action.

   Dated this 31st day of July, 2008.


   Michelle Olsen Baden
   Registered Professional Reporter
   Florida Professional Reporter

162

1          CERTIFICATE OF OATH
2    STATE OF FLORIDA   )
    COUNTY OF HILLSBOROUGH)
3
4
5        I, the undersigned authority, certify that
6    the witness in this matter personally appeared before me
7    and was duly sworn on the 19th day of July, 2008.
8
9        WITNESS my hand and official seal this 31st of
10   July, 2008.
11
12
13
14

15   _____
    Michelle Olsen Baden, RPR, FPR
    Notary Public
16   State of Florida at Large
    My Commission Number:  DD537984
17   Expires:  6/20/2010
18
19
20
21
22
23
24
25