# EXHIBIT 10

JOB NO. 99406

UNITED STATES DISTRICT COURT
MIDDLE DISTRICT OF FLORIDA
ORLANDO DIVISION

IN RE:  Seroquel Products Liability Litigation
MDL DOCKET NO. 1769

This Document Relates to:

David Haller v. AstraZeneca, LP, et al.     Case No. 6:07-cv-15733
Eileen McAlexander v. AstraZeneca LP, et al. Case No. 6:07-cv-10360
Richard Unger v.  AstraZeneca LP, et al.    Case No. 6:07-cv-15812
Linda Whittington v. AstraZeneca LP, et al. Case No. 6:07-cv-10475




ORAL DEPOSITION OF
BRIAN R. TULLOCH, M.D., FRCP, FACP
OCTOBER 8, 2008
VOLUME 2




    ORAL DEPOSITION OF BRIAN R. TULLOCH, M.D., FRCP, FACP,

produced as a witness at the instance of the Defendant and

duly sworn, was taken in the above styled and numbered cause

on Wednesday, October 8, 2008, from 4:05 p.m. to 8:24 p.m.,

before RENE WHITE MOAREFI, CSR, CRR, RPR in and for the State

of Texas, reported by machine shorthand, at Laminack, Pirtle &

Martines, 5020 Montrose Blvd., 9th Floor, Houston, Texas,

pursuant to the Federal Rules of Civil Procedure and the

provisions stated on the record herein.

**156**

APPEARANCES

FOR THE PLAINTIFF:
  TOM PIRTLE, ESQ.
  RUSS BRUDNER, ESQ.
  LAMINACK, PIRTLE & MARTINES
  5020 Montrose Blvd., 9th Floor
  Houston, Texas  77006-6533
  713.292.2750

FOR THE DEFENDANTS:
  JANE THORPE, ESQ.
  BRENDAN KRASINSKI, ESQ.
  ALSTON & BIRD, L.L.P.
  1201 West Peachtree Street
  Atlanta, Georgia  30309-3424
  (404) 881-7000

**157**

INDEX

PAGE

APPEARANCES.......................... 156

BRIAN TULLOCH, M.D., FRCP, FACP

CONTINUED EXAMINATION
  By Ms. Thorpe......................... 158
CORRECTION PAGE..................... 309
SIGNATURE PAGE...................... 310
REPORTER'S CERTIFICATION........... 311

EXHIBITS

| NO. | DESCRIPTION | PAGE |
|---|---|---|
| 17 | Laboratory Report dated 11-20-96 | 172 |
| 18 | Whittington Weight/BMI Chart | 184 |
| 19 | Whittington time line | 187 |
| 20 | Medical record dated 3-24-08 | 190 195 |
| 21 | Expert Report of Brian Tulloch, M.D. re Richard Unger | 224 |
| 22 | Unger time line | 224 |
| 23 | Article titled "Quetiapine Overdose and Severe Rhabdomyolysis" | 235 |
| 24 | Article titled "Quetiapine: Pancreatitis and thrombocytopenia" | 235 |
| 25 | Records authorization | 248 |
| 26 | Letter dated 5-9-08 | 249 |
| 27 | Medical notes from Dr. Cabeda-Rovirosa | 285 |
| 28 | Progress Note dated 10-2-06 | 287 |
| 29 | Progress Note dated 1-6-04 | 290 |
| 30 | Progress Note dated 1-5-05 | 290 |

**158**

(Please refer to Volume 1 of the deposition of Brian R. Tulloch, M.D., FRCP, FACP for the agreements of counsel.)

BRIAN R. TULLOCH, M.D., FRCP, FACP, having been duly sworn, testified as follows:

CONTINUED EXAMINATION

BY MS. THORPE:

Q. Dr. Tulloch, we're going to continue your deposition. And lessons learned from the last deposition are that we need to not talk over each other. So if you'll let me complete my question before you respond, we'll get along better. Okay?

A. I promise to do that --

Q. All right.

A. -- every time I remember it.

Q. Okay. And then secondly, if you will try to answer -- listen very carefully to the question I'm asking you and answer that question. Okay? Is that all right with you?

A. I will do that.

Q. Okay. Now, I want to talk further about Ms. Whittington.

A. Okay.

Q. We agreed the last time we were together that Ms. Whittington never met the American Diabetes

**159**

Association's criteria for the diagnosis of diabetes, correct?

A. We never found a repeat number on any of the criteria, yes, ma'am. We found single numbers that would fulfill that. And certainly in clinical practice I doubt I have any other patients in whom I get a second reading if it is apparent that they will need treatment and in circumstances similar to this lady.

Q. Dr. Tulloch, I need a yes or no answer. Do you agree — let me ask my question.

A. Yes.

Q. Do you agree that Mrs. Whittington never met the American Diabetes Association's criteria for the diagnosis of diabetes?

A. I also -- well, the answer's yes to that statement because we had agreed earlier that the criteria includes two independent numbers.

Q. Okay.

A. But I've also said that as a clinician if somebody comes to me with one of the criteria that would -- would tell me -- and I go back to the analogy of 25 to 105 time of onset of type 2 diabetes in somebody who's likely to get that -- I don't wait for a second before I start treating them.

Q. Okay.

160

1     A. So it would not change --
2     Q. So you agree --
3     A. Let me finish because I was going to finish
4 that one.
5     So it would not change the way I treated
6 that patient were she my patient.
7     Q. But you agree that Mrs. Whittington never met
8 the American Diabetes Association's criteria for the
9 diagnosis of diabetes in that she did not have
10 confirmation of a positive lab test for diabetes,
11 correct?
12     A. Yes, ma'am.
13     Q. Now, tell me the tests -- well, strike that.
14     Let me ask you this: Is it your opinion
15 that Mrs. Whittington has diabetes?
16     A. Yes, ma'am.
17     Q. All right.
18     A. And I -- as I've explained --
19     Q. Okay. There's no question.
20     A. -- in the context of how one treats these
21 patients, one doesn't split hairs unless there is a
22 medical/legal or insurance related issue that would
23 require it.
24     Q. Dr. Tulloch, I want you to point me to the
25 tests you rely on for the diagnosis of diabetes in

161

1 Ms. Whittington.
2     A. A fasting sugar in excess of 126.
3     Q. All right. I want you to show me the test.
4 I'm going to show you what's been marked as Exhibit 11
5 and ask you if that is the test you're relying on for
6 your diagnosis of Ms. Whittington.
7     A. No, ma'am. Exhibit 11 is dated 1993 and --
8     Q. I'm sorry. That's the wrong one.
9     A. -- and it's a fasting sugar of 123.
10     Q. All right.
11     A. So that does not fulfill the criteria.
12     Q. Okay. I'm sorry. That's fine. I pulled out
13 the wrong -- here it is. Excuse me.
14     Let me show you what's been marked as
15 Exhibit 10 and ask you if that's the test that you rely
16 on for your diagnosis of Ms. Whittington with diabetes.
17     A. Yes, ma'am, this is a fasting sugar in excess
18 of 126. She has a single one -- zero to two-hour sugar
19 greater than 200. She misses the third component of the
20 criteria, which is a two-hour sugar, does not make 200.
21     As I explained a moment ago, in somebody
22 with this clinical picture, I would initiate the
23 appropriate treatment for diabetes in this case were she
24 my patient, so --
25     Q. Is -- is Exhibit 11 the only test that you rely

162

1 on -- excuse me. What's the number?
2     A. Ten.
3     Q. Is Exhibit 10 the only test you rely on for
4 your diagnosis of Ms. Whittington with diabetes?
5     A. In this context, yes, ma'am. It's the only
6 data I have. But as we agreed in an earlier discussion,
7 the psychiatric charts are not loaded with blood sugars.
8     Q. So Exhibit 10 is the only test you rely upon
9 for your diagnosis of Ms. Whittington's diabetes?
10     A. The only data I have available to me, yes,
11 ma'am.
12     Q. Now, the oral glucose tolerance test that you
13 referred to in your prior answer that has a one-hour
14 glucose of 261 --
15     A. Yes, ma'am.
16     Q. -- also contains a two-hour glucose, correct?
17     A. Yes, ma'am.
18     Q. And it is the two-hour glucose that doctors
19 look to to establish whether or not someone has
20 diabetes, correct?
21     A. No, ma'am. What you heard me say was we put
22 greatest load on the fasting sugar. And when we
23 discussed all that sometime ago, a -- glucose tolerance
24 tests are not as frequently done now as they were in the
25 past. But if the patient does progress to a two-hour

163

1 glucose tolerance test, we look at both the fasting
2 sugar and the two-hour sugar. And one of the criteria
3 in days gone by was also that one other number between
4 zero and two hours was required to be in excess of 200.
5     Q. Okay. Dr. Tulloch, Exhibit 10 has a fasting
6 glucose on it of 131, correct?
7     A. Yes, ma'am.
8     Q. And as we've discussed, that is the only result
9 you rely on to establish a diagnosis of diabetes in
10 Mrs. Whittington, correct?
11     A. That's correct.
12     Q. Also on Exhibit 10 are the results of an oral
13 glucose tolerance test, correct?
14     A. Yes, ma'am.
15     Q. And that oral glucose tolerance test as
16 reflected in Exhibit 10 reports a number for three
17 different hours of the test, correct?
18     A. To agree let me just check. That's correct, we
19 looked at 1, 2, and 3, yes, ma'am.
20     Q. All right. The American Diabetes Association
21 criteria base their analyses of oral glucose tolerance
22 tests on the second hour of the glucose tolerance test,
23 correct?
24     A. Yes, ma'am, we've agreed on that.
25     Q. All right. And the result on Exhibit 10 for

164

1 the second hour of the oral glucose tolerance test is
2 181, correct?
3    A. Yes, ma'am.
4    Q. That result of 181 is not indicative of -- or
5 does not demonstrate that Ms. Whittington had diabetes,
6 that test alone?
7    A. That's correct.
8    Q. In fact, what it shows is that she has -- she's
9 in the range of impaired glucose tolerance at 181,
10 correct?
11    A. Yes, we agreed on that before --
12    Q. All right.
13    A. -- yes, ma'am.
14    Q. And the -- so in toto, in Exhibit 10 you have
15 an -- a fasting glucose that you're relying on in and of
16 itself by itself of 131 for your diagnosis of her
17 diabetes --
18    A. Yes, ma'am.
19    Q. -- correct?
20      And the oral glucose tolerance with its 181
21 at the second hour indicates impaired glucose tolerance,
22 not diabetes --
23    A. That's correct.
24    Q. -- correct?  All right.
25      Now, it's your testimony, I take it, that

165

1 in your practice as a clinician, you do not require
2 confirmation of a -- when you get a positive fasting
3 glucose test over 126?
4    A. If -- unless there -- as I explained a moment
5 ago, unless there's a medical/legal or insurance
6 required criterion which is necessary, it would not
7 alter my treatment of that lady.  And my belief is this
8 physician probably had the same idea in mind because I
9 note that she was immediately treated with Metformin,
10 which is -- the trade name for which is Glucophage.  So
11 I think this -- this doctor thinks the way I do, lady's
12 got this sort of risk factors -- and we talked about
13 that -- family history, weight gain, psychosis, et
14 cetera, we've now got a fasting of 131; this lady
15 doesn't fully fulfill the criteria for diabetes but she
16 needs to be treated.
17    Q. Okay.  So what you're saying is that because
18 she had one test -- fasting glucose test over 126, it
19 was fine clinically to go ahead and start her treatment
20 even though it was -- she did not have a diagnosis of
21 diabetes that met the ADA standard?
22    A. Yes, ma'am, I think it's good medicine to be
23 proactive in a setting like that, particularly as we
24 mentioned earlier because of all of her other risk
25 factors, and we enumerated them earlier on, I won't

166

1 bring them back again.
2    Q. And so in your clinical practice when somebody
3 has one fasting glucose, you go ahead and start treating
4 them with diabetes medications?
5    A. Yes, ma'am.  I -- well, usually I -- I -- I
6 give them whatever I consider appropriate for that
7 patient.
8    Q. But my question for you is:  Is it your general
9 practice in your clinic that when somebody has a fasting
10 glucose over 126 one time that you go ahead and start
11 diabetes medications before you get a confirmatory test?
12    A. I think it's a reasonable proactive clinical
13 approach.
14    Q. I want to know what you do.
15    A. Oh, and it is what I -- I've said twice already
16 that that's what I do, and now I'm defending it.  And
17 let me go a step further because I said earlier on we
18 are dependent on the most recent of data.  Within the
19 last six months, there has been a conference on impaired
20 glucose tolerance.  And the American Society of
21 Endocrinologists, of which I am one, have looked at data
22 which showed that by the time the patients reach the
23 impaired glucose tolerance step, they probably already
24 lost 70 to 80 percent of their insulin reserves.  So
25 proactive therapy for people in this group will probably

167

1 be forthcoming within the next few years.
2      But I'm standing here saying my proactive
3 approach would be to treat a single sugar in excess of
4 126, and I'm also defending it with new data which is
5 coming out all the time.
6    Q. All right.  Now, you agree that the American
7 Diabetes Association criteria that require a
8 confirmation reflect the general consensus of the
9 scientific community?
10    A. Yes, ma'am.  And I'm a member of the American
11 Diabetes Association.  I have given it plenty of time in
12 the past.  And I think that's a reasonable requirement
13 in the setting that we discussed.
14    Q. The confirmation is a reasonable requirement?
15    A. Confirmation is always sensible.  You never
16 know it's fasting.  There are certain conditions where
17 even fasting sugars can be elevated.  But in a special
18 case like this one with all of the risk factors which
19 we've enumerated, positive family history,
20 hyperlipidemia, psychosis, hypertension, et cetera, I
21 would not fault a physician for making the decision that
22 this lady's doctor did, which was to give her Metformin.
23    Q. And I'm not asking you to assess fault one way
24 or the other.  That wasn't the question, sir.  So let
25 me -- let me come back to my original --

168

1    A. Yes, ma'am.
2    Q. — question. And I'd ask you to answer my
3    question because I'm not asking you to assess whether
4    the doctor treated her in accordance with the standard
5    of care —
6    A. Okay.
7    Q. — okay? That's not my interest.
8        You would agree that you cannot say to a
9    reasonable degree of medical probability that she
10   actually had diabetes based on one fasting glucose test
11   that has not been confirmed?
12   A. No, ma'am, I'm -- I'm afraid I can't agree to
13   that. I have accepted that this lady had an increased
14   fasting sugar and a two-hour sugar that did not make
15   200. I have pointed out that she had many risk factors
16   that would make her at severe risk for the development
17   of type 2 diabetes. And my belief is that this lady had
18   an abnormal fasting sugar at this time, and a second one
19   that might have been done a week -- ten days, two weeks
20   later would have probably also been in excess of 126.
21   Q. So —
22   A. More likely than not, a repeat blood sugar
23   would have been in excess of 126. That -- that it
24   wasn't done, I cannot fault the physician who made these
25   decisions for the reasons we have just discussed.

169

1    Q. And so your opinion is based on — your opinion
2    that Ms. Whittington has diabetes is based on the lab
3    test that she had in Exhibit 10 along with an assumption
4    that if she had a test a week or two later, it would
5    have shown a 126 — 126 or greater again —
6    A. Yes, ma'am.
7    Q. — is that right?
8    A. More likely than not with the risk factors
9    which we have enumerated, I would -- I would put -- I
10   would almost put odds of 9 to 1, 10 to 1 that the repeat
11   sugars would have been abnormal.
12   Q. And you are willing to make that assumption as
13   a basis of your more probably than — more probable than
14   not opinion without actually having a lab test — a
15   confirmatory lab test performed —
16   A. Yes, ma'am.
17   Q. — correct?
18   A. I think that's a reasonable approach for us all
19   to try to keep the costs down. But you also remember I
20   had a clause and the clause was that if it ever became
21   an issue for insurance or any other criteria that a
22   second number was required, it would be reasonable to do
23   it.
24       Now, in retrospect, we have that reason in
25   this case. We didn't or the physician who gave her

170

Metformin didn't have that reason at that time. I'm
defending my colleague. I apologize if it's
inappropriate.
    Q. So — so in a nutshell, Dr. Tulloch, you're
willing to conclude that more probably than not she has
diabetes based on your belief that a lab test that has
not been performed on her would exceed 126?
    A. The second time, yes. We have a first time.
    Q. Okay.
    A. And the second time more likely than not would
be a repeat of the first time given —
    Q. But it hasn't been done —
    A. Given —
    Q. — correct?
    A. Given all the risk factors —
    Q. Sir, it hasn't —
    A. Given all the risk —
    Q. — been done?
        MR. PIRTLE: Y'all can't talk over each
other.
    Q. (BY MS. THORPE) It hasn't been done?
    A. We agreed that we were not going to talk over
one another. And at the time I had the -- the stand and
I will yield it to if you need it right now.
    Q. The second laboratory test that is — that

171

you're basing your opinion on has not been conducted,
correct?
    A. That's correct, we have agreed on that.
    Q. Now, you recall that Ms. Whittington, in
Exhibit 11, had a fasting blood glucose in 1993 of 123,
right?
    A. Yes, ma'am.
    Q. And tell me, sir, if someone in your practice
had a fasting blood glucose of 123, would you start them
on diabetes medications and perhaps put them on a ADA
diet?
    A. Ma'am, I — I think in that context this is a
lady who is ten years younger than she was at the time
we were discussing the second set of numbers, '93 and
2006; is that right? Yes. So 11 years before, she
would have been 11 years younger. I would need to look
back on the time line to see her weight at the time, but
I believe that number would certainly be one indicative
of advice for a patient to be given a calorie- and
carbohydrate-restricted diet, the encouragement to
exercise and to take the appropriate nonpharmacological
measures, and then I would expect a reasonable
physician, both family practitioner and endocrinologist,
to follow her up and watch that blood sugar carefully.
    Q. So it would be appropriate in 1993 to have

172

1 started Ms. Whittington on American Diabetes Association
2 diet of 1800 calories?
3     A. Depending on her weight. I think 18's probably
4 a bit more than she needed, maybe 12, maybe 16, which
5 tends --
6     Q. Okay. Eighteen -- 1200 or 1600 calories
7 down --
8     A. Twelve to 1500 calories, yes, ma'am.
9         (Exhibit No. 17 marked.)
10     Q. (BY MS. THORPE) All right. I'm going to show
11 you what's been marked as Exhibit 17 for identification.
12 And let me find one for Tom here.
13     Q. No. 17. Okay.
14     Q. And you have before you a November 20, 1996
15 laboratory test on Linda Whittington, correct?
16     A. Yes, ma'am.
17     Q. Did you see Exhibit 17 before you formed your
18 opinions in this case?
19     A. I -- I don't recollect it. I'll check and see
20 if it was on the time line.
21     MS. THORPE: Do we have the time line?
22     MR. PIRTLE: Yes, you do.
23     MS. THORPE: Okay. Can we have a copy of
24 the time line printed out?
25     MR. BRUDNER: How long did you say they

173

1 were?
2         THE WITNESS: I -- it comes through on the
3 computer. It's very long, indeed. But she can put it
4 up on the computer.
5     MS. THORPE: No, I want a copy of the -- I
6 want a copy -- let me just -- let me just put on the
7 record that it is impossible to examine the witness
8 without having the materials he relied upon in forming
9 his opinion. I understand that he relied upon some sort
10 of time line or a medical chronology in the cases, and
11 I've asked for them before the deposition began so that
12 I could prepare for the deposition and not waste time,
13 and I still don't have them. We're into the second day
14 of the deposition, and so I'm going to try to move as
15 efficiently as I can, but if -- I may need more time,
16 Tom, because I don't -- still don't have them.
17     MR. PIRTLE: Let me respond. We have --
18 and I have in all honesty about 30 seconds ago handed
19 you a disk across the table that I believe contains time
20 lines for all three. You've asked me -- or four, I'm
21 sorry. You've asked me to print them out. I've sent my
22 person into my office work space to actually print them
23 out in hard copy form. I would have liked to have
24 gotten them to you quicker than I did, but that wasn't
25 my responsibility at the time to do that.

174

1     MS. THORPE: It was somebody's
2 responsibility.
3     MR. PIRTLE: Well, certainly --
4     MS. THORPE: -- it's not my responsibility.
5     MR. PIRTLE: Certainly it was. And there
6 was some discussion as to whether or not those -- I know
7 internally within my group as to whether or not those
8 should rightfully be produced. My position was they
9 should and I have won that debate and you've got the
10 time lines. I wish you could have had them sooner.
11     MS. THORPE: Well, I'm going to keep going,
12 but I'm just saying that I -- we may need more time
13 because I've got to read the document that he relied on,
14 and I'm going to have more questions about that
15 document --
16     MR. PIRTLE: Fair enough.
17     MS. THORPE: -- and all those documents.
18 So -- and I'm sitting here in the middle of the
19 deposition and I still don't have it. And when I ask
20 him if he's seen something, he doesn't know, and I need
21 to know if he's seen it.
22     Q. (BY MS. THORPE) So let me ask you,
23 Dr. Tulloch: You are -- when you refer to a time
24 line -- I don't want to look at it -- I can't mark your
25 computer?

175

1     A. Okay. No problem. Yes, ma'am, please,
2 continue.
3     Q. Dr. Tulloch --
4     A. Yeah.
5     Q. -- when you refer to a time line, can you tell
6 me what that is?
7     A. What we have shared today is a very great deal
8 of data. What I've tried to do as an endocrinologist
9 focusing pretty well mostly on the issues related to
10 this lady's metabolic abnormalities, not to her
11 psychiatric abnormalities, is I have tended to focus on
12 endocrine-related criteria such as her blood sugar, her
13 hyperlipidemia, her body weight. And what was put
14 together for us to understand the progress -- because
15 we're looking at fairly long sequences -- was a summary
16 which had a date, weight, laboratory tests, the
17 antipsychotic medications that this patient was on and
18 any other extenuating circumstances.
19         So what it does is it takes a large pile of
20 data and it summarizes that data from the components of
21 what I would be interested in as an endocrinologist.
22 And I offer it to you -- I apologize it didn't came. I
23 understood it was in the material that was given to you
24 nearly a week ago. When I discovered this afternoon
25 that it was not in that material, I made it available to

176

1  you as soon as possible, and I apologize for the delay.
2      Q. Shall we refer to this document as a time line?
3  Will you know what I'm talking about when I say that?
4      A. Yeah, I think that's perfectly reasonable.
5      Q. Who prepared the time line?
6      A. It was prepared by the colleagues in
7  Mr. Pirtle's office.
8      Q. And the -- when did you receive the time lines
9  for Ms. Whittington's case, the time line for
10  Ms. Whittington's case?
11     A. I believe I got it at a -- the same time as I
12  got all of the other material.
13     Q. And you're putting your hand on Exhibit 4 or --
14     A. Sixteen.
15     Q. The articles that you're talking about?
16     A. All the articles which I shared with you, yes,
17  Exhibit 16.
18     Q. And when did you receive those -- all those
19  materials?
20     A. My best guess would be about 12 months ago.
21     Q. All right. And you received the materials for
22  Mr. Unger at the same time, the time line and the
23  articles?
24     A. Subject to a few months one way or the other,
25  yes.

177

1      Q. And did you receive -- well, how many months?
2      A. A few would be two to three.
3      Q. Okay. And did you receive a time line for
4  Ms. McAlexander?
5      A. Yes, ma'am. I -- when I say --
6      Q. And was that at the same time?
7      A. -- this applies to this patient, the same
8  comment applies to all four patients.
9      Q. Okay. So you received Mr. Haller's time line
10  about 12 months ago?
11     A. To the best of my memory, yes.
12     Q. And -- okay. So let's go back to what's been
13  marked as exhibit -- is it 17?
14     A. Seventeen.
15     Q. Yeah, Exhibit 17. And have you seen this
16  before?
17     A. The answer is no.
18     Q. All right. Can you tell me if you've seen
19  Exhibit 11 before, before your deposition last week?
20     A. Correct. The answer to that is no.
21     Q. So before you formed your opinions in this
22  case, you had not seen the --
23     A. Eleven and 17.
24     Q. The fact that Ms. Whittington had a fasting
25  blood glucose of 123 and a glucose of 137 on November

178

20, 1996 -- that had been marked as Exhibits 11 and 17,
correct?
    A. That's correct, yes.
    Q. Now, the Exhibit 17 is a glucose of 137 which
is high, correct?
    A. It is high.
    Q. If that were a -- if that were a fasting plasma
glucose, that would mean that she had, under your
diagnostic criteria, diabetes, correct?
    A. Without any doubt.
    Q. All right. Do you know whether Exhibit 17 is a
fasting glucose?
    A. We don't have data on that.
    Q. You can't rule out that it's fasting, can you?
    A. No, ma'am.
    Q. You can't rule in that it's fasting?
    A. Well, the only reason why I think it may not be
fasting is the time which I refer to on the top left
corner and you'll see that that time is 5:00 p.m. My
suspicion is that a psychotic patient even if told to
fast would probably not still be fasting at 5:00 p.m.
    Q. Isn't it correct, sir, that the collection time
was 1:30 p.m. on Exhibit 17?
    A. Okay.
    Q. Do you agree with that?

179

    A. I see two -- I had not read that as a time.
But, yeah. So we have a 5:09 p.m. at the top right and
halfway across we have a number which is, in fact,
1:30 p.m., so -- yeah, so this could have been collected
at 1:30 p.m.
    Q. All right. In fact, the title above the
1:30 p.m. says collection date and time, doesn't it?
    A. Your -- your print is better than mine.
    Q. You can't read that?
    A. I can't read that.
    Q. And you see on the right-hand side of
Exhibit 17 it says -- it says report date, 11-21-96,
time 5:09 p.m.?
    A. Okay. I'll accept that. This original -- this
copy here does not -- it doesn't allow that to be read.
    Q. Isn't it correct you don't know one way or the
other whether this is fasting?
    A. That's correct.
    Q. All right. Now, this lady presents with --
strike that.
        These two exhibits, exhibit --
    A. Exhibit --
    Q. -- Exhibit 11 and 17, make it more likely than
not that Ms. Whittington had diabetes as early as 1996;
isn't that correct?

7 (Pages 176 to 179)

180

1     A. Ma'am, I think the second one makes it very
2  probable that she had diabetes if that was a fasting
3  sugar; yes, correct.
4     **Q. In November of 1996?**
5     A. On the date in '96, yes, ma'am.
6     **Q. All right. And that was long before she ever**
7  **took Seroquel, correct?**
8     A. Yes, ma'am.
9     **Q. Now, tell us, Dr. Tulloch, when in your opinion**
10  **her diabetes -- Ms. Whittington's diabetes actually did**
11  **begin.**
12     A. And, again, with -- with the best probability,
13  what I have to provide is -- is at a time when any
14  two -- any two numbers -- if we need to be strict by
15  definition, as I said earlier, one -- often as
16  clinicians makes a decision before the formal
17  definition. Any time that two fasting sugars were
18  greater than 126, she would be labeled, undoubtedly,
19  diabetes. Any single fasting sugar she would be labeled
20  probably having diabetes if she had a number of other
21  criteria which fitted the issues we discussed. And as I
22  said earlier, I would not fault a clinician for treating
23  her as having diabetes on a single number because of the
24  importance of getting it under control.
25     **Q. Well, I guess what I'm getting at is you would**

181

1  **agree with me that a laboratory test that someone has**
2  **gone in to the doctor and gotten a lab test, the fact**
3  **that that test is positive on a given day doesn't mean**
4  **that that's when the diabetes began, right?**
5     A. No.
6     **Q. Right?**
7     A. That's correct.
8     **Q. That's just -- that's just -- they went to the**
9  **doctor and had the test?**
10     A. Yes, ma'am.
11     **Q. The diabetes more likely than not, to use your**
12  **terminology, began before that test, right?**
13     A. Yes, ma'am.
14     **Q. The test is just a diagnostic test, right?**
15     A. It's a time when the abnormality was brought to
16  the physician's notice, yes, ma'am.
17     **Q. And you would agree with me that you cannot**
18  **state with any kind of scientific or medical probability**
19  **any kind of precise date of the -- the onset of**
20  **diabetes; science can't pinpoint this is the day it**
21  **started in an individual?**
22     A. That's correct.
23     **Q. All right.**
24     A. I go back to the analogy we shared long ago
25  because it helps us understand. We agreed that a lady

182

1  with these sort of risk factors would get diabetes
2  sometime between the age of 25 and 105, and the
3  variables in her life would pinpoint the date that I
4  arrived.
5     **Q. And in this lady we agree that more likely than**
6  **not Ms. Whittington developed diabetes, at the very**
7  **latest, sometime in the Nineties, correct?**
8     A. We are looking at a number which is potentially
9  diagnostic were it fasting, the date of 11-21 --
10  11-20-96.
11     **Q. And you agree that more likely than not she was**
12  **diabetic in the Nineties?**
13     A. If that's a fasting sugar that fulfilled the
14  criteria, yes, ma'am.
15     **Q. And you don't know whether or not it is a**
16  **fasting sugar?**
17     A. No. We agreed it was taken at 1:30 midday on
18  one day, and now I can see a clearer version. It was
19  reported at 5:00 in the afternoon on the following day,
20  so the time that it was collected was 11-20 of '96.
21     **Q. Okay. You've got better eyes than I.**
22     A. And it was recorded 11-21 at 5:00 p.m.
23     **Q. So what -- so what you're saying, Dr. Tulloch,**
24  **is -- let's just say that you had Exhibit 11 and the 123**
25  **high result, which is a, clearly, fasting glucose,**

183

1  **you've agreed. If that were the only test that**
2  **Ms. Whittington had, would you conclude that it was more**
3  **likely than not that she had diabetes?**
4     A. I -- I go back to my analogy, but I come back
5  specifically in a setting like that with her strong
6  family history, her obesity, her psychosis, the
7  difference between 123 and 126 is not a great distance.
8  So if you added anything, a few pounds in weight or a
9  few months or years in age, the possibility of her
10  reaching type 2 diabetes would be quite strong.
11     **Q. All right. Well, my question is, though: If**
12  **one -- if Exhibit 11 and the 123 were the only fasting**
13  **glucose she had in the Nineties, based on what you know**
14  **from your review of her medical records, would you say**
15  **that it's more likely than not that at that point she**
16  **had diabetes?**
17     A. No, I wouldn't push it that. But I would go
18  one step before that that more likely than not she was
19  in significant danger of developing type 2 diabetes
20  within a reasonable time span after that.
21     **Q. Okay. And what would that reasonable time span**
22  **be?**
23     A. I knew you'd ask that, and I don't have the
24  answer, but it would be maybe years or maybe pounds.
25  Remember the -- we have a number of variables in a

184

1   patient like this. If she'd gained 20 pounds, I suspect
2   that sugar would go up to above 126 or if we added a
3   couple of years, we -- we -- or as we saw later, or if
4   she was given medication, the final straw could have
5   been applied. And I go back to the analogy of the final
6   straw.
7       (Exhibit No. 18 marked.)
8       Q. (BY MS. THORPE) All right. Let me show you
9   what's been marked as Exhibit 18 for identification.
10  And this is a chart of Ms. Whittington's weights. And I
11  want to tell me if you believe that to be a correct
12  listing of her weights.
13      A. Thank you. I am looking at Exhibit 18, and
14  it's -- if I may call it a weight time line, I've
15  agreed that seral numbers would be called time lines.
16  And the earliest date for which we have numbers is
17  September of 1990. And there are one, two, three, more
18  times and dates which antedate the time line that you
19  have been given. So you have four numbers which are
20  earlier than what will be called Exhibit 19 which is the
21  time line that you've been given. So, yes, ma'am, these
22  are data. If they relate to the patient, they are data
23  which I did not have because my time line starts at the
24  date which you're reading there, and it would be
25  analogous to your date No. 5.

185

1       Q. Dr. Tulloch, this will be unintelligible on the
2   record, so I'm going to have to ask you a few questions
3   about it. Okay?
4       A. Okay. No problem. Anything you need to
5   clarify it, yeah.
6       Q. I want you to assume with me that the medical
7   records for the dates on Exhibit 18 for September of
8   1990, November of 1996, January of 1997 are, in fact,
9   recorded in the medical chart. Okay?
10      A. Yes, ma'am.
11      Q. For Ms. Whittington.
12      A. Yes, ma'am.
13      Q. All right. Now, we were talking about her
14  blood glucose that's reflected in Exhibit 11 of 123,
15  which was fasting, right? You remember that's where we
16  were?
17      A. Yes.
18      Q. And you said that if she put on a few pounds,
19  she would likely become diabetic in a short amount of
20  time, correct?
21      A. More likely than not, yes.
22      Q. And you can see by Exhibit 18 that in 1990
23  Ms. Whittington weighed 145, right?
24      A. That's correct.
25      Q. And by November 20th of 1996, she's gone up to

186

1   194 pounds, correct?
2       A. Yes, ma'am.
3       Q. She has a BMI of 31.3 as of November 20, 1996,
    correct?
4       A. Yes, ma'am.
5       Q. And you would agree that that gain in weight
    over that period of time would be enough to push
    Ms. Whittington into diabetes during the Nineties more
    probably than not, correct?
6       A. I would say better than that. You have
    produced Exhibit 17 which relates to the time line 11-20
    of '96, which would be your second date on Exhibit 18,
    and that difference in weight is more likely than not
    responsible for the sugar difference which went from 123
    to 137.
7       Q. That's reflected in Exhibit 17, correct?
8       A. Yes, ma'am.
9       Q. And so you would agree that more probably than
    not Linda Whittington had diabetes in the Nineties,
    correct?
10      A. Had numbers which were compatible with
    diabetes, yes, ma'am.
11      Q. Okay. And you would agree that more likely
    than not she had diabetes in the Nineties?
12      A. Yes, ma'am.

187

1       Q. All right.
2           (Exhibit No. 19 marked.)
3       Q. (BY MS. THORPE) Now, I have marked, as you
    anticipated, Exhibit 19 for identification, which is
    your time line for Ms. Whittington, correct?
4       A. That's correct.
5       Q. And this is -- do you know specifically who
    prepared this?
6       A. Staff from Mr. Pirtle's office. I know there
    are several nurse practitioners in there, but I do
    not -- or nurse paralegals, but I do not know the names.
7       Q. Okay. Now, is it -- you relied on Exhibit 19
    for your opinions?
8       A. Yes, ma'am, I -- I relied it as a succinct
    summary when I started making my conclusions, yes,
    ma'am.
9       Q. And you've already observed that Exhibit 19
    does not contain any weights before 1999, correct?
10      A. That's correct.
11      Q. And it does not contain citations to the
    medical records in terms of, you know, a record cite so
    that you can go find the record where the information
    described in the chart appears in the actual medical
    record, correct?
12      A. Yes, ma'am. What I had said was Exhibit 18 is

188

1  numbered on individual dates, and numbers 1, 2, 3, and 4
2  are dates which antedate the time line which I had which
3  was Exhibit 19.
4      Q. If you will look at the last page of
5  Exhibit 19, you see that the last entry is on December
6  4, 2007, correct?
7      A. Yes.
8      Q. And, in fact, your report on Ms. Whittington
9  which has been marked as Exhibit 1 — well, excuse me,
10  it's not Exhibit 1.
11      Your report on Ms. Whittington which has
12  been marked as Exhibit 2 has a statement in it that the
13  last weight recorded is 236 pounds.  Do you see that?
14      A. Yes, ma'am.
15      Q. And you got that information from Exhibit 19,
16  didn't you, sir?
17      A. Yes, ma'am.
18      Q. And Exhibit 19 shows a weight of May 24, 2006,
19  correct?
20      A. That's in the last line of my statement, and it
21  relates to the last observed weight which is on page 13
22  of Exhibit 19.
23      Q. And so you — you directly relied on Exhibit 19
24  for that statement in your report that the last weight
25  recorded on this patient was — was 236 pounds on May

189

1  24, 2006, right?
2      A. That's correct, for which I had data.  As I
3  recall, we —
4      Q. Let me just ask you just to — and the data you
5  had was what was in this chart that's been marked as
6  Exhibit 19, right?
7      A. That's all I had, yes.
8      Q. And you were given — let's pull out your
9  report again here.  In Exhibit 2 on page 16, there's a
10  list of medical records you were given, right?
11      A. Yes, ma'am.
12      Q. And you didn't read all those medical records,
13  right?
14      A. I said in an earlier statement I had not.  I
15  listed the ones which I had and — there in the
16  introductory paragraph of my report on this lady.
17      Q. And one of the — one of the medical records
18  you were given that's on page 16 of 17 were the records
19  of Dr. Harold Boyd, right?
20      A. Yes, ma'am.
21      Q. And you didn't read those records, did you?
22      A. I do not — if I did not have them listed on my
23  report, then I did not read those records.  I listed all
24  the reports that I read.
25      Q. And you say in Exhibit 2 in your report that

190

1  after she went off Seroquel, Ms. Whittington lost
2  8 pounds, right?
3          (Exhibit No. 20 marked.)
4      A. Yes, ma'am.
5      Q. (BY MS. THORPE)  And you wanted people to think
6  that she lost those 8 pounds because she went off
7  Seroquel, right?
8      A. I stated it as a fact.  I don't have any
9  ulterior motive to that statement.
10      Q. Well, why is it relevant to her — why is it
11  relevant to your report?
12      A. Well, we had been discussing some atypical
13  antipsychotic side effects of which were weight gain.  I
14  had done a review of atypical antipsychotics and pointed
15  out there were at least two whose — do not have side
16  effects of weight gain.  And since learning about those
17  as an endocrinologist talking to psychologists,
18  psychiatrists, really, I am inclined to encourage them
19  where possible to make use of atypical antipsychotics
20  that have less side effects.
21      So it's part of what I teach general
22  physicians and general psychiatrists when I speak to
23  them.
24      Q. All right.  You mentioned that — so — strike
25  that.

191

1      In Exhibit 2 when you say that there is a
2  loss of 8 pounds, are you or are you not trying to tell
3  the reader of your report that that loss of 8 pounds
4  after Ms. Whittington stopped taking Seroquel is an
5  indication that Seroquel caused her weight gain while
6  she was on it?
7      A. My best belief is that when she comes off a
8  atypical antipsychotic which causes weight gain, I would
9  expect her to lose weight.  If there was clinical data
10  to support that, I would point that out.  I would have a
11  similar content -- comment if she was switched from one
12  of the atypicals that caused weight gain to the two that
13  do not, which are Abilify and Geodon.  And if this lady
14  had been switched to Abilify and Geodon and lost weight,
15  I would say to the physicians, "Look, she went to
16  product X and her weight came down."
17      Q. All right.
18      A. And that's --
19      Q. And so you're saying that the fact that her
20  weight came down after she came off Seroquel was a
21  factor that — that tends to make it more likely than
22  not that Seroquel was causing her weight gain.  That's
23  what you're saying?
24      A. Yes, ma'am.
25      Q. All right.

192

1    A. I'm just --
2    Q. Now, you agree with -- you said you know
3  Dr. Wirshing, right?
4    A. No, ma'am. I have read his deposition in the
5  Zyprexa case.
6    Q. Oh, okay.
7    A. I have not yet read his deposition in this
8  case, but I -- I was -- I thought it was a very good
9  deposition in the Zyprexa case.
10    Q. Okay. I think he's an expert on
11  antipsychotics.
12    A. Oh, I -- yes, ma'am, I think we'd agreed to
13  that earlier.
14    Q. Okay. Now, would you -- I want to read you
15  what Dr. Wirshing said and see if you agree or disagree
16  with this. "For any of these drugs and including
17  Seroquel, is there any evidence if the patient stops
18  taking the drug they will continue to gain weight?"
19  Okay, that was the question.
20       And Dr. Wirshing asked, "As a consequence
21  of having consumed the drug?"
22       And the next -- and the question was
23  "Exactly."
24       And the answer was "No?"
25       "And if they do you'd have to look at

193

1  other -- lifestyle, diet, all the other things one would
2  look at in you or I to figure out why they might be
3  gaining weight?"
4       And Dr. Wirshing replied, "Absolutely.
5  It's difficult to lose weight, but continuing to gain
6  weight in the absence of your suspected cause of the
7  weight gain, really, I think has great doubts on whether
8  or not that was the cause."
9       Do you agree with that statement?
10    A. I think that's a perfectly reasonable
11  statement.
12    Q. So if you continue to gain weight after you
13  stopped taking Seroquel, it really casts doubt on
14  whether Seroquel is the cause of the weight gain?
15    A. Ma'am, we're talking about one specific
16  patient. If we also then look at the literature and
17  look at the --
18    Q. First, tell me if you --
19       MR. BRUDNER: You're interrupting him.
20       MS. THORPE: I'm sorry. There can only one
21  person objecting --
22       MR. PIRTLE: You are interrupting.
23       MS. THORPE: If you want to object -- or
24  whoever's in charge can object, but I'm not going to
25  have two people objecting while I'm taking the

194

    deposition.
       MR. PIRTLE: All right. You're
    interrupting. Let him finish.
       Q. (BY MS. THORPE) Finish your answer. But
    you're not answering my question.
       A. I believe we agreed we weren't going to
    interrupt one another. But what I was saying was if the
    literature is -- associates a number of -- and remember,
    I'm not a psychiatrist, so I would -- I would be
    comfortable to have Dr. Wirshing's input to this.
       But if there's -- literature suggests there
    is weight gain associated with a group of antipsychotics
    and not with others and the patient was either
    terminated on those or switched to another, I would
    expect to observe weight loss. If weight loss was
    present as it was in this case, it would be tempting to
    ascribe more likely than not to the patient coming off
    that appetite stimulant and losing weight as being the
    reason why they lost weight.
       We have a similar analogy when patients are
    given Prednisone and other medications like that. When
    you stop the Prednisone, they start to lose weight.
       Q. Dr. Tulloch, this is my question. It requires
    a yes or no answer. And if you'll give me a yes or no
    answer, then you may explain. Okay?

195

    A. Okay.
       Q. Do you agree that continuing to gain weight
    after stopping Seroquel casts great doubts on whether or
    not Seroquel caused weight gain to begin with?
       MR. PIRTLE: Objection, form.
       A. No, ma'am, I would not agree with that. What I
    would have to say was -- do you want me to condition
    that as to why?
       MR. PIRTLE: You can finish.
       Q. (BY MS. THORPE) Go ahead.
       A. We agreed there were a number of causes of
    weight gain and one of them would be an atypical
    antipsychotic. If somebody continued to gain weight
    when the atypical antipsychotic was stopped, then it is
    quite possible the atypical antipsychotic was not the
    sole cause and that there were other causes. But -- but
    the data in favor of atypical antipsychotics causing
    weight gain of the group that we referred to is fairly
    strong.
       Q. I'm going to show you what's been marked as
    Exhibit 20 to this deposition and ask you if --
       MR. PIRTLE: Do you have a copy?
       MS. THORPE: I don't have an extra copy of
    that one. You can look on.
       Q. (BY MS. THORPE) Can you tell me what weight

196

1  Ms. Whittington had on March 24, 2008?
2  A. I -- if this is later than I had in my time
3  line -- I think we've looked at this one before, and I'm
4  already on record as giving you that date -- that
5  weight, rather, and we had to find it under the
6  physicals -- it's on the second page, page 2 of 3, and
7  the weight is 255 pounds.
8  Q. So the highest weight that Ms. Whittington had
9  in her life that we know of occurred after she went off
10  Seroquel, correct?
11  A. Yes, ma'am.
12  Q. Dr. Tulloch, in May of 2008, two and half years
13  after Ms. Whittington stopped -- well, strike that.
14  Strike that.
15  Are you -- have you read any medical
16  records that go past December 4, 2007, as reflected in
17  the time line by --
18  A. No, ma'am.
19  Q. -- that's marked as Exhibit 19?
20  A. No. I think we agreed on that before, that I
21  had not seen Exhibit 20. We talked about this earlier
22  on.
23  Q. Okay. So you -- you're -- your medical review
24  ends on December 4, 2007?
25  A. That's correct.

197

1  Q. All right. Now, what -- what I want to know,
2  if you'd look in Exhibit 2 of this -- on page 16,
3  your -- the list of medical records you were given.
4  A. Yes.
5  Q. I want you to look down the list on Exhibit 2
6  and tell me which of the ones that you actually read.
7  It's harder to figure out than you might think when I
8  look at your report and when I look at this list.
9  A. Okay.
10  Q. So I need to know exactly what you read.
11  A. To the best of my knowledge, when I was
12  preparing this report, I listed the data which I looked
13  at, and they are listed on Exhibit 2 under the heading
14  Opinions Related to Ms. Linda Whittington, and it
15  includes Mental Health Association Jacksonville,
16  Jacksonville Heart Center, Baptist Hospital --
17  Q. Can we just stop for a minute?
18  If you look at page 16 on your report of
19  the reliance -- of the long list of medical records --
20  A. Yes, ma'am.
21  Q. -- I don't see Mental Health Association
22  Jacksonville.
23  A. Okay.
24  Q. I've tried to do this exercise. That's why I'm
25  asking you.

198

1  A. Okay. I will need to go back to the disks when
2  I was preparing the report. I took the titles off the
3  disks which you were provided with. If it doesn't
4  match, I apologize for that. They may be in there under
5  a slightly different heading. For example, this one
6  we've just looked at, Exhibit 20, were I to list that, I
7  would list it as Baptist Primary Care, but others might
8  list it as chart of Dr. Harold Dale Boyd who's the
9  signatory on page 3. So there may be some descriptive
10  differences there.
11  Q. I'll tell you what, I'd like you to take a pen
12  and just circle the ones on page 16 that you've actually
13  reviewed. If you want to use my copy to look at, it
14  might make it easier. You can turn -- you'll have --
15  A. Okay. What I found were the Baptist
16  Hospital's, which are listed up high; the imaging
17  center, Jacksonville Heart Center, North Florida OB/GYN.
18  I'm looking for Dr. M. Saleh, Jacksonville, and
19  Dr. Charles Haddad, Jacksonville Family Health Center
20  and those I do not find on the listing of page 16. But
21  I -- I put them there because I read them off -- off the
22  titles of what -- when I was preparing the -- the
23  report.
24  And what we agreed was -- not on the list
25  were Dr. Harold and Dale Boyd because those were

199

1  subsequent to the time line which I was working from and
2  the chart which I was relating to that time line.
3  Q. So when you say they're not on the list, you
4  mean on your -- your list about doctor -- about
5  Ms. Whittington, you're not referring to page 16 of your
6  report, correct?
7  A. Yes, I'm referring to the group that I reviewed
8  when I put the report together, which is on the first
9  paragraph under opinions relating to Ms. Whittington.
10  Q. Okay. So you have now circled on -- I hope you
11  did it.
12  A. On your --
13  Q. If you would, please, just put them on the
14  exhibit.
15  A. I have ticked them and they are there.
16  Q. This isn't the exhibit. You have the exhibit
17  in front of you. Flip the -- this is Exhibit 2, Doctor.
18  And we have to do it on the copy that we're attaching to
19  the deposition.
20  A. Ah, okay.
21  Q. So I just want you to be very quick, just
22  mark --
23  A. Mark it on this --
24  Q. Yes.
25  A. -- second copy? Okay. No problem.

12 (Pages 196 to 199)

200

1    Okay. I have listed six which relate to --
2  to the numbers, and I have put them on a copy exhibit
3  which I'm returning to you, and I have the original
4  here.
5    Q. All right.
6    A. To the best of my knowledge, they are --
7    Q. Thank you.
8    A. -- identical in marking.
9    Q. So on Exhibit No. 2 you have identified the
10 medical records that you have reviewed on the list
11 that's -- that's page 16 of your report, right?
12   A. That's correct, at the time I made the report,
13 yes, ma'am.
14   Q. Now, looking back at Exhibit 20, which is
15 the -- let me ask you this, Doctor.
16   Did you -- did you actually read those
17 medical records that you've checked on Exhibit 2?
18   A. Yes, ma'am, I read them on disk and I -- when I
19 was making the list, I hand copied the titles -- I gave
20 them an example of how there might have been a
21 discrepancy because of the title and the signature at
22 the bottom. But the data which I put in the report
23 related to those listed on that paragraph.
24   Q. I need the time line is what I'm looking for.
25 You've got it in front of you. Thanks. No, this is

201

1  fine.
2    So on Exhibit 19 you did not have any
3  glucose levels that you looked at before you formed your
4  opinion regarding Ms. Whittington that predate her use
5  of Seroquel, right?
6    A. What I had said was I had no data listed before
7  the reference number 5 on Exhibit 18 which is March the
8  8th of '99.
9    Q. Okay. So -- so you didn't have any glucose
10 levels that predated 1999 --
11   A. That's correct.
12   Q. -- on Ms. Whittington, right?
13   A. That's correct.
14   Q. And you didn't have any weights that predated
15 1999 on Ms. Whittington, right?
16   A. That's correct.
17   Q. And for the hard numbers, labs, weights, any
18 kind of numerical data, you relied on -- on what we're
19 calling the time line that's been marked as Exhibit --
20   A. Nineteen.
21   Q. -- 19, right?
22   A. Ma'am, I -- I -- at the time I looked at the
23 disks, you will find they also had summaries like this.
24 But, yeah, to -- when -- when I was comparing weights to
25 sugars to dates, the best relationship to those were on

202

Exhibit 19.
   Q. All right. But you relied on the numbers that
somebody from the -- the plaintiffs' lawyer's office
wrote down in Exhibit 19?
   A. That's correct.
   Q. And so that would be true for the cholesterol
numbers, right?
   A. That's correct.
   Q. So you relied on what the plaintiffs' lawyers
said in Exhibit 19 about triglycerides, right?
   A. In the summary -- and when I was putting it
together -- remember what I said, I also looked through
the disks which had these copies of -- I'm holding up
examples of physicians' office charts and laboratory
values.
   Q. But when you --
   A. -- when I was doing the report. So I could say
on this date this was the weight, this was the lab. I
worked from Exhibit 19.
   Q. But you have listed on Exhibit 2, page 16, all
of the medical charts that you looked at, right?
   A. That's correct.
   Q. Okay. Is --
   MR. PIRTLE: When you get to a stopping
point.

203

   MS. THORPE: Yeah, I'll be done with this
in just -- as best I can in just a minute.
   Q. (BY MS. THORPE) Dr. Tulloch, on Exhibit 19, if
you'd look at the first page of it, there's a section
entitled Past Medical History, right?
   A. Yes, ma'am.
   Q. And it begins with tobacco abuse and
schizophrenia and esophageal reflux, so on. Do you see
that?
   A. Yes, ma'am.
   Q. And you used that list in -- in your writing of
your report, the third paragraph relating to
Ms. Whittington, right?
   A. Yes, ma'am.
   Q. In fact -- and there's also a section entitled
Risk Factors for Diabetes Mellitus, right, on
Exhibit 19?
   A. Yes.
   Q. And it says, "Family history of diabetes,
hypertension, and elevated lipids."
   Do you see that?
   A. Yes, ma'am.
   Q. And you have a virtually identical sentence in
your report that's been marked as Exhibit 2 where you
say, "There is a family history of diabetes mellitus,

13 (Pages 200 to 203)

**204**

1    hypertension, and hyperlipidemia," right?

2        A.  That's correct.

3        Q.  You basically took that sentence and plugged it

4    into your report?

5        A.  Well, it summarized what I'd seen on the disks

6    which related to those references which I'd ticked on

7    page 16, yes, ma'am.

8        Q.  And those were causes of diabetes that predated

9    her use of Seroquel as we discussed last time around,

10   right?

11       A.  Yes, ma'am.

12       Q.  It does not — you do not include in that list

13   her obesity that preexisted her diabetes, right?

14       A.  Yes, ma'am, because I — I then talked about

15   the weight in a separate paragraph.  But certainly for a

16   lady of this height, she was obese from fairly early on

17   in this report.

18       Q.  After the February 2006 laboratory test that's

19   been marked as Exhibit 10, you would agree from your

20   review of the records that the blood sugars that were

21   tested using the A1c test on Ms. Whittington were all

22   normal?

23       A.  Yes, ma'am.

24       Q.  You would agree with that?

25       A.  May I put a little explanation on that?

**205**

1        Q.  Well, first, you would agree — first — yes,

2    you may.  But first agree with me —

3        A.  Yes.

4        Q.  — that all the A1cs after February of 2006

5    were normal?

6        A.  That's correct.

7        Q.  Okay.

8        A.  If we define normal as between 4 percent and 6

9    percent.  And I put a little rider on that.  The

10   problems with — hemoglobin A1c is an excellent cross

11   check, but there are — there are patients that have

12   abnormal hemoglobins.  And so we train our medical

13   students that if a hemoglobin A1c doesn't fit the blood

14   sugar, the blood sugar's more likely to be correct.

15       I explain that because somebody from the

16   Mediterranean area who has thalassemia, that kind of

17   hemoglobin runs in a different pattern in the tests by

18   which one derives hemoglobin A1c, and so you can't get

19   meaningful data.  And there are a number of patients out

20   there who have discordant hemoglobin A1cs when you look

21   at blood sugar.  So in that setting the blood sugar is

22   the more important value.

23       Q.  Would you agree that after — during the time

24   that Ms. Whittington was taking — strike that.

25       Would you agree that after February of 2006

**206**

    Ms. Whittington's blood sugars were under control?

        A.  I think that's a reasonable statement, yes,

ma'am.

        Q.  You understand she was hospitalized many times

for her mental health, right?

        A.  Yes, ma'am.

        Q.  She's never been hospitalized for diabetes,

correct?

        A.  She's never had numbers that were sufficiently

discordant to make that necessary, yes, ma'am.

        Q.  So she's never been in the hospital for

diabetes?

        A.  Yes, ma'am.

        Q.  And she's taking oral glucose medications, not

insulin?

        A.  That's correct.

        Q.  And having not had — well, let's — let me ask

you this.

        Ms. Whittington has had no complications

that you have seen from her diabetes?

        A.  I think that's a reasonable statement, yes,

ma'am.

        Q.  And you know nothing about her condition after

the last date of Exhibit 19, which is —

        A.  Can I help you?  December the 7th.

**207**

        Q.  December —

        A.  December the 4th.

        Q.  2007 —

        A.  Yes.

        Q.  — right?

        A.  That's correct.

        Q.  All right.

        MS. THORPE:  This would be a good time to

take a quick break.

        (Short recess from 5:19 to 5:30.)

        Q.  (BY MS. THORPE)  Dr. Tulloch, you would agree

with me that there is no scientific or medical evidence

that Seroquel exacerbated Ms. Whittington's diabetes

that she had back in the Nineties?  Let me ask that a

better way.  That's a long and too windy question.

        You would agree with me that there is no

medical or scientific evidence that taking Seroquel

exacerbated Ms. Whittington's diabetes that you have

said you believe she had all the way back in the

Nineties?

        A.  Ma'am, I think we — we need to be careful

about facts.  What I'm comfortable with agreeing with

you — and we need to agree on the best medical data

is — we have found a sugar which was high before the

earliest data that I had available to me in my report.

14 (Pages 204 to 207)

208

1  And if that was a fasting sugar, it is compatible with
2  a -- a diagnosis of type 2 diabetes.  We have also noted
3  that she received two different atypical antipsychotics
4  during which time she gained a lot of weight.  And I
5  have given the opinion, which I'm modestly able to stand
6  up to, that she gained that weight and that she probably
7  more likely than not had her blood sugar physiology made
8  adverse by that weight gain.
9          But I'm quite comfortable to admit that if
10  that fasting glucose about the mid-1990s was fasting, we
11  have a definition -- we have a time when she definitely
12  had what we would define as diabetes were we to find a
13  second one which antedated either of the atypical
14  antipsychotics.  I'm -- I'm --
15      **Q.  So let me get this straight, Dr. Tulloch.  Now**
16  **you're saying that for the 1990s you have to have two**
17  **tests confirming --**
18      A.  No, ma'am.
19      **Q.  -- her diabetes, correct?**
20          MR. PIRTLE:  Objection, argumentative.
21      **Q.  (BY MS. THORPE)  Is that what you just said?**
22          MR. PIRTLE:  Argumentative.
23      A.  No, ma'am.
24      **Q.  (BY MS. THORPE)  So you don't think you have to**
25  **have two tests?**

209

1      A.  We have agreed that a definition of a fasting
2  sugar greater than 126 is maximum probability of
3  diabetes.  A second number is useful if there would be
4  any doubt for any of the reasons we discussed earlier.
5  We have agreed that we found a sugar which antedated her
6  getting either of the atypical antipsychotics which was
7  compatible if fasting with type 2 diabetes, a single
8  number.  And I have said that if she had that, she
9  probably had diabetes.
10          What I've also said was the content of my
11  report related to weight gain during her administration
12  of two atypicals.  And I'm defending my report for
13  saying that weight gain probably contributed to the
14  abnormal blood sugar which we saw on the date which we
15  agreed.
16          You have taken my comments, which are very
17  reasonable given the position you're needing to take,
18  that she already had diabetes in the early 1990s.  It
19  would depend on that sugar taken at 1:30 at midday being
20  fasting.  And I don't wish to agree or disagree, I just
21  leave a question mark over the validity of a 1:30 p.m.
22  sugar as being fasting, and neither of us can do
23  anything more than speculate.
24      **Q.  All right.  Let me go back to the original**
25  **question I started with.**

210

1      A.  Yes, ma'am.
2      **Q.  Is it your opinion that taking Seroquel**
3  **exacerbated preexisting diabetes in Ms. Whittington?**
4      A.  And what you heard me say was a clarification
5  of my position.
6      **Q.  I'm just --**
7      A.  Do you need me to redo that?
8      **Q.  No.  I need to you say yes or no.**
9      A.  The answer is no, because I'm not certain about
10  the nature of that 1:30 p.m. blood sugar.  If the
11  1:30 p.m. blood sugar was definitely fasting, then she
12  had preexisting diabetes.
13          What you put into my mouth and which I'm
14  not comfortable with leaving it without an explanation
15  is that she definitely had diabetes on a fasting sugar
16  taken at 1:30 midday.  That's my problem.
17      **Q.  Now, tell me, Doctor:  You said somewhere in**
18  **this answer that her weight gain had an impact on her**
19  **blood sugars, her weight gain while she was on two**
20  **antipsychotics have an impact on her blood sugars,**
21  **right?**
22      A.  I'm just quoting the literature and quoting
23  the --
24      **Q.  That's what you said, right?**
25      A.  Yes, yes, I did.

211

1      **Q.  All right.  Now, I want you to point to me to**
2  **the blood sugar or blood sugars that you say her weight**
3  **gain had an impact on.**
4      A.  Well, what -- what we have discussed is a
5  weight gain which occurred and which we agreed and an
6  abnormal sugar which was defined as right at the
7  marginal level on February the 16th of 2006.
8      **Q.  What do you mean?  So you're talking about**
9  **exhibit -- Exhibit 10, right?**
10      A.  Yes, ma'am.
11      **Q.  So Exhibit 10 is the only blood sugar that**
12  **you're contending that weight gain from two**
13  **antipsychotics, Zyprexa and Seroquel, had an impact**
14  **on --**
15      A.  To the --
16      **Q.  -- because of weight gain, right?**
17      A.  Yes, to the best of -- of the data -- my
18  interpretation of the data in front of us.  This was
19  clearly a glucose tolerance test.  And I think it is
20  reasonable to suppose that she was fasting on that day.
21  What I'm putting doubt on is a 1:30 p.m. sugar of 137
22  and wondering if it's really fasting.
23      **Q.  My question to you was:  You made a statement**
24  **that two antipsychotics, Seroquel and Zyprexa, caused**
25  **her to gain weight and have an impact on her blood**

15 (Pages 208 to 211)

212

1  sugar, right?

2      A. More likely than not, yes, ma'am.

3      Q. All right. And the only data that you're

4  relying on for that opinion in terms of the blood sugar

5  is Exhibit 10, correct?

6      A. Exhibit 10, yes, ma'am.

7      Q. And the only number on Exhibit 10 you're

8  relying on is the fasting glucose of 131, right?

9      A. That's correct.

10     Q. All right. Now -- so what you're saying

11 that her weight gain in -- I don't need you to hand me

12 that. Okay?

13         What you're saying is that her weight gain

14 that occurred after Zyprexa and after Seroquel led to

15 the 131. And my question to you is: What led to the

16 123 that she had in 1993?

17     A. The best weight I have for her in 1993 is not

18 in 1993. I'm -- may I offer you Exhibit 18, because we

19 don't have data. In Exhibit 18, which was data I did

20 not have -- do you want me to share it with you?

21     Q. No. You just go ahead and answer the question.

22     A. We have a weight from 1990, which is quite

23 modest for her height, and a BMI of 23.4, a weight of 11

24 of 1996, which is 194 by which time her BMI is in the

25 obese range.

213

1         So we don't know from '90 to '93 what she

2  weighed because we don't have the data, unless it's

3  present on a medical chart that relates to that blood

4  sugar.

5         What can I do to help you?

6      Q. I'm looking for the 123. It's disappeared.

7      MR. PIRTLE: What is it?

8      MS. THORPE: I'm looking for the exhibit

9  that has the 123, the 1993.

10     THE WITNESS: From 1993 a sugar of 123.

11     MS. THORPE: Look over on your side of the

12 table.

13     MR. PIRTLE: I don't have it.

14     A. It must be floating around here. Right in

15 front of you.

16     Q. (BY MS. THORPE) Oh, thank you.

17     A. In my house there lives a gremlin called

18 Murphy. Murphy is capable of many things.

19     Q. So -- so what you're saying, Dr. Tulloch, is

20 that -- is not that weight gain following Zyprexa and

21 Seroquel caused her to have diabetes, right? You're not

22 saying that?

23     A. What I'm saying is that she had abnormal blood

24 sugars on the 2nd of -- on February the 16th of 2006,

25 which was after she had had fairly significant weight

214

gain independent of what -- what the cause. We have
another sugar which was taken in the mid-Nineties of 123
and another one in the 130s a little bit later. And you
took my statements and asked me to agree with you that
she hadn't developed diabetes as a result of the
atypical antipsychotics. And I couldn't.

    MS. THORPE: Move to strike --

    A. I couldn't accept --

    MS. THORPE: -- as nonresponsive.

    A. -- I couldn't accept -- we agreed we weren't
going to speak over one another. I couldn't accept the
statement the way you'd taken it. I'm happy to have you
rephrase it in such a way that I can agree, but
otherwise I'm -- I'm waiting for the next question.

    MS. THORPE: Can you read my question back,
please.

    THE WITNESS: It will be several minutes
ago.

    MS. THORPE: Yes, it will be.

    (Requested portion was read as follows:

    "QUESTION: So -- so what you're saying,

Dr. Tulloch, is that -- is not that weight gain

following Zyprexa and Seroquel caused her to have

diabetes, right? You're not saying that?")

    THE WITNESS: There's an earlier one where

215

she said --

    Q. (BY MS. THORPE) No, that's the question.

    A. Okay. What I'm saying is that in a person

with diabetes in the family, any weight gain of 60 pounds is

more likely than not to contribute to abnormal blood

sugars. If the abnormal blood sugars are compatible

with the definition of diabetes, my belief is that

weight gain contributed to the arrival of diabetes. I

then took your question and --

    MS. THORPE: Sir, I'm going to move to

strike --

    A. If you want me to stop, I'll stop.

    MS. THORPE: -- as nonresponsive.

    MR. PIRTLE: You cut him off.

    Q. (BY MS. THORPE) You agree --

    MS. THORPE: Yes, I can get an answer to my

question --

    MR. PIRTLE: No, you cannot cut him off.

And I will --

    MS. THORPE: -- and then he can answer.

    MR. PIRTLE: -- stop this deposition if you

cut him off.

    MS. THORPE: You know, Tom, he can

answer --

    MR. PIRTLE: I will stop this deposition --

16 (Pages 212 to 215)

216

1　　　THE REPORTER: One at a time, please.
2　　　MR. PIRTLE: -- if you cut him off.
3　　　MS. THORPE: I am not cutting him off. I'm
4　trying to --
5　　　MR. PIRTLE: I'm putting you on fair
6　notice.
7　　　MS. THORPE: I'm putting you on notice --
8　　　MR. PIRTLE: All right. Just keep --
9　　　MS. THORPE: -- that this is a waste of
10　time.
11　　　MR. PIRTLE: -- on doing it.
12　　　THE REPORTER: I can't take two people
13　talking at the same time. My hands are off the writer.
14　　　(Discussion off the record from 5:43 to
15　5:43.)
16　　　Q. (BY MS. THORPE) Dr. Tulloch, I want to know
17　whether it is your opinion in this case that
18　Ms. Whittington has diabetes more probably than not as a
19　result of the ingestion of Seroquel --
20　　　MR. PIRTLE: Objection, asked and answered.
21　　　Q. (BY MS. THORPE) -- or is it just a
22　possibility.
23　　　A. My -- and I'm trying to be scientific and go
24　with the best available data. My belief is that the
25　60-pound weight gain that she incurred prior to the

217

1　definition of diabetes, which was on the date that we
2　discussed, was a terminal contributing factor to her
3　development of diabetes, in other words, as I recalled
4　earlier, the last straw that broke the camel's back.
5　　　You had an earlier question which I was
6　referring to, you had another question which said did I
7　agree that she hadn't -- that she had diabetes in the
8　early Nineties, and that was relating to her blood sugar
9　of 137. I will let you ask that question again so that
10　we're both comfortable with my answer.
11　　　Q. I'll ask the questions I need to ask, sir --
12　　　A. Okay.
13　　　Q. -- okay? I don't need your direction.
14　　　A. Okay.
15　　　Q. And I want to ask you, then: Is it your
16　opinion as a scientist, sir, that the results that are
17　expressed in Exhibit 10, which is a fasting glucose of
18　123, and a result that's expressed as a 137 in
19　Exhibit 17 are different from a scientific standpoint
20　than the fasting -- a single fasting glucose that's been
21　marked as Exhibit 10?
22　　　A. Yes, ma'am. What I --
23　　　Q. So what's the difference?
24　　　A. What I had said and I'll say it again is -- may
25　I have exhibit -- the two exhibits so that we're

218

comfortable with them. Okay -- is Exhibit 17 was taken
at 1:30 p.m. and Exhibit 11 has a time 1430 p.m. on it,
which I would understand to be 2:30 p.m. So my concern
is that these two at midmorning and early afternoon
sugars may not be fasting. What I then said was --
　　　Q. Can you identify them by exhibit numbers,
please?
　　　A. We agreed we weren't going to speak over one
another.
　　　Q. Can you identify them by exhibit numbers,
please --
　　　A. Yes.
　　　Q. -- so the record will be clear.
　　　A. The exhibit -- fasting sugar of 123 was
Exhibit 11, blood sugar taken at 1430, which is 2:30 in
the afternoon. Exhibit 17, blood sugar of 137, a blood
sugar was taken at 1:30.
　　　What I'm doing as a physician is
contrasting these two numbers which are above or very
near the defining level of diabetes as maybe not being
fasting. This one, as I said earlier, because it's a
glucose tolerance test and the requirements are for the
patient to be fasting -- this is Exhibit 10 -- in my
belief are the first definite fasting sugar. I offer
those as medical probabilities.

219

　　　My interpretation, therefore, are based on
the Exhibit 10 with a fasting sugar of 131 during her
glucose tolerance test as definitely being fasting. The
earlier sugars taken midmorning and early afternoon I am
not sure are fasting, and so any conclusions you ask me
to draw from those numbers, Exhibit 11 and Exhibit 17, I
would hedge with may be -- not be fasting.
　　　So when you then asked me to say she had
diabetes before the early 1990s, which is what I
understood from your question, I will have to say maybe
but I'm not sure because I'm not sure those two numbers
are fasting, ma'am. That's all I was trying to offer to
you.
　　　Q. And so you're -- well, let me ask you.
　　　Exhibit 12, which is the order for
Exhibit 11, says that it was ordered as a fasting
glucose, correct?
　　　A. Yes, ma'am, we agreed on that.
　　　Q. Yes, we did.
　　　And you agree that it's more likely than
not that Exhibit 11 reflects a fasting glucose, right?
　　　A. My only concern is the time of the day.
　　　Q. Do you agree that it's more likely than not
that Exhibit 11 is a fasting glucose?
　　　A. I -- you've heard me express concern. Any

17 (Pages 216 to 219)

**220**

1  number which is as late as 1:30 in one case and 2:30 in
2  another case I would wonder if they were fasting.
3  　　Q. And —
4  　　A. I leave my doubts on record and I wish them to
5  remain on record.
6  　　Q. And so what you're saying now is that you
7  personally don't know whether 11 — Exhibit 11 is a
8  fasting glucose even though the order was for a fasting
9  glucose —
10  　　A. That's correct.
11  　　Q. — as reflected in Exhibit 12, correct?
12  　　A. That's correct, ma'am.
13  　　Q. And so it would be pure speculation on your
14  part to conclude it was anything other — that
15  Exhibit 11 was anything other than a fasting glucose,
16  correct?
17  　　A. That any number taken at 1:30 in one case and
18  2:30 in the other case were fasting, yes, ma'am.
19  　　Q. Now, where on Exhibit 11 do you see that it was
20  taken at 2:30? Will you look at the collection time and
21  tell us on Exhibit 11 what the collection time is?
22  　　A. Okay. I'm looking at the top row on Exhibit 11
23  and I see a date and I see the number 1430 after that.
24  　　Q. Well, sir, let me —
25  　　A. I have interpreted that as the time, but I'm

**221**

1  happy to be corrected.
2  　　Q. Do you see that I'm pointing to the letters
3  COLL colon?
4  　　A. Correct.
5  　　Q. And it says 9:15, doesn't it?
6  　　A. Okay. We have two dates — two times on this,
7  and one of them says 9:15 and the other one says 1430.
8  And I stand corrected. The COLL we'll have to assume is
9  collected and, therefore, 9:15 is the probable date. I
10  stand corrected and thank you, ma'am.
11  　　Q. And so you would agree that Exhibit 11 more
12  likely than not reflects a fasting glucose, correct?
13  　　A. Taken at 9:30 in the morning, yes, ma'am.
14  　　Q. All right. So let me ask you my question
15  again.
16  　　A. Okay.
17  　　Q. When we have a fasting glucose of 123 and
18  another glucose taken several years later of 137 in a
19  patient who has gained in the neighborhood of 50 pounds
20  during that time frame, can you tell me whether or not
21  it is more likely than not that she had diabetes at —
22  in the 1990s?
23  　　A. We're hedging on the 137. I certainly think
24  that it is possible she had impaired fasting glucose
25  because that's a sugar 123 taken at 9:15. The main

**222**

1  problem is the date with the value of 137 which we
2  agreed was taken at 1:30 p.m. with the order for it to
3  be taken fasting, and I'm just not certain about a
4  1:30 p.m. fasting.
5  　　Q. And so —
6  　　A. However, if it were fasting, there's no doubt
7  the lady had diabetes by our definition.
8  　　Q. So how do you rule out that she had diabetes in
9  the 1990s?
10  　　A. We don't have the data to rule that out. As I
11  mentioned, sugars are rare in the charts of the
12  psychiatrists. If the blood sugar of 137 was validated
13  by other numbers, she might well have had diabetes
14  before she got the first of the atypical antipsychotics.
15  　　Q. You — you mean if it was confirmed by other
16  tests?
17  　　A. Yeah.
18  　　Q. If there was a second test, right?
19  　　A. (Witness nods.)
20  　　Q. Is that right?
21  　　A. Yes, ma'am.
22  　　Q. And so how do you rule out that she got the 131
23  in 2006 — the 131 fasting glucose in 2006 simply
24  because this was a person who already had impaired
25  glucose tolerance, probably already had diabetes before

**223**

1  she ever had that test in February '06? How do you rule
2  that out?
3  　　A. No, I think we are in agreement, ma'am. My —
4  my — the content of my report was that she had gained
5  60 pounds in weight and whatever her sugar status had
6  been before I would expect the sugars to be higher
7  because of the weight gain.
8  　　Q. How do you rule out, Dr. Tulloch, that this
9  woman was in a state of either preexisting before
10  Seroquel, before Zyprexa, impaired glucose tolerance or
11  diabetes before she ever took those drugs? How do you
12  rule that out?
13  　　A. Ma'am, I — I agree. I believe she did at best
14  have impaired glucose tolerance.
15  　　Q. And at worse she had diabetes?
16  　　A. At worse if the higher number is correct, she
17  might have had diabetes, that's correct.
18  　　Q. And you cannot rule out that she had those
19  conditions before she ever took Seroquel; isn't that
20  right?
21  　　A. We are in agreement, ma'am, yes.
22  　　Q. All right. So let's talk about Mr. Unger.
23  　　Oh, I've got to go back to Ms. Whittington.
24  And let me just say I've got to read carefully
25  Ms. Whittington's — this time line that you're relying

224

1   on -- on Ms. Whittington. And I may have additional
2   questions about Ms. Whittington because --
3       MR. PIRTLE: Well, I don't see any problem
4   during the course of what you're doing if you feel like
5   you need to go back and ask some more about that. I
6   have now in hard copy form provided to your colleague
7   what I believe to be the outlines that the doctor looked
8   at for each of the four individuals.
9       MS. THORPE: Thank you.
10      MR. KRASINSKI: Is this -- the disk, is
11  this on the disk, also?
12      MR. PIRTLE: I believe it is on disk, too.
13      (Short recess from 5:54 to 6:05.)
14      (Exhibit No. 21 marked.)
15      Q. (BY MS. THORPE) All right. Dr. Tulloch, we're
16  going to talk about Richard Unger. Okay?
17      A. Okay.
18      Q. I'm going to show you what's been marked as
19  Exhibit 21 for identification. And that's your report
20  in the Unger case, right?
21      A. Yes, correct.
22      (Exhibit No. 22 marked.)
23      Q. (BY MS. THORPE) And I'm going to show you
24  what's been marked as Exhibit 22 for identification and
25  ask you if that is your time line on Mr. Unger.

225

1       A. That's correct.
2       Q. Now, you prepared this report on Mr. Unger
3   yourself?
4       A. Yes, ma'am.
5       Q. Do you have any additions or changes you want
6   to make to this report?
7       A. Not at this time.
8       Q. This report that's been marked as Exhibit 21
9   fairly and fully reflects your opinions?
10      A. As of this time, yes, ma'am.
11      Q. And you -- it contains an accurate and careful
12  summary of the medical and scientific facts in your
13  opinion?
14      A. Yes, ma'am.
15      Q. You have not reviewed all of Mr. Unger's
16  medical records, correct?
17      A. That's correct.
18      Q. How did you decide what to read and not to read
19  of his medical records?
20      A. I read the records which are listed on page 10
21  of Exhibit 21 and those I considered to be the most
22  clinically absorbing ones.
23      Q. What does that mean?
24      A. Related to his -- to his clinical care and
25  yielding of the best data on blood sugar, blood lipids,

226

blood pressure, et cetera.
    Q. Can you turn to page 16 of the list of medical
records that were provided to you -- strike that.
        Look at in exhibit -- look in exhibit --
    A. Ma'am, I have Exhibit 21, page 16, if that
helps you.
    Q. Okay. And is that a list on page 16 of all
medical records that were provided to you with regard to
Mr. Unger?
    A. That's correct.
    Q. Can you go through page 16 and put a check with
a pen by those records that you reviewed.
    A. Yes, ma'am. What I'll be doing is transferring
the list from page 10 and collating them with the list
on page 16.
        Okay. I have a listing for Memorial
Hospital Pembroke Pines on page 10 which I do not see on
page 16. I have a listing for Medicaid which I do not
see on page 16. I have a listing for Norman A. Bloom,
Dr. Norman A. Bloom, which I do not see on page 16.
        I have a list of -- listing for Dr. Ares
Romero on page 10. And on page 16 there's a listing for
Dr. Patricia Romero. I'd point out the differences. I
have a listing for Dr. Marie Williams on 10 which I do
not see on page 16.

227

        Okay. I have 12 ticks on page 16 which are
my best matching of page 10.
    Q. If you -- Dr. Tulloch, let's put the exhibit
back together so that we don't get confused later. Have
you got the clip there?
    A. Yeah, I have a clip here which I'll put on it.
    Q. Now, by not reading all of Mr. Unger's records,
you are likely not going to be aware of all of his
charted weights; isn't that correct?
    A. That's a reasonable possibility, ma'am, yes.
    Q. By not reading all of his records, you may have
missed some of his blood sugar readings?
    A. I accept that, ma'am, yes.
    Q. By not reading all of his records, you may have
missed some of his glucose readings before he took
Seroquel, correct?
    A. That is correct.
    Q. By not reading all of his records, you may have
missed laboratory results that reflect high cholesterol
or high triglycerides, including such labs before he
took Seroquel?
    A. That is correct.
    Q. And by not reading all of his medical records,
you may have missed some alternative explanations for
his weight gain?

228

1    A. Each of those are reasonable comments.
2    **Q. By not reading all of his medical records, you**
3    **may have missed some other causes of diabetes that you**
4    **did not -- that you just didn't know about, right?**
5    A. They would be -- if there were any, they would
6    be other items on the saddle of the camel, yes, ma'am.
7    **Q. Okay. Are you -- in your -- this analogy you**
8    **keep using, Mr. Unger is the camel?**
9    A. No. There's a -- there's an analogy which
10   refers to the final straw that broke the camel's back.
11   So when a disaster happens, you generally find a stack
12   of issues and then the last thing that happens is the
13   final straw that breaks the camel's back.
14   **Q. And you're saying --**
15   A. So I use that analogy because most of these
16   patients have multiple risks for their diabetes. And I
17   would not wish the Court to have me ascribe any single
18   cause to their diabetes. Some can be more important
19   than others. And if the temporal relationship is close
20   to the time when the blood sugar became abnormal,
21   clearly more likely than not they were more important,
22   and that's there -- there's the analogy for the final
23   straw.
24   **Q. How -- if I understood you correctly, you**
25   **described the records that you chose to read as being**

229

1    **those that you believe bear on his endocrine --**
2    **endocrinological condition; is that correct?**
3    A. Yes, ma'am, to the best of my interpretation at
4    the time. I had a large number of records and a limited
5    amount of time and I tried to be cost effective with my
6    time.
7    **Q. And how did you know that the records that you**
8    **chose to read contained all of the information about his**
9    **endocrinology -- his endocrinological condition?**
10   A. I looked at the -- usually this comes in
11   history of present information, so you'll see the -- in
12   any arriving clinical set of data one sees what -- in
13   the first three or four lines, there's usually a summary
14   of the reason for that patient's arrival.
15   **Q. Well, did you use the time line that's been**
16   **marked as Exhibit 22 or exhibit -- what did we mark the**
17   **time line as? Here it is, Exhibit 22. Did you use**
18   **Exhibit 22, Dr. Tulloch, to help you decide what medical**
19   **records you should look at?**
20   A. I actually looked at the medical records before
21   I looked at the time line. What I -- as I said in the
22   previous patient, the advantage of the time line is it
23   has a direct association between the -- the date, the
24   time, the laboratory tests, and the medications that the
25   patient was receiving. It doesn't tell me a lot about

230

the patient at the time. So I skimmed through the
reason why he was going to see the physicians at the
different times and then I got down to when I had to put
it all back together again to make the report. That's
when the time line became useful, because it -- it
related the temporal relationship between the
biochemical abnormalities and the body weight.
    **Q. For none of the plaintiffs whose records you**
**looked at did you attempt to collect yourself the**
**weights of these patients or their glucoses or other**
**laboratory data, correct?**
    A. On my own, no, ma'am.
    **Q. You just completely relied on the time lines,**
**this one in the case of Mr. Unger, Exhibit 22, right?**
    A. Exhibit 22, yes, ma'am.
    **Q. Okay. Now, Dr. Tulloch, on -- in Exhibit 21,**
**your report, we've referred several times to this long**
**spreadsheet of medical records and scientific literature**
**and various documents that is numbered pages 1 through,**
**I think, 17. Can you turn back to that spreadsheet?**
    A. Oh, okay. I have it, entitled Reference
Exhibit List, yes, ma'am.
    **Q. Okay. Did you prepare the reference exhibit**
**list?**
    A. No, ma'am. This was done for me by the

231

plaintiffs' attorneys' department.
    **Q. Did you collect the materials that are on the**
**references in that list and then give them to the**
**lawyers?**
    A. I had many of them myself, and others I used in
the preparation of these patients, yes, ma'am.
    **Q. Okay. So you collected -- it's your testimony**
**today that you collected the materials that are listed**
**on Exhibits 1 through 17 yourself?**
    A. No, ma'am.
    **Q. Okay.**
    A. Most of the ones relating to the patient and to
the science were collected by me or obtained by me. I
ran an Index Medicus thing, the computer study. Others
were provided to me by the plaintiffs' attorney, and
some of them were patient -- were references which came
over from the Zyprexa issue.
    Remember the Zyprexa case had a number of
references in which Zyprexa was not the only medication
that the patients were given.
    **Q. Well, let me -- let me just sort of cut to the**
**chase here. This identical list appears on the reports**
**of Drs. Perry, Young, Nair, Abramson, Marks, and**
**Kendrick as well as your report.**
    A. Okay. I don't know any of those people. Who

232

1   are they, ma'am?
2       Q. They're experts testifying in this case.
3       A. Oh, okay.
4       Q. And so my question to you is: Did you collect,
5   you know, based on your review -- your Index Medicus
6   review and other efforts these materials and then hand
7   them over to someone at the plaintiffs' firm and then
8   they typed up the reference exhibit list or did they
9   hand you materials that they typed up and put in this
10  reference exhibit list? What's the genesis of this
11  list?
12      A. The -- a large number of these patient -- of
13  these references antedate the Seroquel literature. What
14  I said earlier was I did some work with Zyprexa, so --
15  and those ones were references which I gained together.
16  The scientific references which I was interested in I
17  got from a computer-based search. I looked through
18  Seroquel and side effects and I got some references.
19  Those headlines I got and I gave to the plaintiffs'
20  attorney and I said, "Please get me copies of these
21  references." So the science was generated by me and the
22  hard copy which you're holding today was provided by the
23  plaintiffs' attorneys' offices.
24          That they be common references for other
25  physicians, I don't know, but if that's cost effective

233

1   for an office to have one batch of references, I can
2   understand why they would.
3       Q. So -- so you did -- so what happened was you
4   did a literature search, you got the cites, and you gave
5   them to the plaintiffs?
6       A. Yes, ma'am.
7       Q. And all of the cites that you found on Index
8   Medicus that you thought were supportive of your opinion
9   you put in -- you gave to them and they put in this
10  reference list that's pages 1 through 17 --
11      A. One through 17, yes, ma'am.
12      Q. -- is that right?
13      A. (Witness nods.)
14      Q. Now -- hang on one second.
15          There are a total of 32 scientific articles
16  that appear on this reference list. Do you generally
17  agree with that number?
18      A. I didn't count them. I'll accept your word for
19  it.
20      Q. Does that accord with what you remember from
21  your Index Medicus search?
22      A. I think to ask me how many -- because we're
23  talking over a period of a year. Issues have come up
24  that were relevant to Seroquel which were present in the
25  early years and I dug them up. For example, I remember

234

specifically pancreatitis. All of the cases of
pancreatitis that I've been aware of have been related
to another product. So I then ran the issue over
pancreatitis and Seroquel and bingo, out came several
related to Seroquel. So these were ones which I had
added in because they clearly were relevant for this
particular product.
    Q. And you have said in your report that Seroquel
causes pancreatitis, haven't you?
    A. Yes, ma'am. I said that having found the
references.
    Q. All right.
    A. Yes.
    Q. And the references you found are an article by
Gropper, and that reports on three cases -- three case
reports; is that right?
    A. The name -- your memory for names is better
than mine. As I recall --
    Q. Well, why don't you just tell me --
    A. -- there were -- two groups of cases were both
from Canada. If you'd like to look them up -- they were
both from Canada. They were temporally, not directly
related.
    Q. What do you mean they were temporally, not
directly related?

235

    A. Well, they weren't -- they weren't exactly the
same time, which meant I felt they were probably not the
same case.
        (Exhibit Nos. 23 and 24 marked.)
    Q. (BY MS. THORPE) Okay. Doctor, I'm going to
show you what's been marked as 24 and 25 -- I've already
marked that one -- gosh, let me start that over.
        Doctor, I'm going to show you what's been
marked as 23 and 24 for identification. And I want to
ask you if those are the two articles or two documents
that you've identified as being supporting your opinion
that Seroquel causes pancreatitis.
    A. Yes, ma'am. Let me start by saying -- it's a
little misleading because the first page on page 23
relates to muscle damage from Seroquel. The
pancreatitis starts at the bottom right-hand side and
goes on to the other -- to the next pages, yes.
    Q. And is this all of the scientific literature
that you have identified in your search supporting your
opinion that Seroquel causes pancreatitis?
    A. It is what came up at the time that I ran the
literature search about four months ago, yes, ma'am.
    Q. And Exhibits 23 and 24 reflect the totality of
the scientific literature upon which you rely for your
opinion that Seroquel causes pancreatitis?

21 (Pages 232 to 235)

236

1    A. As of this time, yes.
2    Q. And you will agree with me that Exhibit 23 is a
3    case series involving three cases, correct?
4    A. That's correct.
5    Q. And you will agree with me that Exhibit 24 is
6    a -- is similarly a case series, correct?
7    A. Yes, ma'am, I see 11 reported cases in that --
8    in that reference.
9    Q. And you will agree with me that there is --
10   that pancreatitis occurs in people who don't take
11   Seroquel, correct?
12   A. Oh, yes.
13   Q. There's a -- this is a chronic disease that
14   occurs in the population, generally?
15   A. No, ma'am. I think if we need a brief treatise
16   on pancreatitis, let me be brief. But there is --
17   chronic pancreatitis which you're referring to is
18   usually considered a slightly different condition. It's
19   often associated with alcohol, sometimes it's associated
20   with autoimmune conditions. Acute pancreatitis is
21   something which has been reported after some
22   medications, and sometimes it's seen after presence of
23   gallstones causing bile to go up the pancreatic duct.
24   Q. So your -- your opinion is that Seroquel causes
25   acute pancreatitis?

237

1    A. I -- that's -- as I read these cases here, yes,
2    ma'am.
3    Q. In 23 and 24?
4    A. Yes, ma'am, in references 23 and 24.
5    Q. These case reports?
6    A. Yes, ma'am.
7    Q. Okay. And you will agree with me that acute
8    pancreatitis occurs in people who don't take Seroquel,
9    right?
10   A. I said that it can happen with gallstones, yes,
11   ma'am.
12   Q. And so in order to determine whether or not
13   Seroquel causes pancreatitis, you would agree with me
14   that you would have to have a study that has a control
15   group that controls for the fact that pancreatitis
16   occurs in people who don't take Seroquel?
17   A. Ma'am, I think -- I think we're getting a
18   little bit confused here.
19   Q. If you can tell me whether you agree or
20   disagree with that statement, you can just say yes or
21   no. If you don't agree, that's fine.
22   A. When an adverse effect comes out, one cannot
23   produce a case control study for every adverse effect.
24   Let me go to one that I spent quite a lot of time on,
25   which is Rezulin and toxic hepatitis.

238

1    Q. Let me just make my record here --
2    A. Okay.
3    Q. -- and then you can finish, Dr. Tulloch.
4    A. Okay.
5    MS. THORPE: I move to strike your answer
6    as nonresponsive because that's not at all what I asked
7    you.
8    A. Okay. Well, let me answer your question, then.
9    Your question was for my statement to be correct, there
10   would have to be a case control study. And my answer is
11   no. And I gave you an example which you have refused,
12   and I accept your refusal.
13   Q. Dr. Tulloch, do you agree that in order to
14   establish whether or not Seroquel causes pancreatitis,
15   you need to have a control study, either a cohort study
16   or a case control study or some other study, that has a
17   control group that accounts for the fact that acute
18   pancreatitis occurs in people who aren't taking
19   Seroquel?
20   MR. PIRTLE: Objection, asked and answered.
21   A. Ma'am --
22   THE WITNESS: Do you want me to answer?
23   MR. PIRTLE: Yes, go ahead and answer.
24   A. What I have to start with by saying is in
25   medical field there are isolated aberrant case responses

239

1    which are reported in the literature. Some of them are
2    so rare that we have to accept them as unique to the
3    combination of that particular patient and that
4    particular medication.
5    And I now bring back, if I may, the Rezulin
6    example. Toxin hepatic necrosis occurs in 1 patient in
7    80,000. It would not be possible to get enough numbers
8    for a case control study to prove that Rezulin caused
9    hepatitis of that magnitude without accepting case
10   studies.
11   Q. (BY MS. THORPE) Let me ask you --
12   A. Many other causes of acute hepatitis occur.
13   This one was nailed to Rezulin and stuck.
14   Q. And -- well, let me ask you, Doctor: What is
15   the prevalence of acute pancreatitis?
16   A. Without looking it up, I couldn't give you the
17   answer. It's a relatively rare condition as seen by me
18   in the emergency room. However, globally in the country
19   there's probably a case occurring once or twice a week
20   if not more frequently. So --
21   Q. Do you have any data at all on the prevalence
22   of pancreatitis?
23   A. Haven't looked it up because --
24   Q. You have no idea?
25   A. -- all I needed was association between it and

240

1  another atypical antipsychotic. And time will educate
2  us. As we get more experienced with these cases of --
3  with these medications, we'll know better.
4      Q. You agree that there is an association reported
5  in two case series that have been marked as 23 and 24,
6  correct?
7      A. We are in agreement with that.
8      Q. And you understand that an association reported
9  in a case series is not the same thing as causation?
10     A. Absolutely.
11     Q. Looking at Exhibit 23 -- well, strike that.
12         Nevertheless, in spite of knowing that an
13  association is not causation, you were willing to write
14  in your report that's been marked as Exhibit 22 --
15  exhibit?
16     A. Twenty-one.
17     Q. Strike that.
18         In spite of knowing that an association is
19  not the same thing as causation and that an association
20  in a case series is not the same thing as causation, you
21  were willing to write in your report that's been marked
22  as Exhibit 21 that Seroquel is a cause of pancreatitis,
23  correct?
24         MR. PIRTLE: Objection, form.
25     A. To the best available data as I interpret it,

242

1  then, because I then went back to the next sentence --
2  or two sentences down and clarified the association of
3  acute and fatal pancreatitis.
4      Q. So --
5      A. So I guess the earlier statement could be --
6  could be interpreted as being clarified by the
7  pancreatitis sentence.
8      Q. Well, let's just get it clear on the record
9  here in this deposition.
10     A. Okay.
11     Q. It is your opinion that Seroquel is associated
12  with pancreatitis, but there's not enough evidence to
13  say that it is a cause of pancreatitis. Do you agree
14  with that statement?
15     A. I think that's a reasonable statement on the
16  best available data.
17     Q. All right. I apologize if I've asked you this
18  question. But have you reviewed any reports of any of
19  the other expert witnesses --
20     A. No, ma'am.
21     Q. -- in any of these cases?
22     A. I think we've asked that before.
23     Q. I did.
24     A. And that's okay.
25     Q. And I apologize.

241

1  yes, ma'am.
2      Q. (BY MS. THORPE) And you are aware, are you
3  not, that no one in the world's literature on Seroquel
4  has said that Seroquel causes pancreatitis?
5      A. Ma'am, may I ask you to go back to my report on
6  page 9?
7      Q. Yes.
8      A. Okay. The wording which I used, which I quote,
9  "Moreover, administration of Seroquel has been shown to
10  be associated with the development of acute and fatal
11  pancreatitis." Those were my words.
12     Q. I'm going to direct your attention to the first
13  paragraph on page 9 under the atypical antipsychotics
14  and diabetes.
15     A. Okay.
16     Q. If you look at the sentence that is the -- the
17  third sentence of that paragraph, do you see the
18  sentence that says, "After reviewing the medical
19  literature, I am of the opinion that Seroquel can cause
20  weight gain, dyslipidemia, diabetes, and pancreatitis."
21     A. Okay.
22     Q. Do you see that sentence?
23     A. Yes, ma'am.
24     Q. Is that misstated?
25     A. Well, I guess it's -- it's misinterpreted,

243

1      A. Don't worry about it.
2      Q. I couldn't remember.
3          Before reviewing your opinions about
4  Mr. Unger, you did not review his deposition or his
5  wife's deposition --
6      A. No, ma'am.
7      Q. -- correct?
8          And you did not review the deposition of
9  his endocrinologist, Dr. Quintero; is that right?
10     A. That's correct.
11     Q. And you did not review the deposition of his
12  internal medicine doc, his --
13     A. That's correct.
14     Q. -- internist, right?
15     A. That's correct.
16     Q. And you didn't review any of his psychiatrists'
17  depositions, correct?
18     A. That's correct.
19     Q. You didn't read any depositions, correct?
20     A. That's what I stated for Ms. Whittington, and
21  that applies to Mr. Unger as well, yes.
22     Q. Okay. Now, in -- on the -- in the second
23  paragraph on page 11 of your report on Mr. Unger, you
24  say, "Based on reasonable medical probability, the
25  excess weight gain Mr. Unger experienced as a result of

244

1    the administration of the atypical antipsychotic
2    Seroquel was a cause of his developing diabetes," right?
3        A. Yes, ma'am.
4        Q. The mechanism by which you're contending that
5    Seroquel caused diabetes in Mr. Unger was gaining
6    weight, right?
7        A. That's the best explanation that we have at
8    this time. One of the other atypicals does seem to have
9    a direct insulin resistance-inducing effect. And
10   clearly, I will be looking for other data that might
11   relate Seroquel to a similar secondary effect besides
12   weight gain.
13       Q. Okay. But in — let's just focus on Mr. Unger
14   for a minute. The only mechanism by which Seroquel
15   caused diabetes in Mr. Unger, as far as you know today
16   as we sit here, was through weight gain, right?
17       A. Yes.
18       Q. You're not contending that there is any
19   evidence anywhere that there was a direct effect of
20   Seroquel on Mr. Unger that would have caused him to have
21   diabetes other than through the mechanism of weight
22   gain?
23       A. That's correct.
24       Q. All right.
25       A. But I left that paragraph at the bottom of all

246

1            The mechanism by which you contend Seroquel
2    caused diabetes in Ms. Whittington was weight gain,
3    right?
4        A. To the best of my understanding, yes, ma'am.
5        Q. And you're not making the argument that there
6    was some sort of direct effect on the pancreas in either
7    Ms. Whittington or Mr. Unger by Seroquel, correct?
8        A. By Seroquel, yes, ma'am. Remember, the
9    previous patient had had Zyprexa.
10       Q. Right.
11       A. So on current best available knowledge --
12       Q. Right.
13       A. — yes.
14       Q. And as to Ms. Whittington, because she took —
15   well, strike that.
16           You believe that Zyprexa has a direct
17   effect on the pancreas, correct?
18       A. There was one study. Clearly, I only quote one
19   study because we don't have any more. So it's — it's
20   only that single study.
21       Q. And you included that single study in your
22   reliance list, did you not?
23       A. It's — it's present, yes.
24       Q. It's —
25       A. Because sometimes --

245

1    of these reports, which is if something does turn up
2    between now and -- and court, I reserve the ability to
3    bring that out.
4        Q. And you and I have an agreement that because of
5    your paragraph, that if something does come up, you'll
6    let Mr. Pirtle know and you'll give me the opportunity
7    to examine you about any — any information like that,
8    right?
9        A. We will indeed, ma'am, yes.
10       Q. And you know that if you — if I don't hear
11   about it when and if this case ever goes to trial, I
12   will say to you on the stand that I wanted to know if
13   you had any additional information as reflected in that
14   paragraph. You understand that — that you'll — I'll
15   ask you about that later —
16       A. Yes, ma'am.
17       Q. — right?
18       A. And we agree that my approach to these issues
19   is to share data as much as possible.
20           MR. PIRTLE: And you understand I'll
21   probably object when that happens.
22       Q. (BY MS. THORPE) I'm just telling you.
23           Now, you're saying that weight gain — let
24   me just ask you the same question about Ms. Whittington
25   just to go back for a minute.

247

1        Q. If you identify the study —
2        A. Yes, ma'am.
3        Q. — on page — I think it's on page —
4        A. I will -- I'll find it for you. It's page 16.
5            The reason for it being -- it seems that
6    these atypicals include two which are different from all
7    of the others. So I am cognizant of Eben Blucher's work
8    and would look for somebody else to take the trouble to
9    repeat it with other atypicals, and if that study were
10   to be done, then I would reserve the right to bring it
11   up. It hasn't so far been done.
12       Q. All right. Tell me the name of the study that
13   shows that Zyprexa has a direct effect on the pancreas
14   that's included in your reference list that's part of
15   Exhibit 21.
16       A. Yes, ma'am. The name of the gentleman is Eben
17   Blucher, E-b-e-n B-l-u-c-h-e-r. And it's on page 16,
18   the fifth reference down.
19       Q. And you can not rule out in Ms. Whittington
20   that Zyprexa had a direct effect on her pancreas that
21   ultimately caused her to have diabetes, correct?
22       A. I cannot rule it out. I think that's correct,
23   yes. If -- I'm looking for double negatives in your
24   question. It is possible that an Eben Blucher
25   phenomenon was relevant in Ms. Whittington.

**248**

1    Q. And --
2    A. But we do not have any data that Seroquel has
3    the same features as Zyprexa. So I leave -- as a
4    scientist, when I say look at the best data and ask if
5    all rats have tails, therefore, would all tails belong
6    to rats.
7    Q. Now, you said there were two -- two drugs that
8    were different from Seroquel, I think --
9    A. Yes, ma'am.
10   Q. -- in one of your -- dialing back a few minutes
11   ago.
12   A. Yes, ma'am.
13   Q. What are those two drugs that you are --
14   A. Those are Abilify and Geodon. They do not seem
15   to cause weight gain, they do not seem to cause
16   diabetes, they do not seem to cause, et cetera. And,
17   again, I would leave the statisticians in this world to
18   give you better data on that.
19   Q. The -- you cannot rule out that the direct
20   effect of Zyprexa was the sole cause of
21   Ms. Whittington's diabetes, correct?
22   A. I -- I would agree with that, yes.
23   Q. Now --
24        (Exhibit No. 25 marked.)
25   Q. (BY MS. THORPE) -- let me show you what's been

**249**

1    marked as Exhibit 25 for identification. And in your
2    list of medical records that you say you've reviewed,
3    you said you reviewed records of Memorial Hospital
4    Pembroke, right?
5    A. Yes, ma'am, if it was on the list I did.
6    Q. Isn't it correct that there are no records of
7    Memorial Hospital Pembroke regarding Mr. Unger?
8    A. I -- I see that what you gave me is nothing but
9    a RecordTrak.
10   Q. Well, it says there are no records, right?
11   A. That's correct.
12   Q. Do you -- can you look on your disk and tell if
13   there are any records for Mr. Unger from Memorial
14   Hospital Pembroke?
15   A. Yes. But would you give me time. I mean,
16   let's do it on another evening. I have a number of
17   disks in here. I would have to find --
18   Q. Okay.
19   A. -- all the Unger ones.
20   Q. We're going to see each other tomorrow. Would
21   you check that? That would be great. So that will be
22   your homework. Okay. Is that all right?
23   A. Yes, teacher.
24        (Exhibit No. 26 marked.)
25   Q. (BY MS. THORPE) Okay. I'm going to show you

**250**

what's been marked as Exhibit 26 for identification.
A. Hang on, ma'am, let me just catch up.
Memorial -- Richard Unger and Memorial, that's what I'm
looking for?
Q. Right. Here I gave you 26.
     Let me show you what's been marked as
Exhibit 26 for identification. And that's a letter from
Medicaid, right?
A. Yes, ma'am.
Q. And it says there are no records from Medicaid
for Mr. Unger, right?
A. Yes, you're correct on that. And I have it
listed. Let me see if I have it on this list, Medicaid,
yes. So I -- I worked through a list of -- of
references. And, again, I'll need to look on the disk
and see if there's anything on that.
Q. Okay. If you can do that.
A. So Memorial and Medicaid, yeah.
Q. All right. Thank you. So we'll take that up
tomorrow --
A. Yeah.
Q. -- evening.
     So -- so in your opinion in your report
when you say, "Excess weight gain caused Mr. Unger to
develop diabetes," you say it's a cause of his diabetes,

**251**

right?
A. Yes.
Q. That Seroquel is -- let me get the exact
wording.
     You say that Mr. Unger -- based on
reasonable medical probability, the excess weight gain
Mr. Unger experienced as a result of his -- of the
administration of the atypical antipsychotic Seroquel
was a cause of his developing diabetes, right?
A. That's correct, ma'am.
Q. All right. So tell me what the other causes
are of his diabetes.
A. I go back to page 10. I'll refer you to the
second paragraph. And we would start with he was
getting treatment for hypertension, hyperlipidemia.
Those would be the two. I do not remember seeing a
family history of diabetes in this man. So there was --
he was a cigarette smoker. That was the other thing.
     So hypertension, hyperlipidemia, cigarette
smoker, psychosis would be four reasonable ones that I
can pull up immediately.
Q. Okay. So are those all of the conditions that
Mr. Unger had before he took Seroquel that you believe
are causes of diabetes?
A. Contributing causes, yes, ma'am.

252

1  Q. Okay. That's the whole list?
2  A. All I have at present.
3  Q. And have you — how do you rule out those
4  conditions that you just named, hypertension,
5  hyperlipidemia, cigarette smoking, and psychosis, as
6  causes of his — as sole causes of his diabetes?
7  A. Well, again, we come back to the parable of the
8  camel. If he had all of those when he weighed weight X
9  and six months later he weighs X plus 100 pounds, still
10 has all those conditions but has developed diabetes, my
11 contention would be the two issues that would have
12 contributed to diabetes would have been the weight gain
13 and the passage of six months of time.
14 Q. So — so you're saying that if you have a
15 significant — if a person has a significant weight gain
16 and they are hypertensive, they have hyperlipidemia,
17 they're cigarette smokers, and they have psychosis,
18 within six months they'll have diabetes?
19 A. No, ma'am, no. What I took was the example.
20 I'm sorry, you took my example and turned it upside
21 down.
22 Q. I'm trying to understand it.
23 A. What I said was if a patient was weight X and
24 six months later after having been given a medication he
25 weighed X plus 100 pounds and all of the other

253

1  conditions were stable, on the best available evidence,
2  my comment in that hypothetical case would be that the
3  cause of his diabetes was six months of additional
4  age -- remember age is a factor -- plus the hundred
5  pounds that he gained in weight. Those are the only two
6  variables which have occurred that we were able to
7  identify in this hypothetical case.
8  Q. Well, I'm not asking —
9  A. Now, we'll come to this case. And what I tried
10 to do for the Court on the bottom of page 10 was to look
11 at the weight issue and to look at the gain in weight,
12 which by my calculation was 45 pounds, and say in my
13 view on reasonable probability, the addition of
14 45 pounds, plus if Seroquel has any, let us call it,
15 Zyprexa-like effect, the initiation of his diabetes
16 was -- those were the two variables that came in during
17 that time span.
18 Q. So what you're saying is that the fact that he
19 took Seroquel and then gained 45 pounds and then got
20 diabetes, that time sequence of events is the basis of
21 your opinion that he — that Seroquel caused him to have
22 diabetes?
23 A. With -- with reasonable medical probability,
24 yes, ma'am.
25 Q. Okay. So it's —

254

1  A. And I go back to the camel and the straw and
the camel's back.
2  Q. So it's the — it's the sequence in time of
3  taking Seroquel, then gaining weight, and then
4  developing diabetes. That is the basis of your opinion,
5  right?
6  A. I believe was the best medical probability,
yes, ma'am.
7  Q. Okay. So I go back to my question that I asked
8  a minute ago. How do you rule out hypertension,
9  hyperlipidemia, cigarette smoking, and psychosis as the
10 sole causes of Mr. Unger's diabetes?
11 A. I go back to my analogy. To the best of my
12 belief, those were present and stable during his time of
13 weight gain. He still had hypertension, he still had
14 hyperlipidemia, he was still psychotic. The changes
15 that occurred during the time that we're reviewing were
16 the presence of another medication and the presence of a
17 total gain in weight of 45 pounds and the fact that the
18 medication under review is associated with the
19 development of both weight gain and diabetes.
20 Q. So if Mr. Unger came into your clinic and he
21 had hypertension, hyperlipidemia, he was a cigarette
22 smoker, and he was a psychotic and he had never taken
23 Seroquel by history and he had diabetes, what would you

255

1  say was likely the cause of his diabetes?
2  A. In that case the maximum medical probability
3  was the period of time -- remember, age is one of
4  them -- and the weight gain, whatever its cause, and the
5  cause may have just been change in diet or change in
6  physical activity.
7  Q. Okay.
8  A. I mean, what I tried to do is give you my
9  interpretation of the best available data.
10 Q. Well, I'm — I'm — let's postulate there's no
11 change. He comes in, he has – do you have — let me
12 just ask you this.
13 Do you have patients who are hypertensive,
14 have hyperlipidemia, smoke cigarettes, and who have
15 diabetes?
16 A. Do you mean have diabetes or develop diabetes
17 during a period of time? Because the answer to both is
18 yes.
19 Q. Okay. Well, you — right. That's fine.
20 And you have patients that meet those —
21 that have those conditions who aren't taking Seroquel,
22 right?
23 A. That's correct.
24 Q. All right. So if in a patient like that who
25 comes into your clinic who has hypertension,

26 (Pages 252 to 255)

256

1 hyperlipidemia, and smokes cigarettes, setting aside
2 psychosis, just -- just those three things --
3    A. Yes, ma'am.
4    Q. -- and they're not taking Seroquel and they
5 develop diabetes, what do you tell them caused their
6 diabetes?
7    A. I go back to what we've -- we've discussed.
8 In -- in somebody with a family history of diabetes --
9    Q. I'm asking you those three things.
10    A. -- time is a major issue.
11    Q. Dr. Tulloch.
12    A. We go back to time. Time is a major issue,
13 because as we said, I go back to my early analogy, and
14 you can pull it in any time you like. Somebody who
15 develops -- who inherits family history of type 2
16 diabetes might get it at the age of 105 or get it at the
17 age of 25. And if you stack in all of those numbers,
18 the likelihood of them developing it at 25 becomes much
19 higher. If none of those numbers are present and he has
20 that gene pool, he might develop type 2 diabetes at the
21 age of 105.
22    Q. How long did Mr. --
23    A. Does that help you understand? I'm trying to
24 make it simple.
25    Q. I think I understand perfectly what you're

257

1 doing.
2       How do you -- how long did Mr. Unger have
3 hypertension?
4    A. I can't give you that data offhand. I would
5 have to look back at the chart.
6    Q. Here you go. Look at your chart that's been
7 marked as Exhibit 22 and you tell me how long he had
8 hypertension.
9    A. Okay. What we have -- at least at the start of
10 the time line, which is the 2000 -- February of --
11 07-02-02, he was already on medications for blood
12 pressure.
13    Q. Do you know how old he was -- actually, to be
14 fair, you've got --
15    A. We have his age, we have his date of birth.
16    Q. Dr. Tulloch, you failed to go to the first page
17 of your time line.
18    A. Okay.
19    Q. So let me just help you out here.
20    A. Sorry.
21    Q. I think your first record is January 25, 2001;
22 is that right?
23    A. January 25th?
24    Q. Uh-huh.
25    A. Yes, ma'am.

258

   Q. That's the first time that you have any
information about --
   A. This man.
   Q. -- this fellow. And Mr. Unger was 52 years old
then, wasn't he?
   A. Forty-nine to -- that's correct.
   Q. And so you're missing a half century of medical
history on Mr. Unger, aren't you?
   A. In his -- it would be in his past medical
history in the chart, but that's correct.
   Q. Right. Tell me anything you know about
Mr. Unger before 2001.
   A. Right now I have summarized what I have here.
For anything earlier I would need to go to the charts of
the physicians listed and pull out the past history.
   Q. Do you -- do you know right now as you sit here
whether you know anything about Mr. Unger from a medical
record that predates January 25, 2001?
   A. Yes, ma'am, and I summarized that on page 10.
   Q. I want you to find me a medical record before
January 25, 2001.
   A. 2000 and --
   Q. One.
   A. -- one. Okay.
      What I have summarized on page 10 is that

259

he sustained a back injury in 1997, and it gives the
levels which were injured. It describes that he later
had a problem with infection in an area of his back, and
he then had a cervical fusion in 1990. So all of these
antedate the date that you mention.
   Q. That's not my question, Dr. Tulloch, just to
save you the energy. My question is: Do you have any
medical records that are dated before 2001?
   A. Okay. I -- without looking at the chart, I
can't --
   Q. Okay.
   A. -- tell you.
   Q. Can you make a note to find that out? I
promise I won't give you any more assignments. That
will be my last --
   A. Okay. Earliest Unger records.
   Q. Right.
   A. Okay. I have Memorial data, Medicaid data, and
earliest records on Unger other than -- well, I have to
point out that when a patient tells you this happened in
this year and this happened in that year, that's the
patient's medical history. Sometimes that's all we get,
because they don't --
   Q. Right.
   A. -- have medical records come with them.

27 (Pages 256 to 259)

260

1    Q. You didn't talk to Mr. Unger?
2    A. I have to have the secondhand from the
3  physicians who saw him.
4    Q. So you -- other than what you wrote about in
5  your report in Exhibit 2 about his --
6    A. Past medical history.
7    Q. No. Other than what -- let me finish my
8  question. Okay?
9         Other than what you wrote in your report
10  about his back injury in 1997, you don't know anything
11  about his 50-year history, do you?
12    A. Ma'am, I -- I tell you all I have is what's
13  written there.
14    Q. Okay. And so I'm correct, right?
15    A. To the best of my knowledge, that's correct.
16    Q. All right. So would you agree with me that
17  hypertension, hyperlipidemia, psychosis, and cigarette
18  smoking can be the sole causes of diabetes in people --
19  in some persons?
20    A. In the absence of any other contributing
21  factor, yes.
22    Q. And it's only if -- okay. That's -- strike
23  that.
24        What is the -- have you quantified the
25  contribution of hypertension to Mr. Unger's diabetes?

261

1    A. No, ma'am. And for the Court I would leave it
2  at -- just at that. I will -- for our science there was
3  a paper by a Italian man called Feranini who looked at
4  adult Italian males with hypertension and showed they
5  had significant insulin resistance. So I believe the --
6  for our understanding of this statement, it's through
7  the mechanism of insulin resistance.
8    Q. Okay. But I'm asking you if you have
9  quantified the contribution of this cause to Mr. Unger's
10  diabetes.
11    A. No, ma'am. As I said, it's one of the factors.
12  And I go back to the camel's -- camel's saddle.
13    Q. So you can't put a number on it?
14    A. No, ma'am.
15    Q. And you have not looked in the science to see
16  what relative risks are associated with hypertension and
17  diabetes?
18    A. Other than the article of Feranini which was
19  interesting for our understanding the mechanism, no.
20    Q. Does it report a relative risk?
21    A. No, because I think we go back to the camel.
22  It would depend on the level of all the other factors
23  that relate to the patient when they develop diabetes,
24  how much --
25    Q. Does Feranini talk about camels?

262

1    A. He talked about high blood pressure and insulin
   resistance.
2    Q. All right. Does he give a relative risk?
3    A. No. He talks about a mechanism.
4    Q. Right. Did you when you did your Index Medicus
5  search look for the relative risks for any other kind of
6  numerical quantification of the contribution of
7  hypertension to diabetes?
8    A. No, ma'am, because to my knowledge, the main
9  issue related to the atypicals was weight gain and the
   development of diabetes and then the other complicating
   factors.
10    Q. But you understand Mr. Unger --
11    A. I agree --
12    Q. -- had hypertension before he took Seroquel?
13    A. I understand that --
14    Q. Right.
15    A. -- and I do not have data that would quantify
   it.
16    Q. Okay. So if you -- if you don't have data that
17  quantifies the contribution of -- of hypertension to
18  diabetes, how can you conclude that Seroquel was the --
19  was a cause of his diabetes?
20    A. My main basis --
21    Q. Let me rephrase that question because that

263

1  wasn't a good question.
2    A. Okay.
3    Q. Is it your opinion in Mr. Unger that Seroquel
4  more likely than not caused Mr. Unger to have diabetes?
5    A. Yes, ma'am.
6    Q. So you understand that's a quantitative kind of
7  opinion, right?
8    A. Yes, ma'am.
9    Q. So if you don't know the contribution that
10  hypertension made to diabetes, how do you know -- how do
11  you know that hypertension wasn't a hugely bigger cause
12  than Seroquel?
13    A. What we have available in the way of data on
14  this man was that during the time he took Seroquel,
15  there was a total increase in body weight of 45 pounds.
16  All the other factors, as far as I understood from the
17  chart, were stable.
18        So I go back to my analogy. If a patient
19  is point X, weight gain of 45 pounds, point X plus 45,
20  develops diabetes, all other conditions have been the
21  same, the two factors that would have been relevant in
22  the development of that person's diabetes is the time
23  from the first observation to the second observation and
24  the medication which he took if it's of the groups that
25  cause the onset of diabetes. And we have a number of

28 (Pages 260 to 263)

264

1   them. Tonight we're discussing Seroquel.
2      Q. So what you're saying is that there was a
3   temporal relationship between the Seroquel and the
4   weight gain and then the diabetes —
5      A. That's —
6      Q. — is that right?
7      A. — correct —
8      Q. And that's —
9      A. — the best of my interpretation of this data,
10  yes, ma'am.
11     Q. All right. And you say that his hypertension
12  and hyperlipidemia were stable, right?
13     A. I said that to the best of my knowledge, they
14  were, ma'am, yes.
15     Q. All right. Let me ask you to point to me in
16  your Exhibit 22, this time line that you rely upon, any
17  reference to the stability of his blood pressure or that
18  allows you to conclude that his blood pressure was
19  stable.
20     A. Okay. What we have is a list of his
21  medications on page 2, which include Norvasc and
22  Maxzide.
23     Q. Okay. How does that show that his hypertension
24  is stable?
25     A. No, it just lists his medications.

265

1      Q. Okay. I want to know what on Exhibit 22 shows
2   you that his hypertension was stable.
3      A. Okay. No, I do not have data on that. I would
4   have to go back and look at the references which relate
5   to his physicians' visits as they were listed on page 10
6   and look at the levels of blood pressure.
7      Q. What is the contribution of — I'm sorry. Say
8   that last — what you just said again.
9      A. Look at the levels — your question was was his
10  blood pressure stable. Stable blood pressure is one
11  which measures in an adequate level for treatment by our
12  definition of an adequate blood pressure. And I have
13  not focused on that as a variable other than that he had
14  high blood pressure and has constant treatment for that.
15         If you need an answer to that question, I
16  would need to find the blood pressure numbers and chart
17  them out like we charted out the body weights.
18     Q. And you didn't do that?
19     A. I have not done it.
20     Q. All right. So what is the basis of your
21  opinion that his blood pressure is stable?
22     A. In my belief that when I looked through the
23  chart, there was no major periods when his blood
24  pressure was registered as wildly abnormal and the fact
25  that his medications were not significantly altered

266

during the time of this weight gain.
      Q. And that's why it's important to know when you
first started looking at the medical — what the first
medical record you have is for doctor — for Mr. Unger,
because it's my belief you don't have any records before
January of 2001. So —
      A. 2001?
      Q. Yes.
      A. Okay.
      Q. And I want to know how — what period of time
you know his blood pressure was stable. Okay? So
that's why I need you to check.
      A. Oh, okay.
      Q. So is it fair to say that you have not
quantified the contribution of the causes of
hyperlipidemia, cigarette smoking, and psychosis to
Mr. Unger's diabetes?
      A. I have not considered them to be other than
stable during the duration of these — the time when he
gained 45 pounds in weight under the administration of
the atypical antipsychotic Seroquel, yes, ma'am.
      Q. So you have not quantified the contribution of
those conditions to causing his diabetes?
      A. Yes, ma'am. And what I said, in my view it was
reasonable medical probability to assume that they were

267

stable. There had not been major comments in the
change, but if the issue becomes under question, I'm
happy to review that.
      MS. THORPE: Move to strike as
nonresponsive.
      Q. (BY MS. THORPE) Mr. Tulloch — I mean
Dr. Tulloch, I want to know whether or not — yes or
no — have you quantified the contribution of
hyperlipidemia, cigarette smoking, and psychosis to
Mr. Unger's diabetes.
      A. Ma'am, I have said that they were an additive
and contributing factor. You're asking me to say were
they 60 percent, 80 percent, or 99 percent —
      Q. Or you haven't done it.
      A. I do not have that data.
      Q. Okay.
      A. I do not believe it's there.
      Q. Okay.
      A. I did bring you two nights ago our best
estimate from a clinical study on the risk relationship
between gaining weight, and that's there in the record.
And we'll leave it in the record. I don't want to dig
it up again.
      Q. All I need to know is whether you're — you
have a number that you've attached —

**268**

1  A. Okay. No, I --
2  Q. No, you haven't --
3  A. No.
4  Q. -- right? For hyperlipidemia, cigarette
5  smoking, and psychosis, you have not attached a number?
6  A. No, ma'am.
7  Q. Now, you did attach a number for
8  Ms. Whittington the other night. You said 33 percent.
9  Do you remember that?
10  A. Yes, ma'am.
11  Q. Okay. You're not doing that for Ms. Unger?
12  A. I'm not willing to do that unless you push me
13  to -- unless you insist I have to produce a number. I
14  don't think that --
15  Q. I'm asking you what you've done.
16  A. Yes.
17  Q. If you say no --
18  A. No.
19  Q. -- that's --
20  A. What I said was --
21  Q. No, I'm not asking you what you said. I'm
22  asking you as to hyperlipidemia, cigarette smoking, and
23  psychosis and Mr. Unger you've not come up with a number
24  contribution --
25  A. No.

**269**

1  Q. -- correct? All right.
2  Now, how -- you're saying that because
3  these conditions in your opinion more likely than not
4  were stable, the hypertension, hyperlipidemia, cigarette
5  smoking, and psychosis were stable in Mr. Unger, that
6  they could not be sole causes, right?
7  A. Yes, they were more likely than not were not
8  likely to be or were -- let's take away the double
9  negative -- that they were unlikely to be the sole
10  causes.
11  Q. Because they were stable?
12  A. Yes, ma'am.
13  Q. Why does being stable make it more likely than
14  not that they weren't causes?
15  A. Well, because the one big variable which is
16  apparent during the time line during which he developed
17  diabetes was a 45-pound weight gain.
18  MS. THORPE: Move to strike as
19  nonresponsive.
20  Q. (BY MS. THORPE) Dr. Tulloch, I don't
21  understand and I want you to tell me why the fact
22  that -- let's just take one of them -- hypertension is
23  stable in someone. What does that mean?
24  A. What that means is that under the medications
25  which he was receiving, a blood pressure which had

**270**

previously been high remained at a clinically acceptable
level for the standards of good medical care.
Q. So you mean normal? His hypertension -- he
wasn't hypertense?
A. High blood pressure for normal -- nondiabetic
subjects is defined as in excess of 140/90. Adequate
blood pressure would be defined as less than 130 over
less than 80 or 85. And if all of his numbers in his
chart were of the second category while he was
maintained on the medications listed, in my view, those
were -- the blood pressure was well controlled.
Q. What do you mean by psychosis is stable, that
the psychosis was stable?
A. You're reading too much in my data. It's -- as
far as I understood, he was -- there was no major change
in his mental state during the time that he was under
treatment.
Q. Under treatment for what?
A. What we had --
Q. Under treatment with what?
A. When we were going -- during the time that he
had gained 45 pounds in weight. What I'm trying to do
is isolate out one major contributing factor --
Q. I know that.
A. -- during this time and the --

**271**

Q. I get that.
A. -- contributing factor is 45 pounds in weight
gain which occurred while he was taking an atypical
antipsychotic.
Q. All right.
A. I will be happy to grant you that all of the
other factors are out there.
Q. All right. Let me ask you --
A. And I will be happy to -- let me finish. And I
will be happy to speculate on their quantitation but not
be pinned down to numbers because I don't believe the
numbers would be anything other than illustrative.
Q. I want you to tell me if there were any other
causes of Mr. Unger's weight gain other than, in your
opinion, Seroquel.
A. In my view, again -- and you being -- asking me
how to define stable -- in my view, there was not a
major change in the other factors that relate to weight
gain. In other words, I did not read in his chart at
that time exacerbation of his previous damage to his
back or his cervical spine and had, therefore, read that
as those were present, contributing to his risk for
diabetes but not major contributing factors in the
presence of 45 pounds in weight gain.
Q. Okay. So what was the period of time that the

30 (Pages 268 to 271)

272

1　45-pound weight gain occurred in?
2　　A.　We have -- and I'm reading from the last
3　paragraph on page 10.  His weight is recorded in June
4　2003 as 2,000 -- 282.  He then was on several doses of
5　Seroquel.  And so I rounded them all off to a total
6　increase of 45 pounds.  So on the various doses of
7　Seroquel, he gained 45 pounds.
8　　Q.　Looking for the time, sir.
9　　A.　And the time interval would be from 4 of '04 to
10　9 of '05.
11　　Q.　It's during that period of time you think he
12　gained 45 pounds?
13　　A.　Forty-five pounds.
14　　Q.　Okay.  And is it your testimony that from April
15　of '04 to September of '05, there was no exacerbation in
16　his spine or cervical spine in that period?
17　　A.　To my best reading of the chart, yes.
18　　Q.　All right.  And --
19　　　　MR. PIRTLE:　When you get to a point.
20　　Q.　(BY MS. THORPE)　Are there other causes of
21　Mr. Unger's weight gain besides Seroquel?
22　　A.　Other contributing causes -- no, not to my
23　knowledge during that period of time.
24　　Q.　So the only cause that you know of in your --
25　your review, your extensive review that you've -- you

273

1　believe you've undertaken of Mr. Unger's medical records
2　is Seroquel?
3　　A.　Yes, ma'am.
4　　Q.　You can't think of anything else during the --
5　this -- the period of time that Mr. Unger was taking
6　Seroquel that would account for a 45-pound weight gain?
7　　A.　Other than -- well, we acknowledged the passage
8　of time to be a contributing factor to diabetes but not
9　necessarily for the weight gain.
10　　Q.　I'm focused on weight gain.
11　　A.　Weight gain.  Focus on --
12　　Q.　My question is yes or no.  You can't think of
13　anything else during the time that Mr. Unger was taking
14　Seroquel that could account for his Seroquel -- account
15　for his weight gain -- let me start that over.
16　　　　You can't think of anything else during the
17　time that Mr. Unger was taking Seroquel that could
18　account for his weight gain other than Seroquel?
19　　A.　That's correct.
20　　Q.　All right.
21　　　　MS. THORPE:　We can take a break.
22　　　　(Short recess from 7:19 to 7:29.)
23　　Q.　(BY MS. THORPE)　Dr. Tulloch, I want to
24　understand something you said before the break about
25　your report and this period of time between April of

274

1　2004 and September of 2005 as being the period of the
2　45-pound weight gain.
3　　A.　Yes, ma'am.
4　　Q.　I don't think that's borne out by the language
5　of your report, so I'm trying to find out what you
6　really mean.  According to your report, he weighed
7　310 pounds on April 29, 2004, right?
8　　A.　Yes, ma'am.
9　　Q.　And then he -- in September of 2005, he weighed
10　325 pounds, right?
11　　A.　Right.
12　　Q.　That's a 15-pound weight gain?
13　　A.　Yeah.  What -- what -- if you go back --
14　　Q.　I just want to know the dates.
15　　A.　Okay.  Yeah, go back to the first half of that
16　sentence.  What I said was his weight in January of 2001
17　was 260.  He was given Seroquel; the rate -- the weight
18　was then 282.  It rose to 310.  And I gave you the
19　dates.  And then at the increased dose, it rose to 325.
20　So those.
21　　Q.　So aren't you --
22　　A.　-- are the numbers as I -- as I read them.
23　　Q.　Aren't you comparing June 2003 to September of
24　'05?　I mean, it comes out to be 43 pounds instead of
25　45, but I assume you rounded up.  Is that -- is that

275

1　what you're -- you're really saying -- I mean --
2　　A.　Yes.
3　　Q.　-- I'm really trying to find out.  I think you
4　just misspoke.  It's not April of '04, it's June 2003,
5　isn't it?　The time period --
6　　A.　Yeah.
7　　Q.　-- of the weight gain that you were concerned
8　about?
9　　A.　That's right.  What I said, the weight is
10　recorded in June '03 of 282.  We go from 82 to 325.
11　That's 43.
12　　Q.　Okay.  And is that where you get your
13　45-pound --
14　　A.　That's where I get my 45.
15　　Q.　Okay.  All right.
16　　A.　And I believe he was on Seroquel all that time.
17　　Q.　All right.  So -- so what you're -- you're
18　telling me is that you can't think of anything between
19　June 2003 and September 6, 2005, that happened to
20　Mr. Unger to make him cause weight other than taking
21　Seroquel, right?
22　　A.　Reasonable medical probability, yes, ma'am.
23　　Q.　All right.  Now, the first weight you have for
24　Mr. Unger, according to your time line -- the time line
25　that was prepared for you by the plaintiffs' law firm,

31 (Pages 272 to 275)

**276**

1  is 260 pounds on January 25, 2001?

2      A. That's correct.

3      Q. And you know that Mr. Unger was 5'9", right?

4      A. (Witness nods.) Yes, ma'am.

5      Q. And his BMI at 5'9" is 38.4, correct?

6      A. You calculated it for me, thank you.

7      Q. You don't have any reason to think I'm —

8      A. No, I'll accept that.

9      Q. And so he was obese before he started taking

10  Seroquel, correct?

11      A. Yes, ma'am.

12      Q. That's morbidly obese, correct?

13      A. Yes, ma'am.

14      Q. And morbidly means so obese that it can make

15  you sick, right? Isn't that what's meant — what does

16  "morbidly" mean?

17      A. Being a purist I couldn't give you a definition

18  without looking it up. It's — it's in loose parlance

19  "very." But I grew up reading Latin as probably did you

20  and I — and without — without looking up the

21  derivation I think would just mean "very."

22      Q. So you just mean it's very obese? That's what

23  you think "morbidly obese" means.

24      A. Yeah. Well, there are BMI definitions which I

25  am purposely avoiding. But to go back to the linguistic

**277**

1  roots, I would have to go back to the Latin and define

2  that for you.

3      Q. So — I understand that you blame Seroquel for

4  his weight gain from June of 2003 to September of 2005.

5  Tell me, Doctor: How did he get to be 260 pounds and

6  morbidly obese in January of 2001 before he took

7  Seroquel?

8      A. How did he become? Well, by the reasons all

9  other obese folk become. He was — he took on more

10  calories than he burned.

11      Q. Okay. What happened — what did he do to cause

12  himself to take in more calories than he burned before

13  January 25, 2001, that got him to weigh 260 pounds?

14      A. Do you want me to say anything other than he

15  took in more calories than he burned?

16      Q. Do you know what he did in the way of diet or

17  exercise or anything about his lifestyle that explains

18  how he — how Mr. Unger got to be 260 pounds in January

19  of 2001 before he ever took Seroquel?

20      A. No. I mean, what we know we've already shared.

21  He had injuries that might mitigate his being a little

22  hypoactive. He was psychotic and —

23      Q. What do you mean by "hypoactive"?

24      A. Less — less inclined to exercise. And — and

25  we don't know much about his family, so we don't know if

**278**

he had a family history of obesity, but that's another
possibility.

        Q. Isn't it fair to say that you know absolutely
nothing about how Mr. Unger came to weigh 260 pounds?

        A. Well, I — I think you're being aggressive in
that statement. All we know is that he took on more
calories than he burned.

        Q. Can you think of —

        A. That's a fairly reasonable reason for him
weighing what he did.

        Q. Can you — and that's exactly what happened to
him after he took Seroquel, right, he took in more
calories than he burned?

        A. That's correct. And the reason why I — well,
let me let you ask the questions.

        Q. And so after he took Seroquel, after he —
Mr. Unger started taking Seroquel — well, strike that.

        Before Mr. Unger started taking Seroquel,
you don't know whether he had a habit of eating a gallon
of Ben & Jerry's ice cream every day, do you?

        A. Ma'am, I'm not inclined to speculate.

        Q. You don't know.

        A. Clearly, there were calories there.

        Q. You don't know what he did, right?

        A. No.

**279**

        Q. And you don't know whether after he started
taking Seroquel he picked up the habit of eating a
gallon of Ben & Jerry's ice cream every day, do you?

        A. Ma'am, you're — you're adding the speculation.

        Q. You don't know?

        A. We have no knowledge.

        Q. Right. Because you've never talked to
Mr. Unger, right?

        A. He was not sent to me for interview. What I
will have to say and the reason why I believe Seroquel
was a contributing factor was that weight gain and the
development of diabetes is present in a group of
atypical antipsychotics of which Seroquel is one. So is
Olanzapine, so is Zyprexa.

        So in the best available evidence that I
have in this patient during this time interval, Seroquel
has to be high on that list. And we're talking about
weight gain and then soon we'll be talking about
diabetes, and I would have to go back to the analogy of
the camel and the — and the final straw.

        Q. I don't know why that doesn't surprise me,
Dr. Tulloch, but it doesn't surprise me that you would
go back to the camel and the final straw.

        A. Thank you.

        Q. Can you tell me what it means to be a cause in

280

1 your mind?
2     A. A cause?
3     Q. What is a cause?
4     A. A contributing factor.
5     Q. A contributing factor and a cause are the same
6 thing?
7     A. Well --
8     Q. What is a contributing factor?
9     A. Well, what -- in clinical context one has to be
10 cognizant of many contributing factors in a condition
11 like type 2 diabetes. To the best of my beliefs, this
12 man had the causes -- the contributing factors we've
13 list -- if he developed diabetes shortly after a major
14 weight gain, in my view, even for somebody weighing
15 260 pounds, 43 pounds is a major weight -- major further
16 weight gain. If he then develops diabetes during that
17 time, my belief is that that was the final straw.
18     Q. I'm just asking you what it means to be a
19 cause.
20     A. And I'm asking you as a contributing factor.
21     Q. Okay. Then tell me what --
22     A. The way I would interpret a cause would be a
23 single contributing factor which was without any doubt,
24 then it's easy to say that was the cause. A cause would
25 be a number of factors which might contribute to on the

281

1 best of our available evidence.
2     Q. Okay. And in Mr. Unger's case, there is not a
3 single contributing factor without any doubt that caused
4 him to develop diabetes?
5     A. Other than the 45 pounds in weight gain which
6 was the final straw, yes, ma'am.
7     Q. Okay. So you think the 45 pounds was a single
8 contributing factor without any doubt that caused him to
9 have diabetes. Is that --
10     A. Final straw that broke the camel's back.
11     Q. I didn't ask you about -- you can say yes or no
12 and then you can say your camel speech.
13     A. Okay, ma'am.
14     Q. Are you saying that a single contributing
15 factor without any doubt in Mr. Unger is his 45-pound
16 weight gain?
17     A. Yes, ma'am.
18     Q. Okay.
19     A. And remember, any time that there's a time
20 interval, we also have time.
21     Q. Okay. I'll remember that. I'll try to
22 remember that. In fact, I think I may think about that
23 philosophically tonight.
24     MR. PIRTLE: I'm thinking about this BMI
25 table I'm looking at. Put it on the record. It's bull.

282

    MS. THORPE: Oh, you're worried about your
own BMI?
    MR. PIRTLE: Actually, not really, but --
    MS. THORPE: Okay. I'm sorry. Don't mean
to get personal there.
    Q. (BY MS. THORPE) All right, Dr. Tulloch. I
want to know -- I want to know if Mr. Unger -- I want to
know when you think that he developed diabetes.
    A. What I have here is a weight that relates to
the time he developed a very high blood sugar indeed and
that sugar is so high that my belief would be there
would be sugar slowly rising to that unless there was an
acute precipitating factor.
    Q. And I just want to know when you think he
developed diabetes.
    A. Well, I'm endeavoring to answer your question
as well as I can given that 1,590 milligrams is a very
high level. And sometimes it can be an acute
deterioration that can bring that on. But usually -- on
September the 7th in 2005, there's a sugar of 544. And
there are other random sugars which are off the scale
for five occasions and then become in the 300s.
    On the 6th, day before that, there was a
blood sugar just below a thousand, so clearly by that
time his sugars are very high indeed. Without looking

283

for a history of polyuria, polydipsia, and weight loss,
one would have to believe that his sugars were rising to
that over at least three months before that.
    So we shared -- we don't get sugars as
frequently as we would like in some of our psychiatric
patients. So we don't have data from June the 22nd of
'05 until September. But my belief is that sugar would
have been abnormal at least during that time.
    Q. I want to know when you think he had diabetes.
When do you think his diabetes began?
    A. I'm trying to give you my best available data.
    Q. If you don't know, you can say you don't know.
    A. What I'm saying is the first grossly abnormal
sugar I have is September the 6th of 2005. If you look
at the time line, there aren't many other sugars that go
all the way back.
    Q. So do you not know when he got -- when he
developed diabetes -- it's okay. If you don't know, you
can say, "I don't know when he got diabetes."
    A. That's what I was endeavoring to give you was
to -- starting from a sugar of nearly a thousand and go
back. And I can't tell you when it rose above 126
because we don't have data.
    Q. So you do not know when Mr. Unger developed
diabetes, do you?

284

1    A. That's correct.
2    Q. And you cannot say that he had -- that his
3    diabetes occurred after he took Seroquel. You don't
4    know?
5    A. We don't have data on that.
6    Q. So you don't know, correct?
7    A. That's correct.
8    Q. Now, the -- the blood sugars that you were
9    reading out from --
10   A. September.
11   Q. -- September of 2005 -- let me just ask you in
12   that -- he was admitted to the hospital in September of
13   2005. You're aware of that, right?
14   A. Yes, ma'am.
15   Q. And does that series of blood sugars in your
16   mind meet the criteria for the American Diabetes
17   Association for diabetes?
18   A. Yes, ma'am.
19   Q. And so you think that whatever happened to him
20   in the hospital, those high blood sugars would establish
21   that he had diabetes?
22   A. Yes, ma'am.
23   Q. Okay. So your report -- I want to talk to you
24   about when he took Seroquel. Okay? Your report says
25   that -- says that Mr. Unger started taking Seroquel in

285

1    October of 2002, right? That's -- if you look down at
2    the third paragraph, it has most of your dose
3    information. Do you see that?
4    A. (Witness nods.) Yeah. And that's earlier than
5    we see it on the time line.
6    Q. Show me on your time line.
7    A. I'm looking at time line, page 3.
8    Q. So this is Exhibit 22?
9    A. Halfway down, February the 28th of '03 is the
10   first time it's mentioned on the time line. And so I
11   must have got that from one of the other sources.
12   Q. You don't know which is right right now?
13   A. No, I -- I believe my report is correct. I
14   wouldn't have written it if it wasn't there, but it's
15   clearly not on the time line. So I probably got it from
16   either a clinical chart or a -- you know the printouts
17   that you get from the pharmacist? We looked at one with
18   Whittington, you know, the date when the medication is
19   prescribed through the pharmacy.
20   Q. Well, let's just see if we can reach agreement
21   here. You'll agree that your time line is -- well,
22   strike that. Let me just show you --
23            (Exhibit No. 27 marked.)
24   Q. (BY MS. THORPE) I'm going to show you what's
25   been marked as Exhibit 27 for identification and ask you

286

if that record doesn't show that on October 17, 2002,
Mr. Unger started Seroquel, 25 milligrams, three times a
day.
    A. I agree with that.
    Q. And so your Exhibit 22 is wrong about the dose
of Seroquel, the time line?
    A. Twenty-two being the time line, yes, ma'am.
And as I said, I -- I got the -- my report came from
somewhere, and clearly it wasn't from the time line.
But thank you for finding the source for me.
    Q. So now, tell me -- it looks like from your
report that you think he quit taking Seroquel on
September 27, 2006, correct?
    A. September 22nd, yes, the last but one
paragraph.
    Q. Right. Now, is that -- did you get that from
the time line or where did you get that date?
    A. As you see, there was a comment that he'd
requested to be -- be requested to stop it earlier on.
And I -- I made this report sometime ago, so I can't
recall exactly where it come from. But at least time
line page 22 is a comment here, "Would like to decrease
and stop Seroquel due to association with increased
blood sugar." So at least the patient believed that
Seroquel was contributing to his sugar at that time.

287

    Q. My question to you is about when he stopped
taking Seroquel.
    A. Okay.
    Q. I just want to know the day. And your chart,
Exhibit 22, doesn't say that he quit Seroquel on
September 27th, it says he quit on October -- there's a
note October 2nd that he quit --
    A. Okay.
    Q. -- last night, right?
    A. I wrote in my report when 9-27-06, the dose,
was stopped, so I got that from somewhere --
    Q. But you don't know where you got it from?
    A. Yeah. Here on page 24 of Exhibit 22 it says,
"Stopped the dose last night." And that was 10-02. So
from the time line it would be 10-01, from my report it
would be 9-26, and those were within a few days of one
another.
    Q. I don't mean to be picky, I just want to be
sure that we agree on what the facts are.
            (Exhibit No. 28 marked.)
    Q. (BY MS. THORPE) I'm going to show you what's
been marked as Exhibit 28 for identification. And if
you --
        MR. PIRTLE: You don't have another one?
Oh, thank you.

34 (Pages 284 to 287)

288

1    Q. (BY MS. THORPE)  That's a note dated October 2,
2    2006, that says, "The patient stopped Seroquel last
3    night," right?
4    A. Okay.  I'll buy that.
5    Q. Do you agree that he stopped Seroquel on
6    October 1, 2006?
7    A. Yes.
8    Q. So the time period that Mr. Unger was on
9    Seroquel was October 2002 to October 2, 2006, or October
10   1, 2006, right?
11   A. Yes, I think that's reasonable.
12   Q. Now, you have a lot of dose information in the
13   third paragraph of your report.  Where did you get that?
14   A. I wrote that report sometime ago, so I --
15   can't offhand tell you.  My suspicion is it was either
16   from this time line or from a printout from the -- of
17   the pharmacy department.
18   Q. Okay.  And you don't know which one?
19   A. I don't recall, ma'am, no.
20   Q. Just so that we'll be clear on the record,
21   whenever you say time line, you're talking about the
22   time line prepared by the plaintiffs' law firm?
23   A. Exhibit 22.
24   Q. Okay.  So your report says that by May 3rd his
25   Seroquel dose was increased to 400 milligrams a day and

289

1    that it tailed off slowly in November of 2004 to
2    200 milligrams at bedtime and down briefly to
3    100 milligrams at bedtime on September 11, '05, right?
4    A. Yes, ma'am.
5    Q. Would you agree with me that Mr. Unger did not
6    take Seroquel at a 400-milligram dose at any time in
7    2004, the year before you say he was -- he met the ADA
8    criteria for diabetes in September of 2005?
9    A. Just come back again.  Let me --
10   Q. Let me -- let me ask it again.
11       You agree that Mr. Unger did not take
12   Seroquel at a 400-milligram dose at any time in 2004?
13   A. Tailed off slowly in November 2004 to
14   200 milligrams.
15   Q. Right.  I'm just asking you --
16   A. Yeah.  As I read --
17   Q. There's an ambiguity in here.
18   A. -- this, there was a brief bump up in May 2003,
19   and as I could see that, it then came down to
20   200 milligrams from 2000 -- November 2004.
21   Q. Let me --
22   A. And the 200 milligrams -- seems to be there was
23   a brief drop to 100, but he went back to 200 after a
24   recurrence of symptoms, psychiatric symptoms one
25   assumes.

290

(Exhibit No. 29 marked.)
Q. (BY MS. THORPE)  I only have one copy of this,
but I'm going to show you what's been marked as
Exhibit 29 for identification.  And it's a composite
exhibit, sir.  And I want you to tell me whether or not
during 2004 Mr. Unger took a 400-milligram dose at any
time.
A. Okay.  This is dated January of -- 6th of 2004,
and at that time he's getting two 50s and one hundred.
Q. All right.
A. So that's 200.
Q. Right.  There's something for every month in
there.  I just want you to confirm that he was not
taking a 400-milligram dose during 2004.
A. Okay.  I believe that what I said here was only
briefly up to 400, and I would have to find off -- find
where that came from, because it came from somewhere.
And what we're agreeing with here is that he definitely
had 200 at bedtime and he got other doses during the
day, either 50 or 25 at morning and midday.
Q. Do you agree with me that in 2004 Mr. Unger did
not take Seroquel at a 400-milligram dose?
A. I -- I will agree with that.
Q. All right.
(Exhibit No. 30 marked.)

291

Q. (BY MS. THORPE)  Okay.  I'm going to show you
what's been marked as Exhibit 30 for identification.
And that's a compilation of his doses during 2005 up to
just before he went to the hospital in September 2005.
    And my question to you is:  You agree that
Mr. Unger did not take Seroquel at a 400-milligram dose
at any time in 2005?
A. I'll agree with that.
Q. Okay.  So --
A. If these are solo copies, I'm returning them
there.
Q. You would agree that Mr. Unger's dose in --
dose of Seroquel in 2004 through 2005 ranged from
200 milligrams a day to 250 milligrams a day and never
went above 250 milligrams a day?
A. I think that's a reasonable statement.
Q. All right.  After June of 2004 -- and you can
look in this compilation that's been marked as
Exhibit 29 if you want to confirm it -- over a year
before he went into the hospital where you say he was
diagnosed with diabetes in September of '05, he took all
of his Seroquel at night; isn't that right, sir?
A. I think that's reasonable, yes.  I saw it in
several of those.
Q. Right.  And in July of 2004, again, over a year

292

1    before he was diagnosed with diabetes in September of
2    '05, his dose dropped to 200 milligrams at night?
3        A.  I'll accept that.
4        Q.  All right.  Now, you say that in — in your
5    report that in September — on September 16th, I think
6    is what you say, that his dose was raised to 200
7    milligrams four times a day.  And I want you to tell me
8    where you find — where you got that from.
9        A.  Well, let's start with where's the statement
10   and which page of my report.
11       Q.  It's in the third paragraph on page 10, the
12   sentence that begins, "However, his symptoms relapsed
13   and the dose was increased two days later to
14   200 milligrams at bedtime."
15       A.  At bedtime down briefly to a hundred.  However,
16   symptoms relapsed, dose was increased two days later to
17   200 milligrams at bedtime plus 25 three times a day and
18   then 200 milligrams four times a day on 9-16-05.  So I
19   got that from somewhere -- was this '05 that you gave
20   me?
21       Q.  It doesn't include the hospitalization.
22       A.  Okay.
23       Q.  So —
24       A.  I got it from somewhere and --
25       Q.  Look at your exhibit.

293

1        A.  — I'll see if I can try to — the time line,
2    see if I got it from there.  9-16-05.  Okay.  Do you
3    have Exhibit 22?
4        Q.  Sure.
5        A.  Do you have page 16?  And if you look at the
6    9-16, which is three-quarters of the way down the page,
7    discharge medications, Seroquel, 200 milligrams by mouth
8    four times a day, Dr. Rafael Mas.
9        Q.  All right.
10       A.  That's where I got it from.
11       Q.  All right.  Thank you.
12           And you got it from this time line?
13       A.  Yeah.  Now, if that doesn't reflect in his
14   discharge orders, I apologize.  But that's where I got
15   it from.
16       Q.  All right.  Okay.  So — so you say that —
17   that you — you've testified that Seroquel caused
18   Ms. Whittington to gain 40 pounds, right?
19       A.  More likely than not.
20       Q.  And you've testified now that Seroquel caused
21   Mr. Unger to gain 45 pounds between June of 2003 and
22   September of '05, right?
23       A.  I did, ma'am, until you corrected me.  It's 43.
24       Q.  Forty-three.
25           MR. PIRTLE:  Let me -- I don't want to

294

1    interrupt you, but let me bring up a point.  I know that
2    we're doing these all together, but I would not assume
3    that you'd want these cases to be tried together.
4            MS. THORPE:  No, and you're absolutely
5    right.
6            MR. PIRTLE:  So that questioning pattern is
7    problematic to me.  You know what I'm saying?
8            MS. THORPE:  I'm being very --
9            MR. PIRTLE:  I wouldn't play one off the
10   other unless you want me to make the argument.
11           MS. THORPE:  I -- you know, Tom, these
12   cases should not be tried together, you know that's our
13   position.  And you know I'm trying to be efficient in
14   getting through this deposition.
15           MR. PIRTLE:  And I think it's just a force
16   of habit of doing that, and it's probably something I
17   would do, but you understand my position on it when you
18   said this and that and this and that --
19           MS. THORPE:  Well, I'm not waiving — I'm
20   not doing anything about consolidating cases, and I
21   don't think you're --
22           MR. PIRTLE:  You don't want me to stand up
23   and say they've got 10,000 cases against them, you know,
24   which I believe I should be able to do.  But anyhow, go
25   ahead.

295

1            MS. THORPE:  I don't think what question I
2    ask in a discovery deposition has any impact on the
3    consolidation of the cases.  That's my position.
4        Q.  (BY MS. THORPE)  But anyway, the last paragraph
5    of your report on page 10 — I believe it's page 10 —
6    yeah.  You say after the initiation of Seroquel, the
7    weight as recorded in June of 2003 is 282 pounds.  Wait
8    a minute, that's not the right place.  Sorry.  Okay.
9            The next sentence, you say after the
10   increased dose of Seroquel, the weight recorded —
11   weight is recorded as 325 pounds on September 6, 2005,
12   about the time of the recorded onset of his diabetes,
13   right?
14       A.  Yes, ma'am.
15       Q.  And so you measured the weight gain, as we've
16   discussed, beginning on June 3, right?
17       A.  Yes, ma'am.
18       Q.  And the June 3 weights — June '03 weights and
19   the September 6, '05 weights are the two key weights in
20   Mr. Unger's records to establish how much weight he
21   gained on Seroquel in your opinion, right?
22       A.  To a reasonable medical probability, yes.
23       Q.  And you agree that it's very important that
24   your report state the times, the time period, and the
25   weight gains accurately, right?

296

1      A. To the best of what can be achieved from the
2  data, yes, ma'am.
3      Q. And you chose not to include other weights for
4  Mr. Unger recorded before June 3rd in your report during
5  the time he was on Seroquel because they're not vital to
6  your analysis of the cause of his diabetes, right?
7      A. But as I remember, there weren't a lot of
8  weights. If you look at Exhibit 22, the best one we
9  have before he started Seroquel was the first one I gave
10  you, 260 on January '01. We don't get any more weights
11  until the middle of '03. So that's 18 months when he's
12  on Seroquel we don't have any data, but by that time --
13      Q. Tell me when you don't have any data.
14      A. -- he's gone up 22 pounds.
15      Q. Tell me when you don't have any data on him.
16      A. On this time line.
17      Q. Yeah. No, I'm asking –
18      A. If you have them -- if you have them in there.
19      Q. No.
20      A. I'm working from the time line, yeah.
21      Q. But just –
22      A. And then from '03 until he developed diabetes,
23  we have the numbers which I quoted for you which are up
24  to 325. And so there I'm going from page 3 on
25  Exhibit 22 to page 12 on Exhibit 22. And there's your

297

1  43 pounds.
2      Q. There was a time period you said you don't have
3  any weights in Exhibit 22. Can you tell me what that
4  time period is?
5      A. From January '01 to June of '03.
6      Q. Okay. And –
7      A. And then from June of '03 to -- well, July of
8  '03 we got a weight, but then we don't have another one
9  until April of '04.
10      Q. Now – but – but – let me just get – go at
11  it this way. You're – you picked June of '03 because
12  that's about the time you believe him to have been on an
13  increased dose of Seroquel, right?
14      A. Yes, ma'am.
15      Q. So you picked the weight attached to a certain
16  dose of Seroquel, right?
17      A. Right.
18      Q. And what is that increased dose?
19      A. Well, before that he was on an earlier dose.
20  We have him on two 50s and a hundred. That's 200. On
21  6-2-03 is when he goes up to 200 at bedtime. And that
22  seems to be fairly stable. Some of the other days they
23  add 25s and 50s during the day, but as we mentioned a
24  moment ago, he gets 100 to 200 at bedtime most nights.
25      Q. Dr. Tulloch, you see on the sentence that's the

298

1  fourth line from the bottom of page 10 that says, "After
2  the increased dose of Seroquel" –
3      A. Uh-huh.
4      Q. – "the weight is recorded as 325 pounds on
5  September 6, '05"?
6      A. Uh-huh.
7      Q. What is the increased dose that you're
8  referring to there?
9      A. Let me go to page 8 on Exhibit 22. What we
10  have there is Seroquel, 200 milligrams, take one by
11  mouth at bedtime; Seroquel, 25 milligrams, take two
12  tablets by mouth at bedtime. I make that
13  300 milligrams.
14      Q. On what day?
15      A. I beg your pardon?
16      Q. On what day?
17      A. 7-10-04.
18      Q. Okay. Is – you've measured – we've been over
19  this before. You've measured what you say is a 45-pound
20  weight gain, right?
21      A. Yes, ma'am.
22      Q. And so are you saying in your report that the
23  45-pound weight gain followed an increase in the dose of
24  Seroquel?
25      A. No, ma'am.

299

1      Q. You're not saying that?
2      A. What I'm implying is that on the best of the
3  data available to me, his weight initially was down at
4  lower values. The – tied to Seroquel without much
5  doubt in my mind is the increase from 282 to 325, which
6  we agree is 43 pounds. And I didn't relate heavily to
7  the doses.
8      Earlier on I said doses went up and down
9  and there were attempts to wean him off followed by
10  deterioration of his psychosis and then the dose came
11  back again. So I tried to even things up for
12  simplification, but if this becomes an issue, we can
13  plot out the dose.
14      Q. I just want to know what you mean by "after the
15  increased dose of Seroquel." Is it the July '04 dose
16  you're talking about –
17      A. Yeah.
18      Q. – the 300 –
19      A. I mentioned – yeah, it's July of '04 when he
20  went up to – I make that 300 milligrams.
21      Q. Okay. Is that what you mean by "increased
22  dose" in your report –
23      A. Yeah.
24      Q. – right?
25      Show me in – I'm going to show you the

300

1  record that's been marked as Exhibit 29, which is a
2  composite of various -- or all the orders of Seroquel in
3  2004 and tell me what dose he's on in July of 2004.
4      A. What I see him -- 200 milligrams at bedtime is
5  definite. What I see above that is 25 milligrams, two
6  at bedtime, which would make the 250 doses, but in
7  handwriting is D/C. So it may be that that 25 times two
8  was -- was D/C'd, which means terminated at that date,
9  and that's two days after this one was written that he
10 was on 250.
11     Q. I'm really asking you a very simple question,
12 Dr. Tulloch. I just want to know what you mean by
13 "after the increased dose of Seroquel." In the prior
14 paragraph, you talk about May of 2003 Seroquel was
15 increased to 400 milligrams a day. Is that what you're
16 talking about?
17     A. On one occasion. I mean that -- as I read
18 that, that wasn't for very long.
19     Q. Right.
20     A. And then when they tried to get him down, he
21 had an exacerbation and then he went back up again.
22     Q. Let me go at it this way because I don't want
23 to go on about this. You don't know what you meant by
24 "increased dose"?
25     A. Well, increased greater than 200 milligrams.

301

1  But that's it, I don't -- I don't -- as I sit here, I
2  don't think he was on 400 milligrams for very long.
3      Q. Right. He wasn't --
4      A. So I think the main issue then becomes whether
5  he was on 200, 250 for any length of time. There's no
6  doubt he was on Seroquel, there's no doubt in my mind
7  that he gained 43 pounds in weight.
8      Q. All right. Does it matter to you what dose of
9  Seroquel he was on?
10     A. Not to a modest -- not these fairly modest
11 changes.
12     Q. Do you -- is there a -- you say -- as I read
13 this, it sounds like you're saying the dose was
14 increased and then he started to gain this 45 pounds --
15     A. No.
16     Q. -- is that what you're saying?
17     A. No, I don't -- I think --
18     Q. And you can't tell me what the increased dose
19 is that you're talking about here?
20     A. No. The only one that he definitely was on for
21 a brief period of time was 400. But -- but we're not
22 certain how long that was -- that was on for. I think
23 certainly he was on for 200 milligrams at bedtime for a
24 major duration of this period of time. The amount added
25 and subtracted in the daytime doses I have not plotted

302

1  out but can do if we consider it necessary for the
2  Court.
3      Q. Well, after July of 2004, he's only on Seroquel
4  at bedtime --
5      A. Bedtime.
6      Q. -- right? You agreed with me on that earlier?
7      A. I think so, yeah.
8      Q. All right. I want you to tell me, sir, all of
9  the scientific medical literature you rely upon that
10 establishes that Seroquel is associated with or causes
11 diabetes at a dose of 50 milligrams.
12     A. No, I don't have a dose response curve on -- on
13 any patient let alone a patient who weighs --
14     Q. I'm not asking about --
15     A. -- 325 pounds.
16     Q. -- Mr. Unger. I'm asking about generally.
17     A. Yeah, I don't have -- I don't have a dose
18 curve.
19     Q. Okay. That's -- that wasn't my question. I
20 mean, I appreciate that information, but that wasn't my
21 question.
22     A. Okay.
23     Q. I want you to identify for me any scientific or
24 medical literature that you rely on, if any, to
25 establish that Seroquel is associated with or causes

303

1  diabetes at a dose of 50 milligrams.
2      A. No. I -- what you're asking -- I interpret as
3  asking for a dose curve.
4      Q. You don't have any --
5      A. I don't have any data on that.
6      Q. And you don't have any literature?
7      A. No.
8      Q. You're not aware of any such literature?
9      A. I'm not aware of any data.
10     Q. I'm going to ask you the same question about
11 75 milligrams.
12     A. Okay.
13     Q. Can you tell me whether or not you have any
14 scientific or medical literature that establishes that
15 Seroquel causes diabetes in someone who takes it at
16 75 milligrams a day?
17     A. Okay. When I say a dose curve, what I mean is
18 25, 50, 75, 100, 200, and 400. And what I've said is I
19 do not have a dose curve for the relationship of
20 Seroquel to diabetes. If you want to go on up each
21 individual dose, my answer will be the same.
22     Q. Okay. You cannot tell me the name of an
23 article that reports an association or uses the word
24 "causation" in connection with Seroquel at a dose of
25 50 milligrams a day, correct?

38 (Pages 300 to 303)

**304**

1   A. That's correct.

2   Q. You cannot identify any scientific or medical

3 literature that reports that Seroquel is associated with

4 or uses the word "causation" at 75 milligrams a day,

5 correct?

6   A. That's correct.

7   Q. You cannot identify any literature, scientific

8 or medical literature, which reports an association or

9 causation between Seroquel and a dose -- at a dose of

10 100 milligrams a day?

11   THE WITNESS: Tom, I've given her all the

12 doses up to 400 and now she's going up one at a time.

13 Is it reasonable to let her go on with this line of

14 questioning or shall we say it's been asked and

15 answered? I'm trying --

16   MR. PIRTLE: Well, I'd say it's asked and

17 answered, and she can ask and answer it again. If she

18 wants to spend her time doing it, I guess the answer is

19 yes.

20   A. Please continue, ma'am.

21   Q. (BY MS. THORPE) Can you answer my question?

22   A. Okay. I have said I do not have a dose curve

23 for the -- any of the doses from 25 to 400 milligrams.

24   Q. Okay. Can you identify any scientific or

25 medical literature that reports an association or uses

**305**

1 the word "causation" in relationship to Seroquel and

2 diabetes at a dose of 100 milligrams?

3   A. I do not.

4   Q. I've got one more and then I'll stop. All

5 right?

6   You cannot identify any scientific or

7 medical literature reporting that Seroquel is associated

8 with or causes diabetes at a dose of 150 milligrams a

9 day, correct?

10   A. No.

11   Q. All right. Now, in between -- if I understood

12 you correctly, the same is true between 150 and

13 400 milligrams, correct?

14   A. Yes, ma'am.

15   Q. Can you point to a single article in all your

16 review of medical and scientific literature that says

17 Seroquel is a cause of diabetes?

18   A. Ma'am, what I have found is articles which are

19 associated with weight gain and diabetes. And as we've

20 discussed, the issue of -- between weight gain and the

21 acquisition of insulin resistance is difficult so that

22 my source materials have associated Seroquel as one of

23 the atypical antipsychotics associated with weight gain

24 and the development of diabetes. There's some isolated

25 cases of acute development of diabetes with Seroquel.

**306**

And given a little time -- for the last few days, you've

had all of my -- my references. Given a little time, I

could find those for you.

   MS. THORPE: All right. That's not my

question. I move to strike as nonresponsive.

   A. You asked me about specific dose -- dose levels

and I told you I did not have a dose curve.

   Q. (BY MS. THORPE) My -- my question to you is:

Can you point to a single article in the scientific or

medical literature that you've reviewed that says that

Seroquel is a cause of diabetes?

   A. And I said an association with weight gain and

diabetes was the best I can offer you right now --

   Q. And so --

   A. -- to the best of my memory.

   Q. Is what you're saying is that the medical and

scientific literature reports an association between

Seroquel and weight gain and diabetes, correct?

   A. That's correct.

   Q. And you understand that an association does not

mean that something is -- is a cause. You understand

that, don't you?

   MR. PIRTLE: Objection, form.

   A. Well, I go back to Seroquel and hepatitis and 1

in 80,000. Associations can be very relevant in a

**307**

medical practice like mine.

   Q. (BY MS. THORPE) Would you say that the

relationship between -- the kind of association that's

reported for Seroquel in diabetes is of the same nature

as the type of association that's reported for Seroquel

and acute pancreatitis that you described earlier today?

   A. No, ma'am, there are risk ratios. You've had

my charts for a while. The risk ratios, as I remember,

went from a low of 1.2 to a high of 4.85. And don't ask

me to pull them out, it's late. But you've had those

data.

   Q. Well, I'm going to ask you to pull them

tomorrow. Okay?

   A. And they are there.

   THE WITNESS: And if I'm going to be

pulling them, could I ask that these be stapled back

again because it's a long time to go through them.

   Q. (BY MS. THORPE) We'll do it for you. We'll

make sure they're stapled.

   Now, we've talked about the 43-pound weight

gain --

   A. Yes, ma'am.

   Q. -- of Mr. Unger?

   You cannot identify a single study that

shows that Seroquel is associated with a gain of 40 or

308

1  more pounds, can you?
2      A. I go back to risk ratio for weight gain and
3  diabetes, and I quoted you the numbers. Right now I
4  have not had access to my literature for a while and
5  I -- I can't be specific on -- on dose curves, as I
6  mentioned, or weight gains to that degree, yes, ma'am.
7      Q. So you're not prepared at this point to -- to
8  tell me -- and I'm fine with postponing this until
9  tomorrow. You can -- you can --
10     MS. THORPE: Or, you know, let me just stop
11 here and say we need to schedule this other date. I
12 don't want to walk out of here without knowing we've got
13 tomorrow and then we've got to do -- have -- we've got
14 one more case.
15     MR. PIRTLE: That's fine. Let's go off the
16 record and let's talk about that.
17     (Short recess.)
18     MS. THORPE: Let's let the -- the record
19 reflect that it's 8:23 -- 8:24. Excuse me.
20     (Deposition adjourned at 8:24.)
21
22
23
24
25

310

SIGNATURE PAGE

I, BRIAN R. TULLOCH, M.D., FRCP, FACP, have read
the foregoing deposition and hereby affix my signature
that same is true and correct, except as noted on the
correction page.

_____
BRIAN R. TULLOCH, M.D., FRCP, FACP


THE STATE OF TEXAS      )
COUNTY OF _____ )

    Before me _____ on this day
personally appeared _____ known to me
[or proved to me on the oath of _____ or
through _____ (description of identity
card or other document)] to be the person whose name is
subscribed to the foregoing instrument and acknowledged
to me that he/she executed the same for the purposes and
consideration therein expressed.
    Given under my hand and seal of office this _____
day of _____, 2008.

_____
NOTARY PUBLIC IN AND FOR
THE STATE OF T E X A S

My Commission Expires:
_____

309

CORRECTION PAGE
1
2  WITNESS NAME: BRIAN R. TULLOCH, M.D., FRCP, FACP
3  DATE: 10/08/2008
4
5  PAGE LINE CHANGE      REASON
4  _____
5  _____
6  _____
7  _____
8  _____
9  _____
10 _____
11 _____
12 _____
13 _____
14 _____
15 _____
16 _____
17 _____
18 _____
19 _____
20 _____
21 _____
22 _____
23 _____
24 _____
25 _____

311

THE STATE OF TEXAS      )
COUNTY OF HARRIS        )

REPORTER'S CERTIFICATION
DEPOSITION OF BRIAN R. TULLOCH, M.D., FRCP, FACP
TAKEN OCTOBER 8, 2008

    I, RENE WHITE MOAREFI, Certified Shorthand Reporter
in and for the State of Texas, hereby certify to the
following:
    That the witness, BRIAN R. TULLOCH, M.D., FRCP,
FACP, was duly sworn by the officer and that the
transcript of the oral deposition is a true record of
the testimony given by the witness;
    That the deposition transcript was submitted on
_____ to the witness or the attorney for the
witness for examination, signature and return to Esquire
Deposition Services, by _____;
    I further certify that I am neither counsel for,
related to, nor employed by any of the parties in the
action in which this proceeding was taken, and further
that I am not financially or otherwise interested in the
outcome of the action.
    Certified to by me this _____ day of
_____, 2008.


_____
RENE WHITE MOAREFI, CSR, CRR, RPR
CSR NO. 3070; Expiration Date: 12-31-08
ESQUIRE DEPOSITION SERVICES, LLC
3401 Louisiana, Suite 300
Houston, Texas 77002
(713) 524-4600